UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

BRIAN KOLFAGE,
STEPHEN BANNON,
ANDREW BADOLATO, and
TIMOTHY SHEA

*Defendants.*

20 Cr. 412 (AT)

**FILED UNDER SEAL**

## NON-PARTIES' MOTION TO MODIFY SEALED POST-INDICTMENT RESTRAINING ORDER, OR FOR DISCLOSURE AND A HEARING

JUSTIN S. WEDDLE
JULIA I. CATANIA
WEDDLE LAW PLLC
250 W. 55th St., Fl. 30
New York, NY 10019
212-997-5518
jweddle@weddlelaw.com

*Counsel for Kris Kobach*

KRIS KOBACH (*pro hac vice* to be submitted)
KOBACH LAW LLC
P.O. Box 155
Lecompton, KS 66050
kkobach@gmail.com

*General Counsel for We Build the Wall, Inc.*

October 13, 2020

TABLE OF CONTENTS

BACKGROUND ................................................................................................... 4

DISCUSSION ..................................................................................................... 10

I.   THE ORDER SHOULD BE MODIFIED TO RELEASE FUNDS THAT ARE NOT PROCEEDS
     OF ALLEGED FRAUD ................................................................................... 10

     A.   Applicable Law ................................................................................... 12

          1.   Any Seizure of Property Must Comport with the Constitution .............. 12

          2.   The Court Must Determine, Consistent with Due Process, Whether
               There is Probable Cause that the Frozen Property Has the Requisite
               Connection to the Charged Crime ............................................................ 14

          3.   The Applicable Statute—Section 853—Requires Notice and an
               Opportunity for a Hearing ....................................................................... 15

          4.   The Government's Post-Indictment *Ex Parte* Application Is Not
               Permitted by Section 853 ......................................................................... 17

          5.   Federal Rule of Criminal Procedure 41(g) Provides the Movants with an
               Avenue for Equitable Relief .................................................................... 20

     B.   Argument ............................................................................................. 21

II.  MOVANTS SHOULD HAVE ACCESS TO THOSE PORTIONS OF THE GOVERNMENT'S
     SEALED APPLICATION AND AFFIDAVIT BEARING ON WE BUILD THE WALL'S FUNDS
     AND THE COURT SHOULD HOLD A HEARING ............................................. 23

CONCLUSION ................................................................................................... 25

TABLE OF AUTHORITIES

## Cases

*Abourezk v. Reagan,*
  785 F.2d 1043 (D.C. Cir. 1986)....................................................................24

*Caplin & Drysdale, Chartered v. United States,*
  491 U.S. 617 (1989)..........................................................................14, 19

*De Almeida v. United States,*
  459 F.3d 377 (2d Cir. 2006) ....................................................18, 20, 21

*DSI Associates LLC v. United States,*
  496 F.3d 175 (2d Cir. 2007) ......................................................................18

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
  527 U.S. 308 (1999)....................................................................................14

*Honeycutt v. United States,*
  137 S. Ct. 1626 (2017)...............................................................................16

*In re Application of Eisenberg,*
  654 F.2d 1107 (5th Cir. 1981)...................................................................24

*Kaley v. United States,*
  571 U.S. 320 (2014).......................................................................14, 15, 16

*Luis v. United States,*
  136 S. Ct. 1083 (2016)..................................................................13, 14, 18

*United States v. Capoccia,*
  503 F.3d 103 (2d Cir. 2007) ......................................................................11

*United States v. Crozier,*
  777 F.2d 1376 (9th Cir. 1985)...................................................................18

*United States v. James Daniel Good Real Property,*
  510 U.S. 43 (1993)..............................................................................12, 13

*United States v. Jones,*
  965 F.3d 190 (2d Cir. 2020) ......................................................................18

*United States v. Monsanto,*
  491 U.S. 600 (1989)....................................................................................14

*United States v. Stein,*
  435 F. Supp. 2d 330 (S.D.N.Y. 2006) ..............................................19, 22

*United States v. Stein,*
  541 F.3d 130 (2d Cir. 2008) ......................................................................19

*United States v. Watts,*
  786 F.3d 152 (2d Cir. 2015) ...............................................................16, 18

Statutes

18 U.S.C. § 1956 ............................................................................................. 11
18 U.S.C. § 981 ........................................................................................... 11, 13
18 U.S.C. § 982 ............................................................................................. 13
18 U.S.C. § 983 ............................................................................................. 13
21 U.S.C. § 853 ............................................................................. 13, 16, 17, 18

Rules

Fed. R. Crim. P. 41 .............................................................................. 1, 18, 20, 21
Fed. R. Crim. P. 6(e) ..................................................................................... 17

Non-parties We Build the Wall, Inc., and Kris Kobach, both in his individual and representative capacity, hereby move (i) to modify the Sealed Post-Indictment Restraining Order (the "Order"), pursuant to the Fifth and Fourth Amendments to the Constitution, Title 21 United States Code, Section 853(e), and Federal Rule of Criminal Procedure 41(g); (ii) for disclosure to the movants of the portions of the government's sealed application and affidavit upon which the Court relied in issuing the Order restraining We Build the Wall's funds; and (iii) for a hearing on whether the Order should be modified.

