**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
**UNITED STATES OF AMERICA,**                    :
                                                 :
            - v. –                               :          **20-CR-412 (AT)**
                                                 :
**KOLFAGE, et al.,**                             :
                                                 :
            ***Defendants*.**                    :
----------------------------------------------------------X


## <u>DEFENDANT TIMOTHY SHEA'S</u><br><u>MEMORANDUM OF LAW IN SUPPORT OF</u><br><u>HIS MOTION FOR SEVERANCE</u>


John C. Meringolo, Esq.
Meringolo & Associates, P.C.
375 Greenwich Street, 7th Floor
New York, New York 10013
(212) 941-2077
*Attorneys for Defendant Timothy Shea*

## DEFENDANT TIMOTHY SHEA'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR SEVERANCE

**NOW COMES** Defendant Timothy Shea, by and through his attorney, John C. Meringolo Esq., and respectfully submits this motion to sever his trial from co-defendants, Brian Kolfage and Andrew Badolato, pursuant to Federal Rule of Criminal Procedure 14(a). For the reasons set forth below, severance is mandated by the likelihood of spillover prejudice to Mr. Kolfage from a joint trial with Mr. Kolfage and Mr. Badolato. Therefore, severance from his co-defendants is proper.

## STATEMENT OF FACTS

The Indictment in this case charges Mr. Shea with a one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343 and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). The Indictment centers around a crowdfunding campaign website referred to as "We the People Build the Wall" (later changed to "We Build the Wall"), which sought to raise money to build a privately funded wall along the southern border of the United States. *See* Indictment at ¶ 1. The We Build the Wall ("WBTW") campaign was launched on or around December 17, 2018 and raised over $25 million, "hundreds of thousands of dollars" of which the Indictment alleges were "used in a manner inconsistent with the organization's public representations" by the defendants. *Id.* at ¶ 2.  The Indictment alleges that co-defendants Brian Kolfage and Stephen Bannon[1] received $350,000 and $1,000,000, respectively, from the funds through a non-profit organization. *Id.* The Indictment further alleges that the defendants "devised a scheme to route those payments" through the non-profit organization "and a shell company" allegedly under Mr. Shea's control. *Id.* Allegedly, Kolfage's "secret monthly salary of approximately $20,000 was passed indirectly through other third-party

---

[1] As the Court is aware, former President Trump pardoned Mr. Bannon, who is now no longer a defendant on the case.

entities that were purported vendors for We Build the Wall, including one under the control of" Mr. Shea. *Id.* at ¶ 20. According to the Indictment, "Shell Company-1" began receiving payments from the campaign which Mr. Shea paid to Kolfage. According to the Indictment, Kolfgage, Bannon, and Badolato made false statements when they promised donors all proceeds would go to the wall, and not to them. *Id.* at ¶ 17.

The statements made by Mr. Shea's current (and former) co-defendants are at issue, in part, because of their notoriety and status as public figures at the time. Mr. Kolfage is a decorated veteran of the United States Air Forces and Purple Heart Recipient who had lost his limbs during his service. Not only the founder of WBTW, Mr. Kolfage was inarguably the figurehead and spokesperson of the organization, traveling the country to speak with countless individuals who believed in his mission. As co-founder, he was active on all WBTW websites, social media, and other online written communications.

Although no longer a co-defendant due to former President Trump's pardoning power, Stephen Bannon is, and continues to be, a main figure in WBTW's history, as one of its co-founders.[2] The notoriety and fame of Mr. Bannon, a media executive, political strategist, and former White House cabinet member, cannot be overstated. As alleged in the Indictment, Mr. Bannon accepted over $1,000,000 from WBTW, and like Mr. Kolfage, his words and public statements are the basis for the fraud allegations. Mr. Bannon largely communicated with co-defendant Andrew Badolato, and it was through Mr. Badolato that Mr. Bannon came to know the other co-defendants. *Id.* at ¶ 19.

---

[2] Mr. Bannon is currently listed on the WBTW website as Chairman of the Advisory Board. https://webuildthewall.us/ourteam/

Throughout all pertinent times, Mr. Shea worked as a realtor for his company, Ranch Property Management, as well as a social media coordinator for various projects. Unlike his other co-defendants, Mr. Shea is not a public figure nor did he receive any media coverage or personal notoriety from his involvement with WBTW. Lastly, there are no public statements attributed to him that are alleged to have perpetrated any fraud.

The discovery produced to date by the government – several terabytes worth of data – is proportionate to the defendants' respective involvement in WBTW. That is, the majority of it is dedicated to financial and business records, public statements and correspondences, and other documentary evidence, related to all but Mr. Shea.

## DISCUSSION

### I.      SEVERANCE SHOULD BE GRANTED AS JUSTICE REQUIRES UNDER FED.R.CRIM.P. 14.

Rule 14 of the Federal Rules of Criminal Procedure provides in pertinent part: "[If] the joinder of…defendants in an indictment…appears to prejudice a defendant… the court may order separate trials of counts, sever the defendants' trials or provide any other relief that justice requires." While there exists "strong preference in the federal system for joint trials of defendants who are indicted together," severance must be granted "if there is a serious risk that a joint trial would compromise a trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). In this instant matter, a joint trial would comprise Mr. Shea's rights and would prevent the jury from making a reliable judgment about guilt or innocence from the spillover prejudice of the other co-defendants. Therefore, severance should be granted under Rule 14(a) to preserve Mr. Shea's constitutional rights and to prevent unfair prejudice.

