m5o3she1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   UNITED STATES OF AMERICA,              New York, N.Y.
4              v.                          20 Cr. 412 (AT)
5   TIMOTHY SHEA,
6              Defendant.                  Trial
7   ------------------------------x
8                                          May 24, 2022
                                           8:55 a.m.
9
10  Before:
11                    HON. ANALISA TORRES,
12                                         District Judge
                                           and a Jury
13
14                       APPEARANCES
15
    DAMIAN WILLIAMS
16       United States Attorney for the
         Southern District of New York
17  BY:  ALISON G. MOE
         NICOLAS T. ROOS
18       ROBERT B. SOBELMAN
         Assistant United States Attorneys
19
    MERINGOLO & ASSOCIATES P.C.
20       Attorneys for Defendant
    BY:  JOHN C. MERINGOLO
21       ANGELICA B. CAPPELLINO
         CLARA S. KALHOUS
22
23  Also Present:  Sunny Drescher, Paralegal Specialist, USAO
24
25
```

m5o3she1

1                    (Trial resumed; jury not present)

2                    THE COURT:  Good morning.  Please make your

3     appearances.

4                    MS. MOE:  Good morning, your.  Honor Alison Moe,

5     Nicholas Roos, and Robert Sobelman for the government.  We're

6     joined at counsel table by Sunny Drescher, a paralegal in our

7     office.

8                    MR. MERINGOLO:  John Meringolo, Angelica Cappellino,

9     and Clara Kalhous for Mr. Shea who is standing to my right.

10                   THE COURT:  Please be seated.

11                   Before we have the jurors come in, I wanted to see if

12    there is anything you wanted to raise.

13                   MS. MOE:  Your Honor, from the government, no

14    substantive issues to raise.  I did want to raise a brief

15    technical question.  Which is just that I saw that your Honor's

16    stand was next to the podium as well.  I wanted to make sure if

17    they're double mic'd we won't have a feedback loop.

18                   THE COURT:  I'm going to slide the stand over here so

19    that we don't have so much clutter.

20                   MS. MOE:  Thank you, your Honor.

21                   THE COURT:  Anything from the defense?

22                   MR. MERINGOLO:  No, Judge.

23                   THE COURT:  Sir, you'll have to wait outside.  Thank

24    you.

25                   All right then.  When the clock strikes 9, I'm going

m5o3she1

1    to ask the jurors to be brought in.

2              MR. ROOS:  Is it okay if we test the video just to

3    make sure the A/V system works?

4              THE COURT:  Go ahead.

5              Who is going to open for the prosecution?

6              MS. MOE:  I will, your Honor.

7              THE COURT:  And for the defense?

8              MR. MERINGOLO:  I will, Judge.

9              THE COURT:  Apparently, more than the total number of

10   jurors showed up.

11             (Jury present)

12             (A jury of 12 and four alternates is impaneled and

13   sworn)

14             LAW CLERK:  Please be seated.

15             THE COURT:  Good morning, jurors.  Thank you for being

16   on time.

17             Do the attorneys agree that all jurors are present and

18   properly seated?

19             MR. MERINGOLO:  Yes, your Honor.

20             MS. MOE:  Yes, your Honor.

21             THE COURT:  Members of the jury, this case is

22   officially on trial.  You are the jurors in the case.  As you

23   can see, the jury is composed of 12 members.  In addition,

24   there are four alternates.  If you are an alternate, you need

25   to pay as close attention as the members of the jury.  If for

m5o3she1

1     any reason one of the members of the jury is unable to serve,

2     an alternate will be required to step into the place of that

3     juror.  I will now give you some preliminary instructions to

4     guide you in your participation in the trial.

5          The second part of the trial is about to begin.  This

6     part is the opening statement by the prosecution.  And in the

7     opening statement by the assistant United States attorney,

8     she's required to indicate to you what the government intends

9     to prove by way of evidence to support the charges against the

10    defendant.

11         Once the government's opening statement has been

12    completed, defense counsel has the option to make an opening

13    statement.

14         Now, what attorneys say in an opening statement is not

15    evidence.  An opening statement is in a sense a preview of what

16    the attorney expects that the evidence will show.

17         Next, the assistant United States attorney will

18    present a witness, and will ask the witness questions.  This is

19    called direct examination.  Once the assistant United States

20    attorney completes the questions, the defense counsel will then

21    be given an opportunity to question the witness.  This is

22    called cross-examination.  This process will continue for each

23    witness the prosecution will present to give testimony.  When

24    the government finishes calling all its witnesses, the defense

25    will be given an opportunity to present witnesses.  Remember,

m5o3she1

1    the defense need not prove anything; therefore, they don't have

2    to cross-examine the government's witnesses or offer their own

3    witnesses.

4          Once both sides have finished presenting witnesses,

5    the defense and the prosecution will be given an opportunity to

6    make closing remarks.  These closing arguments will not be

7    evidence.  They are just arguments made by the attorneys to

8    discuss the facts and circumstances in the case, and they

9    should be confined to the evidence and to reasonable inferences

10   that can be drawn from the evidence.

11         So, again, neither opening statements nor closing

12   arguments are evidence, and you should disregard any statement

13   or argument made by the attorneys that is not based on the

14   evidence.

15         After the closing arguments I will give you detailed

16   instructions on the law that relates to this particular case.

17   When I finish my instructions, you will then retire to

18   deliberate to reach a verdict.

19         Now I am going to instruct you on evidence.  First,

20   let me tell you what evidence is, basically.  Evidence consists

21   of oral testimony under oath, any stipulations of the parties,

22   physical exhibits which during the trial are introduced by

23   either the prosecution or the defense and allowed into

24   evidence.  When an exhibit is given to you to examine, you

25   should examine it carefully individually and without comment.

m5o3she1

1          There are two kinds of evidence:  Direct and

2     circumstantial.  Direct evidence is direct proof of a fact,

3     such as testimony of an eyewitness.  Circumstantial evidence is

4     proof of facts from which you may infer or conclude that other

5     facts exist.

6          There is a simple example of circumstantial evidence

7     that is often used in this courthouse.  Assume that when you

8     came into the courthouse this morning the sun was shining and

9     it was a nice day.  Assume that the courtroom shades were down

10    and you could not look outside.  As you were sitting here,

11    someone walked in with an umbrella that was dripping wet.  And

12    a few minutes later, another person entered with a wet

13    umbrella.  Now, you can't look outside of the courtroom and you

14    cannot see whether or not it is raining so you have no direct

15    evidence of that fact.  But on the combination of facts that I

16    have just asked you to assume, it would be reasonable and

17    logical for you to conclude that it had been raining.

18         That is all there is to circumstantial evidence.  You

19    infer on the basis of reason and experience and common sense

20    from one established fact, the existence or non-existence of

21    some other fact.

22         Not all circumstantial evidence presents a clear

23    compelling inference.  The strength of the inferences arriving

24    from circumstantial evidence is for you to decide.  I will give

25    you further instructions on these as well as other matters at

m5o3she1

1    the end of the case.  But have in mind that you may consider

2    both kinds of evidence.

3             If you're instructed that some evidence is received

4    for a limited purpose only, you must follow that instruction.

5    Questions asked by either attorney or even myself are not in

6    and of themselves evidence.  Only questions coupled with

7    answers are evidence.  Therefore, you may not infer any fact

8    from the mere asking of a question.

9             The reason I point this out to you is simple.  During

10   the course of the questioning, the prosecution and defense may

11   exercise their right to object to the other's question, to an

12   answer given to a question, or to introduction of an exhibit on

13   the ground that the attorney believes it is somehow legally

14   improper or inadmissible.  At that point I will either sustain

15   or overrule the objection.  If I sustain an objection to a

16   question, you must disregard it and any answer, if one has been

17   given.  You must also draw no inference from the question or

18   from any answer.  Nor are you to speculate as to what the

19   witness would have said if permitted to answer.  Evidence

20   stricken from the record must be likewise disregarded.

21   Conversely, if I overrule the objection, the question will be

22   allowed or the answer will stand, and it will remain as

23   evidence.

24            When I overrule an objection to any evidence, you must

25   not give such evidence any more weight than if the objection

m5o3she1

1    had not been made.

2            Please bear in mind that my rulings on the law are

3    simply that, and under no circumstance are such rulings to be

4    considered by you as indicating that the Court has an opinion

5    as to the guilt or innocence of the defendant.

6            Under our law, the Court may not and will not

7    entertain any opinion as to the guilt or innocence of the

8    accused.  Members of the jury, you and you alone are the sole

9    and exclusive judges of the facts.

10            Now, I want you to understand that objections may come

11   rather quickly, and at times either party may same rude.

12   Please do not resent this or penalize either party for this.

13   Understand that they are just doing their job and this is a

14   part of it.

15            As I stated at the beginning, you are the triers of

16   fact.  Therefore, it will you be up to you to decide which

17   witness to believe and which witness not to believe.

18   Furthermore, you will decide how much of every witness's

19   testimony to accept and how much to reject.

20            How do you decide what to believe and what not to

21   believe?  Listen to the witnesses and watch them and observe

22   them, then decide whether you believe or disbelieve them in the

23   same way you decide such questions in your ordinary life.  Did

24   they know what they were talking about?  Were they candid,

25   honest, open and truthful?  Do they have a reason to falsify,

m5o3she1

exaggerate or distort their testimony?  Please use your common
sense in evaluating all testimony.  All that is asked of you is
you apply the same common sense you would apply in your
everyday lives to determine who is telling you the truth, who
is not, and who is telling you something less than the full
truth.  Please remember that it is the quality of evidence that
controls, not the quantity of evidence or the number of
witnesses called by either side.

          You must decide the case solely on the evidence and
the law before you and must not be influenced by any personal
likes or dislikes, opinions, prejudices, sympathy, or biases,
including unconscious bias.  Unconscious or implicit biases are
stereotypes, attitudes or preferences that people may
consciously reject, but which may be expressed without
conscious awareness, control or intention.  Like conscious
bias, unconscious bias, too, can affect how we evaluate
information and make decisions.  All of us, no matter how hard
we try, tend to look at others and tend to weigh what they have
to say through the lens of our own experience and background.
We have a tendency to stereotypes others and make assumptions
about them.  Often we see life and evaluate evidence through a
clouded filter that tend to favor those like ourselves.  You
must do the best you can to put aside such stereotypes.  All
litigants and witnesses are entitled to a level playing field
in which we do the best we can to put aside our stereotypes and

m5o3she1

prejudices.

You are to be guided solely by the evidence in this case and my instructions on the law.  Although you are the sole judges of the facts, my job is to be the sole judge of the law. You must accept the law as I give it to you without any hesitation or reservation.  You must accept the law as I give it, even if you privately disagree with me or the law.

There are three basic principles of law that apply to this and all criminal cases:  The presumption of innocence, the prosecution's burden, and the standard of proof.

First is the presumption of innocence.  A defendant is presumed innocent, and that presumption remains with the defendant throughout the trial, and is not removed unless and until the defendant's guilt is proven beyond a reasonable doubt.  The indictment containing the charges against the defendant is only an accusation, nothing more.  It is not proof of guilt or anything else.  Therefore, because no evidence has been presented to you as of yet, if you were to deliberate right now, you would have to find the defendant not guilty.

Second is the prosecution's burden.  The burden of proof is on the government.  The defense has no burden, and is not required to do anything to prove his innocence.  The defense has the option of just sitting back and doing nothing. Why?  Because the defense has no burden of proof, and the defendant is presumed innocent.  The defendant is not required

m5o3she1

1     to put on a defense, or call any witnesses, because of the

2     presumption of innocence.  If a defendant chooses not to take

3     the stand to testify on his own behalf, you may not draw any

4     negative inference from that.  In other words, you could not

5     hold it against the defendant.

6             Third is the standard of proof.  The prosecution is

7     required to prove the defendant's guilt beyond a reasonable

8     doubt.  This standard does not require the prosecution to prove

9     the defendant's guilt beyond all doubt or to a mathematical

10    certainty.  The prosecution does, however, have to prove the

11    defendant's guilt beyond a reasonable doubt.  A doubt is not

12    reasonable if, instead of being based on the nature and the

13    quality of evidence or the insufficiency of the evidence, it is

14    based on some guess or whim or speculation unrelated to the

15    evidence.

16            In my final instructions to you at the end of the

17    trial I'll give you detailed instructions on the law as to the

18    specific charges against the defendant.  Those instructions are

19    intended to guide you through your deliberations and to enable

20    you to reach your decision.

21            Finally I'm now going to instruct you on how you must

22    conduct yourselves during the trial.  You must keep an open

23    mind during the trial.  You must keep your eyes open during the

24    trial.  You may not ask the witnesses questions.  Do not

25    converse either among yourselves or with anyone else about

m5o3she1

anything related to this case.  You may tell the people with
whom you live and your employer that you are a juror and give
them information about when you will be required to be in
court.  But, you may not talk with them or anyone else about
anything related to this case.

        Do not at any time during the trial request, accept,
agree to accept or discuss with any person the receipt or
acceptance of any payment or benefit in return for supplying
information about the trial.  You must promptly report directly
to me any incident within your knowledge involving an attempt
by any person to improperly influence you or any member of the
jury.

        Do not visit or view any place that is mentioned
during the trial which may have something to do with where the
crimes were allegedly committed.  And you must not use internet
maps or Google Earth or any other program or device to search
for and view any location discussed in the testimony.

        Do not read, view, or listen to any accounts or
discussions of the case reported by newspapers, television,
radio, the internet or any other news media.  Do not attempt to
research any fact, issue or law related to this case, whether
by discussion with others, by research in a library, or on the
internet, or by any other means or source.

        In this age of instant electronic communication and
research, I want to emphasize that in addition to not

m5o3she1

1    conversing face to face with anyone about this case, you must

2    not communicate with anyone about the case by any other means,

3    including telephone, text messages, e-mail, internet, chat or

4    chatrooms, blogs or social websites such as Facebook and

5    Twitter.  You must not provide any information about the case

6    to anyone by any means whatsoever.  And that includes the

7    posting of information about the case or what you are doing in

8    the case on any device or internet site including blogs,

9    chatrooms, social websites or any other means.  You must also

10   not Google or otherwise search for any information about the

11   case or the law that applies to the case or the people involved

12   in the case, including the defendant, the witnesses, the

13   lawyers and myself.

14         Now, ladies and gentlemen, I want you to understand

15   why these rules are so important.  Our law does not permit

16   jurors to converse with anyone else about the case or permit

17   anyone to talk to them about the case because only jurors are

18   authorized to render a verdict.  Only you have been found to be

19   fair and only you have promised to be fair.  No one else has

20   been so qualified.  Our law also does not permit jurors to

21   converse among themselves about the case until the Court tells

22   them to begin deliberations, because premature discussions can

23   lead to premature final decisions.

24         Our law also does not permit you to visit any place

25   discussed in the testimony.  Finally, our law requires that you

m5o3she1

not read or listen to any new accounts of the case and that you

not attempt to research any fact, issue or law related to the

case.

Your decision must be based solely on the testimony

and other evidence presented in this courtroom.  It would not

be fair to the parties for you to base your decision on some

reporter's view or opinion or upon information you acquire

outside of the courtroom.  These rules are designed to help

guarantee a fair trial, and our law accordingly sets forth

serious consequences if the rules are not followed.

I trust you understand and appreciate the importance

of following these rules, and in accord with your oath and

promise, I know you will do so.

During the trial, it may be necessary for me to confer

with the lawyers out of your hearing with regard to questions

of law or procedure.  On some occasions you may be excused from

the courtroom for that reason.  I will try to limit these

interruptions as much as possible.  But you should remember the

importance of the matter you are here to determine and should

be patient, even though the case may seem to go slowly.

Finally, I permit jurors to take notes, but you don't

have to take notes.  Notes are just an aid to your own

recollection.  The court reporters in this case report

everything that is said in the courtroom, and any portion of

the testimony can be read back to you here in open court during

1    your deliberations.

2            If you do take notes, be aware that note taking may

3    distract you from something important that's happening on the

4    witness stand.  Whether or not you take notes, rely on your own

5    recollection and don't be influenced by the fact that another

6    juror has taken notes.  One moment.

7            I told you that you are to report any attempt by

8    anyone to improperly influence you.  Lawyers are not permitted

9    to have any contact with you, other than what takes place on

10   the record during the course of this trial.  So, if you see an

11   attorney, for example, in the hallway or outside, and the

12   lawyer doesn't say hello or even acknowledge your presence,

13   please don't think that the attorney is being rude.  Attorneys

14   are simply not permitted to have any type of contact with you.

15           Now, Assistant United States Attorney Alison Moe will

16   make her opening statement.

17           MS. MOE:  Timothy Shea and his business partner

18   started a fundraiser online.  They raised money to build a wall

19   along the southern border of the United States.  Hundreds of

20   thousands of people across the country donated.  They raised

21   millions of dollars.

22           Now, what donors didn't know, but what you're going to

23   learn at this trial, is that Timothy Shea and his partner were

24   working behind the scenes to steal money for themselves.

25   Hundreds of thousands of dollars of donors' money went into the

1   pockets of that man, Timothy Shea, the defendant.

2            Together with his partners in crime, they looted

3   hundreds of thousands of dollars of donors' money, and created

4   fake documents to cover their tracks.

5            That's why we're here today.

6            Now, this opening statement is our opportunity to give

7   you a roadmap of the evidence in this case.  I'm going to do

8   that in three parts.  First, I want to tell you about what I

9   expect the evidence at this trial will show.  Second, I'm going

10  to briefly describe the charges in this case.  And third, I'll

11  explain to you how we will prove beyond a reasonable doubt that

12  the defendant is guilty.

13           So, first, what will the evidence show?

14           You're going to learn that in December 2018, the

15  defendant and his wife had a conversation with their business

16  partner, a man named Brian Kolfage.  Kolfage was a veteran who

17  had become an internet celebrity.  Together, they created a

18  fundraiser on GoFundMe.com.

19           Now, you are going to learn that GoFundMe is a website

20  where people raise money online.  Basically, you post your

21  fundraiser on the website, people learn about it online, and

22  then you can raise money through donations through the website.

23  And their GoFundMe fundraiser was called We Build the Wall.

24           Now, at the time that the defendant and his partners

25  started this fundraiser, there was a lot of talk about building

M5o3she1                         Opening - Ms. Moe

1    a wall along the southern border.  Politicians were talking

2    about whether to build a wall and how to pay for it.  When the

3    defendant and his partners first started this fundraiser, they

4    told donors that they were raising money to give to the

5    government so that the government could build a wall.

6         From the very beginning of the fundraiser, Kolfage was

7    the public face, while the defendant and his wife worked behind

8    the scenes.  And in just a few days, millions of dollars came

9    in, mostly small donations, from hundreds of thousands of

10   people across the country, including folks right here in the

11   Southern District of New York.

12        But the government couldn't accept money from an

13   online fundraiser.  And the defendant and the people he was

14   working with didn't want to give back millions of dollars to

15   the donors.  So they came up with a new plan.  They set up a

16   nonprofit organization called We Build the Wall, and they told

17   donors that the money they had collected would now go to that

18   organization, and be used to build a wall along the southern

19   border.

20        Now, let me just pause here for a moment.  This case

21   is not about whether there should be a wall along the southern

22   border of the United States.  That is not a question you are

23   going to be asked to answer at this trial.  And this case isn't

24   about whether they did build a wall, and this case isn't about

25   whether the defendant did work for We Build the Wall.  You are

M5o3she1                         Opening - Ms. Moe

1    going to learn at this trial that they did build segments of a

2    wall along the southern border, and you are going to learn that

3    the defendant did work for We Build the Wall.

4              But let me be clear:  None of that made it okay for

5    the defendant to steal money from the organization at the same

6    time.  But that's exactly what he did.

7              Now, after the defendant and his partners set up the

8    We Build the Wall organization, some donors were suspicious.

9    It's one thing to donate money to the government, but it was

10   another thing to donate to this new organization that was

11   untested and had no track record.  So people started asking

12   questions.  How was We Build the Wall actually going to spend

13   the donors' money?  And how could they be sure that the people

14   behind We Build the Wall wouldn't take some of that money for

15   themselves?

16             So, in order to keep the donations coming in, in order

17   to keep that money machine going, the defendant and his

18   partners promised on the GoFundMe website and on the website

19   for We Build the Wall that 100 percent of the money would go to

20   building the wall, and that not a single penny would go to its

21   president, Kolfage.  Those same promises were repeated in

22   social media, on posts, and in e-mails that went to donors.

23             But the defendant and his partners wanted some that

24   was money for themselves.  You are going to see e-mails and

25   text messages that the defendant sent showing that, all along,

M5o3she1                          Opening - Ms. Moe

1   he and his partners were looking for an angle to take a cut of

2   the money.

3           So they made a secret agreement.  Kolfage would

4   secretly be paid $100,000 out of the donated money, and then

5   he'd get about $20,000 every month after that.  The defendant,

6   his wife, and their partners in crime, they would also get a

7   cut of the money.  But of course, they couldn't just write big

8   checks to themselves from We Build the Wall.  They didn't want

9   to get caught stealing.  So they figured out a way to secretly

10  steal some of the money that had been donated.

11          Here's how they did it.  The defendant submitted fake

12  invoices and payment requests to We Build the Wall.  The

13  defendant would take a bill for real work and mark it up to a

14  higher number, and sometimes he just doubled it.  And then he'd

15  request that We Build the Wall reimburse him for expenses that

16  weren't real.

17          Now, in order to hide what was going on, the defendant

18  created a new company, it was a shell company, a company that

19  existed only on paper.  He gave the company a vague sounding

20  name, Ranch Property Marketing and Management.  It had a simple

21  website to make it look legitimate, even though it wasn't.  And

22  then the defendant billed We Build the Wall from the shell

23  company.

24          The defendant was able to pull off this scam because

25  his partners in crime had access to the bank accounts.

M5o3she1                          Opening – Ms. Moe

1    Kolfage, his business partner, was the president, and they made

2    the defendant's wife the treasurer so that she was in charge of

3    We Build the Wall's finances.  But that was just half of the

4    scheme.  Once the defendant got paid, he kept his cut of the

5    money, and he kicked back money to Kolfage.  The defendant was

6    making illegal kickback payments to Kolfage, the president, his

7    partner, because they were stealing this money together and

8    they both got a cut of the money.

9              And the defendant put down fake reasons for those

10   payments, too.  The checks from the defendant to Kolfage said

11   that the payments were for things like social media, or making

12   Facebook pages.  But none of that was real.  Over and over the

13   defendant funneled money through his shell company.  The

14   defendant submitted a fraudulent invoice, then he got a payment

15   from We Build the Wall, then he kicked back money to Kolfage.

16             Invoice, payment, kickback.  Again and again.

17             That's how the defendant laundered money to hide the

18   fraud scheme.  That's how the defendant stole hundreds of

19   thousands of dollars.

20             Now, you're going to learn that there were other

21   members of this fraud scheme and they were also stealing money

22   from We Build the Wall and paying kickbacks, too.  Some months,

23   the money would be laundered through the defendant's shell

24   corporation.  And in other months, other partners in this

25   scheme would launder money by passing it through the bank

1    accounts of other people.  They were all playing different

2    roles in the same scam.  It was a coordinated scheme to steal

3    money from the organization and pay kickbacks.

4           Now, when the defendant took money from We Build the

5    Wall and paid kickbacks to Kolfage, the defendant defrauded

6    donors to We Build the Wall who had been promised that Kolfage

7    wouldn't take a penny.  That 100 percent of the money would go

8    to building the wall.  And We Build the Wall was a victim, too.

9    Because the defendant was stealing money from the organization

10   to pay illegal kickbacks.  He and his partners betrayed the

11   loyalty that Kolfage owed to We Build the Wall as its

12   president.  They were committing fraud, plain and simple.

13          Now, you're going to learn that in October of 2019,

14   the defendant found out that there was a criminal investigation

15   relating to We Build the Wall.  He learned that federal

16   investigators right here in Manhattan had asked their bank for

17   copies of We Build the Wall's bank records.  Now, that

18   investigation was supposed to be secret.  By law, the bank

19   wasn't allowed to tell anyone about the investigation.  But a

20   bank employee made a mistake, and he told We Build the Wall's

21   lawyer about the request.  And when that happened, word

22   traveled fast right back to the defendant.

23          When the defendant learned about the criminal

24   investigation, he was worried.  He knew what he was doing was

25   wrong and illegal, because, at this point, he had stolen

M5o3she1                           Opening – Ms. Moe

1    hundreds of thousands of dollars from We Build the Wall and

2    laundered that money through a shell corporation.  He knew that

3    a day like today might be coming.

4            So when he found out about the investigation, what did

5    he do?  He doubled down on all of the lies.  He signed a phony

6    document to create a cover story and obstruct the

7    investigation.  Just days after learning about the

8    investigation, the defendant signed a fake contract to make it

9    look like all of the illegal kickback payments he had been

10   paying were legitimate.  You are going to learn that that

11   contract was backdated.  It was made to look like it was

12   actually signed six months earlier, before the defendant knew

13   about the criminal investigation.  But the document was fake,

14   and he got caught.

15           That is what the evidence at this trial will show.

16   For his role in this scheme, the defendant is charged in three

17   counts.  First, he's charged with participating in a conspiracy

18   to commit wire fraud.  You are going to learn that a conspiracy

19   just means an agreement with other people to do something

20   illegal.  And the evidence will show that this was an agreement

21   between the defendant, Kolfage, and his partners in crime to

22   commit fraud on the donors to We Build the Wall, and to commit

23   fraud on We Build the Wall itself, by stealing money and using

24   some of that money to pay illegal kickbacks to Kolfage.

25           Second, the defendant is charged with participating in

M5o3she1                         Opening - Ms. Moe

1    a conspiracy to launder money.  The evidence will show that the

2    defendant agreed with his partners to launder the money that

3    they stole from We Build the Wall through the defendant's shell

4    company in order to hide their fraud scheme.

5           And third, the defendant is charged with using a fake

6    document to try to cover up his crimes and fool federal

7    investigators.

8           Now, how will we prove to you that the defendant

9    committed the crimes he's charged with?  You are going to see

10   the defendant's own words.  You'll see e-mails and text

11   messages between the defendant and Kolfage.  You'll see the

12   messages in which they hatch the plan for stealing the money

13   and paying illegal kickbacks.

14          You'll see them talking about keeping the payments

15   secret and joking about going to prison if they didn't cover up

16   their crimes.

17          You are going to see the promises that the defendant's

18   partners made in order to get the donors to make donations.

19   The lies that donors were told.  You'll also hear from donors.

20   People who gave money.  Victims.  They'll tell you that they

21   felt comfortable donating to We Build the Wall because there

22   were assurances that all of the money was going to go to

23   building a wall.

24          And you are going to see how the defendant tried to

25   conceal the money he stole from We Build the Wall.  At this

1    trial, you will follow the stolen money, and see where it went:

2    To the defendant and his partners.  You'll see that hundreds of

3    thousands of dollars were being laundered by the defendant

4    through his shell company.  You'll see that the defendant was

5    taking money for himself, and also paying illegal kickbacks to

6    Kolfage.

7          And finally, you'll see the fake documents the

8    defendant and his partners made to cover up their scheme.

9    Inflated invoices, backdated documents, and checks and bank

10   documents listing fake reasons for the payments.

11         You are going to see a lot of evidence and hear from a

12   number of witnesses at this trial.  The evidence will come in

13   piece by piece, and it won't always come in perfect

14   chronological order.  But by the end of the trial, you are

15   going to see how it all fits together, how it proves beyond a

16   reasonable doubt that the defendant is guilty.

17         Now, I am going to sit down in just a moment.  But

18   before I do, I want to ask you to do three things at this

19   trial.  First, please pay close attention to the evidence.  And

20   second, please listen carefully to Judge Torres and her

21   instructions on the law.  And third, as you consider the

22   evidence at this trial, use your common sense.  The same common

23   sense you use every day in your own lives.

24         Now if you do those three things, the defendant will

25   get a fair trial, and the government will get a fair trial.

M5o3she1                         Opening – Mr. Meringolo

1   And at the end of the trial, you will reach the only verdict

2   consistent with the evidence, the law, and your common sense.

3   The defendant is guilty.

4           THE COURT:  Now, you will hear the opening statement

5   of the defense by Mr. John Meringolo.

6           MR. MERINGOLO:  Good morning, ladies and gentlemen.

7   My name is John Meringolo.  Along with Clara Kalhous, Angelica

8   Cappellino, we represent Timothy Shea.

9           We all have roles here in the courtroom.  The

10  prosecutors are prosecuting Mr. Shea, I'm defending him, and

11  Judge Torres is the guardian of the law.

12          I'm not going to sit here and read.  I didn't prepare

13  a script for you, ladies and gentlemen, but I've taken notes on

14  what the prosecutor said and I'm going to try to rebut to see

15  if I can if I can rebut to help Tim Shea.  Okay?

16          So, I want you to hear, I come here to tell you the

17  truth.  That's what I am going to do.  Okay?  The truth.

18          What's the truth?  Brian Kolfage, he's an internet

19  celebrity.  Right?  That's what the government said.  They just

20  said he is an internet celebrity.  Brian Kolfage is a veteran

21  who got blown up by a rocket.  Okay.  A rocket.  No legs, no

22  arm, and another arm sewed back on.  Okay.  I don't think he

23  wanted to become an internet celebrity.  Okay.  So let's just

24  start there.

25          There is another side to this story.  I'm not, after

M5o3she1                      Opening - Mr. Meringolo

1    the prosecutor gets up here and talks, I am not going to run

2    out because that's -- we're guilty.

3           They said a few other things here and I'm going to go

4    through them one by one, and the evidence is going to show, the

5    government came up here and said it was a shell company.

6    Right.  A shell company.  Ranch Property Management was a shell

7    company.  Okay.  That's a charged word.  It is actually not a

8    legal word, it is not term of art, it is some prejudicial word.

9    Maybe some of you said why didn't Meringolo object to that?

10   You know what?  I wanted it in evidence.  I want you all,

11   ladies and gentlemen of the jury, to hear what the government

12   has said.  It is a shell company.  Okay.

13          So what's a shell company?  A shell company is

14   something, and we know, we're New Yorkers.  A shell company is

15   something that you just open, you push money through, you push

16   money out, you give what the government said in their opening,

17   a kickback.  But maybe there is evidence of work.  Maybe Tim

18   Shea worked.  Okay.  Maybe Tim Shea and his friend and business

19   partner for a long time, Brian Kolfage, decided to do this We

20   Build the Wall and build a wall on the southern border.  And

21   whatever your political views, we're New Yorkers, maybe we

22   don't like the wall.  Okay.  But that has nothing to do with

23   this case.  okay.  That has nothing to do with this case.

24          So this internet celebrity who has no legs and no arm

25   and another arm tied back to his -- they do a GoFundMe.  Okay

M5o3she1                        Opening - Mr. Meringolo

1    they believe, and they believe in legal immigration, but they

2    believe in the wall.  That's what they believe.  Maybe we don't

3    believe it, but that's what they believe.  Okay.

4           And there is nothing wrong with us all having

5    different views in this world.  That's what makes us great.

6    That's what makes the country great when you really get down to

7    it.

8           So the evidence will show, they raised $25 million

9    with this GoFundMe.  You know what they wanted to do?  They

10   went to Washington, D.C., right and they tried to dump -- drop

11   the check right in the government.  And the government said you

12   know what, we don't want that check.

13          So they raised all this money through GoFundMe, they

14   didn't have any intention, there is no specific intent, the

15   government can't produce any evidence whatsoever that there was

16   specific intent when they raised all this money and they

17   brought that check to Washington, and they said we want to give

18   this check to the administration, and let's get out of here,

19   let's go do our social media companies, what we've been doing

20   for the last few years.  That's what the evidence will show.

21   So where is the specific intent when you want to drop the

22   check?  There is none.

23          Now, they meet this gentleman by the name of Steve

24   Bannon.  Brian -- what's his name -- Brian Kolfage meets Steve

25   Bannon they said we should do a charity.  We should do a

1    charity or a nonprofit.  Forgive me, because I am going to mess

2    up a little bit.  It is just who I am.  I'm not scripted.  I am

3    just going to try to talk to you the way I know how to talk.

4            So, there is, they open this nonprofit, and what you

5    have to do when you have a GoFundMe, is they have, the people

6    who donated that thought it was going to go to the wall, and

7    they are going to drop the check, they had to opt in.  So the

8    $25 million that they got, they had to opt back in to say okay,

9    it's okay for the charity.  Right.  So they opted in and they

10   opened this nonprofit in approximately January.

11           And one gentleman, I would love you guys if you would

12   write his name down, is attorney Richard Kaye.  Okay.  I want

13   you to remember that name, attorney Richard Kaye.  Now he is a

14   lawyer at -- what's the law firm.  Barnes & Thornburg.  Okay.

15   He's the lawyer for the charity, for the nonprofit at Barnes &

16   Thornburg.

17           Just to put Barnes & Thornburg in perspective, it is a

18   major law firm.  Okay.  It is not some guy like me who works

19   out of my basement.  They wouldn't even let me go in the door.

20   Okay.  So he's the counsel.  And now they have this nonprofit

21   with Steve Bannon and Kris Kobach and Brian Kolfage and my

22   client's wife Amanda Shea.  They said we are going to build the

23   wall.  Right.

24           So we went from, ladies and gentlemen, do the

25   GoFundMe, dropping the check, to say we are going to do a

M5o3she1                           Opening - Mr. Meringolo

1    startup and we're going to build the wall.  Okay.

2           Now, if anyone's working, like Tim Shea's working,

3    right, at the southern border, you should get paid, right?

4    He's not a board of director.  He was getting paid and he did

5    work and the evidence will show he did work.  That it's not one

6    of these shell companies.

7           And I submit to you that if it's not a shell company,

8    they've not proven their case beyond a reasonable doubt and

9    that he's not guilty.

10          Okay.  So Tim Shea and everybody, they actually build

11   a wall.  They build two walls.  And the evidence will show in

12   this case that one wall that they built in New Mexico -- New

13   Mexico.  One wall they built in New Mexico, the Army Corps of

14   Engineers said it couldn't be done, or if it was going to be

15   done, it would cost $41 million and take two years.

16          So Tim's part of the team that builds this wall,

17   whether you like it or not, they build it in 17 days for $6

18   million or $8 million.

19          So they build a wall with the money.  If we let our

20   government do it, it would have cost 30 more million or close

21   to 30 more million and took another two years.  So maybe they

22   should hire them to do our roads in New York.

23          So this wasn't something where we devised a shell, and

24   the evidence will show that we built that wall and we built

25   another wall.  And Ranch Property Management, not a shell

M5o3she1                    Opening - Mr. Meringolo

1    company.  Why is it called Ranch Property Management?  Because

2    all the properties on the southern border are ranch properties.

3    And part of Tim's job, because he is a real estate agent by

4    trade, and he was, they just figured they were going to do this

5    thing after they didn't accept the check, the government, is

6    finding property.  And the evidence is going to show that Tim

7    actually tried to find property.  That was one of his jobs that

8    went through ranch property, ladies and gentlemen.  Not a shell

9    company like the government said.

10          Another one of his jobs was he, and through Ranch

11   Property, took a lead on the security, a lead of the security.

12   And what do you mean by security.  Yes, security of events at

13   the southern border, security -- evidence will show security of

14   events in Detroit, security of events in Cincinnati.

15          So, shell company, if it is not a shell company like

16   the government just represented to you, that's one of the

17   elements that they are going to use, I respectfully submit you

18   should vote not guilty.

19          So in addition to that, not only did he try to find

20   land that he provided security, and let's digress.  I haven't

21   been to the southern border.  The southern border is dangerous.

22   Okay.  Like it or not, the southern border is dangerous.  I

23   believe we'll have Kris Kobach on the stand, and the evidence

24   will show that there is human trafficking, that there is drug

25   trades, I mean we all know the drug trades, and a lot of bad

M5o3she1                    Opening - Mr. Meringolo

1    things happen at the southern border.  And that's probably why

2    they wanted to build these particular walls.  And we'll go into

3    one wall, why it was built with Mr. Kobach when he's on the

4    stand.

5         So, whatever your political views are, this isn't a

6    shell company.

7         In addition to that, Mr. Shea did social media.  And

8    that's what him and his wife do.  That's what they do, partly.

9    He is a real estate broker, but they partly do social media and

10   they've done social media, which is another company I want you

11   to guys to remember is called Freedom Daily.  Now, Freedom

12   Daily, the evidence will show, is Brian Kolfage's company.  And

13   you know what, just wait for some of these cross-examinations.

14   That's the one thing I ask you guys to do is to keep in mind --

15   I don't want to just be up here for an hour and talk about the

16   whole case.  But just keep in mind of some of the

17   cross-examinations.

18        Now, these kickbacks, did Tim earn the money at Ranch

19   Properties?  Yes.  Did he give it back to Brian?  Some of it.

20   And why did he give it back?  The government is saying they

21   gave it back because of this phony deal, phony contract.  That

22   We Build the Wall got a subpoena from the government here.

23   Okay.  So when they did get a subpoena, who did they call?

24   Richard Kaye.

