M5PVSHE1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               20 Cr. 412 (AT)

TIMOTHY SHEA,

                Defendant.                   Trial

------------------------------x

                                             May 25, 2022
                                             9:20 a.m.


Before:

                    HON. ANALISA TORRES,

                                        District Judge
                                          and a Jury


                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  ALISON G. MOE
     NICOLAS T. ROOS
     ROBERT B. SOBELMAN
     Assistant United States Attorneys

MERINGOLO & ASSOCIATES P.C.
     Attorneys for Defendant
BY:  JOHN C. MERINGOLO
     ANGELICA B. CAPPELLINO
     CLARA S. KALHOUS


Also Present:  Sunny Drescher, Paralegal Specialist, USAO

M5PVSHE1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.

3          Would you make your appearances please.

4          MS. MOE:  Good morning, your Honor.

5          Alison Moe, Robert Sobelman, and Nicolas Roos for the

6     government.  We're joined at counsel table by paralegal

7     specialist Sunny Drescher.

8          MR. MERINGOLO:  Good morning, your Honor.

9          John Meringolo, Clara Kalhous, Anjelica Cappellino for

10    Mr. Shea, who's standing to my right.

11         THE COURT:  Please be seated.

12         This morning I received a letter from Mr. Shea's

13    attorneys at ECF 225.  The defendant asks the Court to preclude

14    the government from admitting evidence concerning a small

15    business administration COVID-19 economic injury disaster loan.

16    Defense has also raised questions with respect to certain

17    stipulations that it would like the government to make.

18         I will hear first the defense on the SBA loan issue.

19         MR. MERINGOLO:  Your Honor, we respectfully submit

20    that that should be precluded.  The purpose of the government's

21    submission *in limine* was to show that Mr. Shea owned the

22    company.  I mean, they've introduced more than enough evidence

23    to prove that Mr. Shea owned the company and it was the sole

24    owner, specifically yesterday from the special agent that was

25    on the stand, amongst text messages, amongst documents of

M5PVSHE1

incorporation.

So we believe, your Honor, they have what they wanted. To put that in, in addition to that, Judge, we're all standing here, sitting here, we have masks on.  If they surmise that Mr. Shea did anything improper — and I know this probably hasn't been litigated yet at the circuit or any circuit — did anything improper with the COVID-19 funds of which we've all as taxpayers paid, it could have a tremendous prejudicial effect on him which would be probably detrimental to -- it's not even an uncharged crime; it's almost what the government says, it's a bad act.  But at the time, I think the evidence will show the six questions that he needed to answer that if all of us that had small businesses applied for at that time.

In addition to that, then we would want to combat that, that having that small business loan, which I took and it was forgiven, Mr. Shea is probably less than one percent that didn't ask for forgiveness for that loan and who's currently abiding by the terms of that loan paying it.

So I just think it's too convoluted today with the COVID-19, that we're all sitting here, and it could be a tremendous prejudicial effect.  They have what they wanted. They want to stipulate that it's Mr. Shea's company, we'll stipulate that it's his company, even though it's been in evidence.  And that's my argument, Judge, thank you, in addition to the paper.

M5PVSHE1

1           THE COURT:  I'll hear the government.

2           MR. SOBELMAN:  Your Honor, may I remove my mask to

3    address the Court?

4           THE COURT:  I'm sorry?

5           MR. SOBELMAN:  May I remove my mask to address the

6    Court?

7           THE COURT:  Yes, you may.

8           MR. SOBELMAN:  Thank you, your Honor.

9           Defense counsel is attacking a strawman.  Our argument

10   is different; the facts we wish to elicit are different.

11          If I can explain for a moment.

12          As a preliminary matter, the defense kicked the door

13   wide open on this in their opening statement.  They said, among

14   other things, Ranch Property Management, not a shell company;

15   that's transcript 35 to 36.  Not a shell company like the

16   government said; transcript 36.  So shell company, if it is not

17   a shell company like the government just represented to you,

18   that's one of the elements that they are going to use.  I

19   respectfully submit you should vote not guilty; transcript 36.

20   There's at least 10 to 12 other similar statements that defense

21   counsel made.

22          This does not have to do with control or ownership.

23   This has to do with whether RPMM was a legitimate business

24   doing legitimate work, or whether it was a shell company, as

25   the government contends, that was used for purposes of

M5PVSHE1

1    committing the fraud and money laundering offenses that are at

2    issue in this case.

3          And there are two facts that we want to elicit on this

4    that would probably take about five minutes of testimony with

5    just that one chart and the loan document, which already has a

6    stipulation to authenticity.

7          The first fact is that there are certain

8    representations on the application with respect to the 2019

9    income for Ranch Property Marketing and Management that are

10   inconsistent with other representations the defendant has made.

11   And second, that the cost of goods sold — which is essentially

12   an IRS term for the amount of expenses a company has had — is

13   inconsistent with other representations the defendant has made

14   about the cost of goods sold in 2019 for RPMM.  2019, of

15   course, is the key time period of the conspiracy here; and the

16   loan was obtained also within the time of the conspiracy in

17   early -- early 2020.

18         We do not intend to argue — although it is true — that

19   the defendant fraudulently obtained the loan.  That's not an

20   argument we intend to make.  We understand the Court has found

21   that to be more prejudicial than probative.  We actually think

22   the balance has changed, but we are not asking to go there at

23   this time.

24         The second fact --

25         THE COURT:  Let me interrupt you.

M5PVSHE1

1          MR. SOBELMAN:  Yes, your Honor.

2          THE COURT:  You're saying you want to bring out the

3   fact that there are items in the application which are

4   inconsistent with his positions that he's made; is that

5   correct?

6          MR. SOBELMAN:  Yes, your Honor.

7          For example, in the application, the defendant listed

8   the gross income for 2019 for RPMM and he listed the cost of

9   goods sold for RPMM for 2019.  The same fields are on the

10  defendant's tax return.  The numbers are different.  We think

11  that is strong indicia that RPMM is a fraud vehicle; it's a

12  shell company.  If it's a real company, you would have

13  consistent numbers that you are reporting that are backed up by

14  underlying documentation.  Here, there is no underlying

15  documentation because the company isn't real.

16         And the government has the burden to prove this.  The

17  defense has made this in their opening statement literally the

18  central issue in the case.  And it would be an injustice for us

19  not to be able to put in evidence to combat this.

20         MR. MERINGOLO:  Judge, may I respond please?

21         THE COURT:  No.  I'm just going to hear the rest of

22  his argument and then I'll give you the opportunity to speak.

23         Go ahead.

24         MR. SOBELMAN:  Thank you, your Honor.

25         The second of two facts we wish to put in on this are

M5PVSHE1

1    the way in which the defendant used the loan proceeds.  The

2    government does not intend to suggest that it was a misuse or

3    that it was a violation of the loan agreement; although it was

4    a misuse and it was a violation of the loan agreement.  We're

5    not going to offer the loan agreement; we're not going to argue

6    the funds were misused in any way.

7         What we want to be able to show is just how the funds

8    were used; that there was a loan that came in from the SBA;

9    that the funds were immediately transferred to Tim Shea's bank

10   account, his personal bank account; that he spent it on

11   personal expenses.  We're not going to say, See, he misused

12   this and, therefore, he must have done something else.

13        The argument is that if the company was real, it would

14   spend its loan — which is essentially its only income around

15   that time — on business expenses.  But there are no business

16   expenses because it's a shell company.  And so the government

17   needs this evidence and is entitled to this evidence both in

18   its affirmative case, but certainly in light of the door that's

19   been opened by the defense.

20        And, of course, we would consent and would ask for a

21   limiting instruction on this evidence; it should be used for a

22   limited purpose, the purpose that I've identified, the only

23   purpose the government will suggest to the jury.  We're happy

24   to draft one; we're happy to confer with defense about one.

25        But, your Honor, to the extent the Court was unsure

M5PVSHE1

1    about whether this evidence might not or might come in at this

2    trial before the opening statements, it's difficult to

3    understand how it can't.

4              THE COURT:  Go ahead.

5              MR. MERINGOLO:  Judge, may I take the mask off?

6              THE COURT:  Yes.

7              MR. MERINGOLO:  Judge, for the government to say right

8    now in front of this Court — and maybe they didn't look at all

9    the evidence — that this was a shell company; that Mr. Shea did

10   no work for We Build the Wall; that Mr. Shea didn't sell steel

11   from We Build the Wall that went into his account; that

12   Mr. Shea didn't have any expenses that we're trying to get them

13   to stipulate to the credit cards now, which they won't, your

14   Honor, maybe they didn't look at all this evidence.

15             But to say it was a shell company when they know

16   Mr. Shea was down at the border wall at least four times, when

17   they know Mr. Shea -- whether I can get this in, Judge, or not,

18   this goes to what the government is telling you.  Whether

19   Mr. Shea didn't have Navy SEALs at multiple events in

20   Cincinnati and Detroit, so to say, Mr. Shea, this was a shell,

21   that he didn't do any work, you know, maybe they didn't read

22   all the 125,000 emails that were in this case, maybe they

23   didn't look at the credit cards to see how many times he was at

24   the border.  He didn't go to the border -- you don't go to this

25   border for vacation; you go to work.  And they know he worked.

1          So when you take a loan -- because they were working

2    for the government, maybe they never took the loan or they

3    don't know anybody with small businesses.  If you take the

4    loan, you can get the loan based on your 2019 tax returns.  And

5    if you use it for business purposes, you ask to forgive the

6    loan.  If you don't use it for business purposes, you pay it

7    back.  Mr. Shea is someone less than one percent of the United

8    States of America that got the loan that is not paying it

9    back -- that is paying it back and not asking for forgiveness.

10         So if we were sitting here and Mr. Shea was asking for

11   forgiveness, well, then he'd have a big problem.  But to say he

12   didn't work, to say this is a shell company, they opened up,

13   your Honor, as a shell company.  You know, your Honor, I could

14   have objected.  Obviously, your Honor would have made the call.

15   But a shell company is a term of art; there's nothing legally

16   about a shell company.  It's an insightful thing that they

17   chose to use that I chose not to object because I know Tim Shea

18   worked.  They know Tim Shea worked.

19         So these arguments, whether I could do my job or not

20   and get it into evidence, and I may not be if we can't

21   stipulate to the emails of which the government said they would

22   stipulate to which directly impeaches the shell company, but

23   now to come in here and say, Oh, this is a shell company,

24   knowing that we have all this evidence, knowing that he was at

25   the border, knowing that he sold goods through Ranch Property

M5PVSHE1

1    of steel and coins and pens and all of these things that they

2    know he did, and now we're going to say it's a shell company

3    because they opened on it?  That's impeachment, Judge.

4            So now to sit here and say this was a fake, they

5    probably didn't review all the evidence, because I'm not going

6    to say it's being disingenuous.  They probably didn't review

7    the credit card statements and the airline statements that he

8    was at the border.

9            So can they say he got more money than he deserved in

10   order to kick it back?  Yes.  But can they sit here and say

11   whether -- in front of the jury, if they lose at sentencing,

12   that he did not work?  They can't say he didn't work.  They can

13   say -- and, your Honor, it is what it is; we know what it is.

14   Maybe he was compensated a lot more than he should have been.

15   But to say he didn't work is not -- it's not nice.  It's just

16   not nice.  Thank you, Judge.

17           THE COURT:  So the government is precluded from

18   arguing that the loan was obtained through misrepresentations

19   or fraud.  However, evidence that the loan proceeds were

20   immediately transferred from RPMM into defendant's personal

21   bank account, that the loan application contains

22   representations that are inconsistent with representations made

23   on Mr. Shea's tax returns, and that the proceeds were used for

24   personal purposes, supports the government's claim that RPMM is

25   not an operational business, but rather a shell corporation.

M5PVSHE1

1          Given that the government will not suggest that the

2     loan was obtained unlawfully, this evidence is not unduly

3     prejudicial or complicated; therefore, the government will be

4     able to admit it to the extent that I have just described.

5          Now, the government raised the possibility of a

6     limiting instruction.  And I would only give a limiting

7     instruction if the defense were to agree to that.

8          MR. MERINGOLO:  Judge, we don't want a limiting

9     instruction.  Just come in.

10          THE COURT:  All right.  So then let's go over the

11     various stipulations.  My understanding is that the government

12     does not agree to stipulate that with respect to Defense

13     Exhibits 400 through 406, 407-A through 407-U, and 500 through

14     508, that these are true and correct copies of photos and

15     videos.

16          I understand that the government has refused to

17     stipulate that Mr. Shea obtained a Colorado real estate

18     broker's license, and that there are no disciplinary actions

19     that were filed against him.  I understand that the government

20     refuses to stipulate with respect to a Capital One account, an

21     American Express account, a PayPal account, that statements

22     with respect to those accounts are business records.

23          I also understand that with respect to Exhibit 600

24     through 629, 700 through 824, 900 through 911, and 1000 through

25     1016, the government will not stipulate that these are

M5PVSHE1

1    authentic copies of emails.

2               With respect to Mr. Richard Kaye, the government is

3    refusing to stipulate that he would testify in a certain way.

4               In addition, with respect to a private investigator

5    retained by the defense, the government refuses to stipulate

6    that certain evidence in the form of videos and photographs in

7    Exhibits 300 to 304 are true and accurate representations of

8    the border wall built by We Build the Wall.

9               And finally, the government does not agree to

10   stipulate that Jack Daly would testify to certain facts.

11              Are you asking me to compel the government to

12   stipulate to all these facts, Mr. Meringolo?

13              MR. MERINGOLO:  No, not at all, Judge.  We're just

14   asking you to do -- maybe to tell the government, you know,

15   when they wrote letters about me not stipulating, came in.

16   Then we came in, we stipulated to everything in good faith.

17              To not stipulate to the credit cards, to not stipulate

18   to their own emails that they've given us, these are the emails

19   from their relativity.  And now it's caused me -- forget about

20   the videos; I'll call the investigator and put the videos in.

21   The real estate license, we could ask for judicial notice, good

22   standing for --

23              THE COURT:  You'll have to provide a certified copy.

24              MR. MERINGOLO:  I understand, Judge.

25              But they are the ones who opened on the shell company.

M5PVSHE1

1    They said they would be amenable to stipulations, and now no.

2              Say I said --

3              THE COURT:  So essentially what you're arguing is that

4    the right to cross-examination should be just set aside in this

5    case.

6              MR. MERINGOLO:  No.  If they want to cross-examine,

7    I'll bring the investigator, no doubt about it.

8              THE COURT:  Okay.  Very well.

9              MR. MERINGOLO:  But, Judge, now the emails, their

10   emails, they don't want --

11             THE COURT:  Counsel, this is a case in which your

12   client is accused of fraud, of falsification of documents.  I'm

13   not going to require them to stipulate to any documents

14   introduced by the defense.  So that's it.  That's my ruling.

15             So the answer is I am not going to require the

16   government to make these stipulations.

17             MR. MERINGOLO:  Okay.  Thank you, Judge.

18             MR. SOBELMAN:  Your Honor, I don't want to snatch

19   defeat from the jaws of victory on this; I just want to make

20   one comment for the record to make sure things are clear.

21             We are not going to dispute — and we will sign

22   stipulations — about the authenticity of any records that we

23   produce to the defense:  Emails, bank records, credit cards

24   records.  One, the stipulation was sent very late last night

25   and we haven't had a chance to compare everything yet; so we do

M5PVSHE1

1    want to make sure we have an opportunity to do that.

2              Second, many of the emails -- many of the documents,

3    not from our production, but other things, do not appear to

4    have been produced with respect to the Rule 16 deadline your

5    Honor set, and defense has refused to answer our questions

6    about the timing of that.  They appeared to have produced over

7    150 new exhibits, just email exhibits last night, not complying

8    with your Honor's exhibit deadline.

9              So there are serious issues here.

10             We're trying to be reasonable.  If there are things

11   from our production they want, we'll make sure that those get

12   stipulated to the authenticity; but there's also huge

13   admissibility issues about many categories of these documents:

14   hearsay, relevance, 403.  So we're trying to ask them to narrow

15   it down so we can actually raise these issues with the Court in

16   a timely manner.

17             THE COURT:  I require the laying of a foundation for

18   evidence.  I find these requests to be outlandish.

19             So let us proceed.

20             MR. MERINGOLO:  You ruled that we didn't have to give

21   them impeachment materials.  And, Judge, they -- Judge, I'm

22   just not that guy.  They've been giving us Rule 16 since the

23   day you -- since last week that they've had for years.

24             THE COURT:  Counsel, you've had months and months to

25   prepare for trial.

M5PVSHE1

1          MR. MERINGOLO:  I understand, Judge.

2          Judge, I would like to bring up just one more issue.

3          THE COURT:  One last thing that I'm going to bring up

4     and then I'll allow you to speak.

5          The government made a request last night that I sign

6     an immunity order.  Is the government objecting to my posting

7     that on the docket?

8          MS. MOE:  No, your Honor.

9          And with respect to logistics for that witness, we

10    wanted to let the Court know, I think on scheduling, we

11    anticipate that that witness may testify after the lunch break.

12    But because the immunity order will only take effect after the

13    witness invokes outside the presence of the jury, perhaps we

14    could let the Court know at sidebar when that witness is our

15    next witness so that we can excuse the jury, ask the witness

16    the appropriate questions relating to immunity, the order would

17    then take effect, and the jury would return.  I just wanted to

18    flag so that we can take the appropriate break.  But, again, I

19    don't think that will come up till after the lunch break.

20         THE COURT:  Oh, after the lunch break.

21         MS. MOE:  Yes, your Honor.  But if it happens sooner,

22    I'd be happy to just let the Court know and ask to be heard at

23    the sidebar so that the Court knows that we'll need to take a

24    five-minute break to address the immunity order.

25         THE COURT:  Okay.

M5PVSHE1

1           Go ahead, Mr. Meringolo.

2           MR. MERINGOLO:  Yes, Judge.  Just two quick things.

3           I think we had an issue with a juror yesterday, that

4    Nicolas brought up that he -- I don't know what the issue was.

5    But maybe we could pull the tape to see if that happened and

6    then we question the jury.

7           THE COURT:  What tape?

8           MR. MERINGOLO:  The tape in the courtroom.

9           THE COURT:  What tape in the courtroom?

10          MR. MERINGOLO:  The tape that's recording inside the

11   courtroom.

12          THE COURT:  I know of no tape.

13          MR. MERINGOLO:  Oh, okay.  Then maybe I'm mistaken.

14          THE COURT:  I have a court reporter here; we do not

15   use audio recordings.

16          MR. MERINGOLO:  It was the video, that we said -- what

17   did you say, that the guy handed the other juror something?

18          MR. ROOS:  No, I wasn't saying that.  I was just

19   saying it looked like there might be some cross talk between

20   jurors.

21          But, your Honor, in my view, I'm not positive there

22   was anything; and I thought your Honor addressed it

23   appropriately when you said reminder not to talk about the

24   case.  We weren't asking for any sort of relief.

25          THE COURT:  Are you asking me to question the jurors?

M5PVSHE1

1          MR. MERINGOLO:  Oh, absolutely not, Judge.

2          In addition to that, I would like, if we could -- at

3    the end of the day, if the defense will wait here and if the

4    Court can tell us when the jury is completely off the floor so

5    we don't run into them, because I don't want any issues.

6          THE COURT:  No problem with that.

7          MR. MERINGOLO:  Thank you, Judge.

8          THE COURT:  Anything further?

9          MR. MERINGOLO:  Nothing, Judge.

10          MS. MOE:  Not from the government, your Honor.

11          THE COURT:  Okay.  One moment.

12          Would you have the jurors brought in, please.

13          (Jury present)

14          THE COURT:  Do the parties agree that all jurors are

15    present and properly seated?

16          MR. ROOS:  Yes, your Honor.

17          MR. MERINGOLO:  Yes, Judge.

18          THE COURT:  Good morning, jurors.

19          THE JURY:  Good morning.

20          THE COURT:  I am very sorry that I have made you wait.

21    I know that you were here on time, 9 o'clock, and ready to come

22    in the courtroom.  And we only started at 9:43.  It was because

23    of something that was out of my control and sometimes

24    unexpected things come up.  And so it's not the fault of either

25    side and I hope you accept my apology.

M5PVSHE1                          Ward – Direct

1              All righty.  Please call your next witness.

2              MS. MOE:  Thank you, your Honor.

3              The government calls William Ward.

4      WILLIAM WARD,

5           called as a witness by the Government,

6           having been duly sworn, testified as follows:

7              THE COURT:  If would you state your name and spell it

8      please.

9              THE WITNESS:  My name is Bill Ward, W-A-R-D.

10             THE COURT:  You may inquire.

11             MS. MOE:  Thank you, your Honor.

12     DIRECT EXAMINATION

13     BY MS. MOE:

14     Q.  Good morning, Mr. Ward.

15     A.  Good morning.

16     Q.  Can you tell us where do you live?

17     A.  Gold Canyon, Arizona.

18     Q.  How old are you?

19     A.  72.

20     Q.  Are you currently working?

21     A.  No, I'm retired.

22     Q.  Before you retired, what did you do for work?

23     A.  I was in the military for 21 years, and also worked for the

24     state of Washington for 17 years.

25     Q.  Now, did there come a time when you learned about a

1  fundraising campaign called We Build the Wall?

2  A.  Yes.

3  Q.  Approximately when was that?

4  A.  That would have been late 2018 or early 2019.

5  Q.  How did you come to learn about We Build the Wall?

6  A.  Through a web page or news, I'm not precisely sure.  But I

7  have a tendency to go through a Google news feed every morning,

8  and I assume that's where I first saw some information about

9  it.

10 Q.  And when you first heard about We Build the Wall, can you

11 tell us what did you learn about it?

12 A.  From what I read, the intention was to continue

13 construction of a border wall along portions of the border that

14 may be held in private land that the federal government wasn't

15 able to purchase, and to speed up the process using a private

16 process rather than having to go through continued government

17 bureaucracy to get it done.

18 Q.  And what was your understanding at the time of how this

19 organization was going to do that?

20 A.  They were going to use private funds through a fundraiser

21 and private construction contracts.  And as I understood it,

22 mostly on private land.

23 Q.  You mentioned a fundraiser.  What did you come to learn

24 about raising funds for We Build the Wall?

25           I'm sorry, I've asked a confusing question.  Let me

M5PVSHE1                          Ward - Direct

1   ask that again.

2              You mentioned that you learned that this organization

3   was raising funds?

4   A.   Right.

5   Q.   How did you come to learn that this organization was

6   raising funds?

7   A.   Well, in reading about the organization, they were going to

8   use the GoFundMe page or the GoFundMe organization to raise

9   funds.  And so they were soliciting money through that process.

10  Q.   And did you learn anything at the time about who was

11  involved with this organization or who was behind it?

12  A.   The only name that I remember reading initially was Brian

13  Kolfage, I think his last name was, and his family.  And I

14  imagine there were some other people, but Brian is the one who

15  sticks in my mind.  And that he was going to be -- sort of be

16  the shotgun of the guy to make things happen.

17  Q.   Did you, yourself, visit the GoFundMe website for this

18  campaign?

19  A.   I did.

20  Q.   And when you first visited that page, what was your

21  understanding of what the campaign was and what the GoFundMe

22  campaign was?

23  A.   It seemed fairly straightforward that they were going to

24  raise money, they were going to use the funds as advertised to

25  construct a border wall or portions of the border wall.

1    Q.  Did you donate to We Build the Wall?

2    A.  I did.

3    Q.  How did you donate?

4    A.  Through the GoFundMe page.  I had made kind of a minimal

5    donation.

6    Q.  About how much did you donate?

7    A.  $100 exactly.

8    Q.  Can you please explain for the jury why did you decide to

9    donate to We Build the Wall?

10   A.  Well, personal opinion is that I think our immigration

11   system has been broken for a couple of decades; and I thought

12   that if enough people, sort of, made it known that there were

13   problems by actually putting forward some of their own money in

14   this case to demonstrate that they thought that we needed to do

15   something, that it might send a signal to the government to

16   pass some laws and do things properly.  You know, $100 is

17   minimal; I knew I wasn't going to build much with 100 bucks.

18   It was the idea of getting sort of the ball rolling.

19   Q.  And did you feel comfortable giving your money to We Build

20   the Wall?

21   A.  I did at the time.

22   Q.  At the time why did you feel comfortable giving your money

23   to We Build the Wall?

24   A.  The advertisement or the information that I remember seeing

25   made it sound like it was fairly legitimate; that someone with

1    in good faith was going to try to do what he felt was good for

2    the country.

3    Q.  Directing your attention to January of 2019, did there come

4    a time that month when you received a notification from

5    GoFundMe?

6    A.  I did.  Soon after I made my donation.

7    Q.  And what do you recall about that?

8    A.  I found it a little odd.  Because the money was solicited,

9    I went to GoFundMe, I sent them some money.  And then I got a

10   email a week or two later that said do I really want to do

11   this.  And it said, If you want to opt out, there was a place

12   where I could click on and then opt out of the donation I had

13   already made.  I did not do that.  I let the donation run.

14   Q.  And so just to be clear, did you agree to let the

15   organization keep your money?

16   A.  I did at that point, yes.

17   Q.  All right.

18          MS. MOE:  Ms. Drescher, could you please publish

19   what's in evidence as Government Exhibit 306, and turn to page

20   4.  Thank you.  If you could please highlight the second

21   paragraph there.

22   Q.  Mr. Ward, do you recall ever seeing language like this?

23   A.  Yes.  Absolutely.

24   Q.  What do you remember about that?

25   A.  I remember that it sort of spoke to the sincerity of the

M5PVSHE1                              Ward - Direct

1   operation; that they were really going to take the funds and
2   use the funds as initially advertised, to build the wall.  And
3   that there was no money that was going to be taken for
4   compensation for anybody involved; it was all going to go to
5   the construction of portions of the wall.
6   Q.  And just to be clear, as you sit here today, do you
7   remember whether these are the exact words that you saw or
8   whether your memory is you saw something similar to this
9   language?
10  A.  I couldn't swear to the exact wording, but certainly the
11  thoughts are the same.
12  Q.  So was it your understanding at the time you donated, that
13  100 percent of the money you were donating would be used to
14  build a wall and not for personal purposes?
15  A.  That is correct.
16  Q.  Mr. Ward, if you had known that some of the money you
17  donated would be used for personal purposes, would that have
18  been a factor in your decision to donate?
19  A.  It would have been.
20  Q.  At the time you donated and at the time you agreed to let
21  the organization continue to have your donation, had you ever
22  heard of someone named Timothy Shea?
23  A.  No.
24  Q.  Did any of the information on the campaign page or that you
25  read in news articles tell you anything about We Build the Wall

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M5PVSHE1                        Ward – Cross

1  spending the money that they were raising on an energy drink

2  company?

3  A.  I had never heard that or read that.

4  Q.  Would you have donated to We Build the Wall if you'd known

5  that some of the money raised by the campaign would be given to

6  an energy drink company owned by Timothy Shea?

7  A.  No.

8  Q.  Now, Mr. Ward, did there ever come a time when you learned

9  that the Department of Justice had brought fraud charges

10  relating to We Build the Wall?

11  A.  There was, 18 months later maybe.

12  Q.  And when you learned that, what, if anything, did you do?

13  A.  I went to the GoFundMe page and I inquired about what it

14  would take to try to recover my money.

15  Q.  And can you explain for us why was it that you wanted a

16  refund when you learned about that?

17  A.  Well, I felt that they had not been honest about the reason

18  that they were taking the money.  And so I just tried to find

19  out if I could get my little donation back.

20  Q.  Thank you, Mr. Ward.

21           MS. MOE:  Nothing further, your Honor.

22           THE COURT:  Cross-examination.

23           MR. MERINGOLO:  Thank you, Judge.

24  CROSS-EXAMINATION

25  BY MR. MERINGOLO:

M5PVSHE1                          Ward - Cross

1   Q.   Good morning, Mr. Ward.  My name is John Meringolo, I

2   represent Timothy Shea.

3           You said you were in the military?

4   A.   Yes.

5   Q.   What part of the military?

6   A.   I was in the field artillery primarily.

7   Q.   Thank you for your service, sir.

8           And then you said you were retired now?

9   A.   I am retired now.

10  Q.   How is that going?

11  A.   I'm working into it.

12  Q.   All right.  What did you do for a living?

13  A.   Well, again, I was in the army for 21 years, but then I

14  also -- I helped -- I did -- I had several different middle

15  management jobs in the state of Washington.

16  Q.   Okay.  Great.  Thank you very much.

17          You saw this site for We Build the Wall and you

18  donated $100; correct?

19  A.   Yes.

20  Q.   And you donated that because you knew they were going to

21  build small portions of the wall on the southern border that

22  the government wasn't going to do; correct?

23  A.   That was my understanding, yes.

24  Q.   Okay.  Now, did there come a time that you've learned that

25  they've actually built portions, small portions, of the wall on

M5PVSHE1                          Ward - Cross

1    the southern border?

2    A.  I saw some information about that, yes.

3    Q.  Okay.  Did you see -- maybe you saw a video about that on

4    the website with Kris Kobach?

5    A.  You know, I didn't track the website.  Once the money was

6    out there, it was out there.  But I happened to come across

7    things, yes, I saw -- I saw some news reports or some videos or

8    articles, I can't remember precisely.  But I didn't follow it

9    so much; I just happen to see it.

10   Q.  Okay.  And what you followed and the wall that was built,

11   were you happy with that portion of the wall?

12   A.  It was interesting, satisfying, I guess, that some of the

13   money was used as advertised.

14   Q.  Okay.  And you live in Gold Canyon, Arizona, right?

15   A.  Yes.

16   Q.  Is there a major, I guess, immigration problem down there?

17   A.  Not where I live in particular, no.

18   Q.  But in Arizona itself?

19   A.  I think Arizona has some issues, yes.

20   Q.  So when you donated to this fund, We Build the Wall, you

21   knew it was a private -- they were going to buy private land;

22   correct?

23   A.  Correct.

24   Q.  And were you opposed to We Build the Wall hiring a

25   contractor in order to get that land?

M5PVSHE1                          Ward - Cross

1    A.  No.

2    Q.  It would be perfectly okay if they paid somebody to go out

3    and search for private land, right, to buy?

4    A.  I assume that might be part of the process, yes.

5    Q.  Okay.  And you're certainly okay if they paid for

6    construction work, right?

7    A.  Yes.

8    Q.  And we expected them to pay the guys who were doing the

9    construction, right?

10   A.  Right.

11   Q.  And we expected them to pay for the steel that they got,

12   right?

13   A.  Yes.

14   Q.  And you know that We Build the Wall, they did other

15   fundraisers to get more money, are you aware of that?

16   A.  Yeah, vaguely.  Not in particular, but yes.

17   Q.  Okay.  So if they paid -- you know Steve Bannon?

18   A.  Yes.

19   Q.  And you know -- who is Steve Bannon?

20   A.  He's -- was he the campaign manager for a while for Trump?

21   Q.  Originally he was.

22   A.  Yeah.

23   Q.  Are you aware that he had a high position in the Trump

24   Administration?

25   A.  I was aware that he was in the administration, yes.

M5PVSHE1                          Ward - Cross

1   Q.  And he was part of this We Build the Wall, right?

2   A.  Yeah, I found out afterwards.

3   Q.  Okay.  So are you aware that they had to -- they did

4   fundraising events throughout the country?

5   A.  I was vaguely aware of that, yes.

6   Q.  You donated the $100 -- you said it -- it was, you know,

7   just part to get things going, that's fine.  And you said you

8   haven't received the money back, right?

9   A.  No.

10  Q.  Did the government promise to give you the money back at

11  any time?

12  A.  No.

13  Q.  Did the government tell you they seized millions of dollars

14  from We Build the Wall?

15  A.  It was not discussed.

16  Q.  Who paid for your travel here today, sir?

17  A.  The government paid for the travel.

18  Q.  How do you like New York?

19  A.  It's fun.

20  Q.  Okay.  Good.  It is.

21  A.  Good Chinese.

22  Q.  Okay.  Good.  Let me get back to a few other things.

23          So if there was security for events, would you be

24  opposed of the people who did the security getting paid?

25  A.  Security for which event?

M5PVSHE1                          Ward - Cross

1   Q.  Say a fundraising event, would you be opposed if We Build

2   the Wall paid security officers salary for the day to --

3   A.  No.

4   Q.  Would you be opposed for someone who was an intermediary

5   with the security to get paid, to hire the security, would you

6   be opposed to that person getting paid?

7   A.  No.

8   Q.  Okay.  Just give me a minute.  Just give me one minute.

9            (Counsel conferred)

10  Q.  Now, when you -- I'm sorry, sir, it won't be much longer.

11  A.  That's all right.

12  Q.  There's a lot of good places around here.  You'll be all

13  right.  It's almost lunchtime.

14           When you did the GoFundMe, donate the money, you had

15  to give your personal information, right?

16  A.  Yes, some, yes.

17  Q.  Your email?

18  A.  Yes.

19  Q.  Okay.  Were you aware that We Build the Wall, the owners of

20  We Build the Wall would have your email address?

21  A.  I assume so, sure.

22  Q.  Did you ever call We Build the Wall, email We Build the

23  Wall anything to say, I don't want you to email me anymore --

24  unsubscribe, I'm sorry.  Unsubscribe.  Did you ever unsubscribe

25  to the We Build the Wall email?

M5PVSHE1                           Ward - Cross

1    A.  I may have.

2    Q.  After the fact?

3    A.  Yes.

4    Q.  Okay.  But not before, not when you donated?

5    A.  No, not then, no.

6    Q.  And then when you donated, you did get various emails for

7    things; correct?

8    A.  A couple.

9    Q.  Okay.  And you weren't -- that was okay with you, right?

10   A.  At some point I turned those off.

11   Q.  Okay.  Because they become annoying, right?

12   A.  It was either that or it was after the fact that I felt it

13   may be the funds weren't being used properly.

14   Q.  Right.  But before the fact, before you were aware in 2019,

15   you know, you didn't think anything of it; they had your email,

16   you'd get an email once in a while, and that's all right,

17   right?

18   A.  Correct.

19   Q.  No further questions.  Thank you for your service.

20              THE COURT:  Redirect.

21              MS. MOE:  No redirect, your Honor.  Thank you.

22              THE COURT:  You may step out.

23              (Witness excused)

24              THE COURT:  The government may call its next witness.

25              MR. SOBELMAN:  The government calls Thomas Bolus.

M5PVSHE1                          Bolus – Direct

1    THOMAS BOLUS,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4              THE LAW CLERK:  State and spell your name for the

5    record.

6              THE WITNESS:  Thomas Bolus, T-H-O-M-A-S, B-O-L-U-S.

7              THE COURT:  You may inquire.

8    DIRECT EXAMINATION

9    BY MR. SOBELMAN:

10   Q.  Good morning, Mr. Bolus.

11   A.  Good morning, sir.

12   Q.  Where do you work?

13   A.  I work for the Internal Revenue Service, Criminal

14   Investigation Division, in Scranton, Pennsylvania.

15   Q.  And is the Internal Revenue Service also known as the IRS?

16   A.  Yes, it is.

17   Q.  What is your title with the IRS?

18   A.  I am a court witness coordinator.

19   Q.  How long have you worked at the IRS?

20   A.  For 17 years.

21   Q.  What are your duties and responsibilities with the IRS?

22   A.  So as a court witness coordinator, I primarily represent

23   the commissioner in the Internal Revenue Service in the

24   commissioner custodial duties.

25              So I'm tasked with gathering and retrieving official

1   documents, records, tax returns and other tax-related

2   information that the IRS has in its custody.  And I prepare

3   those documents as certified official records of the Internal

4   Revenue Service, and I bring them into federal criminal trials.

5   Q.  In general terms, what are the activities of the IRS?

6   A.  So the IRS is the tax collection revenue collection agency

7   of the United States Government.

8              MR. SOBELMAN:  Your Honor, at this time the government

9   would offer a stipulation between the parties marked as

10  Government Exhibit S-8.

11             MR. MERINGOLO:  No objection.

12             THE COURT:  And just a reminder, a stipulation is an

13  agreement between the parties to certain facts without

14  presenting a witness on that subject matter.

15             Go ahead.

16             MR. SOBELMAN:  Your Honor, is it received?

17             THE COURT:  It is admitted, yes.

18             (Government's Exhibit S-8 received in evidence)

19             MR. SOBELMAN:  Thank you, your Honor.

20             Ms. Drescher, can you please focus on the first

21  paragraph of S-8.  This paragraph reads:  Government Exhibit

22  154 is an authentic copy of an email.  The "from" and "to"

23  fields accurately display the email addresses or names that

24  sent and received the email.  The "sent" field accurately

25  displays the date and time on which the email was sent.

M5PVSHE1                          Bolus - Direct

1              The government offers Government Exhibit 154.

2              MR. MERINGOLO:  No objection.

3              THE COURT:  It is admitted.

4              (Government's Exhibit 154 received in evidence)

5              MR. SOBELMAN:  Ms. Drescher, can you please now

6    display what's in evidence as Government Exhibit 154 and focus

7    on the top email on the page.

8    BY MR. SOBELMAN:

9    Q.  Mr. Bolus, can you please read the date on this email.

10   A.  So the email is dated August 4th, 2020.

11   Q.  And who is the email from?

12   A.  It is from Amanda Shea.

13   Q.  And who is it sent to?

14   A.  To Bill Constantine.

15             MR. SOBELMAN:  Ms. Drescher, can you just go down to

16   the bottom of the page and focus for a moment on the signature

17   block for Mr. Constantine.

18   Q.  Mr. Bolus, do you see where it says William L. Constantine,

19   CPA?

20   A.  Yes, I do.

21   Q.  What does "CPA" mean?

22   A.  So a CPA is a certified public accountant, someone who's

23   taken the course's requirement of the state to be a certified

24   accountant.

25             MR. SOBELMAN:  Ms. Drescher, can we please go back up

1   to the top of the email on the page.  Thank you.