The government has adopted the untenable position that *all* funds donated to We Build the Wall are the proceeds of fraud, even though the allegations in the Indictment make no claim *none* of those funds were used to further We Build the Wall's stated goals. The government also has refused to permit We Build the Wall to expend funds for plainly legitimate purposes, including paying invoices for services rendered and providing for attorney's fees for We Build the Wall and certain persons who acted on behalf of We Build the Wall. The government first attempted to do this by fiat—stating orally to counsel that all funds raised by We Build the Wall were the proceeds of fraud, thereby intimating that any movement of funds by We Build the Wall could be treated as a money laundering offense. Then, days later, the government obtained the Order on an *ex parte* basis and without any notice to movants or opportunity for movants to be heard. Only after a month of communications regarding this issue did the government reveal to counsel the existence of the Order. which the government obtained by means of documents it has declined to disclose to counsel. During that

1

time, the State of Florida administratively *dissolved* We Build the Wall for failure to make an annual filing and pay a $61.25 fee. The government's actions here are not consistent with due process and are contrary to governing law.

The government has maintained its untenable position even though most (more than $1.6 million) of the money on hand at We Build the Wall was donated well after, as the Indictment admits, We Build the Wall's website was "changed to remove any mention of the promise that KOLFAGE was not being compensated and to add a statement that he would be paid a salary starting in January 2020." Indictment ¶ 26. Moreover, substantial sums have likely been donated even after the Indictment was unsealed. On August 20, 2020, the government issued a press release announcing the unsealing of the Indictment and its allegations—an announcement that received saturation news coverage. Since that date, We Build the Wall has received over 4,000 pieces of mail, most of which likely contain checks representing additional donations. Even though the government would not be able to satisfy its burden of demonstrating probable cause to believe that any funds contained in those mail pieces are the proceeds of the charged crimes, when counsel requested access to those funds for specified uses, the government merely stated that it takes "no position on whether funds raised by We Build the Wall after the Indictment was unsealed are crime proceeds." (Counsel noted that the government's untenable position even blocks We Build the Wall's from making a payment to its vendor to process and deposit those checks so that the money can be safeguarded and managed.)

In short, the gravamen of the Indictment is that, contrary to certain of the defendants' representations, approximately $1 to $2 million were diverted from We Build the Wall to the defendants; there is no allegation that We Build the Wall made *no* legitimate expenditures of funds, nor could there be—We Build the Wall successfully participated in building two sections of wall on the southern border of the United States, and is engaged in ongoing efforts to (a) transfer title of the section in Sunland Park, New Mexico, to the Department of Homeland Security, and (b) build a third section of wall in a location selected from a list published by the Department of Homeland Security. Like any substantial building project, the task of building two sections of wall involved not only expenditures for raw materials (steel and concrete), but also required the purchase of land (and everything that is included in that process), and expenditures for personnel, surveys, identification of potential building sites, logistical support, legal support, outreach efforts, and public awareness campaigns. According to the Indictment, the funds donated to We Build the Wall dwarf those diverted to the defendants—the Indictment alleges that approximately $25 million was raised between January 2019 and October 2019. Moreover, the Indictment contains no coherent theory under which it could be said that funds raised after January 2020 (i.e., well after We Build the Wall's website plainly disclosed that Mr. Kolfage would be compensated for his work) are the proceeds of any fraud. The post-January 2020 funds amount to more than $1.6 million, and those funds should be released so that We Build the Wall can pay vendors, pay legal counsel, and pursue its and its donors' interests in the ordinary course, absent government intervention.

3

In addition, given saturation press coverage of the charges here, it does not appear that the government can satisfy the applicable standards for maintaining the *ex parte* status of the sealed application for the Order or the sealed August 24, 2020 Affidavit of U.S. Postal Inspector Troy Pittenger. We Build the Wall and Mr. Kobach are left to guess whether the government's sealed submissions support probable cause for seeking to restrain *all* funds, and what, even generally, justifies litigating these issues *ex parte*. All of the issues raised herein trace back to important constitutional rights guaranteeing, *inter alia*, due process of law. Accordingly, we respectfully request that the pertinent portions of the application and affidavit be disclosed to We Build the Wall and Mr. Kobach (under any appropriate protective order) and that the Court thereafter conduct a hearing to determine the propriety of the relief requested herein.

## BACKGROUND

On August 20, 2020, the government issued its press release announcing the unsealing of an Indictment of the defendants for conspiracy to commit wire fraud and conspiracy to commit money laundering. *See* October 8, 2020 Declaration of Justin S. Weddle ("**Weddle Decl.**") ¶ 2 and **Ex. A**. The Indictment also contains forfeiture allegations alleging that certain identified property, including "[a]ny and all funds contained in" three separate bank accounts of We Build the Wall, is the proceeds of fraud. Indictment ¶ 34. The Indictment does not allege the amount of funds purportedly subject to forfeiture as the proceeds of fraud. Although the Indictment's forfeiture allegations contain both a "substitute assets provision," Indictment ¶ 36, and a

4

request for a forfeiture money judgment, Indictment ¶ 35 (which amount to the same thing), neither states the amount of allegedly forfeitable money. The closest the Indictment comes to such an allegation is its claims that (i) $250,00 was wired from We Build the Wall to Non-Profit-1, and that Non-Profit-1 paid (as part of the alleged scheme), apparently before and after that wire, a $100,000 initial payment and then monthly payments of $20,000 to Mr. Kolfage, Indictment ¶ 19, (ii) as much as $180,000 was paid (as part of the alleged scheme) by We Build the Wall to Shell Company-1, much of which was allegedly paid to Mr. Kolfage, Indictment ¶ 21, and (iii) approximately $200,000 was paid by We Build the Wall (as part of the alleged scheme) to associates of Mr. Badolato, much of which was then allegedly paid to Mr. Kolfage, Indictment ¶ 22. In other words, out of the alleged $25 million donated to We Build the Wall prior to October 2019, the Indictment specifically describes approximately $630,000 as diverted by the defendants pursuant to the alleged scheme.