## II.   THE PREJUDICIAL SPILLOVER RESULTING FROM A JOINT TRIAL WITH HIS CO-DEFENDANTS WILL PREVENT THE JURY FROM MAKING A RELIABLE DETERMINATION OF GUILT OR INNOCENCE

If any scenario rebuts the presumption favoring joint trials for jointly indicted defendants, then surely this one – with Mr. Shea accused of aiding the transfer of money to co-defendants seeped with notoriety and publicity – fits the bill. A joint trial under these circumstances would create an overwhelming risk of prejudice that will, in effect, deny Mr. Shea a fair trial. As *Zafiro* explains, "such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Zafiro,* 506 U.S. at 539. There is a risk that "evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. *Id.*

Typical spillover prejudice occurs when "evidence admissible against only one defendant is prejudicial to all defendants and that individual trials should have been held to avoid that prejudice." *United States v. DiNome,* 954 F.2d 839, 843 (2d Cir. 1992). The spillover prejudice must so severely harm the defendant that a joint trial would constitute "a miscarriage of justice." *United States v. Cervone,* 907 F.2d 332, 341 (2d Cir. 1990). "The trial court has almost unlimited discretion under Rule 14 to determine whether sufficient prejudice exists." *United States v. Gallo,* 668 F. Supp. 736, 748 (E.D.N.Y. 1987). In determining the severity of spillover prejudice, the Court must consider the following factors:

> [T]he number of defendants and the number of counts; the complexity of the indictment; the estimated length of the trial; disparities in the amount or type of proof offered against the defendants; disparities in the degrees of involvement by defendants in the overall scheme; possible conflict between various defense theories or trial strategies; and, especially, prejudice from evidence admitted only

against co-defendants but which is inadmissible or excluded as to a particular defendant.

*United States v. Gallo,* 668 F.Supp. at 749. *U.S. v. Santiago*, 174 F. Supp.2d 16, 22 (S.D.N.Y. 2001); *United States v. Ramos*, 346 F. Supp. 2d 567, 570 (S.D.N.Y. 2004).

Furthermore, severance should be granted to avoid prejudice, even in the face of countervailing concerns of judicial economy:

> We do not accept the proposition that because of the convenience of the government, the conservation of judicial energy and expense of multiple trials, the discretion of the United States Attorney in indicating numerous defendants . . . should be unfettered. There can be no litmus paper test depending upon the number of defendants and the expected length of trial. Rather the inquiry must be whether the defendants in the case . . . [will be] afforded a fair trial.

*United States v. Moten*, 564 F.2d 620, 627 (2d Cir. 1977).

In the exercise of its discretion, courts have granted severance where the danger from spillover prejudice to a defendant from evidence otherwise inadmissible against him impairs his right to a fair trial. See *United States v. Bellomo,* 954 F. Supp. 630, 650-651 (S.D.N.Y. 1997).

By applying the *Gallo* factors and applicable case law to the specific facts of the Indictment and Mr. Shea's involvement, it is evident that he would be substantially prejudiced if not severed. There is a great disparity in the amount of proof offered against Mr. Shea and his co-defendants, which reflects the disparity of each co-defendant's alleged involvement in the charged conspiracy. Likewise, the massive amount of discovery produced to date is wholly irrelevant to Mr. Shea. If not severed, Mr. Shea will be sitting through a considerably lengthy and complex trial, as large swathes of evidence concerning the WTBW organization, its operations, and the public statements of, and the relationships between, its key figures are presented which, if tried alone, would not be admissible against him. The length of time it would take to establish proof of the conspiracy, in the context of also establishing WTBW's history, background, operations, public information and

5

statements, as well as the complex financial matters of donations and disbursements of funding to the projects, would be inordinate and in relation to Mr. Shea, largely irrelevant.

While differing levels of culpability and proof are not solely dispositive when determining severance – and can, at least in theory, be remedied with a jury instruction – the type of prejudice that occurs from the mere association with not just allegedly more culpable co-defendants but co-defendants who have been the subject of massive notoriety and fame, would be very difficult, if not impossible, for a jury to avoid.

As leading public figures inextricably connected to WBTW, these publicized statements from Mr. Bannon, and by extension, Mr. Badolato, form the crux of the government's theory that a fraud was perpetuated. All of these individuals carry with them a degree of notoriety that will guarantee spillover prejudice to Mr. Shea. Ironically, the most notorious and prejudicial co-defendant (who is no longer a co-defendant) – Stephen Bannon – will still have a stranglehold of the trial. In light of his relationships with WBTW and the other co-defendants, it is indisputable that large amounts of evidence and testimony, not to mention media publicity, will be focused on him. Were Mr. Shea to be tried alone, Mr. Bannon's influence on the trial could effectively limited. From both an efficiency standpoint and with the utmost concern for justice, Mr. Shea should not be tried with any of his co-defendants.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Shea respectfully requests that the Court grant his motion to sever his trial from the trial of his co-defendants.

Dated:   November 15, 2021
         New York, NY


                                        Respectfully submitted,
                                         /s/
                                        _____
                                         John Meringolo, Esq.
                                        Meringolo & Associates, P.C.
                                        *Attorneys for Defendant*
                                        375 Greenwich Street, 7th Floor
                                        New York, NY 10013
                                        (212) 941-2077