25        Now, I am hoping the evidence will show through

1   metadata that the contract that the government just said was

2   fake comes from Richard Kaye's e-mail, the lawyer from Barnes &

3   Thornburg, the big law firm that We Build the Wall paid

4   $700,000 collectively to, and the guy was answering the

5   subpoena.

6          Now, what's wrong if you got a subpoena, and you

7   called your lawyer.  What's wrong if you got a subpoena and

8   everybody called each other.

9          So the government's going to introduce a chart on

10  October 10 and say, Bannon called Richard Kaye, Tim called his

11  wife.  Respectfully, submitted Tim called his wife every day.

12  Okay.  So there is nothing wrong with that.

13         If you get a lawsuit, you get a subpoena, you are

14  going to call a lawyer.  You are going to call the people that

15  are going to represent you.  You are going to call people

16  within the company.  Okay.

17         So, the other things that the government was saying

18  that it's not legitimate.  They also said that there were

19  invoice payments, right.  That they marked, that Tim marked up

20  invoice payments.

21         So the evidence will show that Tim had a drone.  They

22  wanted to do a video, we'll see the video I hope.  We'll see,

23  the evidence may show the video itself and they needed drone

24  footage.  Believe it or not, I hope some of you know drone

25  footage is very expensive.  Especially getting somebody to go

M5o3she1                        Opening – Mr. Meringolo

1    to the southern border.

2             So Tim sent the invoice and Tim got paid.  And when

3    Tim sent an invoice for security, and he marked it up, he got

4    paid.  It's okay to get paid for work.  You will never see Tim

5    Shea ever say I don't want to get paid for work that I'm

6    working on the southern border, and how violent it is.  Okay.

7             Now we have these text messages, and I think the

8    government, they said on one of the text messages on their

9    opening, they said ladies and gentlemen, they said, this was

10   the text message that the government said.  Now, while I try to

11   find this, has anybody ever misinterpreted a text message or

12   had a loved one misinterpret a text message from you or a

13   friend misinterpret a text message from you?  Has that ever

14   happened before?  Okay.

15            So here's what the government said.  There is going to

16   be a text message, right.  Like the shell company.  There is

17   going to be a text message where Tim Shea says, and this is --

18   I'm just reading this one, one text message to Brian.

19            We need a solid -- I don't curse -- F'ing plan

20   otherwise we go to prison.

21            Now that's what the government said on their opening.

22   Let me tell you, we need a solid plan or we're going to go to

23   prison.  Am I just going to leave now and that's the end of the

24   case?  Absolutely not.  You know what?  Because I am going to

25   read the whole text message.  I am going to read what the text

1    message and the other 30 things that were before it, what did

2    it mean.

3           So they are talking about the wall.  They're talking

4    about that they need a Spanish interpreter.  And then right

5    above where we need a solid plan or we're all going to prison,

6    they said, you know, they're scared, the evidence will show.

7    They're scared of Mexican cartels.  And then Mr. Kolfage will

8    say the NM people -- meaning New Mexican people -- we got it

9    locked and loaded.  Maybe we offer security.  Tim says maybe we

10   offer security to them and then they don't care, the evidence

11   will show, we're offering them mega money.  Erik Prince people.

12          Now, Erik Prince, whether you know him or not -- I

13   didn't know him until a few days ago -- he's a multibillionaire

14   guy who does a lot of work around the whole world.  Whether it

15   be he is a former Navy SEAL, he is a guy that has money I can't

16   even imagine.

17          And then they go, and Brian Kolfage says they were

18   stupid.  Meaning the billionaire.  They say Trump is building

19   the wall.  Okay.  Brian Kolfage says they think Trump is

20   building the wall, and Brian Kolfage says Kris even showed them

21   where he's not building in the area.  And Tim Shea uses a curse

22   word, F-U-C-K, and then says we got AZ people.  That's Arizona

23   people, referring to the wall.  And then Brian says we are

24   good.  And then Tim says, we need a solid F'ing plan otherwise

25   we go to prison.

1            Now what does that have to do with the shell, with the

2   kickback, when they're talking about contracting.  So anyone

3   who has ever done contracting, anyone who has ever worked in

4   construction, you know you need permits, you know you need

5   concrete, you know you need steel, and that's what the evidence

6   will show.  We're New Yorkers.  What happens when there' no

7   permits and someone gets hurt or the concrete is not laid

8   right.  What happens?  You get hurt, you go to jail.  There are

9    a lot of people around.

10           So where they are saying, oh, let me show the kickback

11  or we're going to go to jail.  Or are we talking about

12  construction.

13           I can go over -- and I will go over -- all the text

14  messages.  But be careful when we have a text message from

15  March on the chart and then the next text message is over here

16  from April and then they want to pull a wire transfer from May.

17  Then they give you a nice chart and say, look, we're all going

18  to jail.  We got the money, it is kicking back.

19           I submit to you, ladies and gentlemen, that's the

20  evidence that's going to be presented to you.  And I am going

21  to take this all apart, and I ask you to keep an open mind.  I

22  will take this all apart on summation.  And the only verdict

23  that you are going to be is not guilty.  If they don't prove

24  every element of every single crime beyond a reasonable doubt.

25  And Judge Torres will give you what beyond a reasonable doubt

1   is.

2           So, to sum up here, when we have -- I didn't do

3   anything I prepared.  But, when you have the government saying

4   these things, and pulling five e-mails, six e-mails out of

5   125,000, and a few text messages and putting it in a chart and

6   saying this is gospel, you have to read the whole thing.  Okay.

7           And listen, if they prove the case beyond a reasonable

8   doubt, then vote him guilty.  Okay.  If the evidence -- if

9   somebody gets up there on this stand, ladies and gentlemen, and

10  says, Tim Shea conspired with me or I know he conspired with

11  someone else to get kickbacks, convict him.  Okay.

12          Another thing that the evidence may show, I'm not

13  100 percent sure, it may show that Tim was indicted 20 months

14  ago and we've been waiting for you guys for 20 months.  And the

15  evidence will show Tim was indicted in August of 2020.  I don't

16  know if this is 100 percent, don't hold me to it.  The evidence

17  may show every single witness that's going to get on this stand

18  and talk about this case was never interviewed before the

19  indictment.  It was interviewed after the indictment.  Okay.

20  Take that what you will.  Okay.  I can't really make arguments

21  on that.

22          So, in addition to this, you have, oh, the

23  government's going to say that Mr. Shea -- they didn't say this

24  in their opening, the government will say Mr. Shea took a loan

25  for another company he had for $34,000 for it's called Winning

1   Energy.  Right.  So, not a shell company, clearly not a shell
2   company.  My father came to see me so I won't put a hat on
3   inside.  They have a hat the evidence may show.  They have
4   drinks the evidence may show.  Okay.  Maybe he bought drinks
5   and gave them away.  I think 30, 40,000 drinks.  They are going
6   to say that the, they are going to say, the government, that
7   that was wrong that he took a loan.
8            But ladies and gentlemen, when you take a loan, and
9   they took a loan from the nonprofit, and the loan was a 10
10  percent return, not bad in these days, right, 10 percent we'd
11  all take it probably.  10 percent return.  What happens when
12  you take a loan?  What do you do when you take a loan?  You pay
13  a loan back.  Right.  You paying this loan back with interest.
14  And that's the common sense, that's why we're here in front of
15  you, ladies and gentlemen.  In front of you New Yorkers.
16           If we were here kickbacks, stealing, devising schemes
17  and all this, why are we opening another company, and taking a
18  loan out.  Ask yourself why are they opening another company
19  and taking a loan out.
20           You know, maybe the evidence will show these guys
21  never built a wall at the southern border.  That they were in
22  over their head.  everybody knows if you have a startup company
23  how difficult it is, right, on what to do.
24           Tim Shea is a real estate broker.  His wife is a
25  social media guy.  This other guy has no legs and no arm.  They

M5o3she1                          Opening – Mr. Meringolo

1    took on to build the wall.  That's what the evidence is going

2    to show.

3           And does money go into Tim -- I'm honest.  Does the

4    money go into Tim's account?  And into Brian Kolfage's account?

5    The answer is yes.  The answer is yes.  But I'm asking you,

6    please wait for the cross-examination.  I'm asking you please

7    wait.  I'm not disputing that money going from Ranch to

8    Kolfage.

9           The other thing, ladies and gentlemen, they are going

10   to put a tax guy up there.  Right.  And the tax guy is going to

11   say, the evidence is going to show that Tim left things out.

12   Okay.  Tim and his wife, that year was a great year for them.

13   They grossed about 415.  Don't hold me to it.  It's about that.

14   Tim pays taxes on all of the money.  The money he gives to

15   Brian Kolfage.  Anybody who has ever done their tax returns, I

16   told him the other day, why didn't you pull your credit card

17   and write the expenses off to this?  Maybe everything was going

18   on.  He's entitled to actually amend it right now and actually

19   save money on the taxes.

20          Also, the evidence will show, through that tax return,

21   is that's the money he gave Brian Kolfage.  So he gives Brian

22   Kolfage aftertax dollars.  Right.  Now, I respectfully submit

23   we're still in the United States, no one can tell me what any

24   of us could do with aftertax dollars.  If you want to buy

25   Bitcoin.  You want to buy a list.  You want to give it charity.

M5o3she1                    Opening - Mr. Meringolo

1   You want to go to Vegas and put it on black.  You do what you

2   want.

3                  These two gentlemen had a handshake deal.  They had a

4   handshake deal.  You know what that is?  A handshake deal to

5   buy the list.  That's what the evidence will show.  And now the

6   government wants to say it's nefarious, that the lawyer was

7   cleaning up the records, okay.  It is not that they didn't

8   intend to -- they didn't intend to do a contract because they

9   had a handshake.  And maybe, maybe, if Tim's lucky, there may

10  be evidence to show before the indictment that he said that it

11  was a list.  You know.  Maybe there is evidence.  I don't know

12  if I can get that to you, but maybe there is evidence to show

13  what his state of mind, as we would say.  His state of mind was

14  about the list.

15                 So, you can have a handshake deal and then memorialize

16  it.  There is nothing nefarious about that.  There is no shell

17  this, shell that.  You can memorialize an oral contract.  I'm

18  not giving you the law, because, I don't even do that law.  I

19  know you can have a handshake deal and memorialize a contract.

20                 If the government doesn't prove these things beyond a

21  reasonable doubt, whatever feelings you have about me, about

22  Tim, about Clara, about Ang, you have to vote not guilty.

23                 The reason we're here, we can't take wholesale of what

24  the government says.  And I gave you that example right there,

25  with the text message that when you are deliberating, take that

M5o3she1                          Gordon - Direct

1    text message, take their chart, take that text message and read

2    it.  And then there will be other things I'll explain to you.

3              Anything taken out of context, pulling from the sky

4    and implementing it, you can make anything sound bad.  Okay.

5              So with that, thank you for listening to me.  I

6    respectfully submit, if I do my job at the end of the case, you

7    will vote not guilty because they didn't prove the case beyond

8    a reasonable doubt.

9              But the other thing I think you'll do is when you are

10   on the train going home, you'll say, that wasn't nice what they

11   did to Tim Shea.  That wasn't nice.  That wasn't a shell

12   company.  This guy worked.  And we're working people, and when

13   we are working people, you get paid.  I'll prove to you that it

14   wasn't just one way.  Thank you very much.

15             THE COURT:  The government may call its first witness.

16             MS. MOE:  Thank you, your Honor.  The government calls

17   Daniel Gordon.

18             Would the Court like Mr. Gordon to remove his mask?

19             THE COURT:  You may remove your mask.

20             MS. MOE:  Thank you, your Honor.

21    DANIEL GORDON,

22         called as a witness by the Government,

23         having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MS. MOE:

M5o3she1                        Gordon - Direct

1    Q.   Good morning, Mr. Gordon.

2    A.   Good morning.

3    Q.   Can you tell us where do you work?

4    A.   I currently work at a company called Flexible Finance.

5    Q.   How long have you worked there?

6    A.   About eight months now.

7    Q.   Where did you work before you worked at Flexible Finance?

8    A.   I worked for GoFundMe.

9    Q.   During what years did you work for GoFundMe?

10   A.   From 2016 through toward the end of 2020.

11   Q.   Can you explain for the jury what is GoFundMe?

12   A.   GoFundMe is an online fundraising platform where people we

13   call campaign organizers can set up fundraisers to raise money.

14   And others called donors can gift money to those campaigns.

15   Q.   What titles did you hold when you worked at GoFundMe?

16   A.   I started as a vice president of trust policy and

17   communications.  And then after a couple years, I was chief

18   business officer.

19   Q.   You mentioned you had a role on trust policy and

20   communications.  What does that team do at GoFundMe?

21   A.   So the trust policy communications teams, they first and

22   foremost protect the platform from any misuse or violations of

23   our terms of service, our acceptable use policy.  They also set

24   the policy.  So what should GoFundMe allow on its platform what

25   should it not.  They protect all the donors and the donations

1    through our donor protection policies, as well as our donor

2    guarantee we have against fraud.  And then we also coordinate

3    with government stakeholders and law enforcement as needed.

4    Q.  What was your role on that team?

5    A.  So I created the team.  Then I built it out to its current

6    state.

7    Q.  Mr. Gordon, are you an attorney?

8    A.  I am.

9    Q.  Before you became an attorney, what kind of work did you

10   do?

11   A.  I was in the Marine Corps as a captain.

12   Q.  Now a moment ago you were explaining what GoFundMe is.  I

13   want to ask you a bit more about that.

14          What kinds of things can someone raise money for on

15   GoFundMe.com?

16   A.  So generally, on GoFundMe, people can raise money for any

17   purpose as long as it does not violate our terms of service and

18   our acceptable use policies.

19   Q.  Can you please explain for the jury how someone would go

20   about setting up a GoFundMe campaign?

21   A.  Sure.  So GoFundMe has a website, and there is an app you

22   can download on to your phone.  If you want to start up a

23   GoFundMe, you can either do it from the app or from the

24   website.  You go ahead and provide the content on the page,

25   like you have to provide a description for what you want to

M5o3she1                              Gordon - Direct

1    raise money for, for whom, you have to provide some photographs

2    or a video.  Right.  And some information to GoFundMe about who

3    you are, and so we can identify you as well.

4    Q.  Once the campaign is set up at GoFundMe, what's the next

5    step in the fundraising process?

6    A.  So generally, when you're, when somebody is organizing a

7    fundraiser, they want to attract attention and prospective

8    donors, so the next step would be to share the campaign which

9    can be done via e-mail or social media, Twitter, Facebook, the

10   like.

11   Q.  How does someone go about donating to a GoFundMe campaign?

12   A.  So every GoFundMe campaign has a donate button, whether it

13   is on the app, or on the website.  And once somebody, a visitor

14   clicks on the donate button, they're taken to a fairly typical

15   online checkout like you might see on any other website where

16   the donor can enter their credit card or debit card or their

17   payment method, PayPal, for example.  And then go through a

18   checkout process that they would see on any other e-commerce

19   website.

20   Q.  In practical terms, once the donor clicks on that button

21   and enters out that form, where does the money go?

22   A.  So GoFundMe partners with a payment processor at a bank,

23   and the funds are held by the payment processor at that bank

24   until GoFundMe's policies authorize a release.

25   Q.  Why is it that the money doesn't immediately go to the

M5o3she1                          Gordon - Direct

1    person who set up the fundraiser?

2    A.   So, many fundraisers are not -- the purpose of the

3    fundraiser is not to give money directly to that individual.

4    They might be for a different purpose, maybe to an organization

5    or a different person.  And what I, what we built at GoFundMe

6    was this separation of sort of the storytelling about the

7    fundraiser from the movement of money in order to protect that

8    money, to ensure that it goes to the destination, to the

9    recipient that the fundraiser was intended to send it to.

10        So we want to make sure if there is any checks that

11   need to be done, sometimes the campaign or the individual

12   behind the campaign can create some automated check in our

13   system, and we need to clear that before we're willing to

14   release the money.

15   Q.   Can an organizer of a GoFundMe campaign change the

16   fundraising page for that campaign once people have started

17   donating?

18        THE COURT:  One moment, please.  What do you mean when

19   you say that a person behind the campaign can create an

20   automated check?

21        THE WITNESS:  Oh, sorry, your Honor.  So, no GoFundMe

22   has, we have a series of checks that are automated.  The

23   GoFundMe trust and safety team has built a combination of

24   machine and people review, right, of the different fundraisers

25   was what I meant to say.  So, as an individual would start a

M5o3she1                          Gordon - Direct

1   GoFundMe, the content on that that they wrote to put on the

2   page or maybe something about how they indicated who they were

3   as an individual could trigger a flag, either via machine that

4   identifies that flag or a person at GoFundMe who reviewed the

5   campaign and flagged something.  And then that would be a

6   reason why we would not want to release funds immediately.

7   Because we want to make sure that the campaign is safe for

8   donors.

9   Q.  Mr. Gordon, once someone has donated to a campaign, once

10  the campaign is up and running and people are donating, can the

11  organizer of that campaign change the fundraising page on

12  GoFundMe.com?

13  A.  They can.  There are some rules around that though.

14  Q.  Can you please explain for the jury what rules there are at

15  GoFundMe about changing campaign pages after people have

16  started donating?

17  A.  So once -- the first principle is once a campaign has been

18  created, and people have donated, those donors gave money to

19  that campaign with the understanding that the terms on the

20  campaign would -- were representations made by the organizer

21  about how that organizer would use those funds or to whom they

22  would be given to.

23       If there is a change in those representations,

24  GoFundMe has what we call a change of use policy.  And that

25  change of use policy would require that all the existing donors

1    to that point would be given an opportunity to receive a refund

2    if they chose, if they wished.  So the policy would require

3    that the organizer notify all the existing donors of the

4    change, and then provide some period of time where the donors

5    who had already given money would have an opportunity to opt

6    out is what we call it, and say, I don't want to, I don't agree

7    with the new terms so I would like my money back.

8            That's one of the other reasons why we often will hold

9    the funds as well.  We don't want to release them because we

10   may need to give the donors back the money if that would occur.

11   Q.  Why does GoFundMe have a policy like that?

12   A.  Because ultimately, a GoFundMe is really an agreement

13   between an organizer who is saying I'm going to use your money,

14   your donations for a purpose.  And then the donors give money

15   after they read that purpose.

16           If the change -- if there was some change in the way

17   that those funds would be used, we view that as really a change

18   in the donor's understanding of how the campaign would work,

19   and we want to make sure we protect the donors above all by

20   giving them the opportunities to have a return if they wanted.

21   Q.  I want to switch gears now and ask you about a particular

22   campaign.

23           Are you familiar with the We Build the Wall campaign

24   at GoFundMe?

25   A.  Yes, I am.

M5o3she1                         Gordon - Direct

1    Q.  Approximately when did you first learn about that

2    particular campaign?

3    A.  I first learned about the wall campaign in mid

4    December 2018.

5    Q.  I want to ask you a bit more about this campaign.  But

6    before I do.

7            MS. MOE:  Your Honor, I'd like to offer a stipulation

8    between the parties which is Government Exhibit S4 and a number

9    of exhibits pursuant to that.  In particular, the government

10   offers Government Exhibit S4, and Government Exhibits 301, 306,

11   303, 307, 308, 309, 311, and Government Exhibits 402 through

12   408.

13           THE COURT:  First let me explain what a stipulation

14   is.  A stipulation is an agreement between the parties to

15   present evidence to the jury without calling a witness on that

16   subject matter.

17           Those items are admitted.

18           (Government's Exhibit S4, 301, 306, 303, 307, 308,

19   309, 311 received in evidence)

20           (Government's Exhibit 402 through 408 received in

21   evidence)

22           MS. MOE:  Thank you, your Honor.

23           Ms. Drescher, can we please publish what's now in

24   evidence as Government Exhibit S4 so we can take a look at

25   paragraph one.  Can we please highlight paragraph one.  And I'm

1    so sorry, Ms. Drescher, would you mind pulling it out so we can

2    see what's above paragraph one.  Let's start there first.

3             So it is hereby stipulated and agreed by the United

4    States of America and Timothy Shea, the defendant that.

5    Q.  And Mr. Gordon, can you please read that paragraph.

6    A.  Starting with number one?

7    Q.  Yes, please.  Thank you.

8    A.  Sure.

9             "Government Exhibits 301, 303, 306, 307, 308, 309 and

10   311 accurately reflect the GoFundMe campaign page that was

11   known as We the People Will Fund the Wall, We the People Will

12   Build the Wall, and We the People Built the Wall as of the

13   following dates which are reflected in each exhibit.

14            MS. MOE:  Ms. Drescher, can you please highlight the

15   chart below so the jury can see it.  Thank you.

16   Q.  I'd like to ask you, Mr. Gordon, about the first of these

17   exhibits, Government Exhibit 301.  So let's take a look at that

18   first.

19            Ms. Drescher, if you can please publish that.

20   Q.  Do you recognize this, Mr. Gordon?

21   A.  Yes, I do.

22   Q.  What are we looking at here?

23   A.  So this is the GoFundMe page for the We the People Will

24   Fund the Wall as of --

25            MS. MOE:  Ms. Drescher, can you highlight in the

M5o3she1                          Gordon - Direct

1    upper-right corner.

2    A.   Thank you.  As of December 18, 2018.

3    Q.   At the time the campaign was first brought to your

4    attention, what was the publicly stated purpose of the We Build

5    the Wall campaign?

6    A.   The publicly stated purpose of the campaign was to raise

7    money to give to the federal government, I think it was the

8    Trump administration, directly.  Money that would be used by

9    the government to build the border wall between the United

10   States and Mexico.

11           MS. MOE:  Ms. Drescher, we can turn to page three of

12   this exhibit.  Could you please highlight the bullet points at

13   the top.

14   Q.   Mr. Gordon, can you please read -- let me just take a step

15   back.

16           Are we now looking at text that's still on the same

17   GoFundMe page?

18   A.   Yes, you are.

19   Q.   Mr. Gordon, can you please read these bullet points for the

20   jury.

21   A.   "First.  100 percent of your donations will go to the Trump

22   wall.  If for any reason we don't reach our goal, we will

23   refund your donation.

24           "Second.  We are working with a law firm on a legal

25   document that will bind the government to using the funds for

M5o3she1                        Gordon - Direct

1    the border wall itself, nothing else.

2              "Third.  We will hold all funds and not release a

3    single penny until we have all legal aspects covered to ensure

4    our money goes only to the wall.

5              "And last, if we don't reach our goal or come

6    significantly close, we will refund every single penny."

7              MS. MOE:  Thank you, Ms. Drescher.  We can take that

8    down.

9    Q.  Mr. Gordon, what does it mean to be an organizer of a

10   GoFundMe campaign?

11   A.  So, I was explaining earlier that to start a GoFundMe, you

12   would go to the website and enter some information about the

13   campaign, the description for the campaign, information about

14   yourself.  That person who takes those actions, they are the

15   organizer.

16   Q.  Who was the organizer for this particular campaign?

17   A.  It was a gentleman named Brian Kolfage.

18             MS. MOE:  Ms. Drescher, can we please publish the

19   first page of 301 again.

20   Q.  Directing your attention to the date here.  What is the

21   date on which this campaign was initiated?

22   A.  It was initiated on December 16, 2018.

23   Q.  Approximately how soon after that did this particular

24   campaign come to your attention?

25   A.  Within 24 to 48 hours.

M5o3she1                      Gordon - Direct

Q.  In general when you worked at GoFundMe, why would a
particular fundraising campaign come to your attention?
A.  So as I said earlier, I was the head of this department, of
the trust and safety department.  So one of the mandates of
that department was to look for -- identify and potentially
escalate possible violations of our terms of service or
acceptable use policy.

     So, if there was a GoFundMe that maybe was
questionable about whether or not it did violate or there had
to be some other form of policy escalation, I was the senior
executive who would weigh in on those decisions.
Q.  What brought this particular campaign to your attention?
A.  So, my team had identified two concerns that they had.  The
first concern was that the purpose of the campaign expressly
stated was to give money to the federal government.  And we had
known from prior experience with fundraisers that were
attempting to give money to the federal government for a
variety of reasons, that there are rules against -- the
government itself has rules against that.  They can't accept
those types of funds.  And we have a term that says that a
campaign that would be impossible to complete would be a
violation of our terms.

     The second reason that this was brought to my
attention was that there was a statement made in the campaign
that if 100 percent of the funds weren't raised, that the

1   campaign organizer would refund all the donors.  That in and of

2   itself is not necessarily an issue, except that the goal of the

3   campaign was $200 million, which would have been several orders

4   of magnitude greater than any GoFundMe campaign had ever

5   raised, like in the history of the company to that point.

6            So, the combination of a very large goal and a

7   commitment in the campaign to refund all the donors if the goal

8   wasn't reached would potentially be an abuse of the platform.

9   Q.  In addition to those issues, was there anything about the

10  rate of the fundraising for this campaign that came to your

11  attention?

12  A.  Yes.  Thank you.  There is also -- this campaign was

13  raising money pretty quickly.  So I think within the first day

14  it raised over six figures.  Any time a GoFundMe is raising

15  money or having a number of visitors to its particular campaign

16  page that this campaign did would trigger a review by the team.

17           THE COURT:  Why?

18           THE WITNESS:  Because fundraisers that raise -- that

19  are going viral, as we would call it, they can attract the

20  potential for fraud.  They can -- if there are problems with

21  that type of campaign, it becomes a procedural headache to

22  figure out how to refund all the donors if we would need to,

23  for example.  And they can often take a life of their own very

24  quickly.  And we need to be -- in the best interests of the

25  donors and of the bank that our partner bank and their

M5o3she1                          Gordon - Direct

1    policies, we have to know what's -- we have to have a high

2    level of confidence very quickly in those campaigns.

3    BY MS. MOE:

4    Q.  Once these issues were brought to your attention, what was

5    your role in addressing those problems with this campaign?

6    A.  So, first, I agreed with the team that those, that the

7    concerns that they raised were very valid concerns.  And then

8    to supervise the team's efforts to work with the campaign

9    organizer to see if we could notify them of these potential

10   violations and see if they would put their campaign in

11   compliance.

12   Q.  Were you yourself involved in some of those discussions

13   with the campaign about these issues?

14   A.  I was.

15   Q.  Who else at GoFundMe do you recall participating in those

16   discussions with the campaign?

17   A.  We had another lawyer other than myself, we had several

18   members of our policy team who had been the ones to escalate,

19   and they continued to work on this particular campaign.  And we

20   had our, we had a customer support representative who was the

21   main point of contact as a support rep between the company and

22   the campaign organizer.

23   Q.  Who did you communicate with for this particular campaign

24   on the other side?

25   A.  Most of my communications were with the campaign's lawyer.

M5o3she1                          Gordon - Direct

1    Q.  Do you have any contact with anyone else at the campaign?

2    A.  I also had some contact with Brian Kolfage who was the

3    organizer.  There were a few others that were on e-mail threads

4    that I just don't recall right now.

5    Q.  All right.  So, you were explaining you had these

6    conversations with the campaign about coming into compliance

7    with GoFundMe's policies.  About how long did those

8    negotiations last?

9    A.  They lasted a couple weeks.  Through the new year.

10   Q.  While you were working through those issues, what did

11   GoFundMe do with the money that was being raised on the

12   platform?

13   A.  So the money continued to be held at our partner bank.  We

14   did not release any of the funds.

15   Q.  Earlier we were talking about the rate of fundraising.

16   During those weeks while you were negotiating over these

17   issues, what was the volume of donations like for this

18   particular campaign during the weeks you were working these

19   issues out?

20   A.  It remained high.  In the multiple millions of dollars.  I

21   don't recall the exact number.

22   Q.  Did there come a time during your negotiations about coming

23   into compliance with GoFundMe's policies that you learned that

24   Brian Kolfage's plan for the campaign had changed?

25   A.  Yes.

M5o3she1                          Gordon - Direct

1   Q.   Approximately when did you learn that?

2   A.   It was within a few days of January 1st.

3   Q.   What was your understanding at that point about how the

4   campaign was going to change?

5   A.   So, the campaign was going to change in at least two ways.

6   One was that all-or-nothing statement would be -- they wanted

7   to remove it.  Which, and then, second, rather than give the

8   money directly to the government, the new plan as proposed was

9   to create an organization that the funds could be sent to, and

10  that organization would partner with private landowners along

11  the U.S. Mexico border to build sections of wall on those

12  landowners' private property.

13  Q.   You're describing just now that the plan was to set up a

14  new organization.  What was your understanding of what type of

15  organization it was?  Was it a for-profit organization or a

16  not-for-profit?

17  A.   No.  The proposal was it would be a nonprofit organization

18  under Section 501 of the tax code.

19  Q.   So when you learned that they were planning to set up a

20  nonprofit organization, did you ask for any documents from the

21  campaign?

22  A.   Yes, we did.  We asked for the founding documents, charter

23  bylaws, the incorporating documents as well as the approval

24  documents from the state, think it was Florida where they were

25  going to apply for incorporation.

1              MS. MOE:  Ms. Drescher, if you could please show just

2      the witness what's been marked for identification as Government

3      Exhibit 302.

4      Q.  Do you recognize this?

5      A.  Yes, I do.

6      Q.  What is Government Exhibit 302?

7      A.  This is a copy of the articles of incorporation for We

8      Build the Wall, Inc. which was the name of the nonprofit

9      corporation that the organizers had founded.

10     Q.  Is this a fair and accurate copy of a document that the

11     campaign sent to you while you were working out these issues?

12     A.  Yes.

13             MS. MOE:  Your Honor, the government offers Government

14     Exhibit 302.

15             THE COURT:  Any objection?

16             MS. CAPPELLINO:  No objection, your Honor.

17             THE COURT:  It is admitted.

18             (Government's Exhibit 302 received in evidence)

19             MS. MOE:  Ms. Drescher, can we please publish that.

20     Q.  Before we talk about this document, why was it important

21     for you to obtain a copy of the articles of incorporation for

22     We Build the Wall?

23     A.  It was important that we review these documents because

24     both -- GoFundMe or our payment processor and the bank that is

25     regulated, all have an obligation to ensure that when money is

M5o3she1                         Gordon - Direct

1    being sent, that the recipient of the funds has been -- sort of

2    checked out to make sure that it's allowed under law, as well

3    as under all of our different company policies and the bank

4    policies to receive those funds.

5           In this instance, because the organization was so new,

6    there was no way for those checks to occur in the ordinary

7    course of business.  So, we needed to ask for the documentation

8    in order to get all the parties comfortable with releasing

9    funds.

10   Q.  So, taking a look at Government Exhibit 302.  Focusing on

11   Article III where it says purpose.  Could you please read for

12   the jury the purpose of this organization as it is listed in

13   the articles of incorporation.

14   A.  "The purpose for which the corporation is organized is:  To

15   promote social welfare within the meaning of Section 501(c)(4)

16   of the Internal Revenue Code, including, but not limited to,

17   funding, construction, administering, and maintaining a United

18   States southern border wall and the processes associated

19   therewith."

20          MS. MOE:  Thank you.  Ms. Drescher, we can take that

21   down.

22   Q.  So we've been talking about the campaign and this plan to

23   switch to a nonprofit organization.  We talked about this a

24   little bit earlier.  But can you remind us, what are GoFundMe's

25   policies when a campaign changes?

M5o3she1                      Gordon - Direct

1    A.   So when a campaign would change, we require that the

2    campaign organizers notify, usually it is via e-mail, all of

3    the donors that had already donated up to that point, telling

4    them of the new purpose, the new campaign purpose.  And then

5    the donors would have an opportunity, it's usually either one

6    or two weeks, to decide whether they would like a refund.  And

7    then at the end of that period, GoFundMe would go ahead and

8    release the funds.

9    Q.   Did you have any conversations with the campaign about this

10   policy?

11   A.   We did.

12   Q.   What did you discuss?

13   A.   So, we discussed that that policy didn't fit this

14   particular change in campaign use, because this change was so

15   material, right, so drastic, compared to the first campaign.

16   It was really closer to an entirely new campaign.  So, instead,

17   GoFundMe required that the campaign follow what we called an

18   opt-in policy.  So, you recall that the opt-out use of policy,

19   the donors have a period of time where they can choose whether

20   they want to opt-out of the campaign.  And if they notify

21   GoFundMe, via a form, or any other way, then we would refund

22   them.  But if they don't opt-out, then the funds just get

23   released and they are assumed to still be okay with the new

24   campaign terms.

25              In an opt-in policy, which is what we followed here,

M5o3she1                        Gordon - Direct

1    what we required here, the donors have to proactively tell

2    GoFundMe that they want to keep their money with the campaign.

3    And if they do that, then the funds can be released.  But, a

4    donor who either writes back to GoFundMe and says I want my

5    money back or I don't approve, or they do nothing, all of those

6    donations would be refunded after the opt-in window ended.

7    Q.  In your conversations with the campaign, after you raised

8    this policy, did you come to any agreement about how they were

9    going to move forward with the new campaign?

10   A.  We did.

11   Q.  What was that agreement?

12   A.  So the agreement was that the campaign would -- the

13   campaign organizers would create a new campaign description,

14   and it would be published on a certain day.  At the same time

15   the campaign would notify all the donors who had donated up to

16   that point of the change.  And that they, we would create a --

17   we approved of a 90-day opt-in window.  And there was a form

18   that donors could fill where they would have to affirmatively

19   check a box and say yes, I want my money to stay with the new

20   campaign.  After the 90 days, all the donations that came from

21   donors who opted in would be released to the campaign and to

22   this new organization.  And all the donations made by donors

23   who either wrote back and said -- and declined, right, they

24   affirmatively said no, or they just never responded, all that

25   money would be refunded.

M5o3she1                          Gordon - Direct

1    Q.  I believe you mentioned just now this was going to happen

2    on a particular day that this would be announced; is that

3    right?

4    A.  Correct.

5    Q.  On what day was this new change going to be announced?

6    A.  I believe it was January 11.

7    Q.  What year?

8    A.  2019.

9    Q.  Was that 2019?

10   A.  2019, yes.

11   Q.  I want to talk to you about January 11, 2019 in a moment,

12   but before we get there.  I want to talk to you about the days

13   leading up to that.

14        MS. MOE:  Ms. Drescher, can you please publish what's

15   in evidence as Government Exhibit 303.

16   Q.  So Mr. Gordon, what are we looking at here?

17   A.  So, this is the campaign page for the wall campaign on

18   GoFundMe as of January 8, 2019.

19   Q.  So just a few days before the opt-in program was announced?

20   A.  Correct.

21   Q.  According to the website here, at this point, approximately

22   how much had been donated?

23   A.  Over about 19 and a half million dollars.

24   Q.  And while we're talking about the amount listed on the

25   website.  Can you please explain for jury what this figure

M5o3she1                         Gordon - Direct

1   represents and how this number gets on the website?

2   A.   So the number represents the number of donations, which you

3   can see below, raised by 325,000 people over 22 days.   The

4   number above would reflect all of the online donations made to

5   the GoFundMe.   It could also include what we call offline

6   donations, because GoFundMe cannot accept checks directly.   So,

7   when a campaign provides proof of a check, they are allowed to

8   add the check amount to the number, to the total number as

9   well.

10        MS. MOE:   Ms. Drescher, we can take that down.

11   Q.   In the days leading up to January 11, 2019, what documents,

12   if any, did GoFundMe request from the organization to prepare

13   for the launch of the new campaign?

14   A.   So, as I said earlier, we requested some documents about

15   the 501(c)(4) organization.   And we also requested a copy of

16   the new campaign description that would have been posted on

17   January 11.

18   Q.   Why did GoFundMe want to review the revised campaign page

19   before it went out?

20   A.   We wanted to ensure that the revised campaign page would

21   comply with our acceptable use policies and terms of service.

22   Q.   I want to talk about that a little bit more.

23        MS. MOE:   Ms. Drescher, can you please show just the

24   witness what's been marked for identification as Government

25   Exhibit 305.

M5o3she1                        Gordon - Direct

1    Q.  Mr. Gordon, do you recognize this?

2    A.  Yes, I do.

3    Q.  What is Government Exhibit 305?

4    A.  This is an e-mail thread between Rich Kaye, who I mentioned

5    was the lawyer for the campaign organizers here, myself and

6    several other individuals from GoFundMe and from the campaign.

7    Q.  Is this a fair and accurate copy of an e-mail you received

8    on January 11, 2019?

9    A.  Yes.

10             MS. MOE:  Your Honor, the government offers Government

11   Exhibit 305.

12             MS. CAPPELLINO:  No objection, your Honor.

13             THE COURT:  It is admitted.

14             (Government's Exhibit 305 received in evidence)

15             MS. MOE:  Can we publish that, please.

16   Q.  Now that we are all looking at this document, if we could

17   highlight the header.  Without going into every e-mail here.

18   Just in general terms, who is this e-mail from and who is it

19   to?

20   A.  This e-mail is from Rich Kaye who was the campaign

21   organizer's lawyer.  It is to myself, Kim Wilford who was the

22   other lawyer from GoFundMe that I mentioned earlier, and Kelsey

23   Mathis who is the customer support representative from GoFundMe

24   that I mentioned earlier.  And then there are several

25   individuals that are copied on the e-mail, including Brian

1    Kolfage and two others.

2    Q.  We'll talk about this more in a moment.  But do you see

3    right beneath that, are there attachments to this e-mail?

4    A.  Yes, there were two.

5    Q.  We'll talk about that a little bit more in a moment.

6    Before we get there, I want to look at the text below in the

7    thread.  If we can blow that up.

8           So lower in this e-mail thread, is this an e-mail from

9    Rich Kaye to you and other people?

10   A.  Yes.

11   Q.  Could you please read this e-mail for the jury.

12   A.  I can.  There is a bit that's cut off on the right.

13   Q.  I'm sorry.  So Ms. Drescher --

14   A.  It looks like it's cut off in the actual exhibit.

15          MS. MOE:  Let me see if I can get you a paper copy.

16   Your Honor, may I approach the witness?

17          THE COURT:  You may.

18          MS. MOE:  Thank you.

19   A.  What would you like me to read?

20   Q.  Just for the record, I've handed the witness what's now in

21   evidence as Government Exhibit 305.

22          If you could take a look on the thread below, in the

23   full paragraph that starts "good morning," would you mind

24   reading that for the jury.

25   A.  Read the full paragraph?

1    Q.   Yes, please.   Thank you.

2    A.   "Good morning.   We are still waiting on the bank account

3    information, but expect to have shortly.   Attached please find

4    the revised GoFundMe announcement where I added 'I personally

5    will not take a penny of compensation from these donations.'

6    Highlighted for your convenience.   And the attached amended and

7    restated bylaws amending Section 8.4 to add 'The initial

8    president is Brian Kolfage.   Mr. Kolfage will take no salary

9    for the performance of his duties as president of the

10   corporation.'   We made these changes to coincide with Brian's

11   desire to apply all donated funds to the mission and in

12   response to the erroneous BuzzFeed story mentioned in Brian's

13   previous e-mail message.   Please let me know if this is