2   Q.  Mr. Bolus, can you please read this email starting with,

3   "Hi Bill," and ending with "thank you."

4   A.  So, Hi, Bill.  Can you send me the 1099s for myself and

5   Ranch Property Management and Marketing?  Here are the total

6   paid for both below for 2019:  Amanda Shea:  $70,000; Ranch

7   Property Management and Marketing:  $370,000.

8            Thank you.

9   Q.  Mr. Bolus, are you familiar with something called a form

10  1099?

11  A.  Yes, I am.

12  Q.  How are you familiar with it?

13  A.  So in the course of the IRS's recordkeeping, it is a

14  required form for third-party payers to use when they

15  compensate a nontraditional employee or a noncompensated

16  employee that would normally receive a W-2 form.

17  Q.  Let's just break that down for a moment.

18            MR. SOBELMAN:  I'm sorry, your Honor.

19            THE COURT:  I was just going to ask that you do that.

20            Go ahead.

21  Q.  Yes.  Let's break that down for a moment.

22            If someone is a regular employee of a company, for

23  example, a court witness coordinator for the IRS, at the end of

24  the year, what type of form do you receive that reports your

25  compensation to the IRS?

1    A.  So I would receive a Wage-2 statement or a W-2 statement.

2    Q.  And just generally, what is a W-2?

3    A.  So that's a statement of all the earnings that you had for

4    that particular tax year from the payer or the business or

5    company that you work for to you.

6    Q.  And the company that you work for would file the W-2 with

7    the IRS?

8    A.  Yes, it would.

9    Q.  And when the individual, the tax payer, files their taxes

10   with the IRS, would they have to report that income on their

11   taxes?

12   A.  Yes, they would be required to also.

13   Q.  Okay.  And so that's a W-2 for a regular employee, right?

14   A.  Yes, sir.

15   Q.  You mentioned a 1099.  Can you tell us again, how does a

16   1099 differ from a W-2?

17   A.  So a 1099 would be different in the fact that the 1099 is

18   for nonregular employees or noncompensated employees; so

19   someone that does contracted work for the company rather than a

20   regular employee on the payroll.

21   Q.  And at the end of a tax year, the company that's paying the

22   individual or paying the other company would file the 1099 with

23   the IRS just like they would file a W-2?

24   A.  Yes, they would be required to.

25   Q.  And then would the individual be required to disclose that

1  income when they file their taxes?

2  A.  Yes, they would be.

3  Q.  Okay.

4          MR. SOBELMAN:  Ms. Drescher, can you please go down

5  to -- sorry, put back up S-8 and focus on the second paragraph.

6          This paragraph reads:  Government Exhibit 853 is an

7  authentic copy of a tax document issued on behalf of We Build

8  the Wall, Incorporated to Timothy Shea, the defendant, and

9  Amanda Shea on August 4th, 2020.

10          The government offers Government Exhibit 853.

11          MR. MERINGOLO:  No objection.

12          THE COURT:  It is admitted.

13          (Government's Exhibit 853 received in evidence)

14          MR. SOBELMAN:  Ms. Drescher, can you now please

15  display Government Exhibit 853 and focus on the top half of the

16  page.

17  BY MR. SOBELMAN:

18  Q.  Mr. Bolus, what type of document is this?

19  A.  So this document is a form 1099 miscellaneous payment or

20  miscellaneous income form.

21  Q.  And in the top left, there's a box that says payer's name

22  and some other information.  Do you see that?

23  A.  Yes, I do.

24  Q.  And just to be clear, we're talking about 1099s, is this an

25  example of what a 1099 looks like?

1    A.  Yes, it is.

2    Q.  Okay.  And in the upper left-hand corner where it says

3    "payer's name," what does "payer" mean in the context of a

4    1099?

5    A.  So the payer would be the company or business or the

6    third-party element that is paying someone that did work for

7    them.

8    Q.  So in our earlier example, this is the company that employs

9    the other person or pays the other person for a service or

10   product?

11   A.  That's correct.

12   Q.  Okay.  And who is the payer that's listed on this 1099?

13   A.  The payer is listed as We Build the Wall, Inc.

14   Q.  And in the bottom left of this 1099, there's a box that

15   says "recipient's name" and some other information.  Do you see

16   that?

17   A.  Yes, I do.

18   Q.  And who was the recipient listed on this 1099?

19   A.  Is Amanda Shea.

20   Q.  Generally, let's take a look at the right side of the 1099.

21   What are boxes 1 through 13 for?

22   A.  So they would indicate the purpose of the payment from the

23   payer to the payee.

24   Q.  So just to be clear, it would include the amount of

25   whatever money was paid from the payer or the company to the

1  payee, the individual or other company, and it would be

2  categorized by what type of payment that was; is that right?

3  A.   That's correct.

4  Q.   Okay.  So there's, I think, 13 different categories on here

5  or so?  Or maybe --

6  A.   Or so.

7  Q.   Okay.  Let's go through just a couple of the categories.

8         What is box 1?  It says "rents."  What does "rents"

9  mean in the context of a 1099?

10  A.   So that would be if the payer had paid the payee for rent.

11  Q.   What does "rent" mean in this context?

12  A.   It could be renting space or equipment.

13  Q.   Okay.  Like rent on an office building or something like

14  that?

15  A.   Yes, sir.  Office space, office building.

16  Q.   Rent for land, use, or machinery?

17  A.   Yes, it could be, sir.

18  Q.   Okay.  In box 7, it says "nonemployee compensation,

19  $70,000."  What does nonemployee compensation mean in the

20  context of a 1099?

21  A.   So again, the nonemployee would be someone who's not a

22  traditional or a regular employee of that company, on their

23  payroll, such as a contracted employee or someone that does

24  something specific maybe one time for the company.

25         MR. SOBELMAN:  Ms. Drescher, let's go down and focus

1    on the bottom half of this page.

2    Q.  Mr. Bolus, who is the payer on this 1099?

3    A.  So the payer on this 1099 would be We Build the Wall, Inc.

4    Q.  And who is the recipient on this 1099?

5    A.  Is Timothy Shea.

6    Q.  And let's just take a look at box 7 on the right,

7    nonemployee compensation.  How much in income is listed in that

8    box?

9    A.  There is none, sir.  Zero.

10   Q.  Okay.  Let's go up to box 1.  Do you see where it says

11   $370,000 under "rents"?

12   A.  Yes, I do.

13   Q.  Is there any income listed in any other box on this form?

14   A.  No, there is not.

15   Q.  If someone was being paid by an organization to handle a

16   security contract or something like that, what box would that

17   go in here?

18   A.  Probably most likely box number 7.

19          MR. SOBELMAN:  Ms. Drescher, let's go back to S-8 and

20   focus on the third and fourth paragraphs.

21          THE COURT:  I just wanted to ask a question.

22          You said box number 7.

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  Why is it that you give the answer of box

25   number 7?

M5PVSHE1                         Bolus - Direct

1          THE WITNESS:  The question was if it was like a

2     security, the way I understood is like if you hired somebody to

3     provide you security, they are working for you as a

4     noncompensated employee to provide that security to you.

5          THE COURT:  What is it about box number 7 that leads

6     you to conclude that that amount of compensation would go into

7     box number 7?

8          THE WITNESS:  Well, deducting from the other boxes,

9     that would probably be the best box that would fit the category

10    of a security personnel on a security detail.

11         THE COURT:  Go ahead.

12    BY MR. SOBELMAN:

13    Q.  Just to clarify the point that the Court raised, for

14    example, let's just look at a couple of other boxes.

15         Box 2 reads "Royalties."  What kind of compensation

16    would go in that box?

17    A.  So royalty would be considered something that you have the

18    rights to; so you're making money or profit off of those

19    rights.

20    Q.  And let's talk about box 5.  What goes in that box?

21    A.  From what I understand, fishing and boat proceeds would be

22    if someone was using their boat or utilized a boat that

23    belonged to someone else, they would pay them for the use of

24    that boat.

25    Q.  Is box 7 in some ways somewhat of a catchall for things

1    that aren't specified in other boxes?

2    A.  Yes, sir.  As I mentioned, it would probably have been the

3    best box to fit like that scenario of a security person.

4    Q.  Okay.  Let's move back to S-8 and focus on the third and

5    fourth paragraphs.

6         The third paragraph reads:  Government Exhibits 854

7    and 857 are authentic copies of a tax document maintained in

8    the files of HRB Tax Group, Inc.

9         The fourth paragraph reads:  Government Exhibits 855

10   and 856 are authentic copies of tax documents provided by

11   Timothy Shea, the defendant, and Amanda Shea to HRB Tax Group,

12   Inc. in connection with the tax return filed on their behalf on

13   August 18th, 2020.

14        The government offers Government Exhibits 854, 855,

15   856, and 857.

16             MR. MERINGOLO:  No objection.

17             THE COURT:  They are admitted.

18             (Government's Exhibits 854, 855, 856, 857 received in

19   evidence)

20             MR. SOBELMAN:  Ms. Drescher, can you please put 853

21   back up and put 856 next to it.

22   Q.  Mr. Bolus, can you please just compare the top 1099 on 853

23   and let us know if it's the same document in 856.

24   A.  Yes, it appears to be.

25             MR. SOBELMAN:  And now, Ms. Drescher, if you could put

1   the bottom of 853 up and put 855 up next to it.

2   Q.  Are these also the same document?

3   A.  Yes, they are.

4           MR. SOBELMAN:  Ms. Drescher, can you now please

5   display what's in evidence as Government Exhibit 857.

6   Q.  Mr. Bolus, can you please read the title of this document

7   and the sentence underneath it.

8   A.  So Exhibit 857 is Client Sources of Income Verification.

9   To ensure your return is prepared accurately, review the

10  entries below and confirm they represent all of your sources of

11  income, regardless of taxability.

12  Q.  And in the box in the middle, how many sources of income

13  are listed?

14  A.  There are two, sir.

15  Q.  Can you just read -- are these the same sources that were

16  on the 1099s we just looked at?

17  A.  Yes, sir.

18  Q.  Okay.  We don't need to read through those.

19          Can you please read the sentence at the bottom,

20  beginning with my/our signature?

21  A.  My/our signatures below confirms that I/we verify that I/we

22  have no additional sources of income for the 2019 tax year in

23  the categories listed above.

24  Q.  And what is the date next to the signatures for Timothy and

25  Amanda Shea?

1    A.  August 18th, 2020.

2             MR. SOBELMAN:  Ms. Drescher, can you please display

3    what's in evidence as Government Exhibit 854.

4    Q.  Mr. Bolus, can you please read the title at the top of the

5    page?

6    A.  So Exhibit 854 is a form 8879, which is an IRS e-file

7    signature authorization form.

8    Q.  And generally, what is this form used for?

9    A.  So this form is used by the taxpayer to the electronic

10   return originator or the person that prepared the tax forms for

11   the taxpayers.  And this authorizes the electronic return

12   originator to file electronically over the internet to the

13   IRS's main computer system that particular tax form, form 1040,

14   in this case, that pertains to this document.

15   Q.  Just unpack that for a moment.

16            This is a form an individual taxpayer would sign to

17   authorize a tax preparer to file taxes on their behalf;

18   correct?

19   A.  That is correct.

20   Q.  That can be done electronically then, right?

21   A.  It would be, sir, for this one.

22   Q.  And what are the names of the taxpayers listed on this

23   form?

24   A.  Timothy A. Shea and Amanda Shea.

25            MR. SOBELMAN:  Ms. Drescher, can you please focus on

M5PVSHE1                        Bolus - Direct

1    part 2 of this document.

2    Q.  Mr. Bolus, can you please just read the sentence beginning,

3    "Under penalties of perjury."

4    A.   Under penalties of perjury, I declare that I have examined

5    a copy of my electronic individual income tax return and

6    accompanying schedules and statements for the tax year ending

7    December 31st, 2019, and to the best of my knowledge and

8    belief, they are true, correct, and complete.

9    Q.  And is this form signed by the taxpayers at the bottom?

10   A.  Yes, it is.

11   Q.  And what is the date next to the signatures?

12   A.  August 18th, 2020.

13           MR. SOBELMAN:  Ms. Drescher, can you please now show

14   the witness what's been marked for identification as Government

15   Exhibit 852.

16   Q.  Mr. Bolus, did you review this document in preparation for

17   your testimony today?

18   A.  Yes, I did.

19   Q.  Do you recognize it?

20   A.  Yes, I do.

21   Q.  What is it?

22   A.  So Exhibit 852 is a form 1040 U.S. individual income tax

23   return for the tax year 2019 for Timothy A. and Amanda Shea.

24   Q.  And what type of tax return is this?

25   A.  So this would be an individual tax return for the tax year

1    2019.

2    Q.  As opposed to what else?  What are the other just general

3    types of tax returns?

4    A.  As opposed to, say, a business tax return or a statement or

5    a schedule that would be added to a tax return.

6              MR. SOBELMAN:  Ms. Drescher, can you go to page 24 of

7    this document, please.

8    Q.  Mr. Bolus, what is this part of the Sheas' tax return?

9    A.  So page 24 is a Schedule C, which is a profit or loss from

10   business or sole proprietorship business.

11   Q.  What's a sole proprietorship?

12   A.  So a sole proprietorship would be a business that a person

13   owns on their own; it's not a part of a corporation or a

14   partnership, for instance.

15   Q.  How much money -- sorry.  Who is this Schedule C filed on

16   behalf of?

17   A.  Amanda Shea.

18   Q.  And how much money in income does this Schedule C list?

19   A.  $70,000.

20   Q.  Does that match one of the 1099s we looked at earlier?

21   A.  Yes, it does.

22             MR. SOBELMAN:  Ms. Drescher, let's now go to page 20

23   of this document.

24   Q.  Mr. Bolus, what is this document?

25   A.  So page 20 of the tax return is a Schedule C for the 1040

M5PVSHE1                    Bolus - Direct

1    for a profit or loss from business, a sole proprietorship.

2    Q.  And who is this Schedule C for?

3    A.  Timothy A. Shea.

4              (Counsel conferred)

5              MR. SOBELMAN:  My apologies.  Perhaps I overlooked

6    this.  The government offers Government Exhibit 852, in case I

7    didn't yet.

8              MR. MERINGOLO:  No objection.

9              THE COURT:  It is admitted.

10             (Government's Exhibit 852 received in evidence)

11             MR. SOBELMAN:  Sorry.  Was that not displayed to the

12   jury?  Let's just go back real quick just to show them what

13   we're talking about.  My apologies.  Let's put up just the

14   first page just to orient everyone.

15   BY MR. SOBELMAN:

16   Q.  This is the tax return we've been talking about?

17   A.  Yes, it is.

18   Q.  Okay.  And let's go to page 24 real quick, which we just

19   looked at, the two of us, not the jury.

20             This was Amanda Shea's Schedule C?

21   A.  Yes, sir.

22   Q.  Okay.  And let's go to page 20, which is a document I was

23   just asking you about.  This is Timothy Shea's Schedule C;

24   correct?

25   A.  Yes, it is.

M5PVSHE1                         Bolus - Direct

Q.  Can you just remind us again, what is a Schedule C used
for?

A.  So a Schedule C is attached to the taxpayer's 1040, and it
is to address the profit or loss from a business that's a sole
proprietor type business.

Q.  So first I'm going to ask you some questions about what is
filled in on this form, and then I'm going to ask you some
questions about what was left blank, okay?

A.  Yes, sir.

Q.  Box A asks for the principal business or profession,
including product or service.  What's written in that box?

A.  So box A is addressed as other computer-related services.

Q.  Does it say anything about a security company?

A.  No, sir.

       MR. SOBELMAN:  Ms. Drescher, can you please focus on
part 1 in the middle of the page.

Q.  Mr. Bolus, how much income was reported by Mr. Shea on this
form?

A.  $370,000.

Q.  And that matches the 1099 we looked at earlier?

A.  Yes, it does.

       MR. SOBELMAN:  Ms. Drescher, can you please now focus
on part 2.

Q.  Mr. Bolus, generally, what is this section about, this part
2 expenses?

M5PVSHE1                          Bolus - Direct

1   A.  So the part 2 expenses section would list any expenses

2   incurred by this sole proprietorship business.

3   Q.  And line 13 states:  Depreciation and Section 179

4   deduction.  Generally, what is that line for?

5   A.  So that would be used for -- to claim any depreciation or

6   wear and tear on a particular asset of the company.

7   Q.  What is depreciation?

8   A.  So depreciation would be the normal use, wear and tear on

9   an asset that decreases in value over time.

10  Q.  And just generally, why does the IRS ask for a list of

11  expenses in addition to a list of income?

12  A.  So these can be taken to bring down the actual taxable

13  amount in the end, to give the taxpayer a credit or a benefit

14  to that depreciation.

15  Q.  So generally, it would be in the taxpayer's interest to

16  disclose their expenses to the IRS, right?

17  A.  Yes, it would be.

18          THE COURT:  Could you give an example of depreciation.

19          THE WITNESS:  Well, if I have a farm tractor, and I

20  use that -- I bought it for $70,000, and I used it day in and

21  day out for the year; and, then, you know, I want to try to

22  sell it, and that depreciated, the value of it was then

23  $50,000, so then I would have a $20,000 depreciation on that

24  farm tractor.

25          MR. SOBELMAN:  Thank you, your Honor.

M5PVSHE1                          Bolus - Direct

1   Q.  Mr. Bolus, how much in depreciation did Mr. Shea list here?

2   A.  $20,936.

3   Q.  And is there another part of the tax return where most of

4   this amount is calculated?

5   A.  Yes, sir.

6   Q.  Okay.  Let's take a look at page 4 of this exhibit.

7   Mr. Bolus, what part of the tax return is this?

8   A.  So this would be a form 4562, which is the depreciation and

9   amortization form.

10  Q.  And let's go down to section -- hold on.  Let's go to the

11  next page -- next one, actually, page 6.  Let's focus on

12  section A under part 5.

13          Mr. Bolus, is this where most of that $20,000 amount

14  was calculated?

15  A.  Yes, it is.

16  Q.  Under line 26, what is listed under the type of property

17  that was depreciated?

18  A.  Range Rover.

19  Q.  What is your understanding of what a Range Rover is?

20  A.  From what I understand, a Range Rover is a luxury SUV,

21  maybe produced in Great Britain.

22  Q.  And looking to column C, what's the percentage of how much

23  Mr. Shea reported he uses that Range Rover for business versus

24  personal use?

25  A.  100 percent.

1    Q.   100 percent business or 100 percent personal?

2    A.   Business.

3    Q.   And what is the cost listed under column D for the Range

4    Rover?

5    A.   $70,737.

6          MR. SOBELMAN:   Ms. Drescher, let's go back to page 20

7    of this exhibit and focus on part 2.

8    Q.   Mr. Bolus, the only other box filled in in part 2 between 8

9    and 27 is the other expenses, 27a; is that correct?

10   A.   Yes, sir.

11   Q.   And how much did Mr. Shea report in other expenses for his

12   business?

13   A.   $1,454.

14   Q.   And is there somewhere else on the tax return where we can

15   see how that amount is calculated?

16   A.   Yes, sir.

17         MR. SOBELMAN:   Ms. Drescher, please display page 22 of

18   this exhibit, and let's focus on part 5, at the bottom.

19   Q.   Mr. Bolus, can you please read to us the items listed under

20   "other expenses" and the amounts of each as Mr. Shea listed

21   them on his tax return?

22   A.   So those expenses are listed as cell phone, 100 percent

23   business service, prior year tax forms cost, and 800 number.

24   Q.   And how much are the amounts for each of those?

25   A.   Would be 1,094 for the cell phone; $270 for prior year tax

1    forms cost; and $90 for 800 number.

2    Q.  Is there anything listed here about social media accounts?

3    A.  No, sir.

4    Q.  Is there anything listed here about Facebook pages?

5    A.  No, sir.

6    Q.  Anything listed here about renting an email list or

7    something like that?

8    A.  No, sir.

9    Q.  Okay.  And just to be clear, if someone didn't know which

10   other box to put it in, the other 27 boxes of expenses, is this

11   where it would go?

12   A.  It could go there, sir.

13   Q.  Sort of the catchall?

14   A.  Yes, sir.

15   Q.  Now, I want to ask you some questions about some of the

16   lines that were not filled in on Mr. Shea's Schedule C.

17           MR. SOBELMAN:  Ms. Drescher, could you please show the

18   witness what's been marked for identification as Government

19   Exhibit 910.

20   Q.  Mr. Bolus, do you recognize this?

21   A.  Yes, I do.

22   Q.  And is this a chart that you reviewed in preparation for

23   your testimony today?

24   A.  Yes, sir.

25   Q.  And does it accurately reflect certain information or lack

1    of information on Mr. Shea's Schedule C?

2    A.  Yes, it does.

3    Q.  Would it assist you with your testimony today?

4    A.  Yes, it makes it easier.

5           MR. SOBELMAN:  The government offers Government

6    Exhibit 910.

7           MR. MERINGOLO:  No objection.

8           THE COURT:  It is admitted.

9           (Government's Exhibit 910 received in evidence)

10   Q.  Mr. Bolus, generally, what does this chart show?

11   A.  So this chart is Timothy A. Shea's Schedule C for 2019.

12   And it lists the fields of some of the blocks on the Schedule

13   C.  The field location, the number of that field or block, and

14   whether or not it was reported to the IRS.

15   Q.  So I'm not going to go through each line.  This is now in

16   evidence; the jury can look at it whenever they want, but I do

17   want to go through a couple of examples.

18          The first row is for payments requiring 1099.  What is

19   the location of that field on Mr. Shea's Schedule C?

20   A.  So it would be line 1.

21   Q.  And let's take a look at page 20 of Government Exhibit 852

22   and focus on line -- I think it's line I, in the middle of the

23   page.  It's actually above part 1.

24          Mr. Bolus, can you please read the question on line I?

25   A.  Sure.  Line I:  Did you make any payments in 2019 that

1   would require you to file forms 1099?  And the "no" block is

2   checked.

3   Q.  What type of payments that a person or a company or a sole

4   proprietorship would make would require a 1099 to be filed with

5   the IRS?

6   A.  Well, basically, any of those 17 items that we discussed

7   earlier:  Compensation to nonemployees, rents, royalties, etc.

8   Q.  So if you were paying someone, for example, to create

9   social media accounts or maintain social media accounts, would

10   you have to file a 1099 if you weren't employing them as a W-2

11   employee?

12   A.  Yes, sir.

13   Q.  Would that be the same whether it's tens of thousands or

14   hundreds of thousands of dollars?

15   A.  Yes, sir.

16          THE COURT:  So are you saying that both companies and

17   individuals can issue 1099s?

18          THE WITNESS:  Well, the individual is the sole

19   proprietorship of this -- sole proprietor of this particular

20   company that we're talking about.  So it's like maybe a smaller

21   company, maybe in relationship -- or, again, a larger

22   corporation or partnership.  So either way, because they had

23   employees and that sole proprietorship business versus -- or a

24   larger corporation, they still would be required to provide a

25   1099 for a noncompensated employee.

1    BY MR. SOBELMAN:

2    Q.   Similar question:  If you were a Schedule C business, as I

3    think sometimes they are called, a small company, a sole

4    proprietorship, and you paid someone to rent an email list for

5    tens or hundreds of thousands of dollars, would you have to

6    issue a 1099 to report the payment to the other person?

7    A.   You would be required to, sir.

8    Q.   Okay.  But here, Mr. Shea said no, right?

9    A.   That's correct.

10   Q.   Let's take another look at 910, just look at a couple more

11   lines.

12             Mr. Bolus, what is the --

13             MR. SOBELMAN:  And you can take down 852.  We can just

14   focus on the chart for a moment.

15   Q.   What does the "cost of goods sold" mean for purposes of a

16   Schedule C?

17   A.   So the cost of goods sold would be the amount that that

18   sole proprietor could claim for the cost that it takes to,

19   let's say, put that -- put some of those items on the shelf to

20   sell them, like maybe the warehousing and whatever fees were

21   involved with that eventual sale of that cost -- of that goods

22   or services.

23   Q.   And just to be clear, it doesn't just apply literally to

24   goods, it's defined elsewhere on the form as including services

25   and other expenditure you have to incur in order to conduct

M5PVSHE1                          Bolus - Direct

1   your business, right?

2   A.  Yes, sir.  And for the cost of -- that it takes to

3   eventually sell that product.

4   Q.  Or provide a service?

5   A.  Yes, sir.

6   Q.  Okay.  So if you were hiring security contractors or paying

7   people for social media pages, those would be costs if they

8   were incurred in creating a product or creating a service that

9   you were then going to sell to other people; is that right?

10  A.  Yes, sir.

11  Q.  And that would count within this cost of goods sold, right?

12  A.  Yes, sir.

13  Q.  Okay.  And did Mr. Shea report anything on the "cost of

14  goods sold" line?

15  A.  No, he did not.

16  Q.  What does contract labor mean?

17  A.  So a contracted labor would be, you know, someone that's

18  doing work for you from a labor perspective, like maybe

19  yardwork or something, I would say maybe physical or something

20  that -- that they provide work for you.

21  Q.  Could it be social media work or some kind of digital work?

22  A.  Yes, sir, anything that's labor-related.

23  Q.  And how much did Mr. Shea report on this line?

24  A.  None.

25  Q.  Okay.  I just have a few more questions.

1     Let's take a look -- just to be clear, the rest of

2    this chart is accurate, right?  All of these lines are empty?

3    A.  Yes, sir.

4    Q.  Okay.  Let's take a look at Defense Exhibit 1 real quick.

5         Mr. Bolus, did you review this briefly in preparation

6    for your testimony?

7    A.  Yes, sir, I did.

8         MR. SOBELMAN:  Okay.  Let's put that up next to — but

9    just for the witness — Government Exhibit 911.

10   Q.  Mr. Bolus, is this a chart you reviewed in preparation for

11   your testimony?

12   A.  Yes, it is.

13   Q.  And does it take part of Defense Exhibit 1 and then include

14   some information next to that about each line?

15   A.  Yes, it does.

16   Q.  Okay.  And would it assist you with your testimony today?

17   A.  Yes, it did.

18   Q.  The government offers Government Exhibit 911.

19        THE COURT:  No objection.

20        MR. MERINGOLO:  No objection.

21        THE COURT:  It is admitted.

22        (Government's Exhibit 911 received in evidence)

23   Q.  So, Mr. Bolus, we see here on one side Defense Exhibit 1,

24   the other 911.  Do you see that?

25   A.  Yes, I do.

M5PVSHE1                          Bolus - Direct

1    Q.  Okay.  So first, looking at Defense Exhibit 1, there's a

2    few payments listed.  I think the first four lines are from

3    2018.  Do you see that?

4    A.  Yes, I do.

5    Q.  And in 2018, the Sheas did report some income from Freedom

6    Daily to the IRS; is that correct?

7    A.  Yes, they did.

8    Q.  Okay.

9            MR. SOBELMAN:  Let's take down Defense Exhibit 1 and

10   just talk in a little more depth about 2019 and 2020.

11   Q.  In 2019, it looks like there are one, two, three, four,

12   five payments on the defense's chart from Freedom Daily to the

13   Sheas.  Let's just -- I'm not going to go through each one; I

14   can do them one year at a time.

15            In 2019, for that tax year, did the Sheas report any

16   income from Freedom Daily to the IRS?

17   A.  No, they did not.

18   Q.  So none of these payments here were reported; is that

19   correct?

20   A.  That's correct, sir.

21   Q.  Not a dollar?

22   A.  No, sir.

23   Q.  Okay.  For 2020, there are two payments listed here, one

24   for $10,000, one for $50,000.  Did the Sheas report any of that

25   income to the IRS for tax year 2020?

1   A.  No, they did not.

2   Q.  Just a couple more questions and we can take this down.

3        Mr. Bolus, for tax year 2019, we looked at the Sheas'

4   tax return; correct?

5   A.  Yes, sir.

6   Q.  That was Government Exhibit 852.  And that was filed in

7   August of 2020; correct?

8   A.  Yes, it is.

9   Q.  Okay.  And when they filed that tax return, how much in

10  taxes did they owe at that time?

11  A.  About $127,000.

12  Q.  And did they pay their tax bill when they filed it?

13        MR. MERINGOLO:  Objection.

14  A.  No, they did not.

15        THE COURT:  If you'll step up.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

M5PVSHE1                        Bolus - Direct

1             (At sidebar)

2             THE COURT:  Could you read back the question.

3             (Record read)

4             THE COURT:  So what's the issue?

5             MR. MERINGOLO:  It's implying they didn't pay their

6    taxes.  Right now they have a payment plan with the IRS.  The

7    jury hears that they didn't pay their taxes, I mean, that's --

8    this isn't a tax case.

9             THE COURT:  So he's asking did they make the payment

10   when they filed it, and he is going to answer no, and then you

11   can cross on that.

12            MR. MERINGOLO:  Okay, Judge.

13            MR. SOBELMAN:  Your Honor, just to make sure we're not

14   back at sidebar in a minute, I have two questions.  One, the

15   question he just answered, which is, they had a $125,000 tax

16   bill.  They didn't pay it then.  And this is directly

17   responsive to Mr. Meringolo's opening, where he says it's

18   post-tax money.  And his cross is they can do whatever they

19   want with their post-tax money.  They didn't pay their taxes,

20   your Honor; it's directly responsive.

21            And second, they still owe money, that's my last

22   question, which is what's their current bill.  It's over

23   $200,000.

24            MR. MERINGOLO:  Judge, that's extremely prejudicial.

25            THE COURT:  You opened on this.

M5PVSHE1                      Bolus – Direct

1              MR. SOBELMAN:  Yes.

2              THE COURT:  That's the problem.

3              You laid it out there.

4              MR. SOBELMAN:  This is the defense, your Honor.

5              THE COURT:  Your whole defense is he has the right to

6     use his post-tax money as he sees fit.  So taxes are at issue.

7              Let's go.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. SOBELMAN:

3     Q.  Just to refocus us on the question, we looked at a tax

4     return the Sheas filed in August of 2020; correct?

5     A.  For tax year 2019.

6     Q.  Yes, tax year 2019.  It was filed August 2020?

7     A.  Yes, sir.

8     Q.  And at the time they filed that tax return, how much money

9     did they owe to the IRS from 2019?

10    A.  Approximately $127,000.

11    Q.  And did they pay that $127,000 at the time they filed their

12    tax return?

13    A.  No, sir, there was no payment made with the tax return.

14    Q.  Zero dollars?

15    A.  That's correct.

16    Q.  Okay.  And as of today or maybe yesterday, if you checked

17    yesterday, how much do the Sheas owe in taxes from tax year

18    2019?

19    A.  So the outstanding balance, with accrued penalties and

20    interest, is about 200 and some thousand dollars.

21    Q.  It's still owed today?

22    A.  I'm sorry, say again?

23    Q.  That's still owed today?

24    A.  Yes, sir, as of last night when I last looked at it.

25    Q.  For tax year 2020, did the Sheas file a tax return?

M5PVSHE1                          Bolus - Direct

1    A.  No, they did not.

2             MR. MERINGOLO:  Beyond the scope.

3             THE COURT:  Overruled.

4    Q.  Sorry.  I just want to make sure the jury heard.

5             For tax year 2020, did the Sheas file a tax return

6    with the IRS?

7    A.  No, they did not.

8    Q.  For tax year 2021, did the Sheas file a tax return with the

9    IRS?

10   A.  No, they haven't.

11   Q.  Just a few extra questions.

12            In preparation for your testimony, did the government

13   ask you to review IRS records for any tax filings by a company

14   called Ranch Property Marketing and Management LLC?

15   A.  Yes, sir.

16   Q.  And what was the result of your review?

17   A.  That there was no filings.

18   Q.  No filings by Ranch Property Marketing and Management?

19   A.  That's correct.

20   Q.  At all for any year?

21   A.  Not that I saw.

22   Q.  Okay.  And aside from your reviewing certain tax filings,

23   including the ones we went over in preparing to testify today,

24   did you have any role in the investigation or prosecution of

25   this case?

M5PVSHE1                          Bolus – Cross

1  A.  No, I did not.

2            MR. SOBELMAN:  No further questions.

3            THE COURT:  Cross-examination.

4  CROSS-EXAMINATION

5  BY MR. MERINGOLO:

6  Q.  Good morning, Agent Bolus.  My name is John Meringolo.  I

7  represent Timothy Shea.

8            We didn't put in the entire 2019 tax returns, is that

9  correct, just portions of it?

10 A.  Well, the information was provided to the prosecution, and

11 how much -- they just went over a few things with me, sir.

12 Q.  They didn't put the entire document into evidence; is that

13 correct?

14 A.  That's -- well, it was admitted, but they only used

15 portions of it for my testimony.

16           MR. MERINGOLO:  Okay.  Now, if we can go -- if the

17 government can pull up Government Exhibit 154.  Can we blow

18 up -- actually, if the jury can see -- it's going to take a

19 while.

20 Q.  William L. Constantine, he's a CPA, right?

21 A.  According to this email, sir.

22 Q.  So that's from Amanda Shea, right?

23 A.  Yes, it is, sir.

24 Q.  Okay.  And Amanda Shea on August 4th, 2020 was asking for

25 the 1099s; correct?

1   A.   Yes, sir, that's what it appears.

2   Q.   And she was saying, Here's the total paid below for 2019,

3   70,000 and 370,000 for Ranch Property; correct?

4   A.   Yes, sir.

5   Q.   And those reflected on the 1099s that we pulled up and saw

6   and put them together?

7   A.   Yes, they were.

8   Q.   And then you saw that one -- the $370,000 that Timothy Shea

9   received through Ranch Property, we saw that it was in a

10  different -- it wasn't in the compensation, right, it was a

11  different -- different portion of the 1099, rent?

12  A.   Oh, right, yes, sir.

13  Q.   Right, right.  It was rent.

14          Now, who -- to your knowledge, who makes those 1099s

15  up?

16  A.   That would be the third party or the payer.

17  Q.   Right.  So --

18  A.   The company.

19  Q.   So correct me if I'm wrong, this is Amanda Shea writing to

20  the CPA and saying, 1099 us; correct?

21  A.   I'm sorry, 1099 --

22               (Continued on next page)

23

24

25

Q.   This is Amanda Shea writing to CPA saying 1099 Ranch
Property, correct?

A.   Well, it is Amanda Shea writing.

Q.   To the CPA?

          MR. SOBELMAN:  Objection.

          THE COURT:  Please allow him to answer.

A.   What I understand from this exhibit, sir, is this is Amanda
asking the CPA for the 1099s in relationship to the Ranch
Property Management and Marketing.  So I mean, it is not, I'm
not -- are you asking me if the CPA should have provided or
should have been the person that created --

          THE COURT:  Sir, you just answer questions.  Don't ask
him questions.

Q.   Certainly, Amanda Shea didn't prepare the 1099, correct?

A.   Absolutely correct, sir.

Q.   And she's asking for the CPA to prepare the 1099, right?

A.   I don't see that, sir.  She is asking her to send it to
her.

Q.   Okay.  You're correct.  I'll read it.

          Writing to the CPA bill:  Can you send me the 1099s
for myself and Ranch Property Management and Marketing.  Here
are the total for both below for 2019.  And 70,000 and Ranch
Property 370,000, correct?

A.   Yes, sir.

Q.   Now, we saw the other 1099 that was sent to Ranch Property,

1   we can agree it was the CPA or whoever prepared it, put

2   $370,000 as for rent, right?

3   A.  Yes, sir.

4   Q.  Now, you and I, just for the jury, the Ranch Property

5   didn't make that 1099, correct?

6   A.  I don't know that.  But, it should have been Ranch Property

7   that did create it.

8   Q.  They create their own 1099?

9   A.  Yes, sir.  They are the payor.  I'm asking --

10  Q.  No.

11  A.  -- for clarification on that.

12  Q.  If Ranch Property was being paid by another company,

13  $370,000, who by law is required to make that 1099?

14  A.  That would be the other company that you are referring to.

15  Q.  So whatever other company it was, that whether it be the

16  CPA or whomever, is supposed to give Ranch Property the 1099,

17  right?

18  A.  Yes, sir.

19  Q.  So that company that was supposed to give Ranch Property

20  the 1099, made a mistake and put it in as rent and not income,

21  that would have nothing to do with Ranch Property, right?

22          THE COURT:  Counsel, don't ask him hypothetical

23  questions.

24          MR. MERINGOLO:  Okay.

25  Q.  So we can agree Ranch Property is not obligated, if they

M5P3SHE2                         Bolus - Cross

1    are a payee, to 1099 themselves?

2    A.   Yes, sir, that's correct.

3    Q.   In this e-mail, Ranch Property through Mrs. Shea is

4    requesting the 1099 be filed, be given to Mr. Shea?

5            MR. SOBELMAN:   Objection.   He's asked this question a

6    half dozen times.

7            THE COURT:   Asked and answered.   Go on.

8    Q.   So, let's pull up the income.   And if you could recall,

9    without pulling the document up, the Sheas, it was a joint tax

10   return, correct?

11   A.   That's correct, sir.

12   Q.   And there is standard deduction, if they are married, I

13   believe it was a joint tax return married.

14   A.   Yes, sir.   For 2019.

15   Q.   And they are allowed to take deductions, right?

16   A.   Yes, they are.

17   Q.   Standard deductions, correct?

18   A.   If they choose to, sir.

19   Q.   Right now, as we speak for the ladies and gentlemen of the

20   jury, they could amend their tax return right now if they

21   wanted to, correct?

22   A.   They could, sir.

23   Q.   Anybody in America could amend their tax return at any

24   time, correct?

25   A.   That's correct.

1   Q.  Did you know if when you did research and pulled the Sheas'

2   1099s and the documents pursuant to the IRS tax returns?

3   A.  Yes, sir.

4   Q.  Is there anything in the file -- in your research, before

5   this case, is there anything in the Sheas' file regarding a

6   civil audit?

7   A.  A civil what?

8   Q.  Audit from the IRS?

9   A.  I didn't see anything, sir.

10  Q.  Do you know that Mr. Shea was indicted in this case to your

11  knowledge in August of 2020?