The Indictment also more generally alleges that the defendants "each received hundreds of thousands of dollars in donor funds from We Build the Wall . . . in addition to the payments described above to KOLFAGE." Indictment ¶ 24. It is not clear from the Indictment, but it appears likely that this allegation is not in addition to the amounts contained in paragraphs 19-22 of the Indictment, but it duplicates those amounts, at least in part. Thus, it appears that no more than approximately $1.5 million was allegedly diverted as part of the scheme, and that all of that money was allegedly diverted prior to November 2019.[1]

---

[1] Any similarity between the amounts diverted and the amount of money received after January 2020 (which by definition is not the proceeds of the alleged misrepresentations) is coincidence—that is,

On August 21, 2020, counsel spoke with two of the prosecutors regarding the case. **Weddle Decl. ¶ 3**. Among other things, counsel informed the prosecutors that he planned to represent Mr. Kobach and We Build the Wall and inquired about the amount of funds subject to forfeiture, in the government's view. *Id.* The prosecutors (i) stated that they believed there was a potential conflict in the joint representation of the entity and its general counsel, and (ii) stated that all funds donated to We Build the Wall were, in the prosecutors' view, the proceeds of fraud. *Id.* Counsel disagreed with both positions. *Id.* The prosecutors stated they could not comment on whether there was any formal court process freezing or restraining assets. *Id.* Nevertheless, in light of the prosecutors' intimation that any movement of funds might be treated as a money laundering offense, We Build the Wall and Mr. Kobach refrained from causing or accepting any payments from We Build the Wall's bank accounts. *Id.*

On September 1, 2020, counsel again spoke with the prosecutors, and informed them that (i) counsel represents Mr. Kobach, (ii) counsel may, in the future, also represent We Build the Wall, to the extent consistent with conflict rules, and that (iii) counsel would accept a voluntary request for documents on behalf of Mr. Kobach. **Weddle Decl. ¶ 4**. On September 3, 2020, the prosecutors sent a request to counsel that Mr. Kobach voluntarily produce documents. **Weddle Decl. Ex. B**. The prosecutors did not disclose the Order in the September 1 telephone call or in the September 3 request for documents. **Weddle Decl. ¶ 4 and Ex. B**.

---

according to the Indictment, prior to November 2019, approximately $25 million were donated and approximately $1.5 million were diverted. After Mr. Kolfage's compensation was thereafter disclosed, more than $1.6 million in additional funds were donated.

6

On September 15, 2020, the New Jersey Attorney General issued a comprehensive subpoena to We Build the Wall comprising eighteen numbered categories of document requests and requiring that the production be made in a standard database-friendly format. **Weddle Decl. ¶ 6**.

On September 22, 2020, counsel sent a letter to the prosecutors regarding their request that Mr. Kobach voluntarily produce documents. The letter stated, among other things: "Our ability to comply with your request is greatly hampered by the government's position, as conveyed in our telephone call of August 21, 2020, that all money received from donors is the proceeds of fraud." **Weddle Decl. Ex. C**.

The letter went on to specifically describe certain requested expenditures relating to complying with the prosecutors' and New Jersey's requests for information, other pressing legal matters, as well as specific outstanding invoices for services rendered to We Build the Wall. *Id.* Among those invoices, the letter explained that We Build the Wall's contract with Kobach Law LLC provides that Kobach Law LLC will be paid a flat fee of $25,000 per month for its legal services and other work, including Mr. Kobach's service as general counsel; the payments are due on the first of the month to cover services to be provided that month; the last payment Mr. Kobach received was for June 2020; and therefore, pursuant to the contract, as of September 22, 2020, We Build the Wall owed Mr. Kobach $75,000. *Id.*

On September 23, 2020, the government responded by email to the September 22, 2020 letter. **Weddle Decl. Ex. D**. The government did not give permission for any of the requested expenditures, stating only that "funds raised by We Build the

Wall as part of the fraud scheme alleged in the Indictment are crime proceeds." *Id.* The government also requested additional information regarding (1) the existence of any other funds (presumably including Mr. Kobach's personal funds) that might be available to provide for legal representation of We Build the Wall and Mr. Kobach, and "(2) legal authority, if you are aware of any, establishing that individuals (such as Kobach and Kolfage) may have a right to have corporate assets, as opposed to personal assets, freed to cover individual legal fees." *Id.* The prosecutors again did not disclose the existence of the Order. *Id.*

By letter dated September 25, 2020, counsel responded to the prosecutors' September 23, 2020 email. **Weddle Decl. Ex. E**. First, counsel noted that the formulation "funds raised by We Build the Wall as part of the fraud scheme alleged in the Indictment are crime proceeds," appeared to be narrower than the position orally articulated—that *all* money donated to We Build the Wall was the proceeds of fraud. *Id.* Counsel's letter thus sought confirmation that (i) funds donated a reasonable period of time after Mr. Kolfage's compensation was publicly disclosed are not funds falling within the prosecutors' formulation, and (ii) in the alternative, at least checks sent after the Indictment was announced on August 20, 2020 are outside the prosecutors' formulation. *Id.* In response to the prosecutors' request for authority for uncharged individuals' "right" to unfreeze assets, counsel's letter stated, among other things, the following:

> I submit the starting point of the analysis is to determine whether the government's oral statement about its views on the status of the funds is a valid mechanism. consistent with the requirements of due process

of law, for altering the normal freedoms that property-owners enjoy with respect to the use of their property. . . .

In addition, you have requested legal authority regarding the "right to have corporate assets unfrozen." but I am not aware of any legal order freezing any assets, or any court proceeding seeking to do so. To the extent there is such an order, please provide it, and to the extent there is a court proceeding underway, please notify me.