14   acceptable to GoFundMe.   Best regards Rich Kaye."

15   Q.   So the first half of this e-mail talks about some

16   documents.   So are those the documents we were talking about

17   earlier?

18   A.   Yes.

19   Q.   I want to talk about that in a moment.   First I want to ask

20   you about the second half of this e-mail, about BuzzFeed story.

21   Take a step back.

22        What was your understanding of what Rich Kaye was

23   communicating to you when you got this e-mail?

24   A.   So, Rich had told us that there was a story, a news story

25   on BuzzFeed, which is like an online news website of some sort,

1    that had mentioned that Brian Kolfage had done something

2    inappropriate with some funds that were not relevant -- that

3    were not necessarily related to this particular campaign that

4    had happened earlier.  And so, Brian Kolfage and Rich wanted to

5    add in some language in the campaign that we're -- that was

6    going to say that Brian would not take any compensation from

7    the donations.  And then they were going to amend the bylaws of

8    the organization to put some enforcement mechanism within the

9    bylaws themselves.

10   Q.   Now, did GoFundMe ask the campaign to promise donors that

11   none of the money would go to Brian Kolfage?

12   A.   Sorry.  Could you repeat the question?

13   Q.   Did GoFundMe ask the campaign to promise the donors that

14   none of the money would go to Brian Kolfage?

15   A.   No, we did not.

16   Q.   Whose idea was that?

17   A.   That was Brian's and/or Rich's idea.

18   Q.   So, taking a step back.  Let's go back to the top of the

19   e-mail.  We were talking about two attachments to this e-mail;

20   is that right?

21   A.   Correct.

22   Q.   So let's take a look at those two attachments.

23            MS. MOE:  If we could take that down, and show just

24   the witness what's been marked for identification as Government

25   Exhibits 305A and B just side by side.

1    Q.   What are these two documents?

2    A.   So these are the attachments that Rich Kaye had sent me in

3    the prior e-mail.

4              MS. MOE:   The government offers Government Exhibits

5    305A and 305B.

6              MS. CAPPELLINO:   No objection, your Honor.

7              THE COURT:   They are admitted.

8              (Government's Exhibit 305A, 305B received in evidence)

9    Q.   Let's turn first to Government Exhibit 305A.   What are we

10   looking at here?

11   A.   So this is a copy of the amended and restated bylaws for

12   the nonprofit corporation.

13             THE COURT:   Which corporation are you referring to?

14             THE WITNESS:   The We Build the Wall, Inc. which was

15   the corporation that the campaign organizers had created to

16   deliver funds to.

17   Q.   Again, why did GoFundMe need to see a copy of the bylaws

18   for We Build the Wall, Inc.?

19   A.   So, two reasons.   The primary reason, which predated this

20   e-mail, was that, as I had mentioned earlier, this organization

21   was new, and GoFundMe, our processor and the banks, all needed

22   to review and sign off this organization was a safe

23   organization to give money to.   It was duly incorporated and

24   whatnot.

25             The second reason was that because the campaign was

1    going to have this representation that Brian Kolfage would not

2    take a penny from the campaign, we wanted to just review how

3    that particular representation may be enforced within the

4    bylaws.

5    Q.   So just to be clear, when you receive this document, what

6    were you looking for when you reviewed it?

7    A.   At this point in time, I was reviewing it for the language

8    that Rich had indicated in his e-mail, which was that Brian

9    Kolfage would not be compensated by the campaign.

10   Q.   Let's take a look at that.

11            MS. MOE:   Ms. Drescher, can we please turn to page

12   five of the document.   And if you could please highlight

13   section 8.4 where it says president.

14   Q.   Could you please read that for the jury.

15   A.   "Section 8.4.   President.   The president of the board shall

16   preside at meetings of the board of directors and shall perform

17   such other duties and have such other powers as the board of

18   directors may from time to time prescribe.   The initial

19   president is Brian Kolfage.   Mr. Kolfage will take no salary

20   for the performance of his duties as president of the

21   corporation."

22   Q.   As you were doing your review of this campaign, if you'd

23   learned that Brian Kolfage was planning to earn money from We

24   Build the Wall, what would you have done?

25   A.   We would not have allowed them to put in the

M5o3she1                          Gordon - Direct

1    representations that Brian could not earn money from the

2    campaign or from the organization.

3    Q.   If you learned that We Build the Wall wasn't planning to

4    follow these bylaws, what would you have done?

5    A.   We wouldn't have allowed them to continue forward.

6    Q.   I want to turn now and talk about Government Exhibit 305B.

7    Is this the other attachment to the e-mail?

8    A.   Yes, this is.

9    Q.   What are we looking at here?

10   A.   So this is the text, the proposed text copy of the new

11   campaign that the organizers were going, were planning to post

12   on January 11.

13   Q.   When you say the new campaign that they were planning to

14   post, where was this text going to go?

15   A.   This text would go on to the existing GoFundMe as an

16   update.  They would be changing the campaign language.  As I

17   mentioned earlier, this was, as part of the change of terms

18   policy, we were, at GoFundMe, were enforcing this would be the

19   new campaign language that would also have to go out to all the

20   existing donors with that opt-in requirement.

21   Q.   Why did GoFundMe need to review a copy of the new language

22   that was going to go up on the campaign?

23   A.   We needed to review this copy to ensure that the revised

24   campaign language would not violate our terms.

25   Q.   When you reviewed a copy of this document, what, if

1   anything, were you looking for when you reviewed it?

2   A.  So, first and foremost we would be reviewing this copy to

3   ensure that the two prior violations were no longer present,

4   which would be the all-or-nothing requirement as well as the

5   giving money to the government.  So those shouldn't be there.

6   And that the campaign accurately completely described the new

7   purpose that we had already -- the campaign organizers had

8   already agreed to, which with was to create the 501(c)(4), and

9   partner with private landowners on the border.

10          Second, we also would have reviewed the whole

11  campaign -- this revised campaign description just to ensure

12  there were no other new potential violations of our policies

13  that arose from the new language here.

14  Q.  Let's turn to page two of this document.  And if we could

15  highlight the paragraph right there that starts 100 percent.

16  Could you please read this text for the jury.

17  A.  "100 percent of the funds raised on GoFundMe will be used

18  in the execution of our mission and purpose.  To honor the

19  commitment, we made to our donors; all funds raised, less the

20  processing fees and refunds, will be transferred to a special

21  purpose account to carry out the purposes and mission of We

22  Build the Wall, Inc.  I personally will not take a penny of

23  compensation from these donations."

24  Q.  This paragraph that we're looking at here, did this

25  language ultimately go up on the GoFundMe website?

M5o3she1                         Gordon - Direct

1   A.  I believe, yes.

2   Q.  I want to talk about that a little bit.  If we could please

3   publish what's in evidence now as Government Exhibit 306.  If

4   we could please highlight the upper-right-hand corner.

5            What's the date here of this screenshot of the

6   website?

7   A.  The date of the screenshot is January 11, 2019.

8   Q.  Is that the date the opt-in change was announced?

9   A.  Yes.

10  Q.  According to the website, by this point, how much is raised

11  through GoFundMe -- or let me rephrase.

12           At this point, how much had the campaign raised?

13  A.  According to the website, about 20.1 million.

14  Q.  Highlighting the text below the photograph where it says

15  update January 11, 2019.  Is this the language we were just

16  looking at in the attachment to that e-mail?

17  A.  Yes, it is.

18  Q.  Earlier we were discussing the language in the bylaws and

19  in the draft campaign page about Brian Kolfage not taking a

20  penny from the donations.  If you could turn to page four and

21  highlight the second paragraph.

22           Do you see that paragraph here?

23  A.  Yes, I do.

24  Q.  Is that the promise we just talked about that was in the

25  draft document you reviewed?

M5o3she1                          Gordon - Direct

1    A.  Yes, it is.

2    Q.  Can you please read that for the jury.

3    A.  "100 percent of the funds raised on GoFundMe will be used

4    in execution of our mission and purpose.  To honor the

5    commitment, we made to our donors; all funds raised less the

6    processing fees and refunds, will be transferred to a special

7    purpose account to carry out the purposes and mission of We

8    Build the Wall, Inc.  I will personally not take a penny of

9    compensation from these donations."

10   Q.  So at this point, is this promise live on the GoFundMe

11   website?

12   A.  Yes, it is.

13   Q.  Let me just pause here and ask you this.  In your

14   conversations with Rich Kaye and Brian Kolfage, leading up to

15   January 11, did they ever tell you about someone named Timothy

16   Shea?

17   A.  Not that I recall.

18   Q.  To be clear, you don't recall Mr. Kolfage ever telling you

19   he had a business partner named Timothy Shea?

20   A.  No, not that I recall.

21   Q.  Did Brian Kolfage ever tell you about his plans for an

22   energy drink business?

23   A.  No, not that I recall.

24   Q.  All right.  I want to ask you a few more questions about

25   this GoFundMe campaign for We Build the Wall.

M5o3she1                        Gordon - Direct

1          If we could please publish what's in evidence as

2    Government Exhibit 311.  If we could just, first let's start

3    with the date.  If you could highlight the upper-right-hand

4    corner.

5          What's the date of this page?

6    A.  January 17, 2019.

7          MS. MOE:  Ms. Drescher, if you could scroll through

8    this screenshot.

9    Q.  Mr. Gordon, did there appear to be videos on this page?

10   A.  Yes, the big black boxes would be where the video would be

11   embedded.

12   Q.  When someone puts up a GoFundMe campaign, can you post

13   videos to the fundraiser page?

14   A.  Yes.

15   Q.  Can donors click on those videos as they are reviewing the

16   campaign?

17   A.  Yes.

18         MS. MOE:  At this time, your Honor, I'd like to read a

19   portion from the stipulation that's now in evidence as

20   Government Exhibit S4.  If we could publish Government Exhibit

21   S4 and highlight paragraph two.

22   Q.  Mr. Gordon, could you please read that for the jury.

23   A.  Sure.

24         "Government Exhibits 402 and 405 are true and accurate

25   copies of the videos that appeared on the We the People Build

1    the Wall GoFundMe page on January 17, 2019 which is Government

2    Exhibit 311."

3          MS. MOE:   So we were just talking about Government

4    Exhibit 311 and videos on the page.  If we could now publish

5    what's in evidence as Government Exhibit 405, one of the videos

6    from that page.

7          (Video playing)

8    Q.  So, after We Build the Wall announced this opt-in campaign,

9    were there donors who opted in to the new campaign?

10   A.  Yes, there were.

11   Q.  Approximately how many donors opted into the new campaign?

12   A.  I don't recall the exact number.  But it was a significant

13   number of the preexisting donors opted in.

14   Q.  While the opt-in process was happening, was the campaign

15   able to raise new donations?

16   A.  Yes, it was.

17   Q.  Did the campaign raise new funds after January 11, 2019?

18   A.  It did.

19   Q.  Did We Build the Wall raise money outside of the GoFundMe

20   platform?

21   A.  Yes.

22   Q.  How were they raising money?

23   A.  So, I only know of one way.  There may have been others.

24   But the way that I knew that they were raising money was that

25   they had created their own website that was not on GoFundMe.  I

M5o3she1                          Gordon - Direct

1    think it was We Build the Wall.US.  And they had a donation

2    button and means to donate or to give money directly on their

3    own website.

4    Q.  Have you visited that website before?

5    A.  Yes.

6            MS. MOE:  Ms. Drescher, if you could please publish

7    again Government Exhibit S4 which is in evidence, and highlight

8    paragraph four.

9    Q.  Mr. Gordon, once that's highlighted, can you please read

10   that for us.

11   A.  "Government Exhibits 406 and 407 are true and accurate

12   screenshots of portions of the website for We Build the Wall as

13   of January 19, 2019.  Government Exhibit 407 contains a

14   screenshot of the video marked as Government Exhibit 405."

15   Q.  So let's take a look at the website.  If we could publish

16   what's in evidence as Government Exhibit 407 and turn to page

17   two.

18           What are we looking at here?

19   A.  This is the We Build the Wall website that was -- that is

20   their own separate website that was not part of GoFundMe.

21   Q.  And if we could please highlight the upper-right-hand

22   corner.  What does it say here?

23   A.  Would you like for me to read it?

24   Q.  Yes, please.

25   A.  "If you donated before January 11, opt-in here.  If you

M5o3she1                        Gordon - Direct

1    donated before January 11, opt-in and make sure your

2    contribution counts."

3    Q.  Turning back to the first page of this screenshot.  Do you

4    see at the top where it says FAQ?

5    A.  Yes.

6    Q.  On the menu?

7         What does FAQ stand for?

8    A.  FAQ generally stands for frequently asked questions.

9    Q.  So let's take a look at that page.  If we could publish

10   what's in evidence as Government Exhibit 406.

11        Do you see the list of questions here on this page?

12   A.  Yes.

13        MS. MOE:  If you could please highlight the first

14   question.

15   Q.  Mr. Gordon, could you please read for us the question and

16   then the answer.

17   A.  Sure.

18        "What is We Build the Wall, Inc.?

19        "We Build the Wall, Inc. was incorporated in the state

20   of Florida on December 28, 2018, as a nonprofit corporation

21   with the stated purpose of:  To promote social welfare within

22   the meaning of section 501(c)(4) of the Internal Revenue Code

23   regarding funding, construction, administering, and maintaining

24   a United States southern border wall, and the processes

25   associated therewith.  We Build the Wall, Inc. is presently

M5o3she1                         Gordon - Direct

1    applying to the IRS for recognition as a nonprofit tax exempt

2    social welfare organization under section 501(c)(4) of the

3    Internal Revenue Code.  Contributions or gifts to We Build the

4    Wall, Inc. are not tax deductible for IRS purposes."

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M5OVSHE2                          Gordon - Direct

1    BY MS. MOE:
2    Q.  All right.  So scrolling down this website, if we could
3    turn to page 3.  Do you see the question here that says, How
4    much is Brian Kolfage getting paid?
5    A.  Yes.
6    Q.  What's the answer on the website?
7    A.  In accordance with Mr. Kolfage's personal pledge and the
8    bylaws of We Build the Wall, Inc., Mr. Kolfage will not profit
9    even a single penny from We Build the Wall, Inc.
10            MS. MOE:  Your Honor, if I could have just a moment.
11            THE COURT:  All right.
12            (Counsel conferred)
13            MS. MOE:  Thank you, your Honor.
14            THE COURT:  One moment, please.
15            You may continue.
16            MS. MOE:  Thank you, your Honor.
17   BY MS. MOE:
18   Q.  Mr. Gordon, at some point after donors opted into the new
19   plan for the new campaign, did GoFundMe release the opted-in
20   money to We Build the Wall?
21   A.  Yes, we did.
22   Q.  And did GoFundMe release the money from the new donations
23   as well?
24   A.  By new donations, you mean the donations that were given
25   after January 11?

M5OVSHE2                          Gordon - Direct

1   Q.   Yes.  Did GoFundMe release that money, too?

2   A.   Yes, we did.

3            MS. MOE:  So if we could publish what's in evidence as

4   Government Exhibit 308.  And if we could highlight the upper

5   right-hand corner.

6   Q.   What's the date of the page at this point?

7   A.   The date is July 7, 2019.

8   Q.   And according to the website, by this point how much did

9   the campaign raised?

10  A.   According to the website, the campaign had raised almost

11  $25 million.

12  Q.   In 2019, was it common for GoFundMe campaigns to raise that

13  much money?

14  A.   No.

15  Q.   How did the volume of fundraising for this particular

16  campaign compare to other GoFundMe campaigns?

17  A.   At this time, like in July of 2019, this was the largest

18  GoFundMe in the history of the company.

19  Q.   As you sit here today, do you know where the money went

20  after it was transferred to We Build the Wall?

21  A.   No, I don't.

22  Q.   Do you have any firsthand knowledge of how We Build the

23  Wall used that money?

24  A.   No, I don't.

25            MS. MOE:  Nothing further, your Honor.

M5OVSHE2                         Gordon – Cross

1           Thank you, Mr. Gordon.

2           THE COURT:  Cross-examination.

3           MS. CAPPELLINO:  Thank you, your Honor.

4   CROSS-EXAMINATION

5   BY MS. CAPPELLINO:

6   Q.  Good morning, Mr. Gordon.

7   A.  Good morning.

8   Q.  I'm Anjelica Cappellino.  I'm one of the lawyers that

9   represent Timothy Shea.

10          Now, you never met Mr. Shea; is that right?

11  A.  That is correct.

12  Q.  And you never spoke to him, right?

13  A.  That is correct.

14  Q.  No email communications?

15  A.  None that I recall.

16  Q.  Okay.  And to your knowledge, you don't really know him at

17  all, right?

18  A.  That is correct.

19  Q.  And is it fair to say your main point of contact for the We

20  Build the Wall campaign was an attorney by the name of Richard

21  Kaye?

22  A.  Yes, he was my main point of contact.

23  Q.  And he's from some firm in Atlanta, to your knowledge?

24  A.  I don't recall where the firm was, but yes, somewhere in

25  the southeast.

M5OVSHE2                        Gordon - Cross

1   Q.  Okay.  And does Barnes & Thornburg sound familiar?

2   A.  Yes.

3   Q.  Now, Mr. Kolfage was the GoFundMe account owner; correct?

4   A.  That is correct.

5   Q.  I'm sorry.  Is it fair to say that he was the campaign

6   organizer?  Is that GoFundMe parlance?

7   A.  Yes, that would be more accurate.

8   Q.  Okay.  Campaign organizer.

9        Now, you mentioned there were two main issues with

10  this campaign, right?  Now, the first one being they were

11  promising a refund if certain benchmarks weren't met, right?

12  A.  Correct.  They were promising a refund if 100 percent of

13  the campaign goal was not met.

14  Q.  And like you described, that would have been a procedural

15  headache for GoFundMe, right?

16  A.  Well, the way I characterize it is it's an abuse of the

17  platform, because they would -- the most likely outcome would

18  be that we would be accepting a bunch of donations only to

19  refund them, which we don't allow.

20  Q.  And that would create more work for GoFundMe, right?

21  A.  Create, yes, work for GoFundMe and headache for donors.

22  Q.  That would require resources to process the refunds?

23  A.  That is correct.

24  Q.  Processing fees would have to be incurred; correct?

25  A.  Yes.

M5OVSHE2                          Gordon - Cross

1    Q.  And customer service, bandwidth, etc., etc., this would all
2    come out of GoFundMe time and resources, right?
3    A.  That is correct.
4    Q.  Okay.  That was the first issue.
5            Now, another issue was, as you had testified,
6    Mr. Kolfage wanted to raise money and then give it directly to
7    the government, right?
8    A.  Yes.
9    Q.  Now, there were some legal issues regarding whether someone
10   can or cannot do that, right?
11   A.  Yes.
12   Q.  I believe you testified you had prior experience with this
13   issue?
14   A.  Yes.
15   Q.  It was determined by GoFundMe and perhaps their legal
16   counsel, that you cannot just raise money and walk it to the
17   federal government, right?
18   A.  Yes.  There are some very narrow exceptions that I was
19   aware of, but yes, generally that is correct.
20   Q.  And this isn't something typical or specific to
21   Mr. Kolfage, right?
22   A.  No, it is not.
23   Q.  Or to We Build the Wall?
24   A.  Correct.  This is a generally applicable rule.
25   Q.  Okay.  So ultimately it was determined that it just simply

M5OVSHE2                        Gordon - Cross

1    can't be done?

2    A.  Correct.

3    Q.  Despite this being what Mr. Kolfage had said he wanted in

4    his campaign, right?

5    A.  Correct.

6    Q.  So now, instead of the money being handed over to the

7    government, it was determined it would be given to the We Build

8    the Wall nonprofit, as you mentioned; correct?

9    A.  Yes.

10   Q.  And now, part of this decision was that each donor would be

11   contacted and they would get to decide whether they want to opt

12   in to this new charity, right?  Excuse me, this new nonprofit?

13   A.  Correct.

14   Q.  And you refer to this as the opt-in or the opt-in email, is

15   that fair to say?

16   A.  Yes.

17   Q.  So now they could opt in, meaning they could choose to move

18   their money into this new We Build the Wall nonprofit that

19   Mr. Kolfage created, or they can keep their donation, right?

20   Or, excuse me, be refunded?

21   A.  Refunded their donation; correct.

22   Q.  And donors were advised of these rights via email, right?

23   A.  The donors were advised of those rights via email.

24   Q.  And ultimately, most donors did choose to opt in, right?

25   A.  I don't recall if it was most.  I don't remember how many,

1    sorry.

2    Q.  Around that time, was it about 325,000 donors, to your

3    recollection?

4    A.  Yeah, that sounds about right.

5    Q.  And is it fair to say that a majority chose to opt in?

6    A.  Again, I don't remember.  It was a substantial number.

7    Q.  And just to check the money at that point, that was around

8    18 million in the GoFundMe campaign?

9    A.  I don't recall the exact number.

10   Q.  Was it over -- was it several million or up?

11   A.  Oh, yes, yes, in the millions.  Over 10 million.

12   Q.  Okay.  So we had 10 million and a few 100,000 donors, fair

13   to say, ballpark estimate?

14   A.  Yeah, that's fair.

15   Q.  And at that time -- excuse me.  The opt in was in the

16   beginning of January in 2019, right?

17   A.  Correct.

18   Q.  Now, if GoFundMe had to refund a majority of that $18

19   million, is it fair to say GoFundMe would know about that?

20   A.  Oh, yeah, GoFundMe would know about that.

21   Q.  Okay.  So is it fair to say about 90 percent of the donors

22   chose to opt in?

23   A.  I don't know.  I'm not sure how the -- how you're doing the

24   math.  I'm sorry, I'm not quite following you.

25   Q.  Fair enough.

M5OVSHE2                           Gordon - Cross

1          Now, these donors, when they donate to a GoFundMe
2   campaign, any campaign, do they put their contact information
3   down into the form at all?
4   A.   They do.
5   Q.   And who owns that data?
6   A.   Well, I don't know about the legal ownership.  From a
7   policy perspective, I like to think that the donor owns that
8   data.
9   Q.   So if I start a campaign and I have donors donating and
10  they give me their email addresses, do I have a means of
11  communicating with those donors directly?
12  A.   Yes, you do.
13  Q.   Because if I post an update, say, to my campaign, those
14  donors get that update, right?
15  A.   Yes, that's correct.
16  Q.   And I'm assuming, correct me if I'm wrong, but GoFundMe
17  wants the campaign organizers to be in communications with the
18  donors, right?
19  A.   That is correct.
20  Q.   Because we want the donors to be up to date on what's going
21  on in the campaign, right?
22  A.   Yes.
23  Q.   And any changes, right?
24  A.   Yes.
25  Q.   Okay.  So if I'm running that campaign, I'm the campaign

M5OVSHE2                          Gordon - Cross

1    organizer, I'm able to -- excuse me, when I create an update on

2    my campaign, those donors get it via email?

3    A.  Correct.  An update to the campaign is automatically sent

4    to every donor.

5              THE COURT:  But is it that the campaign organizer has

6    knowledge of the specific email addresses?

7              THE WITNESS:  Not through the GoFundMe app that the

8    campaign organizer would interface with.  So when any campaign

9    organizer posts an update, the GoFundMe system automatically

10   distributes that update to every donor.

11             THE COURT:  But does GoFundMe tell the campaign

12   organizer that list of emails?

13             THE WITNESS:  GoFundMe may provide organizers with a

14   list, but they don't do it in every instance.

15   BY MS. CAPPELLINO:

16   Q.  And there would be value in a list of donors, is that fair

17   to say?

18   A.  Yes.  Generally, donor lists have value.

19   Q.  And as is the case sometimes, as you may or may not know

20   with data, would you be able to buy and sell that data to an

21   interested party?

22   A.  I don't know firsthand, but my understanding from working

23   with charities is that donor lists can be made available.

24   Q.  And sometimes would those be available for marketing

25   purposes or promotional purposes?

1    A.   I don't know.

2    Q.   Lastly, how much money has been refunded to donors since

3    the inception of this case in August 2020, if you know?

4    A.   I don't know.

5    Q.   Do you have a ballpark estimate?

6    A.   I don't.  I left the company in October of 2020.

7    Q.   Thank you.

8              MS. CAPPELLINO:  No further questions.

9              THE COURT:  Redirect?

10             MS. MOE:  No, thank you, your Honor.

11             THE COURT:  You may step out.

12             THE WITNESS:  Thank you.

13             (Witness excused)

14             THE COURT:  Please call your second witness.

15             MR. ROOS:  Your Honor, if it's okay with you, we've

16   got a few just very brief stipulations and exhibits that I'll

17   offer, and then we can call our next witness.  Is that okay?

18             THE COURT:  That's fine.

19             MR. ROOS:  We have three stipulations and accompanying

20   exhibits.  I'll try to read these in the most animated way

21   possible, but I want to set everyone's expectations pretty low

22   for that.

23             The first stipulation the government offers is

24   stipulation S-5 and the accompanying exhibits.  And

25   Ms. Drescher, could we just have S-5 up on the screen for the

M5OVSHE2

1      parties.

2              And the government offers exhibit stipulation S-5 and

3      the referenced exhibits, which are:  1000, 1200, 1300, 1400,

4      1500, 1600, 1700, 1800, 1900, 2000, 2100, 2200, 2300, 2400.

5              Any objection?

6              MS. CAPPELLINO:  No objection.

7              THE COURT:  They are admitted.

8              (Government's Exhibits 1000, 1200, 1300, 1400, 1500,

9      1600, 1700, 1800, 1900, 2000, 2100, 2200, 2300, 2400 received

10     in evidence)

11             MR. ROOS:  And could we publish this to the jury?

12             THE COURT:  You may.

13             MR. ROOS:  And it says in the relevant part, paragraph

14     1:  The following government exhibits which I just read are

15     true and correct copies of account information, statements, and

16     other bank records from the following financial institutions.

17     Then it lists several bank accounts on the most right column,

18     and the financial institutions in the middle column, and the

19     government exhibit on the far left column.

20             And we can take that down, Ms. Drescher.

21             Next, the government offers Exhibit S-6 and the

22     referenced exhibits therein.

23             I'm sorry, your Honor.  May I just have one second

24     with defense counsel?

25             (Counsel conferred)

M5OVSHE2

1          MR. ROOS:  Pursuant to this stipulation, the

2     government offers Exhibit 16, 19, 22, 26, 28, 33, 36, 38, 42,

3     43, 44, 45, 46, 48, 49; and then 101 to 147, 149, 152, and all

4     of their subparts; and then 951, 953 to 958 and their subparts.

5          MS. CAPPELLINO:  No objection, your Honor.

6          THE COURT:  They are admitted.

7          (Government's Exhibits 16, 19, 22, 26, 28, 33, 36, 38,

8     42 through 46, 48, 49, 101 to 147, 149, 152, 951, 953 to 958

9     received in evidence)

10         MR. ROOS:  And can we publish this to the jury?

11         THE COURT:  You may.

12         MR. ROOS:  And I will just read a few portions here.

13         In paragraph 1, the exhibits I reference there, which

14    are listed out, say that:  ICloud is a storage service provided

15    by Apple that can be used to back up or store data, including

16    text messages called iMessages from an Apple iPhone.  And all

17    of the exhibits listed there are authentic copies of iMessages

18    that were lawfully obtained pursuant to a court-authorized

19    search warrant, that were backed up to an iCloud account

20    registered to Andrew Badolato from his iPhone.

21         And then paragraph 2:  The exhibits that are

22    referenced there are copies of emails and their attachments

23    that were produced by email service providers pursuant to

24    court-authorized search warrants.

25         And we can go to paragraph 3.

M5OVSHE2

1        Paragraph 3 on that page and on the next page are --
2    states that those referenced exhibits are publicly posted posts
3    on Twitter from the Twitter account @BrianKolfage at the dates
4    displayed on the exhibits, and they were produced by Twitter
5    pursuant to court-authorized search warrant.
6        And then finally, the fourth paragraph:  Government
7    Exhibits 953 through 958 are authentic copies of public posts
8    made on the Facebook page We Fund Trump Wall that were produced
9    by Facebook pursuant to a court-authorized search warrant.
10       We can take that down.
11       Then can we have S-7 for the parties.  So S-7 is a
12   stipulation between the parties.  And I will first offer the
13   exhibits and the stipulation.
14       So S-7 plus Exhibits 1 to 15, 17, 18, 21, 23, 24, 25,
15   29 to 32, 34, 35, 37, 39 to 41, 47, 50 to 52, 53, 54, 55, 56,
16   56-A-1, 57, 58, 59 and all of their subparts; also 501; and
17   then 148, 150, 151, 153 and its subparts; 231, 232 and its
18   subparts.
19       MS. CAPPELLINO:  No objection, your Honor.
20       THE COURT:  They are admitted.
21       (Government's Exhibits S-7, 1 to 15, 17, 18, 21, 23 to
22   25, 29 to 32, 34, 35, 37, 39 to 41, 47, 50 to 56, 56-A-1, 57 to
23   59, 501, 148, 150, 151, 153, 231, 232 received in evidence)
24       MR. ROOS:  Thank you, your Honor.
25       And for this one, we'll just put this up for the jury,

M5OVSHE2

1    Ms. Drescher.  Thank you.  And I'll just read the relevant

2    portions when they are going to come up with a witness later

3    today, so I'll just read the relevant portions then.

4           Finally, your Honor, the government offers Exhibit

5    313-A and 313.  First, can we see 313-A for the parties.  This

6    is a declaration of custodians of records from an individual in

7    the trust and safety part of GoFundMe.  And it is a

8    certification that a certain record is a business record.

9           And can we display Government Exhibit 313.  It's a

10   spreadsheet and I think it's loading up, but there it is.  And

11   the certification says it's all the donation records.

12          So the government offers this pursuant to 902(11).

13          Any objection?

14          MS. CAPPELLINO:  No objection.

15          MR. ROOS:  And, your Honor, on this particular

16   exhibit, since there is personal identifying information of the

17   donors, we would just offer this one under seal.

18          THE COURT:  It's admitted.

19          (Government's Exhibits 313, 313-A received in

20   evidence)

21          MR. ROOS:  Of course, it's available to the jurors.

22          THE COURT:  Yes.

23          MR. ROOS:  Thank you, your Honor.  And that concludes

24   my stipulation reading.  Thank you, your Honor.

25          MR. SOBELMAN:  The government calls Danielle Jones.

M5OVSHE2                     Deperi - Direct

1      DANIELLE DEPERI,

2            called as a witness by the Government,

3            having been duly sworn, testified as follows:

4                  THE LAW CLERK:  Please state and spell your name for

5      the record.

6                  THE WITNESS:  Danielle, D-A-N-I-E-L-L-E; Deperi,

7      D-E-P-E-R-I.

8                  THE COURT:  You may inquire.

9                  MR. SOBELMAN:  Thank you, your Honor.

10     DIRECT EXAMINATION

11     BY MR. SOBELMAN:

12     Q.  Good morning.

13     A.  Good morning.

14     Q.  What is your legal name?

15     A.  Danielle Deperi Jones.

16     Q.  And do you go by Ms. Jones or do you go by Ms. Deperi?

17     A.  I prefer Deperi.

18     Q.  Okay.  And what type of name is Deperi?

19     A.  That is my maiden name.

20     Q.  If you could pull the microphone just a little closer.  I

21     just want to make sure everyone can hear you.

22     A.  Yes, sir.

23     Q.  Ms. Deperi, where do you live?

24     A.  I live in South Carolina.

25     Q.  What do you currently do for work?

M5OVSHE2                          Deperi - Direct

1    A.   Currently I'm a social media manager, I also do a little
2    writing, and I'm also a network marketer for Melaleuca.
3    Q.   What is your educational background?
4    A.   I graduated from high school and some college.
5    Q.   Do you know someone named Timothy Shea?
6    A.   Yes, sir.
7            MR. SOBELMAN:  Ms. Drescher, could you please show the
8    witness what's been marked for identification as Government
9    Exhibit 281.
10   Q.   Ms. Deperi, do you recognize the person in this photograph?
11   A.   Yes, sir.
12   Q.   Who is it?
13   A.   Tim Shea.
14           MR. SOBELMAN:  Your Honor, the government offers
15   Government Exhibit 281.
16           MS. CAPPELLINO:  No objection.
17           THE COURT:  It is admitted.
18           (Government's Exhibit 281 received in evidence)
19           THE COURT:  If you would like to pull the microphone
20   closer to you, that's fine, if you're more comfortable.  It's
21   movable.
22           THE WITNESS:  Thank you.
23           MR. SOBELMAN:  We can take down the exhibit.
24   Q.   Ms. Deperi, how did you first become familiar with Timothy
25   Shea?

1    A.  I met Timothy Shea through his wife, Amanda Shea.

2    Q.  And during the time period when you were in touch with the

3    Sheas, did Mr. Shea and Ms. Shea work together?

4    A.  Yes.  They at the time had a business with weapons, gun

5    holsters or some sort of business in that realm.

6    Q.  How did you first meet Amanda Shea?

7    A.  I met Amanda Shea when we both worked at a publication

8    called Mad World News.

9    Q.  And what was Mad World News?

10   A.  Mad World News was a news site that was published on mostly

11   news articles on online website and then published to Facebook.

12   Q.  Approximately when did you first meet Amanda Shea?

13   A.  Approximately 2012/2013, in that area.

14   Q.  What was your role at Mad World News?

15   A.  I was a writer.

16   Q.  What was Amanda Shea's role at Mad World News?

17   A.  A writer.

18   Q.  Approximately when did you first meet Timothy Shea?

19   A.  I believe it was January of 2017.

20   Q.  Where did you first meet Mr. Shea?

21   A.  Colorado, at their home in Castle Rock, I believe it was.

22   Q.  When you say "their," do you mean Mr. Shea and Amanda Shea?

23   A.  Yes, sir, at their residence.

24   Q.  Why were you at the Sheas' home in January of 2017?

25   A.  I was working at another publication and we were covering

1    Trump's inauguration from 2016 election.

2    Q.  And what, if anything, were the others at Mr. Shea's home

3    doing at that time?

4    A.  Lindsey Lowery, as well as Amanda Shea, and myself.

5    Q.  And what were Ms. Lowery and Ms. Shea doing while you were

6    there covering the Trump inauguration?

7    A.  They were both writers for Freedom Daily.

8    Q.  And what is Freedom Daily?

9    A.  Freedom Daily was another online news article, news site,

10   that most of the articles were published, as well as on

11   Facebook.

12   Q.  And did you ever work for Freedom Daily?

13   A.  Yes, I did.  I eventually worked for Freedom Daily within

14   the first few months of 2017 I was hired on.

15   Q.  Who owned Freedom Daily?

16   A.  Brian Kolfage.

17   Q.  Generally, who is Mr. Kolfage?

18   A.  Brian Kolfage was a war veteran; he was triple amputee.

19   And he also did a lot of different news publications.

20            MR. SOBELMAN:  Ms. Drescher, would you please show the

21   witness what's marked for identification as Government Exhibit

22   282.

23   Q.  Ms. Deperi, do you recognize the person in this photograph?

24   A.  Yes, sir.

25   Q.  Who is it?

M5OVSHE2                              Deperi - Direct

1   A.  Brian Kolfage.

2           MR. SOBELMAN:  The government offers Government

3   Exhibit 282.

4           MS. CAPPELLINO:  No objection, your Honor.

5           THE COURT:  It is admitted.

6           (Government's Exhibit 282 received in evidence)

7           MR. SOBELMAN:  Ms. Drescher, we can take that down.

8   Q.  Over the time that Freedom Daily existed, who, if anyone,

9   were Mr. Kolfage's business partners in that business?

10  A.  Besides Brian Kolfage, Jeff Rainsworth, I believe, as well

11  as Brian Kolfage, Sr., and eventually Amanda Shea and Timothy

12  Shea.

13  Q.  At approximately when did you start working at Freedom

14  Daily?

15  A.  In 2017.

16  Q.  What was your role with Freedom Daily?

17  A.  I was a writer.

18  Q.  When you worked at Freedom Daily, where were the articles

19  that you and other employees wrote published?

20  A.  They were published onto the site and then pushed onto

21  different social media platforms such as Facebook, Twitter, and

22  other sites, I guess.

23  Q.  What is your understanding of how Freedom Daily made money?

24  A.  Through advertisements on the sites where they would

25  publish ads on there and they would be able to -- the

M5OVSHE2                        Deperi - Direct

1    advertisers would then pay for them being able to see the ads

2    throughout the online site.

3    Q.  How were you paid for your work with Freedom Daily?

4    A.  I was paid per click, which usually is between $1.50 to $2

5    per 1,000 clicks.

6    Q.  What was Amanda Shea's role at Freedom Daily?

7    A.  Editor hired on as a writer, but eventually she would be

8    picking our stories and titling them.

9    Q.  When did you stop working for Freedom Daily?

10   A.  2018.

11   Q.  Why did you stop working for Freedom Daily?

12   A.  I was given a ultimatum of --

13   Q.  Could you please explain.

14   A.  I was told that I was not -- if I wanted to continue

15   working there, I needed to not be friends with Lindsey Lowery

16   and have her stop talking to any news media about the Freedom

17   Daily and Brian Kolfage and what was going on at that site.

18   Q.  And generally, what do you mean about what was going on at

19   that site?

20   A.  The click bait headlines, as well as the titling, was very

21   salacious, very just misleading.  And Lindsey was not pleased

22   with what was going on there and ended up leaving.

23   Q.  So what was the choice that you were given by Freedom

24   Daily?

25   A.  That either I stop my friendship with her and also have her

1    not talk to any news media, or I would lose my job or I

2    couldn't be there.

3    Q.  Just to be clear, at that time Ms. Lowery was no longer

4    working at Freedom Daily?

5    A.  Yes, sir.

6    Q.  Does Freedom Daily still exist today?

7    A.  No, it's defunct.

8    Q.  Approximately when did Freedom Daily close?

9    A.  Probably later on in 2018 approximately.

10   Q.  What is your understanding of why Freedom Daily closed?

11   A.  After Facebook came down with a lot of the crackdowns

12   having --

13            MS. CAPPELLINO:  Objection, your Honor.

14            THE COURT:  Overruled.  You may answer.

15   A.  Yes.  After Facebook cracked down on a lot of the news

16   being pushed out onto fake news, so to speak, coming out there,

17   that the ads were lost, a lot of the revenue.

18   Q.  I'm going to switch topics.

19            Are you familiar with a company called Winning Energy?

20   A.  Yes, sir.

21            MR. SOBELMAN:  One moment.

22   Q.  Just to be clear, when you were given the ultimatum about

23   choosing to stay in the company or -- and terminate your

24   friendship with Ms. Lowery or leave the company, how was that

25   resolved?

1   A.  I left.

2   Q.  I'm now going to turn to the next topic.

3       Are you familiar with a company called Winning Energy?

4   A.  Yes, sir.

5   Q.  And how did you become familiar with Winning Energy?

6   A.  Seeing online posts on Instagram, as well as on Facebook.

7   Q.  And specifically, whose posts do you recall seeing?

8   A.  I saw a post from Brian Kolfage, Amanda Shea, and as well

9   eventually Timothy Shea.

10  Q.  And based on your review of Mr. Kolfage, Ms. Shea and

11  Mr. Shea's social media posts about Winning Energy, what do you

12  understand Mr. Shea's role to be with Winning Energy?

13          MS. CAPPELLINO:  Objection.

14          THE COURT:  Overruled.  You may answer.

15  A.  The CEO of Winning Energy.

16  Q.  And just to be clear, what is Winning Energy?

17  A.  It appeared to be an energy drink marketed towards more of

18  conservative patriotic leaning people with using Trump's

19  winning tag line, how he would say people were winning, America

20  was winning, using that tag line.

21  Q.  Turning to another topic, are you familiar with a company

22  called Military Grade Coffee?

23  A.  Yes, sir.

24  Q.  And how did you become familiar with Military Grade Coffee?

25  A.  Through Brian Kolfage, different ads, as well as tweets on

1    Twitter.

2    Q.  These are posts that Mr. Kolfage made?

3    A.  Yes, sir.

4    Q.  Okay.  And on what social media platforms do you recall

5    seeing posts about Military Grade Coffee?

6    A.  On Facebook as well as Twitter.

7    Q.  What is Military Grade Coffee?

8    A.  Coffee that was just -- I believe just -- you know, just

9    regular coffee.  I'm not too sure where it was -- the beans

10   were taken from, but it was used through like a veteran selling

11   coffee towards people.

12   Q.  Is it a company that sells coffee?

13   A.  Yes.

14   Q.  And based on your review of the social media posts you

15   mentioned by Mr. Kolfage, what is your understanding of who

16   owned Military Grade Coffee?

17   A.  Brian Kolfage.

18   Q.  Turn to another topic.

19          Are you familiar with an organization called We Build

20   the Wall?

21   A.  Yes, sir.

22   Q.  What is We Build the Wall?

23   A.  It was a crowdfunding crowd hedge fundraiser type thing

24   that was marketed on Facebook to gain donations to build the

25   wall on the southern border through private donations.

M5OVSHE2                        Deperi - Direct

1    Q.  How did you become familiar with We Build the Wall?

2    A.  Saw it on Facebook as well as Twitter.

3    Q.  And whose social media posts do you recall seeing about We

4    Build the Wall?

5    A.  Brian Kolfage, Amanda Shea.

6    Q.  And on what social media platforms do you recall seeing

7    those posts?

8    A.  Facebook and Twitter.

9    Q.  What, if anything, did you see in those posts regarding how

10   money donated to We Build the Wall would be spent?

11   A.  That all of the funds would go towards the construction of

12   the wall.

13   Q.  Do you recall seeing any posts about who, if anyone, at We

14   Build the Wall would be compensated or not compensated for

15   their work for We Build the Wall?

16   A.  Could you repeat that again?  I'm sorry.

17   Q.  Yes.  It's a little confusing.

18          Did there come a time when you saw posts about whether

19   Mr. Kolfage would be compensated for his work for We Build the

20   Wall?

21   A.  All the posts that were written, as well as in the GoFundMe

22   page, said that he would not receive any money.

23   Q.  And do you recall seeing those kind of statements just once

24   or more than once?

25   A.  Multiple times.

M5OVSHE2                          Deperi - Direct

1              MR. SOBELMAN:  Ms. Drescher, can you please display

2      what's in evidence as Government Exhibit 951-A-1.

3      Q.  Ms. Deperi, are you generally familiar with how public

4      posts appear on Twitter?

5      A.  Yes.

6      Q.  And what are those public posts called?

7      A.  Tweets.

8      Q.  Based on this exhibit, who posted this tweet?

9      A.  Brian Kolfage.

10     Q.  And on what date was this tweet posted?

11     A.  January 12th, 2019.

12     Q.  What is the blue writing at the beginning of this tweet?

13     A.  Those are @ symbols.  He's tweeting at several people.

14     Q.  Just to be clear, it's a public post, but he's tagged to

15     these three other users?

16     A.  Yes, three other users, I'm sorry.

17     Q.  But anyone can see these posts, not just these three users;

18     correct?

19     A.  Yes, yes.

20     Q.  Could you please read the tweet starting with, Big

21     salaries?

22     A.  Big salaries?  It states in our bylaws I take zero dollars,

23     no salary, no compensation.  Great investigative skills.

24     Q.  Ms. Deperi, do you have an understanding of what this tweet

25     refers to?

M5OVSHE2                        Deperi - Direct