12  A.  I do not know that, sir.

13  Q.  So, if Mr. Shea paid taxes on 3 -- or filed to pay taxes on

14  $370,000, there would be a net income, correct?

15  A.  Yes, sir.

16  Q.  Is he allowed -- without committing any crimes or doing

17  anything -- is he allowed to do whatever he wants with that

18  money?

19              MR. SOBELMAN:  Objection.

20              THE COURT:  Sustained.

21  Q.  Are you allowed -- forget it.

22              So he paid taxes on 370,000, right?

23              MR. SOBELMAN:  Objection.  Facts contrary to evidence.

24  Q.  He filed to pay taxes on 370,000.  Right?

25  A.  It's listed on the tax return, but no payment was made with

1    the tax return.

2    Q.  Then without putting it up, you saw the expenses, right?

3    A.  I did, sir.

4    Q.  And he took a deduction on his car, right?

5    A.  This is the Land Rover we are talking about?

6    Q.  Correct.

7    A.  Yes, sir.

8    Q.  There wasn't one deduction for one meal, right?

9    A.  Correct.

10   Q.  And if he wanted today to amend his tax returns and pull

11   his credit cards to get a deduction for one meal, he could do

12   it today, right?

13   A.  He could.

14   Q.  And there wasn't one deduction for taking travel, say, an

15   airplane to the southern border, there wasn't one deduction for

16   that, correct?

17   A.  I did not see that, sir.

18   Q.  There wasn't one deduction for Mr. Shea staying at a hotel,

19   correct?

20   A.  I didn't see that, sir.

21   Q.  There wasn't -- there was a deduction for his cell phone,

22   right?

23   A.  Yes, sir.

24   Q.  And there wasn't one deduction for his insurance on his

25   vehicle, correct?

1   A.  I didn't see that, sir.

2   Q.  And he was a 1099, right?

3   A.  Yes.

4   Q.  We discussed the difference between a 1099 and a W-2?

5   A.  Yes, sir.

6   Q.  Earlier and we did -- so, the health insurance, there

7   wasn't a deduction for health insurance for Mr. Shea on that

8   tax return, correct?

9   A.  I don't recall seeing that, sir.

10  Q.  Okay.  And if there were deductions that he missed to take,

11  he could amend his tax returns tonight, right?

12  A.  He could, sir.

13          MR. MERINGOLO:  I don't have much more.  I'm just

14  going through my notes so it's quicker for you.

15  Q.  If Ranch Property paid a company called Freedom Daily,

16  that, if he wanted a deduction, he could 1099 another company,

17  right?  If he wanted to take the deduction, right?

18  A.  Can you clarify who "he" is, sir?

19  Q.  Ranch Property, company A, pays company B.  If it was for a

20  service, he could 1099 company B, right?

21  A.  That's correct, sir.

22  Q.  And that would deduct his income from the 370, right?

23  A.  Yes.

24  Q.  So, if Mr. Shea paid $190,000 to company B through Ranch

25  Property and it was for a service, you can deduct 190,000 off

M5P3SHE2                          Bolus – Cross

1    the 370, right?

2    A.  Yes, sir.

3    Q.  I can't do the math, but it would be much lower than 370,

4    right?

5    A.  Yes, it would, sir.

6    Q.  But if he took the $370,000 as income on his tax returns,

7    and used his own money to pay for something else that wasn't

8    drugs or anything, that's okay, right?

9              MR. SOBELMAN:  Objection.

10             THE COURT:  Sustained.

11   Q.  What is it called, is it called aftertax dollars?  After

12   you pay your taxes and have the remaining money, is that a term

13   of art, aftertax dollars?

14   A.  Are you talking about like a refund, sir?

15   Q.  No, I'm talking like the net proceeds of your tax return.

16   What would you characterize that as?

17   A.  I mean, that's a little bit out of the scope of my duties.

18   I don't understand some of that.

19   Q.  Meaning, I get 370,000, I file my taxes, my net is 200,000,

20   whatever round numbers.  What is that called?  Is it called net

21   income?

22   A.  Your adjusted income?

23   Q.  Yes.

24   A.  Yes.

25   Q.  That would be cash to myself, right?

M5P3SHE2                         Bolus - Redirect

1    A.  Yes, sir.

2    Q.  Or whoever in America, right?

3            MR. MERINGOLO:  Hold on one moment, Judge.

4    Q.  Just for the record, if Ranch Property paid, which we'll

5    say is company A, paid company B, Ranch Property would have to

6    1099 company B, correct?

7    A.  That's correct, sir.

8    Q.  And if Ranch Property 1099 company B, then he would have

9    to -- meaning Ranch Property -- would have to give a 1099 to

10   company B, correct?

11   A.  They would be required to, sir.

12   Q.  But if Ranch Property paid company B, C, D and E, and

13   didn't 1099 them, and took all the income, meaning 370,000,

14   that would be okay, right?

15           MR. SOBELMAN:  Objection.

16           MR. MERINGOLO:  Okay, that's fine.

17           THE COURT:  I'm going to sustain that objection.

18           MR. MERINGOLO:  Thank you very much, sir.  Have a good

19   day.

20           THE WITNESS:  Thank you, sir.

21           MR. SOBELMAN:  A few questions, your Honor.

22           THE COURT:  Redirect.

23   REDIRECT EXAMINATION

24   BY MR. SOBELMAN:

25   Q.  Mr. Bolus, do you recall being asked questions about

M5P3SHE2                              Bolus - Redirect

1    whether a mistake might have been made on a 1099 issued to

2    Ranch Property?

3    A.  I don't know if I heard the word "mistake," sir.

4    Q.  But do you recall being asked questions on

5    cross-examination about how the $370,000 was in the rent box on

6    the Ranch Property 1099?

7    A.  Yes, sir.  That sounds familiar.

8    Q.  If a payee, a recipient of a 1099 gets an inaccurate 1099,

9    what, if any, steps can they take to correct that?

10   A.  Well, the first step they should do is contact the payor

11   and ask for a corrected 1099.

12   Q.  If the recipient happened to be married to the treasurer of

13   the payor, would that be an easier process?

14           MR. MERINGOLO:  Objection.

15           THE COURT:  Sustained.

16   Q.  If a person gets reimbursed for expenses by their employer

17   or the company that's paying them, so we've been using company

18   A, company B, but we looked at a 1099 where We Build the Wall

19   issued a 1099 to Tim Shea Ranch Property, right?

20   A.  Yes, sir.

21   Q.  And if a person gets reimbursed, if Tim Shea Ranch Property

22   had been reimbursed for expenses for things that defense

23   counsel brought up, like meals or travel, can they also claim

24   that as an expense?

25   A.  No, they cannot.

M5P3SHE2                         Bolus - Recross

1   Q.  So if the travel or meals had already been paid for by We

2   Build the Wall, there would be nothing to list in that 27 boxes

3   of expenses about those, right?

4   A.  That's correct, sir.

5   Q.  There were a couple questions asked about when you can

6   amend a tax return.  August 2020 was a couple years ago now,

7   right?  Year and a half to two years?

8   A.  Yes, sir.

9   Q.  There was no amended tax return filed, right?

10  A.  I did not see any, sir.

11           MR. SOBELMAN:  Nothing further, your Honor.

12           MR. MERINGOLO:  Brief recross.

13           THE COURT:  Yes, you can.

14  RECROSS EXAMINATION

15  BY MR. MERINGOLO:

16  Q.  How many tax returns have you ever seen amended while

17  someone is under a federal criminal indictment in your 17

18  years, sir?

19           MR. SOBELMAN:  Objection.

20           THE COURT:  You can answer.  Tell us how many.

21  A.  Well, I can't put a number on it.  But it does happen

22  frequently.  They attempt to.

23  Q.  They attempt to, right?

24  A.  Yes, sir.  Sometimes there's reasons why the IRS won't

25  accept it.

1   Q.  Right.  And sometimes when you attempt to, if there is a

2   mistake, you can get indicted on a tax issue, right?

3   A.  Yes, sir.  In all fairness.

4   Q.  Mistakes are made on 1099s, correct?

5           MR. SOBELMAN:  Objection.

6           THE COURT:  I think it is obvious that mistakes are

7   sometimes made.

8   Q.  Right.  And if a 1099 says this is for rent, and then on

9   the tax return they claim it as income, is anything wrong with

10  that, sir?

11          MR. SOBELMAN:  Objection.

12          THE COURT:  Sustained.

13  Q.  We can agree in this case that the 1099 said rent, right?

14  A.  Yes, they did, sir.

15  Q.  We can agree in this case that the 1099 for the 370,000 was

16  reported as income, right?

17          MR. SOBELMAN:  Objection.

18          THE COURT:  Sustained.

19          MR. MERINGOLO:  No further questions.

20          THE COURT:  You may step out, sir.

21          (Witness excused)

22          THE COURT:  You may call your next witness.

23          MR. SOBELMAN:  The government calls Hanna Rubin.

24   HANNA RUBIN,

25       called as a witness by the Government,

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MR. SOBELMAN:

4     Q.  Good morning, Ms. Rubin.

5     A.  Good morning.

6     Q.  Where do you currently work?

7     A.  I work at the New York State Attorney General's Charities

8     Bureau.

9     Q.  What is the Charities Bureau?

10    A.  It is a part of the attorney general's office that has

11    oversight of charities operating in New York State.

12    Q.  Just to be clear, the U.S. attorney's office is a different

13    government body than the --

14    A.  Completely different.  This is a state government agency.

15    Q.  U.S. attorney's office is the federal government?

16    A.  Yes.

17    Q.  What is your position with the Charities Bureau?

18    A.  I'm the director of registration.

19    Q.  Approximately how long have you been the director of

20    registration?

21    A.  About five and a half years.

22    Q.  What are your duties and responsibilities as the director

23    of registration for the Charities Bureau?

24    A.  I oversee a team that reviews charities' registrations and

25    their statutorily required annual financial disclosures.

1    Q.   When you say statutorily required, you mean required by

2    law?

3    A.   Yes.

4    Q.   That's state law?

5    A.   Yes, it is.

6    Q.   Approximately how many employees do you supervise as the

7    director of registration?

8    A.   31.

9    Q.   What does it mean to register as a charity with the

10   Charities Bureau?

11   A.   You are required by law to submit certain documents and

12   information that become part of a public registry, which is,

13   again, a statutory requirement.

14   Q.   What organizations are required to register with the

15   Charities Bureau?

16   A.   Any charity operating in New York State.  It can be based

17   here or it can be raising money here.

18   Q.   Does that include raising money online?

19   A.   Yes, it does.

20   Q.   What is the purpose of the registration requirement?

21   A.   It is to make transparent to the public what charities are

22   doing, and also to funders, so that they can look at the record

23   and see if this is something they want to support.

24   Q.   You are talking about people like donors?

25   A.   Yes, donors, foundations, government agencies, also the

M5P3SHE2                          Rubin - Direct

1    press.

2    Q.  Generally, how does the registration process work?

3    A.  So, our registration process is now completely online.  We

4    have an interactive program, organizations go through various

5    web pages answering questions and submitting documents, and all

6    that is then reviewed for completeness and correctness.

7               MR. SOBELMAN:  Ms. Drescher, can you please show the

8    witness what's been marked for identification as Government

9    Exhibit 352.

10   Q.  Ms. Rubin, do you recognize this?

11   A.  Yes.

12   Q.  What is it?

13   A.  It is a registration form for a charity.

14   Q.  Was this filed with your office?

15   A.  Yes.

16              MR. SOBELMAN:  The government offers Government

17   Exhibit 352.

18              THE COURT:  Any objection?

19              MR. MERINGOLO:  No objection.

20              THE COURT:  It is admitted.

21              (Government's Exhibit 352 received in evidence)

22              MR. SOBELMAN:  Ms. Drescher, let's show it to the jury

23   and focus on the top half of the page.

24   Q.  Ms. Rubin, can you please read the title of this document.

25   A.  "Registration statement for charitable organizations."

1   Q.   Generally, what is this form?

2   A.   So, this is the application that charities submit to the

3   Charities Bureau in order to register.

4   Q.   What organization was this application filed for?

5   A.   We Build the Wall, Inc.

6   Q.   How is this form completed by the applicant?

7   A.   Through the web application.  They enter information and

8   then upload documents.

9   Q.   At the top of the page under the title of the document, can

10  you please read the office and address underneath the title.

11  A.   New York State Office of Attorney of the Attorney General.

12  Charities Bureau.  Registration Section.  28 Liberty Street,

13  New York, New York 10005.

14  Q.   Where was this registration form electronically received

15  and reviewed by the Charities Bureau?

16  A.   At that address.

17  Q.   Is that where you personally work?

18  A.   Yes, it is.

19  Q.   Approximately how far is that from here?

20  A.   10, 12 blocks.

21  Q.   That's here in Manhattan, correct?

22  A.   Yes, it's here in Manhattan.

23  Q.   In the upper-right corner of the document, it states "open

24  to public inspection."

25  A.   Yes.

1    Q.   What does that mean?

2    A.   That is the public registry I mentioned.  We're required by

3    law to post these documents on the Charities Bureau website so

4    they're available to the public, to funders, to donors, etc.

5           MR. SOBELMAN:  Ms. Drescher, can you please display

6    page five of this document.

7    Q.   Ms. Rubin, what is on this page of the application?

8    A.   This is the attestation for the registration.

9    Q.   What do you mean by attestation?

10   A.   So, all registrations must be attested to by -- this is,

11   again, a legal requirement, the president or other authorized

12   officer, and the person who has fiscal responsibility for the

13   organization.  These are the people who really execute the

14   charity's mission and have responsibility for its finances.

15   And they attest on penalty of perjury that everything within

16   the application and documents is true to the best of their

17   knowledge.

18   Q.   Whose signatures appear below the attestation?

19   A.   Brian Kolfage.

20   Q.   And who else?

21   A.   Amanda Shea.

22   Q.   What does it say their roles are on the left-hand side?

23   Sorry.  On the right-hand side.  Under title.

24   A.   So, Mr. Kolfage is the president, and Ms. Shea is the

25   treasurer/CFO.

1   Q.  Let's go back to the first page.  Ms. Rubin, under filing

2   information at the top, what type of filing was this?

3   A.  This was a registration, an initial registration.

4           MR. SOBELMAN:  Ms. Drescher, can you please focus on

5   the box at the bottom of the page that's titled statute review.

6   Q.  Ms. Rubin, can you please read question number four.

7   A.  "Does the organization solicit, or plan to solicit or

8   receive more than $25,000 in total contributions from New York

9   State residents, foundations, corporations or government

10  agencies?"

11  Q.  Why does the application include this question?

12  A.  That is, again, in New York State law, if an organization

13  is raising over 25,000, it triggers a registration requirement.

14  Q.  How is this question answered?

15  A.  "Yes."

16          MR. SOBELMAN:  Ms. Drescher, can you please display

17  page three of this exhibit and focus on the bottom half of the

18  page.

19  Q.  Ms. Rubin, can you please read the names and titles

20  underneath list all officers, directors, trustees, key

21  persons/employees?

22  A.  Brian Kolfage, president.  Amanda Shea, treasurer/CFO.

23  Dustin Stockton, director.  Kris Kobach, director.

24  Q.  Why does the application ask for a list of individuals in

25  these positions?

1   A.  So, if an organization, a nonprofit is incorporated in New

2   York State, they must have a minimum of three directors.

3   That's a statutory requirement.  We also want to see that

4   charities that are not incorporated here have a structure in

5   place and persons responsible for the mission.

6   Q.  Generally, what types of obligations does someone in a

7   position like this have to their organization?

8   A.  Well, they are responsible for ensuring that the mission is

9   followed, they have a duty of loyalty to the organization, to

10  put its interests first, and to make sure that its purposes are

11  fulfilled.

12  Q.  Is that sometimes referred to as a fiduciary duty?

13  A.  Yes.

14          MR. SOBELMAN:  Ms. Drescher, can you please display

15  page four of this document and focus in on box five.

16  Q.  Ms. Rubin, box five states describe the organization's

17  charitable purposes.  Why does the application ask this

18  question?

19  A.  Because our authority is only over charitable

20  organizations, not over nonprofits that do not have the

21  charitable purposes.

22  Q.  Can you please read the answer provided.

23  A.  "Promote social welfare within the meaning of section

24  501(c)(4) of the Internal Revenue Code including but not

25  limited to funding, construction, administration, and

M5P3SHE2                          Rubin - Direct

1    maintenance of a United States southern border wall and the

2    processes associated therewith."

3    Q.  Does this answer say anything about an energy drink

4    company?

5    A.  No.

6          MR. SOBELMAN:  Ms. Drescher, can you please focus on

7    box 11 lower on the page.

8    Q.  Ms. Rubin, question 11 asks does the organization solicit

9    or plan to solicit contributions in New York State.  The answer

10   is quite long.  So I'll just ask you to read the second

11   paragraph.

12   A.  "How the contributions will be used:  100 percent of the

13   funds raised on GoFundMe will be used in the execution of our

14   mission and purpose.  To honor the commitment, we made to our

15   donors; all funds raised, less the processing fees and refunds,

16   will be transferred to a special purpose account to carry out

17   the purposes and mission of We Build the Wall, Inc.  I will

18   personally not take a penny of compensation from these

19   donations."

20   Q.  Can you remind us who signed this document under penalty of

21   perjury?

22   A.  Brian Kolfage.

23   Q.  This question's answered "yes," correct?

24   A.  Yes.

25   Q.  They plan to solicit contributions in New York State?

1    A.  Yes.

2    Q.  Okay.

3            MR. SOBELMAN:  Ms. Drescher, can you please focus in

4    on boxes 13, 14, and 15 at the bottom of the page.

5    Q.  Ms. Rubin, question 13 asks does the organization have a

6    conflict of interest policy.  Do you see that?

7    A.  Yes.

8    Q.  And what is a conflict of interest policy?

9    A.  So, charitable assets are raised to support the mission of

10   a charity.  They shouldn't go to benefit a private individual.

11   A conflict of interest policy really establishes a disclosure

12   framework, so that if someone who is on the board of a charity

13   or is a key employee and has an interest in a transaction the

14   charity is considering, has a process of disclosure that they

15   have to make to the board.  And the board can consider whether

16   or not that is in the best interest of the charity.

17   Q.  And that question is answered "yes"?

18   A.  Yes.

19   Q.  The next question is does the organization have a

20   whistleblower policy.  What is a whistleblower policy?

21   A.  That is a policy that protects an employee who believes

22   there is something amiss and wants to report it.

23   Q.  Why does the application ask this question?

24   A.  This is also a requirement of charities incorporated in New

25   York State.  But, the Charities Bureau believes both of these

1    are essentially best practices for all charities.  So, we ask

2    all.

3    Q.  And how is that question answered?

4    A.  "No."

5    Q.  Number 15 states attached organization's required

6    documents.  And then there is a list.  What is a certificate of

7    incorporation?

8    A.  So, that is essentially the document that creates a

9    charity, if a charity is going to be a nonprofit corporation,

10   it's issued by a state, department of state, generally.  And it

11   establishes the corporate structure of a charity.

12   Q.  Let's turn to page eight of this document.  Is this an

13   attachment to the application?

14   A.  This is a requirement, the certificate of incorporation or

15   other founding document.

16   Q.  It's titled "articles of incorporation."  Do you see that?

17   A.  Yes.

18   Q.  What do you mean by founding document?

19   A.  It creates, it actually is establishing the entity and how

20   it will be structured.

21   Q.  What organization is this articles of incorporation for?

22   A.  We Build the Wall, Inc.

23   Q.  Have you reviewed articles of incorporation as part of your

24   job with the Charities Bureau?

25   A.  Yes.

1   Q.  Approximately how many?

2   A.  Hundreds.

3          MR. SOBELMAN:  Ms. Drescher, can you please focus on

4   article V at the bottom of the page.

5   Q.  What's the name and title of the person listed under

6   initial officers and/or directors?

7   A.  Brian Kolfage.

8   Q.  Let's go to page 10 of this exhibit which is two pages into

9   the articles of incorporation.

10          Ms. Rubin, what is a rider to an articles of

11   incorporation?

12  A.  It is an addition, an attachment that isn't in the sort of

13  standard text, but it's something that the organization wished

14  to include as part of its structure.

15  Q.  Can you please read number one starting with "no part."

16  A.  "No part of the net earnings of the corporation shall inure

17  to the benefit of any private individual."

18  Q.  What's your understanding of what that means?

19  A.  It means that nothing, no net revenue that the charity gets

20  through donations, etc., will go to benefit a private person.

21  It will go to the charity's mission.

22  Q.  Let's go to the next page, page 11.  This is another

23  attachment to the application.

24  A.  Yes.

25  Q.  Can you please read the title of this document.

1   A.   "Amended and restated bylaws of We Build the Wall, Inc."

2   Q.   What are bylaws?

3   A.   Bylaws are the rules document for an organization.  They

4   establish, you know, a framework for things like electing

5   directors and annual meetings and such.

6   Q.   How many bylaws have you reviewed in your role as director

7   of registration?

8   A.   Hundreds.

9            MR. SOBELMAN:  Ms. Drescher, can we go to the last

10  page of this document, please.  Sorry.  One earlier.  One

11  before that.  Page 21.

12  Q.   Can you please read the sentence that begins "the

13  foregoing."

14  A.   "The foregoing amended and restated bylaws were adopted by

15  the board of directors on the 25th day of January, 2019."

16  Q.   Whose signatures appear below that sentence?

17  A.   Brian Kolfage, Amanda Shea.

18           MR. SOBELMAN:  Ms. Drescher, let's go back a few pages

19  and focus in on section 5.1 of the bylaws.

20  Q.   Ms. Rubin, can you please read 5.1.

21  A.   "Powers.  The directors shall supervise and control the

22  business, property and affairs of the corporation, except as

23  otherwise provided by law, the articles of incorporation of the

24  corporation, or these bylaws."

25  Q.   Let's now take a look at section 5.6.  This is on page 13

1    of this exhibit.  Can you, Ms. Rubin, can you please read just

2    the first sentence after where it says section 5.6

3    compensation.

4    A.   "Directors shall not receive salaries for their services,

5    but by resolution of the board of directors, expenses of

6    attendance, if any, may be allowed for attendance at any

7    regular or special meeting of the board."

8    Q.   What does this provision mean?

9    A.   It is stating that the board of directors members will not

10   be paid for their services, for their work that they do for the

11   charity, but it will cover expenses for meetings of the board.

12   Q.   Can you please read the second sentence.

13   A.   "The corporation shall not provide personal loans to any

14   director."

15   Q.   And let's read the third sentence, please.

16   A.   "Nothing in this section 5.6 will prevent an officer who is

17   also a director from receiving compensation for performing his

18   or her duties as an officer of the corporation."

19   Q.   What does that mean?

20   A.   So, let's say the director of a board was also the CFO of

21   the company or the executive director.  They might get a salary

22   for their work running the charity, but they wouldn't be paid

23   as a board member.

24   Q.   Let's take a look at section 8.4.  It says section 8.4

25   president.

1           Ms. Rubin, can you read this section for us.

2   A.   "The president of the board shall preside at meetings of

3   the board of directors, and shall perform such other duties and

4   have such other powers as the board of directors may from time

5   to time prescribe.  The initial president is Brian Kolfage.

6   Mr. Kolfage will take no salary for the performance of his

7   duties as president of the corporation."

8   Q.   So just to be clear, we earlier read a provision that said

9   no members of the board can be paid for being on the board,

10  right?

11  A.   Yes.

12  Q.   So if Mr. Kolfage was a board member, he couldn't get paid

13  for being a member of the board?

14  A.   No.

15  Q.   Okay.  And there was a general rule in the earlier section

16  that if someone was an officer, they could get paid for their

17  work as an officer, correct?

18  A.   Yes.

19  Q.   But then there is a more specific provision we just read,

20  right?

21  A.   Yes.

22  Q.   What does this provision mean?

23  A.   It means that as -- president, which is an officer of the

24  corporation, Mr. Kolfage will not receive a salary.

25          MR. SOBELMAN:  We can take this down.  If you could

1    just show the witness what's marked for identification as

2    Government Exhibit 351.

3    Q.   Ms. Rubin, do you recognize this document?

4    A.   Yes.

5    Q.   What is it?

6    A.   This is the notice of registration that we issue to

7    charities when they have submitted a complete and correct

8    application.

9    Q.   What organization is this notice for?

10   A.   We Build the Wall, Inc.

11          MR. SOBELMAN:   The government offers Government

12   Exhibit 351.

13          THE COURT:   Any objection?

14          MR. MERINGOLO:   No objection.

15          THE COURT:   It is admitted.

16          (Government's Exhibit 351 received in evidence)

17   Q.   Ms. Rubin, can you please read the title on this document.

18   A.   "Notice of registration."

19   Q.   What is the date on this document?

20   A.   The date is December 30, 2019.

21   Q.   Just remind us what organization does this relate to?

22   A.   We Build the Wall, Inc.

23   Q.   Whose name did this notice of registration go out under?

24   A.   It went out under my name.

25   Q.   Generally, what did this notice convey to We Build the

M5P3SHE2                          Rubin - Direct

1   Wall?

2   A.   It lets them know that they are duly registered in New

3   York, and that they now can raise money here, and it also

4   alerts them to their obligation to file annual financial

5   disclosures with the Charities Bureau, and it flags the first

6   time those disclosures will be due.

7   Q.   If you had learned before issuing this notice that certain

8   information on We Build the Wall's registration application was

9   false, would you have issued this notice?

10  A.   Likely not.

11  Q.   What, if anything, would you do if you learned that there

12  are false representations in a registration application or its

13  attachments?

14  A.   We would elevate to the enforcement section of the

15  Charities Bureau.

16          MR. SOBELMAN:  No further questions.

17          THE COURT:  Cross-examination?

18          MR. MERINGOLO:  No questions, Judge.

19          THE COURT:  Thank you.  You may step out.

20          (Witness excused)

21          THE COURT:  Would you call your next witness, please.

22          MS. MOE:  The government calls Karl Mitchell, your

23  Honor.

24   KARL MITCHELL,

25       called as a witness by the Government,

1        having been duly sworn, testified as follows:

2   DIRECT EXAMINATION

3   BY MS. MOE:

4   Q.  Mr. Mitchell, can you tell us where do you work?

5   A.  The Drink Ink.

6             THE COURT:  You may take off your mask if you want.

7             THE WITNESS:  Thank you.

8   A.  The Drink Ink.

9   Q.  Can you tell us what is the Drink Ink?

10  A.  We're a private label beverage company.

11  Q.  What is your title at the Drink Ink?

12  A.  Owner.

13  Q.  What kind of work do you do day to day as the owner of the

14  Drink Ink?

15  A.  Just the day-to-day operations, answering e-mails and

16  scheduling production.

17  Q.  Do you sometimes interface with your customers?

18  A.  Usually only through e-mail.

19  Q.  Where is your business currently based?

20  A.  In Las Vegas.

21  Q.  In general, when you're working with a customer, can you

22  describe for us what's the process for developing the drinks at

23  your business?

24  A.  Well, the process is they inquire through e-mail and they

25  design a label and we put it on our product.

M5P3SHE2                         Mitchell - Direct

1    Q.  Aside from you, does anyone else at the Drink Ink interface

2    with your customers?

3    A.  Yes.

4    Q.  Who's that?

5    A.  Chris Stone.

6    Q.  What does Chris Stone do at the Drink Ink?

7    A.  He is an employee.

8    Q.  Are you familiar with a company called Winning Energy?

9    A.  I am now, yes.

10   Q.  How are you familiar with that company?

11   A.  They inquired through e-mail, and we did a private label

12   beverage for them.

13   Q.  Were they a customer at the Drink Ink?

14   A.  Yes.

15   Q.  What services, if any, did the Drink Ink provide to Winning

16   Energy?

17   A.  They -- we did energy drinks for them with their label on

18   it.

19   Q.  Who, if anyone, did you interact with when Drink Ink did

20   business with Winning Energy?

21   A.  Tim Shea.

22   Q.  How did you typically communicate with Tim Shea?

23   A.  Through e-mail.

24   Q.  Have you ever met in person?

25   A.  No.

1    Q.  Taking a step back, can you explain for us how did you

2    first come to know about Winning Energy?

3    A.  Through an e-mail inquiry.  They e-mailed us and wanted to

4    do a private label beverage.

5    Q.  When you say they e-mailed us, who e-mailed you asking

6    about --

7    A.  Tim Shea.  Tim Shea.

8    Q.  I am so sorry.  I want to make sure that my question and

9    your answer don't overlap so the court reporter can get it

10   down.  So if you'll wait just a beat before answering.

11           Approximately when did you first learn about Winning

12   Energy?

13   A.  Sometime in 2020.

14   Q.  When Tim Shea reached out to you about Winning Energy, what

15   happened next?

16   A.  He submitted a label for the energy drink can, and we

17   produced his beverage for him.

18   Q.  From your communications with Tim Shea, what was your

19   understanding about what Winning Energy was?

20   A.  I just thought it was a joke about Trump.

21   Q.  When you say Winning Energy was a joke about Trump, what do

22   you mean by that?

23   A.  Well, the design label was -- had Donald Trump on there,

24   and it was a cartoon character of him.

25   Q.  You mentioned Tim Shea sent you a label for this energy

1    drink.  Just to be clear, did Tim Shea become a customer at the

2    Drink Ink?

3    A.  Yes, he did.

4    Q.  What, if anything, did he purchase from you?

5    A.  He purchased energy drinks.

6    Q.  Did he purchase one shipment or more than one shipment of

7    energy drinks?

8    A.  I believe he -- he received one shipment for a small order

9    as a test, and then he moved on to a larger order.

10   Q.  When you say a larger order, what was the approximate

11   volume of energy drinks that Tim Shea bought from the Drink

12   Ink?

13   A.  A truckload which is about 50,000 cans.

14   Q.  I think you mentioned just now that Tim Shea had sent you a

15   label.

16          MS. MOE:  If we could just show the witness what's

17   marked for identification as Government Exhibit 205.

18   Q.  Mr. Mitchell, do you recognize this?

19   A.  Yes.

20   Q.  What is Government Exhibit 205?

21   A.  It is the Winning Energy design label for the energy drink

22   cans.

23   Q.  Is this the label that Tim Shea sent to you?

24   A.  Yes.

25          MS. MOE:  The government offers Government Exhibit

M5P3SHE2                         Mitchell - Direct

1   205.

2            MR. MERINGOLO:  No objection.

3            THE COURT:  It is admitted.

4            (Government's Exhibit 205 received in evidence)

5   Q.  Earlier you mentioned that you communicated with Tim Shea

6   by e-mail; is that right?

7   A.  That's correct.

8   Q.  So I want to talk about some of the e-mails with Tim Shea.

9            MS. MOE:  If we could show the witness for

10  identification what's been marked as Government Exhibit 201 and

11  then alongside that 202.

12  Q.  Do you see those, Mr. Mitchell?

13  A.  Yes, I do.

14  Q.  And just while we're looking at these, can we take those

15  down and put up just for the witness Government Exhibits 203

16  and 204.

17           Do you recognize Government Exhibits 201, 202, 203,

18  and 204?

19  A.  Yes.

20  Q.  And what are they?

21  A.  They are a e-mail chain.

22  Q.  Are these e-mails from the Drink Ink?

23  A.  Yes.  And from Tim Shea.

24           MS. MOE:  The government offers Government Exhibits

25  201, 202, 203, and 204.

1          MR. MERINGOLO:  No objection.

2          THE COURT:  They are admitted.

3          (Government's Exhibit 201, 202, 203, 204 received in

4     evidence)

5          MS. MOE:  If we could please publish what's now in

6     evidence as Government Exhibit 201.

7     Q.  And just for context, what are we looking at here,

8     Mr. Mitchell?

9     A.  We're looking at an e-mail between Tim Shea and Chris Stone

10    and myself.

11    Q.  Can you remind us who Chris Stone is?

12    A.  He is an employee for me.

13    Q.  I want to focus your attention on the bottom e-mail in this

14    thread.  If we could highlight that.  Who is this e-mail from

15    and who is it to?

16    A.  The e-mail is from Tim Shea, and it's to Karl Mitchell, me,

17    Chris Stone, and Brian Kolfage.

18    Q.  Is this on May 15, 2020?

19    A.  Yes, it is.

20    Q.  Could you please read for us the e-mail that Tim Shea sent.

21    A.  I'm sorry.  I didn't hear that.

22    Q.  Would you mind just reading for us the body of the e-mail

23    that Tim Shea sent.

24    A.  Yeah, it says "I wanted to introduce our business partner

25    Brian Kolfage, I have added him to the e-mail as well.  We

1    wanted to talk about ordering more cans.  We also were

2    wondering if you guys worked with any distributors there in

3    Nevada.  This would eliminate a big shipping charge."

4    Q.  From your e-mail communications with Tim Shea, did you have

5    an understanding that Tim Shea had a business partner?

6    A.  Not until we got this e-mail.

7    Q.  If you turn now to talk about Government Exhibit 203 which

8    is in evidence.  Mr. Mitchell, what are we looking at here?

9    A.  Another e-mail chain.

10   Q.  Who sent this e-mail?

11   A.  This one is from Chris Stone to Tim Shea and to me.  I was

12   cc'd on it.

13   Q.  Focusing under the top of the e-mail.  Do you see the two

14   lines here that says Winning Energy and wire transfer info?

15   A.  Yes, I do.

16   Q.  And are those attachments to this e-mail?

17   A.  Yes.

18   Q.  I want to talk about those in a moment, but first let's

19   talk about the body of this e-mail.

20           Right under where it says, "Hi Tim," could you read

21   those first two lines for us?

22   A.  "Attached is the invoice along with our wiring instructions

23   for payment.  If sending a check, please send to the address in

24   my signature below."

25   Q.  Why was the Drink Ink sending an invoice and wiring

1    instructions to Tim Shea?

2    A.  Whenever it is a larger run, we require that the customer

3    wire us the money so we don't have to pay credit card fees.

4    Q.  What was the order that was at issue in this e-mail?

5    A.  It was for a truckload of energy drinks, for 50,000 cans of

6    energy drinks.

7    Q.  So we were talking before about how there were attachments

8    to this e-mail.

9         MS. MOE:  If we could show just the witness what's

10   marked for identification as Government Exhibits 203A and 203B.

11   Q.  Mr. Mitchell, do you recognize these?

12   A.  Yes.

13   Q.  What are we looking at here?

14   A.  You are looking at the invoice for the 50,000 cans and our

15   wiring instructions on how to pay us.

16   Q.  Are those the two attachments to the e-mail we just looked

17   at?

18   A.  Yes.

19        MS. MOE:  The government offers Government Exhibits

20   203A and B.

21        MR. MERINGOLO:  No objection.

22        THE COURT:  They are admitted.

23        (Government's Exhibit 203A, 203B received in evidence)

24        MS. MOE:  Turning first to 203A.  We can leave them

25   both up side by side.  Can we just highlight the invoice so the

M5P3SHE2                            Mitchell - Direct

1   jury can see it a little bit larger.

2   Q.  We were talking about this before.  But just to be clear,

3   what was this an invoice for?

4   A.  For 24,960 regular energy drinks and 24,960 sugar-free

5   energy drinks.

6   Q.  What was the total amount for the invoice?

7   A.  $34,044.80.

8   Q.  Turning to 203B.  What are we looking at there?

9   A.  That is our wiring instructions.

10  Q.  Now, under company name and address, it says Drinkworks LLC

11  d/b/a Drink Ink.  What does that mean?

12  A.  Drinkworks LLC is my business name.  And we do business as

13  the Drink Ink.

14  Q.  Are there wiring instructions on this form?

15  A.  Yes.

16  Q.  So if someone is sending a wire to your business, does it

17  go to the Drink Ink or Drinkworks LLC?

18  A.  It goes to Drinkworks LLC.

19  Q.  Did Drinkworks receive a payment for this invoice?

20  A.  Yes.

21  Q.  In your communications with Timothy Shea, did he ever

22  mention an organization called We Build the Wall?

23  A.  No.

24  Q.  As you sit here today, do you know where Tim Shea got the

25  money to pay this invoice?

M5P3SHE2                          Mitchell - Cross

 1    A.  No.

 2              MS. MOE:  Nothing further, your Honor.

 3              Thank you, Mr. Mitchell.

 4              THE COURT:  Cross-examination?

 5              MR. MERINGOLO:  Very briefly, Judge.

 6    CROSS-EXAMINATION

 7    BY MR. MERINGOLO:

 8    Q.  Good morning, Mr. Mitchell.  My name is John Meringolo.  I

 9    represent Tim Shea.

10              Did you deal directly with Tim at this time?

11    A.  Yes, Chris Stone and myself both.

12    Q.  You said it was, you know, it's more of like a -- the logo

13    I guess of Trump you thought it was more like a gimmicky thing?

14    A.  Yes.

15    Q.  It was gimmicky to I guess try to sell drinks, right?

16    A.  Correct.

17    Q.  And he paid you every dollar that you invoiced him, right?

18    A.  Correct.

19    Q.  He gave you a wire?

20    A.  Correct.

21    Q.  He gave you a credit card?

22    A.  I don't remember any credit card.

23    Q.  Okay.  He didn't take out a line of credit?

24    A.  No.

25    Q.  So Mr. Shea owes you zero, right?

M5P3SHE2                          Mitchell - Cross

1    A.  Zero.

2    Q.  Do you recall from looking at the invoices exactly what

3    date you guys sent out the drinks, the 50,000 drinks?