*Id.*

The letter also stated that "it is by no means unusual for employees to look to employers to cover legal fees relating to investigations." *Id.* (citing *United States v. Stein*, 435 F. Supp. 2d 330, 335 (S.D.N.Y. 2006) (Kaplan, J.) (finding Sixth and Fifth Amendment right to be free of government intervention in the payment of legal fees), *aff'd* 541 F.3d 130 (2d Cir. 2008) (affirming Sixth Amendment ruling, declining to reach Fifth Amendment analysis).

On September 30, 2020, the prosecutors responded by email to counsel's September 25, 2020 letter. **Weddle Decl. Ex. F**. The government stated that its position is that "all funds raised by We Build the Wall" between "at least December 2018" and "August 2020" "are crime proceeds." *Id.* The government stated: "At the present time, we take no position on whether funds raised by We Build the Wall after the Indictment was unsealed are crime proceeds." *Id.* And, for the first time, the government revealed the existence of the Order. *Id.* The prosecutors stated: "Although it was filed under seal, we are providing it to you pursuant to the Court's provision that we may provide a copy to any person in order to facilitate the execution of the order. We request that you treat this document as confidential and do not share it with anyone aside from your client, who should not distribute it further." *Id.* The prosecutors did

not explain why they had not disclosed the Order in the intervening month, even though the Order specifically permitted them to do so. *Id.*

On October 6, 2020, counsel requested that the prosecutors provide the government's application and supporting affidavit that are referenced in the Order. **Weddle Decl. Ex. G**. The prosecutors declined. *Id.*

On October 8, 2020, We Build the Wall learned that it had been "administratively dissolved" for missing a September 18, 2020, deadline to make a filing and pay a $61.25 annual fee. **Weddle Decl. ¶ 12**. To reinstate an administratively dissolved entity, the entity must submit a reinstatement application, the annual report and fee, and a $175 reinstatement fee. *Id.*

DISCUSSION

The Court should modify the Order to permit the specific expenditures identified herein, as well as to permit the use of funds received after January 2020 because those funds are, as a matter of law, not the proceeds of fraud. In the alternative, the Court should order disclosure to counsel of the pertinent portions of the documents supporting the Order and conduct a hearing on whether the government can establish probable cause that *all* funds donated to We Build the Wall are the proceeds of fraud.

## I. THE ORDER SHOULD BE MODIFIED TO RELEASE FUNDS THAT ARE NOT PROCEEDS OF ALLEGED FRAUD

At the very least, the Order should be modified to permit the expenditures described in counsel's September 22, 2020, letter. *See* **Weddle Decl. Ex. C**. As a matter of law, donations made after the January 2020 disclosure of Mr. Kolfage's compensation (as described in the Indictment) are not the proceeds of any purported fraud to

10

conceal and lie about Mr. Kolfage's compensation, and there is therefore no basis for restraining those funds. There is even less basis for restraining donations made after the Indictment was unsealed, as the government's take-no-position position apparently concedes. *See* **Weddle Decl. Ex. F**. Even if this result were not required as a matter of law, as a factual matter, the government cannot satisfy its burden of tracing these funds to the alleged fraud. Indeed, even accepting the Indictment's allegations (including its allegation that the conspiracy continued until the date the grand jury returned the indictment), only payments diverted from We Build the Wall to facilitate purportedly hidden payments to Mr. Kolfage and Mr. Bannon are payments relating to the fraud. And only those donations made in reliance on the purported false statements are the proceeds of the fraud, not (as the government apparently believes) all donations made during the time period that the conspiracy existed. See 18 U.S.C. § 981(a)(1)(C) ("Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."); 18 U.S.C. § 1956(c)(7) (defining "specified unlawful activity" to include wire fraud); *see also United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) ("the government has not established (nor logically could it) that the funds involved in the pre-May 2000 transfers were 'obtained ... as the result' of the later, particular transfers of which Capoccia was convicted"). Payments made in the ordinary course of business, including payments for services rendered and for legal expenses relating to the prosecutors' and other authorities' requests for information are part of the mission of We

11

Build the Wall; there is no legal basis for the prosecutors to interfere with We Build the Wall's baseline freedom to spend funds in pursuit of it mission.

According to the Indictment, the fraud consisted of hidden or misrepresented diversions of funds to the personal benefit of Mr. Kolfage and others; it nowhere alleged that activities designed to further the mission of attempting to fund and build segments of the border wall are fraudulent. In other words, there is no allegation that any donor would object to We Build the Wall paying for services rendered in attempting to accomplish its mission, nor is there any allegation that any donor would object to We Build the Wall indemnifying its officers as contemplated by its by-laws, or in obtaining its own legal advice in the face of an indictment and investigation by the United States Attorney's Office and other authorities.

## A.  Applicable Law

### 1.  Any Seizure of Property Must Comport with the Constitution

The Supreme Court has held that seizures of property in the forfeiture context must satisfy the requirements of the Constitution, including the requirements of the Fifth Amendment. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 50-52 (1993) (analyzing both the Fourth and Fifth Amendment in the context of an *ex parte* seizure of the alleged proceeds of crime; "the proper question is not which Amendment controls but whether either Amendment is violated."). Specifically, the Supreme Court explained that:

> [t]he Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the

> Government deprives them of property. *See United States v. $8,850 in U.S. Currency,* 461 U.S. 555, 562, n.12 (1983); *Fuentes v. Shevin,* 407 U.S. 67, 82 (1972); *Sniadach v. Family Finance Corp. of Bay View,* 395 U.S. 337, 342 (1969) (Harlan, J., concurring); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313 (1950).