```
1    A.  An article that was -- that came out from BuzzFeed.

2    Q.  And how did you become familiar with this article?

3    A.  I was interviewed.

4    Q.  You were interviewed for that article?

5    A.  Yes.

6            MR. SOBELMAN:  Ms. Drescher, can you please show the

7    witness what's been marked for identification as Government

8    Exhibit 401.

9    Q.  Ms. Deperi, do you recognize this?

10   A.  Yes.

11   Q.  What is it?

12   A.  The article that I was interviewed for through BuzzFeed.

13   Q.  And it's the article that Mr. Kolfage was responding to in

14   that tweet?

15   A.  Yes.

16           MR. SOBELMAN:  The government offers Government

17   Exhibit 401.

18           MS. CAPPELLINO:  We object, your Honor.

19           MR. SOBELMAN:  Not being offered for its truth, your

20   Honor.

21           THE COURT:  It's merely being offered for what

22   purpose?

23           MR. SOBELMAN:  Your Honor, we mentioned -- it was

24   already mentioned in Mr. Gordon's testimony.  Ms. Deperi will

25   discuss it.  And it is proper to show context for Mr. Kolfage
```

1    and other co-conspirators' public and private statements that

2    they took many actions that are at issue in this case in

3    response to the allegations in this article.  Without an

4    understanding of what the allegations are, subsequent actions

5    lack a certain context.

6              THE COURT:  All right.  So this article is not being

7    offered for the truth of what is said in the article.  In other

8    words, it doesn't prove that something was true; it's being

9    offered to show how people responded to it, certain actions

10   that they may have taken.

11             It is admitted.

12             (Government's Exhibit 401 received in evidence)

13             MR. SOBELMAN:  Thank you, your Honor.

14             Ms. Drescher, we can publish this to the jury.

15   Q.  We're not going to go through the article now, but,

16   Ms. Deperi, can you just read the headline and the date on this

17   article?

18   A.  I felt dirty:  Former employees of the veteran crowdfunding

19   Trump's wall say he pushed fake news to get rich.

20   Q.  What's the date and time this article was published?

21   A.  January 10th, 2019 at 8:01 p.m.

22   Q.  Ms. Deperi, do you know who's quoted in this headline?

23   A.  Yes.

24   Q.  Who was it?

25   A.  Myself.

1          MR. SOBELMAN:  We can take this down.

2          Ms. Drescher, can you please display what's in

3    evidence as Government Exhibit 953, and focus on the

4    third-to-last post on the page, please.

5    Q.  Ms. Deperi, are you familiar with a Facebook account that

6    was known as We Fund the Wall and a couple other similar names

7    as of January 2019?

8    A.  Yes, sir.

9    Q.  And generally, based on your observation of its posts, what

10   was that Facebook account used for?

11   A.  This was an account to publish information about the We

12   Build the Wall fund, as well as spreading the news of what was

13   going on at that time.

14   Q.  What is the date on this Facebook post?

15   A.  January 12th, 2019.

16   Q.  Can you please read the post, starting with, Brian has.

17   A.  Brian has stated he takes zero dollars salary, zero dollars

18   compensation, and it's in the bylaws.

19          MR. SOBELMAN:  Ms. Drescher, can you please display

20   what's in evidence as Government Exhibit 951-A-2.

21   Q.  Ms. Deperi, what's the date that this tweet was posted?

22   A.  January 13th, 2019.

23   Q.  Can you please read the tweet starting with, I'm the

24   president?

25   A.  I'm the president and I'm taking nothing.  Zero.  Our board

M5OVSHE2                        Deperi - Direct

1   is just a board.  We cover travel expenses.  It's a charity now

2   too, so we follow strict rules.

3            MR. SOBELMAN:  Ms. Drescher, can you please display

4   what's in evidence as Government Exhibit 951-A-3.

5   Q.  Ms. Deperi, what date was this tweet posted?

6   A.  January 13th, 2019.

7   Q.  Please read the tweet starting with, We promised.

8   A.  We promised 100 percent of the funds raised on GoFundMe

9   only go towards border wall construction.  We have an audit

10  committee who will verify this for everyone.

11           MR. SOBELMAN:  Ms. Drescher, please display Government

12  Exhibit 954, and focus on the top half of the page.

13  Q.  Ms. Deperi, what's the date of the video uploaded with the

14  ID number ending in 8596?

15  A.  January 13th, 2019.

16           MR. SOBELMAN:  Ms. Drescher, can you please display

17  Government Exhibit S-4 and focus on paragraph 4 on the second

18  page.

19           Government Exhibits 406 and 407 are true and accurate

20  screenshots of portions of the website for We Build the Wall as

21  of January 19th, 2019.  Government Exhibit 407 -- sorry, I

22  think I'm looking at the wrong -- I said -- I may have said

23  S-4, but I meant S-6.  I apologize.

24           Just focusing on the last sentence, it says:

25  Government Exhibit 954A is an authentic copy of a video that

M5OVSHE2                          Deperi - Direct

1   was publicly posted on the Facebook page on January 13th, 2019,

2   which is contained in Government Exhibit 954.

3   Q.  Ms. Deperi, did you watch Government Exhibit 954A in

4   preparation for your testimony today?

5   A.  Yes, sir.

6            MR. SOBELMAN:  And Ms. Drescher, can you just please

7   show the witness what's been marked for identification as

8   Government Exhibit 954A-T.

9   Q.  Ms. Deperi, do you recognize this?

10  A.  Yes, sir.

11  Q.  What is it?

12  A.  Transcript of the We Build the Wall video that was on the

13  Facebook page.

14  Q.  And did you watch the video and compare this transcript to

15  what was said on the video?

16  A.  Yes, sir.

17  Q.  And is it accurate?

18  A.  Yes, sir.

19           MR. SOBELMAN:  The government offers 954A-T as an aid

20  to the jury.

21           MS. CAPPELLINO:  No objection, your Honor.

22           THE COURT:  It is admitted as an aid.

23           (Government's Exhibit 954A-T received in evidence)

24           MR. SOBELMAN:  Ms. Drescher, can you please display

25  Government Exhibit 954A-T on one side of the screen and play

M5OVSHE2                          Deperi - Direct

```
1    954A on the other.
2                (Video played)
3                MR. SOBELMAN:  Ms. Drescher, can we now display what's
4    in evidence as Government Exhibit 951-A-4.
5    Q.  Ms. Deperi, what date was this tweet posted?
6    A.  January 13th, 2019.
7    Q.  Can you please read the tweet, starting with, All money.
8    A.  All money donated to the GoFundMe campaign goes directly to
9    wall, not anyone's pocket.  We have audit committee for full
10   disclosure and oversight.
11               MR. SOBELMAN:  Ms. Drescher, can you please display
12   what's in evidence as Government Exhibit 951-A-5.
13   Q.  Ms. Deperi, what date was this tweet posted?
14   A.  January 13th, 2019.
15   Q.  Can you please read the tweet starting with, I thought.
16   A.  I thought it was pretty clear.  I made a promise that I
17   would never take a penny.  100 percent of fundraising through
18   @GoFundMe donations will only go towards the wall.  100 percent
19   means 100 percent, right?  Board won't see any of that money.
20   Donations will be accountable by an audit committee as well.
21               MR. SOBELMAN:  Ms. Drescher, please display what's in
22   evidence as Government Exhibit 951-A-6.
23   Q.  Ms. Deperi, what date was this tweet posted?
24   A.  January 14th, 2019.
25   Q.  Please read the tweet, starting with, I want to point, and
```

1    ending with, Almost there.

2    A.  I want to point this out, we say it a lot, but want to show

3    you a section of our corporate bylaws.  Section 8.4:1, take no

4    salary whatsoever working on this project.  It's completely

5    volunteer and it's how a nonprofit should be run.  Project 2 is

6    coming on hot.  Almost there.

7           MR. SOBELMAN:  Ms. Drescher, please display what's in

8    evidence as Government Exhibit 956, and focus on the post from

9    Lisa Benz at the top of the page and the two comments under

10   that.

11   Q.  Ms. Deperi, can a Facebook user make a public post or

12   comment on a page like We Build the Wall?

13   A.  Yes.

14   Q.  And does the person who operates the page on which the post

15   or comment is made then have the ability to respond?

16   A.  Yes.

17   Q.  And Ms. Deperi, on what date was the post by Lisa Benz

18   made?

19   A.  January 15th, 2019.

20   Q.  Please read what Ms. Benz wrote, starting with, Any chance.

21   A.  Any chance of using some of these funds in some way for the

22   border patrol not being paid?

23   Q.  On what date did We Build the Wall respond?

24   A.  January 21st, 2019.

25   Q.  Can you please read We Build the Wall's response, starting

1    with, We can't.

2    A.   We can't.  We have bylaws in place that state where money

3    can be spent and have an audit committee to oversee this.

4    Q.   Can you now please read Ms. Benz's reply?

5    A.   I understand.  It is great that you will now keep things

6    private.  I have the POTUS firm.

7            MR. SOBELMAN:  Ms. Drescher, can you please display

8    what's in evidence as Government Exhibit 955, and focus on the

9    post in the middle that states it is from Joanne Thompson.

10   Q.   Ms. Deperi, on what date was this post made?

11   A.   January 16th, 2019.

12   Q.   Can you please read Ms. Thompson's post beginning with,

13   Before I opt in.

14   A.   Before I opt in for my prior donation, I'd like to know

15   more about the people running the organization.  Are funds

16   going towards paychecks for them?  I know Brian said he'd not

17   receive any money, but what about the others?

18           MR. SOBELMAN:  Ms. Drescher, please now focus on the

19   post lower down on the page by Tim Shea.

20   Q.   Ms. Deperi, on what date was this post made by Mr. Shea?

21   A.   January 16th, 2019.

22   Q.   Can you please read what Mr. Shea posted.

23   A.   In its first month, We Build the Wall, Inc. has raised over

24   20 and a half million from 345,000.  Opt in today.

25           MR. SOBELMAN:  Ms. Drescher, now please display what's

1   in evidence as Government Exhibit 956 and focus on the last

2   post on the page.

3   Q.  Ms. Deperi, could you please read the last three sentences

4   that Mr. Buice posted, starting with, Is your team?

5   A.  Is your team working for free or do they get paid through

6   the funds raised?  Now I have found this article.  I donated

7   but now have second thoughts.

8          MR. SOBELMAN:  Ms. Drescher, could you please display

9   what's in evidence as Government Exhibit 957 and focus on the

10  top three comments on the page.

11  Q.  Can you please read what Casey Coughlin posted on January

12  20th, 2019, starting with Richard Buice:  This is a scam.

13  A.  Richard Buice:  This is a scam.  You are correct.  These

14  people are paying themselves.  They can't build shit.  Like you

15  said, it's federal, state, private land.  They can't possibly

16  do it.  They don't have names or phone numbers or any

17  information.  Scam.

18  Q.  Can you please read what We Build the Wall posted on

19  January 21st, 2019, starting with, It's not scam?

20  A.  It's not scam.  Brian and his team are building the wall.

21  Brian is taking no salary and no compensation.  We are working

22  with private landowners who want the wall.  Anyone can build a

23  wall on their property if they want it.  It's very simple

24  common sense approach.

25         MR. SOBELMAN:  Ms. Drescher, please focus lower on the

1    page starting with the post by Fred Lybarger and including the

2    first three comments below that.

3    Q.  Ms. Deperi, please read Mr. Lybarger's post on January

4    17th, 2019, beginning with, This started out.

5    A.  This started out as a We Fund the Wall page where all

6    donations were actually going to build the wall.  It later

7    became the We Build the Wall Corporation.  When this started, I

8    donated to the We Fund the Wall page.  Now it's my

9    understanding this money is going to pay for corporate wages

10   and employees and trips, etc., etc.  I believe we had a little

11   bait-and-switch going on here.

12   Q.  Please now read We Build the Wall's response posted on

13   January 21st, 2019, starting with, Brian is not taking.

14   A.  Brian is not taking any salary or compensation.  He's

15   building the wall and the money he's raising will get the wall

16   built faster than the government can.

17            MR. SOBELMAN:  Ms. Drescher, please display what's in

18   evidence as Government Exhibit 951-A-7.

19   Q.  Ms. Deperi, on what date was this tweet posted?

20   A.  January 21st, 2019.

21   Q.  Can you please read the tweet, starting with, Thank you,

22   and ending with, Company.

23   A.  Thank you @MilGradeCoffee is how I support my family.

24   While I work on this wall project, remember I'm taking no

25   salary and no compensation.  Please support my coffee company.

M5OVSHE2                              Deperi - Direct

1              MR. SOBELMAN:  Ms. Drescher, could you please display

2       what's in evidence as Government Exhibit 958 and focus on the

3       top of the page.

4       Q.  Ms. Deperi, please read the post at the top of the page,

5       posted on January 12th, 2019.

6       A.  I donated in December and again in January.  And everything

7       looks great.  However, one questions that has not been answered

8       in all the recent announcements:  What are the salaries of all

9       these new advisors?  How much of this donated fund will

10      evaporate into the salaries of all these new advisors?  Please

11      post the salaries of each ASAP.

12      Q.  Can you please read We Build the Wall's response posted on

13      January 21st, 2019, starting with, Brian is taking.

14      A.  Brian is taking no salary or compensation.  All the money

15      goes towards the wall and paying workers to build it.

16              MR. SOBELMAN:  Ms. Drescher, can you please focus on

17      the post in the middle of the page by James Jones.

18      Q.  Ms. Deperi, can you please read Mr. Jones's post made on

19      January 21st, 2019.

20      A.  Yes, I know Brian is taking zero.  But are all the recently

21      announced advisors taking zero, too?  If not, their salaries

22      must be made public.  Thank you for the response.

23              MR. SOBELMAN:  Ms. Drescher, let's take a look at one

24      last exhibit.  If you can go to Government Exhibit 951-A-9,

25      which is in evidence.

M5OVSHE2                         Deperi - Cross

1   Q.  Ms. Deperi, on what date was this tweet posted?

2   A.  January 23rd, 2019.

3   Q.  Can you please read the tweet starting with, I'm sad, and

4   ending with, Order now.

5   A.  I'm sad to leave my day job as the cofounder of

6   @MilGradeCoffee.  I'm donating 100 percent of my time to

7   building this wall and not taking any paycheck or compensation

8   from the money raised.  My coffee biz is how I take care of my

9   family.  Please check it out.  K-cups and amp bags.  Order now.

10            MR. SOBELMAN:  Ms. Drescher, you can take this exhibit

11   down.

12   Q.  Just a couple of additional questions, Ms. Deperi.

13            Did you ever do any work for We Build the Wall?

14   A.  No, sir.

15   Q.  Did you ever donate to We Build the Wall?

16   A.  No, sir.

17            MR. SOBELMAN:  No further questions.

18            THE COURT:  Cross-examination.

19            MS. CAPPELLINO:  Thank you, your Honor.

20   CROSS-EXAMINATION

21   BY MS. CAPPELLINO:

22   Q.  Good morning, Ms. Deperi.  I'm Anjelica Cappellino.  I'm

23   one of the lawyers that represent Mr. Timothy Shea.

24            You testified on direct that you met Mr. Shea's wife,

25   Amanda, in 2012/2013?

M5OVSHE2                          Deperi - Cross

```
 1    A.  Yes.

 2    Q.  And did you two meet via social media?

 3    A.  Through social media, through Mad World News.

 4    Q.  Okay.  And to clarify, around that time, to your knowledge,

 5    they were living in Colorado right?

 6    A.  Yes, yes, ma'am.

 7    Q.  And you were living out of state?

 8    A.  Yes, ma'am.

 9    Q.  Did you ever meet in person around that time?

10    A.  In 2012/2013, no.

11    Q.  And you and Amanda Shea began working at Mad World News

12    publication together.  That was a remote job, right?

13    A.  Yes.

14    Q.  So you didn't have any in-person contact with Amanda;

15    correct?

16    A.  No, ma'am.

17    Q.  Nor with Mr. Shea; correct?

18    A.  No, ma'am.

19    Q.  And then Mrs. Shea went over to Mr. Kolfage's site, as you

20    testified, Freedom Daily, and then you followed shortly

21    thereafter?