4    A.  I do not.

5             MR. MERINGOLO:  Can we pull that up just for a moment.

6    The last invoice that was pulled up.

7    Q.  That date was June 3, 2020, correct?

8    A.  That's when he was invoiced, yes.

9    Q.  And you said this was a 50,000 drink order?

10   A.  Correct.

11   Q.  And you shipped that to Florida?

12   A.  I don't remember where we shipped it to.

13   Q.  Okay.  And your company's located in Las Vegas?

14   A.  That's correct.

15   Q.  And how did you get here?

16   A.  I came by airplane.

17   Q.  That was good.  Who paid for your airplane?

18   A.  The prosecution, I guess.

19   Q.  And when was the first time the prosecution contacted you?

20   When was your first contact with the prosecution?

21   A.  I was on vacation actually so it was in -- middle of April.

22   Q.  April of 2022?

23   A.  Yes, this year.

24             MR. MERINGOLO:  No further questions.

25             THE COURT:  Redirect?

1              MS. MOE:  Very briefly, your Honor.

2    REDIRECT EXAMINATION

3    BY MS. MOE:

4    Q.  Mr. Mitchell, do you remember being asked some questions by

5    defense counsel whether you were paid for the invoices?

6    A.  Yes, from him just now, yes.

7    Q.  I believe you testified you were paid for these invoices?

8    A.  Correct.

9    Q.  Just to be clear, do you know whose money Tim Shea paid you

10   with?

11   A.  No.

12             MS. MOE:  Nothing further, your Honor.

13             MR. MERINGOLO:  Two questions.

14             THE COURT:  Go ahead.

15   RECROSS EXAMINATION

16   BY MR. MERINGOLO:

17   Q.  Two questions.  Maybe three.

18   A.  That's okay.

19   Q.  When you take -- have you ever taken a loan out for a car?

20   A.  Have I?  Personally, yes.

21   Q.  And you pay that loan back?

22   A.  Yes.

23   Q.  And then it's okay, right?  It doesn't go on your credit,

24   no one sues you.  Am I right?

25             MS. MOE:  Objection, your Honor.

M5P3SHE2                         Palmer - Direct

1          THE COURT:  Sustained.

2          MR. MERINGOLO:  No further questions.

3          THE COURT:  You may step out.

4          THE WITNESS:  Thank you.

5          (Witness excused)

6          THE COURT:  You may call your next witness.

7          MR. ROOS:  The government calls Dustin Palmer.

8    DUSTIN PALMER,

9         called as a witness by the Government,

10        having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. ROOS:

13   Q.  Good morning.  What do you do for work?

14   A.  I am a consultant and I help financial institutions to

15   comply with anti-money laundering and to find money laundering

16   and then report it to the government.

17   Q.  How long have you been doing that?

18   A.  In private practice, I've been doing it for about 11 years.

19   Q.  I am going to take a moment to go back a little bit and

20   talk about your educational background and your experience.

21   Let's start with your educational background.

22          Did you attend college?

23   A.  Yes, I did.  I attended Brigham Young University with a

24   degree in economics.

25   Q.  Did you do any type of secondary schooling?

1   A.  Yes, I went to law school after that at the University of

2   Chicago.

3   Q.  After graduation, where did you go to work?

4   A.  I worked for a year for Judge Karen Williams on the Fourth

5   Circuit in South Carolina.  And then I went to work for a law

6   firm Gibson, Dunn & Crutcher in Washington, D.C. for about four

7   years.

8   Q.  Did you enter government at some point?

9   A.  I did.  After almost four years, I went to work for the

10  Department of Homeland Security where I worked for one year.

11  And then I went to the Treasury Department for another four

12  years after that.

13  Q.  Let me take those in parts.  So at the Department of

14  Homeland Security, what was entailed in your job?

15  A.  Yeah, so I was in the legal counsel office.  I worked very

16  closely with CBP, the Customs and Border Patrol, and then ICE,

17  the Immigration and Customs Enforcement groups in their money

18  laundering investigations and advisement of the department of

19  justice as to whether or not to take certain cases.

20  Q.  Then the other part of government, can you explain what

21  your job was there?

22  A.  Yeah, so at the Treasury Department I actually first

23  started there during the financial crisis and spent the first

24  six months working on bankruptcy, which was an interesting area

25  to help out in.  But after that I continued working in the

1    anti-money laundering area along with sanctions, where I worked

2    with the undersecretary for terrorists financing and financial

3    crime.  On anti-money laundering investigations I helped with

4    the -- what was called the terrorist financing tracking program

5    to help review and set up certain patterns that may be involved

6    in terrorist financing, so we could identify those and then

7    combat it.

8    Q.  Did you leave government at some point?

9    A.  I did.  In 2011 I left government and joined a consulting

10   firm Promontory Financial, where I started to advise financial

11   issues like banks or credit unions on how to identify money

12   laundering and then report it to the government.

13   Q.  Are you still at that firm?

14   A.  I left about a year, year and a half ago, and joined a firm

15   called Berkeley Research Group, but still doing the same thing,

16   just at a new firm.

17   Q.  Do you do work now with Berkeley Research Group relating to

18   detecting or providing guidance related to money laundering?

19   A.  Yes, I do, that's the main part of my work is working with

20   different financial institutions to identify money laundering

21   and then report it to the government.

22   Q.  Have you published any articles relating to money

23   laundering?

24   A.  Yes, I have.

25   Q.  Have you lectured or given any type of speeches about money

M5P3SHE2                          Palmer - Direct

1    laundering?

2    A.  Yeah, I lecture or am on panels for money laundering

3    probably three or four times a year.

4    Q.  As part of your professional work, have you been involved

5    in designing money laundering detection programs?

6    A.  Yes, I have.  I've been involved in many of those, both in

7    setting up the systems that banks use to detect and also

8    setting up patterns of what we call typologies, so they can

9    detect those and investigate them and send them to the

10   government.

11   Q.  We are going to come back to those patterns in a bit.  Have

12   you testified in court before?

13   A.  Yes, I have.

14   Q.  Were you qualified as an expert in those cases?

15   A.  Yes.

16            MR. ROOS:  The government requests that Mr. Palmer be

17   qualified as an expert in the techniques, means, and methods of

18   money laundering.

19            MR. MERINGOLO:  Brief voir dire, Judge?

20            THE COURT:  Okay.

21   BY MR. MERINGOLO:

22   Q.  You said you were an attorney as well?

23   A.  Yes, I am.

24   Q.  You still maintain being an attorney in good standing?

25   A.  Yes, I do.

Palmer - Direct

1    Q.  What does that mean, to be an attorney in good standing?

2    A.  It means that I am active on my dues and I have not

3    violated any ethics obligations.

4    Q.  And you are up to date with your CLEs?

5    A.  That's correct.

6    Q.  That would be for the jury continuing legal education?

7    A.  Correct.

8    Q.  You said you testified in trials before, correct?

9    A.  Yes, I have.

10   Q.  How many?

11   A.  In -- in person, I've done one, and I've had a written

12   testimony in another.

13   Q.  For all of us, for me, what is a written testimony?

14   A.  So, it's the same thing that I am doing here, except it is

15   just in written form.  If the Court wants some specific

16   expertise in an area to get the Court up to speed on an area of

17   law.  So in this case it was money laundering and specifically

18   a designation of a bank as a primary money laundering concern

19   by the government.

20   Q.  So this would be -- this third time you're testifying, but

21   the second time in person, correct?

22   A.  Correct.

23   Q.  And the other case that you testified, was it a criminal

24   prosecution?

25   A.  No, it was a civil case.

M5P3SHE2                          Palmer - Direct

1    Q.  And it was a civil case.  And where was the jurisdiction?

2    A.  Miami, Florida.

3    Q.  And civil is money, right, not --

4    A.  Correct.

5    Q.  So this would be your first criminal case, correct?

6    A.  Yes.

7    Q.  And you said you work at the Berkeley Research Group?

8    A.  Yes.

9    Q.  Where is that located?

10   A.  My office is in Washington, D.C.

11   Q.  Where is -- is Berkeley in California or I'm losing it.

12   A.  It was started in Emeryville, California, but there are

13   offices everywhere.

14   Q.  And when was the first time that the government contacted

15   you to testify?

16   A.  In this case, approximately six to eight weeks ago.

17   Q.  And you have no firsthand knowledge whatsoever of anything

18   in this case?

19             MR. ROOS:  This is cross at this point.

20             MR. MERINGOLO:  We would object.  He's never been

21   qualified as an expert in a criminal case.

22             THE COURT:  Overruled.  I qualify the witness as an

23   expert in the techniques, means, and methods of money

24   laundering.

25   BY MR. ROOS:

M5P3SHE2                         Palmer - Direct

1   Q.  Mr. Palmer, I want to ask you, you were just asked a little

2   bit about Berkeley Research Group.  Are you being compensated?

3   A.  Yes, I am.

4   Q.  In relation to this matter?

5           THE COURT:  Is that a yes?

6           THE WITNESS:  Yes.

7   Q.  And do you have an hourly rate?

8   A.  Yes.  750 per hour.

9   Q.  Do you personally bill that or is that billed by your firm?

10  A.  That's billed by the firm.

11  Q.  Does your rate depend on the outcome of the case at all?

12  A.  No, it does not.

13  Q.  What about whether your firm is paid.  Does that depend on

14  the outcome of the case at all?

15  A.  No.

16  Q.  The money that's billed on this matter, does this go

17  directly to you?

18  A.  No, it goes to the firm.

19  Q.  How are you paid?

20  A.  I just get paid a regular salary regardless.

21  Q.  Do you know how much has been billed to date by your firm

22  on this matter?

23  A.  Yeah, approximately 7,800.

24  Q.  So, a little under $8,000?

25  A.  Correct.

1    Q.  Have you met with the government previously regarding your

2    testimony today?

3    A.  Yes, we've met three to four times, yeah.

4    Q.  Let's talk briefly about your involvement in this

5    particular case.

6            Do you have any personal knowledge regarding the

7    evidence in the case?

8    A.  No.

9    Q.  Have you been asked to review any of the evidence in the

10   case?

11   A.  No.

12   Q.  What, if anything, have you seen about this case?

13   A.  Just the indictment.

14   Q.  You'd agree the indictment is not evidence?

15   A.  Correct.

16   Q.  Like the judge will instruct that also.

17           Have you been asked to render any kind of opinion

18   about the conduct of the defendant in this case?

19   A.  No.

20   Q.  What is your testimony about?

21   A.  Just about the means by which or the common patterns of

22   money launders, and how money is laundered through the system

23   by individuals and small businesses.

24   Q.  So let's start with the concept of money laundering.  Could

25   you briefly describe to the members of the jury what money

1    laundering is.

2    A.   Sure.  Money laundering is the use of financial

3    transactions to conceal the origin of illegally obtained goods.

4    So, this is -- doesn't matter if they were obtained because for

5    whatever reason, drugs, fraudulently obtained money, whatever.

6    It is typically done by placing those funds into the system,

7    that's usually the first transaction.  Second of all, there is

8    usually some sort of layering that happens with multiple

9    transactions to, again, conceal the origin of the funds.  And

10   then ultimately, extraction or use of those funds to buy real

11   estate, cars, boats, luxury goods, etc.

12   Q.   What's typically the goal of money laundering?

13   A.   Well, the goal is to be able to use the money without

14   people knowing it is illegal, that it was illegally obtained

15   somehow, get it through the system so people can't track it all

16   the way.

17   Q.   Is there just one way to do money laundering?

18   A.   No, there are many, many ways.

19   Q.   Earlier in your testimony, you referenced -- earlier in

20   your testimony, you referenced patterns of money laundering.

21   And can you describe for the jury what you're referring to when

22   you said a pattern of money laundering?

23   A.   Yeah, sure.  So a pattern is a sort of -- we call them

24   typologies in the industry.  It is just a typical way that a

25   money launderer will move money through the system, and it is a

M5P3SHE2                          Palmer - Direct

way for either law enforcement, whether it is state or federal,

to identify or maybe a financial institution like a bank, they

may identify this pattern that's a typical way for money

launderers to move it, and with that they can sort of

investigate it further to determine if it is actually criminal

behavior.

Q.  And in your work, how do patterns or you also used the word

typologies come into play in anti-money laundering detection?

A.  These are very commonly used.  They come into play because

all banks use what are called transaction monitoring software.

This software, we go and we program these patterns or

typologies into the software to be able to identify potential

money laundering.  We'll go in and, for example, for

individuals and small businesses, we might program up to about

20 usually typologies of different patterns that they're

looking for.  And once that comes up, then there will be an

alert which either the bank or law enforcement can investigate

further to see if it is money laundering.

Q.  Are there certain patterns that are well recognized as

patterns of money laundering?

A.  There are.  Again around 20 that are fairly typical or

common for small businesses or individuals.

Q.  How are you familiar with those?

A.  I'm familiar with them in multiple ways.  First of all,

just my experience in working with financial institutions for

1    the last 11 years.  Plus my work at the Treasury Department and

2    Homeland Security.

3            And then second of all, there are multiple published

4    guides, one is from what's called the Federal Financial

5    Institution Examination Council, which is made up of all the

6    bank regulators in the United States, they publish a list of

7    typical patterns.  There are also certain industry groups, one

8    is the Wolfsberg Group, the other is the Egmont Group.  These

9    are bank industry groups that publish typical patterns so that

10   all banks can be looking for these types of patterns.

11   Q.  You mentioned roughly you said 20 patterns of money

12   laundering that can come up in the context of smaller

13   businesses.  Is it only 20 or are there more than 20 that

14   exist?

15   A.  There are more than 20.  But there are just 20 -- roughly

16   20 that are more common or more typical.

17   Q.  Are you familiar with those, say, roughly 20 most common

18   patterns of money laundering?

19   A.  Yes, I am.

20   Q.  These are -- when you say patterns, we are talking about

21   means and methods by which money laundering happens?

22   A.  Correct, yes.

23   Q.  What I'd like to do is I want you to explain those

24   approximately 20 patterns or means for the jury.  And that's a

25   long list so we've got a whiteboard, if it is okay with your

1    Honor.  We'd like to approach with the whiteboard, that way

2    Mr. Palmer can write them out as he's describing them.

3              THE COURT:  That's fine.

4              MR. ROOS:  Ms. Drescher, anything I can do to help?

5    Q.  Maybe we could -- I don't know if it is possible for you

6    to -- I guess you need to be seated in order to write.  I am

7    not sure the jury will be able to see it at that angle.

8    A.  I am happy to turn it.

9    Q.  Sort of three things at once.  Talk, turn it and face

10   towards the jury and write.  I think that would be ideal that

11   way.  The folks can see it?

12             THE COURT:  If you would like to stand, we do have a

13   wireless mic.

14             THE WITNESS:  That would be very helpful.  Yes, thank

15   you.

16             MR. ROOS:  Thank you.  That would be ideal if the

17   witness can stand.

18             THE COURT:  You can also reposition yourself so that

19   you're more facing more of the jurors -- I don't know if

20   everyone can see the whiteboard.

21             THE WITNESS:  Would it be okay if I moved it right

22   here maybe?

23             MR. ROOS:  I wonder if right -- if we could -- if it

24   would be okay for the witness to testify right in front of the

25   jury box and move the whiteboard right there.

1            LAW CLERK:  The jurors are asking if it is possible to

2      move the whiteboard up.

3            MR. ROOS:  Let's move it over and we can adjust it.

4      Q.  Mr. Palmer, my question to you was going to be if you could

5      identify those 20 or so patterns, and I am going to have some

6      followup questions.

7            So I am thinking you can list them with a brief

8      explanation as you write them out and then I'll ask you

9      followup questions about some of them.  Okay?

10     A.  Okay.

11           So when I discuss this with financial institutions, I

12     usually put it in four different categories.  I'll do that as

13     well here.

14           First category is an information category.  It falls

15     into two different buckets.  Number one might be a lack of

16     sufficient information or we can see incomplete information,

17     and this is so number one, might be incomplete customer info.

18     So there might be lacking name, date of birth, Social Security

19     number, address, etc. or just incomplete.

20           The second one involves incomplete transaction

21     information.  So it might be a large transaction that simply

22     has no information on it, which is a bit odd.

23           The second category of these are unusual customer

24     information.  Again, this same category, name, date of birth,

25     etc., if something is unusual there.  If it says 123 Main

1   Street as the address.   Something odd.

2         The fourth one is unusual transaction information.

3   Again, with the transaction comes through, if the memo says

4   something really unusual or odd, that would fall into that

5   category.   And then a good example of this might be a fake or

6   above-market -- I hope I'm not writing too small -- invoice.

7   This is common where something may come through, it might just

8   say "car," nothing more and it is an invoice for $200,000.

9   Right.   Typically if the car does cost that much, there is

10  usually more information than that.

11        The next category of information is something like

12  general pattern.   It applies to everybody.   And in this case

13  for general, here are some good examples.   The first one --

14  I'll keep the numbering going.   So number six just layering of

15  extra transactions.   So a situation where one transaction will

16  do, instead there might be multiple transactions within a bank.

17  Maybe it goes from Bank of America to Citibank and then back to

18  Bank of America, but it is usually layering extra transactions.

19        Another category is something called money mule.   And

20  it's somewhat similar to the layering, where instead of just

21  going from one person to another person, right.   The payor to

22  the payee, instead, now we are going to have this middle person

23  be the mule.   The money goes to the money mule first, the money

24  mule takes some percentage cut, and then sends it along to the

25  ultimate person.   And they may take 10, 15, 20 percent.   This

1  was popularized with the drug trade where they'd give the money

2  to get it back to the cartels.

3          The next category for general is called large round

4  dollar transactions.  This situation is where there are -- it

5  is a large payment or deposit, usually with three or four

6  zeros, and round, and happens multiple times in a situation

7  where that's not normal.  Oftentimes for different types of

8  invoices, they are typically precise amounts, not large round

9  dollars amounts, especially if it happens over and over again.

10          The next general one is something called structuring.

11  This happens when a money launder wants to deposit a lot of

12  money into a bank, say $18,000.  And instead of doing it in one

13  transaction, they may break it up into two.  Maybe two

14  transactions of 9,000 or three transactions of 6,000 just to

15  break it up.

16          The next one is called Smurfing.  This is where they

17  break it up into even smaller denominations, so maybe 18

18  transactions of $1,000 or 36 transactions of $500.

19          At this point I am going to run out of space so let me

20  just draw a line here.

21          The next category is sort of -- customer specific.

22  There are five or six in this category.  The first one is

23  something called living beyond means.  So I'll do 11.  This is

24  where an individual might have years of transactions that are

25  pretty typical say for a middle class person.  Then all of a

M5P3SHE2                           Palmer - Direct

1    sudden that person starts buying real estate and boats and

2    going on vacations, etc. and it is called living beyond means.

3            The next one in this category is the commingling of

4    personal and business accounts.  This oftentimes happens when

5    somebody wants to hide transactions because business accounts

6    are more active and you can hide a larger transactions there

7    than in a personal account.

8            The next one involves high volume of transactions.

9    Again, this is somewhat similar where you may have a person may

10   have a typical amount of transactions to go through their

11   account each month and all of a sudden it doubles or triples

12   and there are a huge amount of transactions going in and out.

13   It is another way to layer, but it is called high volume of

14   transactions.

15           Another one is we just referred to as cashing checks,

16   I'll write it down as 14, cashing checks.  This involves

17   someone who gets checks.  Instead of depositing them, cashing

18   them out a lot.  The reason why it's personal, sometimes there

19   are cash-intensive businesses where that's normal.  For most of

20   us, that is not normal to go out and cash out thousands of

21   dollars of checks.

22           Then 15 is something we refer to as behavioral change.

23   Again, individuals, a small business have typical behaviors.

24   There might be a massive change all of a sudden.  It might be

25   huge deposits coming in or maybe the spending going out or

1    both.  A large pattern change, we call that behavior change.

2              And the final category I refer to as related parties.

3    There are three typical ways, they're all very similar, and

4    these are fairly common methods.

5              The first one involves thinking back, looking back

6    over here to money mule.  Sort of like the money mule situation

7    but it involves related parties here.

8              The first one we call it shell companies, instead of

9    the payor paying the payee  directly, they'll send the money to

10   a shell company and then that shell company will then pass over

11   all or some portion of it to the individual.

12             Similar to shell company, it might be a situation

13   where they may use a nonprofit or a charity so the money goes

14   through that nonprofit or the charity and ultimately to the

15   payee.

16             And finally, as I wrote at the bottom, hopefully you

17   can all see that, it is family and friends.  Same idea.

18   Instead of money going directly from the payor to the payee,

19   the money will go to a spouse, a child, a parent, a friend, and

20   which will then transfer ultimately to the payee.

21   Q.  Thank you.  I think you've said -- you can --

22   A.  Should I stay here or sit back down?

23   Q.  Why don't you, if it's okay with the judge, since we'll be

24   referencing a few things on the whiteboard, maybe you can stay

25   right there.

1             THE COURT:  That's fine.

2             THE WITNESS:  Thank you, your Honor.

3             MR. ROOS:  Let me ask you first, your Honor, with

4    permission of the Court we'll put a sticker on the whiteboard

5    and offer it as an aid to the jury.

6             THE COURT:  Okay.  If you'll tell me what exhibit

7    you're identifying it.

8             MR. ROOS:  We'll offer it as 364.  Just put it up

9    here.  We'll take a picture of it later also.

10            THE COURT:  Is there any objection?

11            MR. MERINGOLO:  No objection.

12            THE COURT:  It is admitted.

13            (Government's Exhibit 364 received in evidence)

14   Q.  So, let me ask you a few questions about this.  For

15   starters I think you were saying number 20.  I see 18 up there.

16   Was this an approximation?

17   A.  Yes, it was just an approximation, yeah.

18   Q.  All right.  Understood.  Before I ask you some questions

19   about these, are these all the ways that money laundering can

20   happen?

21   A.  No.

22   Q.  So, why these then?

23   A.  Yeah, so there are certainly other ways.  Money launderers

24   can be very creative.  These are just the more typical patterns

25   that are seen within the industry.  They are also the ones that

1    are flagged by the federal financial regulators, by the Egmont

2    Group and these other groups, as the typical ways that they see

3    money laundering happen.

4    Q.   In cases that you've seen money laundering in the past, are

5    all these characteristics present, like all 18 sort of boxes

6    checked?

7    A.   No.  Rarely, if ever.

8    Q.   Should we expect like half of them to appear?

9    A.   No, it's probably more common to see somewhere between two

10   to five or two to six, somewhere in that range is more common.

11   Q.   I am going to go through some of the categories you listed

12   up here.  One of the categories you said was large or round

13   dollar transactions.  I think you said a lot of zeros.

14            Am I right there is nothing -- that people can have

15   large transactions, right?

16   A.   Absolutely.  It is only in the circumstances where it is

17   unusual for those transactions to be round.  It is usually not

18   just $100.  It is 10,000, 50,000, 100,000 or so rounded.  And

19   typically in an invoice type context where it is less common to

20   be a round dollar.

21   Q.   As you are assessing means and methods of money laundering,

22   to what extent does repetition of that pattern of multiple

23   large round transactions is that a factor at all?

24   A.   It is a factor in actually almost all of these, but

25   definitely in the round dollar.  If you just see one, usually

1    not a big deal.  If you see it happening over and over again,

2    especially in the context where it's not normal, then that can

3    make it more suspicious.

4    Q.  Let me ask about a different category or pattern there.

5    Some of the early categories you identified relate to

6    incomplete information or lack of information.  I want to ask

7    you some specific questions about that with regard to financial

8    transactions.  So, wire transfers or checks.  Does that sort of

9    phenomenon show up on wire transfers or checks?

10   A.  It does.  Typically, for wire transfers and checks, but

11   especially wire transfers, there is a memo that is filled out.

12   Especially for the larger ones, they ask for it.  So that field

13   is typically included.  If it is either not there or truncated

14   or too short or just unusual, then that's a red flag.

15   Q.  What do you mean by truncated?

16   A.  Meaning it may say one word instead of a full description

17   of what the transaction is about.  So, again, like my previous

18   example with another one, it might just say "car" but nothing

19   more than car.  Usually it will be a longer memo, longer

20   explanation, especially for the larger transactions.

21   Q.  I am going to jump around a little bit.  You mentioned

22   shell companies, that was one of the later ones.  In case we're

23   not all familiar with it, what is a shell company?

24   A.  A shell company is a company that's established but doesn't

25   actually conduct any business.  It might be held for certain

1    reasons, there are certain tax or other legitimate reasons to

2    have those.  But they're sometimes few and far between, but

3    they don't actually conduct any business.

4    Q.  I think some of us are familiar with a type of company

5    called like an LLC.  Have you heard of that?

6    A.  Yes.  Limited liability company.

7    Q.  I just want to be clear.  Is an LLC the same thing as a

8    shell company?

9    A.  No.  It could be.  I mean, but a shell company, most LLCs

10   actually conduct business.  Where a shell company does not do

11   any business.

12   Q.  Understood.

13   A.  That's the big difference.

14   Q.  So, how does a person get a shell company then?

15   A.  Yeah, well, they're fairly easy to set up, especially in

16   certain jurisdictions where it is easier to set them up.  You

17   can set it up and don't have to conduct any business.  It is

18   not a requirement of those jurisdictions to conduct business.

19   You can set up the corporation, and then put money in it.

20   Q.  What are some of those jurisdictions?

21   A.  Well, it is common, so, for example, internationally,

22   common ones are Switzerland, Cayman Islands, British Virgin

23   Islands.  In the U.S. more typical in Delaware, Nevada and

24   Wyoming.

25   Q.  Are there particular reasons why people will pick those

1  states or those countries for setting up a shell company in

2  connection with money laundering?

3  A.  Yes.  Probably three main reasons.  Number one, they are

4  easy to set up.  They are usually relatively inexpensive, and

5  the most important reason is there are usually good privacy

6  laws around disclosing the people behind the company.

7  Q.  What do you mean by that?

8  A.  Meaning that the information about the owners of the

9  company does not have to be disclosed necessarily to other

10 parties.

11 Q.  I just want to make it clear though, are there legitimate

12 reasons for having a shell company?

13 A.  There are.  There are legitimate tax reasons to have a

14 shell company.  People use them to stage a hostile takeover of

15 a company, because they can put assets in it.  So there are

16 legitimate reasons for them.

17 Q.  So it can be a sign of money laundering but there also can

18 be legitimate reasons for it.

19 A.  Yes, yup.

20 Q.  What's the advantage of using a shell company -- well, let

21 me withdrawn.  Let me try the question again.

22        For someone engaging in money laundering, what's the

23 advantage of using a shell company over say a personal account

24 or a regular business account?

25 A.  Well, it's a little bit of the layering, so you have one

M5P3SHE2                          Palmer - Direct

1    extra transaction to help hide the origin of the funds for
2    money laundering and there is also the privacy aspect.  So you
3    may not be able to see into the shell company, behind who owns
4    it, you may see the name of it.  Shell Company, LLC, whatever
5    it may be.  So those are the primary reasons.
6    Q.  You mentioned right below shell company it says nonprofits
7    or charities.  I think many of us are familiar with pretty
8    reputable charities.  Obviously we are not saying like the Red
9    Cross is a money laundering organization I don't think, right?
10   A.  Correct.  Correct.  And again, all of these are simply,
11   like, sometimes we refer to them as red flags.  Things that
12   need to be investigated further.  This is a common way that
13   money launderers move the money.  It certainly does not mean
14   all charities or nonprofits are laundering money.
15   Q.  Can you explain why the use of a charity or nonprofit can
16   be a sign of money laundering?
17   A.  Well, the main reason is if it looks unnecessary, and that
18   it conceals the origin of the funds, which is what all money
19   launderers wants to do, they want to conceal the fact it's
20   illegal and they can move it through different organizations.
21   That's the reason why they would like to use them.
22   Q.  You mentioned friends and family right below that.  That's
23   the last one on there.  Under the same sort of concept of
24   related party transactions.  I think my question is similar to
25   the last one.  If I send money to my brother, that doesn't mean

M5P3SHE2                           Palmer - Direct

1    I'm involved in money laundering right?

2    A.   Absolutely not.  And again, all of these -- and I probably

3    should have prefaced it.  These are all transactions that

4    appear to be unnecessary.  Right.  So if you send it to your

5    brother and your brother immediately sends it to someone you

6    owed money to, it might look a little more suspicious.  Just

7    sending money to friends and family, not a big deal.  Sometimes

8    there might be a reason to have that intermediary person.

9         That's why these are all red flags and not perfect

10   signals.

11   Q.   Are there other, besides shell companies, nonprofit and

12   charities, friends and family, are there other types of

13   intermediaries that are sometimes used?

14   A.   There are.  There are a lot of different ways to do it.

15   Sometimes people will set up even their own accounts in

16   different institutions to sort of hide it.  So there are a lot

17   of different ways, again, money launders can be very creative.

18   These are just the most common ones.

19   Q.   What about the use of professionals?

20   A.   Certainly some of the biggest cases have involved

21   accounting firms or law firms or other firms like that where

22   money may go into a large fund or account and then it can come

23   back out.  That way, which is part of the reason why some of

24   these parties, like lawyers or accountants or professional

25   service providers, are typically looked at as higher risk for

M5P3SHE2                        Palmer - Direct

1    money laundering.  Because of that.

2    Q.  I want to switch to a different concept.  On the top-right

3    side, you have the word layering.  Can you explain what that

4    means?  I think that's maybe not a term we are all familiar

5    with.

6    A.  Yeah, and it's similar to a few others, but it's simply

7    engaging in more transactions than are necessary for the

8    transaction.

9         If I need to pay one other person, so I am the payor,

10   and I need to give it to the payee, then it's usually just a

11   direct transaction.  But usually layering involves multiple

12   hops.  They want to hide it.  Sometimes it will involve

13   multiple accounts within one bank.  It could involve accounts

14   to other banks or to other people or maybe even to myself in

15   other banks.

16        But ultimately just means extra transactions when only

17   one or two will do.

18   Q.  Can you give us an example?

19   A.  Yeah.  So, I mean the most common example is to -- if I

20   have money in Bank of America, I send it to an account in

21   Citibank, and then I send that money to an account in Fifth

22   Third, and I ultimately pay the person I want it to get to.

23   There are essentially two extra hops or three extra hops that

24   were unnecessary.

25   Q.  Right below there is your little I guess chart of three

M5P3SHE2                        Palmer - Direct

1   people.  And you described that as money mule.  I think you
2   even referenced this.  Some of us are familiar with money mule
3   from like something we've seen on TV, regarding sale of drugs
4   and cartels.
5           Can this concept or term apply in other contexts, like
6   in a white collar or fraud context?
7   A.  Absolutely.  This money mule idea can apply across the
8   board.  So, again, if you want to be able to conceal the money
9   and you want to get it to a party that looks innocent.  One
10  good way is to give it to a party that is innocent.  For their
11  risk premium or the amount they hold, they might keep a
12  percentage back, and then they pass the rest of it on to the
13  ultimate payee.
14  Q.  What's the purpose of having a money mule?
15  A.  Just to conceal where the money is coming from.  If you
16  want to conceal it is coming from this first payor, you want to
17  give it to some intermediary party so when that bank sees that
18  last transaction, they won't see it's coming, in this case,
19  from the payor.  It is coming from the mule who is an innocent
20  party.
21  Q.  The other side you referenced either fake invoicing or
22  above market invoicing.  Can you explain what you're referring
23  to with that?
24  A.  Yeah.  So this is a situation where there is an invoice
25  that is either fake, like it's not legitimate, whatever, there

1   were no goods transacted at all, it just makes it look like

2   there were goods that were transacted.  Or in my car example, a

3   good might be transacted but it is way above market value.

4   They are giving all that extra money so they can launder that

5   money and make it appear legitimate.

6   Q.   Connected to that, are you familiar with the concept of

7   papering or papering a transaction?

8   A.   Yes.

9   Q.   What does that mean?

10  A.   Papering a transaction is when the parties will put

11  together papers either before or after the transaction to make

12  sure that others when they see the transaction get the

13  appropriate impression.  It can sometimes be used in a

14  fraudulent way, in this case like for money laundering, if they

15  want people to think a car was transacted, they might write

16  that down even though it actually was not.

17  Q.   From your experience, what are some of the signs a

18  transaction has been papered?

19  A.   Especially if it has been papered in an illegitimate way,

20  oftentimes it happens after the fact or it's sloppy.  There are

21  other indications on there, the dates are wrong or other

22  information is incorrect or unusual.

23          MR. ROOS:  Just a few more followups on this.

24  Q.   Back to the concept of shell company.  Can a company serve

25  sort of a mixed use, like some work can be done but it can also

1    be a vehicle for money laundering?

2    A.   Absolutely.  It is similar to the nonprofit or charity

3    situation.  Where oftentimes they are legitimate nonprofit or

4    charities, but they funds can be laundered through them.  So

5    same thing can happen with a shell company.  In that case it

6    may not be a shell company, but it may be laundered through a

7    company.  But, it can absolutely happen.  It can happen through

8    any party.  Those three are just the most common.

9    Q.   Then one more followup question on the money mule, so the

10   three little stick figures.  I think you maybe said it could

11   be -- the middle person could be an innocent party.  Did I

12   understand that right?

13   A.   Yeah, in other words, they might appear to be innocent.  In

14   other words, they are certainly part of the money laundering

15   because it is illegal to actually move fraudulent or illegal

16   money through the system.  But they will look innocent to the

17   last party when they see that transaction.

18   Q.   I see.  So, what do you mean by they would look innocent?

19   A.   So, again, I'll use the drug example.  So the first person

20   sharing the money might be someone who is known to be involved

21   in the drug trade.  Right.  So they are known to be involved in

22   that.  But if they get to the person in the middle, that person

23   is not known to be involved in the drug trade, so they look,

24   they appear innocent.  So when anybody sees that last

25   transaction, when it gets to the payee, it will look like an

1    innocent transaction because it will not be connected to the

2    first person who may have some criminal taint to what they are

3    doing.

4              MR. ROOS:  No further questions.

5              THE COURT:  Cross-examination.

6    CROSS-EXAMINATION

7    BY MR. MERINGOLO:

8    Q.  Good afternoon, Mr. Palmer.  I'm John Meringolo.  I

9    represent Timothy Shea.

10             You can sit down.

11   A.  Thank you.

12             MR. ROOS:  Your Honor, if it would be helpful we can

13   move the whiteboard also.

14             THE COURT:  You can move it.

15             MR. MERINGOLO:  We may use it.

16             THE COURT:  Okay.

17   Q.  Sir, you testified on direct examination that you are

18   getting paid $7,500?

19   A.  I testified that so far I have billed about $7,800 for

20   this, yes.

21   Q.  And you're billing at $750 an hour?

22   A.  Correct.

23   Q.  And you worked for this Berkeley Group in Washington?

24   A.  Yes.

25   Q.  And are you aware that the government paid the Berkeley

M5P3SHE2                            Palmer - Cross

1   group $65,000 for your testimony?

2   A.  I am not aware of that.  I think the contract says it can

3   go up that high.  But they have not paid, we've only invoiced

4   for $7,800.

5   Q.  And your testimony is that you are getting paid $750 an

6   hour?

7   A.  Yes.

8   Q.  Well, I am going to -- I want to see -- so your testimony

9   is you only billed $7,500, correct?

10  A.  So far, correct.  So far I've only billed $7,800.

11  Q.  Do you recall ever billing $30,000 at $1,000 an hour to

12  examine this case?

13  A.  No.

14  Q.  Do you recall billing $30,000 to prepare for testimony?

15  A.  No, I have not billed for that.

16  Q.  Do you know your company, did you ever see the contract

17  between the company and the government?

18          MR. ROOS:  Your Honor, objection.  He's misreading the

19  contract.  I think the witness already testified this is the

20  cap, not what's actually been paid.

21  Q.  So you're capped at $65,000; is that correct?

22  A.  Yes.

23  Q.  And you're capped to examine this case at $1,000 an hour

24  for 30 hours, correct?

25  A.  I know, I'm pretty sure it is 30,000.  30,000.  I'm billing

M5P3SHE2                          Palmer - Cross

1    at 750 per hour.

2    Q.  And your company may have an upsell?

3    A.  No, it's 750 total.  I do not -- that's all they get is 750

4    per hour.

5    Q.  Isn't it a fact the contract says $1,000 an hour?

6              MR. ROOS:  The contract is not in evidence.

7              MR. MERINGOLO:  May I try to refresh your

8    recollection.  Will it refresh your recollection.

9              THE COURT:  He hasn't said he doesn't recall.

10   Q.  Do you recall billing $1,000 an hour?

11   A.  I have not billed $1,000 an hour.  I've only billed 750 per

12   hour in this case.

13   Q.  Has anybody at the Berkeley Group ever said we are going to

14   bill $1,000 an hour?

15   A.  To my knowledge, no.

16   Q.  Have you ever seen any documents that says we are going to

17   bill $30,000 to examine the case?

18             MR. ROOS:  Objection.  I think he's misstating.

19   Q.  Have you ever seen any documents?  You can say no.

20   A.  I have seen e-mails where we talked about that we would

21   bill up to 65,000 for the case, and I am billing at 750 per

22   hour.

23   Q.  You've only billed 10 hours so far?

24   A.  I don't remember the exact number of hours.  I remember

25   seeing the invoice and the invoice was for 7,800.  So I have a

M5P3SHE2                          Palmer - Cross

1    senior associate who worked on this for a few hours as well,

2    and he billed out at $280 per hour.  So some combination of the

3    two of us for that last invoice was 7,800.

4    Q.  You have a senior associate and what did he bill or she

5    bill at?

6    A.  He billed at 280 per hour.  $280 per hour.

7    Q.  What's his name?

8    A.  Connor Stanhope.

9    Q.  Do you know how many hours he billed at $280?

10   A.  No, not off the top of my head.

11   Q.  Do you know if anybody else billed the government for this

12   case in your Berkeley organization?

13   A.  Nobody else has billed in this case.

14   Q.  So, is your testimony between you and the gentleman so far

15   you've only billed $7,800?

16   A.  That is all we've invoiced for.

17   Q.  When was that invoice, sir?

18   A.  It was sent in early to mid May for the work up until that

19   point.  I don't know the exact date.

20   Q.  So, are you aware when you were contracted on this case,

21   when you started to work?