*Id.* at 48-49. The applicable statute invoked by the Order, Title 21, United States Code, Section 853,[2] applies only to *tainted* assets—that is, assets that are the proceeds of a charged crime. *Luis v. United States,* 136 S. Ct. 1083, 1091 (2016). And, the Supreme Court has held, in the Sixth Amendment context, that the *pretrial* restraint of assets is only permissible, in the forfeiture context, where those assets are *tainted*—that is, where there is probable cause to believe they are themselves traceable crime proceeds. *See id.* (analyzing, in Sixth Amendment context, property law principles and concluding that the key distinction between tainted property and untainted property is "not a technicality. It is the difference between what is yours and what is mine.").

As the Court in *Luis* demonstrated, this outcome is deeply rooted in principles of property law and in historical common law theories of forfeiture. Thus, the *Luis* decision explained that, in the landmark forfeiture cases, *Caplin & Drysdale,*

---

[2] The Order also references Title 18, United States Code, Sections 981 and 982, but no provision of those statutes is applicable here, since neither provides for the issuance of a "Restraining Order." Section 981 is a *civil* forfeiture statute, which is an *in rem* proceeding against tainted property, providing for *seizure warrants* pursuant to (a) the Federal Rules of Criminal Procedure governing search warrants, (b) the Supplemental Rues for Certain Admiralty and Maritime Claims governing arrest warrants *in rem*, and (c) seizures effected pursuant to an exception to the Fourth Amendment's warrant requirement. 18 U.S.C. § 981(b). Section 981 contains no provision for a restraining order, except in the case of persons arrested or charged in a foreign country. 18 U.S.C. § 981(b)(4). It should also be noted that if this were a civil forfeiture proceeding, it would provide for notice and an opportunity to be heard. *See* 18 U.S.C. § 983. Section 982 is a criminal forfeiture statute, providing for the entry of an order of forfeiture *as part of a criminal sentencing proceeding.* 18 U.S.C. § 982. Section 982 does not itself authorize the issuance of a restraining order, although it states that "any seizure" of property "shall be governed by" Title 21, United States Code, Section 853. 18 U.S.C. § 982(b)(1).

*Chartered v. United States*, 491 U.S. 617 (1989), and *United States v. Monsanto*, 491 U.S. 600 (1989), "the Government even before trial had a 'substantial' interest in the tainted property sufficient to justify the property's pretrial restraint." *Luis*, 136 S. Ct. at 1092. The Court also analogized to bankruptcy law and invoked its prior precedent in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). *Id.* The Court stated: "Here, by contrast, the Government seeks to impose restrictions upon Luis' *un*tainted property without any showing of any equivalent governmental interest in that property. . . . At least regarding her untainted assets, Luis can at this point reasonably claim that the property is still 'mine,' free and clear." *Luis*, 136 S. Ct. at 1092. *Grupo Mexicano* confirmed the established principle that, in an action at law for money damages, a district court is *without power* "to issue a preliminary injunction preventing [a] defendant from transferring assets in which no lien or equitable interest is claimed." 527 U.S. at 308, 321.

Thus, based on these principles, whether the government is permitted to restrain assets prior to conviction depends on whether the particular assets, are, in fact, "proceeds" of criminal conduct.

2. **The Court Must Determine, Consistent with Due Process, Whether There is Probable Cause that the Frozen Property Has the Requisite Connection to the Charged Crime**

In *Kaley v. United States*, 571 U.S. 320 (2014), the Supreme Court noted that whether there is probable cause to believe that property is forfeitable is a two-part determination: "There must be probable cause to think (1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the

14

requisite connection to that crime." *Id.* at 323-24. The second issue was not before the Court,[3] although the Court noted that lower courts have "uniformly allowed the defendant to litigate the second issue stated above: whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment." *Id.* at 324. The Court also noted:

> But the tracing of assets is a technical matter far removed from the grand jury's core competence and traditional function—to determine whether there is probable cause to think the defendant committed a crime. And a judge's finding that assets are not traceable to the crime charged in no way casts doubt on the prosecution itself. So that determination does not similarly undermine the grand jury or create internal contradictions within the criminal justice system.

*Id.* at 331 n.9. Thus, it is not contradictory or in any way at odds with the grand jury's finding for this Court to determine which assets are traceable to the charged crime and which are not.

### 3. The Applicable Statute—Section 853—Requires Notice and an Opportunity for a Hearing

*Kaley*'s apparent recognition that a grand jury indictment is not controlling on the traceability question presents an important gloss on the statutory scheme invoked here. In particular, subsection (e) of Title 18, United States Code, Section 853, which provides for temporary or preliminary restraining orders, contemplates notice and an opportunity to be heard "to persons appearing to have an interest in the property," except in circumstances not present here, either legally (as *Kaley*'s recognition demonstrates), or factually (as a review of the Indictment reveals and an (*in camera*)

---

[3] The Court instead focused on whether a grand jury's issuance of an indictment precludes re-litigating the first part of the determination. The Court stated that it does. *Id.* at 322.

review of the grand jury minutes in this case would confirm). *See Honeycutt v. United States*, 137 S. Ct. 1626, 1633 (2017) (stating that Section 853(e)(1) "authorizes pretrial freezes 'to preserve the availability of property described in subsection (a) . . . for forfeiture.' Pretrial restraints on forfeitable property are *permitted only when the Government proves, at a hearing*, that (1) the defendant has committed an offense triggering forfeiture, and (2) 'the property at issue has the requisite connection to that crime.'" (quoting *Kaley*, 571 U.S. at 323-24) (emphasis added)).