22    A.  Yeah, a couple months later, I believe.

23    Q.  And that was a remote job as well?

24    A.  Yes, ma'am.

25    Q.  And you never met Mr. Kolfage in person; is that correct?
```

M5OVSHE2                          Deperi - Cross

1    A.  Yes, ma'am, no.

2    Q.  And you testified that you had some sort of falling out at

3    Freedom Daily?

4    A.  Yes, ma'am.

5    Q.  And in sum and substance, you chose to leave and Amanda

6    Shea chose to stay; correct?

7    A.  Yes.

8    Q.  And that would mean that Mr. Kolfage remained her boss,

9    right?

10   A.  I believe so, yeah.

11   Q.  Mr. Kolfage was the owner of Freedom Daily, right?

12   A.  Yes.

13   Q.  And Ms. Shea was the employee; correct?  She worked for

14   Mr. Kolfage; correct?

15   A.  I was -- it seemed that they were business partners.

16   Q.  Do you have any personal knowledge of that?

17   A.  From conversations with Amanda over the phone.

18   Q.  And you testified on direct Mrs. Shea was an editor, right?

19   A.  Mm-hmm.

20              THE COURT:  Is that yes?

21              THE WITNESS:  Yes.  Yes.  I'm sorry, your Honor.

22   A.  Yes.

23              THE COURT:  Thank you.

24   Q.  Now, you went over to Freedom Daily in 2017, and you

25   mentioned Freedom Daily closed in 2018.  So do you know when

M5OVSHE2                     Deperi - Cross

1   you left?

2   A.   Some time in the beginning of 2018.   I'm not exactly --

3   exactly sure of the date.

4   Q.   And when you leave, did you have any further communication

5   with Mr. Kolfage?

6   A.   No.

7   Q.   What about Mrs. Shea?

8   A.   No, ma'am.

9   Q.   Is it fair to say you two weren't -- or, excuse me, you

10  three weren't on speaking terms?

11  A.   Yes.

12  Q.   And then We Build the Wall was established in or around

13  December 2018, to the best of your knowledge?

14  A.   To the best of my knowledge, yes.

15  Q.   And you had mentioned you saw -- you learned about We Build

16  the Wall through social media posts?

17  A.   Yes.

18  Q.   And you learned about Military Grade Coffee, Mr. Kolfage's

19  company, through social media posts?

20  A.   Yes.

21  Q.   Twitter, correct?

22  A.   Yes.

23  Q.   Facebook?

24  A.   Yes.

25  Q.   And you also learned of Winning Energy, Mr. Shea's energy

M5OVSHE2                         Deperi - Cross

1   drink company, through social media as well?

2   A.  Yes, ma'am.

3   Q.  So is it fair to say anything you know about those

4   companies you learned from social media?

5   A.  Yes.

6   Q.  Ms. Deperi, you're a professional writer by trade, right?

7   A.  Yes, ma'am.

8   Q.  And you're also known as a digital creator, is that fair to

9   say?

10  A.  Yeah, yes, ma'am.

11  Q.  For those of us who don't know, can you please explain what

12  a digital creator is.

13  A.  Digital creator is to be able to post content on Facebook,

14  as well as maybe Instagram, or being able to -- original

15  content, I guess you could say.

16  Q.  Your experience is mostly with posting about current events

17  with, say, a conservative lean, is that fair to say?

18  A.  Yes.

19  Q.  So like Mad World News, Freedom Daily, they target a

20  conservative audience?

21  A.  Yeah, I could say that.

22  Q.  Now, you mentioned you got paid per clicks about $2 -- or

23  1.50 to $2 per 1,000 clicks?

24  A.  Yes, ma'am.

25  Q.  So as a writer, is that fair to say it could be a lot of

M5OVSHE2                           Deperi - Cross

1   money or a little money depending how good your articles are?

2   A.  Yeah, that could be fair.

3   Q.  So I'm assuming your goal is writing; you want to get as

4   many views and clicks as possible, right?

5   A.  Yes.

6   Q.  Okay.  And you want to amass -- do you refer to them as

7   viewers or subscribers?

8   A.  Followers.  Do you mean reading the article or --

9   Q.  Yes.

10  A.  Okay.  Yes, viewers, I guess, or to be able to read,

11  subscribers.

12  Q.  And when you worked for Freedom Daily, for example, were

13  those viewers contacted via email blast or some way to get the

14  content?

15  A.  Through Facebook, on a Facebook page the articles would be

16  posted.

17  Q.  If we're talking about Facebook, you want as many Facebook

18  followers, is that the fair terminology to say?

19  A.  Yes, as well as they would also be published onto a

20  website, but then they would be pushed.  And when I say

21  "pushed," be posted onto Facebook.

22  Q.  So you're across different platforms as a digital content

23  creator for Freedom Daily; correct?

24  A.  For myself, no.  I would write the story and then the --

25  whoever pushed that content, they would decide where it would

M5OVSHE2                          Deperi - Cross

1    go.  That was not on my decision basis.

2    Q.  Got it.

3            And is the overall goal to have as wide an audience as

4    you possibly can?

5    A.  I guess, yeah, that would be a fair assessment.

6    Q.  And when we talk about audience, is there a value to

7    subscribers and followers?

8    A.  On a Facebook page, no.  There is no -- from my

9    understanding, there is no value to how many followers that you

10   have on a page in the monetary sense, just as a page growth.

11   You know, having that many, you know, so-called 1,000

12   followers, obviously can potentially see more of your content.

13   But that's only about one to five percent.

14   Q.  And that can translate into monetary value if they click or

15   otherwise view an article, right?

16   A.  If they click and view the article, but they also have to

17   view the article for a certain amount of time.

18   Q.  What about ads?  There's a certain amount of money in ads;

19   correct?

20   A.  I believe so.  But that was never what I was -- what I ever

21   worked on was on the ad.  I know what ads are and I know how

22   they work, but I do not know how the money or any of that is

23   exchanged.

24   Q.  To your knowledge, is there value in having contact

25   information for readers or followers?

M5OVSHE2                         Deperi - Cross

1   A.  If they want to subscribe by putting an email address, they

2   are able to capture so they could have that content delivered

3   straight to their email.

4   Q.  And the more email addresses that are sent that content,

5   arguably, at least, the more viewers, right?

6   A.  I would -- I would think so.  Like I said, I was not on

7   that side.

8   Q.  And to your knowledge, to your best estimate, can you

9   estimate the amount -- or withdrawn.

10          Now, you have your own social media sites; is that

11  correct?

12  A.  Besides my Facebook page.

13  Q.  You run a Facebook page?

14  A.  Well, my Facebook profile.  I don't have any pages, no.

15  Q.  I'm sorry.  To clarify, you're a Facebook user?

16  A.  Yes, that's --

17  Q.  And you post about your life?

18  A.  Mm-hmm.  Yes, ma'am.

19          THE WITNESS:  Yes, your Honor.  Sorry.

20  Q.  And you share your opinions on things on Facebook?

21  A.  At times, yes.  Mm-hmm.  Yes.

22  Q.  And you posted about things related to this case; correct?

23  A.  In the past, yes.

24  Q.  Well, you posted about when law enforcement first contacted

25  you; correct?

M5OVSHE2                          Deperi - Cross

1   A.   Yes.

2   Q.   And then you posted just a few weeks ago; is that correct?

3   A.   Yes.

4   Q.   You noted on Facebook that you would testify in this case,

5   right?

6   A.   I said that I potentially -- that was at the time.

7   Q.   Then the government asked you to take that post down,

8   right?

9   A.   No, actually, I took that down.

10  Q.   It's your testimony the government did not tell you to take

11  the post down?

12  A.   No, the government did not tell me.

13         I took it down myself.

14  Q.   Ms. Deperi, you mentioned you currently live in South

15  Carolina; correct?

16  A.   Yes, ma'am.

17  Q.   And you had a few meetings with the government starting in

18  April on this case?

19  A.   I believe so, yes.

20  Q.   How many times have you met with the government?

21  A.   I would say a handful of times; a couple of Zoom meetings,

22  a few.

23  Q.   And how did you get here today?  Who paid for your travel?

24  A.   I was flown out by the government.

25  Q.   Do you recall the last time you spoke to Mrs. Shea?

M5OVSHE2                          Deperi - Cross

1   A.  Excuse me, who again?

2   Q.  Amanda, Mrs. Shea, Amanda Shea.

3   A.  Oh, I have not spoke to her in a few years now, at least

4   since 2018.

5   Q.  Got it.

6           And just to clarify, you never worked for Mr. Shea,

7   right?

8   A.  No, ma'am.

9   Q.  And you never worked with Mr. Shea?

10  A.  No, ma'am.

11  Q.  You weren't particularly friendly with him; is that

12  correct?

13  A.  I didn't know him personally, as friendly as with Amanda,

14  so no.

15  Q.  And you only met him in person, I believe you testified,

16  once in January 2017?

17  A.  Yes, ma'am.

18          MS. CAPPELLINO:  No further questions.  Thank you.

19          THE COURT:  Redirect?

20          MR. SOBELMAN:  No, your Honor.

21          THE COURT:  You may step out.

22          (Witness excused)

23          THE COURT:  And you may call your next witness.

24          MS. MOE:  Thank you, your Honor.

25          The government calls Nicole Keller.

M5OVSHE2                    Keller – Direct

1    NICOLE KELLER,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              THE LAW CLERK:  Please be seated and state and spell

5    your name for the record.

6              THE WITNESS:  Nicole Keller; N-I-C-O-L-E, K-E-L-L-E-R.

7              THE COURT:  You may inquire.

8              MS. MOE:  Thank you, your Honor.

9    DIRECT EXAMINATION

10   BY MS. MOE:

11   Q.  Good afternoon, Ms. Keller.

12   A.  Good afternoon.

13   Q.  Where do you live?

14   A.  I live in Lancaster County, Pennsylvania, about an hour

15   west of Philadelphia.

16   Q.  And where do you work?

17   A.  I am a high school teacher.  I teach at Ephrata High School

18   in Lancaster County.

19   Q.  What do you teach there?

20   A.  I teach 10th grade biology.

21   Q.  What's your educational background?

22   A.  I have a undergrad degree from Messiah College in biology

23   education, and a master's degree in educational leadership from

24   Edinboro University.

25   Q.  Now, did there come a time when you learned about a

1  fundraising campaign called We Build the Wall?

2  A.  There did.

3  Q.  About when was that?

4  A.  It was late in 2018.

5  Q.  And how did you learn about We Build the Wall?

6  A.  Something that I had seen talked about on the news and on

7  the internet.

8  Q.  And what do you remember learning about We Build the Wall

9  when you first heard about it on the news and on the internet?

10  A.  There was a private citizen.  He was an injured war vet,

11  and he was frustrated with the pace at which the wall at the

12  southern border was being completed.  So he intended to raise

13  money to privately help complete the wall.

14  Q.  Now, you mentioned that you learned that this was being

15  raised by a private citizen.  Do you remember what that

16  person's name was?

17  A.  Brian, I believe his last name is pronounced Kolfage.

18  Q.  And when you learned about this, did this campaign have a

19  name?

20  A.  We Build the Wall.

21  Q.  What was your understanding at the time of how We Build the

22  Wall was raising money?

23  A.  It was through the GoFundMe website.  And he was requesting

24  that private citizens donate money to his campaign, and then he

25  was going to do what he could to build the wall at the southern

1   border.

2   Q.  And what is GoFundMe?

3   A.  It's a website where you can start a campaign to raise

4   money for different causes.  I've donated to people that their

5   house burned down in a fire, and it's to help them rebuild

6   their house, or maybe somebody loses a family member to help go

7   fund -- help fund their funeral, things of that nature.

8   Q.  And did you visit the GoFundMe page for We Build the Wall?

9   A.  I did.

10  Q.  When you first visited the page, what was your

11  understanding of what the campaign was?  What was it about?

12  A.  That there was a private citizen, an injured vet.  I was

13  kind of inspired by his patriotism.  And he wanted to continue

14  to speed up the progress of building the wall at the southern

15  border.

16  Q.  And when you visited the website, did you donate to We

17  Build the Wall?

18  A.  I did.

19  Q.  About how much did you donate?

20  A.  I believe it was between 50 and $100.

21  Q.  And did you make your donation through the GoFundMe

22  website?

23  A.  I did.

24  Q.  Why did you decide to donate to We Build the Wall?

25  A.  As a citizen of this country, I believe one of the roles of

M5OVSHE2                         Keller - Direct

1  my government is to help protect the citizens.  And one of the

2  ways that we do that is, just like my house, control who's

3  coming in and out.  And that's easier to do with a wall at the

4  southern border.

5       I also am -- my late husband, Mark, was a border

6  patrol agent.  He was -- he started his career in -- stationed

7  in the Rio Grande Valley sector of the border patrol.  And he

8  was at the Harlingen Station.  So we were about a half an hour

9  above the border.  And at that point I was also a teacher.  And

10  he protected the border, and I taught the kids that lived at

11  the border.

12       And at that point, Mark was fighting cancer and he was

13  forced to retire.  At that point we had moved back up to

14  Pennsylvania at the northern border.  But he was -- he was

15  fighting cancer, so it was a little bit personal, too, because

16  it's something that he had dedicated his career, and our lives

17  were committed to protecting the country.

18  Q.  Directing your attention to January of 2019, did there come

19  a time that month when you received a notification from

20  GoFundMe?

21  A.  Yes.  Correct.

22  Q.  And what do you recall about receiving a notification from

23  GoFundMe in January of 2019?

24  A.  That the funds that had been donated to We Build the Wall

25  could not be used -- utilized directly through GoFundMe.  And

M5OVSHE2                          Keller - Direct

1    in order for Mr. Kolfage to access that money, we had to move

2    it to a different account.  And I'm not a businessperson, but I

3    had to give my permission to move it to that account so he

4    could access the money.

5    Q.  And did you end up giving your permission for that?

6    A.  I did.

7         MS. MOE:  Ms. Drescher, could we please publish what's

8    in evidence as Government Exhibit 306.  Thank you.

9    Q.  Do you recognize this?

10   A.  I do.

11   Q.  And what are we looking at here?

12   A.  The GoFundMe web page for We Build the Wall.

13   Q.  And have you seen this website before?

14   A.  Yes.

15        THE COURT:  Is that a yes?

16        THE WITNESS:  Yes.

17        MS. MOE:  If you could turn to page 4 and highlight

18   the second paragraph there.

19   Q.  Do you recognize this?

20   A.  I do.  I especially remember the 100 percent portion made

21   an impression on me that I could donate in good faith.

22   Q.  I'm going to talk about that a little bit more, but first

23   could you please read this paragraph for the jury?

24   A.  100 percent of the funds raised on GoFundMe will be used in

25   the execution of our mission and purpose.  To honor the

M5OVSHE2                         Keller - Direct

1   commitment we made to our donors, all funds raised, less the

2   processing fees and refunds, will be transferred to a special

3   purpose account to carry out the purposes and mission of We

4   Build the Wall, Inc.  I will personally not take a penny of

5   compensation from these donations.

6   Q.  Now, you testified just a moment ago that when you read

7   this paragraph, it had an impression on you.  Can you explain

8   what you meant by that.

9   A.  That Mr. Kolfage was committed to the project, to the

10  extent that he was guaranteeing that 100 percent of the money

11  would be used towards the cause.  And he would not take a penny

12  of the compensation.

13  Q.  And what was your reaction when you learned that that was

14  the promise the campaign was making?

15  A.  It gave me confidence that he was going to do his best to

16  commit to this cause.  It just made me feel like I could get

17  behind him.

18  Q.  If you had known that this promise wasn't true, would that

19  have been a factor in your decision to donate?

20  A.  Yes, it would have been a factor.

21  Q.  At the time that you donated, and then when you gave

22  permission for the new campaign, had you ever heard of someone

23  named Timothy Shea?

24  A.  No.

25  Q.  Did any of the information on the campaign page tell you

M5OVSHE2                           Keller - Direct

1    something about someone named Timothy Shea?

2    A.   No.   I only recall Brian's name.

3    Q.   And did any of the information on the campaign page that we

4    just looked at tell you anything about We Build the Wall

5    spending money they were raising on an energy drink company?

6    A.   No.

7    Q.   Would you have donated to We Build the Wall if you'd known

8    that some of the money raised by the campaign would be given to

9    an energy drink company owned by someone named Timothy Shea?

10   A.   No.

11   Q.   Did there come a point in time when you became concerned

12   that We Build the Wall wasn't using donors' money properly?

13   A.   There did.   There was, yes.

14   Q.   And why were you concerned about that?

15   A.   It seemed like it was taking a long time to getting that --

16   the wall completed or started.   And it just gave me some

17   concerns that my donation wasn't being used in the way that I

18   had intended it would be.

19   Q.   And without getting into the substance of what you read,

20   did there come a time when you saw news articles online about

21   We Build the Wall that were negative?

22   A.   Yes.

23   Q.   Okay.   And when you saw that, when you learned this, what,

24   if anything, did you do?

25   A.   I went to the GoFundMe website to try to get my money back.

M5OVSHE2                          Keller - Cross

1   Q.  And why did you want your money back?

2   A.  I had felt maybe that I was being scammed.  And what I had

3   thought I had donated money to was not being used wisely.

4   Q.  Thank you, Ms. Keller.

5               MS. MOE:  Nothing further, your Honor.

6               THE COURT:  Cross-examination.

7               MR. MERINGOLO:  Very briefly.

8   CROSS-EXAMINATION

9   BY MR. MERINGOLO:

10  Q.  Good afternoon, Ms. Keller.  My name is John Meringolo.  I

11  represent Timothy Shea.

12              Just a few questions, nothing -- so when did you

13  contact the government regarding testifying in this case?

14  A.  I did not contact them; they contacted me.

15  Q.  Do you know when they contacted you?

16  A.  I believe it was about six months ago or so.

17  Q.  Okay.  And have you received your donation back?

18  A.  I have not.

19  Q.  Did the government tell you that they seized millions of

20  dollars and they would give you the donation back?

21  A.  They did not.

22  Q.  Are you aware that the government has seized millions of

23  dollars from the We Build the Wall account?

24  A.  I am not.

25  Q.  Okay.  Now, you originally donated because Mr. Kolfage --

M5OVSHE2                        Keller - Cross

1   at the time you donated, he had an inspiring story; correct?

2   A.  That was part of the reason why I donated.

3   Q.  He was a triple amputee?

4   A.  Correct.

5   Q.  And, you know, the most injured person ever to come out of

6   the Iraqi War, that was part of, like, what his bio was, do you

7   recall that?

8   A.  I believe there's people that also gave their life.

9   Q.  Oh, absolutely.  But injured.

10  A.  Injured.  I was not aware of that.  I do recall his picture

11  of him sitting in the wheelchair.

12  Q.  I'm not trying to -- I'm just trying to ask you a few

13  questions.  I apologize.

14  A.  That's okay.

15  Q.  And you said your late husband — and I'm sorry — was a

16  border patrol agent?

17  A.  That's correct.

18  Q.  Now, even though you're unhappy now about the $100 that you

19  donated, and it's understandable, we all understand that.  Were

20  you happy about the two walls that were built to help the

21  border patrol?

22  A.  I was frustrated that the project was not completed as

23  described by Mr. Kolfage.

24  Q.  Okay.  But were you aware that the one border wall that

25  they did, the Army Corps of Engineers said it needed $41

M5OVSHE2                        Keller - Cross

1    million, our government said it needed $41 million in two years

2    to build, and We Build the Wall did that in 17 days for $6

3    million?  Were you aware of that?

4                MS. MOE:  Objection, your Honor.

5                THE COURT:  I'm going to allow the question.

6    A.   I had heard through the news media outlets that small

7    portions maybe of the wall were attempted; but the wall as

8    described on We Build the Wall's web page was not completed.

9    Q.   Okay.  Are you familiar with a gentleman by the name of

10   Khris Kobach?

11   A.   I've never heard that name before.

12   Q.   Thank you very much.  I'm sorry.  Thank you.

13               THE COURT:  Redirect?

14               MS. MOE:  No redirect, your Honor.  Thank you.

15               THE COURT:  You may step out.

16               (Witness excused)

17               THE COURT:  The government may call its next witness.

18               MR. ROOS:  Thank you, your Honor.

19               The government calls Special Agent Yves Hunziker.

20    YVES HUNZIKER,

21        called as a witness by the Government,

22        having been duly sworn, testified as follows:

23               THE LAW CLERK:  Please be seated.  State and spell

24   your name for the record.

25               THE WITNESS:  Yves Hunziker.  First name, Y-V-E-S;

M5OVSHE2                      Hunziker - Direct

1   last name, H-U-N-Z-I-K-E-R.

2              THE COURT:  You may inquire.

3              MR. ROOS:  Thank you, your Honor.

4   DIRECT EXAMINATION

5   BY MR. ROOS:

6   Q.  Good afternoon.  Where do you work?

7   A.  I work for the U.S. Attorney's Office, Southern District of

8   New York.

9   Q.  What's your title there?

10  A.  Special agent.

11  Q.  How long have you been with the U.S. Attorney's Office?

12  A.  A year and a half.

13  Q.  Generally speaking, what are your duties and

14  responsibilities as a special agent with the U.S. Attorney's

15  Office?

16  A.  I investigate criminal violations of the federal code.

17             THE COURT:  Could you draw the microphone a little

18  closer to you, please.

19  Q.  You can kind of like yank it also if you need to.

20  A.  Okay.

21  Q.  What did you do before the U.S. Attorney's Office?

22  A.  I was a special agent at the IRS, criminal investigations

23  division.

24  Q.  Okay.  Now, so obviously many of us know what the IRS is,

25  but what does criminal investigations division do?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M5OVSHE2                          Hunziker - Direct

1   A.   They investigate criminal violations of the Internal

2   Revenue Code, as well as related financial crimes.

3   Q.   All right.  How long were you there?

4   A.   Almost ten years.

5   Q.   What sort of -- you don't have to go through your whole

6   résumé, but what sort of education and background and training

7   did you have before the IRS?

8   A.   I graduated college, Babson College, in 2005, with a degree

9   in accounting.  From there I went to KPMG, which is a Big Four

10  accounting firm, where I worked in the audit group.  I then

11  moved into Forensics Group, doing consulting work, forensic

12  accounting, on the private side.  From there I went --

13           THE COURT:  What do you mean by forensic accounting?

14  Q.   That was my question also.

15  A.   Sure.  We would get hired by companies.  It's basically

16  looking back and trying to put together financial records a lot

17  of times for court purposes.  From there I went to a small

18  consulting company that did hedge fund liquidation work.  And

19  then after that I joined the IRS.

20  Q.   All right.  And I think you said it, but do you have

21  experience doing financial tracing, tracing out where money

22  goes?

23  A.   Yes.

24  Q.   Which of those jobs were you doing?

25  A.   I would say all of them.

Hunziker - Direct

1    Q.  Let's talk about this case.

2            Have you ever heard the name Timothy Shea?

3    A.  I have.

4    Q.  And how did you become familiar with him?

5    A.  When I was asked to review some exhibits for this trial.

6    Q.  All right.  So let me just ask a few background questions

7    about that.

8            Were you involved in the investigation of this case,

9    so before there were charges?

10   A.  No.

11   Q.  And what's your role been then as part of the case?

12   A.  I reviewed a number of exhibits for accuracy by comparing

13   them to the supporting documentation.

14   Q.  Did you create those exhibits?

15   A.  No.

16   Q.  Who created them?

17   A.  The prosecution team.

18   Q.  So what was your role then in preparing the exhibits or

19   charts?

20   A.  I reviewed them for accuracy, I compared them to the

21   underlying supporting documentation.  Most of it in this case

22   were bank records, financial records, wire transfers.  There

23   was also text messages, emails, and some websites, for some of

24   the messaging and communications.

25   Q.  Were you able to verify that all the information on these

1   charts was drawn from an exhibit, piece of evidence?

2   A.  Yes.

3   Q.  We'll look at those charts shortly, but are the source

4   documents for those charts cited on the charts?

5   A.  They are, yes.

6   Q.  And with respect to bank records, what did you do to

7   prepare for your testimony today?

8   A.  I reviewed the actual bank records that are in evidence; so

9   that includes the monthly statements, the copies of checks,

10  wire transfer detail, things of that nature.

11  Q.  Roughly, how many pages are we talking of statements here?

12  A.  There are a number of bank accounts; thousands of pages.

13  Q.  And did you review emails in connection with the case?

14  A.  Yes, I did.

15  Q.  And just to be clear, did you review all the emails and

16  evidence collected with the investigation?

17  A.  No, I did not.

18  Q.  Okay.  So just some sort of subset, is that right?

19  A.  That's correct.  The ones that were in the exhibits.

20  Q.  All right.  Special Agent Hunziker, do you have a copy of

21  what's been marked for identification as Government Exhibits

22  901, 902, 903, 904, 905, and 906 in front of you in the folder

23  there?

24  A.  I do, yes.

25  Q.  Okay.  And what are these?

M5OVSHE2                         Hunziker - Direct

1   A.   These are the exhibits that are reviewed, the ones we were

2   just discussing.

3   Q.   These are the ones that you verified the accuracy of?

4   A.   Yes.

5            MR. ROOS:   Government offers 901, 902, 903, 904, 905,

6   and 906.

7            MR. MERINGOLO:   Hold on, Judge.

8            (Counsel conferred)

9            MR. MERINGOLO:   Judge, we are going to object to 902;

10  and I'm going to request a voir dire on 901.

11           MR. ROOS:   Your Honor, they have cross-examinations.

12  These are summary charts they've had for a few weeks.  They

13  don't need a voir dire.

14           MR. MERINGOLO:   I don't believe they are accurate.

15           MR. ROOS:   Seems like that's something he can

16  cross-examine on.  That goes to weight, not admissibility.

17           THE COURT:   You can test the accuracy by questioning

18  the witness during cross-examination.

19           MR. MERINGOLO:   Okay, Judge.  So 902 we would object;

20  more prejudicial than probative.  Various things.

21           MR. ROOS:   Your Honor, it's a flow chart of financial

22  transactions.

23           THE COURT:   If you'll step up, please.

24           (Continued on next page)

25

1          (At sidebar)

2          MR. ROOS:  Your Honor, first of all, let me just give

3     you a copy.  You said 902, John?

4          MR. MERINGOLO:  Yes, 902.

5          MR. ROOS:  This is 902, just so your Honor can see

6     what the document is.

7          MR. MERINGOLO:  It has all transactions in addition to

8     Mr. Shea, but other transactions that don't include Mr. Shea;

9     Steve Bannon, Citizens of America.  They have the same

10    transactions from We Build the Wall to Mr. Shea, to Amanda,

11    back to Freedom Daily.  But to have these is extremely

12    prejudicial.  And they have it already here.  Now we're going

13    to include Steve Bannon and all these other transactions.  We

14    think it's improper.  And I could ask Clara for the law.

15         MR. ROOS:  As your Honor knows, Steve Bannon, the

16    other individuals in the chart are alleged to be part of the

17    conspiracy; they are part of We Build the Wall.  The

18    government's charge in the indictment was that they laundered

19    money to Brian Kolfage through a series of shell entities.

20    These are them.  These are all of them.  These are the charts,

21    the ones alleged in the indictment.  We're allowed to put on

22    evidence of a conspiracy.

23         They are free on cross-examination -- this, to me, is

24    all cross-examination points that the defendant isn't part of

25    this or isn't part of something else.  They can make those

M5OVSHE2                              Hunziker - Direct

1    points.  That's obviously totally permissible

2    cross-examination.  But there's nothing about this that is

3    unduly prejudicial to them; it's part of the alleged

4    conspiracy.

5              THE COURT:  This is a conspiracy case.  This evidence

6    is proper.  And you can distinguish between those matters that

7    he was involved in, your client was involved in, and those that

8    he was not.  So the objection is overruled.

9              MR. ROOS:  Thank you.

10             Your Honor, while we're up here, can I just ask --

11   I've got about 30 minutes until the lunch break.  Do you want

12   me to stop right at 1 or, if it's okay, I could say, you know,

13   sort of reach a natural stopping point.  I can try to do it

14   shortly before 1, if that's good for your Honor.

15             THE COURT:  That's fine.

16             MR. ROOS:  All right.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1                (In open court)

2                THE COURT:  Overruled.

3                MR. ROOS:  Thank you.  So 901 through 906, the

4     government offers, I understand are in evidence.

5                Let's start with Government Exhibit 904.

6                THE COURT:  So it is admitted.

7                MR. ROOS:  Thank you, your Honor.

8                (Government's Exhibits 901 to 906 received in

9     evidence)

10    BY MR. ROOS:

11    Q.  Let's start with Government Exhibit 904.  And Special Agent

12    Hunziker, can you explain what we're looking at here.

13    A.  Yes.  These are a number of text messages and emails and

14    some screenshots of websites between a number of participants.

15    They are numbered on the left there in chronological order.

16    Q.  Okay.  And so on this summary chart, there are various text

17    messages and emails you're saying?

18    A.  Yes.

19    Q.  And where are these messages drawn from?

20    A.  If you look all the way on the right, GX on the top there,

21    they are drawn from, on this first page, the first one, GX 1,

22    and that's in evidence.

23                THE COURT:  So what does that stand for, GX?

24                THE WITNESS:  That was a number that I used to find

25    where it was in evidence.

1    Q.  "GX," government exhibit; is that right?

2    A.  Right.

3    Q.  GX 1 is Government Exhibit 1?

4    A.  Yes, Government Exhibit 1.  And that's where I would

5    compare the -- what you find in this chart to.

6    Q.  So is this every email and text message that's in evidence?

7    A.  No.

8    Q.  Okay.  And what time period generally do these texts and

9    emails in the chart relate to?

10   A.  These are the beginning times of the GoFundMe page.  So

11   it's the end of 2018, December 2018, and into 2019.

12   Q.  And before we get into the substance, let me ask you a few

13   questions about the layout of the chart.

14           So first, are the materials organized in a particular

15   way?

16   A.  Yes, chronologically.

17   Q.  Okay.  And so how do we read this chronologically?

18   A.  From top to bottom, the numbers on the left there start at

19   1.

20   Q.  Okay.  And you just read down?

21   A.  Yes.

22   Q.  And you go to the next page?

23   A.  Exactly.

24   Q.  Can you explain what each of the columns are?

25   A.  Sure.  Column one is just the number of the text

1   chronologically.  The second column is the date and time.

2   Column three and four are the participants in the chart, from

3   and to.  The fifth column is the message, so the statements

4   that were made.  And that final column all the way on the right

5   is the government exhibit where these texts can be found.

6   Q.  So what's the significance of the numbers in the left-most

7   column, the row numbers?

8   A.  Those are the -- those are to be able to identify which one

9   we're discussing and they are also numbered chronologically.

10  Q.  Okay.  That's just mostly we can talk about which message

11  we're referring to?

12  A.  Yes.

13  Q.  Now, you testified this information comes from other

14  exhibits; is that right?

15  A.  Yes.

16  Q.  Where on the chart does it say, again, which exhibit it

17  comes from?

18  A.  The column all the way on the right.  GX is the government

19  exhibit.

20  Q.  So let's just do an example.  The first line has Government

21  Exhibit 1 on the right-most column.

22          MR. ROOS:  Ms. Drescher, can you pull that up.

23  Q.  This is in evidence.  And Special Agent Hunziker, do you

24  see the text from the first line on the first chart on this

25  exhibit?

M5OVSHE2                         Hunziker - Direct

1    A.  I do.

2    Q.  Okay.  And let's zoom in on that and flip through this

3    exhibit.  So it's three pages.  And are various parts of this

4    text message incorporated into the chart?

5    A.  Yes, they are.

6    Q.  If the jury wanted to see the full source materials, is

7    this also in evidence?

8    A.  It is.

9    Q.  So you could look at the chart, you could look at the

10   source document; is that right?

11   A.  Yes, they can.

12   Q.  How do you know on this exhibit who's involved in this text

13   message exchange?

14   A.  On the top there you can see the participants.

15   Q.  Okay.  And so who on this one, for instance, are the

16   participants?

17   A.  This one, it's Mr. Brian Kolfage, Mr. Tim Shea, and

18   Ms. Amanda Shea.

19   Q.  Okay.  And --

20           THE COURT:  Are you able to tell who is the sender and

21   who is the receiver?

22           THE WITNESS:  Yes.

23           THE COURT:  And how do you tell that?

24           THE WITNESS:  In this column on the GX 1, that third

25   column has the "from."

M5OVSHE2                        Hunziker - Direct

1   Q.  And so then how do we know who it's to?

2   A.  On the top it lists all the participants.

3   Q.  So, for instance, on this one, if it says Brian Kolfage,

4   Tim Shea, Amanda Shea, and the message is from Brian Kolfage,

5   who are the other participants?

6   A.  They would be Tim Shea and Amanda Shea.

7   Q.  All right.  So if the jury found it easier to look at the

8   summary chart -- well, that's in evidence too, right?

9   A.  Yes.

10  Q.  All right.  So let's --

11              THE COURT:  So are you saying that the owner is always

12  the sender?

13              THE WITNESS:  No.

14  Q.  Okay.  So it's all three, but the sender could be any of

15  these people; is that right?

16  A.  That's correct.

17  Q.  And whoever is not the -- the two people who are not the

18  sender are the recipients of the message?

19  A.  That's correct.  And that's how the summary chart is

20  actually laid out.

21  Q.  Okay.  All right.

22              So let's go back to the summary chart.  And on the

23  summary chart, how can we tell who the participants are on a

24  particular message?

25  A.  In column three and column four, the "from" and the "to"

M5OVSHE2                        Hunziker - Direct

1   list out the participants in that chart.  And the "from" is who
2   sent this -- who sent the chat.
3   Q.  Okay.  Understood.  Now we can zoom in on that.
4           And I asked you a few minutes ago about whether
5   multiple text messages from one of those exhibits were
6   incorporated into the chart.  Take a look at the first six
7   messages.  And what exhibit are those drawn from?
8   A.  Those are from GX 1, the exhibit we just looked at
9   previously.
10  Q.  So this is pulling a lot of material from GX 1.  And then
11  we'll go to the next government exhibit; is that right?
12  A.  Yes.
13  Q.  Okay.  Here's what I'd like to do:  We're going to read
14  through this together.  You're going to read the part -- you're
15  going to read the messages sent by Tim Shea and Amanda Shea.
16  I'll read the parts written by Brian Kolfage.  If there are
17  different participants later on, we'll sort of pick out new
18  roles, okay.  And I may ask you some questions along the way.
19  Okay?
20  A.  Okay.
21  Q.  All right.  So let's start.  And looking at the first
22  message on 904, that's from Brian Kolfage.  So I'll read it.
23  It's on December 12th, 2018 at 7:08 p.m.  And he writes to Tim
24  and Amanda Shea:  I have a great idea that I stole.  Let's
25  create a GoFundMe to pay for the Trump wall.  And if Trump

1    doesn't take the money, then we donate it to our organization.

2    And that comes from Government Exhibit 1.

3    A.   Tim Shea replies at 7:14:  That's so perfect.

4    Q.   And then at 7:15, Brian Kolfage writes back to Tim and

5    Amanda Shea:  It might be too difficult to fund entire thing,

6    but let's say fund a portion, like 400 million.

7    A.   Tim Shea replies:  Amanda, Trump can't take the money like

8    Kavanaugh couldn't, so we could transfer it.

9    Q.   Brian Kolfage writes back, 7:15:  We the people fund the

10   wall, create a website too.

11   A.   A minute later Tim replies:  Yaaaaass.

12   Q.   Now, these are all from Government Exhibit 1 which we just

13   looked at.

14        Before we go any further, let me just ask you about

15   the context.  Around this time in December 2018, what was going

16   on with the border wall?

17   A.   President Trump was negotiating with Congress to get

18   funding for the border wall.  In late December 2018, the

19   government shut down partly over those negotiations for

20   approximately 35 days.

21   Q.   Okay.  Got it.

22        And so on the fourth message, is it your

23   understanding, where it says, Trump can't take the money,

24   that's a reference to those efforts like whether or not Trump

25   could take the money from this GoFundMe?

M5OVSHE2                         Hunziker - Direct

1    A.  Yes, I think they had some experience regarding this with

2    Kavanaugh.

3    Q.  All right.

4              THE COURT:  What do you mean by "Kavanaugh"?

5              THE WITNESS:  They had set up a GoFundMe, or some

6    folks did, that I believe Brian Kolfage was participating with.

7    And they wanted to raise money for the Supreme Court Justice.

8    And I think there were some issues about actually how to

9    transfer that money to him.

10   BY MR. ROOS:

11   Q.  Okay.  Let's look at the next message, which is number 7 on

12   this.  And since it's Brian Kolfage, I'll read it.  Now, this

13   is from a different exhibit and a different date.  So this is

14   December 16, 2018 and 11:17 p.m.  Brian Kolfage writes to Tim

15   Shea and Amanda Shea:  Hi everyone.  Please click here to

16   support my GoFundMe campaign.  We the People will fund the

17   wall.

18             And then the next message at 11:28, on the same day

19   from the same exhibit, he sends -- he texts the link

20   GoFundMe.com\TheTrumpWall.

21             And then can we go to the next page.  So then this is

22   on December 17th, 2018 at 9:52 a.m.  Brian Kolfage texts Tim

23   and Amanda Shea again from the same exhibit an image.

24             So let me ask you, what does this image appear to be?

25   A.  This appears to be the GoFundMe page.  It states:  We the

M5OVSHE2                         Hunziker - Direct

1   People will fund the wall.  And it has a picture on the left of

2   President Trump.

3   Q.  Okay.  And why don't you read the next message?

4   A.  At 9:55 a.m., Amanda Shea writes:  Looooooooovvee.

5          Tim Shea a minute later writes:  That is perfect.

6          Amanda Shea replies:  Let's get it on our Twitters.

7   Q.  All right.  By the way, before I read the next message, let

8   me ask you, what's your understanding of where these materials

9   came from, these text messages?

10  A.  I believe they came from search warrants.

11  Q.  Okay.  On various cell phones?

12  A.  On cell phones, yeah.

13         MR. ROOS:  And Ms. Drescher, could we move away from

14  this exhibit for one second and look at S-7.  And scroll down.

15  Q.  And Special Agent Hunziker, you see that this references

16  various exhibits we're looking at and indicates they came from

17  phones and computers belonging to Tim Shea, Amanda Shea, Brian

18  Kolfage, and Stephen Bannon that were seized pursuant to

19  court-authorized search warrants?  Do you see that?

20  A.  Yes.

21  Q.  All right.  Let's go back to the exhibit.  And we're

22  picking up at number 13.  Again, this is all still just from

23  Government Exhibit 2.

24         And Brian Kolfage writes to Tim and Amanda Shea:  Do

25  you have a P.O. Box?

1  A.  Amanda replies:  No, but we keep meaning to set one up.

2  Tim can do it today if we need one.

3  Q.  Okay.  And on the next page, line 15, Brian Kolfage writes

4  back to Tim and Amanda Shea:  People want to send checks?

5  A.  Amanda replies:  Who uses checks anymore?  We'll set one up

6  today.

7  Q.  And Brian Kolfage responds, line 17:  Old people.

8  A.  Amanda replies:  I can't wait to see where it ends up by

9  the end of the day.

10  Q.  Brian replies a minute later:  We need media on it.

11  A.  Amanda replies:  Tim and I will focus on the articles if

12  you want to do the emailing.  I'll post them on Joe, too.

13          MR. ROOS:  Okay.  Can we just bring up Government

14  Exhibit 2 for one minute.  Can we just scroll through it.

15  Q.  Special Agent Hunziker, all the messages we've been reading

16  for the last few minutes have come from this exhibit,

17  Government Exhibit 2, right?

18  A.  Yes.

19  Q.  All right.  And this is in evidence, right?

20  A.  Yes.

21  Q.  So folks could review it if they want?

22  A.  Yes.

23  Q.  Okay.  Let's go back to 904.  All right.  And we'll pick up

24  now on line 21, which is pulling from the third exhibit.

25          So line 21, Brian Kolfage says to Tim and Amanda Shea

M5OVSHE2                        Hunziker - Direct

1    on December 17, 2018 at 1:35 p.m.:  I updated the GoFundMe mr.

2    A.   Amanda replies:  Also, do you want there to be in fine

3    print that a percentage goes to us to cover the legal, etc.?

4    Q.   Okay.  And Brian Kolfage writes back to that:  No.  No fine

5    print.  We'll get so much from it already.

6          So then this is later that day at 10:38 p.m., Brian

7    Kolfage writes to Tim and Amanda Shea:  Will hit 30K.

8          That's from Exhibit 4.

9    A.   Right.

10   Q.   And then do you see line 25, there's an entry from GoFundMe

11   on December 18, 2018?

12   A.   Yes.

13   Q.   And first, why don't you just read what's in the box about

14   that?

15   A.   We the People will fund the wall.  GoFundMe page says 100

16   percent of your donation also go to the Trump wall.

17   Q.   Okay.  And that comes from Government Exhibit 301, which

18   the jury may have seen.

19          MR. ROOS:  Why don't we just put up 301.  And can we

20   scroll down to where that statement came from.

21   Q.   So that's a statement that's on your chart, right?  This

22   came off of the GoFundMe page?

23   A.   Yes.

24   Q.   All right.  Let's go back to 904.

25          So this is basically just like a chronology, right,

1   for the early days that we're walking through?

2   A.  Right.  From the end of December 2018.

3   Q.  Okay.  So then line 26, which is that same day as that

4   GoFundMe page, Brian Kolfage says to Tim and Amanda Shea:  40K.

5   And what's that -- that's like a reference to how much money

6   they've raised?

7   A.  I believe so, yes.

8   Q.  And what's the next message?

9   A.  Tim Shea replies:  Holy shit.

10          Tim Shea then writes:  I mean, people are crazy.  Who

11  would throw money at something like this at Christmastime?

12  Q.  Okay.  And then Brian Kolfage says in response to that,

13  like 40 minutes later:  Let's do a lot of posts today.

14          Is your understanding he's referring to social media

15  posts?

16  A.  I believe that's what it is, yes.

17  Q.  And then he says again to Tim and Amanda Shea at the same

18  time:  We gotta start making more money.

19          And then I guess my turn again.  December 18th, 2018,

20  later that morning he writes:  Donations rolling in.

21  A.  At 10:46 a.m., Amanda Shea replies:  More on fire today

22  than yesterday.

23          Tim Shea replies:  Christmas bonus?

24  Q.  Brian Kolfage then writes that evening -- that was in the

25  morning, so the evening:  200!!!  Ours is full-blown viral.

1          What do you understand "viral" to mean?

2   A.   I believe when something goes viral, the speed that it

3   moves around, in this case something on the internet.

4   Q.   So it's kind of like newsy on the internet, people are

5   excited about it or it's caught on?

6   A.   Yeah, there's a lot of attraction.

7   Q.   All right.  Line 36 is December 19.  Brian Kolfage writes

8   to Tim and Amanda Shea:  I need that P.O. Box.  And he writes:

9   I have hundreds wanting to mail checks.

10  A.   Tim Shea replies:  I went over to set it up on Monday, and

11  the line was out the door to ship shit.  They open at 8:30 this

12  morning.  I'll set it up then.

13  Q.   Set it up, the P.O. Box?

14  A.   That's what I believe it's a reference to, yes.

15  Q.   Brian Kolfage writes to Tim and Amanda Shea:

16  Gofundthewall.com is open.

17  A.   At 8:41 Tim Shea replies:  It might make it to 1b.

18  Q.   And Brian Kolfage responds on the same chat:  Question is

19  do we make this an org?

20  A.   Amanda Shea replies:  I think org.

21  Q.   So what do you understand "org" to be in this context?

22  A.   An organization.

23  Q.   Okay.  Brian Kolfage writes:  What's Tim email?  I need to

24  add him to GF as a team member, if that's okay.

25          And let me -- before you get the next message, let me

M5OVSHE2                        Hunziker - Direct

1   ask, what do you understand "GF" to be a reference to?

2   A.   GoFundMe.

3   Q.   Go ahead.  You can read the next message.

4   A.   Tim Shea replies:  Timshea.realestate@gmail.com.

5   Q.   Okay.  And then about 30 minutes later, Brian Kolfage texts

6   Tim and Amanda Shea again:  Over 500K.

7        So at this point he's basically updating them on the

8   donation numbers?

9   A.   That's what I think it is, yes.

10  Q.   All right.  Why don't you read the next message, line 46.

11  A.   At 11:09 a.m. Tim Shea writes:  Our new mailbox, 4833 Front

12  Street, Unit B-158, Castle Rock, Colorado, 80104.

13  Q.   And line 47?

14  A.   Tim Shea writes at 11:46 a.m.:  People here in our city are

15  arguing if you live here in Castle Rock.  They see the GoFundMe

16  address.  And there's a screenshot from a Fox 31 news article.

17  And the article title is GoFundMe to Build Trump's Border Wall

18  Raises More Than $3.5 million in Three Days.  And the person

19  who screenshotted that writes:  This guy lives in Castle Rock.

20  Q.   I just want to be sure everyone is following on this part.

21  So the last message is an address, and then there's this

22  screenshot, and then a message connected to it.  So can you

23  explain what's happening here?

24  A.   Yeah.  I think what's going on is that there's -- there's

25  some discussion on Facebook on Mr. Brian Kolfage lives in

M5OVSHE2                       Hunziker - Direct

1   Florida, and the address for the GoFundMe is in Castle Rock,
2   Colorado.  So I think there's some arguments about why that is.
3   Q.  Okay.  Let's read the next message now, line 48, the one
4   after this one.
5   A.  At 11:56 a.m. Tim Shea writes:  We may have to do some
6   damage control.  Eventually people will question the legitimacy
7   of the GoFundMe account when you are in Florida, but the
8   GoFundMe address in Castle Rock, Colorado.
9   Q.  So people are -- your understanding is people are asking
10  what's up with this, is it legitimate, since the address is in
11  Colorado?
12  A.  Yeah.  I think the public is trying to just wrap their
13  hands around it.
14  Q.  All right.  Line 49, Brian Kolfage says to Tim and Amanda
15  Shea:  I can say I run a business there.  We are partnered.  So
16  I do.
17            And let me just stop there.
18            This message I just read is on December 20th.  Based
19  on the materials you've looked at up through this date, what's
20  your understanding of what the plan was with respect to the
21  GoFundMe?
22  A.  The plan was to raise the funds and then give the funds to
23  the government, for the government to then build the wall along
24  the border.
25  Q.  Okay.  And then the next message on this line 50, before I

1    read it, is a week later, is that right?

2    A.  Yes.

3    Q.  So why don't I'll read the message, and then I'll ask you a

4    question about it.

5         So line 50 is a week later, December 27, 2018.  And

6    Brian Kolfage on this one texts just Tim Shea:  Plan:  We are

7    building wall.  We.  Physically us.  We are bypassing

8    government.  It will be symbolic to get the real wall support.

9    After we get this corp. set up, I'll call you.  We are setting

10   up an office in Florida.  Will be in my area since they are

11   doing the c4 in Florida.

12        So first let me ask you, what's your understanding of

13   what the new plan was?

14   A.  The new plan was to pivot from funding the wall and

15   providing those funds to the government to actually raising the

16   funds and then building the wall themselves.

17   Q.  And there's a reference in here to c4.  Do you have an

18   understanding of what that's a reference to or what a c4 is?

19   A.  I believe that's in reference to a 501(c)(4), which is a

20   nonprofit designation by the IRS.

21   Q.  So it's like an organization or an entity that you would

22   set up pursuant to the IRS code?

23   A.  Yes.

24   Q.  Why don't you read line 51.

25   A.  At 6:12 p.m. Amanda writes:  For the article of

M5OVSHE2                          Hunziker - Direct

1    incorporation, I want to be listed as an officer or both Tim

2    and I listed as officers.

3    Q.   Okay.  And line 52, Brian Kolfage writes to Tim and Amanda

4    Shea:  That was Steve's plan.  I told him you guys are

5    partnered with me.  He wanted to give you guys a different

6    title, like president or something.  You won't be left out.

7              And let me pause there for a second.  There's a

8    reference to Steve.  From your involvement in this

9    investigation, do you know who that is?

10   A.   I believe that is Steve Bannon.

11             MR. ROOS:  And can I show just the witness what's been

12   marked for identification as Government Exhibit 284.

13   Q.   Do you recognize this?

14   A.   I recognize the individual, yes.

15   Q.   And who is it?

16   A.   Steve Bannon.

17             MR. ROOS:  Government offers 284.

18             MR. MERINGOLO:  No objection.

19             THE COURT:  It is admitted.

20             (Government's Exhibit 284 received in evidence)

21             MR. ROOS:  May we publish to the jury?

22             THE COURT:  Yes.

23   Q.   All right.  Special Agent Hunziker, the jury hadn't seen

24   the picture when I asked you the question, so let me ask you

25   now, who is this?

1    A.  Steve Bannon.

2    Q.  Okay.

3          MR. ROOS:  We can take that down.

4    Q.  Let me ask you though, what was Steve -- or who is Steve

5    Bannon?

6    A.  Steve Bannon was a campaign manager for Donald Trump's run

7    for president; and then later was a senior adviser in President

8    Trump's White House.

9    Q.  Okay.  Let's go back then to 904, the chart.  And we'll

10   pick up the next message, which is line 53.

11   A.  Tim Shea writes:  We know that.  We trust you.

12   Q.  So that's a response to the prior one that says:  I told

13   him you guys are partnered with me.  He wanted to give you guys

14   a different title, like president or something.  You won't be

15   left out.

16   A.  Yes.

17   Q.  All right.  So then the next message, line 54, is between

18   different people, right?

19   A.  Yes, these are different participants.

20   Q.  So let's look at Government Exhibit 16.  So this is on the

21   timeline, but it's from a totally different text message

22   exchange; is that right?

23   A.  Yes.

24   Q.  Okay.  And who is this text message exchange between?

25   A.  The participants, as you can see on top, are Andy Badolato

1    and Steve Bannon.

2    Q.  We just talked about Steve Bannon.

3         Who's Andy Badolato?

4    A.  Andy Badolato is a business associate of Steve Bannon's.

5    Q.  Okay.  And so why don't we -- there's seven messages on

6    this and some of them appear on the timeline chart.  Why don't

7    we go back to that, Government Exhibit 904.  And for this, on

8    line 54, why don't you read messages from Andy Badolato and

9    I'll read any messages from Steve Bannon, if there are any.

10   A.  Okay.  On December 30th, 2018 at 12:55 p.m., Andy writes to

11   Steve Bannon:  I got Brian to agree to the following that will

12   be disclosed in the GoFundMe deal and the most talked about

13   media narrative ever.  He will not be paid a dime and get a

14   bonus milestone when the wall starts and when it's finished.

15   Lol yugge.  But we gotta find an end around to get him stuff

16   and something soon.

17   Q.  All right.  Let me ask you about -- a few questions about

18   this statement.  So he says he got Brian.  Who do you

19   understand Brian to be a reference to?

20   A.  Mr. Kolfage.

21   Q.  He got Brian Kolfage to agree to the following that will be

22   disclosed as part of the GoFundMe deal.  And then there's the

23   next sentence, which says:  He will not be paid a dime and get

24   a bonus milestone when the wall starts and when it's finished.

25        So let me break that part in half.  Did you see -- in

M5OVSHE2                          Hunziker - Direct

1     the materials you reviewed, have you seen other materials that

2     reference that Brian Kolfage will not be paid a dime?

3     A.   Language similar to that, yes.

4     Q.   Is that stuff that comes after this date, December 30th, so

5     like later public statements?

6     A.   Yes.

7     Q.   And what about this other part though, did you ever end up

8     seeing anything where they end up saying he's going to get a

9     bonus?

10    A.   This is the only reference that I saw to any sort of bonus.

11    Q.   And just to be clear, this one is not a public statement

12    made to donors, right?

13    A.   No, this is a message between Andy Badolato and Steve

14    Bannon.

15    Q.   Okay.  And then he says:  Lol yugge.  And then the last

16    sentence:  But we've got to find an end around to get him stuff

17    and something soon.

18    A.   Right.

19    Q.   All right.  Okay.  Let's move on then to message 55.

20              And who's this exchange between?

21    A.   So this one goes back to the participants being Tim Shea,

22    Amanda Shea, and Brian Kolfage.  On January 9th, 2019 at 9:22

23    a.m., Tim Shea writes:  Boom.  Thursday is still announcement

24    day?

25    Q.   Okay.  And then what's the next message?

M5OVSHE2                        Hunziker - Direct

1   A.   On January 11th, 2019, there's a BuzzFeed article.  I felt

2   dirty:  Former employees of the veteran crowdfunding Trump's

3   wall say he pushed fake news to get rich.

4   Q.   The jury has seen this one.  Put it up on the screen, 401.

5   This is the BuzzFeed article?

6   A.   Yes.

7   Q.   Okay.

8        MR. ROOS:  We can take that down.

9   Q.   So the next message is line 57.  And since I'm reading for

10  Stephen Bannon, Stephen Bannon says to Andy Badolato:  BuzzFeed

11  working with GoFundMe you can tell.

12       And can you read the response?

13  A.   Sure.  Andy responds to Steve Bannon:  I'm working on press

14  release.  I think a strict bylaw review.  And in the press

15  release Brian says not a penny will go to him at all; and he

16  says a private donor has agreed, reached out to compensate him

17  directly as milestones are reached.  That removes all

18  self-interest taint on this.  All money goes to wall.  It gives

19  Brian sainthood and reputes the articles as haters.  Go build

20  the wall donations, GoFundMe.  He is willing to do that.

21  Q.   All right.  Let me ask you a few questions about this.

22       So Badolato says he's working on a press release.

23       Do you see that?

24  A.   Yes.

25  Q.   And he says:  And the press release should say Brian is not

M5OVSHE2                       Hunziker - Direct

1   taking a penny.

2           Who do you understand "Brian" to be a reference to?

3   A.  Mr. Brian Kolfage.

4   Q.  It says:  He won't take a penny and that a private donor

5   would compensate him.

6           Did you see in the course of review of public

7   materials, materials that said Brian Kolfage wouldn't take a

8   penny?

9   A.  Yes.

10  Q.  But did they end up ever saying that a private donor would

11  compensate him?

12  A.  Not in my review, no.

13  Q.  Not in your review of any public statements?

14  A.  Right.

15  Q.  All right.  It says it removes all self-interest taint.

16  What do you understand that to be a reference to?

17  A.  I believe, and with this article that there was -- there

18  are people discussing how much the administrators like Brian

19  Kolfage would take in this fund raise.  And so I think this was

20  an effort to make it show that he wasn't going to take any

21  money from this -- from this effort.

22  Q.  Okay.  Now, a few minutes ago you read a statement that

23  said you have to find Brian Kolfage an end around.  Do you

24  remember reading that?

25  A.  Words like that, yes.

1    Q.  Right up here, line 54, but we got to find an end around to

2    get him stuff and something soon.

3    A.  Yes.

4              MR. ROOS:  Why don't we scroll down to line 59.

5              THE COURT:  And if you could wrap up, please.

6              MR. ROOS:  I'll do this last one and wrap up for

7    lunch.

8    Q.  Line 59, what does Steve Bannon say to Andy Badolato in

9    response to this?

10   A.  COAR can pay him.

11   Q.  What do you understand COAR to be a reference to?

12   A.  That's Steve Bannon's nonprofit company Citizens of the

13   American Republic.

14   Q.  Okay.  So he says Brian will say he's not taking a penny,

15   and Steve Bannon says his nonprofit can pay him?

16   A.  Right.

17             MR. ROOS:  All right.  Why don't we break there, your

18   Honor, if that's okay.

19             THE COURT:  All right, then.

20             You may step down.

21             Members of the jury, it's now 1:02.  We will resume at

22   2:02.  So I'll need for you to be outside the courtroom and

23   ready to walk in at that time.

24             Remember that you're not allowed to discuss this case

25   amongst yourselves or with anyone else.  Don't allow others to

1    discuss the case in your presence.

2              Have a good lunch.

3              (Jury not present)

4              THE COURT:  Is there anything you wanted to raise

5    before we take our lunch?

6              MS. MOE:  Not from the government, your Honor.

7              Thank you.

8              MR. MERINGOLO:  Not from the defense, Judge.

9              THE COURT:  All right.  We'll resume at 2:02.

10             (Luncheon recess)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M5o3she3

AFTERNOON SESSION

1:55 p.m.

1    (In open court; jury not present)

2    THE COURT:  You may be seated.  I understand that you

3    wanted to raise some issues.

4    MR. ROOS:  One, for starters, your Honor, so there is

5    an exhibit Government Exhibit 29, it is in evidence.  Basically

6    there is some I guess off color, defense says they're off color

7    comments in the exhibit that they'd like redacted.  We had

8    tried to truncate the exhibit.

9    THE COURT:  What type of nature?

10   MR. ROOS:  It is a text exchange.  I'll pass it up to

11   your Honor.

12   So, we had tried to cut part of the exhibit just to at

13   least partially solve the issue.  Mr. Meringolo then referenced

14   parts of the exhibit we had cut.  We don't care if it is cut or

15   not.  We had to go back because he used parts that were in

16   opening that we had thought were going to be cut.  Now I think

17   they probably have to come into the case.

18   So, as a result, that's why we're raising this

19   redaction issue with your Honor now.  There is a few messages

20   that defense counsel wants redacted.  I think maybe since it is

21   their objections, they could just list the line number and

22   we'll tell you if we are okay with redacting or else what our

23   view of why the statement is relevant if that works for

M5o3she3

1  everyone.

2          MS. CAPPELLINO:  We're starting with the old --

3          MR. ROOS:  Do you need a copy?

4          MS. CAPPELLINO:  Thank you.

5          We just ask that anything regarding race, sexual

6  orientation, any off colored language about people or where

7  they're from.  So, for example, on this 29, it starts with line

8  12, we ask that be redacted.  They are talking about people by

9  the border they don't trust crackers.  That's an off color

10 remark.  The people we're dealing with won't trust the Mexican.

11         THE COURT:  Are you challenging the accuracy?

12         MS. CAPPELLINO:  No, your Honor.  We just think it is

13 off color and based on -- based on a 403 analysis.  With the

14 epithets and what it references, we think it is off color and

15 it would be way more prejudicial than probative.  We think it

16 can be redacted without affecting the overall message or

17 interpretation of the string of texts.  So that would be our

18 argument.  It goes throughout the exhibit as well.

19         THE COURT:  So you can't agree on what should be

20 redacted?

21         MR. ROOS:  So basically, your Honor, this is a chat

22 between the defendant and his co-conspirators, so, sort of like

23 they made these statements, I mean, if they are substantively

24 irrelevant, we'll give them the redactions and I think

25 Ms. Cappellino e-mailed us some and we're fine with them.  I

M5o3she3

1      don't have the numbers off the top of my head, but if she wants

2      to call them out, we can say yes or no or we can work it out.

3      There is maybe a few where we think, even though it's

4      insensitive for some reason, it is still substantively

5      relevant.  Like so for those --

6              THE COURT:  Why don't we talk about the ones that are

7      in contention.

8              MR. ROOS:  Great.

9              MS. CAPPELLINO:  I believe that's line 67 through 69.

10     Those are the ones we objected to and I believe the government

11     wants to keep those in.

12             MR. ROOS:  I believe there is one before that also.

13             THE COURT:  67 to 69?

14             MR. ROOS:  They also objected to 41.

15             THE COURT:  Line 67, Mr. Kolfage allegedly said too

16     bad you're not disabled.  Then again in 68 he says and black.

17     And in 69 and a woman.

18             And the prosecution feels this is relevant because?

19             MR. ROOS:  Starting on line 54, actually 53, Kolfage

20     says if it came out we hired ourselves, it would be bad.  And

21     the defendant says we need to create companies that I hired

22     you, I'm paying you for a service consulting.  Kolfage says,

23     part of me says do it, but I am not sure if Steve would let it

24     fly.  He says Pitch Fork is actually legitimate.  Then he says,

25     the defendant says, but the transfers this between me and you

M5o3she3

1    if you own -- then Kolfage says, if you own a construction

2    firm, and can do it for cheap, by golly fist bump.  The

3    defendant says, yeah we need to talk through this.  And Kolfage

4    says too bad you are not disabled and black and a woman go to

5    Detroit.  Find one.  The defendant says if 600K comes in and I

6    transfer you 300K.  Kolfage says, yeah, that's legit.

7           So the relevance is that they are basically talking

8    about, like, we need to create a company through a shell

9    company through which we can send the money.  And Kolfage is in

10   a joking way saying this would be so much easier if you were

11   black and disabled and lived in Detroit because it would give

12   us sort of like a cover.  But, you're not.

13          So that's the context.

14          THE COURT:  But he's implying that if you fit a

15   certain demographic, you would be treated more favorably by

16   whom?

17          MR. ROOS:  I guess whoever is, like, looking to detect

18   these things.

19          THE COURT:  In other words, that the demographic

20   information gives some greater legitimacy.

21          MR. ROOS:  If it was a minority.  He is jokingly

22   suggesting if it was a minority owned business, it would be

23   treated -- it would get more favorable treatment or wouldn't be

24   looked at as suspiciously.

25          THE COURT:  I think it is relevant.

M5o3she3

1          Anything else?

2          MR. ROOS:  Then the other one is line 39.  The

3    defendant says, who is building it?  And this is a reference to

4    the wall.  40, the defendant says or Kolfage says, we are.  And

5    line 41 the defendant says, that's gay.  And then line 42

6    Kolfage says, who else.  And Tim Shea says, what's the name of

7    the construction company that's building the wall.

8          They object to the line "that's gay," and our position

9    is he is responding to Kolfage's statement in a negative way.

10   Like, that's a dumb idea.

11         So, I mean, obviously I think we all wish there was a

12   different wording that was used.  But you can't like divorce

13   the context here which is he is responding to the suggestion

14   that they are going to say they are building the wall.

15         THE COURT:  You are saying that "that's gay" means?

16         MR. ROOS:  That's dumb.

17         THE COURT:  That's silly?

18         MR. ROOS:  Silly, yeah.

19         MS. CAPPELLINO:  I mean it clearly is an off color

20   remark.  I don't really understand the context one way or

21   another.  I do believe it is irrelevant and it would be

22   prejudicial to Mr. Shea.  I don't believe he meant any harm.  I

23   don't believe this is a --

24         THE COURT:  They're discussing whether the plan would

25   be seen as legitimate.  Do you agree with that?

M5o3she3

1          MS. CAPPELLINO:  Your Honor, it is my understanding

2     they are talking about who could be sent down to do the actual

3     construction, and the conversation begins on the premise that

4     whoever goes down and deals with the people along the border,

5     whoever they are buying property from etc., etc., they need to

6     be trustworthy.  I know the government's interpretation is that

7     we're creating a shell and we want it to look legitimate.

8     That's not our reading of it.

9          THE COURT:  Where is it you're beginning?

10          MR. MERINGOLO:  The whole thing is about construction.

11          MS. CAPPELLINO:  From line one onward.

12          THE COURT:  Let me just read it through.

13          (Counsel conferring)

14          THE COURT:  I want to understand this.  Starting on

15     line one, Mr. Shea is saying to negotiate these land deals, we

16     need a Spanish speaking negotiator.  Brian, and I have one.

17          So, these land deals are deals with individuals who

18     would be property owners?

19          MR. ROOS:  That's my interpretation.

20          THE COURT:  So, is it your impression these property

21     owners are not English speakers?

22          MR. MERINGOLO:  Some of them aren't.

23          THE COURT:  Some of them are not English speakers.  So

24     whether they're Hispanic or not certainly seems relevant.

25          MR. MERINGOLO:  That is relevant, yes.

M5o3she3