22   A.  I don't know the exact date.  Probably late April.

23   Q.  Would it be April 22, 2022?

24   A.  That sounds correct.

25   Q.  So April 22, 2022, did you even know about this case?

M5P3SHE2                        Palmer - Cross

1    A.  Yes.

2    Q.  Prior to that?

3    A.  We did an initial research when we first received it.

4    Q.  When did you receive that?

5    A.  In late April.

6    Q.  So, April -- that's when you first became aware of this

7    case, April 21, 2022?

8    A.  Approximately, yes.

9    Q.  And then, your last invoice was mid May, right?

10   A.  Early to mid May.

11   Q.  Early to mid May?

12   A.  I don't remember exactly when we sent off the invoice.

13   Q.  Since early to mid May, you've met with the government,

14   right?

15   A.  Yes.

16   Q.  You've gone over your testimony that you just testified to?

17   A.  Yes.

18   Q.  You did the questions and answers like you just did now?

19   A.  Mostly, yes.

20   Q.  You went over the 20 points?

21   A.  Yes.

22   Q.  16 points.  And then, they asked you to explain things

23   because you are an expert, right?

24   A.  Yes.

25   Q.  So did you know how many hours now you've billed since

M5P3SHE2                         Palmer - Cross

1    early May until today?

2    A.  I do not.  I have not looked recently.

3    Q.  Could you guesstimate how many hours you billed?

4            THE COURT:  Don't ask the witness to guess.

5    Q.  Are you aware -- no.  Sorry, Judge, I'm very rusty.

6            You think you billed more than 20 hours since early

7    May?

8    A.  I do not know.

9    Q.  You don't know how many hours you billed to prepare since

10   mid May?

11   A.  No.

12   Q.  How many cases are you preparing to testify for right now?

13   A.  One.

14   Q.  And this case is a pretty big case, it is a criminal case,

15   right?

16   A.  Yes.

17   Q.  This case is in the Southern District of New York, right?

18           MR. ROOS:  Objection.

19           THE COURT:  Overruled.  You may answer whether or not

20   we are in the Southern District of New York.  Go ahead.

21   Q.  You knew you were going to testify in the Southern District

22   of New York, right?

23   A.  Yes.

24   Q.  Okay.  And it is a pretty big deal, right?

25   A.  Yes, but I am an expert in this and I deal with these exact

M5P3SHE2                         Palmer - Cross

1   typologies all the time, so it does not take a significant

2   amount of time for me to, you know, learn them.  I already know

3   them.

4   Q.  Okay.  So how much time did you spend if it's not a

5   significant amount of time?

6   A.  I don't know because I have not looked at my exact hours

7   that I've spent.

8   Q.  What would you categorize as a significant amount of time,

9   sir?

10  A.  Over 60 or 80 hours.

11  Q.  So if you billed 60 or 80 hours, that would be 60 to

12  80,000, right?

13  A.  Yup.

14  Q.  That would actually exceed the retainer of 65,000, right --

15  withdrawn.  Sorry, Judge.  Okay.

16          So, the government paid for your travel, right?

17  A.  Yes.

18  Q.  You haven't invoiced them for your travel?

19  A.  Yes.

20  Q.  Are you paid per hour as you travel up from D.C. to here or

21  is it a flat fee?

22  A.  I am just paid for the time that I work on the case.  I am

23  not charging for the time that I travel.

24  Q.  Did you review specific materials on this case?

25  A.  The only thing that I've reviewed is the indictment.

M5P3SHE2                          Palmer - Cross

1   Q.  How long did it take you to review the indictment?

2   A.  Probably 30 minutes.

3   Q.  So, you have no idea of any of the material in this case,

4   right?

5   A.  Any of the evidence?  I've not seen the evidence, correct.

6   Q.  And you have no past dealings with Mr. Shea?

7   A.  Correct.

8   Q.  You don't know Mr. Shea's business practices?

9   A.  Correct.

10  Q.  And you testified about all these money laundering things,

11  right --

12  A.  Patterns.

13  Q.  You are aware that there is over 30 million LLCs and small

14  businesses in this country?

15  A.  I do not know the exact number.

16  Q.  But there is a lot, right?

17  A.  Yes.

18  Q.  And people open businesses for a number of reasons,

19  correct?

20  A.  Yes.

21  Q.  People open businesses, you said Wyoming, Delaware, maybe

22  for tax structure?

23  A.  Yes.

24  Q.  And people open businesses because they don't want anyone

25  to know where they live or where they live or where their

1    businesses is, right?

2    A.  For privacy reasons, certainly.

3    Q.  Privacy reasons could be security reasons as well, for

4    their personal well being?

5    A.  Yes.

6    Q.  Certainly it's not a crime to want to hide where your

7    residence is, right?  Is it a crime to hide?

8    A.  No, it is not.  These are just indicia.

9    Q.  You have no idea what's going on here, right?

10   A.  Right.  Which is why these are the patterns, typologies,

11   they get investigated.

12            MR. ROOS:  If he can let the witness finish his

13   answers.

14            THE COURT:  Did you want to say anything further?

15            THE WITNESS:  That's all.

16   Q.  It is similar to like a fraud alert on your cell phone from

17   your credit card, right?  Like there are things that trigger

18   things, right?

19   A.  It is similar in that regard.  There is a pattern that was

20   triggered and thus an alert was created which needs to be

21   investigated to determine if there is actually money

22   laundering.

23   Q.  Sometimes you do a credit card transaction or you deposit a

24   check or write a check and you'll get an alert on your phone.

25   Are you aware of that?

M5P3SHE2                            Palmer - Cross

1    A.  Yes.

2    Q.  And in your experience, 99 percent of the time it's not a

3    fraud, right?

4             MR. ROOS:  Objection.  He's not a credit card expert

5    here.

6             THE COURT:  Sustained.

7    Q.  With these fraud alerts, you would either say yes or no,

8    right?

9    A.  When I respond to them?

10   Q.  Yeah.

11   A.  Yes.

12   Q.  Even you, with all your experience, sometimes you get fraud

13   alerts, right?

14            MR. ROOS:  I am not sure why we're talking about

15   credit card fraud alerts.

16            THE COURT:  As much as I'm interested in his credit

17   card fraud alerts, I don't think it's relevant to the case.  Go

18   ahead.

19   Q.  So, you have no idea of the evidence in this case, correct?

20            MR. ROOS:  Asked and answered.

21            THE COURT:  Sustained.

22   Q.  You have no idea of Brian Kolfage and Mr. Shea's

23   relationship, right?

24            MR. ROOS:  Asked and answered.

25            THE COURT:  Sustained.

1    Q.  You have no idea of what Freedom Daily does?

2              MR. ROOS:  That's asked and answer.

3              THE COURT:  Outside of the scope, counsel.

4              MR. MERINGOLO:  Okay, okay.

5    Q.  I'll move on from all those questions.

6              We can agree people do business in different ways,

7    right?

8    A.  Yes.

9    Q.  And you said sometimes if there is a large transaction, and

10   then you immediately wire it out, that would be something that

11   happens in money laundering.

12             In your opinion, that would be one of your 16 things?

13   A.  I don't know if that's sufficient.  Just a large

14   transaction that gets wired out.  I mean, there are a lot of

15   large transactions that get wired out that are not -- as long

16   as there is, you know, not unusual, the information is

17   complete, there is no other suspicious indicia.  Yeah.

18   Q.  So if I got a transaction tomorrow and then I immediately

19   wired money to Angelica or Clara, any transaction, with

20   multiple zeros, flat fee.  Would that be considered something

21   that would trigger a rise from the money laundering department

22   in the bank?

23   A.  It could if you were an unnecessary party.  If you were the

24   unnecessary party, and it went through you, then it could

25   trigger an alert because it would be an unnecessary transaction

1    that could be an indication of layering.

2    Q.  And what would happen, the bank would call you immediately

3    and ask --

4    A.  Typically, no.  Typically the bank would do its own

5    internal investigation, it would look to see if it had

6    information to determine if it was a money laundering or not.

7    They might reach out to you.  They may not.

8    Q.  Then when a bank would have its own internal investigation,

9    they may call me, right?

10   A.  They might.

11   Q.  They may say, John, what the hell is going on with this

12   money going in and out of your account, right?

13   A.  They might.

14   Q.  And I would give them an answer, right?

15   A.  Presumably, yes.

16   Q.  And what would happen if they weren't satisfied with my

17   answer?

18   A.  So if they were not satisfied, and the transaction

19   otherwise looked suspicious, like it might be money laundering,

20   they would fill out what's called a suspicious activity report

21   or a SAR.  And they would file that SAR with the government as

22   potentially money laundering.  And then at that point, it would

23   be on the government to do its own internal investigation to

24   decide if it was a criminal or not.

25   Q.  You are an attorney, correct, in good standing?

Palmer - Cross

1    A.  Yes.

2    Q.  And I am not trying to be difficult.  Just my voice.

3          So, you said that sometimes -- do you ever memorialize

4    a contract that you had in your experience?

5          MR. ROOS:  Objection, this.  Is way outside the scope.

6          THE COURT:  Sustained.

7    Q.  Didn't you testify on direct examination that sometimes

8    people -- hold on.  Do fake invoicing --

9          THE COURT:  You asked him whether he had memorialized

10   a contract.  That was the question.  So let's come up with a

11   question that's relevant to the case, counsel.

12         MR. MERINGOLO:  Okay.  Sorry, Judge.

13   Q.  You said that there is fake invoicing.  Correct?

14   A.  Yes.

15   Q.  And you also said that sometimes that people would increase

16   their invoice, right?

17   A.  Yes.  That's above market invoicing is what we call it.

18   Q.  Above market?

19   A.  Above market.

20   Q.  But people are allowed to do -- if I'm going to contract

21   say Angelica or Clara, although we are a team for the last 15

22   years, if I am going to contract Angelica and Clara, so to

23   speak, the two lawyers at the end of the table, that's

24   perfectly okay, right?

25         MR. ROOS:  Objection.

1            THE COURT:  I'll allow the answer.

2    A.   Presumably.

3    Q.   And if we are going to do a transaction, that I send them

4    money, and then we memorialize the contract at a future date,

5    is anything wrong with that?

6            MR. ROOS:  Objection.

7            THE COURT:  So this is well outside the scope of his

8    expertise.  So I'm going to sustain the objection.

9            MR. MERINGOLO:  Okay.  All right.  I'll go through my

10   notes and I'll be done.  I try to go as quick as possible,

11   Judge.

12   Q.   People open up companies when they start new businesses,

13   correct?

14   A.   Usually, yes.

15   Q.   Like a startup would open a new company, right?

16   A.   Yes.

17   Q.   And then sometimes when you have a business opportunity,

18   you would open up a new company, correct?

19   A.   Yup.

20   Q.   There is nothing wrong with that, right?

21   A.   Yes.

22   Q.   And I wouldn't know if I'm -- if someone --

23           MR. ROOS:  Objection to the last question.

24           MR. MERINGOLO:  We're going to just stop this.

25           THE COURT:  One moment.

M5P3SHE2                            Palmer - Cross

1              You can answer whether or not if you have a business

2      opportunity you might open a company.  You can answer that

3      question.

4              THE WITNESS:  You might.

5              MR. MERINGOLO:  Thank you.

6              No questions, Judge.  Thank you very much.

7              THE COURT:  Redirect?

8              MR. ROOS:  No redirect, your Honor.  So the witness

9      can be excused.  But if we can have a side bar.

10             (Witness Excused)

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. ROOS:  Your Honor, I've asked for a sidebar

3    because there -- it's a quarter to 1.  We could call our next

4    witness.  He is the witness that needs to be immunized, which I

5    know courts will sometimes do the formal immunity outside the

6    presence of the jury, so I thought maybe it's appropriate to

7    just take the lunch break now, so we can do that immunity.  And

8    then start him right after the lunch break.

9          THE COURT:  That's fine.

10         MR. ROOS:  Just to give your Honor a sense, we can do

11   this on the public record.  We are going to rest today.  We

12   have a few stipulations and three witnesses left and I can't

13   imagine they are going to fill the three hours that we'll have

14   after the lunch break.

15         THE COURT:  Will you be ready with your first witness,

16   will you put on a defense?

17         MR. MERINGOLO:  We'll be ready.  They were going to

18   call this gentleman by the name of Kris Kobach, Judge, and his

19   lawyer told me late last night, not the government, that he

20   wasn't being called.  So I'm having him fly in and he's flying

21   in tonight.  So he'll be ready in the morning.

22         THE COURT:  Okay.

23         MR. MERINGOLO:  If we can agree to some stipulations

24   at lunch, I'll start reading the stipulations right away.

25         MR. ROOS:  We'll talk to them about stipulations.

1          MR. MERINGOLO:  If they want to stipulate to

2   Mr. Kobach what he's going to testify to two videos, a few

3   things I don't have to call him and he doesn't have to get on

4   the plane at 5 o'clock.  But if not, we'll have to call him.

5          MR. ROOS:  On the stipulation thing, I think basically

6   we have an objection to those two videos on 401 and 403

7   grounds.  Now, if your Honor agrees with us, there may not be a

8   reason to call Mr. Kobach.  If you agree with Mr. Meringolo on

9   the other hand, then I think we could probably just stipulate

10  to them.  We'll have lost our objection.  So maybe it makes

11  sense for us to confer, we can raise the relevancy prejudicial

12  exhibits before your Honor, get a ruling.  And then if we lose,

13  then we will just stipulate so Mr. Meringolo doesn't have to

14  call the witness.

15         THE COURT:  Are you saying then that you would be, we

16  would be having this discussion after you rest?

17         MR. ROOS:  I think probably what makes sense is we

18  will, we'll talk to the defense team during lunch about the

19  stipulations they want.  We could then either at the end of the

20  day or when the government rests, then raise these issues with

21  your Honor, and then tomorrow either the defense can put on

22  their stipulations and rest or they can call their witnesses.

23         MR. MERINGOLO:  It's fine if we don't call -- I don't

24  believe we are going to get through our e-mails which it is

25  what it is.  But if we have stipulations, and not the

1    testimony, you can give them off tomorrow and I can do it

2    within 15 minutes.  If we had the e-mails it is going to take

3    30 minutes on Tuesday.  Meaning it is up to you.

4            THE COURT:  Is there a possibility that you would sum

5    up tomorrow?

6            MR. ROOS:  I mean, it sort of depends what's happening

7    with the defense case.  It seems like it is not completely

8    clear.  We would ask for a little bit of time.  We would like

9    to know, like have an evening to know what the defense evidence

10   is before we sum up on it.  That's our only request.  If they

11   are putting it on tomorrow, we'd ask for Tuesday.  If they are

12   putting it on today, we'd close tomorrow.

13           MR. MERINGOLO:  We're ready.

14           THE COURT:  I'm going to tell them to come back at 2.

15           MS. MOE:  Your Honor, sorry.  Just on logistics should

16   we tell the witness to come back at 1:50 so we can take care of

17   the immunity before he testifies or should we take care of that

18   at 2?

19           THE COURT:  Does the defense take any position on this

20   issue?

21           MR. MERINGOLO:  I don't know the law.  If we should --

22   I don't know if we should preserve the client's rights to

23   object or not.  I have no idea.  Let me ask.

24           MR. ROOS:  My understanding is they don't have a say.

25           MR. MERINGOLO:  I've never been in a trial where it's

M5P3SHE2                              Palmer - Cross

1   happened.

2           MS. MOE:  Your Honor, in terms of what we have in

3   mind, traditionally I think what happens is, the witness is on

4   the witness stand, outside the presence of the jury is asked

5   three simple questions where he invokes and it makes clear on

6   the record he would invoke if asked questions.  And the last

7   paragraph of your Honor's immunity order provides that the

8   order doesn't take effect unless and until the witness does

9   just, that invoke his right against self-incrimination, after

10  asking those three questions.  So the jury can be brought in to

11  hear his testimony.  We'll of course ask him questions about

12  the immunity order in front of the jury.  It doesn't take

13  effect until he invokes.

14          Of course if the defense prefers he invoke in front of

15  the jury, we take no position.

16          THE COURT:  I have to say, I have done it the other

17  way, but I don't have a problem doing the way you suggested.

18          MS. MOE:  Thank you, your Honor.

19          (In open court)

20          THE COURT:  Members of the jury, we are ready for our

21  lunch break.  So, you'll be coming back at 2.  Remember that

22  you're not allowed to discuss the case among yourselves or with

23  anyone else.  Don't allow anyone to discuss the case in your

24  presence.  Have a good lunch.

25          (Jury excused)

M5P3SHE2                        Palmer - Cross

1              THE COURT:  All right then.  Please be seated.  So, we

2       will resume at 10 to 2 to discuss the matter that we discussed

3       at the sidebar.

4              MS. MOE:  Thank you, your Honor.

5              (Luncheon recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

M5PVSHE3

```
 1                    A F T E R N O O N   S E S S I O N

 2                            2:00 P.M.

 3            (Jury not present)

 4            MR. ROOS:  One thing, your Honor, in terms of the

 5   government's and defense plans.  I think we've made some

 6   progress on stipulations, which may eliminate the need for

 7   witnesses.  If it would be okay with everyone, we propose that

 8   we will call our witnesses today, put in our stips.  But if

 9   it's okay with the Court, we'll formally just rest tomorrow

10   morning; that way, in case there's any sort of developments

11   with the stips over the night or something like that, we can

12   just sort of do that.  We'll do it first thing.  We're not

13   going to call anyone else.

14            THE COURT:  That's okay.

15            MR. MERINGOLO:  Judge, if we get all these stips we're

16   going to be 15 minutes.

17            THE COURT:  Do you still want to wait till Tuesday to

18   sum up?

19            MR. MERINGOLO:  Judge, there's only one issue.

20            THE COURT:  You don't have to make up your minds now.

21   I just want to get going with this witness.

22            MS. MOE:  Would you like us to bring the witness in?

23            THE COURT:  Please do.

24            MS. MOE:  Thank you.

25            THE COURT:  Let's get going.
```

M5PVSHE3                        Billue - Direct

ROBERT BILLUE,

         called as a witness by the Government,

         having been duly sworn, testified as follows:

              THE LAW CLERK:  State and spell your name for the
record.

              THE WITNESS:  My name is Robert Billue; R-O-B-E-R-T,
B-I-L-L-U-E.

              THE COURT:  Go ahead.

              MS. MOE:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. MOE:

Q.  Good afternoon, Mr. Billue.

A.  Good afternoon.

Q.  Mr. Billue, would you refuse to testify today if you did
not have court-ordered immunity?

A.  Yes.

Q.  And is that because your testimony would incriminate you?

A.  Correct.

Q.  If you were asked questions today without an immunity
order, would you invoke your Fifth Amendment right against
self-incrimination?

A.  I would.

              MS. MOE:  Thank you, your Honor.

              THE COURT:  All right.  You may step out.

              (Witness not present)

1          THE COURT:  So I'm going to want to swear him again

2    before the jury.

3          MS. MOE:  Yes, your Honor.

4          THE COURT:  I have to take care of one matter before

5    we start.

6          (Recess)

7          (Jury present)

8          THE COURT:  Do the parties agree that all jurors are

9    present and properly seated?

10          MS. MOE:  Yes, your Honor.

11          MR. MERINGOLO:  Yes, Judge.

12          THE COURT:  Please be seated.  And government, would

13    you call the next witness.

14          MS. MOE:  Yes, your Honor.

15          The government calls Robert Billue.

16     ROBERT BILLUE,

17        called as a witness by the Government,

18        having been duly sworn, testified as follows:

19          THE COURT:  Please state your name and spell it.

20          THE WITNESS:  Robert Billue; R-O-B-E-R-T, B-I-L-L-U-E.

21          THE COURT:  You may inquire.

22    DIRECT EXAMINATION

23    BY MS. MOE:

24    Q.  Good afternoon, Mr. Billue.

25    A.  Good afternoon.

M5PVSHE3                          Billue - Direct

1    Q.   Where do you work?

2    A.   I work at Synovus Bank.

3    Q.   What is Synovus Bank?

4    A.   Synovus is a regional bank headquartered in Georgia that we

5    provide retail and commercial banking services to companies

6    throughout the southeast.

7    Q.   And how long have you worked there?

8    A.   Fifteen years.

9    Q.   What is your title at Synovus Bank?

10   A.   Community president or community executive.

11   Q.   What are your duties and responsibilities as a community

12   executive at Synovus Bank?

13   A.   My duties are twofold.  Number one, to bring in new

14   business to the bank, so to solicit new customers; and also to

15   manage a book of business and as well as I have a commercial

16   team of three lenders that report to me as well.  So I'm a

17   team -- a team manager or team lead also.

18   Q.   And where is your office located at Synovus?

19   A.   It's located in Douglasville, Georgia, just west of

20   Atlanta.

21   Q.   Now, did there come a time when an organization called We

22   Build the Wall became a customer at Synovus bank?

23   A.   Yes.

24   Q.   And approximately when was that?

25   A.   Around February of 2019.

1    Q.  What responsibilities, if any, did you have in connection
2    with that account?
3    A.  Just setting up the account at the bank, working with the
4    representatives of We Build the Wall to open the account, and
5    set up the banking services for the -- for -- the checking
6    account for the company.
7    Q.  At the time that We Build the Wall was a customer at
8    Synovus Bank, what was your understanding at the time of what
9    We Build the Wall was?
10   A.  My understanding was that they were a nonprofit
11   organization that was set up to receive donated funds that
12   would be used to build a wall, a private wall on the southern
13   border.
14   Q.  What was the nature of We Build the Wall's banking
15   relationship with Synovus?
16   A.  It was a strictly depository relationship, meaning that we
17   set up the checking account for the company and managing the
18   inflows and outflows related to the operations of the business.
19   Q.  Who was your point of contact for We Build the Wall when
20   you worked on this account?
21   A.  Initially it was Rich Kaye to get the account set up.  And
22   then after that it was mainly Andrew Badolato, I believe, is
23   his last name.  And he was kind of the main point of contact.
24   Q.  And aside from those two people, did you ever have any
25   communications with anyone else at We Build the Wall?

1    A.  I think one or two phone calls included Brian Kolfage.

2    Q.  Did there come a time when the bank decided to close the

3    account?

4    A.  Yes.

5    Q.  And approximately when was that?

6    A.  Around April 30th, roughly two months after the account was

7    opened.

8    Q.  Who, if anyone, did you notify that the account was being

9    closed?

10   A.  Well, the first contact was Rich Kaye, and he was the main

11   person that I contacted.  And I think after that, I think I

12   contacted Andrew as well.

13   Q.  I want to direct your attention now to October of 2019.

14   Did there come a time that month when you received a grand jury

15   subpoena?

16   A.  There did.  There was.

17           MS. MOE:  Your Honor, may I approach the witness?

18   We're having some issues with the tech, so I just want to show

19   hard copies, if that's all right.

20           THE COURT:  That's fine.

21           MS. MOE:  I've handed the witness what's been marked

22   for identification as Government Exhibits 551 and 751 just for

23   the record.

24   Q.  So focusing on Government Exhibit 551, do you recognize

25   that?

1    A.  I do.

2    Q.  What is Government Exhibit 551?

3    A.  This is the subpoena from the Southern District of New York

4    presented to the Synovus Bank legal department.

5    Q.  Is that a fair and accurate copy of the grand jury subpoena

6    that you received?

7    A.  It is.

8             MS. MOE:  Your Honor, the government offers Government

9    Exhibit 551.

10            MR. MERINGOLO:  No objection.

11            THE COURT:  It is admitted.

12            (Government's Exhibit 551 received in evidence)

13            MS. MOE:  Thank you, your Honor.

14            Can we publish that.  Thank you.

15   Q.  All right.  So I want to talk to you about this subpoena.

16            MS. MOE:  If we could just highlight the top half.

17   Q.  Mr. Billue, who issued this grand jury subpoena?

18   A.  The Southern District of New York.

19   Q.  And who is the subpoena addressed to?

20   A.  Synovus Bank, attention the legal department.

21   Q.  How did you first become aware of the subpoena?

22   A.  By an email, October 21st.

23   Q.  And was that bank -- was that email from the bank or from

24   someone else?

25   A.  It was generated from our bank's legal department.

M5PVSHE3                              Billue - Direct

1   Q.  When you got that email, was this subpoena attached to it?

2   A.  It was.

3   Q.  And just so we're clear, approximately when did you receive

4   that email with the subpoena?

5   A.  I think it was around 3 p.m. on October 10th.

6   Q.  And when you saw the email with the subpoena, what did you

7   do next?

8   A.  Well, my first thought was to -- not knowing exactly what

9   it was, my first thought was to contact Rich Kaye, who was a

10  representation from the client and ask him what this was.

11  Q.  Did you speak with him that day?

12  A.  I did.

13  Q.  What do you remember telling Rich Kaye during that phone

14  call?

15  A.  I remember asking him if he was -- what this was and if he

16  was aware of it.  And he said that he was not.  And he asked me

17  specifically what the document stated.  And I remember reading

18  to him pretty much what's on this first page to him, who it was

19  from, the codes that it was identified, and pretty much

20  everything on the first page probably identified to him.

21  Q.  I think you mentioned just now that you read over the phone

22  the codes that are here.  So I just want to focus on that for a

23  moment.

24          MS. MOE:  If we could highlight the middle of the

25  subpoena on the first page.

Billue - Direct

1    Q.  Do you see where it says:  The appearance is to testify and

2    give evidence in regard to an alleged violation of, and then it

3    says, 18 United States Code, Sections 1341, 1343, 1349, and

4    1956?

5    A.  Yes.

6    Q.  And is that what you read over the phone?

7    A.  It is.

8    Q.  And then I believe you mentioned that you read over the

9    phone who it was from.

10          MS. MOE:  Can we just highlight the bottom block.

11   Q.  Is that the information you shared?

12   A.  Correct.

13   Q.  When you shared the information about this subpoena, how

14   did Rich Kaye respond?

15   A.  He wasn't aware of it, and I think he was trying to figure

16   out what it was as well.  And so he asked me to share a copy

17   with him by email.

18   Q.  And when he asked you that, what did you do?

19   A.  I told him I'd have to speak with my bank's legal

20   department before I could do that.

21   Q.  After you got off the phone with Rich Kaye, did you

22   continue to review the subpoena?

23   A.  I did.

24   Q.  And when you did that, what, if anything, did you notice?

25   A.  Well, on page 3 I noticed the warning disclosure associated

M5PVSHE3                        Billue - Direct

1   with the subpoena.

2   Q.  Let's talk about that.  Before we do, just to orient us, so

3   page 1 is this cover page of the subpoena.  Let's turn to page

4   2.  Do you see this rider?

5   A.  Yes.

6   Q.  And is that a request for particular records at Synovus

7   Bank?

8   A.  It is.

9   Q.  Let's turn to page 3.

10  A.  Okay.

11  Q.  Mr. Billue, is this the warning that you just mentioned?

12  A.  It is.

13  Q.  So let's take this section-by-section.

14          MS. MOE:  Ms. Drescher, if you could highlight the

15  language in bold.

16  Q.  Mr. Billue, could you please read that for us.

17  A.  Yeah.  Disclosure of the existence of contents of this

18  subpoena is prohibited by law.  Violations may subject you and

19  your employer to civil and criminal liabilities -- or

20  penalties.

21  Q.  All right.  And let's go to the second paragraph.  Could

22  you please read that for us.

23  A.  Okay.  Attached hereto is a grand jury subpoena for

24  financial institution records as defined by Title 18, United

25  States Code, Section 1510(b)(3)(B).  Civil and criminal

1   penalties exist for making certain disclosures regarding this

2   subpoena.  The prohibited notifications and applicable

3   penalties are stated in Sections 943 and 962 of the Financial

4   Institutions Reform Recovery and Enforcement Act of 1989, as

5   amended.  12 U.S.C., 3420(b) and 18 U.S.C. and 15(b)

6   respectively.

7   Q.  All right.  Let's take a look at the last paragraph.

8        Can you read that for us?

9   A.  Yes.  The criminal penalties include fines and a maximum

10  prison term of five years if an officer of a financial

11  institution, as defined in 18 U.S.C. 15(b) notifies directly or

12  indirectly any person regarding the existence or contents of

13  this subpoena with the intent to obstruct a judicial

14  proceeding.

15       In addition, fines and maximum prison term of one year

16  may be imposed if the notification is made directly or

17  indirectly to a customer of the financial institution whose

18  records are sought by the subpoena or to any other person named

19  in the subpoena.  Civil money penalties may also be imposed.

20  Q.  I thank you, Mr. Billue.

21       So after you read those warnings, what was your

22  reaction?

23  A.  I was in quite the panic at that moment because I realized

24  I'd just broken the law.  And so I was -- that was my first

25  thought.

1   Q.  And when you had that thought, when you had that reaction,

2   what did you do next?

3   A.  Well, my next thought was to try to mitigate the damage

4   that was underway.  So my first thought was to contact Rich

5   Kaye and ask him not to disclose the information that I had

6   just indeed disclosed to him.

7   Q.  Did you reach out to Rich Kaye that afternoon?

8   A.  I did.  I texted him and told him to call me.

9   Q.  Let's talk about that a little bit.

10          I placed in front of you what's marked for

11  identification as Government Exhibit 751.  Do you see that

12  there?

13  A.  Yes.

14  Q.  Do you recognize this?

15  A.  Yes, that's my text messages between myself and Rich Kaye.

16  Q.  Is that a true and accurate copy of text messages that you

17  exchanged with Rich Kaye on October 10th, 2019?

18  A.  It is.

19          MS. MOE:  Your Honor, the government offers Government

20  Exhibit 751.

21          MR. MERINGOLO:  No objection.

22          THE COURT:  It is admitted.

23          (Government's Exhibit 751 received in evidence)

24  Q.  All right.  So you were explaining to us a moment ago that

25  you reached out to Rich Kaye by text.  I want to focus now on

1    the text message.

2              MS. MOE:  If we could highlight the message that's

3    time stamped Thursday, October 10th at 3:26 p.m.

4    Q.  Who sent this message?

5    A.  I sent that to Rich Kaye.

6    Q.  What did you send to him?

7    A.  "Call me."

8    Q.  After you sent that message, did you get on the phone with

9    Rich Kaye?

10   A.  I attempted to call him, I think, three times

11   consecutively.  And I think he eventually answered, I think, on

12   the third or fourth phone call.

13   Q.  And when he answered and you got on the phone with him that

14   afternoon, what instructions, if any, did you give him?

15   A.  I told him that he didn't need to disclose the information

16   that I had disclosed to him to the clients; and that I

17   communicated to him that it was against the law for me to

18   disclose that information to him, and he needed to not disclose

19   it to the clients.

20   Q.  And when you told him not to disclose the subpoena to his

21   clients, how did he respond?

22   A.  He told me that he had already disclosed it.

23   Q.  When you learned that, what was your reaction?

24   A.  I was even more panicked at that point than I was when I

25   first read the warning disclosure.  So my next thought was I

1    needed to -- I needed to tell somebody else.

2    Q.   And when you say you needed to tell someone else, did you

3    take any steps to notify anyone that you'd disclosed the

4    subpoena?

5    A.   I did.   I immediately called the bank, called the legal

6    department, and told them I had -- I had disclosed the

7    information in the subpoena.

8    Q.   And about how soon after your phone call with Rich Kaye did

9    you contact the bank to let them know about what had happened?

10   A.   It was just a few minutes.

11   Q.   Did you have any other phone calls with Rich Kaye that day?

12   A.   I did not.

13   Q.   I want to direct your attention back to the text messages

14   on Government Exhibit 751.

15              MS. MOE:   If we can highlight the two text messages on

16   Thursday, October 10th at 10:12 p.m.

17   Q.   Starting with the one on the top on the left, who sent that

18   text message?

19   A.   Rich Kaye sent that message to me.

20   Q.   Can you read that for us?

21   A.   "No worries for you.   Just don't leak it."

22   Q.   How did you respond?

23   A.   I said:   "I fully disclosed my error to the bank and I

24   can't discuss any further."

25   Q.   All right.   Turning to the bottom of this exhibit, do you

M5PVSHE3                          Billue - Direct

1    see the text message here time stamped Monday, October 14th at
2    9:41 a.m.?
3    A.  I do.
4    Q.  Is that about four days later?
5    A.  Yes.
6    Q.  Who sent this text message?
7    A.  Rich Kaye sent that to me.
8    Q.  And can you read that for us?
9    A.  "Just saw this.  I spoke with your general counsel.  No
10   worries."
11   Q.  Aside from the text messages we've just gone through and
12   the phone calls you've just described, have you had any other
13   contact of any kind with Rich Kaye since October 10th of 2019?
14   A.  I have not.
15   Q.  Did there come a point after the events that you've
16   testified about where you retained a lawyer?
17   A.  Yes.
18   Q.  And did there come a point in time when the government made
19   a request through your lawyer to speak with you?
20   A.  Yes.
21   Q.  Did you agree to speak with the government?
22   A.  I did.
23   Q.  How many occasions have you met with the government?
24   A.  Probably three to four times.
25   Q.  And in those meetings, did you answer questions about

1   disclosing the grand jury subpoena?

2   A.  I did.

3   Q.  Did you receive a subpoena requiring you to be in court

4   here today?

5   A.  I did.

6   Q.  Are you testifying under an order of immunity from the

7   Court?

8   A.  I am.

9   Q.  What do you understand that that immunity order does?

10  A.  I understand that anything that I testify about today

11  cannot be used against me.

12  Q.  And does it give you immunity for anything else?

13  A.  No.

14  Q.  If you don't tell the truth today at this trial, can you be

15  prosecuted for lying under oath?

16  A.  Yes.

17  Q.  Can you just explain for the jury in your own words why did

18  you believe that you needed immunity to testify as a witness at

19  this trial?

20  A.  Because obviously I had broken the law and I had disclosed

21  the existence of the subpoena, which put me in jeopardy of

22  prosecution.  And so the Constitution affords you the right to

23  not willingly self-incriminate yourself.  And so I felt like I

24  needed that immunity to be able to speak truthfully about what

25  happened.

M5PVSHE3                          Billue - Cross

1   Q.  Thank you, Mr. Billue.

2                MS. MOE:  Nothing further, your Honor.

3                THE COURT:  Cross-examination.

4   CROSS-EXAMINATION

5   BY MR. MERINGOLO:

6   Q.  Good afternoon, Mr. Billue.  I'm John Meringolo.  I

7   represent Tim Shea.

8   A.  Good afternoon.

9   Q.  You never spoke to my client; correct?

10  A.  No, sir, I have not.

11  Q.  You haven't text with my client?

12  A.  No, sir.

13  Q.  You never emailed with my client; correct?

14  A.  No, sir.

15  Q.  You talked about this gentleman by the name of Rich Kaye.

16  Who is he?

17  A.  My understanding is he is an attorney that was representing

18  We Build the Wall in reference to setting up the organizational

19  documents, Secretary of State documents, and so forth to allow

20  the company to enter into the banking relationships that the

21  company was desiring to enter into.

22  Q.  And you're located in Georgia?

23  A.  Yes, sir.

24  Q.  And Mr. Kaye is located in Georgia?

25  A.  Yes, sir.

1  Q.  And isn't it true that you and Mr. Kaye knew each other

2  through your business prior to We Build the Wall?

3  A.  That is correct.

4  Q.  And according to you -- and Mr. Kaye is at Barnes &

5  Thornburg at the time of this?

6  A.  I believe that's correct.

7  Q.  That's a major firm in the Atlanta area, to your knowledge?

8  A.  I don't know if it's a major firm, but it is a firm in

9  Atlanta.

10  Q.  Okay.  Well, weren't you going to help Mr. Kaye with a

11  possible $200 million opportunity at the time?

12          MS. MOE:  Objection, your Honor.

13          THE COURT:  Overruled.  I'll allow him to answer.

14  A.  When you say 200 million opportunity, are you referring to

15  this?

16  Q.  No, your Honor -- I mean, no.

17  A.  To a different relationship?

18  Q.  Yes.

19  A.  I don't recall that.

20  Q.  And you've had other dealings with Mr. Kaye with other

21  clients; correct?

22  A.  I believe so.

23  Q.  And you told the government that --

24          MS. MOE:  Objection, your Honor.

25          No foundation for any of this.

Billue – Cross

1   Q.   And you proffered with the government, right?

2              THE COURT:   If you'll step up please.

3              (Continued on next page)

1          (At sidebar)

2          THE COURT:  I want to know where you're going.

3          MR. MERINGOLO:  He proffered with the government.  And

4   when he proffered with the government, he said that Mr. Kaye

5   was a major influence in the Atlanta area.

6          MS. MOE:  I'm going to object to the relevance of

7   that.

8          THE COURT:  So what does that have to do with $200

9   million?

10         MR. MERINGOLO:  It's a different line.  I'm not going

11  to keep going on 200 million.  That's independent knowledge.

12  I'm going to ask him -- he's the one who sent Mr. Kaye a text

13  message unsolicited.  The reason why he sent Mr. Kaye a text

14  message unsolicited is to give him a heads-up.  The reason why

15  he's giving him a heads-up is because Mr. Kaye, according to

16  him, is a major influence in the Atlanta area.  I just want the

17  jury to know what his state of mind was when he was sending the

18  text message.

19         MS. MOE:  That's not right, your Honor.  I think if

20  asked, I would have no objection to the question, Why did you

21  notify Mr. Kaye about the subpoena?  I think he would answer,

22  Because he was the client on this account, and I thought he

23  should know and talk to him about it; and thought he would have

24  been aware of it because he didn't realize it was a secret

25  investigation.  That would be appropriate.

1           But I do strongly object to attempts to elicit

2    character evidence about an attorney who's not on trial in

3    service of a half-baked advice of counsel defense.  We've tried

4    this several times -- it's completely inappropriate to try to

5    elicit that Rich Kaye is a reputable lawyer, that he's

6    well-established and everyone knows him.  It's designed to

7    suggest that he's credible, an attorney, and if he were

8    affiliated with We Build the Wall, then no crime occurred.  I

9    think it's really inappropriate, your Honor, and I don't think

10   this line of cross should continue.