The statute provides that there is no such notice and opportunity to be heard required "upon the filing of an indictment or information charging a violation . . . for which criminal forfeiture may be ordered under this section and *alleging that the property with respect to which the property is sought would, in the event of conviction, be subject for forfeiture under this section.*" 21 U.S.C. § 853(e)(1)(A) (emphasis added). As *Kaley* recognizes, the traceability of any particular asset is "a technical matter far removed from the grand jury's core competence and traditional function—to determine whether there is probable cause to think the defendant committed a crime." *Kaley*, 571 U.S. at 331 n.9. Thus, legally, indictments do not allege the traceability finding; they only provide notice of the government's intention to forfeit property. *See United States v. Watts*, 786 F.3d 152, 172 (2d Cir. 2015) (stating that prior to a *Monsanto* hearing or trial finding on traceability, "the government has simply announced its intent to seek forfeiture through the indictment, the property is seen merely as 'potentially forfeitable.'").

Factually, the Indictment issued in this case appears to confirm this. In the section entitled "Forfeiture Allegations," in contrast to the other portions of the Indictment, it does not state "The Grand Jury Charges . . ." And, as a matter of fact, whether the grand jurors were instructed by the prosecutors that the "Forfeiture Allegations" section of the Indictment were "notice provisions" as to which the grand jury need not vote, or otherwise instructed the grand jury regarding a traceability analysis, can be revealed in a sealed hearing (pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i)), either by the prosecutors who presented the proposed Indictment or by the grand jury minutes (or both). Nevertheless, the Order itself seems to reflect the government's tacit admission that the grand jury made no controlling decision on the traceability of assets—the application was apparently based not on the grand jury proceedings, but instead on an affidavit of a Postal Inspector, and "upon finding of probable cause," which evidently means a finding by this Court, not the grand jury.

Absent a legally and factually controlling decision on traceability, Section 853 requires notice and an opportunity for a hearing.

### 4. The Government's Post-Indictment *Ex Parte* Application Is Not Permitted by Section 853

Moreover, there is no applicable provision in Section 853 permitting what the government did here—obtain an *ex parte*, post-indictment restraining order. Rather, Section 853(e) only permits an application "without notice or opportunity for a hearing *when an information or indictment has not yet been filed* with respect to the property." 21 U.S.C. § 853(e)(2) (emphasis added). Moreover, that provision contains important due process safeguards and limitations. First, it provides that the restraining

17

order issued without notice or an opportunity to be heard lasts only for a short period of time. *Id.* Second, it provides: "A hearing requested concerning an order entered under this paragraph shall be held at the earliest possible time and prior to the expiration of the temporary order." *Id.* In short, after indictment, the statute requires notice and an opportunity to be heard because, as *Kaley* implies, an indictment that reflects a binding finding of traceability does not exist.[4]

Of course, if the statute unambiguously permitted a seizure, based solely on an *ex parte* application with no subsequent opportunity for notice or a hearing, it would run afoul of the constitutional due process protections discussed above.[5] *See United States v. Crozier*, 777 F.2d 1376, 1383-84 (9th Cir. 1985) (holding that "[t]he statutory forfeiture provisions [including Section 853(e)] do not satisfy due process"

---

[4] Section 853 also authorizes issuance of a seizure warrant "in the same manner as provided for a search warrant." 21 U.S.C. § 853(f). It appears that the government did not pursue a seizure warrant under Section 853(f) or Federal Rule of Criminal Procedure 41.

[5] Section 853(k)'s "bar on intervention" does not apply because, by its terms, it applies to persons "claiming an interest in property subject to forfeiture under this section." 21 U.S.C. § 853(k). In other words, it applies to persons with competing (and perhaps superior) claims to the same property in which the government has a property interest—i.e., *tainted* property. *See Luis*, 136 S. Ct. at 1092 (the government only has a present property interest in tainted property). Here, the challenge is only to the restraint of property that is *not tainted*, not a claim that Mr. Kobach or We Build the Wall have a superior property interest to the government's, or that Mr. Kobach or We Build the Wall are bona fide purchasers for value. *See* 21 U.S.C. § 853(n)(6) (listing grounds for overcoming forfeiture order and not referencing preliminary "restraining" orders). Moreover, if Section 853(k) precluded the intervention of any person with an interest in property subject to a pretrial *restraining order*, it would render superfluous the many references in Section 853(e) to notice to interested persons and hearings. *See United States v. Jones*, 965 F.3d 190, 194-95 (2d Cir. 2020) (the "canon against surplusage" "requires courts to 'construe statutes in a manner that gives effect to all of their provisions.'" (quoting *Hayward v. IBI Armored Servs.*, 954 F.3d 573, 576 (2d Cir. 2020))). While certain Second Circuit decisions invoke Section 853(k) as barring third parties from seeking relief from forfeiture orders, importantly, those decisions do not involve challenges to restraining orders, but all occur in a post-conviction context. *See United States v. Watts*, 786 F.3d 152, 175 (2d Cir. 2015) (involving post-conviction forfeiture order and citing *De Almeida v. United States*, 459 F.3d 377, 381 (2d Cir. 2006) and *DSI Associates LLC v. United States*, 496 F.3d 175, 183-84 (2d Cir. 2007)); *DSI Associates*, 496 F.3d at 183 (2d Cir. 2007) (citing out of circuit cases) (post-conviction forfeiture order, claimant conceded that intervention was barred by Section 853(k)); *De Almeida*, 459 F.3d at 381 (2d Cir. 2006) (post-conviction and post-ancillary proceedings case, characterizing Section 853(k) in dicta).

and "cannot be construed as [providing] a hearing . . . 'at a meaningful time'" when
the "hearing for parties with a third party interest . . . takes place months or years
after a restraining order is issued[]").