```
 1              THE COURT:  So what is not relevant in your opinion?
 2              MR. MERINGOLO:  The reference to "it's gay."  That
 3    Mr. Kolfage said.
 4              THE COURT:  So, I understand the prosecution to be
 5    saying that that remark is a disparagement of what was said or
 6    proposed by the speaker, and I think it's relevant.  So, I'm
 7    going to permit it to go in.
 8              MR. ROOS:  Thank you, your Honor.  There is some other
 9    lines, 12 through 19, which I don't think we particularly care
10    about so we'll work out a redaction with the defense counsel on
11    those.
12              (Counsel conferring)
13              MS. MOE:  Your Honor, there was one other issue that
14    we wanted to raise before the jury comes back.  Which is that
15    during the presentation of evidence this morning, we heard
16    defense counsel speaking rather loudly at counsel table and in
17    a way that I think is audible to us and I think also to the
18    jury, making comments about the government's case.  Sort of
19    underscoring some themes from the defense opening.
20              I just wanted to make a record, I've let Mr. Meringolo
21    know, I want to make sure that won't happen going forward, that
22    there will be comments during the presentation of our evidence
23    that the jury can hear.
24              Whether it is an accident or not, I don't mean to cast
25    aspersions.  I want to make sure going forward there aren't
```

M5o3she3

1    comments at counsel table the jury can hear.

2              MR. MERINGOLO:  We would like to know what witness

3    this was and when.

4              MS. MOE:  Yes, your Honor.  By way of example, during

5    the direct examination of Ms. Deperi, I heard a comment "This

6    is also scripted."  Which is of course a comment that was also

7    in opening.  And also a comment during the presentation of some

8    of the chat messages "This is also misleading."

9              It is just comments at defense counsel table that are

10   being overheard.  Again, I don't mean to cast aspersions in any

11   way.  I want to make sure going forward that the jury can't

12   hear what the attorneys are talking about at counsel table.  So

13   I flag that for defense counsel and just hope going forward

14   that's not an issue.

15             MR. MERINGOLO: First, that didn't happen at all.

16   Number one.  Number two, she's doing direct examination from

17   here.  Angelica is over here, Tim is over here, and I'm over

18   here.  And I was writing notes to Angelica to try to help her.

19   She doesn't need any help.  And I was just writing notes and

20   tell her about the notes.  I did not one note -- they are all

21   in the garbage -- not one note I said was misleading.

22             You know, she may have heard this.  That's fine.  What

23   they want to hear.  But, when you are -- let's just call a

24   spade a spade, Judge.  When you are doing direct examination,

25   you are listening to the answer.  I'm 10 feet away.  It just

M5o3she3

```
 1   didn't happen.  And I understand the game.  I've been around a
 2   long time.  I understand the game.  I'm an emotional
 3   ballplayer, but I didn't say that.
 4           THE COURT:  All right.  So, everyone will be careful
 5   not to make comments that are audible to the jury.  Very well.
 6   Let's have the jurors come in.
 7           MS. CAPPELLINO:  Can I bother with you one more issue.
 8   I was on the ground floor, I entered the elevator, a juror, I
 9   believe Juror 3 entered, so I immediately exited.  There was no
10   communication but I wanted to put on the record.
11           THE COURT:  Okay.  Please have the jurors come in.
12           I wanted to observe that, apparently, one or more
13   jurors observed to one of my law clerks they would like me to
14   remove my mask when I'm talking.
15           MR. ROOS:  Okay.
16           (Jury present)
17           THE COURT:  Do the parties agree that all jurors are
18   present and properly seated?
19           MR. ROOS:  Yes, your Honor.
20           MS. CAPPELLINO:  Yes.
21           THE COURT:  Let's bring the witness back, please.  And
22   we'll continue with the direct examination of Mr. Hunziker.
23           MR. ROOS:  Your Honor, I think there may be an A/V
24   system issue.
25           THE COURT:  Oh.
```

1           MR. ROOS:  Looks like they're already -- looks like

2    the experts here are already at work on it.  So hopefully it

3    will be resolved shortly.

4           THE COURT:  We'll just wait a moment.

5           Members of the jury, I didn't bring you in right at

6    2:02 because there were some questions of law that I needed to

7    discuss with the attorneys.  Sometimes this comes up.  Issues

8    come up during the trial.  I'm very aware, I'm thinking about

9    you all the time, I know you are waiting, and I want you to

10   know your time is important to me.  And I would not just have

11   you wait for something trivial.

12          Mr. Hunziker, remember that you are still under oath.

13          THE WITNESS:  Yes, ma'am.

14          MR. ROOS:  Your Honor, it looks like the computer

15   system is working again so if I may proceed.

16          THE COURT:  You may.

17          MR. ROOS:  Thank you, your Honor.  Can we look at

18   Government Exhibit 904 again.

19   BY MR. ROOS:

20   Q.  This is the chart we were looking at earlier with some of

21   the texts and e-mails, and I think we made it up to January 11,

22   2019.  That's line 59.

23          Do you remember that, Special Agent Hunziker?

24   A.  I do.

25   Q.  That's the one about in which Bannon responds to Badolato

1   COAR can pay him.  Do you see that?

2   A.  I do.

3   Q.  Let's do the next message and why don't you sort of read

4   that off the chart for us.

5   A.  On January 11, 2019, at 3:47 p.m. Andy Badolato texts

6   several people or I should say e-mailed several people.  "I

7   personally will not take a penny of compensation from these

8   donations except to the extent of reimbursement of expenses

9   incurred in furtherance of this mission.  Is a material item I

10  also feel this should be incorporated in the press release also

11  in the quotes by Brian."

12  Q.  So, I think to understand that why don't we put up

13  Government Exhibit 103.  So the exhibit from which it came.

14  Can I ask you to start by just reading the subject line.

15  A.  Sure.  "Final GoFundMe page update for approval ASAP."

16  Q.  What's the date?

17  A.  January 11, 2019.

18  Q.  There is a lot of people on this.  Can you read who it is

19  from and who it is, to the extent you recognize any names on

20  the cc line.

21  A.  From Andy Badolato.  It is to Rich Kaye, Dustin Stockton,

22  Brian Kolfage, Steve Bannon, and on the cc line there is a

23  couple other people, including Dan Fleuette.

24  Q.  Okay.  And sorry.  Did you say who it is from?

25  A.  Yes.  Andy, yes.

1   Q.  All right.  Why don't you read the e-mail here and this is

2   in -- can we zoom out for a second.  This is, do you see below

3   this is like a statement to be posted on the GoFundMe page.  Do

4   you see that?

5   A.  Yes.

6   Q.  So, just to give everyone the context.  So let's look at

7   the top, and can you read the full e-mail here and I'll ask you

8   some questions about it after.

9   A.  "Please find below the final GoFundMe page update as

10  approved by GoFundMe to date with exception to the highlighted

11  in yellow portion that states," and the highlighted portion is

12  "I personally will not take a penny of compensation from these

13  donations except to the extent of the reimbursement of expenses

14  incurred in the furtherance of this mission."  End of

15  highlight.  "This is bing submitted to GoFundMe since it is a

16  material item I also feel this should be incorporated in the

17  press release also in quotes by Brian."

18  Q.  So just to make sure we are understanding this thing.

19  First of all, it says the highlighted in yellow portion.  There

20  is no yellow on this.  Is that the gray part?

21  A.  Yes.

22  Q.  This was printed out in gray or something?

23  A.  Yes.

24  Q.  And so, can you just -- there is not a lot of punctuation

25  on here.  Maybe you can explain how you read this.

M5o3she3                          Hunziker – Direct

1          MR. MERINGOLO:  Objection, Judge.

2          THE COURT:  Sustained.

3   Q.  All right.  Let me ask the question a different way.

4          It says please find below the final GoFundMe page

5   update as approved by GoFundMe to date with exception to the

6   highlighted portion.  I'll stop there.

7          So is the part that I directed you first, is that the

8   final GoFundMe page update?

9   A.  I think that's Andy writing to the group of people about

10  the GoFundMe update.

11         MR. MERINGOLO:  Objection to thinking.

12         THE COURT:  Sustained.  He cannot interpret what the

13  sender was thinking.

14         MR. ROOS:  Okay.

15  Q.  The part after where it says "I personally will not take a

16  penny of compensation."  What does the e-mail say about that

17  statement in the next sentence?

18  A.  "This is bing submitted to GoFundMe since it is a material

19  item I also feel this should be incorporated in press release

20  also in quotes by Brian."

21  Q.  Have you reviewed screenshots of the GoFundMe page?

22  A.  Yes.

23  Q.  Have you reviewed screenshots of the GoFundMe page that

24  postdate this e-mail?

25  A.  Yes.

M5o3she3                           Hunziker - Direct

1    Q.   Is the language that is in highlight here, have you

2    reviewed screenshots in which that language appears?

3    A.   Yes.

4    Q.   Let's look at government, let's go back to Government

5    Exhibit 904.

6    A.   Okay.

7    Q.   And line 61 which is the next line.  And that's that?

8    A.   That's a GoFundMe page.  "100 percent of the funds raised

9    on GoFundMe will be used in the execution of our mission and

10   purpose.  I will personally not take a penny of compensation

11   from these donations."

12   Q.   Now, directing your attention to line 62.  And what's the

13   date?  There is a little bit of a time bump here.  What's the

14   date on this one?

15   A.   February 4, 2019, 9:01 a.m.

16   Q.   It is a few weeks after this, right?

17   A.   Yes.

18   Q.   Can you read the message?

19   A.   From Tim Shea to Brian Kolfage and Amanda Shea.  "Hey for

20   the Build the Wall store do we want this statement at the top."

21   And then there is a screenshot of the website.  And in red with

22   white font it says "all proceeds go directly to building the

23   wall."

24   Q.   Let's bring up source material which is Government Exhibit

25   23.  And starting at the top, who are the participants on this

1   text message exchange?

2   A.  Brian Kolfage, Tim Shea, and Amanda Shea.

3   Q.  Then let's look at the texts.  What's the first text

4   message?

5   A.  That's on February 1st, 2019.  What's the story with

6   pay/backpay on We Build the Wall for Amanda.

7   Q.  Can you read the next message?

8   A.  That's the one I just read from the summary chart.  "Hey,

9   for the Build the Wall store do we want this statement at the

10  top?"  Then it also includes that screenshot.

11  Q.  All right.  Then can we zoom out.  And look at the next

12  message.  The next few messages.  Can you read through them.

13  A.  Sure.

14          Brian Kolfage replies:  I'll ask.  I think since it

15  can't be proven it's okay.

16  Q.  What's that a reference to?

17          MR. MERINGOLO:  Objection.

18          MR. ROOS:  Not asking what he thinks.  It is literally

19  since, we can crop it so we can see the other thing.

20          THE COURT:  Are you asking what he's replying to?

21          MR. ROOS:  I am asking what the response is to.  Where

22  it says "I'll ask.  I think since it can't be proven it's

23  okay."  I think it was just because it was the message above it

24  wasn't captured.  So maybe I can reask it.

25          THE COURT:  Go ahead.

1              MR. ROOS:  Okay.

2    Q.  So, line three Brian Kolfage says in the second sentence,

3    "I think since it can't be proven it's okay."

4              And the prior message, what does the prior message

5    say?

6    A.  Tim Shea's asking if they want to include the line "all

7    proceeds go directly to building the wall included on the We

8    Build the Wall store."

9    Q.  Let's look at line four.

10   A.  Tim Shea responds "K."

11   Q.  Then what he does he write?

12   A.  Tim Shea also writes "I don't want to go to jail."

13   Q.  How does Brian respond?

14   A.  "All proceeds are licensing do."

15   Q.  How does Amanda Shea respond?

16   A.  "LOL... jail."

17   Q.  How does Tim Shea respond?

18   A.  "Don't bend over for the soap."

19   Q.  Are there any more messages on this chain?  Let's zoom out.

20   A.  No, I believe that's the only page.

21   Q.  Okay.  So then let's go back to the summary chart.  And

22   line 63, did we just read that?

23   A.  Yes.

24   Q.  How about line 64 and 65, did we just read those too?

25   A.  We did, yes.

M5o3she3                         Hunziker - Direct

1   Q.  So most of the messages that were on Exhibit 23 are also on

2   the summary chart here?

3   A.  Yes.

4   Q.  The jury can look at either?

5   A.  Yeah, they can.

6   Q.  Line 66.  Can you read that?

7   A.  Brian Kolfage texts Andy Badolato.  "My 100K hasn't gone

8   through yet."  It is an e-mail.

9   Q.  Why don't we bring up that e-mail.  Can we see Government

10  Exhibit 112.  And just start at the top.  Who is the e-mail

11  from and to and what's the subject line?

12  A.  From Brian Kolfage to Andy Badolato.  And the subject line

13  is "pay."

14  Q.  And then what, without reading all of it, is listed up to

15  the point of Brian Kolfage, so everything above it?

16  A.  There are several individuals with a dollar amount and then

17  also a mailing address.

18  Q.  Then to the part where Brian Kolfage is, can we zoom in on

19  that paragraph that has name Brian Kolfage and also.  Just like

20  that.  Will you read that.

21  A.  "Brian Kolfage, 18,200 biz expenses on personal card.

22  Facebook ad snafu dollar sign plus Dustin and Jen lodging for

23  one month.  Also my 100K hasn't gone through yet.  We had issue

24  with check was supposed to ACH now."

25  Q.  We can zoom out and take that exhibit down.  And let's do

1    the summary chart again.  904.  Which line did we just read?

2    A.  66.

3    Q.  So let's look at 67 then.

4    A.  On February 13, 2019 Tim Shea writes to Brian Kolfage and

5    Amanda Shea, "Hey, are you wanting Amanda/me to sign the

6    consulting agreement?  It doesn't apply."

7    Q.  Let's go to the source document so Government Exhibit 25.

8    And can you tell us who the participants are on this text

9    message exchange?

10   A.  Sure.  On the top you can see the box participants and it

11   lists Brian Kolfage, Tim Shea, Amanda Shea.

12   Q.  Can you read us through the chat.

13   A.  Sure.  9:37 p.m. on February 13 Tim writes, "Hey, are you

14   wanting Amanda/me to sign the consulting agreement."  Tim Shea

15   then writes "it doesn't apply."  Brian Kolfage replies "Yup,

16   everyone needs to sign.  It applies to pay.  The regular pay."

17   Q.  I want to ask you about that last statement.  In your

18   review of materials, specifically bank records, did you see any

19   regular monthly payments going to Amanda Shea?

20   A.  Yes.

21   Q.  What amount were they in?

22   A.  They started off between five and $6,000 and at a later

23   time looked like they jumped to 10 grand a month.

24   Q.  Roughly the same as that e-mail we looked at where she was

25   listed out?

1    A.  Yes.

2    Q.  In your review of the bank records, did you see other

3    payments to Tim Shea besides those monthly payments to Amanda

4    Shea?

5    A.  Yes.  Just other payments.

6    Q.  So we'll come back to that.  Let's go back to the summary

7    chart.  And there are two more messages here at the bottom.

8    Why don't you read the first one.

9    A.  On February 19, Brian Kolfage texts Andy Badolato, "We need

10   to figure out my pay.  We started everyone at December 20th

11   mine was 100K upfront then 20 a month.  How's it work for me"

12   and Andy Badolato replies "yes."

13   Q.  If we bring up Exhibit 26.  Are these the same exact

14   messages that were on the chart?

15   A.  Same messages and the same participants.

16   Q.  So we can take this down.  We went through all those

17   messages on the exhibit.

18           And now I want to circle back to something that we

19   read on January 17, there was -- maybe we'll bring up 904

20   again.  On January 17, there's this GoFundMe post and have you

21   seen this type of statement, "100 percent of the funds I won't

22   take a penny" in other places in the materials you read?

23   A.  Yes.

24   Q.  Where?

25   A.  I saw them in transcripts of audio interviews or video

1    interviews.  I saw them on Brian Kolfage's Twitter account.  I

2    saw them on We Build the Wall Facebook page.  I also saw in

3    what looked like some sort of mass e-mailing or reply all from

4    Brian Kolfage.

5          MR. ROOS:  Ms. Drescher, can we please take a look at

6    Government Exhibit 905.

7    Q.  Special Agent Hunziker, what's this?

8    A.  These are statements that occurred at the end of December

9    and into January 2019 from the GoFundMe page, from video

10   interviews with Brian Kolfage, from Brian Kolfage's Twitter

11   account, from the We Build the Wall Facebook account.

12   Q.  Does this chart reflect the entirety of the statements or

13   just an excerpt?

14   A.  These are just excerpts.

15   Q.  If the jury wanted to examine the entirety of the

16   statement, is that possible?

17   A.  Yes.  Again, all on the way on the right that GX,

18   Government Exhibit has the supporting documentation and the

19   jury could go there and review the entire document or audio or

20   Twitter.

21   Q.  So you just described for us the last, the furthest right

22   column and what that means.  Can you just briefly for the jury,

23   what do the other columns, dates, statement, and location a

24   reference to?

25   A.  So on the left there is date.  In this chart it is in

1    chronological order.  The next one is a statement which is just

2    what was on that source document.  The location is the type of

3    information, so if it was Twitter or Facebook.  And that last

4    column is where you could find the support for that excerpt.

5    Q.  I think you testified earlier that January 11 was when this

6    sort of new announcement happened.  Is that right?

7    A.  Yes.

8    Q.  So, this is you said also this is a chart for the month of

9    January.  Roughly, how many statements are on this chart?

10   A.  A little over two dozen.

11   Q.  So for this one, I'm not going to go through all these

12   statements.  I just want to ask you about a few of them.  So

13   let me first can we zoom in on the third line.  January 11.

14         Is this the same statement as was on the other chart?

15   A.  Yes.

16   Q.  So it's from the GoFundMe page?

17   A.  Yes.

18         MR. ROOS:  Why don't we put that up Government 306,

19   please.  And can we go to I think it is page four.

20         Let's go back to the chart, please, Ms. Drescher,

21   Government Exhibit 905.

22   Q.  So we looked at the first few entries are all from a

23   GoFundMe page.  The fourth entry, why don't you read that for

24   us?

25   A.  This is a video interview with Mike Cernovich on YouTube

1   and GoFundMe.  And this is Brian Kolfage speaking.  "This whole

2   project, I won't take a penny from these donations, not a

3   penny.  I won't get paid from this corporation.  Nothing.  I

4   can't touch that money.  It's not for me.  We have bylaws set

5   up.  If I did anything wrong with that money, I would be booted

6   out of the corporation.  Just like that, I would be voted out.

7   In our bylaws it is specifically spelled out.  I will not take

8   a penny for anything.  Every dollar of that GoFundMe will

9   100 percent only go to the construction of the border wall."

10  Q.  You said this is from a video interview?

11  A.  Yes.

12          MR. ROOS:  And so, why don't we first show the witness

13  only Government Exhibit 402A-T, Government Exhibit 402B-T and

14  Government Exhibit 402C-T.

15  Q.  Special Agent Hunziker, are these transcripts of the video

16  interview portions which are 402, specifically 402 subparts A,

17  B and C?

18  A.  Yes.

19  Q.  They accurately reflect to the best of your review?

20  A.  Yes.

21          MR. ROOS:  The government offers 402A-T, 402B-T and

22  402C-T.

23          MR. MERINGOLO:  No objection.

24          THE COURT:  They are admitted.

25          (Government's Exhibit 402A-T, 402B-T, 402C-T received

M5o3she3                       Hunziker - Direct

1   in evidence)

2             MR. ROOS:  Let's start by playing 402A, and have the

3   transcript next to it, Ms. Drescher.

4             THE COURT:  When you use the word transcript, what do

5   you mean, counsel?

6             MR. ROOS:  It is the written text of the portion of

7   the interview that's about to play.  Thank you, your Honor, for

8   the clarification.

9             (Video playing)

10            MR. ROOS:  Can we look at 402B and the accompanying

11  transcript or written text.

12            (Video playing)

13            MR. ROOS:  Can we do the last one, 402C and the

14  transcript.

15            (Video playing)

16  Q.  If we go back to Government Exhibit 905.  So we've looked

17  at the first four entries.  Let's look at the fifth one

18  January 12, 2019.  And what does this one say?

19  A.  This is from Brian Kolfage's Twitter account.  "Big

20  salaries?  It states in our bylaws I take zero dollars.  No

21  salary, no compensation."

22  Q.  What source or location did that come from?

23  A.  Again it's from Brian Kolfage's Twitter account.  And it

24  can be located in Government Exhibit 951A-1.

25            MR. ROOS:  Ms. Drescher, can we put that up for the

M5o3she3                          Hunziker - Direct

1    jury so they can see it.

2    Q.  This is the tweet that's quoted in the chart?

3    A.  Yes.

4    Q.  Can we look at the chart again.  905.  And let's look at

5    the next one.  And what does that one say?

6    A.  "Brian has stated he takes zero dollar salary, zero

7    compensation, and it's in the bylaws."  This is from the We

8    Fund the Wall Facebook.  That can be located at 953.

9    Q.  May we please put that one up so everyone can see the

10   source document.

11            This is the Facebook record from which it came?

12   A.  Yes.

13   Q.  All right.  And let's go back to 905.  Can we go to the

14   second page.  So I'm skipping over some of these, but, sort of

15   what generally are all the statements about?

16   A.  Like the ones we were just discussing regarding

17   compensation.

18   Q.  Okay.  So let's look, there is a message from January 16,

19   2019.  And what's this one?

20   A.  It is an e-mail, in all caps it says from Brian Kolfage to

21   Timothy Shea.  "I will not take a penny in salary or

22   compensation for my work."

23   Q.  Have you seen this language in other materials you've

24   looked at?

25   A.  Yes.

1   Q.  Let's look at the actual e-mail.  So Government Exhibit

2   107.  What's, well, first of all, where is the line that you

3   just read from?

4   A.  It's second from the bottom in all caps.

5   Q.  What's this e-mail about?

6   A.  It is about raising money for the GoFundMe page for

7   building the wall.

8   Q.  And the subject line has this thing where it says we are

9   building a wall four exclamation points and re travel expenses.

10          What does that mean, or what is your understanding of

11   what that means?

12          MR. MERINGOLO:  Objection.

13          THE COURT:  Sustained.

14   Q.  Okay.  Have you seen other e-mails that appear like this?

15   A.  Yes.

16   Q.  What's that a reference to?

17   A.  Again, raising money for the wall.

18   Q.  Let's go back to the chart.  And can we look at -- there is

19   a video on January 17.  Can you read that?

20   A.  "100 percent of your money goes towards the wall.  It is

21   not going to line someone's pocket.  I'm taking zero dollars of

22   a salary.  No compensation.  It is going towards the wall."

23   Q.  And that comes from a video?

24   A.  Comes from a video on the GoFundMe page and a video of

25   Brian Kolfage.

M5o3she3                         Hunziker - Direct

1    Q.   Have you reviewed a transcript of the video?

2    A.   Yes.

3             MR. ROOS:   Can we show the witness Government Exhibit

4    405-T.

5    Q.   Special Agent Hunziker, does the transcript fairly and

6    accurately reflect the statements, the words that play in the

7    video?

8    A.   Yes.

9    Q.   That's a part of that is what's quoted on the chart; is

10   that right?

11   A.   Yes, on the summary chart, yes.

12            MR. ROOS:   Can we play the video with the transcript

13   next to it.   I'm sorry.   We offer Government Exhibit 405-T.

14            MR. MERINGOLO:   No objection.

15            THE COURT:   Admitted.

16            MR. ROOS:   Thank you, your Honor.

17            (Government's Exhibit 405-T received in evidence)

18            MR. ROOS:   Ms. Drescher, can we display this next to

19   the video.

20            (Video playing)

21   Q.   Can we please go back to Government Exhibit 905.   And

22   Special Agent Hunziker, just one more off this chart.   Let's go

23   to the final page.   And do you see the first line for

24   January 22?

25   A.   Yes.

1   Q.   Can you read it?

2   A.   "I will not take a penny in salary or compensation for my

3   work."

4   Q.   What does that come from?

5   A.   An e-mail from Brian Kolfage to Timothy Shea.

6   Q.   Let's look at the exhibit.   Government Exhibit 110.   What's

7   this?

8   A.   This is the e-mail that I just read from, the supporting

9   documentation.

10          MR. ROOS:   And Ms. Drescher, can you highlight the

11   line that the special agent read.

12   Q.   Who is, by the way, who is the e-mail from and to?

13   A.   It's from Brian Kolfage to TimShea.realestate@gmail.com.

14   Q.   Thank you.   We can take this down and we can take down the

15   chart of all the statements also.

16          I want to go back to one of the source documents, the

17   last one we looked at, the last chart was Government Exhibit

18   26.   Can we put that back up again.

19          So, Brian Kolfage texts Andy Badolato, "We need to

20   figure out my pay.   We started everyone at December 20th.   Mine

21   was 100K up front and then 20 a month.   How's it work for me."

22          Do you see that?

23   A.   I do.

24   Q.   That's February 19.   Do you see that?

25   A.   Yes.

M5o3she3                          Hunziker – Direct

1    Q.   In the course of your review of bank records, have you seen

2    evidence that Kolfage was paid 100K and then 20K a month from

3    We Build the Wall?

4    A.   Yes.

5    Q.   In what form was he paid that money?

6    A.   It was sent from We Build the Wall through an intermediary

7    to finally to Brian Kolfage.

8             MR. MERINGOLO:  Objection.

9             MR. ROOS:  What's the objection?

10            THE COURT:  Do you want to approach on that?

11            MR. MERINGOLO:  I don't think he should be allowed to

12   opine on an intermediary.

13            THE COURT:  So then let's come forward.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

M5o3she3                          Hunziker - Direct

1              (At the sidebar)

2              THE COURT:  So, the witness is saying that the money

3    went from We Build the Wall to someplace, which he's calling

4    intermediary.  Why can't he just say what that place is?

5              MR. ROOS:  I didn't know he was going to say

6    intermediary.  I was going to ask him what he meant and then I

7    was going to show him a chart.

8              MR. MERINGOLO:  Okay.

9              THE COURT:  Okay.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Overruled.

3    BY MR. ROOS:

4    Q.  Special Agent Hunziker, you used, in describing how the

5    money went from We Build the Wall to Brian Kolfage, you said it

6    went through an intermediary.  What did you mean by

7    intermediary?

8    A.  There was another entity or individual involved in the

9    transaction.  So it didn't go directly from the We Build the

10   Wall bank accounts to Brian Kolfage.  It went to another entity

11   or person's bank account and then on to Brian Kolfage.

12   Q.  Have you worked on an analysis tracing that out?

13   A.  I reviewed the analysis, yes.

14   Q.  Do some of those payments involve Timothy Shea?

15   A.  Yes.

16   Q.  Why don't we look at Government Exhibit 902.  Special Agent

17   Hunziker, can you explain for the jury what 902 shows.

18   A.  Transfers to Brian Kolfage.

19   Q.  And what period does this document cover?

20   A.  Almost all of 2019.

21   Q.  Before we get talk about what any of these transactions

22   are, I just want to talk about what all the arrows and the

23   boxes mean.

24          So, can you describe for the jury how we're supposed

25   to read this thing.

M5o3she3                        Hunziker - Direct

1    A.   Sure.  You start on the left with We Build the Wall.  And

2    then you follow the arrows to the right, you'll see another

3    box, and then you continue following those arrows all the way

4    on the right on the end there, and you can see additional boxes

5    and usually the name Brian Kolfage or Freedom Daily.

6    Q.   And then on this page it says in big blue numbers 1, 2, 3.

7            MR. ROOS:  Ms. Drescher, this is a multipage document.

8    Can we flip through the next two pages.

9    Q.   4, 5, 6, 7, 8, 9, 10, 11, 12.

10           So what do the numbers 1 through 12 reference to?

11   A.   These are just the number of the transactions.  So there

12   were 12 transactions total.  And the numbers on the left just

13   indicate which number we're referencing to.

14   Q.   12 transactions paying Brian Kolfage?

15   A.   Yes.

16   Q.   There were many more than that number of transactions in

17   the bank records you looked at, I take it?

18   A.   Many more.

19   Q.   So we understand the chart.  Why don't we focus in on this

20   first transaction here.  The one that's numbered number one.

21   And why don't we start, why don't you walk us through what

22   we're looking at here.

23   A.   Okay.  So on the left, they all start with We Build the

24   Wall.  And then you can see the arrow going to Citizens of the

25   American Republic.  That's a Steve Bannon company.  On the top

1    of the line you can see the date February 4, 2019, and below

2    that you can see the dollar amount of that transaction, in this

3    case $250,000.  Below the entity you can see that the beginning

4    balance for Citizens of the American Republic on that morning

5    was $93,557.  That's before the wire came in.  And then on

6    February 11, 2019, $100,000 was sent to Brian Kolfage's

7    personal PenFed account ending in 9026.  And then on

8    February 19, 2019, $238,370 was sent to Stephen Bannon's AmEx

9    card.

10   Q.  So I want to break this down a little bit more.  So, the

11   first box is a bank account.  Is that right?  On the left.  I'm

12   sorry.

13           The first box on the left that says We Build the Wall?

14   A.  Yes.  This represents the Capital One account for We Build

15   the Wall, and you can see the account number or the last four

16   digits of it.

17   Q.  And what does signers mean?

18   A.  Those are the people who are able to make transactions on

19   that bank account.  So in this case, Brian Kolfage and Maureen

20   Otis are the signers.

21   Q.  So how are you able to figure out who the signers were on

22   an account?

23   A.  I was able to review opening documents from the bank

24   account.  And part of that is a signer page.

25   Q.  And then from the first bank account was the blue arrow and

M5o3she3                     Hunziker - Direct

1    it is sort of the pointing in the direction of the yellow box.

2    So is there any significance to the direction of the arrow?

3    A.   Yes, that's the direction of the flow of money.

4    Q.   What does the blue arrow signify?

5    A.   The blue arrow signifies that the money is coming from the

6    We Build the Wall account at Capital One and going into the

7    City National bank account in the entity's name Citizens of the

8    American Republic.  The signers on that account are Stephen

9    Bannon and Grace Chong.

10   Q.   And the information above and below the arrow.  What does

11   that mean?

12   A.   The date and dollar amount.

13   Q.   And does the date refer to the date of the, let's say, I

14   think you said this one was a wire transfer, right?

15   A.   Yes.

16   Q.   If there are checks, does the date refer to the date that's

17   on the check or the date it was deposited?

18   A.   In some of them, both are captured.  So you will see the

19   date of the check, but a lot of times it is the date that the

20   check was actually deposited as opposed to mailed or signed by

21   whoever was sending the check.

22   Q.   Got it.  All right.  So then the middle yellow box, that's

23   another bank account I think you just said; is that right?

24   A.   Yes.

25   Q.   And then we have more arrows, so, what do those mean?

M5o3she3                        Hunziker - Direct

1    A.   It means that money is flowing from that Citizens of the

2    American Republic account into, in this case, Brian Kolfage's

3    PenFed account, and Steve Bannon's AmEx account.

4    Q.   And last two boxes, what are those, what do those signify?

5    A.   Those are the bank accounts and the name on the bank

6    account.   Or the AmEx card in this situation for Stephen

7    Bannon.

8    Q.   So out of this reading it all together, $100,000 goes to

9    Kolfage; is that right?

10   A.   Yes, on February 11.

11   Q.   We'll come back.   Can we zoom out of this.   We'll come back

12   to the other 11 transactions that are listed on here.

13          Let me ask, for some of these transactions, have you

14   worked on timelines?

15   A.   Yes.

16   Q.   Let's look at, you know what, I forgot to ask you a

17   question.   There's little purple numbers here at the bottom.

18   What are those a reference to?

19   A.   Those are the government exhibits where these bank accounts

20   can be found.   So if the jury wanted to look up some of these

21   transactions, they could refer to these numbers to find the

22   source material.

23   Q.   Okay.   So I was asking you about whether you made some

24   timelines to go with some of these transactions and I think you

25   said yes, right?

M5o3she3                    Hunziker - Direct

1   A.  I didn't make the timelines.  I reviewed the timelines.

2   Q.  Got it.  Let's look at an example of one of those and we'll

3   come back to this financial chart.

4          Can we please see the timelines which are Government

5   Exhibit 906.

6          Now, Special Agent Hunziker, is there a timeline for

7   each one of the transactions?

8   A.  No.

9   Q.  Is this a sampling or how many are we talking about here?

10  A.  Less than a dozen, maybe eight.

11  Q.  And at the top of this first page here it says timeline of

12  transaction number one.  January/February 2019.  Do you see

13  that?

14  A.  I do.

15  Q.  So when it says transaction number one, what's that a

16  reference to?

17  A.  That's a reference back to Government Exhibit 902.  That