11          It's in the record that Rich Kaye was counsel to We

12   Build the Wall.  Beyond that, I don't understand the relevance

13   of his reputation in the Atlanta community or involvements in

14   other transactions or other people's impressions of him,

15   favorable or unfavorable.  It's entirely irrelevant.

16          THE COURT:  Why did you ask about $200 million?

17          MR. MERINGOLO:  Because in the 302 it said he was

18   going to help fund -- Richard Kaye asked him to help fund the

19   $200 million project.  I don't know what project that is.  It's

20   vacant.

21          MS. MOE:  Completely irrelevant, your Honor.

22          The fact that Rich Kaye has other business dealings

23   with Synovus Bank and what Mr. Billue's impressions was -- Mr.

24   Billue has engaged in other business transactions with Rich

25   Kaye.  And his impressions of Rich Kaye in connection with

1     those transactions are irrelevant.

2              MR. MERINGOLO:  This gentleman, who was in the bank

3     for 13 years at the time in a very high position, chose to

4     commit a crime and give Rich Kaye information.  We can't get

5     his state of mind on what Rich Kaye and who Rich Kaye was to

6     him?

7              MS. MOE:  I don't follow the logic of that.

8              THE COURT:  So my understanding of this testimony is

9     that he made the disclosure unaware that he was committing a

10    crime.  Did you have a different understanding?

11             MR. MERINGOLO:  My understanding is he tipped Richard

12    Kaye off.  If he was at the bank for that long, there's a

13    reason why he tipped Richard Kaye off.  He doesn't know that

14    was a crime after he read it.  He read the document, your

15    Honor.  It said, You're committing a crime.  And he chose to

16    commit a crime.  Why?  Why did you choose Richard Kaye?

17    Because he's of influence; the guy's a major lawyer down there.

18    His firm does tremendous business.

19             THE COURT:  I did not hear him testify, I knew I was

20    about to commit a crime and I committed a crime.  I didn't hear

21    that.

22             MR. MERINGOLO:  He said he read the subpoena, and in

23    the back it says he committed a crime if he did something.

24             MS. MOE:  Even if the attempt here was to suggest an

25    impeachment of Mr. Billue that he, in fact, tipped off Mr. Kaye

M5PVSHE3                        Billue - Cross

1     intentionally, knowing it was illegal, I think the proffered

2     testimony wouldn't serve that purpose, because the suggestion

3     would be he tipped him off illegally because he knew he was a

4     good guy.  Again, I think we're going in illogical circles

5     here; all of this is irrelevant; and again, it's at way of

6     back-dooring in character evidence about an attorney who's not

7     on trial in service of an advice of counsel defense that is

8     improper.

9              MR. MERINGOLO:  Judge, these buzz words, we have no

10    privilege -- Tim Shea has no privilege with Rich Kaye.  If I

11    wanted to do an advice of counsel defense, which would be great

12    for him, I can't do it.

13             MS. MOE:  Exactly, your Honor.  That's why this is

14    irrelevant.

15             THE COURT:  You haven't established the relevance of

16    these questions for me.  I was open to it, but you haven't

17    given me anything to go on.

18             MR. MERINGOLO:  Other than the reason why he may have

19    tipped him off was because he's a person of influence in the

20    community?

21             THE COURT:  No.  No.

22             MR. MERINGOLO:  Okay.

23             (Continued on next page)

24

25

1              (In open court)

2              THE COURT:  The objection is sustained.

3              The answer is stricken.

4              Counsel, please speak into the microphone.  Also, sir,

5      if you would also speak into the microphone.

6      BY MR. MERINGOLO:

7      Q.  So when you received that subpoena, did you read the entire

8      subpoena?

9      A.  Prior or after the phone call with Rich Kaye?

10     Q.  Prior.

11     A.  No.

12     Q.  So you immediately called Rich Kaye; correct?

13     A.  Correct.

14     Q.  Why did you immediately call Rich Kaye?

15     A.  I was upset.

16     Q.  Why would you call Rich Kaye if you were upset?

17             MS. MOE:  Objection to form.

18             I think the witness has testified about two different

19     phone calls.  I'm not sure which one we're talking about.

20     Q.  The call afterward, the call that you made to tip him off,

21     why were you so upset?

22     A.  I was wondering why I was getting a subpoena.  And I was

23     upset that I thought once the bank made the decision to close

24     the account, that that was the end of the relationship.  And I

25     was agitated to put -- to give a little bit more context to

M5PVSHE3                          Billue - Cross

1     this, that entire week I was -- I had been ill and I was on

2     prednisone and I was extremely agitated.  And so I was very

3     impulsive in the decisions I was making.  That included the

4     phone call to Rich Kaye, that included the phone call to the

5     bank immediately following.  I made a lot of decisions that day

6     without total clarity as I should have.

7              But I was agitated initially because I received the

8     subpoena and I wanted to know what was going on now.  I was

9     like what the --

10    Q.  I gotcha.

11    A.  -- heck is going on here?

12    Q.  And you have immunity today; correct?

13    A.  Correct.

14    Q.  And you got that immunity maybe ten minutes before your

15    testimony, right?  You were put on the stand about 15, 20

16    minutes ago?

17    A.  Correct.

18    Q.  And the government made an application for you to get

19    immunity; correct?

20    A.  Correct.

21    Q.  And that application was granted by the Court, right?

22    A.  It was.

23    Q.  Okay.  So I'm not trying to get you in trouble.

24    A.  Oh, sure.

25    Q.  I'm the last guy in the world.  So I'm not trying to do

M5PVSHE3                          Billue - Cross

1   that.

2          But with respect to this -- when was the -- so you

3   said you had three or four meetings with the government, right?

4   A.  Correct.

5   Q.  Were any of them in person or was it all via Zoom?

6   A.  All via Zoom.

7   Q.  And you came up here and the government paid for your

8   travel; correct?

9   A.  Correct.

10  Q.  And who's paying for your lawyer?

11  A.  My bank is.

12  Q.  To your knowledge, remember reading the criminal and

13  penalties -- not you, but it said the bank could have civil or

14  criminal penalties; correct?

15  A.  Correct.

16  Q.  As you sit here today, do you still work for the bank?

17  A.  I do.

18  Q.  As you sit here today, were there any civil or criminal

19  penalties to your knowledge for the bank?

20          MS. MOE:  Objection.

21          THE COURT:  Sustained.

22  Q.  What's your position at the bank, sir?

23  A.  I'm a commercial banker, commercial lender.

24  Q.  Okay.  Have you -- you know, with respect, has the bank

25  admonished you in any way since this?

M5PVSHE3                         Billue - Cross

1   A.  Admonished being?

2   Q.  Did you get pay docked?

3   A.  No.

4   Q.  And you wouldn't testify here today before these ladies and

5   gentlemen without immunity, right?

6   A.  Correct.

7   Q.  And why is that?

8   A.  Because the Constitution grants me the ability to not

9   self-incriminate myself.

10  Q.  Believe me, I'm with you.

11          You made a mistake, right?

12  A.  I did.

13  Q.  And you're sorry?

14  A.  Very much so.

15          MR. MERINGOLO:  No further questions.

16          THE COURT:  Redirect?

17          MS. MOE:  No redirect, your Honor.  Thank you.

18          THE COURT:  You may step out.

19          (Witness excused)

20          THE COURT:  And you may call your next witness.

21          MR. SOBELMAN:  The government calls Enrique Santos.

22   ENRIQUE SANTOS,

23      called as a witness by the Government,

24      having been duly sworn, testified as follows:

25          THE LAW CLERK:  Please be seated and state and spell

M5PVSHE3                              Santos - Direct

1    your name for the record.

2                THE WITNESS:  Enrique Santos.  That's E-N-R-I-Q-U-E,

3    S-A-N-T-O-S.

4                THE COURT:  You may inquire.

5    DIRECT EXAMINATION

6    BY MR. SOBELMAN:

7    Q.  Good afternoon, Mr. Santos.

8    A.  Good afternoon.

9    Q.  What organization do you work for?

10   A.  The U.S. Attorney's Office for the Southern District of New

11   York.

12   Q.  Approximately how long have you worked for the U.S.

13   Attorney's Office?

14   A.  Thirteen years.

15   Q.  What position do you hold with the U.S. Attorney's Office?

16   A.  I'm an investigative analyst.

17   Q.  Generally, what are your duties and responsibilities as an

18   investigative analyst?

19   A.  I perform forensic examinations of mobile devices such as

20   cell phones, GPS devices, and tablets; and I also do call

21   detail record analysis.

22   Q.  Have you also examined other types of evidence in your

23   career such as financial records?

24   A.  Yes.

25   Q.  In preparation for your testimony today, did you assist or

1  review a couple of summary charts?

2  A.  Yes.

3  Q.  Let's start about Government Exhibit 909.

4        MR. SOBELMAN:  Can you please show that to the

5  witness.

6  Q.  Mr. Santos, do you recognize this?

7  A.  I do.

8  Q.  What is it?

9  A.  This is an illustration of a series of phone calls and

10  messages that were exchanged between some individuals involved

11  in this case.

12  Q.  And is it approximately an 18-page document?

13  A.  Yes.

14  Q.  And does it summarize certain communications contained

15  within otherwise voluminous records?

16  A.  Yes.

17  Q.  Is the chart accurate?

18  A.  Yes.

19  Q.  Did you make the chart or did someone else make it and

20  provide it to you to review?

21  A.  Someone else.

22  Q.  Was that the prosecution team?

23  A.  Yes.

24  Q.  Okay.  And how do you know that the information in here is

25  accurate?

1    A.  I went through all the data in the -- in the presentation,

2    and then I compared it to the underlying data, which consisted

3    of call detail records provided by phone companies.  I believe

4    it was AT&T.

5    Q.  And did you match up every item in this chart to underlying

6    records that are in evidence in this case?

7    A.  Yes.

8    Q.  And it was all accurate?

9    A.  Yes.

10            MR. SOBELMAN:  The government offers Government

11   Exhibit 909 pursuant to Rule 1006.

12            MR. MERINGOLO:  No objection.

13            THE COURT:  Admitted.

14            (Government's Exhibit 909 received in evidence)

15            MR. SOBELMAN:  Before we go through it, Ms. Drescher,

16   if we could put up S-1, which I will offer at this time, a

17   stipulation between the parties.  The government offers S-1.

18            MR. MERINGOLO:  No objection.

19            THE COURT:  It is admitted.

20            (Government's Exhibit S-1 received in evidence)

21   BY MR. SOBELMAN:

22   Q.  We're not going to read through this, but, Mr. Santos, is

23   this a stipulation to certain call detail records, phone

24   records from phone providers?

25   A.  Yes.

1          MR. SOBELMAN:  Ms. Drescher, if you could just show

2     the next page.

3     Q.  And does this have a list of people and phone numbers on

4     it?

5     A.  Yes.

6     Q.  And just to read paragraph 3 above the chart:  The

7     following telephone numbers were used by the following

8     individuals in 2018, 2019, and 2020.  Do you see that?

9     A.  Yes.

10    Q.  And then on the left there's a list of names and on the

11    right there's a list of phone numbers; correct?

12    A.  Yes.

13    Q.  And on the chart that we're about to look at are whenever

14    someone's name that's on this list appears, is it a reference

15    to the phone number on the right side of the chart?

16    A.  Yes.

17    Q.  Okay.

18         MR. SOBELMAN:  Ms. Drescher, if you could zoom out and

19    just go back up.

20         The government offers Government Exhibits 601 through

21    622 and 651 through 656.

22         MR. MERINGOLO:  No objection.

23         THE COURT:  They are admitted.

24         (Government's Exhibits 601 to 622, 651 to 656 received

25    in evidence)

1             MR. SOBELMAN:  All right.

2             Let's go back to Government Exhibit 909.

3    BY MR. SOBELMAN:

4    Q.  Let's spend a few minutes explaining how this chart works

5    and going through its slides.

6             So a moment ago you told us about a chart that shows

7    certain calls between different individuals; is that right?

8    A.  Yes.

9    Q.  Okay.  And let's first orient ourselves.  This is an

10   approximately 18-page document?

11   A.  Yes.

12   Q.  And am I correct that the first slide shows some

13   communications, and then each slide subsequent moves through

14   time and adds additional communications?

15   A.  Yes.

16   Q.  Okay.  So in the upper left-hand corner it says October

17   10th, 2019.  Are all the communications in this timeline from

18   October 10th, 2019?

19   A.  I believe some were from the next day also.

20   Q.  Okay.  We'll take a look at that.  And then underneath the

21   day is there a time that's listed?

22   A.  Yes.

23   Q.  And is that the window in which the red items below appear?

24   A.  Yes.

25   Q.  So just for example, here we have one communication, it

1   says 3:06 p.m. to 3:16 p.m. EDT.  First, what's "EDT" mean?

2   A.  Eastern Daylight Savings Time.

3   Q.  Is that New York time in October 2019?

4   A.  Yes.

5   Q.  And some of the records, were they in New York time or were

6   they in other time zones?

7   A.  I believe they were in UTC time.

8   Q.  What is UTC time?

9   A.  UTC is an acronym that stands for Universal Coordinated

10  Time.  It's basically the referenced time by which the rest of

11  the world adjusts its clocks to, usually in one-hour

12  increments.

13  Q.  And does this chart take UTC time and convert it to be all

14  in New York time?

15  A.  Yes.

16  Q.  Okay.  And let's look at the couple of boxes we see here.

17          On the top there's a box that says "Robert Billue."

18  Do you see that?

19  A.  Yes.

20  Q.  Okay.  And that represents the phone number that we saw in

21  that other chart; is that correct?

22  A.  Yes.

23  Q.  So on the chart on the stipulation, it says Robert Billue.

24  And there was a phone number.  That means that this -- that

25  phone number had a contact, right?

1    A.  Yes.

2    Q.  Okay.  Then there's a red arrow.  What does the red arrow

3    mean?

4    A.  It indicates the directionality of the communication, so

5    either a call or message.

6    Q.  And here, what kind of communication is shown from -- that

7    happened between 3:06 p.m. and 3:16 p.m. on October 10th, 2019?

8    A.  So we're seeing here an outgoing -- excuse me, an outgoing

9    call from Mr. Billue's phone to Mr. Kaye's phone.

10   Q.  And at the bottom, there is a list of government exhibit

11   numbers.  Do you see that?

12   A.  Yes.

13   Q.  If the jury wanted to go look at any of the underlying

14   communications, are all the communications in this presentation

15   found in those documents?

16   A.  Yes.

17   Q.  All right.  So we have just one phone call on this slide,

18   right?

19   A.  Yes.

20   Q.  All right.  Let's go to slide 2.  What happened next?  Can

21   you tell us the time period in which it happened and what is

22   added on this slide.

23   A.  Mr. Kaye made two phone calls to Mr. Badolato, two

24   attempted and one call which actually connected and lasted a

25   minute and 31 seconds.

460

1          MR. SOBELMAN:  Before we go on, I just want to show

2    one example of an underlying communication.  Let's pull up

3    Government Exhibit 613 and go to page 5.

4    Q.  And Mr. Santos, just as an example, what kind of document

5    is this?

6    A.  This is a call detail record from AT&T.

7    Q.  What is a call detail record?

8    A.  It's a record that's kept by the cell phone companies.  And

9    they list, for example, the time and date that a call was

10   placed, the directionality of the call, the duration of the

11   call; in some instances, the device that was used to place the

12   calls, generally that kind of data.

13   Q.  When you say "duration," you just mean how long a call

14   lasted?

15   A.  Correct.

16   Q.  When you say "directionality," you mean did I call you or

17   did you call me?

18   A.  Yes.

19   Q.  Okay.  Let's take a look at the line that's labeled 32033.

20   And, Mr. Santos, is this the call that appeared on the very

21   first slide where Mr. Billue called Mr. Kaye?

22   A.  Yes.

23   Q.  And we see here it says October 10, 2019.  That's the day

24   of the call?

25   A.  Yes.

1   Q.  And then 19:06:21, is that that UTC time you told us about?

2   A.  Yes.

3   Q.  So just for example, how would you go about adjusting that

4   to get the 3:06 p.m. New York time that you had on the slide?

5   A.  So you would subtract for EDT, I believe it's minus four

6   hours for EDT.  And then this UTC time presented here is also

7   listed in 24-hour, sort of, military time.  So you'd want to

8   convert that into like a 12-hour a.m./p.m. time to better

9   understand whether it's a daytime or nighttime call.

10  Q.  Just to walk through that — and we're only going to do it

11  once — 19:06 UTC would be the same as 7 p.m. UTC, right, or

12  7:06 UTC p.m.?  And then you would remove four hours to get to

13  EDT; is that right?

14  A.  Correct.

15  Q.  So you go from 19:06 to 7 p.m., 7:06 p.m.  Then 7:06 p.m.

16  to 3:06 p.m., and then you're in EDT?

17  A.  Yes.

18  Q.  Okay.  What's seizure time mean?

19  A.  Seizure time is basically how long it took for -- from the

20  moment you hit the send button on your cell phone, for that --

21  for the phone call to travel through the AT&T network and then

22  reach the other side of the -- the other phone you're trying to

23  reach.  So sort of that little lag time.

24  Q.  How long the phone rang before it was picked up?

25  A.  Yes.

M5PVSHE3                        Santos - Direct

1    Q.  Okay.  And ET, 9:45, what does that mean?

2    A.  The duration of the call.

3    Q.  And that's nine minutes, 45 seconds here?

4    A.  Yes.

5    Q.  And then originating number, terminating number.

6    Originating is who's calling out; terminating is who's getting

7    the call?

8    A.  Yes.

9    Q.  Okay.  And we don't have to do it right now, but you

10   matched up these phone numbers to the chart and found that

11   Mr. Billue called Mr. Kaye?

12   A.  Yes.

13   Q.  Okay.  Let's go back to 909.  And just to be clear, for

14   every single one of these lines, every single one of these

15   boxes, there's a record like the one we just looked at that

16   shows that call?

17   A.  Yes.

18   Q.  All right.  So we talked about what happened between 3:06

19   p.m. and 3:19 p.m. with these two calls from -- two attempted

20   calls from Mr. Kaye to Mr. Badolato and one completed call.

21   Let's see what happened next.  Let's go to page 3.

22          Mr. Santos, what does this slide show?

23   A.  We're seeing a call from -- or, excuse me, a few calls from

24   Mr. Badolato to Mr. Kolfage, two attempted calls, one which

25   completed and lasted for 58 seconds.

1    Q.  And just to orient us on the time, the original call we

2    looked at, that first gray arrow now on there between Billue

3    and Kaye, was it 3:06 p.m. to 3:16 p.m.; correct?

4    A.  Yes.

5    Q.  So now we're just a few minutes after that call ended;

6    correct?

7    A.  Yes.

8    Q.  Okay.  Let's take a look at page 4.

9            Mr. Santos, what does this slide show?

10   A.  We're seeing a text message that was sent from Mr. Billue's

11   phone to Mr. Kaye's phone, and it reads:  "Call me."  And there

12   were also two attempted calls.

13   Q.  And this is still approximately 15 to 20 minutes after that

14   initial call from Mr. Billue to Mr. Kaye?

15   A.  Correct.

16   Q.  Let's go to page 5.  And what's added on this page?

17   A.  We have -- we have a -- two calls from Mr. Billue to

18   Mr. Kaye, one of which connected and lasted two minutes and two

19   seconds.  And then we also have three calls between Mr. Kaye

20   and Mr. Badolato, three attempted calls.

21   Q.  And just to orient us on the time, just a minute or two

22   after the last page we looked at, right?

23   A.  Yes.

24   Q.  Okay.  Let's go to page 6.  What's new on this page?

25   A.  Here we're seeing a call from Mr. Kolfage's phone to

1   Mr. Badolato's phone which lasted for ten seconds.  And then

2   we're also seeing a call from Mr. Shea's phone to Mr. Kolfage's

3   phone that lasted nine minutes and 50 seconds.

4   Q.  And this is all within less than an hour and a half from

5   that original call?

6   A.  Yes.

7   Q.  So all the calls and messages that we looked at so far are

8   within about 90 minutes of that first call from Mr. Billue to

9   Mr. Kaye?

10  A.  Yes.

11  Q.  Let's go to the next page.  What do we see added on this

12  page?

13  A.  We have a call from Mr. Badolato to Mr. Kaye which lasted

14  for 21 seconds.  And we also have a call from Ms. Shea to

15  Mr. Badolato that lasted three minutes.

16  Q.  And these two calls are just a few minutes after the call

17  from Timothy Shea to Brian Kolfage ended; is that right?

18  A.  Yes.

19  Q.  Let's take a look at slide 8.

20          What do we see added on here?

21  A.  A series of attempted calls between Mr. Badolato and

22  Mr. Kolfage, one of which connected for 18 minutes and 38

23  seconds.

24  Q.  And this is all within about two and a half hours of the

25  original call from Mr. Billue to Mr. Kaye?

1    A.  Yes.

2    Q.  Let's go to page 9.  What's added here?

3    A.  A call from Mr. Shea's phone to Ms. Shea's phone that

4    lasted a minute and 44 seconds.

5    Q.  Let's go to slide 10.  What's added here?

6    A.  A call from Mr. Shea's phone to Mr. Kolfage's phone that

7    lasted for 19 seconds.

8    Q.  And at this point in time, it's a little less than three

9    hours from that original call, and that all of these different

10   communications occurred; correct?

11   A.  Yes.

12   Q.  Let's go to the next slide.  What's added here?

13   A.  Another call between -- from Ms. Shea's phone to Mr. Shea's

14   phone for 17 seconds.

15   Q.  Let's go to slide 12.  What's added here?  This looks a

16   little different than the other slides.

17   A.  Here we have -- we have some phone calls attempted, one of

18   which completed for three minutes and 54 seconds, but then we

19   also have some text messages being sent between Mr. Badolato

20   and Mr. Bannon.

21   Q.  And these text messages, are they from another exhibit

22   that's already in evidence?

23   A.  Yes.

24   Q.  Okay.  Let's just read through these text messages, which,

25   to be clear, were all sent or received in this two or

1    three-minute window from 5:57 p.m. to 5:59 p.m. on October

2    10th?

3    A.   Yes.

4    Q.   Okay.  Why don't you be Mr. Badolato and I can be

5    Mr. Bannon and we can just read through these.

6    A.   Urgent 911 call me.

7    Q.   In Athens.  What's up?

8    A.   Gotta tell you on the phone.

9    Q.   Just called you.  Call me.

10        And these are in close time with the three attempted

11   calls and one completed phone call that's displayed to the left

12   of that?

13   A.   Yes.

14   Q.   Okay.  Let's go to slide 13.

15        Mr. Santos, what do we see on this slide?

16   A.   We have a call from Mr. Shea's phone to Ms. Shea's phone

17   that lasted a minute and 31 seconds.

18   Q.   And in terms of our timing, we're still less than three

19   hours from the original call from Mr. Billue to Mr. Kaye; is

20   that right?

21   A.   Yes.

22   Q.   Let's go to slide 14.  What's added on this slide?

23   A.   Another call from Mr. Shea's phone to Ms. Shea's phone

24   lasting for 31 seconds.

25   Q.   Let's go to slide 15.  What's added on this slide?

1    A.   A text message from Mr. Kolfage to Mr. Bannon.

2    Q.   And what did Mr. Kolfage write to Mr. Bannon?

3    A.   You get briefed?

4    Q.   And with respect to timing, this is now within six hours of

5    the phone call from Mr. Billue to Mr. Kaye?

6    A.   Yes.

7    Q.   Let's go to slide 16.   What do we see on this slide?

8    A.   We have messages between Mr. Billue and Mr. Kaye.

9    Q.   And so it says Mr. Kaye texted Mr. Billue:  No worries for

10   you.   Just don't leak it.   Do you see that?

11   A.   Yes.

12   Q.   And then Mr. Billue texted back:  I fully disclosed my

13   error to the bank.   I can't discuss any further.

14            Do you see that?

15   A.   Yes.

16   Q.   And that happened sometime between 9:24 p.m. and 10:12

17   p.m.; is that right?

18   A.   Yes.

19   Q.   And that's roughly six to seven hours after that initial

20   call that started this chart?

21   A.   Yes.

22   Q.   Let's go to the next slide, slide 17.   What do we see added

23   on this slide?

24   A.   Text message from Mr. Bannon to Mr. Kolfage.

25   Q.   And was Mr. Bannon replying to the message we just looked

1   at a few slides ago?

2   A.  Yes.

3   Q.  And what did he write?

4   A.  Informed, not briefed.

5   Q.  And let's take a look at slide 18.

6           And Mr. Santos, is there anything added on this slide

7   or is this sort of a summary slide that shows all the various

8   connections that we just looked at?

9   A.  Just the summary slide.

10  Q.  And so in total, this period of time it covers is about

11  seven and a half hours; is that right?

12  A.  Yes.

13  Q.  All on October 10th, 2019?

14  A.  Yes.

15  Q.  Now, aside from the seven individuals whose names appear on

16  this chart, were you asked to analyze the communications of

17  anyone else?

18  A.  No.

19  Q.  Aside from the limited time period on October 10th, 2019

20  that this chart covered, were you asked to analyze

21  communications for this chart from any other time period?

22  A.  No.

23  Q.  Let's take a look at Government Exhibit 52 in evidence.

24          So the chart we just looked at ended late in the

25  evening on October 10th, 2019; is that right?

M5PVSHE3                          Santos - Direct

1    A.  Yes.

2    Q.  Okay.  The messages we're about to look at, when do they

3    pick up?

4    A.  The next day, October 11th, 2019.

5    Q.  In the morning?

6    A.  Yes.

7    Q.  Okay.  And who are the messages between?

8    A.  So this is a group chat between Ms. Amanda Shea, Mr. Andrew

9    Badolato, Mr. Tim Shea, and Mr. Brian Kolfage.

10   Q.  Let's read through these.  I can be the defendant, Tim

11   Shea; and why don't you be everyone else.

12   A.  Okay.  So it starts with Mr. Kolfage:  I'm inviting you to

13   install Signal.  Here is the link.  And then there is a

14   hyperlink below that.  Then he says:  Was Signal what Erik

15   Prince uses?  Wickr Me is what Prince uses.  Just asked.

16          And then Ms. Shea said:  I downloaded Signal.  I'll

17   get this other one.

18   Q.  Then Mr. Shea wrote:  I downloaded Wickr.  Brian, what's

19   your name on Wickr?

20   A.  Mr. Kolfage responds:  We Build the Wall.

21          And then below that is a message that says:  Hey, join

22   me on Wickr Me for the ultimate secure and private

23   communications experience for free at, and then there's a

24   hyperlink.  My We Build the Wall ID is.

25   Q.  Mr. Shea then wrote:  Can't find you.  I'm TShea.

M5PVSHE3                          Santos - Direct

1    A.  And then Ms. Shea responds:  I'm Amanda Shea.

2              And then Mr. Kolfage responds:  Messages you guys.

3    Andy get on Wickr Me.  It's good.

4              And then Mr. Badolato responds:  I'm on.

5    Q.  Mr. Shea wrote:  What's your if?  I'd, ID.  Fuck.

6    A.  And Mr. Badolato responds:  AMartinB.

7    Q.  Mr. Santos, what is Signal?

8    A.  It's a messaging app.

9    Q.  And what is Wickr Me?

10   A.  It's also a messaging app.

11   Q.  Is there any difference between Signal and Wickr Me on one

12   hand and regular text messaging on the other?

13   A.  Regular text messaging relies on a different protocol to

14   send messages back and forth.  They are not -- they rely on a

15   different form of encryption than something that Signal and

16   Wickr would use.

17   Q.  What, if anything, does the difference in the ability of

18   law enforcement to obtain Signal and Wickr Me messages on one

19   hand and regular text messages on the other?

20             MR. MERINGOLO:  Objection.

21             THE COURT:  Overruled.  You may answer.

22   A.  Law enforcement would need a warrant to be able to

23   capture -- or a Title III to capture text messages; whereas

24   Signal or Wickr Me are encrypted in the air and would rely on

25   having the physical device to view the messages.

Santos – Direct

1   Q.  Law enforcement typically wouldn't be able to intercept

2   those kind of messages; is that correct?

3   A.  No.

4   Q.  Let's take a look at Government Exhibit 50, which is in

5   evidence.  And Mr. Santos, we looked earlier in the chart at

6   the messages on lines 1 through 4; is that correct?

7   A.  Yes.

8   Q.  Okay.  Let's take a look at the messages below that.

9        What time period are these messages from?

10  A.  Yes, this is now October 12, 2019.

11  Q.  And so that's the day after the messages we just looked at

12  in Government Exhibit 52?

13  A.  Yes.

14  Q.  Okay.  And two days after the events of the chart with all

15  the calls?

16  A.  Yes.

17  Q.  Okay.  And who are these messages between?

18  A.  This is between Mr. Bannon and Mr. Badolato.

19  Q.  I'll be Mr. Badolato, you can be Mr. Bannon.  Let's read

20  through these quickly.

21  A.  Can I get a case number.

22  Q.  Investigation indictment came from New York Southern

23  District.  Working on.  I don't think it's case yet.  It's

24  grand.  Just to make a case.

25  A.  How does Spiro find it?  Has to have a case number.

1   Q.  There is no case number.  Supposed to be secret.

2   A.  What is the name of the U.S. Attorney?

3   Q.  New York Southern District court attorney Geoff Berman.

4           Let's take a look at Government Exhibit 53.

5           And Mr. Santos, what's the date on these messages?

6   A.  October 17th, 2019.

7   Q.  So approximately a week after the call chart; correct?

8   A.  Yes.

9   Q.  And a few days after the text messages we just looked at?

10  A.  Yes.

11  Q.  And who are these messages between?

12  A.  This is a group chat between Brian Kolfage, Tim Shea, and

13  Amanda Shea.

14  Q.  All right.  Let's read through these.  I'll be the

15  defendant, Tim Shea, and you can be the others.

16  A.  Messages start out with Mr. Kolfage.  It says:  Spoke with

17  lawyers.  They said that court puts out hundreds of subpoenas

18  every day.  Most don't turn into anything.  It's the first

19  step, he said also.  He then says:  The attorney who filed it

20  also used to be an associate at their firm.  So if anything

21  comes up, they can easily go to the guy.  They believe what

22  triggered it was either the switch in funds from government to

23  c4 or something political with Kris maybe and the FEC.

24          And then Ms. Shea responds:  That's good to know.  I

25  had no idea so many were sent out in the regular as a general

1    practice.

2    Q.  Mr. Shea then wrote:  Okay.  That's good to know.

3    A.  And then Mr. Kolfage responds:  Get RPMM stuff ASAP.

4    Q.  Mr. Shea then responded:  I was going to send it out with

5    Amanda on Sunday.

6    A.  And then Mr. Kolfage ends:  Perfect.

7            MR. SOBELMAN:  We can take this down.

8            Let's turn to some different exhibits.

9            At this time, the government offers certifications

10   marked as Government Exhibits 626 and 627.  And pursuant to

11   those certifications, Government Exhibits 623, 624, and 625.

12   The government also offers certifications marked as Government

13   Exhibits 362-A and 363-A, and Government Exhibits 362 and 363

14   pursuant to those certifications.

15           MR. MERINGOLO:  No objection.

16           THE COURT:  They are admitted.

17           (Government's Exhibits 623 to 627, 362, 362-A, 363,

18   363-A received in evidence)

19           MR. SOBELMAN:  Ms. Drescher, if we could pull up

20   Government Exhibit 362 please.

21   BY MR. SOBELMAN:

22   Q.  Mr. Santos, did you review this travel record in

23   preparation for your testimony?

24   A.  Actually, I don't recall this one.

25   Q.  That's okay.  We can read through it.

Santos - Direct

1              What's the hotel name on this travel record?

2     A.   Loews Regency Hotel.

3     Q.   And who is it for, the name of the person in the upper

4     left-hand corner?

5     A.   Stephen K. Bannon.

6     Q.   And when did Mr. Bannon check into the Loews Regency Hotel?

7     A.   January 4th, 2019.

8     Q.   When did he check out?

9     A.   January 7th, 2019.

10    Q.   Just to be clear, is the Loews Regency Hotel located at

11    that address in Manhattan?

12    A.   I believe so.

13             MR. SOBELMAN:  Let's pull up -- one moment, your

14    Honor.  Government Exhibit 363.

15    Q.   And Mr. Santos, this is an American Express record for

16    Stephen K. Bannon; is that correct?

17    A.   Yes.

18    Q.   Okay.  Let's go down and take a look at a charge from the

19    Loews New York on January 8th, 2019.  It's right in the middle

20    of the page there.

21             Mr. Santos, do you see those charges by the Loews

22    Hotel in New York?

23    A.   Yes.

24    Q.   Okay.  And those charges show an arrival date of January

25    4th, 2019 and a departure date of January 7th, 2019; is that

1    correct?

2    A.  Yes.

3              MR. SOBELMAN:  We can take this down.

4              Ms. Drescher, can you -- sorry, we offer Government

5    Exhibit 20 pursuant to a stipulation that's already in

6    evidence.

7              MR. MERINGOLO:  No objection.

8              THE COURT:  It is admitted.

9              (Government's Exhibit 20 received in evidence)

10             MR. SOBELMAN:  Let's publish that for the jury.

11   Q.  Mr. Santos, who are these messages between?

12   A.  Mr. Badolato and Mr. Kolfage.

13   Q.  And the date on this, what's this date?

14   A.  January 5th, 2019.

15   Q.  And that's in the window we just looked at, right, that

16   January 4th, 2019 to January 7th, 2019?

17   A.  Yes.

18   Q.  Okay.  And can you please read the messages.  You can be

19   Mr. Kolfage, I can be Mr. Badolato.

20   A.  Mr. Kolfage says:  We going to Palm Beach on Tuesday?

21   Q.  Mr. Badolato wrote:  Yes, I'm with Steve in NYC all weekend

22   meetings.  We drove up last night 10 p.m., arrive 2:30.

23   Brutal.  Will call 11:45.

24   A.  K.

25   Q.  Now, Mr. Santos, did you review AT&T records marked as

M5PVSHE3                          Santos - Direct

1   Government Exhibit 623 through 627 for Mr. Kolfage, Mr. Bannon,

2   Mr. Badolato, for that three or four-day period in January,

3   that January 4th through 7th, 2019?

4   A.  Yes.

5   Q.  And just generally, are there communications between the

6   three of them on their cell phones during those days?

7   A.  Yes.

8   Q.  Turn to a different topic.

9           MR. SOBELMAN:  We could just show the witness what is

10  marked for identification as Government Exhibit 312.  Actually,

11  can we put it next to 313.  No, we can't.  Okay, just 312.

12  Q.  Mr. Santos, did you review a spreadsheet of donor data from

13  GoFundMe for We Build the Wall that's in evidence as Government

14  Exhibit 313 in preparation for your testimony?

15  A.  Yes.

16  Q.  And is that spreadsheet very long?

17  A.  Yes.

18  Q.  Okay.  Thousands and thousands of people listed on it?

19  A.  Yes.

20  Q.  And did you also review in preparation for your testimony

21  this exhibit, Government Exhibit 312?

22  A.  Yes.

23  Q.  And is 312 a subset of the data that's in 313?

24  A.  Yes.

25  Q.  So just to be clear, 313 has names, dates of donations,

1   amounts of donations, ZIP codes of donors from all over the

2   place, right?

3   A.  Yes.

4   Q.  People all across the country?

5   A.  Yes.

6   Q.  312, on the other hand, is just individuals who live in the

7   Southern District of New York; correct?

8   A.  Yes.

9   Q.  And 312 adds one column of information which is the county

10  for the ZIP code that these people live in; is that right?

11  A.  Yes.

12  Q.  And do you look through sort of a representative sample

13  here to make sure that the county that's listed matches the ZIP

14  code that's listed in the chart?

15  A.  Yes.

16          MR. SOBELMAN:  The government offers Government

17  Exhibit 312.

18          MR. MERINGOLO:  No objection.

19          THE COURT:  It is admitted.

20          (Government's Exhibit 312 received in evidence)

21          MR. SOBELMAN:  We can just show it briefly.  Oh, it

22  should be offered under seal.  Thank you, Ms. Moe.

23          THE COURT:  Yes, that's understood.

24          MR. SOBELMAN:  Thank you, your Honor.

25          Why don't we just show the jury just for a moment so

1    they can see what it looks like, show a couple of pages.  Is it

2    on the jury screens, Ms. Drescher?  Okay.

3    BY MR. SOBELMAN:

4    Q.  So very briefly, Mr. Santos, the first column here, date,

5    time, that lists the date and the time of the donation;

6    correct?

7    A.  Yes.

8    Q.  Then there's donor name; is that right?

9    A.  Yes.

10   Q.  Then there's the amount of the donation, it's column C?

11   A.  Yes.

12   Q.  Then there's the postal code that the person provided to

13   GoFundMe, right?

14   A.  Yes.

15   Q.  And then last is the county that matches that postal or ZIP

16   code; correct?

17   A.  Yes.

18   Q.  Okay.  And if we could just scroll through this, quickly

19   show a few of the pages.  So there's Bronx County we saw,

20   Dutchess County, New York County, right?

21   A.  Yes.

22   Q.  That's Manhattan; is that correct?

23   A.  Yes.

24   Q.  And just maybe go all the way to the bottom so we can see

25   how many people are on this list.

1          Over 3,000 people on the list?

2     A.  Yes.

3     Q.  Okay.

4          MR. SOBELMAN:  We can take this down.

5     Q.  Just a few more questions and exhibits.

6          MR. SOBELMAN:  Ms. Drescher, can you please put up

7     Government Exhibit S-3, which the government offers at this

8     time, a stipulation between the parties.

9          MR. MERINGOLO:  No objection.

10         MR. SOBELMAN:  And the government offers pursuant to

11    that stipulation Government Exhibits 451, 453, and 454.

12         THE COURT:  They are admitted.

13         (Government's Exhibits S-3, 451, 453, 454 received in

14    evidence)

15         MR. SOBELMAN:  I'm going to read the stipulation with

16    respect to a couple of them.