Finally, with respect to the particular request for the release of funds to pay
Mr. Kobach's legal fees, there is an additional Fifth Amendment interest at stake.
Although Mr. Kobach has not been charged with any crime, he is nevertheless enti-
tled to legal representation as he and the corporation respond to the prosecutors' vo-
luminous requests for documents while attempting to keep the corporation alive and
capable of fulfilling its mission to continue building sections of border wall. As Judge
Kaplan explained in *United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006):

> [A]n employer often must reimburse an employee for legal expenses
> when the employee is sued, or even charged with a crime, as a result of
> doing his or her job. Indeed, the employer often must advance legal ex-
> penses to an employee up front, although the employee sometimes must
> pay the employer back if the employee has been guilty of wrongdoing.

> This third principle is not the stuff of television and movie drama. It
> does not remotely approach Miranda warnings in popular culture. But
> it is very much a part of American life. Persons in jobs big and small,
> private and public, rely on it every day. Bus drivers sued for accidents,
> cops sued for allegedly wrongful arrests, nurses named in malpractice
> cases, news reporters sued in libel cases, and corporate chieftains em-
> broiled in securities litigation generally have similar rights to have their
> employers pay their legal expenses if they are sued as a result of their
> doing their jobs. This right is as much a part of the bargain between
> employer and employee as salary or wages

*Id.* at 335, *aff'd* 541 F.3d 130 (2d Cir. 2008); *see also United States v. Stein*, 541 F.3d
at 155 (noting, in the Sixth Amendment context, that "[i]t is easy to distinguish [from
the circumstances of *Caplin Drysdale*] the case of an employee who reasonably ex-
pects to receive attorneys' fees as a benefit or perquisite of employment, *whether or*

*not the expectation arises from a legal entitlement.* As has been found here as a matter

of fact, these defendants *would* have received fees from KPMG but for the govern-

ment's interference." (first emphasis added)).[6]

### 5. Federal Rule of Criminal Procedure 41(g) Provides the Movants with an Avenue for Equitable Relief

In the alternative, We Build the Wall is entitled to the return of property, pur-

suant to Federal Rule of Criminal Procedure 41(g). The Second Circuit has recognized

that:

> A Rule 41(g) motion is an equitable remedy that is available only when
> there is no adequate remedy at law and the equities favor the exercise
> of jurisdiction. Jurisdiction under Rule 41 is to be exercised with great
> restraint and caution since it rests upon the court's supervisory power
> over the actions of federal law enforcement officials.

*De Almeida v. United States,* 459 F.3d 377, 382 (2d Cir. 2006) (internal citations and

quotation marks omitted). In *De Almeida,* the Second Circuit indicated that the ex-

ercise of this equitable power is discretionary, and that it *may* not be appropriate

where there is an adequate remedy at law. *Id.* Thus, the Second Circuit noted that it

had upheld dismissal of such an action "where the government had commenced a civil

forfeiture proceeding," and thus the claimant would be "afforded the opportunity to

test the legality of the seizure in the forfeiture proceeding." *Id.* The Court noted, how-

ever, that "[a] third-party claimant contesting a *criminal* forfeiture may lack an ade-

quate remedy at law if the claimant faces months or years of delay before the claimant

---

[6] Indicted defendants likewise have a Sixth Amendment interest in We Build the Wall's funds, to the extent, absent government intervention, We Build the Wall would contribute to their legal defense. We Build the Wall has informed the government that, absent that intervention, it would pay at least a portion of Brian Kolfage's legal fees.

may seek an ancillary proceeding in the criminal forfeiture action." *Id.* (emphasis added). In *De Almeida*, however, that "potential inadequacy [was] not present [then and there] . . . because there has been a conviction and an ancillary proceeding has been conducted (and concluded)." *Id.*[7] Thus, in the present context, jurisdiction pursuant to Federal Rule of Criminal Procedure 41(g) would be appropriate, absent another remedy.

### B. Argument

The government's attempt—by fiat and via *ex parte* sealed proceedings, which afforded no semblance of due process or notice and an opportunity to be heard—to freeze assets of We Build the Wall that necessarily bear no legal or factual nexus to the charged crime is untenable and should not be countenanced. As noted above, funds donated to We Build the Wall after January 2020, when We Build the Wall's website was updated to state that Mr. Kolfage would receive compensation for his work, cannot be the proceeds of the fraud alleged in the Indictment. This is even more so of donations received by We Build the Wall after the announcement of the

---

[7] *De Almeida* also stated in non-binding dicta, citing out-of-circuit cases, that "[a]n ancillary proceeding [under Section 853(n)] is evidently the *only* avenue for a post-indictment third-party claim to forfeited property, because the statutory scheme [i.e., Section 853(k)] bars commencement of 'an action at law or equity against the United States concerning the validity of [a third party's] alleged interest in the property . . . subsequent to the filing of an indictment or information alleging that the property is subject to forfeiture under this section.'" 459 F.3d at 381. The comment was dicta because, as the Court noted, "[t]hat bar does not in plain terms affect the Rule 41(g) motions" at issue in that case. *Id.* Moreover, for reasons explained above in footnote 5, and the text, there is no such indictment here (legally and factually), and Section 853(k) should not be read to apply to restraining orders. In *De Almeida*, the challenge related to a seizure warrant—not a restraining order—that had been converted to a "Consent Judgment and Preliminary Order of Forfeiture" before the district court dismissed the action. *Id.* at 379-80.

Indictment on August 20, 2020. In a fair hearing on notice, the government would not be able to establish probable cause that these funds are the proceeds of fraud.