18  flow chart we were just looking at for the transfers to Brian

19  Kolfage.

20  Q.  Transaction one was that transaction where the 250 went

21  from We Build the Wall to Steve Bannon's entity and then the

22  other -- the $100,000 went from Kolfage there.  That's what

23  transaction one is, right?  That we now have up on the screen.

24  A.  Yes, the first of 12.

25  Q.  So this is a timeline about that?

1    A.   Yes.

2    Q.   Just to orient ourselves.  Why don't we look at the next --

3    we'll stay on this page.  Just to orient ourselves, how does a

4    person read this document.

5    A.   You read it from left to right.  In the middle there you

6    can see the date, it is in chronological order.  And if there

7    is multiple boxes on the same date, just read them from the top

8    to the bottom and go on to the next day.

9    Q.   And is there any significance to the colors?

10   A.   Yes.  The colors, the red are the messages, the blue green

11   teal color there is the transaction.  And there is also a black

12   box that's just other information.

13   Q.   So let's start on this first transaction.  And can you just

14   walk us through from left to right the timeline here.

15   A.   Sure.  On January 18, 2019, Badolato e-mails Bannon that

16   Kolfage will be paid $100,000 with 20,000 monthly.  That's at

17   12:01 p.m.  On February 4, We Build the Wall wires $250,000 to

18   Citizens of the American Republic.  The balance on that day was

19   $93,557 before the wire.  On February 5, Kolfage e-mails

20   Badolato, "My 100K hasn't gone through yet.  We had issues with

21   check.  Was supposed to ACH now."  On February 11, Citizens of

22   the American Republic wires $100,000 to Brian Kolfage.  And on

23   February 19, Kolfage texts Badolato "We need to figure out my

24   pay.  We started everyone at December 20th, mine was 100K

25   upfront then 20 a month.  How's it work for me."

M5o3she3                      Hunziker - Direct

1   Q.  On this timeline, do you see where it says GX and then a

2   little number at the end of each of these bubbles?

3   A.  Yes.

4   Q.  What does that refer to?

5   A.  Again, that's the source documentation for that message in

6   this case.  And if the jury wanted to, they can go and look

7   that up.

8   Q.  I think actually we've already looked at a bunch of these

9   on here.  Why don't we pull up the middle one GX 112.  This is

10  the e-mail that we looked at earlier, right?

11  A.  It is, yes.

12  Q.  And the part about "my 100K hasn't gone through yet" is at

13  the bottom there, right?

14  A.  Yes.

15  Q.  So the timeline is taking parts of the various e-mails and

16  text messages and putting them on the timeline; is that right?

17  A.  Yes.

18  Q.  Let's go back to the timeline then.  So on February 4,

19  there is the wire from We Build the Wall to Citizens of

20  American Republic.  Then the next day, is that e-mail, then how

21  many days in between that e-mail and when Citizens of American

22  Republic wires $100,000 to Kolfage?

23  A.  Six.

24  Q.  Okay.  And then there is the last text message, and this is

25  the one that I think we looked at just a few minutes ago,

M5o3she3                        Hunziker - Direct

1    right, Government Exhibit 26 where Kolfage is talking about

2    100K a month, 100K upfront and 20K a month?

3    A.  Yes.

4    Q.  Okay.  So, after that message, which is on February 19,

5    2019, were you able to observe whether Kolfage started getting

6    payments of $20,000 or more a month?

7    A.  Yes.

8    Q.  Sorry.  Yes, you observed it, or you were able to observe

9    something or, yes, he was receiving that?

10   A.  Both.  I was able -- I was able to trace that money into

11   his account, approximately $20,000 a month, and then we just

12   discussed this $100,000 upfront payment.

13   Q.  Okay.  So let's go back to Government Exhibit 902.  And

14   let's look at the second transaction.  Can we zoom in on that.

15         Is this organized in the same way as the first

16   transaction?

17   A.  It is, yes.

18   Q.  That last one was January/February and this one is March,

19   right?

20   A.  Yes.

21   Q.  Can you explain what we're looking at here?

22   A.  Yes.  It is very similar to the first transaction we looked

23   at.  This is the second one in March.  We Build the Wall wires

24   $100,000 on March 6 to Citizens of the American Republic,

25   that's Steve Bannon's company.  The beginning balance on that

M5o3she3                              Hunziker – Direct

1    day was $821,789.  Then the next day on March 7, 2019, $20,000

2    is wired or sent to Brian Kolfage's PenFed account.  And then

3    on March 11, $100,000 is sent to Steve Bannon's AmEx account.

4    Q.  Okay.  And then, let me ask you just in terms of the way

5    this is structured.  How does it compare to the first

6    transaction?

7    A.  It's very similar.  It uses the same intermediary company,

8    Citizens of the American Republic.  And the money goes to Brian

9    Kolfage and Steve Bannon.

10   Q.  All right.  Zoom out of there.

11            MR. ROOS:  Can we have a side bar for one second.

12            THE COURT:  Yes.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. ROOS:  Your Honor, I just noticed a few jurors

3     look a little sleepy.  I don't know if your Honor ever takes an

4     afternoon break.  I know maybe this is the financial stuff of

5     stuff can be dense for some people.  I thought maybe the jurors

6     want to stand up and stretch their legs for a second.  I'll

7     leave it to you.  I just notice somebody in the back, two

8     people in the back seemed to be a little snoozy.

9          THE COURT:  Well --

10         MR. ROOS:  Maybe it's a reflection on me.

11         THE COURT:  You are taking a very granular approach to

12    the presentation of evidence and it is repetitive.  I think you

13    have gotten your point across and I think you should consider

14    paring.

15         MR. ROOS:  I'll keep it kind of moving.  I am not as

16    animated as John here.  So keep the jury in the same way.

17         THE COURT:  If you want me to give them 10 minutes

18    I'll do that.  That's all right.  I think they'll appreciate

19    that.  But I do want you to pick up the pace.

20         MR. ROOS:  Maybe if it is okay with your Honor, give

21    them a very short break, I'll take that time to cut some of my

22    questions or either reading it off the chart or off the exhibit

23    but not both.  And we can maybe resume.

24         THE COURT:  Okay.

25         (In open court)

1            THE COURT:  Members of the jury, we're going to take a

2       brief 10-minute break.  Remember that you are not allowed to

3       discuss the case amongst yourselves or with anyone else.  Don't

4       permit anyone to discuss the case in your presence.

5            (Jury excused)

6            (Recess)

7            (In open court; jury present)

8            THE COURT:  The parties agree that all the jurors are

9       present and properly seated?

10           MR. ROOS:  Yes, your Honor.

11           THE COURT:  Mr. Meringolo?

12           MR. MERINGOLO:  Yes, Judge.

13           THE COURT:  Please be seated.  And you may continue

14      your inquiry.

15           MR. ROOS:  Thank you, your Honor.

16           THE COURT:  And remember you are still under oath.

17           THE WITNESS:  Yes, your Honor.

18      BY MR. ROOS:

19      Q.  Can we bring up Government Exhibit 906.  Page two.  And

20      sorry.  That's not right.  I'm sorry.  Let's go back to 902.

21      And we had just talked about the top two transactions.

22           Let's talk about number three.  Can we zoom in on

23      that.  Can you walk us through this transaction.

24      A.  On March 27, 2019, We Build the Wall sends $100,000 to

25      Timothy Shea and Amanda Shea's personal U.S. Bank account

M5o3she3                    Hunziker - Direct

1    number 8292.  The opening balance on that day was $6,290.  Then

2    later that day, again on March 27, $50,000 is sent to Freedom

3    Daily, which is Brian Kolfage and Ashley Kolfage account at

4    Wells Fargo ending in 4584.

5    Q.  Let's put up Government Exhibit 901.  This says transaction

6    number three at the top.  What is this chart?

7    A.  This chart has a little bit more detail from the Government

8    Exhibit 902.  So it is the same transaction number three.  But

9    at the end there you can see the Freedom Daily account, that's

10   where the last one ended and this one then shows that $50,000

11   on March 29 was sent to Brian Kolfage's personal PenFed account

12   ending in account number 9026.

13   Q.  Let me just ask you a question about this chart.  So, We

14   Build the Wall sends $100,000 to Tim and Amanda Shea's bank

15   account.  Before that $100,000 was sent, how much money was in

16   the account?

17   A.  $6,290.

18   Q.  Later that day or the same day, there is a payment for

19   $50,000.  Was there enough money in the account to pay Freedom

20   Daily without the wire from We Build the Wall?

21   A.  No.  They needed the $100,000 from We Build the Wall to

22   cover that 50.

23   Q.  We can take this down.

24        Is there a timeline like the ones we were looking at

25   earlier that also goes along with this transaction?

1    A.  Yes.

2    Q.  Let's put up Government Exhibit 906, page two.  And what is

3    this a timeline of generally?

4    A.  Transaction number three that we just looked at.

5    Q.  Here's what I'd like to do.  You see how the first all four

6    messages on the first day are from the same exhibit?

7    A.  Yes.  29.

8    Q.  Why don't we pull up that exhibit and read them off the

9    exhibit.  So let's do Government Exhibit 29.  And who are the

10   participants or the people on this text message exchange?

11   A.  Brian Kolfage, Andy Badolato, Tim Shea, Amanda Shea, and

12   Dan Fleuette.

13   Q.  And let's flip through it.  How many pages are we working

14   with here?

15   A.  Five.

16   Q.  Five pages, okay.  So, we're not going to read all this out

17   loud.  So everyone can rest easy.  I'm going to ask you some

18   numbers, okay.

19   A.  Okay.

20   Q.  So let's start on the first page.  Why don't we look at the

21   first one.

22          What's the date of the first message?

23   A.  March 19, 2019.

24   Q.  I want you to read for starters the very first message of

25   the chain.

1    A.   It's from Tim Shea.  "To negotiate these land deals we need

2    a Spanish speaking negotiator.  Brian and I have one."

3    Q.   All right.  Then let's go to the second page.  And do you

4    see line 23?

5    A.   I do.

6    Q.   And why don't you read from 23 until 27.

7    A.   Brian Kolfage texts on March 19, "The NM people.  We got

8    Lochiel locked up."  Tim Shea replies, "Maybe we offer

9    security."  Brian Kolfage replies, "They don't care.  We

10   offered mega money."

11   Q.   Then let's look at line 33.  Sorry.  Line 33 and line 34.

12   A.   A text from Brian Kolfage on March 19.  "We got AZ people.

13   We are good."

14   Q.   So for all of these NM, AZ, are those states?

15   A.   I believe so, yes.

16   Q.   New Mexico and Arizona?

17   A.   Yup.

18   Q.   So we are talking about people in various states?

19   A.   Yes.

20   Q.   And the first message you read, I think you said was about

21   a land deal; is that right?

22   A.   Yes.

23   Q.   Let's look at now line 35.  And can we do line 35 to the

24   end.  And can you just read from line 35 down to the bottom of

25   the page?

M5o3she3                    Hunziker - Direct

1    A.   Sure.

2           Tim Shea starts "We need a solid fucking plan,

3    otherwise we go to prison." Brian Kolfage replies "LOL."  Tim

4    Shea replies "LOL."  Brian Kolfage writes "We have AZ nailed

5    down."  Tim Shea replies "Who building it."  Brian Kolfage

6    writes "we are."  Tim Shea, "That's gay."  Brian Kolfage, "Who

7    else."  Tim Shea, "What is the name of the construction company

8    that is building the wall?"  Brian Kolfage, "We haven't hired."

9    Tim Shea, "blink blink."  Brian Kolfage, "LOL.  It's already

10   came up".

11   Q.   Let's turn the page.  And can you start at 48.

12   A.   Brian Kolfage writes, "It might be too shady."  Tim Shea,

13   "We have to firm this shit up.  Also on Pitch Fork."  Brian

14   Kolfage writes, "Everyone will want to know.  We need to have

15   that be legit.  If it came out we hired ourselves it will be

16   bad."  Tim Shea replies, "We need to create companies that I

17   hired you.  I'm paying you for a service, consulting."  Brian

18   Kolfage, "Part of me says do it, but I'm not sure if Steve

19   would let it fly.  Pitch Fork is actually legitimate.  We had a

20   real purpose and experience."  Tim Shea writes, "But the

21   transfer between me and you."  Brian Kolfage, "If you own a

22   construction firm and can do it for cheap.  LOL.  By golly.

23   Fist bump."  Tim Shea writes, "Yeah, we need to talk threw

24   this."  Brian Kolfage writes, "Too bad you are not disabled and

25   black and a woman.  Go to Detroit.  Find one."  Tim Shea, "If

M5o3she3                     Hunziker - Direct

1   600K comes in and I transfer for 300K to you."  Brian writes

2   back, "Ya that's legit."  Tim Shea writes, "We'll have to

3   account for that."  Brian Kolfage writes, "Media Vines."  Brian

4   writes "K1."  Tim Shea replies, "We're creating a family trust

5   that is cloaked."  Brian Kolfage, "What's that mean."  Tim Shea

6   replies, "It's veiled so no one knows who ones the home or

7   business."  Brian Kolfage replies, "I'm going to dump my 300

8   into the market."  Tim Shea replies "LOL.  On what?"   Brian

9   Kolfage FB.  Tim Shea "fuck you."  Brian Kolfage, "Then I'm

10  going to blow up their sgare holder meeting.  And sue them.

11  Like Nunez just sure Twitter.  Sued."  Tim Shea writes, "Then

12  FB stock drops?"  Brian Kolfage "I'm not."  Tim Shea, "Why

13  buy."  Brian Kolfage, "I am going to let my buddy handle it

14  all.  He manages the Merrill Lynches in Florida."

15  Q.  We can stop there.  Now, many of these messages appear on

16  the timeline we were just looking at, right?

17  A.  Yeah.

18  Q.  Let's bring up 906 again.  And do you see the four red

19  bubbles here on the left side?

20  A.  Yeah.  As I mentioned, the red indicates text messages or

21  messaging and to read them from the top to the bottom.

22  Q.  Did all four of these come out of that very long text chain

23  that I just read?

24  A.  Yes.

25  Q.  I want to unpack that a little bit.  So, starting on one of

1    these March 19 text messages.  Do you see the reference where

2    Tim Shea says in the last message about creating a company or

3    family trust that is cloaked or veiled.  Do you see that?

4    A.  Yes.

5    Q.  All right.  According to the timeline, what happens on

6    March 26?

7    A.  A week later, Ranch Property Marketing and Management LLC

8    created in Wyoming by an incorporation service.  Tim Shea is

9    100 percent owner.

10          MR. ROOS:  Ms. Drescher, can we please see Government

11   Exhibit 501.  The front page there says formation documents.

12   Now can we pull up the stipulation marked S7 which is in

13   evidence.  If you zoom in on paragraph one.  And just looking

14   at the first sentence.

15   Q.  Special Agent Hunziker, where did that exhibit we were

16   looking at, 501, come from?

17   A.  It came from a court-authorized search warrant from the

18   residence of Timothy Shea and Amanda Shea located in Castle

19   Rock, Colorado.

20   Q.  So let's go back to the material, to that 501 exhibit.  And

21   so formation documents, let's look at page four of this

22   document.  What state is this incorporation paperwork from?

23   A.  The state of Wyoming.

24   Q.  What is the name of the company that's being incorporated?

25   A.  Ranch Property Marketing and Management LLC.

M5o3she3                         Hunziker - Direct

1    Q.  This is incorporation paperwork for Wyoming.  What state is

2    the mailing address located in?

3    A.  Colorado.

4    Q.  Do you recognize that Colorado address?

5    A.  Yes, that's from the page we just read, the stipulation, it

6    is the residence of Timothy Shea and Amanda Shea.

7    Q.  Let's go to page seven of these formation documents.  And

8    do you see the date on which this company was created?

9    A.  March 26, 2019.

10   Q.  How many days after the text messages where he says it's

11   veiled is this?

12   A.  One week.

13   Q.  Can we look at page eight.  Who does it say the owner on

14   page eight is of Ranch Property?

15   A.  Timothy Shea, 100 percent owner.

16   Q.  For companies incorporated in Wyoming, are you familiar

17   with what kind of information about the ownership the state

18   makes publicly available?

19   A.  Yes, Wyoming has very favorable corporate secrecy laws, so

20   they don't make the owner of the company public.

21            MR. MERINGOLO:  Objection, Judge.

22            THE COURT:  Sustained.  He is not testifying as a

23   legal expert.

24            MR. ROOS:  I can lay a foundation as a law enforcement

25   witness who previously worked for the IRS, if that's helpful.

M5o3she3                        Hunziker - Direct

1     THE COURT:  Then you should lay the foundation.

2   Q.  Special Agent Hunziker, I think you testified earlier that

3   you worked for the IRS; is that right?

4   A.  Yes.

5   Q.  And as part of the IRS, as your work with the IRS and then

6   your current work as a Special Agent with the U.S. attorney's

7   office, were you involved in any investigations that related to

8   incorporating companies?

9     MR. MERINGOLO:  Objection, leading.

10     THE COURT:  Overruled.  You may answer.

11  A.  When at the IRS, there was the Panama Papers leaks and the

12  IRS was involved in that investigation.  Through that

13  investigation, it came out that a number of those companies in

14  Panama were incorporated in Wyoming.  So, through my

15  involvement in that investigation, I learned that Wyoming had

16  favorable corporate secrecy laws.

17  Q.  Let's go back to Government Exhibit 902.  Let's go to

18  transaction four.  I'm sorry.  Actually, my apologies.  Let's

19  go back to Government Exhibit 906.

20     This is the timeline we were just looking at and we've

21  been through the first column, and we looked at the

22  incorporation documents.  Let's just read through the last

23  column here on this page.  Go ahead.

24  A.  Sure Kolfage texts Tim Shea.  "Send me an invoice for the

25  Facebook pages, Joe and Trump group.  100K invoice to We Build

M5o3she3                        Hunziker - Direct

1    the Wall and We Fund the Wall.  Three pages for 100.  Hold off.

2    Just talked to Andy."  Tim Shea replies, "Still no money.  I

3    wonder if he did the wire wrong."

4              Then We Build the Wall wires $100,000 to Tim Shea's

5    bank account.  The balance that morning was $6,290 before the

6    wire came in.

7              Tim Shea texts Kolfage, "I got the wire, sending to

8    you."

9              And Tim Shea bank account wires $50,000 to Freedom

10   Daily bank account.  Kolfage is the signer.

11   Q.  Let's go now to Government Exhibit 902 which are the

12   transactions and look at the fourth one.  And this is another

13   one of the transactions to Steve Bannon's entity?

14   A.  Yes, Citizens of the American Republic.

15   Q.  Can you summarize it briefly.

16   A.  Sure.  On April 12, 2019, $30,000 is sent from We Build the

17   Wall to Steve Bannon's entity Citizens of the American

18   Republic.  Then on April 22, 2019, $20,000 is sent to Brian

19   Kolfage's personal PenFed account.

20   Q.  Okay.  Is there a timeline that goes with this?

21   A.  Yes.

22   Q.  Can we look at Government Exhibit 906, page three.  Can you

23   just read us through the timeline.

24   A.  On April 11, 2019, Dan Fleuette texts Badolato, "Hey, no

25   dollar sign dollar sign hit.  I can't pay Brian."  Badolato

M5o3she3                    Hunziker - Direct

1    replies, "Will show early first thing a.m."

2              On April 12, We Build the Wall wires that $30,000 to

3    Citizens of the American Republic.  And Badolato texts

4    Fleuette, "Wires sent.  Turn Brian today please you got 10K."

5              On April 15, Badolato texts Fleuette, "Brian did not

6    get his wire.  Check it ASAP please."  Fleuette replies, "Can't

7    talk.  I'm on it."  Badolato responds, "Tell Brian.  It's

8    embarrassing.  Thanks."

9              On April 18, Badolato texts Fleuette, "Brian's funds

10   did you speak to him?"  Fleuette replies, "Yes.  Funds have

11   been released.  He should have them today."

12             And then on April 22, Citizens of the American

13   Republic wires $20,000 to Brian Kolfage's account.  Fleuette

14   texts Badolato, "Tracking it through the bank.  It was

15   definitely sent."

16   Q.  I think Dan Fleuette's name has come up a few times.  Based

17   on the materials you reviewed, do you know what, if any,

18   relationship he has with We Build the Wall or Citizens of

19   American Republic?

20   A.  He's the treasurer of Citizens of American Republic.

21   Q.  And other name on here besides Kolfage is Andy Badolato.

22   Can you remind us who Andy Badolato is?

23   A.  Andy Badolato is a business associate of Steve Bannon's.

24   Q.  Let's move on from this transaction and go to transaction

25   number five.  Who is the intermediary on this transaction?

M5o3she3                          Hunziker - Direct

1    A.   Ranch Property Marketing and Management.  That's that

2    Wyoming LLC we discussed earlier.

3    Q.   Can you just describe this transfer for us.

4    A.   On April 22, $50,000 is wired from We Build the Wall to

5    Ranch Property Marketing and Management.  The beginning balance

6    for Ranch Property Marketing and Management was 100 bucks that

7    day.  On the same day $25,000 is sent to Freedom Daily which is

8    Brian Kolfage and Ashley Kolfage's account.

9    Q.   I think earlier you showed us a more detailed version of

10   one of these charts.  Is there a similar, like, version of this

11   chart with a little more detail?

12   A.   Yes, it is.

13   Q.   Can we see Government Exhibit 901 page two.  What does this

14   show?

15   A.   So this will show the $50,000 that was sent to Ranch

16   Property Marketing and Management from We Build the Wall.  The

17   wire transfer detail had a memo line that said "per invoice."

18   And then on the memo line that was on the $25,000 that was sent

19   to Freedom Daily on April 22, it said "social media accounts."

20   We can trace that money further from Freedom Daily, there was

21   $20,000 that was sent on May 1st to Brian Kolfage's American

22   Express account.  Then if you go back to Ranch Property

23   Marketing and Management, on April 29, 2019, $20,000 is sent

24   from that account to Timothy Shea and Amanda Shea's personal

25   bank account.  On May 10, another $2,000 is sent to that

M5o3she3                          Hunziker - Direct

1    personal account.

2    Q.  So this $100 in Ranch Property; is that right?

3    A.  On April 22 there was.

4    Q.  50,000 comes in?

5    A.  Yes.

6    Q.  25,000 goes to Freedom Daily?

7    A.  On the same day.

8    Q.  And if you combine those two, 22,000 goes to Tim and Amanda

9    Shea's bank account?

10   A.  Yes.

11   Q.  You mentioned this memo line.  Where does that come from?

12   A.  That was the copy of the check.

13   Q.  Why don't we look at that check.  Can we see Government

14   Exhibit 1900, page number 258633.

15           Which bank account is the check from?

16   A.  Ranch Property Marketing and Management.  That's the

17   Wyoming company opened by Timothy Shea.

18   Q.  Who is it written to?

19   A.  Freedom Daily, LLC.

20   Q.  The memo line?

21   A.  "Social media accounts."

22   Q.  That's what you were referencing on the charts?

23   A.  The memo line.

24   Q.  Is there a timeline that goes along with this transaction

25   sequence?

M5o3she3                            Hunziker - Direct

1   A.  Yes.

2   Q.  Can we see Government Exhibit 906, page four.  And this is

3   the timeline for that whole transaction; is that right?

4   A.  Yes.

5   Q.  So this is from April 5 to April 30?

6   A.  Yes.

7   Q.  Can you read us chronologically through the timeline.

8   A.  Sure.  Start again on the left, April 5, Kolfage texts Tim

9   Shea and Amanda Shea, "Good job, Tim.  I heard your new company

10  found a bunch of land for us smiley face.  Ranch Property

11  Management."  Amanda Shea laughed at the text and replied, "I

12  was kidding about the raise.  I'm 10 times happier with RPMM

13  LOL."  On April 16, Tim Shea e-mails Kolfage and Badolato

14  "Wondering if I should add Brian as a member of RPMM.  That

15  would cover taxes at the end of the year and his name would be

16  hidden in the company veil in Wyoming."  Kolfage responds, "For

17  taxes I contract you got social media and u 1099 me."

18  Q.  The text from Kolfage says -- or the e-mail says "For taxes

19  I contract you got social media."

20          What remind us what the memo line on the check said?

21  A.  "Social media accounts."

22  Q.  Sorry.  Continue now with the rest of the timeline.

23  A.  April 22, Tim Shea e-mails Badolato wiring instructions for

24  Ranch Property Marketing and Management.  Then We Build the

25  Wall wires $50,000 to Ranch Property Marketing and Management.

M5o3she3                           Hunziker - Direct

1    On April 22, same day, $25,000 from RPMM is deposited into

2    Freedom Daily's bank account with the memo line on the check

3    "social media accounts."  Tim Shea texts Kolfage, "Hey, sent

4    you a check today, it will be there on Wednesday, from RPMM.

5    25K."  On April 30 Tim Shea texts Kolfage and Amanda Shea,

6    "Brian, have you seen RPMM's website RanchPMM.com."  Amanda

7    Sheas replies "It is only a splash page for legitimacy."

8             MR. ROOS:  Let's look at the website.  Government

9    Exhibit 404.  Ms. Drescher, can you slowly scroll through.

10   Q.  At the bottom there, Special Agent Hunziker, where does it

11   say it's based?

12   A.  In Casper, Wyoming.

13   Q.  Can we scroll have up a little bit.  What does it say the

14   sort of the words in terms of the service on the website?

15   A.  "Professional property solutions."

16   Q.  What did Amanda Shea say about this website?

17   A.  It was a splash page just for legitimacy purposes.

18   Q.  Let's go back to Government Exhibit -- we're done with this

19   timeline of transaction number five.  Let's go back to the

20   exhibit that shows all the transactions and look at transaction

21   number six.

22   A.  Okay.

23   Q.  So the last transaction was for April, this one is in May.

24   Can you walk us through it?

25   A.  Sure.  It's very similar to the last one.  It's We Build

M5o3she3                          Hunziker - Direct

1   the Wall sends $30,000 on May 21, 2019, to RPMM.  The beginning

2   balance on that day for that account in Wyoming was May 21 --

3   was $553.  And then on there is a check signed on May 20 and it

4   deposits June 5 into the account of Freedom Daily for $20,000,

5   and that's Brian Kolfage's and Ashley Kolfage's bank account.

6   Q.  Is there a more detailed version of the chart?

7   A.  Yes.

8   Q.  And let's look at 901 page three.  What does this show?

9   A.  This shows the transaction we just discussed in a little

10  bit more detail.  As you can see in that initial $30,000

11  transaction there is a memo on the wire detail says "Per

12  invoice consulting and construction expenses."  That goes to

13  Ranch Property Marketing and Management.  On May 22, $30,000 is

14  sent to Tim Shea and Amanda Shea's U.S. Bank account.  And on

15  that same day, $20,000 is sent to Ranch Property Marketing and

16  Management account.  Then there is a check sent with a memo

17  line "Facebook pages" for $20,000 to Freedom Daily.  That's

18  Brian Kolfage's account.  And on May 21, $6,000 sent to James

19  Benvie.

20  Q.  Is there a timeline that goes along with this transaction?

21  A.  Yes, there is also a timeline.

22  Q.  All right.  So let's look at Government Exhibit 906, page

23  five.  This is a timeline that goes with this transaction we

24  were just looking at; is that right?

25  A.  Yes.

M5o3she3                         Hunziker - Direct

1   Q.  Can you just read us through the timeline.

2   A.  On May 6 Kolfage texts "get me paid."  On May 21, Tim Shea

3   texts Badolato wiring instructions for Ranch Property Marketing

4   and Management's bank account.  Then We Build the Wall wires

5   that 30,000 to RPMM with the invoice "per invoice," with a memo

6   line "per invoice consulting and construction expenses."

7   Badolato replies to Tim Shea, "Send Benvie 6K and BK 20K" and

8   texts wiring instructions for James Benvie.  $6,000 from Tim

9   Shea's bank account to James Benvie's bank account goes out

10  that day.  And Tim Shea texts Kolfage, "Hey I overnighted that

11  thing."  On May 28 Tim Shea texts Kolfage, "Hey, what's up?  I

12  overnighted that check last week.  Did you get it?"  Kolfage

13  replies, "Yeah.  Need to cash."  And then on June 5, that

14  $20,000 check from RPMM is deposited into Freedom Daily's bank

15  account.  The check is dated May 20 and the memo line on the

16  check states "Facebook pages."

17  Q.  Let me just ask a followup question.  The text on May 21

18  from Badolato to Tim Shea says "Send Benvie 6K and BK 20K."

19  A.  Right.

20  Q.  Do you see anything in the financial tracing of the

21  transactions that matched up with that?

22  A.  Yes, James Benvie received 6K, and Brian Kolfage received

23  20K.

24  Q.  Let's go to back to the document that lists all the

25  transactions, Government Exhibit 902.  So we're through all of

1   these.  The first six.  Number seven.

2          And whose name is on the middle bank account here that

3   we're looking at on this chart?

4   A.  The name is Lewis Moon.  The Glenda F. Moon Revocable

5   Trust.

6   Q.  From your review of e-mails, do you know of any other

7   person who used the Glenda F. Moon Revocable Trust, other than

8   Glenda Moon?

9   A.  Lewis B. Moon.

10  Q.  So can you just describe what we see in this transaction?

11  A.  On June 28 We Build the Wall sends $50,000 to the Glenda F.

12  Moon Revocable Trust.  The trust had $1,321 on that morning.

13  On July 8, 2019, $20,000 is sent to Brian Kolfage's PenFed

14  account.

15  Q.  Let's look at the next transaction on this page.  What's

16  the middle entity on this transaction?

17  A.  This is Ranch Property Marketing and Management.  That's

18  the Tim Shea company based in Wyoming.

19  Q.  Is there a more detailed version of this chart?

20  A.  Yes.

21  Q.  Why don't we look at the flow of money on that chart rather

22  than this one.  So, we'll go to 901, page four.  Thank you.

23  Can you walk us through this transaction.

24  A.  On July 3, $48,762 is sent from We Build the Wall to Ranch

25  Property Marketing and Management.  They had an opening account

M5o3she3                      Hunziker – Direct

1    of $19 that morning.  Then on the same day, $20,000 is sent to

2    Freedom Daily.  That's Brian Kolfage's account.  And then on

3    July 8, $7,780 is sent to Timothy Shea and Amanda Shea's

4    personal U.S. Bank account.  On July 10, 2019, $20,916 is sent

5    to Vision Quest Solutions.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M5OVSHE4                        Hunziker - Direct

1    BY MR. ROOS:

2    Q.  All right.  And is there a timeline that goes with this

3    one?

4    A.  Yes, there is.

5    Q.  Let's look at Government Exhibit 906, page 7.

6            All right.  Can you read us through this and we'll go

7    over a few documents that are referenced.

8    A.  Between June 30th and July 2nd, Charlie Ford of Vision

9    Quest Solution emails Tim Shea a bill for $20,916.22 for work

10   concerning a telethon event.  Tim Shea forwards that invoice to

11   Badolato and writes:  Let's get this check out right away.

12           Tim Shea forwards the invoice to Kolfage and writes:

13   Here's the invoice for Charlie and his team.  That check

14   doesn't go out right away but, rather, the next day an email

15   account for Ranch Property Management LLC emails Badolato an

16   invoice for $48,762 for Vision Quest Solutions at the June

17   telethon event.

18           Tim Shea texts Badolato wiring instructions and asks:

19   Did you send that wire?  We Build the Wall wires $48,762 to

20   Ranch Property Marketing and Management bank account.  And a

21   check from Ranch Property Marketing and Management bank account

22   for $20,000 to Freedom Daily's bank account.

23           Between July 8th and July 10th, on the bottom you see

24   that Ranch Property Marketing and Management bank account pays

25   that $20,916 to Vision Quest Solutions.  That's the invoice we

M5OVSHE4                          Hunziker - Direct

1    read about earlier on June 30th.  And Ranch Property Marketing

2    and Management bank account pays $7,780 to Tim Shea's bank

3    account.

4    Q.  I just want to ask you a few follow-up questions about the

5    invoice here.  So let's look at the black box and let's start

6    by looking at the Vision Quest Solutions invoice, so Government

7    Exhibit 116-A.  Can we put the email that sends it next to it.

8              So for starters, looking at the invoice, who's the

9    invoice from?

10   A.  The invoice is from Charlie Ford of Vision Quest Solutions,

11   and he's sending it to We Build the Wall, Inc.

12   Q.  And who's listed as the company rep for We Build the Wall?

13   A.  Company rep is Tim Shea and has his email account.

14   Q.  How much is the invoice for?

15   A.  It's for $20,916.22.

16   Q.  Okay.  And then who is the invoice sent to?

17   A.  This invoice is then sent -- it's sent to Andy Badolato.

18   Q.  Okay.  By who?

19   A.  By Tim Shea.

20   Q.  By the way, I should ask, sort of what generally, based on

21   your reading of the invoice, is the invoice for?

22   A.  It looks like security.

23   Q.  All right.  And so then let's go back to the timeline.  So

24   after that invoice is emailed to Andy Badolato by Tim Shea or

25   forwarded, is there another invoice sent to Badolato?

1    A.   Yes, there's another invoice sent on July 3rd from Ranch

2    Property management LLC, which is Tim Shea's company, for

3    $48,762 for Vision Quest Solutions.

4            MR. ROOS:   And can we put up that invoice, Government

5    Exhibit 118-A.

6    Q.   And who is the invoice from and to?

7    A.   It's from Ranch Property Marketing and Management LLC, and

8    it's to We Build the Wall.  And it's for the items, security

9    services, Vision Quest Solutions.  And there's a little bit of

10   detail.

11   Q.   Okay.  And does it say any other -- does it say the invoice

12   is for anything else besides Vision Quest Solutions?

13   A.   No.

14   Q.   And what's the amount on this invoice?

15   A.   $48,762.

16   Q.   Okay.  And can we compare this one to Government Exhibit

17   116-A, the Vision Quest invoice.

18           So how did the two bottom-line figures compare to each

19   other?

20   A.   The one from RPMM to We Build the Wall is about two and a

21   half times the cost as the one from Vision Quest to We Build

22   the Wall, Inc.

23   Q.   Okay.  And let's go back to Government Exhibit 901, page 4.

24   And so then how much does We Build the Wall pay after getting

25   those -- that invoice?

M5OVSHE4                          Hunziker - Direct