17         First, Government Exhibit 454 is an authentic copy of

18    an electronic application that Timothy Shea, the defendant,

19    filed with the SBA on April 1, 2020.

20         Let's take a look at that.  If we can pull up

21    Government Exhibit 454.  I just wanted to show it briefly.  And

22    then if we can put up Government Exhibit 451 briefly.

23         The stipulation S-3 says for this:  Government Exhibit

24    451 is an authentic copy of a record of the Small Business

25    Administration, or SBA, displaying the bank account information

480

1    to which funds were transmitted by the SBA in connection with a

2    loan obtained by Timothy Shea, the defendant, in connection

3    with Ranch Property Marketing and Management LLC.

4            All right.  Let's take a look at our last exhibit,

5    which is Government Exhibit 908.  Not of the trial, just of

6    this witness.  This is just for the witness for the moment.

7    BY MR. SOBELMAN:

8    Q.  Mr. Santos, did you review this chart in preparation for

9    your testimony today?

10   A.  Yes.

11   Q.  And does it show certain financial transactions that are

12   reflected in bank records that are in evidence?

13   A.  Yes.

14   Q.  Is it accurate?

15   A.  Yes.

16           MR. SOBELMAN:  The government offers Government

17   Exhibit 908.

18           MR. MERINGOLO:  No objection.

19           THE COURT:  It is admitted.

20           (Government's Exhibit 908 received in evidence)

21           MR. SOBELMAN:  Ms. Drescher, if we could publish it to

22   the jury.

23   Q.  Mr. Santos, I'm just going to ask you a couple of questions

24   about this.  These various boxes and arrows, do they represent

25   financial transactions?

M5PVSHE3                         Santos - Direct

1    A.  Yes.

2    Q.  And just walk us through the top couple of transactions.

3    A.  So the presentation starts with a loan that was disbursed

4    from the Small Business Administration into a U.S. bank account

5    ending 4630.  The account was administered by Mr. Shea.

6          And then we're seeing another transfer for $60,000

7    from that specific U.S. bank account to another U.S. bank

8    account with the account number ending in 8292.  And in that

9    bank account, we see all the activity that's listed below,

10   namely, several payments to different credit cards, purchases

11   at The Skin Company, DoorDashes, and disbursements to several

12   individuals.

13   Q.  And just to be clear, on May 27, 2020, when the $59,700

14   comes into the Ranch Property account, the balance on that day

15   before that deposit is only $1,900; correct?

16   A.  Yes.

17   Q.  And in that very same day, that entire 59,700, plus another

18   300 goes out to Timothy Shea's personal bank account; correct?

19   A.  Yes.

20   Q.  And then the boxes beneath that reflect, sort of,

21   categories of the way that that money was spent ultimately from

22   the personal account; is that correct?

23   A.  Yes.

24   Q.  Okay.  Aside from reviewing these particular transactions

25   to make this chart, did you review any other financial

M5PVSHE3                          Santos - Cross

1    transactions for this case?

2    A.  Just the underlying statements for these accounts.

3    Q.  And just to be clear, did you make this chart or was this

4    chart provided to you by the prosecution team?

5    A.  Provided by the prosecution team.

6    Q.  You took the time you needed to go through and make sure

7    that it was accurate?

8    A.  Yes.

9    Q.  Okay.

10            MR. SOBELMAN:  One moment, your Honor.

11            (Counsel conferred)

12   BY MR. SOBELMAN:

13   Q.  Mr. Santos, aside from reviewing the exhibits we discussed

14   today and assisting in verifying the accuracy of these charts,

15   did you have any other role in the investigation or prosecution

16   of this case?

17   A.  No.

18            MR. SOBELMAN:  No further questions, your Honor.

19            THE COURT:  Cross-examination.

20   CROSS-EXAMINATION

21   BY MR. MERINGOLO:

22   Q.  Good afternoon, sir.  My name is John Meringolo.  I

23   represent Tim Shea.

24   A.  Good afternoon.

25   Q.  Did the government provide you --

M5PVSHE3                          Santos - Cross

1        THE COURT:  Would you go to the microphone, please.

2    Q.  Did the government provide you the loan agreement that

3    Mr. Shea did with Ranch Property, that you just -- the SBA

4    loan?

5    A.  I don't recall.

6    Q.  Did the government provide you any information that

7    Mr. Shea is actually paying that loan back?

8    A.  No.

9        MR. MERINGOLO:  If we could pull up 908.

10   Q.  You see you wrote two payments, personal credit card.  Two

11   payments to Tim Shea, The Skin Company, DoorDash, and other

12   payees, 130 payments, 60 payments to DoorDash.  Do you see

13   that?

14   A.  Just to be clear, I didn't create this graph; I just

15   confirmed that it was accurate.

16   Q.  Okay.  Well, it was accurate.  What spanned those 60

17   payments, from what period of time to what period of time?

18   A.  I don't recall.

19   Q.  What spanned those 130 payments, from what time to what

20   time?

21   A.  I believe it was a period of about a year or two.

22   Q.  We can agree that that loan was given on 5/27/20, right?

23   A.  Yes.

24   Q.  And those payments were a year or two, sir?  A year maybe?

25   We'll go to the low end.  About a year?

M5PVSHE3                        Santos - Cross

1    A.  Yes.

2    Q.  Okay.  And 60 payments to DoorDash, about a year?

3    A.  Yes.

4    Q.  And then two payments to The Skin Company within the year?

5    A.  Yes.

6    Q.  And the last two to credit cards and Mr. Shea within a

7    year, right?

8    A.  Yes.

9    Q.  Okay.  So you sit there today, you don't know exactly when

10   those payments were made, right?

11   A.  I don't recall.

12   Q.  Okay.  Do you know how many payments to DoorDash was made

13   after 5/27?

14   A.  I don't recall the exact number.

15   Q.  Do you know any payments to The Skin Company or when those

16   were?

17   A.  No.

18   Q.  Do you know if Mr. Shea took this loan agreement -- did you

19   know if he took it as income, sir?

20   A.  I don't know.

21   Q.  You're here testifying about this loan from the SBA.  Are

22   you aware of the loan program?

23   A.  No.

24   Q.  Are you aware that only one percent of the SBA loans, this

25   type of loan --

1           THE COURT:  Counsel, don't testify.

2    Q.  You're not aware that Mr. Shea is actually paying this loan

3    back, right?

4    A.  I don't know.

5    Q.  You talked about Signal.

6    A.  Yes.

7    Q.  And Signal, for the jury, is similar to WhatsApp?

8    A.  Yes.

9    Q.  Okay.  And if you seize somebody's phone, you can get into

10   their phone, right, your experience?

11   A.  It depends on the make and model of the phone, the

12   operating system version that's installed on the phone, whether

13   the phone is encrypted or not.

14   Q.  Did you review any of the phones that were seized from my

15   client when he was arrested?

16   A.  No.

17   Q.  Did you review any of the phones seized from Brian Kolfage?

18   A.  No.

19   Q.  Did you review any of the phones seized from Steve Bannon?

20   A.  No.

21   Q.  What about Mr. Badolato?

22   A.  No.

23           MR. MERINGOLO:  No further questions, your Honor.

24           THE COURT:  Redirect?

25           MR. SOBELMAN:  Your Honor, I'm sorry, but I need a

1    brief sidebar.

2              THE COURT:  Okay.

3              (At sidebar)

4              MR. SOBELMAN:  I'm sorry for the delay, your Honor.  I

5    did not offer the loan agreement, which we've stipulated to,

6    because of the concerns Mr. Meringolo expressed earlier.  And

7    then he crossed the witness about whether he had been shown the

8    loan agreement.

9              At this point, I think I'm entitled to offer it.  I'm

10   not sure we need to go through it with the witness now, but I

11   think he's opened the door to that.  In addition, this is now

12   the second time he's brought up making payments.  Mr. Shea has

13   made zero payments on this loan.

14             MR. MERINGOLO:  That's not true.

15             MR. SOBELMAN:  They are not past due.

16             MR. MERINGOLO:  That's not true.

17             MR. SOBELMAN:  I can have a witness here tomorrow --

18   do not talk over me, sir.

19             MR. MERINGOLO:  Listen, Judge --

20             MR. SOBELMAN:  Let me finish.

21             THE COURT:  Please just wait.

22             MR. MERINGOLO:  I know what they're doing.

23             THE COURT:  Hang on for a second.  I just want to hear

24   what he's going to say.  Go ahead again.

25             MR. SOBELMAN:  Thank you, your Honor.

1          We have Kathleen Littwin, who we produced 3500

2     material for, a witness from the SBA.  She's an attorney with

3     the SBA.  She would testify — and it's in the 3500 material —

4     that he has made zero payments.  We were not going to bring

5     that out because they actually are not yet due.  We don't think

6     it's -- it was not pertinent.

7          But Mr. Meringolo has now repeatedly opened the door

8     to it and falsely suggested to the jury that he has made

9     payments on this loan.  I don't think it's particularly

10    relevant, but I don't want to have the jury be misled.

11         THE COURT:  It's concerning because you've raised the

12    issue.  And I'm trying to think of a way that you can tidy this

13    up so that he does not have to go through the loop.

14         MR. MERINGOLO:  I think the evidence in the record is

15    he has no -- first he said he doesn't know.  So the evidence is

16    just it's just a question and there is no evidence.  It's just

17    a question.  There's no evidence.  If the jury asked for a

18    readback, did the witness testify that there was, in fact, a

19    loan payment, he would say, I don't know.  There's no evidence.

20         THE COURT:  Do you have any further information that

21    you wanted to share?

22         MS. CAPPELLINO:  It is my understanding Mr. Shea paid

23    around 200 and change.  And it had to do with minimum payments,

24    though nothing is due.  I do believe I read in the 3500, I

25    would have to check, but that's what I am being advised.  And

M5PVSHE3                     Santos - Cross

1    that's consistent with what I read.

2                THE COURT:  Are you saying that he made a payment that

3    he didn't --

4                MR. MERINGOLO:  Nominal payment, yes.

5                MS. CAPPELLINO:  I think it's a nominal payment.  Your

6    Honor, I don't know much beyond that.

7                MR. SOBELMAN:  That's correct.  There was a processing

8    fee.

9                THE COURT:  One second.

10               So the one thing is the processing, the other thing is

11   the amount which is due on the loan.

12               MS. CAPPELLINO:  I believe it's some sort of minimum

13   payment towards the loan.  But I --

14               MR. MERINGOLO:  You can yell at me.  Don't make faces

15   at her.

16               THE COURT:  One moment, please.

17               So this is a question of fact which can be easily

18   resolved.  But I don't quite understand what your position is

19   at this moment.

20               MR. SOBELMAN:  I have two issues.  Maybe it can be

21   resolved later.  I wanted to flag it immediately.

22               One is he implied that we should have provided the

23   loan agreement to the witness.  We stipulated to the loan

24   agreement.  I'm happy to put it into evidence.  But I think it

25   strongly suggests that the defendant misused the funds, which

1   is something we had agreed not to get into.

2            The second issue is he's now twice — two different

3   witnesses — suggested that the defendant made payments on a

4   loan that he has not made any payments on.  He wasn't required

5   to yet; it's still in forbearance.  But I don't want the jury

6   to get the misimpression based on the fact that there could

7   have been a $200 fee on a $60,000 loan.

8            THE COURT:  So you've opened the door to the loan

9   application.  You've opened the door to these payments.  What

10  are you going to do about it?

11           MR. MERINGOLO:  If he wants to put the application --

12  I would object.  Judge, they just submitted a chart for 130

13  payments.  And now this is why we're here, because they're

14  pulling everything up, that's fine.  I'm a gamer.  It is what

15  it is.  But they put this chart in and the guy had no

16  background.  So I cross him on this chart that's inconsistent,

17  that doesn't have any support.  You know, it's prior to the

18  loan, after the loan.

19           THE COURT:  All right.  Let's go back to the chart.

20  Is that Exhibit 980?

21           MR. SOBELMAN:  908.

22           THE COURT:  Okay.  Exhibit 908, at the top it says SBA

23  loan.  It certainly says nothing about COVID-19.

24           MR. MERINGOLO:  Right.  But anyone who has a small

25  business --

1                THE COURT:  No, no, no.  Small Business Administration

2       makes loans that are unrelated to COVID.

3                MR. MERINGOLO:  Yes, yes.

4                THE COURT:  So there's no insinuation that it's a

5       COVID loan.  And that was what you were worried about, that

6       there was going to be some sort of implication.

7                MR. MERINGOLO:  Yes, your --

8                THE COURT:  That he had obtained it unlawfully.  They

9       didn't bring it up.  It's not on the chart.  But you brought it

10      up.  And so it's out there.

11               And so if he wants to bring up the loan application or

12      bring up the payments, he's entitled to do it.  But I would

13      allow you to tidy this up in some way so that we don't have to

14      go down a road that could be unnecessarily damaging to your

15      client.

16               MR. MERINGOLO:  You are correct, Judge.  I stopped the

17      questions.

18               THE COURT:  Right.  But that's not enough.

19               MR. SOBELMAN:  Maybe I can make a suggestion about a

20      compromise that could work.  For now, we could offer the loan

21      agreement.  We can work out with defense counsel about what we

22      can bring out in closing about it.  I won't go through it with

23      this witness.  And if there's an issue, we'll bring it to your

24      Honor's attention.

25               With respect to the payments, we can confer.  And if

1    he's made a $200 payment, we'll stipulate that he's made a $200

2    payment.  But then I want the stipulation to reflect the facts.

3    There's a $60,000 loan, he's paid $200.  And that way -- I

4    don't think we're going to argue on it, but that way there's no

5    misimpression left with the jury, and we can read that

6    stipulation later today or tomorrow.

7              THE COURT:  I want to go back to the first one about

8    the agreement, the loan agreement.

9              MR. SOBELMAN:  Yes.

10             THE COURT:  What is it that you're expecting?

11             MR. SOBELMAN:  So, your Honor, I did not offer the

12   loan agreements, because even though we stipulated to it, what

13   I'm saying is I can offer it now, because he's now put us in a

14   position where he said to the witness, Well, he didn't show you

15   the loan agreement.

16             THE COURT:  So you're saying that you want your client

17   to be exposed by seeing that loan agreement.  It's going to say

18   COVID all over it.

19             MR. SOBELMAN:  Your Honor, we could redact that.

20             MR. MERINGOLO:  I don't want it in, Judge.  But if I

21   opened the door and made a mistake, I live with my mistakes in

22   life.  You know, what it is, Judge, I was crossing basically

23   that he wasn't given all the information, you know?  And that

24   the payments, 130 payments, didn't happen after the loan,

25   Judge.  The 130 payments just didn't happen after the loan.

1          THE COURT:  All right.  Well, if you're okay with the

2    loan agreement coming in with references to COVID-19 redacted,

3    then that's okay.

4          MR. SOBELMAN:  So we'll offer it now.  We won't put it

5    up.

6          THE COURT:  You won't put it up.

7          MR. SOBELMAN:  We'll redact it later.  That's how

8    we'll deal with it.  I can talk with them about the payment

9    issue.  I'd rather not have to call another witness to chase

10   down something that's really a sideshow.

11         MR. MERINGOLO:  I think for the client and the record,

12   we agree the team is that we have to object.  But if we're

13   overruled, it comes in, we'd ask that it be redacted.

14         THE COURT:  You can absolutely make your objection.

15   I'm not telling you not to make your objection.

16         MR. MERINGOLO:  No, no, I know you're not, Judge.  But

17   I may have said I live with my -- you know.

18         THE COURT:  I understand.

19         So the application is going to come in.  He won't show

20   it; and then if the jury asks for it, it will be in a redacted

21   form.

22         MR. SOBELMAN:  Just to be clear, the application is

23   already in evidence.  I put it up very briefly.

24         THE COURT:  Oh, it is in evidence.

25         MR. SOBELMAN:  Yes.  He asked about the loan

1    agreement.

2           THE COURT:  I'm sorry, the loan agreement.  Two

3    different documents.

4           MR. SOBELMAN:  That's what I intend to offer.

5    Pursuant to a stipulation that's already signed, we'll redact

6    references to COVID-19.  Frankly, I didn't look through the

7    application; it may also have such references.  We'll redact

8    those too.  It's irrelevant to the case whether it's a COVID-19

9    loan or not.

10          THE COURT:  It's not relevant to the case, but we had

11   certain agreements about what would come in and what would not

12   come in, and I want to see that they're honored as closely as

13   possible.

14          MR. SOBELMAN:  We're trying.

15          THE COURT:  Okay.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. SOBELMAN:  Your Honor, I don't have any additional

3    questions.  I just want to offer Government Exhibit 452

4    pursuant to stipulation S-3.  Just give me one moment to confer

5    with counsel.

6          (Counsel conferred)

7          MR. SOBELMAN:  The wisdom of my colleagues is better

8    than mine.  I do have a few questions, if that's all right.

9          THE COURT:  All right.

10         MR. SOBELMAN:  First, I'm not going to put up the

11   document, but let's just put up the stipulation so it's cleared

12   what was just received in evidence, which was 452.  If we could

13   put up S-3.  It says:  Government Exhibit 452 is an authentic

14   copy of a loan authorization and agreement between the SBA and

15   Timothy Shea, the defendant, dated May 22nd, 2020.

16   REDIRECT EXAMINATION

17   BY MR. SOBELMAN:

18   Q.  Mr. Santos, do you recall being asked by defense counsel

19   whether we showed you the loan agreement for the SBA loan?

20   A.  Yes.

21   Q.  And based on your reading of the stipulation, is that the

22   loan agreement we just offered into evidence?

23   A.  Yes.

24   Q.  Okay.

25         MR. SOBELMAN:  You could take that down, Ms. Drescher.

1    Q.  You were asked a few questions about how quickly the money

2    that was transferred into Tim Shea's personal account was

3    spent.  Do you recall those questions?

4    A.  Yes.

5    Q.  Okay.  Would it be helpful to your recollection to look

6    through some of the bank records that you analyzed in

7    authenticating the chart?

8    A.  Yes.

9    Q.  Okay.

10          MR. SOBELMAN:  Ms. Drescher, could you please put up

11   Government Exhibit 1900 and go to the page with number 259374.

12          Thank you.

13   Q.  And do you see here that the money was transferred from --

14   the first account, the SBA account, into the other account, the

15   Ranch Property account, on May 27th, 2020?

16   A.  Yes.

17   Q.  Okay.  That was the first arrow on the chart, right?

18   A.  Yes.

19   Q.  Okay.  Let's go look at the second account now, which is

20   Government Exhibit 2000.  We're looking at page 259134.

21          And do you see the top line under "deposits credits,"

22   this is the deposit or the transfer from the Ranch Property

23   account to Tim Shea's personal account; correct?

24   A.  Yes.

25   Q.  Which was the same day as the loan payment?

1    A.  Yes.

2    Q.  And that's for $60,000; correct?

3    A.  Yes.

4          MR. SOBELMAN:  Now, let's look at the top.  And if we

5    can zoom in on the total deposits and withdrawals for that

6    month.

7    Q.  When you add up the withdrawals that month and you look at

8    both card withdrawals and other withdrawals, is that amount

9    more than $60,000?

10   A.  Yes.

11   Q.  So just to be clear, essentially, all the money that had

12   come in that month was spent approximately in that month;

13   correct?

14   A.  Yes.

15   Q.  Didn't take a year or two years for all those other

16   transactions to occur?

17   A.  Correct.

18   Q.  Your recollection is refreshed on that now?

19   A.  Yes.

20   Q.  Okay.

21         MR. SOBELMAN:  No further questions, your Honor.

22         THE COURT:  Recross.

23         MR. MERINGOLO:  No questions, Judge.

24         THE COURT:  You may step out.

25         THE WITNESS:  Thank you.

1           (Witness excused)

2           THE COURT:  And you may call your next witness.

3           MR. ROOS:  Thank you, your Honor.

4           The government calls Andrew Crain.

5    ANDREW CRAIN,

6         called as a witness by the Government,

7         having been duly sworn, testified as follows:

8           THE LAW CLERK:  State and spell your name for the

9    record.

10          THE WITNESS:  My name is Andrew Crain; A-N-D-R-E-W,

11   C-R-A-I-N.

12          THE COURT:  You may inquire.

13          MR. ROOS:  Thank you, your Honor.

14   DIRECT EXAMINATION

15   BY MR. ROOS:

16   Q.  Good afternoon, Mr. Crain.  What do you do for work?

17   A.  I work as a managing director at a firm called Berkeley

18   Research Group.

19   Q.  And what kind of work do you do there?

20   A.  I specialize in digital forensics work.

21   Q.  I'm going to ask you a few questions about what that is in

22   a moment, but let me just ask, how long have you worked in your

23   current job?

24   A.  I've been with my current firm since the summer of 2018.

25   Q.  How long have you been doing digital forensics?

Crain - Direct

1   A.   A little more than 20 years now.

2   Q.   So what is that?  What are digital forensics?

3   A.   So I guess described generally, it's the identification and

4   preservation and then analysis or interpretation of digital

5   evidence; things that come off of computers, phones, thumb

6   drives, cloud accounts, things like that.

7   Q.   Okay.  I'll come back to that.  But let me just get a

8   little more of your background.

9            So did you go to college?

10  A.   I did, yes.

11  Q.   Where did you go to college?

12  A.   I went to a school in Indianapolis called Butler

13  University.

14  Q.   Do you have secondary schooling?

15  A.   Yes, I have a law degree from the University of Colorado.

16  Q.   Can you walk through your experience after law school.

17  A.   Sure.  So after law school, I joined an investigative

18  boutique run by some former FBI agents.  And that was where I

19  got my start in computer forensics.  The firm had a need for

20  that at the time; so on top of doing, you know, traditional

21  investigative work, I've been doing this computer work now for

22  about 20 years.

23  Q.   Okay.  And have you received any sort of specialized

24  training with respect to the computer work?

25  A.   Yes.  We do training every year.  Over the past 20 years,

1    I've done training courses from pretty much all of the major

2    software providers that make the software we use, as well as a

3    variety of other things like conferences, etc.

4    Q.  What are some of the contexts in which you're hired to do

5    digital or computer forensic work?

6    A.  There can be a lot of different things.  I have developed

7    sort of a specialty in these cases where people are accused of

8    having taken confidential information when they move from

9    company to company.  But I've done kind of the whole gamut of

10   fraud and embezzlement and even down to, you know, interpreting

11   information about, you know, who cut down some trees.

12   Q.  Okay.  Have you testified in court before?

13   A.  I have a number of times, yes.

14   Q.  What types of cases?

15   A.  Mostly civil cases, a couple of criminal cases.  Like I

16   said, many of them are these theft of confidential information

17   cases.

18   Q.  And in cases you've testified in, are you typically

19   compensated?

20   A.  Yes, my firm receives, you know, compensation in the form

21   of my hourly rate.

22   Q.  Your firm bills your hourly rate.  And do you get that

23   money?

24   A.  Not directly.  I just get paid a base salary with an

25   opportunity for a bonus.

M5PVSHE3                        Crain - Direct

1    Q.  Okay.  Is your firm being paid in connection with your work

2    in this case?

3    A.  Yes, it is.

4    Q.  Do you know how much has been billed to date?

5    A.  I think on the order of $20,000.

6    Q.  Okay.  And what types of work have you sort of been -- have

7    done or been billed?

8    A.  We were asked to look at some specific documents, and the

9    forensic evidence and dates associated with those documents.

10   Q.  We'll come back to that.

11          Does your pay depend at all on what the outcome of

12   this case is?

13   A.  No, not at all.

14   Q.  And you don't get like a bonus or anything for testifying

15   or the outcome of the case, right?

16   A.  Nope.

17   Q.  All right.  Let's talk a little bit about -- by the way,

18   actually, just on the question of your pay, has part of your

19   billing times that you've met with the government?

20   A.  Yes.  Correct.

21   Q.  And how many times do you think you've met or had

22   conversations before testifying today?

23   A.  Maybe three or four.

24   Q.  How much, like, total time are we talking about?

25   A.  Those meetings are generally an hour or less.

1    Q.   Okay.  So the majority of the time that you've billed has

2    been on the actual, like, computer forensic work; is that

3    right?

4    A.   That's correct.

5    Q.   Let's talk about that forensic analysis.

6            Can you describe in broad terms what sort of analysis

7    you did in connection with this case.

8    A.   Well, like I said, we were asked to look at some specific

9    documents.  So we looked for all copies of those documents that

10   we could find, and then really honed in on the dates that were

11   associated with them.

12   Q.   And is there a particular document or agreement you're

13   referring to?

14   A.   The primary one is what I've been calling the donor list

15   agreement.

16   Q.   Okay.  And let's take a look at it.

17           MR. ROOS:  Ms. Drescher, can we please bring up

18   Government Exhibit 153, which is in evidence.

19   Q.   Mr. Crain, is this the document?

20   A.   Yes, this is what I was calling the donor list agreement.

21   Q.   Okay.  And this is the document you've done some analysis

22   on or versions of this document; is that right?

23   A.   That's exactly right.

24   Q.   Why don't we start by just reading the document.

25           MR. ROOS:  Ms. Drescher, can we zoom in a little bit.

M5PVSHE3                        Crain - Direct

1   Q.  And Mr. Crain, would you mind just reading it from top to

2   bottom.

3   A.  Sure.  So dated March 29, 2019, addressed at the top, Tim

4   Shea, RPMM, Inc., re line, donor list agreement.

5           Dear Tim:  As you know, I am the owner of the donor

6   contact list for my various campaigns and have a license

7   covering new donor list information from We Build the Wall,

8   Inc.  That license excludes any use related to the southern

9   border wall.  I would agree to license the list I own and

10  sublicense the list I license to RPMM, Inc. for $150,000 for

11  six months' use or until a second wall is built by We Build the

12  Wall, Inc. or a related entity, whichever is later.

13          RPMM agrees not to use this list for any activities

14  that would conflict with my agreement not to use the list for

15  any matters related to the construction of a southern U.S.

16  border wall.  Six-month period begins from the date of first

17  use of the lists by RPMM.  If this agreement meets with your

18  approval, please sign below and I will forward the list upon

19  receipt of your signature and the payment.

20          Best regards, signed, Brian Kolfage.

21          And then:  Read and approved, RPMM, signed, Tim Shea,

22  member.

23  Q.  Okay.  So the agreement is the sale of this list for six

24  months for $150,000, at least that's what it says on its face?

25  A.  That's what it appears to me.

M5PVSHE3                              Crain - Direct

1   Q.  And do you have any firsthand knowledge of the substance of

2   this agreement?

3   A.  No.

4   Q.  What's the date on the top of it?

5   A.  So at the top, March 29, 2019.

6   Q.  What were you -- what was your assignment or what were you

7   trying to determine with respect to this agreement as part of

8   this case?

9   A.  Specifically trying to determine what the forensic metadata

10  tells us about the dates of this document and, again, all the

11  copies that we could find.

12  Q.  So what does that mean?

13  A.  So computers track various dates related to files that they

14  create and modify.  So we can look at a variety of different,

15  sort of, date sources and different forensic clues to tell us

16  when documents were created or opened or downloaded, printed,

17  all these kind of things.

18  Q.  So basically, you're trying to figure out when this

19  document was created?

20  A.  Correct.

21  Q.  And what did you determine about the date or dates on which

22  this agreement was created and signed?

23  A.  All the dates that we could find relative to this document

24  from a forensic standpoint are from October of 2019.

25  Q.  So six months after this date on the agreement?

1    A.  I think that math would be right, yes.

2    Q.  Okay.  Let's talk about how you got there.

3            I'm going to show you first just for the witness for

4    identification Government Exhibit 907.

5            And what is this?

6    A.  So this is a timeline that we compiled essentially

7    summarizing all of our findings about what I was just

8    describing.

9    Q.  And what's the source material for the timeline?

10   A.  Well, we have some government exhibits there out to the

11   right, but we looked at various email accounts, computers,

12   phones, that's where we found all this information.

13   Q.  And is the data, the source data that's in the government

14   exhibits and from which this is drawn, voluminous data?

15   A.  Definitely, especially in the case of computer images.

16   Q.  Okay.  So like it includes things like system files and

17   stuff like that?

18   A.  Correct.  Deleted information.  You're talking about

19   hundreds of gigabytes.

20           MR. ROOS:  Government offers 907.

21           MR. MERINGOLO:  No objection.

22           THE COURT:  It is admitted.

23           (Government's Exhibit 907 received in evidence)

24           MR. ROOS:  Can we publish to the jury.

25   Q.  So, Mr. Crain, this is the first time the jury is seeing

1    this.  So could you start by orienting us, what are the columns

2    and the rows?

3    A.  Sure.  So I guess the column headings there in the second

4    line should be pretty self-explanatory.  The date column,

5    corresponding time in the second column for whatever date is

6    indicated.  The third and fourth columns, from and to, that's

7    in the case of email messages, who it's from and who it's to.

8            The detail column essentially summarizes what the line

9    means or what we found on that line.  And then the GX column at

10   the far right is the government trial exhibit numbers.

11   Q.  Okay.  All right.  So let's walk through this.  Let's start

12   with the first entry.  What's the first entry?

13   A.  Sure.  So this is, again, occurring on October 22nd.  And

14   this is the first, sort of, trace of this document that we

15   could find, which is it being emailed from someone named Rich

16   Kaye to Amanda Shea.

17   Q.  And when you say that "we could find," where did you look,

18   like, what kind of things were you looking in?

19   A.  Again, looking across all these different sources of

20   evidence, like email accounts, computers, phones, etc.

21            (Continued on next page)

22

23

24

25

 1   Q.  So, you had the full phones, computers, e-mail accounts for

 2   various people, and you're looking across all of them?

 3   A.  Correct.  As well as looking in a database of all the

 4   documents that's housed and part of the litigation.

 5   Q.  Got it.  So why don't we look at the documents that are

 6   referenced here on the right which are the source materials for

 7   this.

 8           MR. ROOS:  And Ms. Drescher, can we start by pulling

 9   up Government Exhibit 129.

10   Q.  Can you read what we see on Government Exhibit 129?

11   A.  Sure, so this is an e-mail header from RK, with the address

12   RichKayeESQ@gmail.com sent Tuesday, October 22, 2019, 6:50 p.m.

13   Sent to the address AT.sheamedia@gmail.com.  And attaching a

14   file entitled March 29.docx.

15   Q.  What, if anything, stood out to you about this e-mail?

16   A.  Well, it's just a bare e-mail transmitting this attachment,

17   you'll see there is no subject line, there is no body to the

18   e-mail.  It was also a little bit notable in it was sent from

19   Mr. Kaye's Gmail address, whereas the bulk of the e-mail I saw

20   in the population from him came from a different address.

21   Q.  Can you look at the attachment, 129A, please.  What file

22   format was the attachment on the last -- on this e-mail?

23   A.  So this is the attachment to what we just looked at sent as

24   a Word document.

25   Q.  Did you review metadata in connection with this Microsoft

1   Word document?

2   A.  Yes, we did.

3   Q.  What is metadata, by the way?

4   A.  So metadata is often described as data about data.  It is

5   also sometimes described as kind of bibliographic information.

6   In the case of an e-mail, it would be things like the to and

7   the from and the date.  In the case of the documents, it could

8   be the date it was created or how long it was edited.

9   Q.  Sort of like a big word, but really just means like when

10  the document was created, who created it, when it was edited,

11  when it was printed; stuff like that?

12  A.  Exactly.  Hence the sort of bibliographic definition.

13  Q.  So, let's look at the metadata.  Let me pause.  This is the

14  document that's attached to the e-mail, right, the Word

15  document?

16  A.  That's correct.

17  Q.  How does it compare to the very first document we looked

18  at, the signed one?

19  A.  I think it is missing signatures.

20  Q.  So it is otherwise the same?

21  A.  I believe so.

22  Q.  Now let's look at the metadata.  The data about the data.

23  What did you learn from looking at the metadata on this

24  document?

25  A.  So, we learned the things that are indicated here, document

1   authored by Rich Kaye, he's also the person that last saved the

2   document.  We go down a few lines, we can see it was created on

3   October 22, 2019, and then last saved about 15 minutes later.

4   Which you'll see is also corroborated by that furthest down

5   field, total editing time 15 minutes.

6   Q.  The document we were looking at, can we go back to the

7   first page, says it is dated March 29, 2019.  Was there any

8   metadata associated with this showing it was created or edited

9   in March 2019?

10  A.  No.

11  Q.  Is this document signed?

12  A.  Not this version.

13  Q.  So let's go back to the chart now please.  What's the next

14  entry in the chart?

15  A.  The second line, which again is happening on October 22, is

16  Amanda Shea e-mailing this document to Timothy Shea, which I

17  think is just a few minutes later than it was received on the

18  first line.

19  Q.  So why don't we look at that source document.  Can we see

20  130, please.  And is this the e-mail you were referring to?

21  A.  Yes, you can see that Ms. Shea is forwarding what she

22  received from Mr. Kaye I think about five or six minutes later

23  on that same October 22 date.

24  Q.  Other than the signature block, is there any sort of

25  message or content to the e-mail?

1   A.  No, it does have a subject line now just because it's a

2   forward that's automatically created.

3   Q.  Let's look the attachment.  So 130A.  Thank you.  And how

4   does this document compare to the version agreement you looked

5   at a moment ago?

6   A.  The attachment at this point is identical.

7   Q.  Let's go to the next page.  What, if anything, did you see

8   in the metadata?

9   A.  We see the exact same thing we talked about a few minutes

10  ago when we examined the metadata of this document as it had

11  been sent from Mr. Kaye to Ms. Shea.  It is unchanged here as

12  forwarded.

13  Q.  She's just forwarding the e-mail?

14  A.  Yes, five or six minutes later.

15  Q.  Let's go back to the chart.  What's the next entry?

16  A.  So our third line there which is now October 28 is Mr. Shea

17  sending this same attachment March 29.docx to Mr. Kolfage.

18  Q.  Let's look at those documents, why don't we put them side

19  by side, so 131 and 131A next to each other.

20          Starting on the e-mail, what's the date of the e-mail?

21  A.  October 28, 2019, 11:39 p.m.

22  Q.  Who is it from and to?

23  A.  So from Tim Shea with the address

24  TimShea.realestate@gmail.com.  And sent to Brian Kolfage with

25  the address BK@BrianKolfage.com.

1    Q.   Looking at the attachment, which is a Word document; is

2    that right?

3    A.   That's correct.

4    Q.   How does the Word document, which is 131A, compare to the

5    two Word documents we already looked at, the ones sent on

6    October 22?

7    A.   It is identical.  It was unchanged as it was received on

8    October 22.

9            MR. ROOS:  Ms. Drescher, can we go to the second page.

10   Q.   Here is the metadata again.  Is there anything new in the

11   metadata?

12   A.   No, same thing.

13   Q.   Does the document show anything about being created in

14   March?

15   A.   No.  Again, all the dates point to October of 2019.

16   Q.   Why don't we go back to the chart then.  What's the next

17   entry in the chart?

18   A.   So that's our fourth line there.  Occurring again on

19   October 28.  So this is some information that we found on

20   Mr. Shea's iPhone, where essentially he's scanning in a signed

21   copy of this document.

22   Q.   Okay.  So this is like a slightly different type of data or

23   information; is that right?

24   A.   That's correct.  This is related to an application on his

25   iPhone called CamScanner.

M5p3she4                          Crain - Direct

1   Q.   What's CamScanner?

2   A.   An application that allows you to take a picture of a

3   document as a means of scanning it, like you used to have to do

4   with a printer or something.

5   Q.   So, let's look at the documents then that are part of this

6   entry.  Let's start with 58.  So Mr. Crain, what's Government

7   Exhibit 58?

8   A.   So this is a picture of this document, which we can see is

9   now signed by Mr. Shea.  Again, found on his iPhone associated

10  with the CamScanner application.

11  Q.   Who has signed the agreement?

12  A.   So Mr. Shea has signed the document at this point.

13  Q.   Has Brian Kolfage?

14       THE COURT:  Are you saying that this is a document

15  stored within CamScanner?

16       THE WITNESS:  It is part of the application on his

17  phone, yes.

18  Q.   Maybe you can explain how CamScanner works.  If I have a

19  document right here that I want to scan, turn into a scan, how

20  do I get with my phone -- how do I make it into a scan.

21  A.   There is various applications that can do this now.  You

22  take a photo of the document, as it's printed in hard copy

23  sitting on the table.  And the application will essentially

24  create a picture, it can render a PDF, generally, of what it

25  scans.

1    Q.  I mean, this picture that's on the screen doesn't really

2    look like a scan.  How does it get to a scan?

3    A.  So, these applications will do a little bit of clean up on

4    the photo.  So what we are seeing here is the photo as it's

5    first taken.  It is actually stored on his phone in a JPEG

6    format like a picture file format.  Then it will kind of whiten

7    it up and clean the background and make it look more like an

8    electronic document.

9    Q.  We'll walk through that.  Let me ask you one or two

10   questions about this picture.  This is the first step in the

11   scanning process; is that right?

12   A.  That's correct.

13   Q.  So, is there any information on the phone about when this

14   picture was taken?

15   A.  Yes, there is.  And that's stored in some information in

16   the phone again connected to the CamScanner application.

17   Q.  Why don't we look at Government Exhibit 58D.  What's this?

18   A.  So this is an excerpt of some reporting from a forensic

19   software tool called Cellebrite which is commonly used to

20   examine mobile devices like phones.  And this is the

21   information related to what we just looked at in Exhibit 58.

22   The JPEG picture of the printed and signed document.

23   Q.  So, what does this information say about when that picture

24   was taken in connection with the CamScanner app on his phone?

25   A.  So we can see kind of in the lower-right-hand corner there

1    a creation and modification time stored.  So it tells us that

2    this picture was taken on October 28, 2019, at 6:04 p.m.

3    Q.  I think you said that -- if we go back to 58.  I think you

4    said that the app cleans up this picture; is that right?