In addition, there are important interests at stake for We Build the Wall and its donors. We Build the Wall's donors donated money to support the mission of We Build the Wall, which could not have moved forward without extensive legal work provided by Mr. Kobach to facilitate border wall construction, as well as non-legal work provided by other vendors. The outstanding invoices for services rendered (which are detailed by individual vendor and amount in counsel's September 22, 2020 letter to the government, **Weddle Decl. Ex. C**), including the compensation currently owed to Kobach Law LLC for Mr. Kobach's service as general counsel, are part of that mission and necessarily outside the gravamen of the fraud—diversion of funds for the personal benefit of Mr. Kolfage and other defendants. Moreover, the government's untenable position that *all* funds donated to We Build the Wall through August 20, 2020 are the proceeds of fraud, tramples on We Build the Wall's and Mr. Kobach's Fifth Amendment rights to be free of government interference with their property rights, to be afforded due process, and, in the case of Mr. Kobach, to look to We Build the Wall to pay for his legal fees relating to his work on its behalf. *See Stein*, 435 F. Supp. 2d at 335 (finding Sixth and Fifth Amendment right to be free of government intervention in the payment of legal fees), *aff'd*, 541 F.3d at 130 (affirming Sixth Amendment ruling, declining to reach Fifth Amendment analysis).

The alternative, of course, is that no person will perform any work (legal or otherwise) on behalf of We Build the Wall, and all funds donated will languish,

22

uninvested and not safeguarded in a bank, potentially for years, while the government pursues this prosecution. Indeed, during the period of time in which the government delayed revealing to counsel the Order, Florida administratively dissolved We Build the Wall for missing a September 18, 2020, deadline to make a filing and pay a $61.25 annual fee. If this Court does not provide due process and revisit the traceability of these assets, no Court will do so at any meaningful time. That would be the opposite of protecting the donors or the Fifth Amendment rights of We Build the Wall, Mr. Kobach, and of any legitimate creditors of We Build the Wall.

## II. MOVANTS SHOULD HAVE ACCESS TO THOSE PORTIONS OF THE GOVERNMENT'S SEALED APPLICATION AND AFFIDAVIT BEARING ON WE BUILD THE WALL'S FUNDS AND THE COURT SHOULD HOLD A HEARING

As noted above, the government here has, without legal basis, proceeded *ex parte* and under seal, submitting an application and affidavit that it has declined to release to We Build the Wall or Mr. Kobach. *See* **Weddle Decl. Ex. G** (prosecutors' October 6, 2020 email declining to provide government application or affidavit).[8] As then-Judge Ruth Bader Ginsburg stated:

> It is a hallmark of our adversary system that we safeguard party access to the evidence tendered in support of a requested court judgment. The openness of judicial proceedings serves to preserve both the appearance and the reality of fairness in the adjudications of United States courts. It is therefore the firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte*, *in camera* submissions. *See*

---

[8] The prosecutor's October 6, 2020 email incorrectly claims that there is an "ambiguity around who you are representing." As counsel informed the prosecution on September 1, 2020, counsel represents Mr. Kobach, and has been asked to represent We Build the Wall. **Weddle Decl. ¶ 4.** Counsel confirmed that information by email on October 8, 2020. **Weddle Decl. Ex. G.** Counsel believes that there is no non-waivable conflict presented by accepting the request to represent We Build the Wall. **Weddle Decl. ¶ 13.** Counsel has also informed the government that Mr. Kobach, as general counsel, represents We Build the Wall. **Weddle Decl. Ex. G.**

*In re Application of Eisenberg*, 654 F.2d 1107, 1112 (5th Cir. 1981). Exceptions to the main rule are both few and tightly contained.

*Abourezk v. Reagan*, 785 F.2d 1043, 1060-61 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987). Because the movants have not seen the government's submissions referenced in the Order, we are left to guess about the arguments presented to the Court in an attempt to justify deviating from this "firmly held main rule." *Id.*

To the extent it is based on any ongoing investigation, in light of the public (and publicized) nature of the charges, it would appear that no harm could be done to such an investigation by disclosure of the government's arguments and evidence seeking to establish that all funds held by We Build the Wall are the proceeds of crime. As set forth above, Mr. Kobach and We Build the Wall are fully capable of presenting arguments demonstrating that the funds are not proceeds of fraud on notice to the government also without doing any harm to the investigation. Nor does there appear to be any privilege issue involved, or sensitive personal information about the government or its actors or witnesses. Instead, it appears that any sensitive personal information would be personal information of Mr. Kobach or We Build the Wall (or its donors, shared with We Build the Wall). Thus, Mr. Kobach and We Build the Wall should likewise be given notice of the government's arguments and evidence so that they can be tested according to due process.

Thus, for the reasons stated in Part I above, the Court should modify the Order to clarify either (i) that funds donated after January 31, 2020 are not restrained, (ii) that funds donated after August 20, 2020 are not restrained, or (iii) that the particular outstanding invoices and legal fees enumerated in counsel's September 22, 2020

letter (**Weddle Decl. Ex. C**) are permitted. In the alternative, the Court should order the disclosure to movants of the portions of the *ex parte* documents that relate to We Build the Wall's Funds and should hold a hearing to determine the propriety of restraining those funds, in whole or in part.

CONCLUSION

For the foregoing reasons, the Court should (i) modify the Order to release funds that are not proceeds of crime or to make certain payments, or (ii) provide access to Kris Kobach and We Build the Wall to the pertinent portions of documents submitted *ex parte* in connection with the Order's restraint of We Build the Wall's funds and a hearing to determine whether there is probable cause supporting the traceability of the funds to the alleged fraud.

Dated:        October 13, 2020

/s/ Kris Kobach_____

Kris Kobach (*pro hac vice* request to be submitted)
Kobach Law PLLC
P.O. Box 155
Lecompton, KS 66050
kkobach@gmail.com

*General Counsel for We Build the Wall, Inc.*

Respectfully submitted,

Justin S. Weddle
Julia I. Catania
Weddle Law PLLC
250 W. 55th St., Fl. 30
New York, NY 10019
212-997-5518
jweddle@weddlelaw.com

*Counsel for Kris Kobach*

25