```
 1   A.  They pay the RPMM the full amount of the invoice, $48,762.

 2   Q.  And what happened to that $48,762?

 3   A.  On July 10th, Vision Quest gets the $20,916 from that first

 4   invoice that we saw.

 5   Q.  That's the amount that was invoiced for?

 6   A.  From Charlie Ford, yes.

 7   Q.  Okay.

 8   A.  And Brian Kolfage's account gets $20,000, and Timothy Shea

 9   and Amanda Shea's account gets $7,780.

10   Q.  Okay.  Let's go back to Government Exhibit 902.  We have --

11   we're through numbers one through eight.  Let's just take a

12   quick look at number nine.  Number nine involves a different

13   middle party, is that right?

14   A.  Decisive Fiber Group.

15   Q.  Okay.  And does the same general type of thing happen with

16   this transaction?

17   A.  Yes.  We Build the Wall sends money, then they, Decisive

18   Fiber Group, sends $70,000 to Freedom Daily, Brian Kolfage's

19   account, and $50,000 to White Knights and Vultures, which is

20   Andy Badolato's account.

21   Q.  Okay.  And then after transaction number nine, let's go to

22   the next page.  There are three more transactions.  What's the

23   middle party on these three transactions?

24   A.  They are all the same, Ranch Property Marketing and

25   Management, the Tim Shea company.
```

1    Q.  We're not going to go through these ones in any more

2    detail, but let me just ask you a few general questions.

3            Generally, for each of these, how much money went

4    from -- after money came from We Build the Wall to Ranch

5    Property, how much money went from Ranch Property to Brian

6    Kolfage?

7    A.  Between 20 and $30,000 approximately.

8    Q.  And roughly how frequently were these transactions?

9    A.  Monthly.

10   Q.  I asked you earlier about the amounts of these

11   transactions.  I want to draw a big picture for the 12

12   transactions that you've been through now.  First, how much

13   money in total went from We Build the Wall to Tim Shea and

14   Ranch Property Marketing Management, approximately?

15   A.  Approximately $400,000.

16   Q.  And how much money in total went from Tim Shea and Ranch

17   Property Marketing Management to Kolfage?

18   A.  Almost half, 190,000.

19   Q.  And after paying Kolfage, how much money approximately went

20   to Tim and Amanda Shea?

21   A.  Approximately $153,000.

22   Q.  Okay.  So that doesn't quite add up to $400,000, 190 plus

23   153; it leaves a little short.  Where's the difference?

24   A.  The difference is there were a couple invoices from Vision

25   Quest Solutions that were paid, as well as the James Benvie

1    account that we looked at for 6K.

2    Q.  Okay.  And looking at all 12 of these transactions,

3    including the ones that involve a middle party that's not Tim

4    Shea, how much money was Kolfage paid?

5    A.  Approximately 420,000.

6    Q.  Okay.  And after the first $100,000 payment on the first

7    page, approximately how much was Kolfage paid per month?

8    A.  Approximately 20K.

9    Q.  Okay.  We've been talking about transactions in 2019.  I

10   want to ask you about one last transaction, which is in a

11   different year.  Before I ask you about that transaction, I'd

12   like to ask you something about Winning Energy.

13             Are you familiar with Winning Energy?

14   A.  I am.

15   Q.  Let's look at Government Exhibit 408, which is in evidence.

16             What's this?

17   A.  This is a screenshot of Winning Energy's website.

18   Q.  Okay.  And what is depicted on the left side of the screen?

19   A.  Depicting a can, an energy drink.

20             MR. ROOS:  Your Honor, may I approach?

21             THE COURT:  You may.

22   Q.  Special Agent Hunziker, do you recognize that from the

23   picture?

24   A.  Yeah.  Looks like the same can.

25             MR. ROOS:  The government offers -- Sunny, what's the

M5OVSHE4                        Hunziker - Direct

1    marking?  361?

2              MR. MERINGOLO:  No objection.

3              THE COURT:  Admitted.

4              (Government's Exhibit 361 received in evidence)

5    Q.  All right.  On the right side of the screen, what's the

6    price of these things?

7    A.  A 12-pack case is $36.99 for the sugar-free or the regular.

8    Q.  Twelve of those things for $37?

9    A.  Yeah, three bucks a can.

10   Q.  And have you seen any records relating to where Winning

11   Energy was registered as a company?

12   A.  Yes.

13             MR. ROOS:  Can we look at Government Exhibit 142.

14   Q.  And where is Winning Energy registered?

15   A.  Colorado.

16   Q.  And have you analyzed transactions relating to the company

17   Winning Energy?

18   A.  Yes.

19             MR. ROOS:  Can we please see Government Exhibit 903.

20   Q.  What is this?  Can you describe it?

21   A.  Yes.  This is a Winning Energy transfer, a transaction from

22   We Build the Wall to Winning Energy LLC.

23   Q.  Okay.  We'll come back to this.  But is there a timeline

24   associated with this transaction?

25   A.  There is, yes.

1          MR. ROOS:  Can we look at Government Exhibit 906, page

2     8.

3     Q.  All right.  Can you walk us through the transaction -- or

4     the timeline?

5     A.  On January 1st, 2020, Tim Shea incorporates Winning Energy

6     LLC.  That's the Colorado company and the website we just

7     looked at.  On May 12, 2020, Tim Shea texts Brian Kolfage,

8     copying Amanda Shea:  I trademarked Winning Energy and started

9     this energy drink.  We have everything set up, website, etc.

10    The can is Trump beating the impeachment.  Our next can will be

11    Trump crushing COVID.  We, of course, want you to be part of

12    it.

13         On June 2nd, 2020, Tim Shea emails Karl Mitchell and

14    Chris Stone at DrinkInk that he wants to order 49,920 cans of

15    the Winning Energy drink at 69 cents per can.  Tim Shea emails

16    Amanda Shea $38,500 and the wiring instructions for Winning

17    Energy LLC.

18         On June 30th, 2020, invoice for the DrinkInk is

19    $34,444.80 in two payments of $17,222.40.  We Build the Wall

20    wires $38,500 to Winning Energy LLC.  On June 4th there's a

21    promissory note between Winning Energy and We Build the Wall

22    for $38,500.  Winning Energy LLC wires $17,222 to DrinkWorks

23    LLC.  And then the second half of that payment, on June 26,

24    Winning Energy LLC wires $19,722 to DrinkWorks LLC.

25    Q.  Okay.  So you mentioned a promissory note, the last red

1   bubble there.

2   A.   Yes.

3         MR. ROOS:  Let's first -- which is Government Exhibit

4   148.  Let's first put up stipulation S-7.  Can we zoom in on

5   paragraph 2.

6   Q.   And Special Agent Hunziker, what does the stipulation say

7   that the promissory note came from?

8   A.   That they are a document and image from Kolfage's computer

9   during a search warrant.

10  Q.   And now let's look at the promissory note.

11        MR. ROOS:  Can we see Government Exhibit 148.

12  Q.   So let me just first ask, what's a promissory note?

13  A.   A promissory note is a loan contract.

14  Q.   Okay.  And how much is this -- how much is this promissory

15  note for?

16  A.   $38,500.

17  Q.   Let's go to the last page.  Who's it signed by?

18  A.   This one is signed by Timothy Shea or Tim Shea, the

19  president of Winning Energy, LLC.  And there's a spot for We

20  Build the Wall, Inc. and Brian Kolfage as the president.

21  Q.   All right.  Does the promissory note say when repayment of

22  that amount of money is due?

23  A.   It does.

24  Q.   And what does it say, when is it due?

25  A.   It's due August 3rd, 2020, a couple months later after the

1    June signing.

2    Q.  Is there a lender fee associated with this?

3    A.  Yes.

4    Q.  And what does it say that is?

5    A.  The numerical number is $1,950.

6    Q.  All right.  From your review of bank records, did you see

7    any bank records indicating that this money was -- the 38,500

8    was repaid to We Build the Wall?

9    A.  No.

10   Q.  Did you see any records showing that any interest or a

11   lender fee was ever paid to We Build the Wall?

12   A.  No.

13   Q.  And from your review of the Winning Energy website, did you

14   see anything indicating that Winning Energy was affiliated with

15   We Build the Wall?

16   A.  No, I didn't see anything.

17   Q.  Take a look at that can.  See anything on there suggesting

18   it has anything to do with We Build the Wall?

19   A.  No.

20           MR. ROOS:  No further questions.

21           THE COURT:  Cross-examination.

22   CROSS-EXAMINATION

23   BY MR. MERINGOLO:

24   Q.  Mr. Hunziker, my name is John Meringolo.  I represent

25   Timothy Shea.

1   A.  Good afternoon, sir.

2   Q.  Good afternoon.

3       You just talked about a promissory note; correct?

4   A.  Yes.

5   Q.  What happens when you don't pay a promissory note back?

6   A.  The company that's owed the money can pursue some legal

7   action to get repaid.

8   Q.  Okay.  You're aware of a gentleman by the name of Kris

9   Kobach?

10  A.  No.

11  Q.  You're not aware that he's the general counsel of We Build

12  the Wall right now?

13  A.  No.

14  Q.  Are you aware that the government seized money from We

15  Build the Wall?

16  A.  No.

17  Q.  So if you take a loan, you either pay it back or you don't

18  pay it back; you could have a civil lawsuit, correct?

19  A.  Yes.

20  Q.  Now, you went through a lot of testimony for a few hours;

21  correct?

22  A.  Yes.

23  Q.  All these charts?

24  A.  Yes, sir.

25  Q.  But you didn't do those charts, did you?

M5OVSHE4                          Hunziker - Cross

1   A.  I didn't create them; I reviewed them for accuracy.

2   Q.  And you reviewed the bank records?

3   A.  Yes.

4   Q.  And it's bank records from We Build the Wall?

5   A.  Yes.

6   Q.  Freedom Daily?

7   A.  Yes.

8   Q.  Ranch Property?

9   A.  Yes.

10  Q.  And Timothy Shea and Amanda Shea?

11  A.  Yes.

12  Q.  Okay.  As part of your job you went through them

13  diligently; correct?

14  A.  Yes.

15  Q.  And you matched them up with the charts that you were given

16  by the government; correct?

17  A.  Yes.

18  Q.  Who created those charts, to your knowledge?

19  A.  The prosecution team.

20  Q.  The whole team or one individual?

21  A.  I don't know who created it.

22  Q.  Okay.  So the prosecution team, nothing wrong with that,

23  they gave you these charts and you just matched them up to the

24  text messages and bank records; correct?

25  A.  Yes, sir.

1  Q.  And you and I could agree that certain things were pulled

2  out of other exhibits and various other -- strike that.

3         The text message -- this would be one text message

4  pulled out, put on this transactional chart, and there would be

5  a lot of other text messages in there; correct?

6  A.  Yes.

7  Q.  And that's pretty much every single text message that's in

8  these charts.  There's missing text messages from the charts,

9  right?

10 A.  Not every single one.  Some of the exhibits, the entire

11 text thread was included, but for many of the other ones it was

12 just a sample of the ones from that -- from the government

13 exhibits.

14 Q.  And who made the decision to put -- it's true the

15 government -- the prosecution team, they are the ones who made

16 these charts, right?

17 A.  Yes.

18 Q.  Now, you went through a lot of testimony regarding Ranch

19 Property, right?

20 A.  Yes.

21 Q.  And you are an IRS agent?

22 A.  I was.

23 Q.  Okay.  There's nothing wrong with incorporating in Wyoming

24 or Delaware or New York or Colorado; correct?

25 A.  Correct.

1   Q.  And isn't it true in your experience as an IRS agent, an

2   agent today, a human being that does business, when you are

3   going to do business, you incorporate mostly, right?

4   A.  I don't know if that's true.  I know there's a lot of small

5   businesses — my time at the IRS — that were Schedule C

6   businesses; and those aren't incorporated, but I imagine many

7   businesses are incorporated, yes.

8   Q.  Wouldn't -- a Schedule C business wouldn't be incorporated?

9   A.  No, that's on your 1040.

10  Q.  Okay.

11  A.  So it's not an incorporated business.

12  Q.  Are you aware there are over 30 million small businesses

13  that are incorporated in the United States?

14  A.  No, I don't.

15  Q.  So you would incorporate for various reasons, potentially

16  tax reasons, right?

17  A.  Yes.

18  Q.  Safe havens?

19  A.  Yes.

20  Q.  You would incorporate for liability, right?

21  A.  Absolutely.

22  Q.  You're providing security at the border wall; you may want

23  to incorporate for liability to protect your personal assets,

24  right?

25  A.  Yes.

M5OVSHE4                          Hunziker - Cross

1    Q.   Okay.  And there's nothing wrong with that, right?

2    A.   There is not, no.

3    Q.   And sometimes high-profile people in your experience as an

4    IRS agent, you know, they want to incorporate in Wyoming, they

5    want to incorporate in Missouri; correct?

6            MR. ROOS:  Objection.  He's just asking him to

7    speculate about why other people --

8            MR. MERINGOLO:  They opened the door.  He's an IRS

9    agent.

10           THE COURT:  I'll allow the question.

11   Q.   So they would want to incorporate Wyoming, Missouri,

12   Delaware, things that have favorable personal -- piercing the

13   corporate veil, right?

14   A.   Yes.

15           THE COURT:  I don't understand the question.

16           Rephrase that.

17           MR. MERINGOLO:  Strike that.

18   Q.   Sometimes you get sued, your corporation gets sued, you

19   want to protect your personal liability, right?

20   A.   Yes.

21   Q.   And that's one of the many reasons someone would

22   incorporate; correct?

23   A.   Yes.  You wouldn't get that benefit on a Schedule C

24   business.

25   Q.   Like we just discussed.

1   A.   Right.

2   Q.   So you would get a benefit of protection of your personal

3   liability from an LLC and an Inc., right?

4   A.   Yes.

5   Q.   And there's nothing wrong with that either, right?

6   A.   Again, no.

7   Q.   You just testified that Ranch Property got $400,000 gross;

8   correct?

9   A.   Yes.  Sorry, within those 12 transactions.

10   Q.   Right.  From just We Build the Wall, right?

11   A.   Yes.

12   Q.   Okay.  And you being a former IRS agent -- strike that.

13           Mr. Shea, when he gets paid for Ranch Property for

14   work, he can do whatever he wants with that money; correct?

15   A.   When Ranch Property pays him?

16   Q.   Yeah.  If Ranch Property earns money, Mr. Shea can do

17   whatever he wants with that money; correct?

18   A.   As the sole owner?  Yeah, it's his business.

19   Q.   Okay.

20   A.   As long as he reports it on his taxes.

21   Q.   As long as he reports it on his taxes.

22           And just for an example, if I grossed 400,000 -- let's

23   say Mr. Shea grossed 400,000, and he paid tax on 400,000.  And

24   just round numbers — because I'm not good at math — his net was

25   200,000.  If he wanted to give 200,000 to Brian Kolfage, if he

1   wanted to go to Atlantic City, if he wanted to buy Bitcoin, if

2   he wanted to buy an Apple computer, he can do that?

3           MR. ROOS:  I'm not sure I'm following the question

4   here.

5   Q.  With the net proceeds that Mr. Shea, after tax dollars, he

6   can do whatever he wants; correct?

7   A.  As the sole owner of that business, I think he has -- yeah,

8   he would have a lot of authority over what that business will

9   do with the money.

10  Q.  Whatever he wants to do; correct?

11  A.  I don't believe he had a board of directors to report to.

12  Q.  He did not.  So whatever he does with his money, as long as

13  he pays his taxes, right?

14  A.  And it's legal.

15  Q.  And it's legal.  No, but after tax dollars, if I want to

16  buy Bitcoin with after-tax dollars, can I buy Bitcoin?

17  A.  The only distinction I was making is if you want to buy

18  drugs with that money, then I would say -- that was the only

19  distinction I was making.  But sure, yeah, if that's his

20  taxable income, yeah.

21  Q.  Taxable income.  If he wants to buy a social media list, he

22  could buy it; correct?

23  A.  Yes.

24  Q.  Okay.  Now, back to Ranch Property with the income.  Did

25  you match all the invoices he sent to We Build the Wall to

1    bring that income in?

2    A.  No.

3    Q.  The government didn't provide you all the invoices for

4    Ranch Property to We Build the Wall?

5    A.  I had access to a number of records.  I don't recall seeing

6    all the invoices sent.  It may have been somewhere in that --

7    in that document production.  I just don't recall seeing it.

8    Q.  Okay.  But to your knowledge, as you sit here today, you

9    did not put a chart together about all the invoices; correct?

10   A.  I didn't put any charts together, so that's correct.

11   Q.  Okay.  And you certainly didn't -- you reviewed some emails

12   from Tim Shea; correct?

13   A.  Yes.

14   Q.  And some of the emails you reviewed he was providing

15   security?

16   A.  I don't know if I can say that.

17   Q.  Okay.  Would it refresh your recollection if he hired

18   former Navy SEALs to provide security at events for We Build

19   the Wall?  Does that refresh your recollection?

20          MR. ROOS:  Objection.  Foundation.

21          THE COURT:  Sustained.  It's not in evidence.

22   Q.  Well, is there any events that you reviewed that Tim Shea

23   was emailing that you can recall as you sit here today?  Any

24   work on the email to verify the income?  Did the government

25   provide -- strike that.

M5OVSHE4                          Hunziker - Cross

1          Did the prosecution team provide you any emails of

2    which Mr. Shea was doing work, getting land or providing

3    security?  Did they provide you any of those emails?  Yes or

4    no, sir?

5    A.  Land deals, no.  And I don't believe security either.  The

6    only reason I hesitate is because the -- okay.

7    Q.  Sir, I'm not -- I'm not trying to get you.  I'm just asking

8    you.

9    A.  I just want to be complete, that's all.

10   Q.  But there was certainly no chart of emails of Mr. Shea

11   doing work; correct?

12   A.  No.

13   Q.  And there was no videos or -- at the border that you've

14   seen Mr. Shea in; did they provide you any videos of Mr. Shea

15   at the border?

16   A.  I didn't review any videos with Mr. Shea.

17   Q.  Did they provide you -- put your IRS hat on.  If you have a

18   credit card and you're paying -- and you're doing business,

19   Ranch Property is doing business traveling to the border and

20   you swipe your Amex card, that would be an expense; correct?

21   A.  Are you saying is that a business expense?

22   Q.  There's business expenses; correct?

23   A.  If you're there for business, if you're being contracted by

24   We Build the Wall, and then you're down there for business,

25   there are some allowable expenses, absolutely.

M5OVSHE4                          Hunziker - Cross

1    Q.  And plane flights to the border to provide services for We

2    Build the Wall would be deductible; correct?

3    A.  Yes, if you're contracted by We Build the Wall, sure.

4    Q.  And maybe some meals would be deductible?

5    A.  Partially, yes.

6    Q.  Well, you're right.  Sometimes it's 50 percent, but the

7    last two years has been 100 percent per meals, if you're aware?

8    A.  I left about two years ago, so I'll take your word.

9    Q.  So, well, we can agree you could write meals off, right?

10   A.  At least some of it.

11   Q.  Some of it.  A rent-a-car, if you're going to go down to

12   the border?

13   A.  Yes, it's part of your business, yes.

14   Q.  Gas for the rent-a-car?

15   A.  Okay.

16   Q.  Maybe a notebook if you're going to take notes, right?

17   A.  Sure.

18   Q.  Did the government provide you any credit card statements

19   of my client?

20   A.  I believe there were -- if they were there, they were

21   available, but they -- I didn't tie them out to anything in the

22   exhibit, so it was not something I focused my review on.

23   Q.  That's fine.  You have no personal knowledge of anything in

24   this case, right?

25   A.  That's fair.

M5OVSHE4                        Hunziker - Cross

1   Q.  You're just here to go through the charts that the

2   government created, right?

3   A.  Yes.

4   Q.  And did the government ever create a chart of Ranch

5   Property or Tim Shea or Amanda Shea about their credit card

6   expenses over this period of time?  Did they ever give you a

7   chart with that to review?

8   A.  No, I don't think so.

9   Q.  But if there were expenses for the business, it would be

10  deductible; correct?

11  A.  If there were legitimate business expenses, then yes.

12  Q.  Now, when you reviewed -- when you reviewed Freedom Daily's

13  bank account, you were aware that was Brian Kolfage's company,

14  right?

15  A.  Yes, he was a signer on the account.

16  Q.  Did they give you -- did the prosecutor give you the

17  corporate papers, to your knowledge?

18  A.  I don't believe I saw the corporate papers, but I saw the

19  opening documents from the bank.

20              THE COURT:  What do you mean by "opening documents"?

21              THE WITNESS:  So when you go into a bank to open an

22  account, there's some documentation required by the bank; it's

23  know your client, where they also ask who can sign on this

24  account.  And you'll ask those people to print their name and

25  actually sign their name so the bank can -- you know, if you

M5OVSHE4                          Hunziker - Cross

1    write a check, they can, in theory, compare that signature to

2    what's on their records.

3              MR. MERINGOLO:  Can we pull the government -- if the

4    government remembers, can we pull the exhibit up with the 13

5    transactions?

6              MR. ROOS:  Twelve?

7              MR. MERINGOLO:  Twelve transactions.

8              MR. ROOS:  902.

9              MR. MERINGOLO:  What?

10             MR. ROOS:  902.

11             MR. MERINGOLO:  902.  I'm not that good, everybody.

12   Q.  You know Freedom Daily and Brian Kolfage was -- they

13   provided social media services for people, to your knowledge?

14   A.  I saw some checks with the memo line saying social media

15   accounts.

16   Q.  Okay.

17   A.  I didn't look at any invoices if any services were

18   rendered, but I did see the checks with that --

19   Q.  And it said social media accounts; correct?

20   A.  Social media accounts is one of them, yup.

21   Q.  Did you ever see a contract between my client and

22   Mr. Kolfage for 150,000 for a social media list from GoFundMe?

23   A.  No.

24   Q.  The government never provided you a contract between

25   Mr. Shea and Mr. Kolfage for 150,000 for social media accounts,

1   lists or whatever people call it that do this?

2   A.  I didn't see a contract, no.

3   Q.  The government didn't show you that contract, right?

4   A.  I didn't see it, no.

5   Q.  Did you ever see the contract between We Build the Wall and

6   Ranch Property?

7   A.  Contract?

8   Q.  Contract between We Build the Wall and Ranch Property, have

9   you ever seen that contract?

10  A.  No.  I believe the only thing I saw was that invoice from

11  Ranch Property back to We Build the Wall.

12  Q.  So the government didn't provide you the contract between

13  We Build the Wall and Ranch Property; is that correct?

14  A.  Correct.

15  Q.  So we're going to go through -- let's look at the number --

16  number three, okay, there's $100,000 that -- from We Build the

17  Wall to Timothy Shea and Amanda Shea; correct?

18  A.  Yes.

19  Q.  And that's given 50,000 right to Freedom Daily, right?

20  A.  Yes.

21  Q.  Okay.  Let's keep going.  Let's look at the next one.  And

22  five and six are 50,000 to Ranch Property, and you never saw

23  that invoice; correct?  For the 50,000?

24  A.  No, just text messages that we reviewed.

25  Q.  Okay.  And then it was $25,000 right to Freedom Daily;

M5OVSHE4                        Hunziker - Cross

1   correct?

2   A.   Yes.

3   Q.   Okay.  Now you got number six was $30,000, and then -- and

4   then Mr. Shea gave -- you're better at math than me.  He gave,

5   I don't know, 60-something percent, 20,000 right to Freedom

6   Daily, right?

7   A.   Two-thirds.

8   Q.   Two-thirds.  That's why you're there and I'm there.  I'm

9   not doing taxes.  We can forget about that.

10           And then let's go back.  Let's keep going up.  And we

11   have number eight, you got $48,000.  And he sends Freedom Daily

12   20,000; correct?

13   A.   Yes, sir.

14   Q.   And let's go one more time.  And then you got three

15   transactions, 66,000.  And then he writes a check to Freedom

16   Daily; then he writes a check to himself, which is wife and his

17   himself.  There's nothing wrong with that, as long as they pay

18   taxes, right?  It's his account; he's a sole owner; he can do

19   whatever he wants, right?

20   A.   It's his business.

21   Q.   Did you see any checks to any credit cards?  If you don't

22   remember, don't worry.

23   A.   I'm just trying to think back to the bank statements I

24   reviewed for -- are you talking about from the RPMM account or

25   from the Shea account?

1   Q.  Either one.

2   A.  I don't recall.

3   Q.  Don't worry.  Then we have the last one of where Mr. Shea

4   gets around 57,000, and then he writes Mr. Kolfage 31,000;

5   correct?

6   A.  In November, yeah.

7   Q.  Then he writes himself a pay, 26,000.  So the final number

8   you gave us was he grossed 400; Brian got 100, Freedom Daily

9   got 190,000, and the Sheas got 153,000; correct?

10  Approximately?

11  A.  Brian Kolfage got -- yeah, it wasn't just the Freedom Daily

12  account.

13  Q.  Right, right.

14          Now, sir, how many times did you meet with the

15  prosecutors regarding this?

16  A.  I believe it was about five times.

17  Q.  And you practiced the direct testimony that you just gave

18  today pretty much?

19  A.  I reviewed the charts with them and they asked me questions

20  about the charts.

21  Q.  They asked you questions; you gave them answers, right?

22  A.  Yes.

23  Q.  Did they prepare for this cross-examination?  Did they

24  prepare you for cross?

25  A.  For about 90 seconds.

M5OVSHE4                         Hunziker - Cross

1    Q.  Is it this crazy guy is going to get up here, he's going to

2    start yelling, right, something to that effect?

3    A.  No, I don't think they said that.

4    Q.  All right.  Well, it's okay.

5    A.  They are much too polite.

6    Q.  They are very polite.  But we can agree they didn't give

7    you a chart of the credit cards; they didn't give you the

8    contract between my client and Mr. Kolfage; and they didn't

9    give you the contract of Ranch Property and We Build the Wall.

10   We can agree with that, right?

11   A.  I don't recall reviewing them.

12   Q.  Okay.  For the judge and the jury, did the government ever

13   tell you to look for bank records from Freedom Daily to the

14   Sheas?  Did they ever ask you -- you reviewed the documents.

15   Did they ever ask you, We want to see money from Freedom Daily

16   to the Sheas?  Did they ever ask you that?  Yes or no, sir?

17           MR. ROOS:  Objection.

18           What we're asking him doesn't matter.

19           THE COURT:  Overruled.

20   Q.  Did they ever ask you that, sir?

21   A.  I was asked to review the charts for accuracy, so I mean as

22   far as --

23   Q.  But you reviewed the bank records for Freedom Daily, right?

24   A.  I tied out the bank records from the exhibits to Freedom

25   Daily.

1   Q.  Sir, respectfully, you testified about ten minutes ago that

2   you reviewed the bank records for Freedom Daily, sir?

3   A.  I just want to be clear with what I said.  With reviewing,

4   was I went to the exhibits, and on the transaction dates I

5   would make sure that that transaction dollar amount was there.

6   Now, through that review, sometimes I would -- I would see

7   other transactions, of course.

8   Q.  Tell the jury how many transactions did you see from

9   Freedom Daily to the Sheas?

10  A.  I don't -- I don't recall seeing any, but there may have

11  been some.

12  Q.  If I tell you in the bank records there were many

13  transactions from Freedom Daily to the Sheas, you sit there and

14  you don't know that?  Is that your testimony, sir?

15  A.  I believe on a summary -- on a chart that I saw, I did see

16  Freedom Daily.  I don't recall if it was going into RPMM or

17  into the Sheas' personal account.  If you have something to

18  refresh my memory, I could take a look.

19  Q.  You know what's great? This document is in evidence.  Am I

20  right?

21          Government Exhibit 2000, we want to pull it up, Bates

22  numbers, for the government, 00258301.

23          I'm sorry.  I'm sorry.  This is the Sheas' bank

24  account.  And we got transfers from Freedom Daily to the Sheas,

25  I gave the Bates stamp and it's in evidence.  I want to put it

M5OVSHE4                    Hunziker - Cross

1    on the screen.

2            Did you see this 20 --

3            MR. ROOS:  Can we see that?

4            MR. MERINGOLO:  Sure.  If you want to pull it up on

5    the screen, that would be great.

6            MR. ROOS:  This is for 2018.

7            MR. MERINGOLO:  It's in evidence.

8            MR. ROOS:  Sure.

9    BY MR. MERINGOLO:

10   Q.  So I want you to see this bank record.

11   A.  Sure.

12   Q.  Does that refresh your recollection that what's in

13   evidence, Freedom Daily paid the Sheas on September 5th, 2018,

14   $26,000?

15   A.  On September 5th, there was an electronic deposit from

16   Freedom Daily into the Sheas' U.S. bank account for $26,894.

17   Q.  Okay.  We should do our own -- okay.  So you and I and the

18   government, what's in evidence is GX 20, we're going to

19   start -- GX 2000, I'm sorry, everybody.  We're going to say on

20   September 5th, 2018, $26,894 goes from Freedom Daily.  I'm just

21   going to write FD.  And I'm just going to write Sheas, if

22   that's okay.

23           October 22nd, 2018 statement, Bates stamp 00258283,

24   the Sheas bank account.  I'm going to show you a transfer on

25   October 3rd from Freedom Daily to the Sheas.  So that's a month

1   later.  We'll keep going.

2          Can you tell the jury how much money Freedom Daily,

3   Brian Kolfage's company, paid the Sheas?

4   A.  It was wired for $10,518 on October 3rd, 2018.

5   Q.  Okay.  Thank you.

6          So I'm going to write in our new chart, October 3rd,

7   2018, $10,518.00 from Freedom Daily to the Sheas.  And you

8   know, why don't we try to do this all at once.

9          I'm going to give you -- the next one is going to be

10   00258287, and it's a wire transfer from Freedom Daily to the

11   Sheas for $13,469; and then 0025879, there's a wire transfer

12   from Freedom Daily to the Sheas for 15,700.

13          MR. ROOS:  What are the dates?

14          MR. MERINGOLO:  That's December 4th.  And then --

15          MR. ROOS:  What year?

16          MR. MERINGOLO:  Of 2018.  Then -- we'll get to '19.

17          Then January 18, 2019, 00258271 from Freedom Daily to

18   the Sheas for 3600.  Then on March 5th, 2019, one transfer on

19   March 5th, 2019, from Freedom Daily to the Sheas, $8,384.40.

20   And then January 7th -- June 7th, 2019, June 7th, 2019, from

21   Freedom Daily to the Sheas, 22,247.13.

22          Then on July 16th, 2019, from Freedom Daily to the

23   Sheas, $21,162.44.  Then on September 17th, 2019, from Freedom

24   Daily to the Sheas, $5,299.90.  And then in August, from

25   Freedom Daily to the Sheas, 10,000.

1              And let me just confer to make sure I get the next

2       number right.

3              (Counsel conferred)

4              MR. ROOS:  These are all in evidence.  We'll stipulate

5       to them.  But I don't know if there's a question.

6              I believe you.

7              MR. MERINGOLO:  I'm not good -- I'm reading it to the

8       jury.

9       Q.  So from Freedom Daily to the Sheas on August 11th, 2019,

10      50,000.  I want you to just double-check that I'm right.  If

11      you want to just read them off to me as you're on the stand.

12      A.  Sure.

13      Q.  Let's start from the top.

14      A.  Okay.  On November 2nd, $13,469.

15      Q.  13,000 what?

16      A.  469.

17      Q.  Okay.

18      A.  2018.

19              Again in 2018, December 4th, $15,700.

20      Q.  Okay.

21      A.  On January 18th, 2019, 3600.

22      Q.  Okay.

23      A.  On March 5th, $8,384.

24      Q.  Okay.  2019, right?

25      A.  2019.  These are all 2019 now.

M5OVSHE4                     Hunziker - Cross

1   Q.  Okay.

2   A.  And June 7th, $22,247.13.

3   Q.  Repeat that, I'm sorry, sir?

4   A.  $22,247.13.

5   Q.  Okay.

6   A.  On July 16th, $21,162.44.

7   Q.  One more time.  I'm not that good.  21,000 --

8   A.  21,162.

9   Q.  Okay.  July what, 16th?

10  A.  July 16th.

11  Q.  Okay.

12  A.  September 17th, $5,299.90.

13  Q.  Okay.

14  A.  August 10th, 2020.

15  Q.  August 10, 2020?

16  A.  Yes.

17  Q.  Yes.

18  A.  August 10th, 2020 is $10,000 from Freedom Daily.

19          And then on August 11th, 50,000.

20  Q.  August 11th, 2020 was 50,000, right?

21  A.  Yes, 50,000.

22  Q.  Okay.

23          MR. MERINGOLO:  Do you have a sticker?

24          Your Honor, I'm going to mark this as Defense 1.  And

25  I'll have the witness double-check all the numbers to make sure

M5OVSHE4                      Hunziker - Cross

1    I'm correct.

2              THE WITNESS:  I'm sorry, did you give me September 5th

3    and October 3rd, those first two transactions?

4              THE COURT:  From what year?

5              THE WITNESS:  2018.  Sorry.  I'll try to go quickly.

6              MR. MERINGOLO:  We're going to do one more thing, if

7    it's okay with your Honor, and I'm not going to take much more

8    time.  I'm going to need him to add this up, because it will be

9    a complete disaster if I add it up.  And I can give him my

10   calculator, if you want.

11             THE COURT:  That's fine.

12   A.  Do you need an exact number or --

13   Q.  I'm going to give you a calculator.

14   A.  Okay.

15   Q.  Because if I'm doing the numbers, we're going to have a

16   problem.

17   A.  Approximately 187K.

18             THE COURT:  And that covers what period?

19             THE WITNESS:  That covers $187,273.  There might be

20   some cents.

21   Q.  Don't worry about it.

22   A.  Covers September 5th, 2018 through August 11th, 2020.

23   Q.  Do you want to put that on the top?  I'll give you a pen.

24   A.  If you like.

25   Q.  Just the time frame, timeline.

1              MR. MERINGOLO:  And I'll show the government this,

2     your Honor.  I'd like to move this into evidence, Judge.

3              MR. ROOS:  No objection.

4              THE COURT:  It is admitted.  What is it marked?

5              MR. MERINGOLO:  It's marked Defense Exhibit 1.  But

6     what was the number?  We didn't put the final number there.

7              (Defendant's Exhibit 1 received in evidence)

8              MR. MERINGOLO:  Your Honor, it's Defense Exhibit 1.

9              During this period of time, it's $187,273 from Freedom

10    Daily to the Sheas.

11             No further questions.

12             THE COURT:  Redirect?

13             MR. ROOS:  Sure, just a brief redirect.

14    REDIRECT EXAMINATION

15    BY MR. ROOS:

16    Q.  So these payments from Freedom Daily to the Sheas are from

17    September 2018 to August 2020, right?

18    A.  Yes.

19    Q.  And 60,000 of that total comes in August 2020, right?

20    A.  Yes.

21    Q.  Let me first ask you, when was the -- when were those text

22    messages you read about Winning Energy, when was that?

23    A.  June 2020.

24    Q.  Okay.  And do you know what these payments were for?

25    A.  No idea.

1   Q.  Do you know if they were related to the social media

2   business that --

3                   MR. MERINGOLO:  Objection.  He said he didn't know.

4                   THE COURT:  Overruled.  You may answer.

5   Q.  Do you know if they are related to the social media

6   business that the Sheas and Kolfage had?

7   A.  I don't know what they are for.

8   Q.  Do you know if they are related to Winning Energy?

9   A.  No, sir.

10  Q.  Now, do you know if this total, 187,000, was reported on

11  Tim Shea's taxes?

12  A.  I never saw his tax returns.

13  Q.  Okay.  I'll give this back to you.

14          Let me ask a few questions about some of the other

15  things defense counsel asked you about.  You were asked these

16  questions about, you know, sort of like cherry-picking text

17  messages into the charts.  Do you remember those questions?

18  A.  Yes.

19  Q.  I just want to make it clear, if the jury wants to see any

20  of the text messages or the emails, are all of those in

21  evidence too?

22  A.  Yes.  As we discussed, on the right side, that GX number is

23  the source document.  We pulled a number of those up.

24  Q.  Okay.  You were asked some hypothetical questions about

25  suing someone to get a loan back, right?

1   A.   Yeah.

2   Q.   Now, I think your testimony was that you weren't familiar

3   with any kind of lawsuit to get the money back; is that right?

4   A.   Unaware of any lawsuit.

5   Q.   Now, if somebody didn't know that a loan existed, would

6   they know to sue for it?

7   A.   I imagine not, no.

8   Q.   So if it's a secret loan, there's no lawsuit to be had,

9   right?

10   A.   I doubt it.

11   Q.   All right.  You were asked about reasons why a person might

12   incorporate a business, do you remember those questions?

13   A.   Yes, I do.

14   Q.   And you were asked some questions about taxes and safe

15   havens, do you remember those questions?

16   A.   Yes.

17   Q.   Is one reason somebody could incorporate a business to

18   conceal a crime?

19   A.   Yes.

20   Q.   Now, you were asked some questions about invoices, do you

21   remember those?

22   A.   Yeah.

23   Q.   All right.  And I think the questions had to do with

24   whether the government showed you some invoices?

25   A.   Yes.

M5OVSHE4                          Hunziker - Redirect

1   Q.  I just want to ask you about sort of an assumption in that

2   question.  Do you know if invoices even existed for some of

3   these transactions?

4   A.  I have no idea if they exist.

5   Q.  All right.  And you didn't see any invoices on

6   cross-examination either, did you?

7   A.  I was not shown any, no.

8   Q.  You were also asked some questions about, you know,

9   somebody -- could you get reimbursement for meals and --

10  A.  Gas.

11  Q.  Gas, etc.

12  A.  Legitimate business expenses, I remember.

13  Q.  Okay.  Do you know if Tim Shea incurred those business

14  expenses relating to We Build the Wall?

15  A.  No, I was saying those are -- could be legitimate business

16  expenses.  I don't know if they were incurred or not.

17  Q.  Okay.  On this question of invoices, you did look at some

18  invoices in connection with your direct testimony; is that

19  right?

20  A.  The Vision Quest ones?

21  Q.  Right.  And those are in evidence, right?

22  A.  Yes, we looked at it.

23  Q.  And did you also review some invoices about drones?

24  A.  I saw some in my review.

25  Q.  Okay.  All right.  Well, let's bring up Government Exhibit

1    902 -- I'm sorry, 901.  And do you see that first payment for

2    $100,000?

3    A.  On March 27th?

4    Q.  Yeah.  Did you ever see an invoice for that?

5    A.  I don't believe so.

6    Q.  Do you know if one exists?

7    A.  I don't know if one exists.

8    Q.  All right.

9           MR. ROOS:  One second, your Honor.

10          (Counsel conferred)

11   Q.  All right.  You were asked a bunch of questions about, you

12   know, how a transaction -- how doing something as part of a

13   transaction could be legitimate, right?

14   A.  Could be legitimate?

15   Q.  Yes.

16   A.  Yes.

17   Q.  And defense counsel gave you some reasons why maybe

18   something could be legitimate, right?

19   A.  Sure.

20   Q.  To give you an example, I think defense counsel asked you

21   about spending your own money, right?

22   A.  Yes.

23   Q.  And said once you get your money, you can sort of spend it

24   for whatever you want.  Do you remember that?

25   A.  If it's your money, yes.

1  Q.  And I think you had sort of a caveat that you were trying

2  to make.  What was that?

3  A.  I believe it has to be -- if it's your business, then you

4  have to -- the business expenses have to be legitimate; and

5  then that money has to flow to you, and you have to report it

6  on your tax returns.

7  Q.  All right.  So you gave the example of even if it's your

8  money, you can't go by a bunch of -- do an illegal drug

9  transaction, right?

10  A.  No, that would be money laundering.

11  Q.  All right.  And what about could you pay a kickback?

12  A.  No, you couldn't do anything illegal with it.  I mean, I

13  guess you could do something illegal with it.  You shouldn't do

14  something illegal with it.

15  Q.  Okay.

16        MR. ROOS:  No further questions, your Honor.

17        THE COURT:  Recross?

18        MR. MERINGOLO:  Yes.

19  RECROSS EXAMINATION

20  BY MR. MERINGOLO:

21  Q.  You said -- I think you just pulled up that $100,000

22  payment on March of 2019; correct?

23  A.  March 27th.

24  Q.  27th.  During the course of you being involved in this case

25  and reviewing Tim Shea's emails, did you ever come across an

1    email where he was hiring a company, a respected security

2    company, with 18 Navy SEALs in Cincinnati around March of 2019?

3    A.  I didn't see that email, no.

4    Q.  Maybe it would refresh your recollection if you see it?

5              MR. ROOS:  He said he'd never seen it.

6    A.  I didn't see that email.  That one I think I would

7    remember.

8    Q.  Okay.  So it's your -- do you remember any emails in March

9    of 2019 with Mr. Shea?

10   A.  I have to double-check the timeline with the text messages,

11   but the ones I saw would be captured in the summary documents

12   on the exhibits 902 through 906.

13   Q.  Okay.  Well, maybe on March 27, 2019, do you remember

14   reviewing an email with Tim Shea and Foreman Mike at the border

15   who does the construction, who did the construction for the

16   wall, do you remember that email?

17   A.  No.

18   Q.  No?  And that wouldn't refresh your recollection either,

19   right?

20   A.  No, I didn't see it.

21             MR. MERINGOLO:  Okay.  Can we pull up the last

22   exhibit, the $100,000 that came in to Ranch Property?  I'd like

23   to see the date on that.  March 27, 2019.

24   Q.  So you reviewed -- you obviously reviewed that date, right,

25   that this chart that the government provided, and you reviewed

M5OVSHE4                          Hunziker - Recross

1    and verified March 27, 2019; correct?

2    A.  From the bank records, yes.

3    Q.  And you don't -- the government didn't give you or you

4    didn't review an email between Ranch Property Management and

5    Foreman Mike to help build the final preparations of the border

6    wall?  Are you sure, sir?

7    A.  No, I didn't review that.

8    Q.  And that wouldn't refresh your recollection, right?

9    A.  I'm certain I didn't review that email.

10   Q.  Are you sure the government didn't give you that?

11              MR. ROOS:  Your Honor, asked and answered.  This stuff

12   is not in evidence.

13              THE COURT:  Sustained.

14              MR. MERINGOLO:  One more, Judge.

15   Q.  Did you ever review any emails between Foreman Mike, the

16   person who helped building the wall, and Tim Shea?

17              MR. ROOS:  Objection.

18              THE COURT:  Counsel, you cannot testify.

19              MR. MERINGOLO:  I understand.  I'm sorry.

20   Q.  Did you ever review any emails between Tim Shea and someone

21   at the border?

22   A.  No.

23   Q.  Did you ever review any emails with Tim Shea and anyone who

24   was going to build the wall in New Mexico?

25   A.  No.

M5OVSHE4

1    Q.  Did you ever review any emails at anytime of Tim Shea

2    contacting landowners to buy their land at the southern border?

3    A.  No.

4    Q.  Did you ever review any emails of Tim Shea hiring a drone

5    company to help with a video at the southern border?

6    A.  No.

7            MR. ROOS:  Your Honor, I think we're kind of going

8    beyond the scope here.

9            THE COURT:  I know.  He'll wrap up very soon because

10   it's five minutes to five.

11           MR. MERINGOLO:  I'll wrap up right now, Judge.

12           Thank you very much for the latitude.

13           THE COURT:  All righty, then.

14           You may step out.

15           (Witness excused)

16           THE COURT:  Members of the jury, we've come to the end

17   of our day.  You'll return tomorrow.  Tomorrow breakfast is at

18   8:15.  By 8:45, you must be in 9B, because there's some forms

19   that I need you to fill out.  So by 8:45, in room 9B.  Now,

20   very soon thereafter, the clerk on my staff will bring you up

21   here to come into the courtroom.  So I need everyone to be on

22   time.

23           Remember that you're not allowed to discuss the case

24   amongst yourselves or with anyone else.  It's very tempting

25   when you start to hear testimony to start to chat about the

M5OVSHE4

1    case, but you can't do that.  Don't permit anyone to discuss

2    the case in your presence.  Have a good evening.

3          (Jury not present)

4          THE COURT:  You may be seated.

5          How are we doing as far as pace?

6          MR. ROOS:  So I think we're doing great, your Honor.

7    I think it's actually pretty likely the government is going to

8    rest in either the morning or midday on Thursday of this week.

9          THE COURT:  And do you have a full day of witnesses

10   tomorrow?

11         MR. ROOS:  We're going to fill the day tomorrow.  At

12   midday we can certainly give your Honor an update of whether

13   we're moving even faster than that, such that we can even rest

14   at the end of the day tomorrow.  My guess is that's not going

15   to be the case, or whether we think we're going to rest in like

16   the first hour, the first three hours of Thursday.  But I think

17   we -- based on all the work we're able to do today, we're

18   moving at a pretty fast pace.

19         THE COURT:  Okay.  So then we would be returning on

20   Tuesday, and the defense would decide whether to put on a case.

21         MR. ROOS:  I think we would ask, if we're done in

22   early part of Thursday, that the defense put on their case so

23   we can have all the evidence in and then have the weekend to do

24   the summations.

25         THE COURT:  Does the defense feel they could put on

M5OVSHE4

1    the case in half a day?

2              MR. MERINGOLO:  Judge, we have a number of -- we're

3    waiting for a number.  We don't have any of our stipulations

4    signed.

5              MR. ROOS:  We'll meet with the defense this afternoon

6    on their stipulations.

7              MR. MERINGOLO:  What we're going to do, since the

8    opening we pulled a lot of emails that we believe we're going

9    to see if we can get -- we'll try to work tonight.  It is what

10   it is, right, Judge?  We'll try to get them all done.  I don't

11   see it's a problem.  You know, we'll have --

12             THE COURT:  You'll cooperate.  Okay.

13             So then I will expect the defense to be prepared to

14   start on Wednesday afternoon.  And it could be that then on --

15   I'm sorry, Thursday afternoon.  I'm sorry.  Thursday afternoon.

16   Then on Tuesday, summations.

17             Anything else?

18             MR. MERINGOLO:  No.

19             MR. ROOS:  There's one other thing I just want to

20   note, and I may be totally misreading the situation.  It looked

21   like to me that Juror No. 4, the gentleman in the turquoise

22   shirt, was commenting on exhibits to Juror 5, who at some point

23   I sort of noticed had kind of like waved him off.  Your Honor

24   just gave an instruction about not talking about the case, so

25   my guess is that will hopefully solve it.  I know sometimes

M5OVSHE4

1    jurors are interested and they want to engage with someone, but

2    it looked like perhaps Juror 5 wasn't interested in that, but I

3    don't really know.

4              THE COURT:  I didn't observe that, but you've noted

5    it.

6              Okay.  All right, then.  So I will see you then

7    tomorrow morning at 9.  Thank you.  Have a good evening.

8              (Adjourned to May 25, 2022 at 9 o'clock a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION
 2   Examination of:                              Page
 3    DANIEL GORDON
 4   Direct By Ms. Moe . . . . . . . . . . . . . .46
 5   Cross By Ms. Cappellino . . . . . . . . . . .85
 6    DANIELLE DEPERI
 7   Direct By Mr. Sobelman . . . . . . . . . . . .97
 8   Cross By Ms. Cappellino . . . . . . . . . . 119
 9    NICOLE KELLER
10   Direct By Ms. Moe . . . . . . . . . . . . . 129
11   Cross By Mr. Meringolo . . . . . . . . . . . 136
12    YVES HUNZIKER
13   Direct By Mr. Roos . . . . . . . . . . . . . 139
14   Cross By Mr. Meringolo . . . . . . . . . . . 238
15   Redirect By Mr. Roos . . . . . . . . . . . . 261
16   Recross By Mr. Meringolo . . . . . . . . . . 266
17                        GOVERNMENT EXHIBITS
18   Exhibit No.                                Received
19    S4, 301, 306, 303, 307, 308, 309, 311   . . . .53
20    402 through 408   . . . . . . . . . . . . . .53
21    302   . . . . . . . . . . . . . . . . . . .62
22    305   . . . . . . . . . . . . . . . . . . .68
23    305A, 305B   . . . . . . . . . . . . . . . .72
24    1000, 1200, 1300, 1400, 1500, 1600, . . . . .93
25            1700, 1800, 1900, 2000, 2100,
```

```
 1              2200, 2300, 2400
 2     16, 19, 22, 26, 28, 33, 36, 38, 42  . . . . . .94
 3              through 46, 48, 49, 101 to
 4              147, 149, 152, 951, 953 to 958
 5     S-7, 1 to 15, 17, 18, 21, 23 to 25, 29  . . . .95
 6              to 32, 34, 35, 37, 39 to 41,
 7              47, 50 to 56, 56-A-1, 57 to
 8              59, 501, 148, 150, 151, 153,
 9              231, 232
10     313, 313-A . . . . . . . . . . . . . . . . .96
11     281  . . . . . . . . . . . . . . . . . . . .98
12     282  . . . . . . . . . . . . . . . . . . . 101
13     401  . . . . . . . . . . . . . . . . . . . 109
14     954A-T  . . . . . . . . . . . . . . . . . . 112
15     901 to 906 . . . . . . . . . . . . . . . . 146
16     284  . . . . . . . . . . . . . . . . . . . 162
17     402A-T, 402B-T, 402C-T  . . . . . . . . . 191
18     405-T  . . . . . . . . . . . . . . . . . . 195
19     361  . . . . . . . . . . . . . . . . . . . 235
20                    DEFENDANT EXHIBITS
21     Exhibit No.                          Received
22     1  . . . . . . . . . . . . . . . . . . . . 261
23
24
25
```