5    A.  That's correct.  In order to save it ultimately as a PDF.

6    Q.  Why don't we look at 59.  What's this one?

7    A.  So this is the PDF that ultimately gets rendered by

8    CamScanner as part of that scanning process.

9    Q.  Is there data associated with this PDF also?

10   A.  Yes, much like what we just looked at.

11   Q.  Let's look at 59D.  Can you tell us what we are looking at

12   here?

13   A.  We are again looking at an excerpt from that same

14   Cellebrite software tool now related to the cleaned up copy.

15   59.  And we can see again in the lower-right-hand corner we

16   have the October 28, 2019, date.  We'll note this is about

17   10 seconds after what we just looked at in the prior exhibit.

18   Q.  So put it together for me.  58, 58D, 59, 59D, what happened

19   here?

20   A.  Mr. Shea printed out the document to hard copy.  Signed it.

21   Took a photo of it with the CamScanner application and saved it

22   as a PDF.

23   Q.  When does the metadata say that happened?

24   A.  October 28, 2019.

25   Q.  Let's go back to the chart.  What's the next entry on the

1    chart?

2    A.   So next we have an e-mail from just a little bit later that

3    same minute of 6:04 p.m., where Mr. Shea e-mails the PDF to

4    Mr. Kolfage.

5    Q.   Let's look at that document.  So, Government Exhibit 152,

6    please, Ms. Drescher.

7              What do we see here?

8    A.   So this is the e-mail transmitting the PDF copy sent from

9    Mr. Shea to Mr. Kolfage.  We see there that it says October 29,

10   2019.  That date stamp is in what's called UTC time.  Greenwich

11   Mean Time.  So if we convert that time or normalize that time

12   back to Mountain Time, we get the 6:04 p.m. on October 28.

13   Q.   Is there a date in the file name?

14   A.   Yeah, which is typical with these scanning applications,

15   that the default file name will contain date and time

16   information.

17   Q.   Now let's look at that actual attachment, that PDF

18   document.  So thank you, 152A.  And how is this attachment

19   that's e-mailed compare to the one that we were just looking at

20   as the scan from the phone?

21   A.   I believe it is identical.

22   Q.   Let's go back to the chart and look at the next entry.  And

23   what's the entry right below the e-mail there?

24   A.   So this is a couple minutes later, again, on October 28.

25   This is a finding from Mr. Kolfage's computer, specifically

M5p3she4                          Crain - Direct

1    showing that he downloaded a document with the same name that
2    we just saw in the preceding e-mail.
3    Q.  The exhibit that's assigned to that is 231D.  Why don't we
4    pull that up.  Can we zoom in on this.
5            So Mr. Crain, this could be another language to me.
6    Can you explain what we are looking at here?
7    A.  Sure.  So this is an excerpt of reporting from a forensic
8    software tool called Magnet Axiom.  If we scroll down a little
9    bit.  We can make sense of some of the fielded information.
10           So this is reporting about a forensic artifact on that
11   computer.  Something called a jump list.  Or excuse me.  It's
12   this is a download record.  So this is showing that the file
13   with that name new doc 2019-10-28 was downloaded to his
14   computer on October 28, 2019, using the Chrome application.
15   Q.  What's Chrome?
16   A.  Chrome is made by Google, so internet browser much like
17   Internet Explorer or other ones that people might be familiar
18   with.
19   Q.  This whole thing just says that Kolfage's computer
20   downloaded the thing that was e-mailed?
21   A.  Correct.
22   Q.  And that happened on October 28, 2019 at 18:06?
23   A.  That's correct.  That's local time, Mountain Time.
24   Q.  Now, can we look at Government Exhibit 232D.
25           Mr. Crain, this is also referenced in the chart.  What

1   does this printout show?

2   A.   So this one is the jump list one I was thinking about, and

3   I apologize for my confusion.  Jump lists are an artifact in a

4   Windows computer that keep track of documents that have been

5   opened.

6          So when we parse that artifact, with our forensic

7   tool, we can see that the file that had just been downloaded,

8   the new doc 2019-10-28, the PDF was opened.  And it was opened

9   at 18:07.  That's a little bit about halfway down the field

10  called last access date time.

11  Q.   Okay.  So, let's go back to the chart.  Which entry are we

12  on now?

13  A.   So we just did both of the -- we did the 18:06 entry and

14  the 18:07 entry.

15  Q.   What's the last entry?

16  A.   So the last one is just a few minutes later, again on

17  October 28.  Which that file, new doc 2019 is now being

18  e-mailed from Mr. Kolfage to Mr. Shea.

19  Q.   Let's look at those source documents.  Can we see

20  Government Exhibit 133 and 133A together.  Let's start on the

21  left on the e-mail.

22          Can you read through the e-mail for us.

23  A.   Sure.  So sent from Brian Kolfage, the address

24  BK@BrianKolfage.com to Tim Shea, with the address

25  TimShea.realestate@gmail.com.  Subject re new doc 2019-10-28.

18.04.05 with a sent time Tuesday, October 29, 2019, 12:09 a.m.

I would note that's in UTC time.  And showing there is an

attachment new doc 2019-10-28 18.04.05.PDF.  And the body of

the e-mail just says "executed."

Q.  Let's look at the attachment.  Now, how is the attachment

different than the prior version of the attachment we looked

at?

A.  This one now contains Mr. Kolfage's electronic signature,

presumably.

Q.  Can you explain what an electronic signature is?

A.  It's just a way PDF files that you can typically up -- just

electronically apply your signature to a document.

Q.  Have you looked at metadata for this version of the

document that is signed by both Tim Shea and Brian Kolfage?

A.  Yes, we can look at the PDF metadata of that.

Q.  What date was it last modified on?

A.  October 28.

Q.  Let's go back to the chart.  So, can I just ask you, on

October 28, starting at 18:04, you testified that's when

Timothy Shea's phone uses the CamScan application to scan it.

Is that right?

A.  That's right.

Q.  Can you just walk us through, put it together for us what

happens after that point.

A.  So after the printed version is scanned in, it's e-mailed

M5p3she4                          Crain - Cross

1     to Mr. Kolfage.  Mr. Kolfage downloads it, opens it, and then

2     e-mails a countersigned version back to Mr. Shea.

3     Q.  Now, the countersigned version that he e-mails back to

4     Timothy Shea, is that the same version as the first one we

5     looked at, at the beginning of your testimony?

6     A.  I believe it is.

7     Q.  Based on all these materials, what are your findings about

8     when this document was created, modified, and signed?

9     A.  In between October 22 and October 28 of 2019.

10    Q.  Is there any evidence in all the electronic data you looked

11    at this document was created, modified or signed in March 2019?

12    A.  No.

13              MR. ROOS:  No further questions.

14              THE COURT:  Cross-examination?

15              MR. MERINGOLO:  Yes, Judge.

16    CROSS-EXAMINATION

17    BY MR. MERINGOLO:

18    Q.  Good afternoon, sir.  My name is John Meringolo.  I

19    represent Tim Shea.

20              How are you?

21    A.  I'm good, thank you.

22    Q.  The first time we got your information I thought it was the

23    metaverse, not metadata, so excuse me on how we are going to do

24    it.

25    A.  That would make it a little more interesting.

M5p3she4                        Crain - Cross

1    Q.  I would like to pull up Exhibit 129.  And that exhibit,
2    this is where the contract, the March 29 contract originates
3    from, correct?
4    A.  This is, from everything I've seen, yes, the beginning of
5    the story.
6    Q.  But you can't testify for certainty that that was created
7    on October 22, correct?
8    A.  I'm not sure that's correct, unless I'm misunderstanding
9    your question.
10   Q.  Did you search any of the computers from Mr. Kaye?
11   A.  I don't believe we had Mr. Kaye's computers.
12   Q.  Did you search any of the phones of Mr. Kaye?
13   A.  Same answer.  I don't believe we had access to that.
14   Q.  And that document was sent from Richard Kaye, right, ESQ?
15   A.  That's the address, yes.
16   Q.  And you went to law school, right?
17   A.  Yes, I did.
18   Q.  You were a lawyer until 2008?
19   A.  I'm not sure what you're referring to.
20   Q.  You let your license expire in 2008?
21   A.  It's not expired.  I just keep it on inactive status
22   because I don't practice law.
23   Q.  You would not be a lawyer in good standing; you would be
24   inactive, right?
25   A.  I guess I don't think inactive and good standing are

1   synonymous.

2   Q.  Are you up to date on the CLEs you have to take?

3             MR. ROOS:  Objection, your Honor.  I don't know what

4   the point of this is.

5             MR. MERINGOLO:  He's the one fighting me.

6             THE COURT:  He can explain what his status is.

7   A.  In California, when you put your license on inactive

8   status, you don't have CLE requirements.

9   Q.  But if you wanted to be active, you would actually have to

10  make up continuing legal education, correct?

11  A.  I guess I don't know the answer to that.

12  Q.  Okay.

13  A.  I would have to look at that.

14  Q.  No one is trying to get you.  I'm just talking.

15  A.  Okay.

16  Q.  But you didn't, you've never seen Richard Kaye's computers

17  or phones, so you can't say with scientific certainty that this

18  was created on October 22, correct?

19  A.  There is data that travels inside that document as sent by

20  Mr. Kaye to Ms. Shea.  And that's what we looked at.  So that

21  would bear that stamp of October 22.  But, you're correct in a

22  hypothetical sense, if there was some other version on

23  Mr. Kaye's devices, I don't have those.

24  Q.  Meaning if Mr. Kaye wrote it on October 21 at 10 p.m., and

25  then he sent it on October 22, you can't tell me for certainty

M5p3she4                        Crain - Cross

1    that it was created on October 21, right?

2    A.  We do know that by virtue of the metadata that travels

3    inside the Word document.  If he did something in a completely

4    separate document on the 21st, then you would be correct.

5    Q.  But if you had his cell phone or his computer, it would be

6    much better evidence to make a determination, correct?

7              MR. ROOS:  Objection.

8              MR. MERINGOLO:  Meaning Mr. Kaye.

9              THE COURT:  He can answer as to whether it is better.

10   But he hasn't answered.

11   Q.  If you had Mr. Kaye's computer or wherever this was edited

12   or written, that would give you more scientific evidence on

13   exactly what time it was originated, right?

14   A.  Only if Mr. Kaye, like I said, had a second different

15   version or something.  The creation date that we get from the

16   metadata in the Word document travels with, so, I find that

17   reliable.

18   Q.  Okay.  But this -- and that's his e-mail, right, Richard

19   Kaye?

20   A.  As far as I know, yes.

21   Q.  But you said on direct examination that you reviewed a bulk

22   of Mr. Kaye's e-mails right?

23   A.  I didn't review a bulk of his e-mails.  But I noted he had

24   a different e-mail address, and there was many more of those.

25   Q.  Do you remember the firm he worked for, Barnes & Thornburg?

1    A.  That sounds right.

2    Q.  You are familiar with them?

3    A.  A little bit.  Not really.

4    Q.  So, just for the jury, so from the origination of

5    Mr. Kaye's e-mail to Amanda Shea, until the last, until the

6    completion of Mr. Kolfage's signature, nothing changed in the

7    document itself.  Right?

8    A.  I don't believe so.  I think what you are referring to

9    would be the language or the substance.

10   Q.  The language, correct.  Like, meaning they didn't change

11   the top date, they didn't change a word in the paragraph.  They

12   didn't change a number.

13           Isn't that true from what Mr. Kaye sent, from the

14   beginning to the execution, other than the signatures, it was

15   completely the same, right?

16   A.  I believe that's correct.  That really was not the focus of

17   my assignment.

18   Q.  How many hours you think you put into this?

19   A.  Are you asking me personally or my team as well?

20   Q.  You and your team if that's possible.

21   A.  I don't know.  I'd have to I guess do the math backwards.

22   Like I said the billings are at about $20,000.  So that's -- I

23   am not doing the math in my head.  30 hours, something along

24   those lines.

25   Q.  So it's around 900 something an hour?

M5p3she4                         Crain - Cross

1    A.  My rate is 630, and then I had someone working on the file

2    that's in the upper 400s.

3    Q.  It starts as a Word document, not a PDF?

4    A.  Correct.

5    Q.  You said that you reviewed phones, right?

6    A.  We had access to some phones, yes.

7    Q.  What phones did you have access to?

8    A.  I know specifically Mr. Shea's iPhone.  Because we talked

9    about the CamScanner finding from there.  I don't have the

10   device inventory list memorized, so I don't recall.

11   Q.  But there were other phones, right?

12   A.  I believe that's generally correct, but like I said, I

13   don't have a specific recollection.

14   Q.  Were there computers?

15   A.  Yes.

16   Q.  Whose computers did you review?

17   A.  Specifically Mr. Kolfage's.

18   Q.  Did you review Mr. Kolfage's phone?

19   A.  I just don't remember from the device inventory list if his

20   phone was in there or not.

21   Q.  Did you prepare with the government before your testimony?

22   A.  I've met with the government a few times, yes.

23   Q.  Did they ask you questions and you gave them answers,

24   similar to what your testimony just was?

25   A.  Yeah, we talked about --

M5p3she4                         Crain - Cross

1    Q.  And the government's the one who supplied you the phones
2    and computer, right?
3    A.  That's correct.
4    Q.  So as you sit here today testifying, on whatever date it
5    is, you don't know the number of phones that you reviewed in
6    this case?
7    A.  I don't have that at perfect recall.  There was on the
8    order of 30, maybe 40 total devices.
9    Q.  The government supplied you 30 or 40 devices with respect
10   to this case; is that correct?
11   A.  That's correct.
12   Q.  Did they ask you to look in this Signal app, any contents
13   from a Signal app?
14   A.  No.
15   Q.  Or a WhatsApp app?
16   A.  No.
17   Q.  So, this CamScan, what happened -- and if I'm correct, or
18   I'm probably not correct.  But, you have the Word document, it
19   was sent to Amanda Shea, forwarded, right?
20   A.  I believe it's just sent to her.
21   Q.  Sent to her?
22   A.  And then forwarded.
23   Q.  Then forwarded to Tim Shea.  He had do a CamScan, he signed
24   it, right?
25   A.  He would have printed it out.

M5p3she4                          Crain - Cross

1    Q.   Printed it out?

2    A.   Signed it.

3    Q.   And CamScan is where you take a picture and send it?

4    A.   He would take a picture to scan it back in.

5    Q.   He sends it to Mr. Kolfage, right?

6    A.   That's correct.

7    Q.   And Mr. Kolfage sends an executed copy?

8    A.   Yes, countersigned.

9    Q.   That's what you testified in that nice fancy chart, right?

10   A.   I'm glad you found it fancy, yes.

11   Q.   Did you make that chart?

12   A.   Yes.

13   Q.   Oh.  Well, it was fancy.

14            And when you did that chart, did you look at -- did

15   you go over that chart with the government?

16   A.   Yes.

17   Q.   Did you do any drafts to that chart?

18   A.   No.

19   Q.   So that was --

20   A.   Not separate from what you looked at.

21   Q.   There were no draft charts, right?

22   A.   Not that I know of.

23   Q.   Okay.  I don't know.

24            We're going to wrap up in a minute.

25            So as far as your testimony is, that contract was

M5p3she4                          Crain - Cross

1    originated and wherever it was originated, it came from

2    Mr. Kaye's e-mail, right?

3              MR. ROOS:  Objection.  Asked and answered.

4              THE COURT:  Sustained.

5    Q.  Of the 40 devices that you were given by the government,

6    was there a log of where they came from?

7    A.  Yes.

8    Q.  Of those 40 devices, do you recall how many were

9    Mr. Shea's?

10   A.  Not specifically.  Five to 10 lines on that chart,

11   something like that.

12   Q.  So, not specifically, not holding you to it.  There were

13   approximately five to 10 devices that were referenced as Tim

14   Shea, right?

15   A.  I believe that's correct, but again, I am just going from

16   memory.

17   Q.  Could you and I agree, with all the devices, Tim Shea's and

18   the 40 devices, it was a massive amount of material?

19   A.  It's a lot of information in the sense that it would be

20   horrible to print out.  But we do cases with hundreds of

21   devices involved, so I guess it is all kind of your scale of

22   reference.

23   Q.  How did you come up with this March 29 date or October 22

24   date to hone in on the metadata?  Was that the government that

25   told you to look?

M5p3she4                         Crain - Redirect

1    A.  They asked me about that document.

2    Q.  Okay.  So, did they ask you about any other documents in

3    this case?

4    A.  I believe one other, yes.

5    Q.  What document was that?

6    A.  It is something we've called RPMM.

7    Q.  What about that RPMM?

8    A.  I am not sure I follow your question.

9    Q.  What kind of document?  Was it a contract?

10   A.  I believe so.  I guess I don't have a perfect picture of it

11   in my mind.

12   Q.  Right.  But it had something to do with RPMM that you did

13   an analysis on, right?

14   A.  That's correct.

15   Q.  And you didn't come here and testify about the analysis you

16   did on the document from RPMM, right?

17   A.  The government didn't ask me any questions about that one,

18   no.

19              MR. MERINGOLO:  No further questions.

20              THE COURT:  Redirect?

21              MR. ROOS:  One second, your Honor.

22   REDIRECT EXAMINATION

23   BY MR. ROOS:

24   Q.  Can we bring up Government Exhibit 135.

25              Can we go to the attachment.  Sorry.  Wrong one.  You

M5p3she4                           Crain - Redirect

1   can take that down.

2            Here we go.  Can we bring up 128A.

3            Mr. Crain, is this the document you were asked about?

4   A.  Yes.

5   Q.  By defense counsel?

6   A.  Yes, this is the one that I've called RPMM.

7   Q.  It is an agreement that on its face says it is between

8   Ranch Property and We Build the Wall, right?

9   A.  That's correct.

10  Q.  This is a government exhibit in evidence, right?

11  A.  I believe that's correct.

12  Q.  And do you see the date on it?

13  A.  Yeah.  The first line there it says March 1, 2019.

14  Q.  Did you review metadata in connection with this agreement?

15  A.  We did the same kind of exercise with this document, yes,

16  looking for the dates associated with it.

17  Q.  What was the final sort of modification signing date that

18  you observed based on reviewing this document?

19  A.  The latest date I saw associated with this document was

20  again in October of 2019.

21  Q.  Let's look at the e-mail this is attached to.  Can we see

22  Government Exhibit 128.

23            And what is the date that this PDF is sent?

24  A.  So that says sent Saturday, October 19, 2019.

25  Q.  Yup.

M5p3she4                         Crain - Recross

1          And different topic.  Mr. Meringolo asked you about

2     reviewing all of the data on the defendant's devices.  Do you

3     remember that question?

4     A.  Yes.

5     Q.  And like whether you looked through everything on those

6     devices?

7     A.  Yes.

8     Q.  You looked at some data on the defendant's cell phone,

9     right?

10    A.  Yes, Mr. Shea's phone.

11    Q.  How far back were you able to look at the defendant's text

12    messages on his own phone?

13    A.  His text messages only went back about 30 days from the

14    time that they stopped on that phone.

15    Q.  Why is that?

16    A.  That phone had a setting to delete messages older than 30

17    days.

18          MR. ROOS:  No further questions.

19          MR. MERINGOLO:  Just a few, Judge.

20          THE COURT:  Recross.

21    RECROSS EXAMINATION

22    BY MR. MERINGOLO:

23    Q.  How many phones did you review for Mr. Kolfage?

24    A.  I think you asked me that earlier.  I don't remember.

25    Q.  Okay.  But there were phones that you reviewed of

1    Mr. Kolfage, right?

2    A.  I think you asked me that earlier.  Again, I just don't

3    remember.

4    Q.  Do you recall Mr. Kolfage having his text messages set to

5    delete after 30 days?

6    A.  I don't remember that specifically.  But I just don't have

7    good recall on that.

8    Q.  Did the government show you any exhibits in evidence of

9    Mr. Shea's text messages from a year prior to you opening the

10   text messages?

11   A.  I don't believe so.

12           MR. ROOS:  Objection.

13   Q.  Did the government show you any text messages from Mr. Shea

14   in 2019?

15   A.  I'm sorry.  Can you repeat your question?

16   Q.  Did the government show you any text messages from Mr. Shea

17   from 2019?

18   A.  No, I don't believe so.

19   Q.  When you reviewed all these phones, just to clarify, you

20   never reviewed any Signal I guess or type of WhatsApp thing,

21   right?

22   A.  I know what those are, and no, we did not.

23           MR. MERINGOLO:  Thank you very much.

24           THE COURT:  Thank you.  You may step out.

25           (Witness excused)

M5p3she4

1        THE COURT:  The government may call its next witness.

2        MR. ROOS:  Your Honor, can we have a sidebar.

3        THE COURT:  Yes.

4        (At the sidebar)

5        MR. MERINGOLO:  I think we have an agreement.

6        MR. SOBELMAN:  We just agreed.  We have one

7    stipulation we just worked out regarding the SBA loan.  We need

8    a few minutes to add a couple of sentences we agreed on.  I am

9    not sure if we have other things.

10        MR. ROOS:  There are a few minor housekeeping things

11   like offering a few other stipulations.  That was the end of

12   our witnesses on our direct case.  So one thing I wanted to

13   raise for your Honor was how you want to proceed.  It is 4:30.

14   So we certainly can rest today.  It sounds like we probably

15   will be able to reach agreement with defense on a bunch of

16   stipulations.  Some of those will not be done before 5.

17        THE COURT:  What we can do is simply I can say to the

18   jurors that we've come to the end of our day and we'll return

19   tomorrow.  And then we can do whatever we need to do in the

20   morning.

21        MR. ROOS:  Okay.  We're fine with that.

22        THE COURT:  What are we expecting to happen tomorrow?

23        MR. SOBELMAN:  On that.  Talking with defense counsel

24   earlier, it sounds like the defendant is not likely to testify.

25        MR. MERINGOLO:  He's not going to but I need him to --

M5p3she4

1    I just have to him sign something.

2              MR. SOBELMAN:  The short version, defense needs a

3    little bit of time.  We would be grateful to come back after

4    defense counsel has had time to talk to the client, have the

5    defendant allocuted today so we have certainty what's happening

6    tomorrow.

7              In terms of whether closings are tomorrow.  Mr. Roos

8    is doing our closing so I am looking at him.  Although --

9              MR. ROOS:  The question of sleepless night or weekend

10   interrupted.

11             MR. SOBELMAN:  Does your Honor have any preference on

12   how we proceed?

13             THE COURT:  Well, if you close tomorrow, then it will

14   all be stale by the time they come back on Tuesday.  Unless you

15   expect your closings to be fairly short so they can start

16   deliberating.

17             MR. ROOS:  Without having written the whole thing, I

18   just don't know.  I will certainly be in excess of an hour.  It

19   could be two hours.  These numbers I am making up.

20             THE COURT:  So I would expect with these instructions

21   it will probably take me about an hour and a half.  If you have

22   an hour, how long do you think you'll take?

23             MR. MERINGOLO:  It always, no matter what trial it is,

24   takes an hour.  Whether it is a six-month trial or a two-day

25   trial.  So probably an hour.

M5p3she4

1          MR. ROOS:  It might be say four hours in total between

2     all of the summations.  Just as an estimate.  Then your Honor

3     reading the instructions.

4          THE COURT:  How do you get to four hours?

5          MR. ROOS:  I was estimating with two hours plus an

6     hour, plus 30 minutes plus various sidebars or whatever, I

7     figured like four hours.  That was my math.

8          THE COURT:  So the question then is do you want the

9     jurors to start deliberating tomorrow?

10          MR. ROOS:  If we start immediately at 9.  That takes

11     us -- it's 1, then the Court instructs after lunch.  And then

12     they maybe have an hour and a half or two hours, but probably

13     they'll have like an hour.

14          THE COURT:  If your preference is to do it on Tuesday,

15     that's okay.

16          MR. SOBELMAN:  Can we have a few minutes to decide?

17          THE COURT:  Yes.

18          MR. MERINGOLO:  The other thing, Judge, if we are

19     going to be 15 minutes maximum, I'll run through it.  Do we

20     want to bring them in tomorrow for 15 minutes or start Tuesday

21     morning at 8:45 and not have --

22          THE COURT:  Why don't you talk about this.  I can

23     excuse them.  I don't know.  I can give them a little break and

24     have them come back.

25          (In open court)

M5p3she4

1          THE COURT:  Members of the jury, we're going to take a

2     10-minute break.  Remember that you are not allowed to discuss

3     the case among yourselves, don't let anyone talk about the case

4     in your presence.  I'll be calling you back in soon.

5          (Jury excused)

6          (Recess)

7          (In open court; jury not present)

8          THE COURT:  All righty.  What do you have to tell me?

9          MR. SOBELMAN:  Hello, your Honor.  Thank you for your

10    patience.  We all appreciate it.  We I believe are prepared to

11    read a few stipulations and offer a few exhibits and rest.  We

12    understand the defense also will offer maybe a couple

13    stipulations or some exhibits and rest as well.  And that maybe

14    after a brief break or even now, after the jury's excused, the

15    defendant can be allocuted on his right to testify, and the

16    defense will be able to be done as well.  And then I think the

17    plan is we would sum up tomorrow.

18         MR. MERINGOLO:  Judge, I didn't commit 100 percent.  I

19    don't think that we can accomplish that this evening.  Because

20    I had to talk to my client a few times and I want him to be

21    reassured, and I want the Court to inquire with him about his

22    testimony.  I'm saying he is a gentleman, he's never been

23    difficult.  We put a lot of time in preparing and I understand

24    he would want to, but my advice is he doesn't.  And we are just

25    outside and he was a little hesitant so I think he needs --

M5p3she4

1          THE COURT:  Are you saying he hasn't yet made up his

2    mind?

3          MR. MERINGOLO:  He's not 100 percent.  He's not

4    100 percent.  My advice of counsel is not to.  He's close, but

5    he's definitely not 100 percent and I know we prepared but

6    sometimes --

7          THE COURT:  It is an important decision, and if he

8    feels he needs the evening to think about it.

9          MR. SOBELMAN:  The plan would be a different then.  We

10   understood maybe even after a break, brief break, he would be

11   allocuted tonight.  We don't want to be up all night preparing

12   for closings that won't happen.  We would have to be prepared

13   for cross.

14         So, we would prefer that defense counsel take whatever

15   time he needs with him, and we can obviously excuse the jury,

16   and if the Court is willing to stick around for a little bit,

17   come back, and have that allocution tonight and that way we can

18   proceed tomorrow.  And if not, I think the schedule will have

19   to be different.

20         THE COURT:  So, Mr. Meringolo, do you think that

21   further discussion this evening might lead to a resolution?

22         MR. MERINGOLO:  What I really think is the team,

23   meaning me, Angelica and Clara, should sit with Mr. Shea for

24   five minutes together, just go over again the pros and cons of

25   testifying, and then come hopefully we'll give you an answer

M5p3she4

1    and hopefully we can do that allocution.

2             THE COURT:  This evening?

3             MR. MERINGOLO:  Yes.

4             THE COURT:  All right.

5             MR. SOBELMAN:  What we propose is bring the jury back,

6    we'll read our stips off our exhibits, they can read their

7    stips off their exhibits, the government will have rested.  The

8    defense I suppose wouldn't rest yet.  We could then excuse the

9    jury, have the defendant allocuted whenever the defense is

10   ready.  They can then rest in front of your Honor and rest on

11   the record tomorrow morning.  And proceed with summations,

12   assuming the defendant will not testify.

13            MR. MERINGOLO:  Judge, I think to proceed, like we

14   discussed at the sidebar, to proceed with summations and then

15   give the jury charge with the holiday weekend, I mean, it would

16   be a half hour deliberation.  I just don't think that that's, I

17   don't think that's --

18            THE COURT:  The prosecution is prepared to sum up

19   tomorrow.

20            MR. MERINGOLO:  We're prepared to sum up too, but I

21   don't think --

22            THE COURT:  Well, I would go forward with summations.

23            MR. MERINGOLO:  Then your Honor, then we'd like to put

24   our 15 to 20 minute defense in tomorrow.  Not tonight.  I

25   need -- they just agreed --

M5p3she4

1          THE COURT:  Wait a minute.  They just said,

2     Mr. Meringolo, you needed five minutes to talk to your client.

3          MR. MERINGOLO:  To the client.  Not for our case in

4     chief.  I don't know why I'm being rushed.  We have five

5     e-mails that were in dispute that we have to go over.

6          THE COURT:  So, I can go back to chambers and you can

7     see whether you can resolve any outstanding stipulations.

8          MR. SOBELMAN:  I thought we had solved the problem.  I

9     guess not.  Sorry to waste your Honor's time.

10          MR. MERINGOLO:  We're not wasting the Court's time.

11          THE COURT:  Yes, you are wasting the Court's time if

12     you're back and forth.  So, I am going to give you the

13     opportunity to spend a little more time.  Can the stipulations

14     be resolved within the next few minutes or should I excuse the

15     jury now?  It's almost 5 o'clock.

16          MR. SOBELMAN:  There are no stipulations at issue.

17     There is literally five e-mails we said are hearsay which they

18     are.  The defense said okay I think we'll cut those.  I just

19     spoke with them and they decided to cut them.  I don't know,

20     that's literally the only outstanding issue.

21          THE COURT:  I can allow you folks to just keep going.

22     The night is young.  And I will just excuse the jury and tell

23     them to come back tomorrow morning, and we'll figure out

24     between now and then what's going to happen.

25          MR. MERINGOLO:  Thank you, Judge.

M5p3she4

1          MR. SOBELMAN:  Just to be clear, that's not the

2     government's preference.  Because I think that will make it

3     difficult to know exactly what will happen tomorrow.

4          THE COURT:  I don't have to tell them what's going to

5     happen.  What I am saying is I will let them go now, tell them

6     to come back in the morning.

7          I will be here in the courthouse waiting for your

8     signal that you've decided on the stipulations and waiting for

9     the answer as to whether the defendant will testify.  When all

10    of that is done, I'll come back to the courtroom.

11         MR. SOBELMAN:  Thank you, your Honor.  He can be

12    allocuted this evening?

13         THE COURT:  Yes, absolutely.

14         MR. SOBELMAN:  Thank you.

15         THE COURT:  All right then.  Let's have the jury come

16    back in.

17         (Jury present)

18         THE COURT:  The parties agree that all the jurors are

19    present and properly seated?

20         MR. MERINGOLO:  Yes, Judge.

21         MR. ROOS:  Yes, your Honor.

22         THE COURT:  Members of the jury, we've reached the end

23    of our day.  Now that you've heard testimony and you've seen

24    evidence, it becomes very tempting to talk about the case or to

25    research matters about the case.  I want to remind you that you

M5p3she4

1    are not permitted to do any research of any type.  Not research

2    about the subject matter, about the defense, about the

3    prosecution, or about me.  You are not to listen to any form of

4    news or read any type of news about this case.  You are not to

5    permit anyone to talk to you about the case and you can't talk

6    amongst yourselves until I tell you that it's time to

7    deliberate.  We have not reached that point yet.  You will be

8    returning tomorrow morning at 9 a.m.

9              Thank you and have a good evening.

10             (Jury excused)

11             THE COURT:  All right.  Ms. Marder-Spiro will give you

12   her cell and you can notify her when you're ready with respect

13   to the stipulations and on the issue of whether the defendant

14   will testify.  And I will be just seconds away in chambers.

15             MS. MOE:  Thank you, your Honor.

16             THE COURT:  You're welcome.

17             (Recess)

18             (In open court; jury not present)

19             MR. ROOS:  Your Honor, whenever it is appropriate I

20   can give you an update on the parties' plans.

21             THE COURT:  Please do.

22             MR. ROOS:  We have conferred.  Before the government

23   rests, we have a few pretty short housekeeping things, a few

24   stipulations that have an exhibit or two attached and that will

25   take a few minutes.  I think we have now agreed, although we

540

M5p3she4

1  haven't typed them up, we have agreed in principle on the

2  defense stipulations they may either read into the record or

3  read into the record e-mails or play a video that are coming in

4  through the stipulation.  And also Mr. Meringolo will correct

5  me if I'm wrong, they'll make a Rule 29 application.

6          So as a result, we're concerned that these things are

7  going to push sort of the start of the summation late enough

8  such that either maybe we'll finish the summations but we won't

9  get to instructions so the jury won't have time to deliberate.

10         So we propose we come in tomorrow the normal time, the

11 government will conclude its case and rest, the defense will do

12 its case and rest.  We send the jury home and we come in

13 Tuesday morning at 9 a.m. to do summations.

14         THE COURT:  That's fine.

15         MR. ROOS:  That's the first matter.  The second matter

16 is the defendant's right to testify in his own defense and

17 maybe it is appropriate for me to turn to Mr. Meringolo.

18         MR. MERINGOLO:  After conferring with Mr. Shea, as

19 well as our entire team, Mr. Shea is not going to testify.

20 That is his choice.  It is also advice of counsel.  But it is

21 his choice and he's chosen not to testify in this case.  We

22 believe that's the smart decision.

23         MR. ROOS:  Your Honor, the government would request

24 that you allocute the defendant on that.

25         THE COURT:  All right, then.

M5p3she4

1          Mr. Shea, you understand that you have the right to

2     take the stand in your own defense, right?

3          THE DEFENDANT:  Yes, I do, ma'am.  And thank you for

4     letting me take the time to make that decision.

5          THE COURT:  Of course.

6          Are you satisfied that your lawyers have spent enough

7     time with you and have explained the advantages and

8     disadvantages and have answered all of your questions

9     concerning whether or not to testify?

10          THE DEFENDANT:  Yes, ma'am.  I have.

11          THE COURT:  And understand that the decision to

12     testify is yours and yours alone?

13          THE DEFENDANT:  Yes, Judge.

14          THE COURT:  So, am I right that you have made the

15     decision to not testify?

16          THE DEFENDANT:  Yes, that's correct, your Honor.

17          THE COURT:  Okay.

18          MR. ROOS:  Thank you, your Honor.  The only other --

19     the only other thing just to flag is I anticipate likely this

20     evening we'll put in a letter just about the jury charge that

21     your Honor submitted previously, and specifically I think there

22     is going to be two or three issues that may result -- that we

23     may ask for additional instructions on based on the course of

24     the trial.  That's it.

25          THE COURT:  Okay.

M5p3she4

1          MR. ROOS:  You'll have our letter.  You don't need to

2     do anything right now with it.

3          MR. MERINGOLO:  Nothing further, Judge.  Thank you.

4          THE COURT:  All right then.  So we will convene at

5     9 a.m.

6          Thank you.  Have a good evening.

7          MR. ROOS:  Thank you, your Honor.

8          (Adjourned to May 26, 2022 at 9:00 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 WILLIAM WARD

Direct By Ms. Moe . . . . . . . . . . . . . 292

Cross By Mr. Meringolo . . . . . . . . . . 298

 THOMAS BOLUS

Direct By Mr. Sobelman . . . . . . . . . . 305

Cross By Mr. Meringolo . . . . . . . . . . 337

Redirect By Mr. Sobelman . . . . . . . . . 346

Recross By Mr. Meringolo . . . . . . 348 recross

 HANNA RUBIN

Direct By Mr. Sobelman . . . . . . . . . . 350

 KARL MITCHELL

Direct By Ms. Moe . . . . . . . . . . . . . 366

Cross By Mr. Meringolo . . . . . . . . . . 375

Redirect By Ms. Moe . . . . . . . . . . . . 377

Recross By Mr. Meringolo . . . . . . . . . 377

 DUSTIN PALMER

Direct By Mr. Roos . . . . . . . . . . . . 378

Cross By Mr. Meringolo . . . . . . . . . . 406

 ROBERT BILLUE

Direct By Ms. Moe . . . . . . . . . . . . . 427

 ROBERT BILLUE

Direct By Ms. Moe . . . . . . . . . . . . . 428

Cross By Mr. Meringolo . . . . . . . . . . 442

544

```
 1     ENRIQUE SANTOS

 2    Direct By Mr. Sobelman . . . . . . . . . . . 453

 3    Cross By Mr. Meringolo . . . . . . . . . . . 482

 4    Redirect By Mr. Sobelman . . . . . . . . . . 494

 5     ANDREW CRAIN

 6    Direct By Mr. Roos . . . . . . . . . . . . . 497

 7    Cross By Mr. Meringolo . . . . . . . . . . . 518

 8    Redirect By Mr. Roos . . . . . . . . . . . . 527

 9    Recross By Mr. Meringolo . . . . . . . . . . 529

10                     GOVERNMENT EXHIBITS

11    Exhibit No.                          Received

12    S-8  . . . . . . . . . . . . . . . . . . . 306

13    154  . . . . . . . . . . . . . . . . . . . 307

14    853  . . . . . . . . . . . . . . . . . . . 310

15    854, 855, 856, 857 . . . . . . . . . . . . 315

16    852  . . . . . . . . . . . . . . . . . . . 320

17    910  . . . . . . . . . . . . . . . . . . . 326

18    911  . . . . . . . . . . . . . . . . . . . 330

19    352  . . . . . . . . . . . . . . . . . . . 352

20    351  . . . . . . . . . . . . . . . . . . . 364

21    205  . . . . . . . . . . . . . . . . . . . 370

22    201, 202, 203, 204  . . . . . . . . . . . . 371

23    203A, 203B  . . . . . . . . . . . . . . . . 373

24    364  . . . . . . . . . . . . . . . . . . . 395

25    551  . . . . . . . . . . . . . . . . . . . 432
```

```
 1    751    . . . . . . . . . . . . . . . . . . . 437

 2    909    . . . . . . . . . . . . . . . . . . . 455

 3    S-1    . . . . . . . . . . . . . . . . . . . 455

 4    601 to 622, 651 to 656  . . . . . . . . . . 456

 5    623 to 627, 362, 362-A, 363, 363-A  . . . . . 473

 6    20     . . . . . . . . . . . . . . . . . . . 475

 7    312    . . . . . . . . . . . . . . . . . . . 477

 8    S-3, 451, 453, 454  . . . . . . . . . . . . 479

 9    908    . . . . . . . . . . . . . . . . . . . 480

10    907    . . . . . . . . . . . . . . . . . . . 504
```