M5VVSHE1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          20 Cr. 412 (AT)

 5   TIMOTHY SHEA,

 6              Defendant.                  Trial

 7   ------------------------------x

 8                                          May 31, 2022
                                            9:00 a.m.
 9

10   Before:

11                  HON. ANALISA TORRES,

12                                          District Judge
                                              and a Jury
13

14                        APPEARANCES
15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   BY:  ALISON G. MOE
          NICOLAS T. ROOS
18        ROBERT B. SOBELMAN
          Assistant United States Attorneys
19
     MERINGOLO & ASSOCIATES P.C.
20        Attorneys for Defendant
     BY:  JOHN C. MERINGOLO
21        ANGELICA B. CAPPELLINO
          CLARA S. KALHOUS
22

23   Also Present:  Sunny Drescher, Paralegal Specialist, USAO

24

25
```

M5VVSHE1

| | |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  Please make your appearances. |
| 3 | MR. ROOS:  Good morning. |
| 4 | Nick Roos, Robert Sobelman, Alison Moe for the United |
| 5 | States. |
| 6 | MR. MERINGOLO:  Good morning, your Honor. |
| 7 | John Meringolo, Anjelica Cappellino, and Clara Kalhous |
| 8 | for Timothy Shea, who's on my right, present. |
| 9 | THE COURT:  Please be seated. |
| 10 | We're missing two jurors. |
| 11 | So I wanted to address the jury charge. |
| 12 | The government had asked for an advice of counsel |
| 13 | defense, which I have added; as well as an instruction with |
| 14 | respect to seizure of funds, which I have added; as well as an |
| 15 | instruction with respect to equally available evidence, which I |
| 16 | have added. |
| 17 | The defense asked for an idle chatter statements of |
| 18 | co-conspirators charge, which I found confusing and not helpful |
| 19 | and which I have not added.  But there is a section that |
| 20 | discusses some of these issues.  It's titled "Liability for |
| 21 | Acts and Declarations of Co-conspirators."  It's on page 22. |
| 22 | Is there anything further? |
| 23 | MR. SOBELMAN:  Not from the government, your Honor. |
| 24 | MR. MERINGOLO:  Not from the defense, Judge. |
| 25 | THE COURT:  The government made a motion with respect |

M5VVSHE1

1   to niceness, and I'll hear you on that.

2          MR. SOBELMAN:  Yes, your Honor.

3          Defense in opening said that the jury would find at

4   the end of the case that the government had not been nice to

5   Tim Shea.  We think that's an improper comment to the jury;

6   that's not an issue before the jury.  It speaks to the

7   government's motivations and treatment of the defendant.

8          It appears, based on our review of other jury

9   addresses he's made in several other cases, this is a theme

10  that he improperly often pushes on the jury.  And we would like

11  the Court to advise the defense that they are not to engage in

12  any impermissible sort of argument casting shade on the

13  government for charging the defendant, arresting the defendant,

14  or prosecuting the case.  The arguments should be focused on

15  the sufficiency of the evidence or lack thereof.

16         THE COURT:  Mr. Meringolo.

17         MR. MERINGOLO:  I have nothing to add, Judge.

18         THE COURT:  So I'd like your --

19         MR. MERINGOLO:  I think it's improper to rule for the

20  government.  I think that they took everything out of context.

21  I said that they would find that they didn't prove their case

22  beyond a reasonable doubt, therefore, they would vote not

23  guilty.  And they may say when they are going home after that

24  that it wasn't nice what happened to Tim Shea, not what the

25  government did, what happened.

M5VVSHE1

1          But, Judge, we could make a emotional arguments,

2     that's -- I believe that's *Old Chief* and then -- whatever,

3     Judge.  Whatever you decide, we have something special for

4     them.

5          THE COURT:  What happened to Mr. Shea is that he was

6     indicted and that there's been a jury trial.  That's what's

7     happened.  And so niceness has nothing to do with that.  And so

8     I don't want to hear from either side any form of disparagement

9     as to the tactics that were employed.

10          MR. MERINGOLO:  Tactics from the government.  I can't

11     say it's not nice what the government did, right?

12          THE COURT:  Correct.

13          MR. MERINGOLO:  Is that the ruling?

14          THE COURT:  Yes.

15          MR. MERINGOLO:  Okay, Judge.  I'm sorry.  We've been

16     doing this -- apparently this is how I get all my acquittals, I

17     just say it's not nice, not the thousand cross-examinations

18     over the years, but just all the acquittals is it's not nice.

19          And I say that because my grandmother died before one

20     of the trials.  And she used to tell me, It's not nice, John.

21     It's not nice.  Don't worry, somebody up there gave me

22     something even better than that, which we're getting ready to

23     use, and I think it's going to be 100 times more effective,

24     maybe a million times.

25          THE COURT:  So long as it doesn't involve

M5VVSHE1

1   disparagement.

2              MR. MERINGOLO:  No disparagement, Judge.

3              MR. ROOS:  Your Honor, one more thing.  Very minor.

4              THE COURT:  Yes.

5              MR. ROOS:  The government would move to seal the bank

6   record exhibits, which are 1000 through 2300.  They contain --

7   it looks like they contain the actual checks written by all the

8   donors who wrote checks, and so they've got like the donors'

9   names, the donors' bank account number, and their address.  And

10  so for the reasons previously -- I'm sorry, 1000 through 2400.

11  For the reasons previously that the Court sealed the donation

12  records, we ask that those bank records be sealed.

13             THE COURT:  No objection?

14             MR. MERINGOLO:  No objection.

15             THE COURT:  Okay.  So they are sealed.

16             Please have the jurors brought in.

17             MR. MERINGOLO:  In between the government's summation

18  and my summation, can we have five minutes?

19             THE COURT:  Yes.

20             MR. MERINGOLO:  I apologize to the court reporter.

21             MR. SOBELMAN:  Your Honor, if defense counsel is given

22  that courtesy, would it be possible for our side to be given

23  the same courtesy for rebuttal?

24             THE COURT:  That's fine.

25             MR. SOBELMAN:  Thank you, your Honor.

M5VVSHE1

1          (Jury present)

2          THE COURT:  The parties agree all jurors are present

3    and properly seated?

4          MR. MERINGOLO:  Yes, Judge.

5          MR. ROOS:  Yes, your Honor.

6          THE COURT:  Please be seated.

7          Good morning.  Welcome back.

8          Members of the jury, both sides have rested and have

9    finished presenting evidence.  We've now reached that point of

10   the trial where you're about to hear summations of counsel.

11   Following summations, I will instruct you as to the laws,

12   rules, and principles of law that will guide you during your

13   deliberations and rendering your verdict.

14         The government will make its summation first and the

15   defense will follow.  In making their summations, both sides

16   will review the evidence that you've heard and seen during the

17   course of the trial, and will suggest to you certain inferences

18   or conclusions which they in their opinion believe may be

19   properly drawn from the evidence in the case.  If you find that

20   a particular attorney's analysis of the evidence is correct and

21   accurate, then you are at liberty to adopt such inferences and

22   conclusions in whole or in part.

23         On the other hand, if you find that a particular

24   attorney's analysis of the evidence is not correct and not

25   accurate, then you are at liberty to disregard such inferences

1    and conclusions in whole or in part.  Either way, you're free

2    to draw your own conclusions based on your analysis of the

3    evidence presented.

4              Nothing said by either attorney in their summations is

5    evidence in this case; it is argument.  Nothing that I will say

6    in my final instructions will be evidence either.

7              You've heard all the evidence in this case.  You, and

8    you alone, are the sole and exclusive judges of the facts in

9    this case.

10             Now we will hear the summation of the government.

11             MR. ROOS:  Thank you, your Honor.

12             May I proceed?

13             THE COURT:  You may.

14             MR. ROOS:  Good morning.

15             Timothy Shea, the defendant, schemed with his business

16   partner, his partner in crime, to lie to thousands of donors to

17   We Build the Wall.  Schoolteachers, retired folks, New Yorkers,

18   they were promised that 100 percent of the donations they were

19   giving would go to building a wall, and not a penny would go to

20   salary or pay to Brian Kolfage, the organization's president.

21   That wasn't true.  It was false.  It was fraudulent.

22             The defendant made a secret agreement with Kolfage,

23   take the money from We Build the Wall and pay kickbacks.  And

24   to cover it up, he created fake documents, and he obstructed

25   justice.  That is what the evidence showed last week during

1    trial.

2            So this is the government's summation.  I'm going to

3    summarize the evidence you heard last week and talk about why

4    the defendant is guilty.  There are three charges in this case,

5    and those charges are also called counts.  These are the

6    charges:  Count One, conspiracy to commit wire fraud; Count

7    Two, conspiracy to commit money laundering; Count Three,

8    falsification of documents.

9            We're going to talk about all these in some depth, so

10   you don't need to memorize them now or commit them to memory.

11   We'll talk through them.  We're going to start with the first

12   count, conspiracy to commit wire fraud.

13           The defendant is charged with conspiracy to commit

14   wire fraud in two ways, two types of wire fraud.  Each way or

15   type is called an object or objective of the conspiracy.  So

16   this on your screen is the first object of Count One, the first

17   way that the defendant conspired to commit wire fraud.  This is

18   about a fraud on the donors to We Build the Wall.  So I'll read

19   it.  He conspired to commit wire fraud by agreeing to

20   participate in a scheme to defraud to obtain money by making

21   materially false or fraudulent statements or promises to

22   donors.

23           So the scheme was to tell them that all their money

24   was going to the wall, none was going to go to Brian Kolfage or

25   any of the other insiders and, instead, the scheme involved

1     taking some of the money that they raised, and that they raised

2     those false promises and taking it for themselves.  So we're

3     going to talk about the evidence of Count One.

4            This is the second object.  So I said there are two

5     parts.  The second way the defendant conspired to do wire

6     fraud, it's very similar to the first way he committed the

7     crime.  This is about the fraud on We Build the Wall, the

8     organization.  So I'll read it.  It's a conspiracy to commit

9     honest services wire fraud by agreeing to participate in a

10    scheme to defraud We Build the Wall of its right to Brian

11    Kolfage's honest services through kickbacks.  So, folks, the

12    focus here is how the defendant committed a fraud against the

13    organization.

14           All right.  So those are the two parts, the two

15    different ways the defendant is charged with violating the law

16    of conspiring to commit wire fraud.  And the evidence shows

17    that the defendant did that, that he conspired to commit wire

18    fraud against the donors of We Build the Wall, against We Build

19    the Wall for several reasons.  So I'm going to talk to you

20    about those reasons now, what the evidence shows.

21           There are eight reasons I'm going to go through, okay.

22    So we'll just number them and we'll go through them.

23           Reason number one is the defendant was in it for the

24    money.  The evidence at the trial showed that the reason the

25    defendant and Kolfage created a GoFundMe and We Build the Wall

M5VVSHE1                          Summation - Mr. Roos

1    was to make money for themselves.  The defendant thought it was

2    crazy that people were donating their money to the wall, but he

3    got involved because he saw this as a way to make money, to

4    line his pockets.  That's the first reason you know he's

5    guilty.  So let's walk through the evidence.  This is from the

6    start of the scheme, and it shows how the defendant was in it

7    for the money.

8            So first you learn that the scheme started in 2018.

9    Tim Shea, his wife, Brian Kolfage, were in business together.

10   They were partners.  They worked on this news site called

11   Freedom Daily.  They published news on Facebook and made money

12   off of selling ads.  Danielle Deperi, who testified up there

13   last week, she said she wrote articles for them, and the Sheas

14   and Kolfage split the money.  But then something happened.  In

15   late 2018, Facebook shut down the defendant's news site.  So he

16   needed to do something else.

17           Here's what Danielle Deperi said at page 103 of the

18   transcript about this.  And by the way folks, the transcript --

19   the testimony throughout the trial will be available to you.

20   So I'm going to tell you sometimes a transcript cite or I'm

21   going to read it off the screen, it's on the bottom in the

22   right corner.  If you want to see any of this testimony, you

23   can just write down the cite.  Same goes for the exhibit

24   numbers, just write it down, you'll have that available to you.

25           So here's what she says:  After Facebook cracked down

1   on a lot of the news being pushed out, fake news, so to speak,

2   coming out of there, ads were lost, a lot of revenue.

3            So basically, just to put it together, it's the second

4   half of 2018, and suddenly the source of income for the

5   defendant and Kolfage is drying up, okay?

6            And you know the defendant was looking for money at

7   the time because he said it.  These are his text messages:

8   Quote, Can you send 10K, that will cover my Amex and my house

9   payment.  That's Government Exhibit 24.  That's him to Kolfage.

10           Here's another one, this is the defendant to Kolfage:

11   Send us money or we will be really tight.  That's Government

12   Exhibit 21.

13           So this is the beginning of the criminal scheme then,

14   right here in black and white.  They are looking for money.

15   And here we have Government Exhibit 1.  Kolfage says:  Let's

16   create a GoFundMe to pay for the Trump wall.  Bam.

17           And from that first day, the defendant and Kolfage

18   already have an angle, and the angle is to take a cut of the

19   money for themselves.  They say, Let's create a GoFundMe to pay

20   for the Trump wall.  And if Trump doesn't take the money, then

21   we'll donate it to our organization.  So they are already

22   thinking about this way where they can bring money into a

23   company or an entity they've set up.

24           And the defendant says, That's so perfect.  He loves

25   this idea.  It's the next money-making scheme for them.

1              And from day one, the defendant knows they are not

2       going to be able to donate this money to President Trump.

3       These are his words right here in Government Exhibit 1:  Trump

4       can't take the money, but we can transfer it.

5              So they didn't go down to Washington with a check,

6       remember that?  They didn't go down to Washington with a check.

7       They knew from the start that they weren't going to give the

8       money directly to the government.  They are not worried about

9       giving the money to the government because they have other

10      ideas.  We the People fund the wall, create a website, as we

11      know this whole thing is a way of making money, a way to

12      generate money after their Facebook business dried up.

13             Here's the defendant's wife to the defendant and

14      Kolfage:  They thought it would be a gold mine for sure.

15      That's Government Exhibit 2.  And they were thrilled with how

16      many donors believed their lie, that they were going to hand

17      all this money over to the government.

18             This is Government Exhibit 4.  The defendant couldn't

19      believe people would be throwing money at something like this.

20      That's what he says.  He couldn't believe people would throw

21      money at something like this.

22             So let's pause for a second.

23             This is the defendant making fun of people who are

24      donating, people like Bill Ward who flew here from Arizona.  He

25      truly believed in the cause; he believed in the goal of

1  spending his hard-earned money because it was going to a cause

2  he believed in.  He didn't donate it to line people's pockets.

3          So why is the defendant making fun of people who are

4  donating to this GoFundMe that he set up?  Because he and his

5  co-conspirators knew all along that they were going to take a

6  cut.  So the defendant is sort of treating donors like mopes

7  because that's exactly how he viewed them.

8          All right.  But then you know from listening to the

9  evidence that something changed, right, GoFundMe puts a pause

10  on this money venture.  They say what the defendant knew all

11  along:  Hey, you can't give money directly to the government.

12  Dan Gordon, who is the first witness who testified, he told you

13  about that.  GoFundMe told Kolfage what they already knew, that

14  they couldn't donate money to the government, and that GoFundMe

15  was going to return all that money back to the donors.

16          So plan B time.  They go to their plan B.  And that's

17  setting up some sort of organization that can get the money.

18  And this is Government Exhibit 14.  Kolfage announces this new

19  plan to Tim Shea in text message.  He says:  We are building

20  the wall.  We.  We are bypassing the government, because

21  there's no way they are going to let all this money just sort

22  of slip through their fingers now that it's been donated

23  through GoFundMe.

24          People were suspicious though.  You saw the evidence

25  of that.  They had all sorts of questions about this new plan.

1    Here's a potential donor who emailed Kolfage, Government

2    Exhibit 105.  What is this new organization?  Where will this

3    money go?  Who will manage it?  Are these assurances that it

4    will go to -- are there assurances that it will go to help fund

5    the wall?

6              There's another example.  The donor writes:  Before I

7    make a decision, I'd like to know if you or anyone on the

8    committee will be paid or are you all just volunteering your

9    time.  So that's Government Exhibit 104.

10             Are the individuals serving on the advisory board and

11   the construction, finance, or the audit committees, operations,

12   administration, PR, media, and ongoing fundraising receiving

13   compensation from donated funds?  That's Government Exhibit

14   106.

15             And they are getting lots of questions like this.

16             And then the articles came out about Kolfage and We

17   Build the Wall that said the whole thing was a scam.  The

18   articles came out the day before We Build the Wall's big

19   announcement about getting people to opt in.  So this was a

20   pretty big turning point, a pretty bad timing for them to get

21   this type of negative press.

22             So an article ran in BuzzFeed, and it's on the screen.

23   And it said:  Kolfage pushed the limits of misleading content

24   in pursuit of online traffic and profits.  And the article also

25   claimed that Kolfage had spearheaded other crowdfunding

1    ventures in the past, other campaigns on GoFundMe with the

2    promise of helping people like veterans at military hospitals.

3    But the article claimed that actually there was no record of

4    Kolfage ever donating the money.  So people were seeing this

5    article and they are feeling suddenly very suspicious, as

6    Kolfage and his partner in crime are just going to pocket the

7    money.

8         So We Build the Wall and Kolfage are taking a beating

9    in the press.  They are just getting hammered by these

10   accusations about having misleading information, about

11   pocketing money.  So they have another plan.

12        That brings us to the second reason the defendant

13   conspired to commit wire fraud:  The lies to donors.

14        After the donors were suspicious and they were asking

15   questions and the press was accusing them of, you know,

16   misleading information and pocketing money, they come up with a

17   new idea.  And the idea is lie to everyone and tell them that

18   all of the money will go to the wall and not a penny will go to

19   Brian Kolfage.  And they blast this lie out everywhere.

20        This is what they posted on the GoFundMe in response

21   to the accusations of fraud.  There are several screenshots of

22   this GoFundMe page, and they all just promise:  100 percent of

23   your donations will go to the Trump wall.  100 percent of the

24   funds raised on GoFundMe will be used in the execution of our

25   mission and purpose.  Brian Kolfage, quote, will personally not

1    take a penny of the compensation from these donations.

2           And remember, that's the GoFundMe that the defendant,

3    his wife, and Kolfage launched in December 2018.  The defendant

4    we saw had login credentials, that's Government Exhibit 9.

5           So they are running this thing.  And they made a

6    website for We Build the Wall, and made the same false promises

7    there.  Government Exhibit 406.  This is what he says.  The

8    website says:  How much is Brian Kolfage getting paid?  In

9    accordance with Mr. Kolfage's personal pledge and the bylaws of

10   We Build the Wall, Inc., Mr. Kolfage will not profit even a

11   single penny from We Build the Wall.  So not even a single

12   penny from We Build the Wall should be going to Brian Kolfage.

13          The defendant, he worked on We Build the Wall's

14   website.  He helped write the fraudulent language.  Here's an

15   example, Government Exhibit 23.  The defendant, he's

16   checking -- he's checking with his business partners and he's

17   saying, What do you think about this language?  He's asking the

18   language to put on the website because they are all in on the

19   lie.  And he wants to be sure he can get away with it.

20          So he asks Brian Kolfage and his wife whether this

21   language on the screenshot at the top of the website should

22   have the statement, All proceeds go directly to building the

23   wall.  And Brian Kolfage says as they are editing this website,

24   I think since it can't be proven, it's okay.  Because no one

25   can ever prove -- he's saying no one can ever prove people are

1    taking it, so it's fine.

2            Tim Shea says, Okay.  Cool, cool.  I just don't want

3    to go to jail.  And he and his wife are joking about going to

4    jail.  And the reason they are worried about going to jail is

5    because the statements they are making about what they are

6    doing with the donors' money are false.  They are lies.  And

7    that's how you know it's a fraud, because they are talking

8    about how their statements on the website could end them up in

9    jail.

10           And so the defendant and his wife and Kolfage also

11   posted on social media; we saw a bunch of evidence about this.

12   They said Kolfage wasn't being paid; all the money goes to the

13   wall.  Talking about the Facebook pages that the defendant, his

14   wife, and Kolfage talked very hard about pushing.

15           So here's an example, Government Exhibit 2.  Kolfage

16   says:  So we just hit it hard on Facebook.  And Government

17   Exhibit 4 says:  Let's just do a lot of posts today.

18           So they are all agreeing to flood social media posts

19   about We Build the Wall.  And what do the posts look like?

20   These are the types of things that are posted on Facebook, on

21   the account that Kolfage says they should push.

22           It's Government Exhibit 953, and there's a lot of

23   these.  Brian has stated he takes zero salary, zero

24   compensation, and it's in the bylaws.  Government Exhibit 957,

25   Brian is not taking any salary or compensation.  Government

1    Exhibit 958, all the money goes to the wall.

2              So look, the defendant and his wife and Kolfage posted

3    the same lies, literally sometimes verbatim words over and over

4    again.  They wrote it on the website, they wrote it on the

5    GoFundMe, they wrote it on social media.  And you've seen that

6    a lot.  I'm not going to go through all the tweets and

7    everything, all the emails we've looked at.

8              But let me just remind you of Government Exhibit 905

9    which is in evidence.  Here it is.  It's the chart of the

10   dozens of times in the month of January alone the defendant and

11   his co-conspirators promised to donors those two things:  100

12   percent of the money would go to the wall, not a penny to go to

13   Kolfage's pay.  That exhibit is available to you if you want to

14   look at all the times in January alone where these statements

15   were made.

16             Why the defendant and his co-conspirators promised

17   over and over and over and over and over again that he wasn't

18   taking a penny?  You already know the reason they went

19   absolutely wild posting these things, tweeting them and

20   announcing them everywhere, emailing people, because it really

21   mattered to the donors.  They had to win the donors' trust.

22   And that's how you get the money.  You have to get them to opt

23   in, so they had to win their trust.

24             And how do you know that the lies were material to

25   donors?  Here's Government Exhibit 103.  This is an email from

1    Andy Badolato to a bunch of folks.  And remember, Badolato

2    worked for We Build the Wall.  He was basically like a money

3    guy.  He worked for the wall, and he worked for Steve Bannon.

4    And he says the reason they are telling all the donors that

5    Kolfage personally will not take a penny is because it's a

6    material item.  That means it's something that matters; it

7    matters to donors.

8            They knew it mattered to donors for the reasons up on

9    the screen.  They knew it mattered to donors that they say

10   Kolfage isn't taking a penny because it would be the most

11   talked about media narrative ever.  That's a text.  It would --

12   here's what he says.  Badolato says:  It would remove all

13   self-interest taint, meaning it would eliminate the claims that

14   they were doing this to profit.  It would give Brian Kolfage

15   sort of a sainthood status in the mind of donors.  It would

16   repute the haters, the haters like the people at BuzzFeed or

17   the donors asking questions.

18           So the defendant and his partners were right.  They

19   were right about this.  They were right that these statements

20   were really important to donors in terms of building trust and

21   getting them to donate money.  And it mattered to people that

22   you heard testify at trial last week.  It mattered to Nicole

23   Keller.  Border protection, that was personal to her.  Her

24   husband, as you heard, the retired border agent, was sick.  She

25   knew it meant something to him.  She donated money to We Build

1    the Wall.  She felt confident doing it because she thought all

2    the money was going to go to the wall.

3            Here is her testimony, transcript at 133.  She said

4    she especially remembered the 100 percent statement.  It,

5    quote, made an impression on her that she could donate in good

6    faith.

7            It also mattered to Bill Ward.  He's the retired

8    military veteran living in Arizona who testified last week.  He

9    also remembered that promise and it was important to him.

10   Here's his testimony, transcript at 296.  He said it spoke to

11   the sincerity of the operation; that they were really going to

12   take the funds and use the funds as initially advertised, to

13   build the wall.

14           So this promise, this false promise, was really

15   important to raising money.  It stuck with donors and that's

16   why the donors, the victims of the fraud, remembered it years

17   later; that's why they asked for refunds when, as we're about

18   to talk about, they realized they were lied to.

19           Here's the deal:  It's crystal clear that the donors

20   were being lied to.  We've now talked about the promise that

21   was made over and over and over and over again to donors, that

22   not a single penny would go to Kolfage.  But you know the

23   truth, because behind the scenes, they were talking about

24   Kolfage getting a cut of the money, and were actually paying

25   him a cut of the money and we've seen that in the evidence.

1          So here it is.  This is the text message that lays out

2     the scheme that the defendant was a part of.  It's Government

3     Exhibit 26.  It's a text between Kolfage and Badolato.  The

4     text message reads:  We need to figure out my pay.  This is

5     Kolfage writing this.  We need to figure out my pay.  Mine was

6     100K up front, then 20 a month.  This means that Kolfage was

7     going to get paid initially 100K up front, and then $20,000 a

8     month in salary; $20,000 a month as sort of a kickback that

9     we're going to talk about.

10          And here's where Bannon and Badolato, the money guy,

11     confirmed the arrangement again.  It's Government Exhibit 109.

12     Bannon confirms that they want $100,000 for Brian Kolfage.

13     Badolato writes the arrangement is $100,000 up front, and then

14     $20,000 monthly as the kickback.  The bank records show that

15     they did exactly what the text messages and the emails said

16     they were going to do.

17          This is Government Exhibit 902.  I'm going to

18     reference it a bunch.  We're going to go through this in more

19     detail later, but here's the key takeaway, okay?  They secretly

20     paid Kolfage $100,000 up front, just as they had all agreed.

21     After Kolfage gets that first $100,000 payment, which is

22     transaction one up on that slide, he starts getting $20,000

23     monthly.  That's all the other transactions, $20,000 or more a

24     month.  And notice how the money didn't go directly to Kolfage

25     on this.  There's always a little middleman, a little -- what

1    somebody called an intermediary.  And that's because they'd

2    easily get caught if they paid Kolfage.  Too easy for everyone

3    to detect if literally the organization is shelling out money

4    to Brian Kolfage.  So they disguise the pay through all these

5    transactions where they are sending to a middleman, to an

6    intermediary, like the defendant.

7            Okay.  So I want to put it together.  Reason number

8    two.  The defendant and his partners in crime told donors that

9    100 percent of their money would go to building a wall; not a

10   penny would go to Kolfage.  The evidence shows the defendant

11   literally wrote those promises, and those promises were totally

12   false.  Everyone knew the promises mattered; they were

13   material, it was really important to these donors.  But still

14   behind the scenes everyone agreed that Kolfage, he was getting

15   secretly paid 100 grand up front, 20 grand a month.  And the

16   fact that the defendant lied to these donors about something so

17   significant is a reason he's guilty of Count One.

18           All right.  Third reason.  The defendant's text

19   messages setting up the kickback scheme or the third reason you

20   know he's guilty.  Text messages.

21           Let me just say this for starters:  The defendant did

22   not want you to see these text messages.  He very much knew his

23   words alone would convict him.  That's why as Andy Crain, the

24   tech guy who testified last at the trial, told you, his

25   messages were set to auto delete after 30 days.  And that's why

1    he wanted to switch over to those two encrypted messaging

2    applications, Signal and Wickr, when he learned of a federal

3    investigation.  That's why none of the text messages in this

4    case came off of Tim Shea's phone.  He made sure when federal

5    investigators came for it, all those messages were gone.  So

6    it's another way he tried to hide his crimes and obstruct

7    justice.  But thanks to court-issued search warrants, we have

8    the text messages from the people that he was texting with,

9    from their phones, and they're enough to convict Tim Shea of

10   wire fraud conspiracy alone.

11           Let's start with Government Exhibit 29.  This is a key

12   exhibit.  Tim Shea is setting up the scheme in Government

13   Exhibit 29.  This is one to look at.

14           He texts Brian Kolfage.  His wife, who's working for

15   We Build the Wall, is on this text chain.  The two other people

16   on the text chain are the two money guys, Badolato and

17   Fleuette, who work for Bannon.  And here's what he says:  We

18   need a solid f'ing plan, otherwise we go to prison.  This is

19   what it means.  Tim Shea is telling his co-conspirators they

20   need a plan to build some wall and secretly pay themselves

21   kickbacks and not get caught, because otherwise they are going

22   to prison.

23           After he says, We need a solid f'ing plan, otherwise

24   we go to prison, and they all chuckle, here's what's next:  Tim

25   Shea writes:  We have to firm this shit up.  And Brian Kolfage,

1    his co-conspirator, he agrees.  He says:  Everyone will want to

2    know.  Everyone is going to want to know.

3         Brian Kolfage adds:  If it came out we hired

4    ourselves, it will be bad.

5         The defendant is saying, We need to firm this up.  We

6    need to firm up our plans.  And Kolfage is saying, I totally

7    agree.  If it came out we were paying ourselves, if it came out

8    that We Build the Wall hired you and me, it will be really bad.

9    So this is about them not getting caught stealing.

10        I've highlighted the next three text messages on

11   there.  This is right afterwards.  And this is how Tim Shea

12   responds to Kolfage's comment, that it would be bad if it came

13   out that they hired themselves.  He says:  We need to create

14   companies that I hired you.  I'm paying you for a service.

15   Consulting.

16        So the defendant is saying, The way we don't get

17   caught is hiring ourselves by creating a company and having We

18   Build the Wall pay the company for a pretend service like

19   consulting.  But that's just half the transaction; that's just

20   how you explain the payments from We Build the Wall to the fake

21   company.

22        How about the payments from the defendant or his fake

23   company to Kolfage?  Here's what Tim Shea says, same exhibit:

24   But the transfers between me and you, we need to talk through

25   this.  If 600K comes in and I transfer 300K to you, we'll have

1    to account for that.  So the defendant knows they need to come

2    up with a cover story, fake explanations, to explain away the

3    money they were stealing from We Build the Wall.  And so Tim

4    Shea says what he's going to do is he's going to create a

5    family trust that is cloaked.  He says:  It's veiled so no one

6    knows who owns it.  He's saying he's going to -- basically,

7    he's saying he's going to hide what they are doing behind the

8    company so that no one knows that they are paying themselves.

9            So the defendant's words in Government Exhibit 29 are

10   the plan for the entirety of the criminal scheme here.  This is

11   the solid f'ing plan, and everything the defendant laid out in

12   his texts are in this diagram showing how he received the

13   money.

14           Let's walk through it.  Government Exhibit 901.  I

15   just want to be clear about this.  The defendant didn't just

16   lay out a criminal plan in text messages with Brian Kolfage.

17   That would actually be enough to convict him of conspiracy of a

18   criminal agreement.  But he actually carried through it.  And

19   we're going to walk through that.  And that's how you know his

20   words mean exactly what he said and don't mean something else,

21   because literally his actions then matches up with his words.

22   So let's look at that.

23           The first thing Tim Shea said was:  We need to create

24   companies that I hired you.  And that's what he did.  See it on

25   the chart.  Within a week of the text message, he creates Ranch

1    Property Marketing and Management.  I put a red box on it.  The

2    company is set up in Wyoming deliberately.  It's "veiled" so no

3    one knows who owns the business, and it's hired by We Build the

4    Wall.

5           The next part of the plan that we just saw on the text

6    messages was saying, I'm paying you for a service, consulting.

7    And there it is, in the red box on the memo line for the wire

8    they say:  Per invoice consulting.  That's the pretend fake

9    reason for the payment, just like the defendant described in

10   the text message.

11          Then there's the last part of the plan, the

12   defendant's transfers between Shea and Kolfage.  He said if

13   600K comes in and Shea transfers half to Kolfage, they need to

14   account for that.  So here, take a look on this particular

15   transaction; when 30K comes in, Shea transfers 20 to Kolfage.

16   They need to account for that.  And so they write Facebook

17   pages.  That's the whole crime right there.  That's the whole

18   solid plan.  It's a whole criminal scheme.  We Build the Wall

19   to Ranch Property, Ranch Property to Freedom Daily, which is

20   Brian Kolfage, and then paper the transactions in the middle.

21          Now, in his opening statement, defense counsel focused

22   on this particular text message, the solid plan text message,

23   and told you it means something else.  Why did he say that?

24   Because this text message exchange alone is a reason to convict

25   the defendant.  It's really a smoking gun.  It matches up

1   perfectly with the transactions.  So he has to try to tell you

2   it means something it doesn't.

3            Now, I want to be clear about this.  The defendant

4   doesn't have a burden in this case.  He doesn't need to make

5   any arguments.  There's no burden of proof for him.  We have

6   the burden; the government has the burden.  But when the

7   defense makes arguments, you have to ask yourself whether they

8   make sense and line up with the evidence.

9            So defense counsel in his opening statement said this

10  whole text message exchange is actually about construction, and

11  I wrote down what he said.  He said -- this is his explanation:

12  Quote, when there's no permits and someone gets hurt or

13  concrete is not laid right, you go to jail.  So defense counsel

14  would have you believe that the defendant is just really

15  talking about construction, he's really concerned -- he's

16  really concerned that if they don't lay the concrete right,

17  they would go to jail, because he's concerned about

18  construction safety.

19           Look at Government Exhibit 29.  Here's what you won't

20  see in there:  Discussions about people going to prison because

21  of quality of concrete, permits, workplace entries, etc.  The

22  whole explanation is made up.  And the reason you know that is

23  just find the message that says solid plan, read up, read down,

24  the messages right after make it clear it's about a criminal

25  conspiracy, it's not about workplace safety.  So that's the

1   third reason you know Tim Shea is guilty of wire fraud

2   conspiracy, because he spells it out in messages with his

3   partner in crime.  And then he carries through on it.  And he

4   knows it's a crime because he's talking about a plan to stay

5   out of prison to not get caught.

6          All right.  Let's go to the next reason, reason number

7   four you know Tim Shea is guilty of participating in a wire

8   fraud scheme is because what he was doing is the exact same

9   thing as what the other members of the conspiracy were doing.

10  So this is your classic, sort of, like if it walks like a duck

11  and it quacks like a duck, it's a duck type situation.  And if

12  Tim Shea is moving the money in the same way the other people

13  in the conspiracy are moving the money, and it's in the same

14  amounts, and he's doing it on the same schedule, on the same

15  timing, saying the same things, what does that mean?  It means

16  he's participating in the same crime, in the same conspiracy.

17         So here's a payment -- here's a payment from We Build

18  the Wall to Steve Bannon's nonprofit called Citizens of

19  American Republic.  It's Government Exhibit 902.  The amount is

20  $30,000.  And after Citizens of the American Republic gets the

21  money, it kicks back 20 to Brian Kolfage.  You remember the

22  text messages that we looked at a few minutes ago between

23  Bannon and Andy Badolato, his money guy, about paying Kolfage.

24  So that's in writing in black and white.  And we've got it

25  right up on the screen in front of you.  The screen shows

1    $30,000 to Citizens of the American Republic; 20,000, the

2    secret amount being paid to Kolfage for the month of April.

3           So Tim Shea, he isn't directly involved in this

4    transaction, right, nowhere on this screen.  It's just Kolfage,

5    Bannon, and Badolato.  But look what happens the very next

6    month.  So we looked at April.  Here's May.  We Build the Wall

7    sends $30,000 to Tim Shea's company, and he kicks back 20 to

8    account in the name of Freedom Daily, which is Brian Kolfage's

9    company.  The amount from We Build the Wall is identical; the

10   amount kicked back to Kolfage is identical.  They are one month

11   apart.

12          It's not like this is some sort of one-time fluky

13   thing where by chance the numbers happen to match up.  Here's

14   June:  $50,000 from We Build the Wall to L. B. Moon, another

15   guy working with We Build the Wall; and then $20,000 kicked

16   back to Brian Kolfage.  And the next month, looks similar:

17   Nearly $50,000 out of We Build the Wall, and this time to Tim

18   Shea's company again, then $20,000 kickback to Brian Kolfage.

19          Let's recap this.  So we have in writing messages from

20   Kolfage, Badolato, and Bannon agreeing that Kolfage will get

21   paid $100,000 up front and $20,000 a month secretly from We

22   Build the Wall.  These are the messages.  We've already looked

23   at them.  Then we have payments from We Build the Wall to

24   Bannon's nonprofit and from the nonprofit to Kolfage.  And the

25   amount of those payments, the first one is $100,000, and it's

1    $20,000 a month.

2            And then we have the defendant's payments to Kolfage.

3    Those payments fit the same pattern as all the other illegal

4    kickback payments that are part of the conspiracy.  They are

5    just like the payments being made by Bannon, being made by

6    L. B. Moon.  They fit the amount.  They are all $20,000 or

7    more, they fit the format, they all involve a payment from We

8    Build the Wall, followed shortly after by a payment to Kolfage

9    and they fit the schedule.  Kolfage is secretly promised

10   $20,000 a month.  The payments from Tim Shea fit in that

11   monthly schedule.  They come monthly.

12           On that last point, let me show you this:  This

13   information comes from Government Exhibit 902.  Brian Kolfage

14   has a secret agreement to get 100,000 up front, and 20 a month,

15   right?  Here's that $100,000 at the top, plus the first six

16   months of pay.  And you can see it.  They pay through Tim Shea

17   for Ranch Property.  It matches perfectly on this schedule of

18   payments to Kolfage.  That's how you know Tim Shea is guilty of

19   participating in the wire fraud conspiracy.

20           And on the other hand, let's pull these out, if the

21   payments through Ranch Property, through Tim Shea, had nothing

22   to do with the scheme, as the defendant would like you to

23   believe, well, then where are the monthly Kolfage payments for

24   May, July, and August?  Right?  Here they are.  The defense

25   believes they are missing.  This isn't some coincidence where

1    he just happened to have some totally unrelated business deal

2    with Kolfage in the same three months for the exact same amount

3    as the kickbacks.  He was being paid in the other months.

4           And by the way he knows all these people, right.  It's

5    not like by random chance some people totally unknown to Tim

6    Shea are paying Brian Kolfage, and then Tim Shea just happens

7    to pay Brian Kolfage.  It isn't a coincidence.  He knows these

8    people.  He's doing the exact same types of transaction as the

9    other people he knows who are also working with We Build the

10   Wall.  So he's plainly guilty of participating in the wire

11   fraud conspiracy.  All right.  That's reason number four.

12          Here's reason number five:

13          The kickbacks were paid with money stolen from We

14   Build the Wall.  I've already said a bit about how the money

15   came to Tim Shea's accounts and how he kicked $20,000 back to

16   Kolfage.  But I want to make a point about why the money in

17   particular proves Tim Shea is guilty.  So it's not just that

18   the payments came within days of Tim Shea getting paid by We

19   Build the Wall, sometimes even the same day.  An important

20   point is that these payments to Kolfage would have been

21   impossible, totally impossible, without the We Build the Wall

22   money.  So let me put it another way.  The money that came to

23   Kolfage is the exact money; it's literally like a $10 bill into

24   your wallet, take that $10 bill, pay it to the next guy.  We

25   know that because the balance in the accounts wasn't high

1    enough for it to be another way.

2         So let me show you a few examples.  And literally

3    didn't have the money otherwise.  Here's Government Exhibit

4    901, $100,000 to Tim Shea.  The same day, $50,000 goes to

5    Kolfage.  Tim Shea literally could not have made that payment

6    without the donor money.  The balance on this account was just

7    over 6,000 at the time.

8         Here's another one:  $50,000 from We Build the Wall to

9    Ranch Property, same day.  $25,000 goes from Ranch Property to

10   Kolfage.  That payment would not have been possible without the

11   money stolen from We Build the Wall, okay?

12        So are we supposed to believe this is all just some

13   sort of coincidence; that the defendant had some completely

14   unrelated business arrangement where he'd just get money from

15   We Build the Wall and, by total chance, just happen to pay it

16   to Kolfage, 50 percent of it to Kolfage around the same day?

17   Of course not.  This was a way to get Kolfage secret payments

18   from We Build the Wall.

19        The sixth reason you know Tim Shea is guilty of Count

20   One is he couldn't keep his story straight.  So you jurors have

21   life experience.  And our life experience tells us that when a

22   person has an ever-changing story, you know, a lot of

23   inconsistencies, a lot of conflicting explanation, lies that

24   don't match up with one another, well, in those circumstances,

25   it's a sign they aren't telling the truth, right?

1    So here we have a lot of evidence of the defendant

2    with an ever-changing story, a lot of conflicting explanations,

3    many explanations for what the payments are, and they don't all

4    match up together.  And that's a reason he's guilty of Count

5    One.

6        What am I talking about?

7        So in emails and financial documents and tax forms and

8    even during the trial, the defendant provided several reasons

9    why We Build the Wall was paying him and paying his company,

10   and reasons also why he and his company were paying Brian

11   Kolfage.  So the reasons provided by the defendant that

12   contradict one another, right, they don't square up, and so

13   that's proof he was engaged in a fraud.

14        So let's start with the reasons why the defendant gave

15   for being paid by We Build the Wall.

16        You heard that Tim Shea and Ranch Property got about

17   $400,000, not counting expense reimbursements and not counting

18   the regular pay that was going to Amanda Shea.  So for the

19   first payment, Kolfage suggests to the defendant that he send

20   an invoice for Facebook pages.  So the first payment was 100

21   grand, and he says, send an invoice for Facebook pages to We

22   Build the Wall for 100 grand.  That's Government Exhibit 30.

23   If he really did the work and this was a real business, why did

24   Kolfage need to tell him, Hey, yo, send an invoice for 100

25   grand for Facebook pages?  And why did he need to tell him what

1    to put on the invoice?  And why did he need to tell him how

2    much to bill for?  He wouldn't.  He wouldn't need to tell him

3    those things, and that's how you know this initial explanation

4    is made up.

5           And then it's an invoice to We Build the Wall for

6    consulting and construction expenses.  That's Government

7    Exhibit 1700.  So what consulting and construction expenses?

8    None.  This is also just made up.  And then the defendant

9    starts submitting these invoices for big dollar amounts like

10   this one, Government Exhibit 118-A, where he invoices for

11   $48,762 for security services.  Remember this invoice, by the

12   way?  We're going to come back to it.  And then there's this

13   invoice, it's Government Exhibit 122-A, where he claims to be

14   invoicing for $61,760 for contracting military contractors,

15   police coverage, etc.

16          And then there's this invoice, Government Exhibit

17   125-A, where the defendant claims to be invoicing for drone

18   services.  And then in October 2019, after he learns of the

19   criminal grand jury investigation, he's got another -- a new

20   reason, and it's this vendor services contract that he

21   backdates to March of the year.  And that backdated contract

22   says the reason that We Build the Wall has been paying Ranch

23   Property is to "advise We Build the Wall on gathering

24   landowners' information to secure property."  And then in --

25   all right.  This is the agreement here where it says just that.

1    And, of course, the contract, as I said, is backdated.  He

2    wrote March 1st on it even though the data shows it was

3    actually from October.  And we'll cover that further.

4           And then in 2020, when Amanda Shea gets a tax form

5    1099 for the payments to Tim Shea and Ranch Property.  It has

6    yet another totally different reason for the payments; it's in

7    the first box that's highlighted, rent.  This is Government

8    Exhibit 853.  And Tom Bolus of the IRS, he told you that the

9    rent box is for things like renting space and equipment.  So

10   for all the various reasons Tim Shea has already given for

11   these payments, Facebook pages, contracting, consulting, drone

12   services, security services, none of them have to do with rent.

13   If it was security contracting, it would go in box 7.  If it

14   was employee compensation, the IRS said it would go in box 7.

15   If it was reimbursement, it wouldn't even have to go on here.

16          And that wasn't even the last explanation, by the way.

17   When Tim Shea then filed his taxes under penalty of perjury, he

18   says it's something totally different.  He writes:  other

19   computer-related services.

20          So, folks, it's impossible to square all these things.

21   The money from We Build the Wall to Tim Shea can't be for

22   Facebook pages and consulting and security services and drone

23   services and property research and rent and computer-related

24   services.

25          By the way, that pattern of changing reasons for the

1    payments has continued during this trial.  First defense

2    counsel suggested these payments were for reimbursements; then

3    he gave another reason which was security services; then they

4    showed you some contracts and some invoices about hiring guards

5    or flying a drone around; then he told you that Tim Shea was

6    actually helping We Build the Wall buy property, which is a new

7    sort of twist on the explanation.  And for many of these,

8    there's no actual evidence that Tim Shea did that.

9         Let's say drone services, for example.  The evidence

10    in the case is an invoice.  It's two pieces of evidence in the

11    case.  There's an invoice about hiring somebody to do drone

12    services.  No evidence that actually that ever happened.  And

13    there's an email where the defendant responds to a pretty high

14    quote for drone services.

15         So it can't be that the defendant was just doing a

16    bunch of different things for We Build the Wall, because the

17    reasons for the particular payments conflict with one another.

18    It's not just like substantively they conflict, like Facebook

19    pages is not the same as rent; but also the numbers just don't

20    add up.  It can't be that literally like the same money, 100

21    grand, is for Facebook pages and also it's for computer-related

22    services or rent.  And when someone can't get their story

23    straight and they tell you six different versions of it, you

24    know it's a lie.  That's evidence that he's engaged in a fraud.

25         That's just half the transaction.  Everything I was

1    talking about, all the stories, all the reasons, we're just

2    talking about the reasons from We Build the Wall to Ranch

3    Property.  What about what are the reasons he gives to Ranch

4    Property to pay Brian Kolfage, Tim Shea paying Brian Kolfage?

5    There's a lot of shifting stories there.

6           So the first is that Tim Shea is paying Brian Kolfage

7    for "social media accounts."  What accounts?  Why does it cost

8    $25,000?  There's no evidence in this case that Brian Kolfage

9    sold social media accounts to Tim Shea, and that's because it

10   didn't happen.  It's a cover story.  Then on your screen it's

11   Facebook pages as the reason for the payments from Tim Shea to

12   Brian Kolfage.  What would Tim Shea possibly have paid his

13   business partner $20,000 to do on Facebook?  Nothing.  This is

14   made up.

15          And then in October 2019, again, after they learn

16   about a federal criminal investigation, it's another backdated

17   contract, backdated to March.  They put this together after

18   they learn of a subpoena.  And the backdated contract says the

19   reason for the payment was Tim Shea was actually buying from

20   Kolfage an email list for $150,000.

21          I'm going to say more about this in a bit when we talk

22   about Count Three.  But notice how even on the face of this

23   document, the reason given for the payment contradicts the

24   other reasons Shea gave for the payments to Kolfage.  Are we

25   supposed to believe that it was for Facebook pages and an email

M5VVSHE1                    Summation - Mr. Roos

1   list, creating social media accounts and an email list?  The

2   numbers just don't match up.

3           Here's the bottom line on this:  The defendant

4   couldn't keep his story straight.  He's got a dozen reasons of

5   why We Build the Wall is paying him.  He's got several reasons

6   why he's paying Kolfage.  The payments to Tim Shea came in with

7   enough money to kick back at least $20,000 to Brian Kolfage,

8   okay?  And the fact that Tim Shea couldn't keep his story

9   straight about why he's getting the money and why he's sending

10  the money proves he's guilty of wire fraud.

11          All right.  Reason seven.  Reason seven that the

12  defendant is guilty is he hid the payments to Kolfage from the

13  IRS.  You heard from the defense in this case that the reason

14  Tim Shea was paying Brian Kolfage is because he bought a list

15  of emails.  We just looked at the document that this is based

16  on.  So they are saying, He actually did, he bought this list

17  of emails for $150,000.  And they say they weren't kickbacks,

18  they were just purchasing this list of emails.  He's purchasing

19  an email list.

20          I've got a lot to say about this, okay, and we're

21  going to get to it in a bit.  But one point I want to make now,

22  if it's true that the money he was paying was for some sort of

23  email list, a legitimate expense for some sort of email list

24  business, why didn't he report that as an expense to the IRS,

25  which you learned would allow him to lower his taxes?  $150,000

1    as a business expense would have been a pretty big tax

2    deduction for him.

3           Defendant knows how to do tax deductions.  He's

4    deducting 18,000 in depreciation on a $70,000 Range Rover, and

5    the cost of a cell phone, his tax forms, an 800 number.  But he

6    doesn't deduct the 150, which would be by far the largest

7    deduction for buying an email list.  It would be in his

8    interest to deduct that 150.

9           Tom Bolus of the IRS told you, page 322 of the

10   transcript, that such a deduction can be -- "Can be taken to

11   bring down the actual taxable amount to give the taxpayer a

12   credit.  It would be in the taxpayer's interest."  So it would

13   be in Tim Shea, the taxpayer's, interest to take this

14   deduction.  And he knows how to deduct the expenses.  And if he

15   had really bought an email list for $150,000, then he's got

16   this big deduction and it's in his interest to take the

17   deduction.  And it brings down his taxable amount.  And he'd

18   have every reason to do that, because as Tom Bolus also told

19   you, he ended up owing $127,000 at the end of the year, so

20   there's plenty of room to take a deduction.  But he doesn't.

21          You know, in his opening statement defense counsel

22   said, Tim pays taxes on all the money he gives to Brian.  And

23   then defense counsel questioned why the defendant didn't deduct

24   the payments to Kolfage.

25          MR. MERINGOLO:  Objection.

1          THE COURT:  Overruled.

2          MR. ROOS:  Here's the answer:  The fact that the

3     defendant didn't take the $150,000 tax deduction tells you

4     something.  It tells you something.  People take tax deductions

5     for legit business expenses.  They don't take deductions for

6     payments they made when they are doing a crime.  They don't

7     deduct their kickbacks or their money laundering.  He doesn't

8     want an IRS agent to ask him why he was paying $150,000 to

9     Brian Kolfage.  And the easiest way to do it is not to put it

10    on your taxes.  Take the deduction if it's a real business

11    expense.

12          But if you happen to pay $150,000 in illegal

13    kickbacks, well, you probably don't want to bother with the

14    deduction.  Tim Shea didn't want the heat, and so he just left

15    this off his taxes, and that's another reason you know this was

16    an illegal payment; and that's another reason why he's guilty

17    of wire fraud conspiracy.

18          So here's the eighth reason.  I said eight reasons for

19    Count One.  This is the eighth reason.  The eighth reason is he

20    broke We Build the Wall's rules.  The defendant and Kolfage

21    stole money from We Build the Wall secretly and without board

22    approval.  And in the process, he broke We Build the Wall's

23    rules, and that's evidence that he was violating the law.

24          Let's start with the rules.  We Build the Wall had

25    bylaws.  It submitted those bylaws to GoFundMe and it filed

1      them with the New York Attorney General.  And you've seen

2      references to these bylaws in the websites and the social media

3      posts.  The bylaws say that Kolfage would not take a salary.

4      That's the highlighted language in Government Exhibit 352.

5      Paying Kolfage violates We Build the Wall's rules.  Okay?

6           The bylaws also have this conflict of interest

7      section, and it's something that Hanna Rubin from the New York

8      Attorney General's office testified about.  She reviewed these

9      with you and they are up on the screen.  So the purpose, as it

10     says, the purpose of this conflict of interest policy was to

11     protect We Build the Wall to make sure that the organization

12     didn't have any improper transactions, any sort of

13     inappropriate transactions that might benefit the private or

14     personal financial interests of someone who's involved in We

15     Build the Wall.

16          So the idea here is you've got this policy.  It says

17     if you work for We Build the Wall as like its president or an

18     officer and you're going to do a financial transaction, that's

19     a potential conflict of interest.  So we've got to have certain

20     checks in place to make sure there's not a problem and that it

21     doesn't hurt We Build the Wall.  And the conflict of interest

22     policy says in those circumstances, if I'm the president and I

23     want to do -- I want to sell something that I make to We Build

24     the Wall, if I want to take a loan, if I want to do a deal with

25     We Build the Wall, I got to disclose it to the board, and the

1    board has got to say thumbs up, like you got it, no problem,

2    okay.  So we're looking for board approval and board -- telling

3    the board and board approval.  It's basically against We Build

4    the Wall's rules to do a transaction involving someone who

5    works for We Build the Wall, unless it's told to the board and

6    the board says okay.

7         All right.  Throughout all of 2019, the period we've

8    been talking about, not a single payment to Kolfage was

9    authorized by the board, and not a single transaction between

10   We Build the Wall and Ranch Property Marketing and Management

11   was authorized by the board.  Here's the evidence of that.

12        This is Kris Kobach.  Neither party called him during

13   the trial.  There is though a stipulation by the parties of

14   what he would have said, and you can credit that as if he

15   testified.  That's Government Exhibit S-10.

16        The stipulation says that Kobach was a member of We

17   Build the Wall's board of directors since January 2019.  And

18   here's the key part:  He was not informed of and had no

19   knowledge of payments from We Build the Wall to Brian Kolfage

20   in 2019 for compensation or salary.  So this is very

21   incriminating.  All those monthly payments to Kolfage of

22   $20,000 that were rooted through middlemen, they kept Kobach,

23   the board member, in the dark.  The board did not know about

24   this.  And that's important.  That's how you know they violated

25   conflict of interest policy.  If they had followed it, they

1    would have had to disclose those transactions, those payments,

2    and Kobach or the board would have had to either approve or

3    deny them.

4            The same is true for the payments from We Build the

5    Wall to Ranch Property Marketing and Management.  The

6    stipulation says Kobach was not informed of and had no

7    knowledge of the payments by We Build the Wall to Ranch

8    Property.  So if the payments to Ranch Property were

9    legitimate, why weren't they approved by the board?  Why didn't

10   the defendant -- why did the defendant Kolfage keep them a

11   secret from Kobach?  Why violate this conflict of interest

12   policy?  If these are legitimate payments for vendor services

13   or for doing work for We Build the Wall, why are these things

14   kept totally secret?  Why are they violating the conflict of

15   interest policy?  And the answer is because they were secretly

16   stealing the money.  This was all a sham.  It was all a

17   pretext.  And it was something they knew that Kris Kobach, who

18   you heard is a credentialed lawyer, would not stand for; was

19   not going to follow it.  So they do it secretly.  They violate

20   the conflict of interest policy, and that's another reason you

21   know the defendant is guilty of wire fraud.

22           Give you another example.  You remember this, you

23   remember Winning Energy, the official fuel of winners.  It's an

24   energy drink.  And here's the website.  You can get a can --

25   you can get a 12-pack cans for 36.99.  And this is Tim Shea's

1   business.  He brought the cans; one of them is in evidence.  It

2   had no connection to We Build the Wall.  Karl Mitchell, who

3   literally made these energy drinks from the DrinkInk, said

4   there was no connection; he never heard about it being part of

5   We Build the Wall.  The website says nothing about We Build the

6   Wall.  There's nothing on the can that says anything about We

7   Build the Wall.

8        But when Tim Shea wanted to buy what Mitchell called a

9   truckload of cans, 50,000 cans of this stuff, he needed some

10  money.  He needed -- it's on here -- $34,444.80 to buy 50,000

11  of these cans, pull up a truck with them.

12       So where did the money come from?  The money comes

13  from We Build the Wall.  His business partner, Brian Kolfage,

14  was the president.  The defendant's wife was the treasurer.

15  This is Government Exhibit 903.  They wire 38,500 from We Build

16  the Wall to Winning Energy.  This is literally the next day

17  after the invoice.  At the time Winning Energy has no money.

18  Look at the balance.  $21.  And then almost all the money is

19  used to buy energy drinks.  So the defendant stole money and

20  used it to buy a truckload of these themed energy drinks.

21       They papered it as a so-called loan.  It was secret.

22  It was on Kolfage's computer, not in We Build the Wall's files.

23  The document was between Kolfage on behalf of We Build the

24  Wall, and Tim Shea on behalf of Winning Energy.  It said the

25  full amount with interest would be repaid on August 3rd, 2020.

1    That never happened.  Defendant never paid any money back.  He

2    never paid interest.

3            By the way, all that money was due before the

4    defendant was arrested; he just never paid any of it.  No money

5    ever went back to We Build the Wall from Winning Energy.  And

6    on a real loan like this, that's a problem.  The bank takes the

7    money back.  But nothing happened with the defendant, no

8    repayment, no collection, that's why you know it's not a real

9    loan.

10           And what happened after Kolfage betrays his duty to We

11   Build the Wall and sends money to Winning Energy?  You've got

12   the kickback right here, a share of profits.  They say it's

13   blowing up; the money from it should be deposited tomorrow.

14   Kolfage is going to get his share.  But none goes back to We

15   Build the Wall.  And here's what the stipulation about Kobach

16   says about Winning Energy:  Kobach was not aware of any of the

17   payments from We Build the Wall to Winning Energy.  That means

18   the wire transfers to Winning Energy was totally unauthorized.

19   It doesn't matter if it was a real or unpaid loan or just

20   papering another transaction, either way, the defendant and

21   Kolfage violated We Build the Wall's rules.  Kolfage couldn't

22   just loan the money to himself for one of these businesses.

23   The whole thing was sort of a secret arrangement they came up

24   with behind Kobach's back as a way to commit this crime.

25           So those are the eight reasons that the defendant is

1    guilty of conspiracy to commit wire fraud.  I've put them up on

2    the screen and I'll just pause for a minute and leave them up

3    there.

4            All right.  Judge Torres is going to tell you each

5    crime has some parts and they are called elements.  And I'm

6    going to describe some of the legal instructions, but I expect

7    Judge Torres will give you the elements.  And the instructions

8    she gives you is what controls and what you should listen to,

9    okay?  I'm just giving you a little roadmap so you could follow

10   the evidence and how it matches up with the law.

11           As I said earlier, there are two objects or two parts

12   to this first count.  That means there are two ways the

13   defendant committed the crime in Count One, conspiracy to

14   commit wire fraud.  So the elements of each object are very

15   similar.  Here are the elements that I expect you'll hear for

16   the first object.  And this is the fraud on donors.

17           So the first part of Count One is the conspiracy to

18   commit wire fraud on the donors, and there are three elements:

19           First, an agreement of two or more people to do a

20   scheme to defraud or to obtain money through materially false

21   or fraudulent statements or promises.  Second, that the

22   defendant, Tim Shea, agreed to participate in the scheme with

23   knowledge of its fraudulent nature and with specific intend to

24   defraud.  And third, that in executing the scheme, the

25   defendant or one of this his co-conspirators used or caused to

1    be used the interstate wires.

2            I'm going to go through these quickly because you're

3    going to hear the legal instructions from Judge Torres.  This

4    is just to orient you in terms of the evidence we have.

5            So we could check off the first and second element.

6    We went through the evidence on this already; we just went

7    through the eight reasons why you know what the defendant did

8    with his co-conspirators was a scheme to defraud donors, to lie

9    to them, to make false promises to them in order to obtain

10   their money in a manner that was material to them, those false

11   statements where the 100 percent of the money goes to

12   rebuilding the wall and that not a penny goes to Kolfage.

13           Those eight reasons I just went through are also the

14   eight reasons that you know the defendant was participating in

15   that scheme.  He was all over it.  He knew it was fraudulent.

16   He was engaged in the secret illegal money transactions.

17           We can also check off the third element easily.

18   You've seen many bank records, charts, and diagrams showing

19   financial wires between companies or people in different

20   states.  Those are all interstate wires.

21           So here's just two examples.  These are from

22   Government Exhibit 1600.  Wires from We Build the Wall to Tim

23   Shea for 100,000, goes from Florida to Colorado.  Here's

24   another example:  $50,000 from We Build the Wall to Ranch

25   Property, Florida to Colorado again.

1          And you're also going to hear from Judge Torres that

2     interstate wires can also mean things like besides wires.  It

3     can be like an email that goes between states, a text message

4     that goes between states, phone calls between states, those are

5     all interstate wires.  So the scheme obviously involves wires.

6          Like I said, the second object of Count One is very

7     similar and here are the elements:  This is the fraud on We

8     Build the Wall, okay.  And the first element is an agreement of

9     two or more people to do a scheme to defraud We Build the Wall

10     of its honest -- I'm sorry, scheme to defraud We Build the Wall

11     of its right to Brian Kolfage's honest services through

12     kickbacks.  The second and the third element here are the same

13     as the first object.  So I'm not going to talk about them

14     again, but let's talk about the first element briefly.

15          So I expect Judge Torres is going to tell you this:

16     The corporate officer, like Brian Kolfage, who was president of

17     We Build the Wall, owes what's called a fiduciary duty of

18     loyalty to the organization, which means he has a duty to put

19     the organization first.  He has to put We Build the Wall first,

20     ahead of his own interests.  So, in other words, the

21     organization is owed the honest services of the president,

22     that's the law.

23          And I expect Judge Torres is also going to tell you

24     that when an officer like the organization's president takes

25     actions on behalf of the organization in exchange for a

1    kickback, that deprives the organization of the honest

2    services.  And so what's a kickback?  It's money in exchange

3    for doing something which then produces money that are kicked

4    back.

5         We already went through the evidence of Kolfage

6    breaching his duty of We Build the Wall by paying the

7    defendant.  So Kolfage was responsible for wiring hundreds of

8    thousands of dollars to We Build the Wall.  He's on the

9    checking accounts we've all looked at.  And he did it without

10   board approval.  We just talked about it at length.  And in

11   exchange for violating that duty of loyalty to We Build the

12   Wall, he's getting a kickback from the defendant.

13        So here we see it, $100,000 is wired from We Build the

14   Wall.  Brian Kolfage is one of the two signers.  He's texting

15   Tim Shea about doing the wire.  And then the exchange for Brian

16   Kolfage taking that action, Tim Shea kicks back 50 grand.  And

17   you've seen it in a lot of charts.  I know you get it.  It

18   happened with Ranch Property Marketing and Management; it

19   happened with Winning Energy.  But the point is each time this

20   happens, it's a kickback in exchange for Brian Kolfage

21   violating his duty to We Build the Wall.  So he's defrauding

22   the organization of its honest services and, in doing that, he

23   gets rewarded by the defendant, by his partner in crime, with a

24   kickback.

25        So that's the first element.  And like I said, we

1    already went through the two other elements, but the first part

2    is Count One, so we check off all those boxes.

3            All right.  Count Two.  Count Two is a conspiracy to

4    commit money laundering.  The defendant is charged with

5    conspiring to commit money laundering in two ways.  So there's

6    two types of money laundering, just like the first count.  Two

7    types or two objects of wire fraud conspiracy; two types or two

8    objects for money laundering conspiracy.

9            So this is the first object.  It's the first way that

10   the defendant conspired to commit money laundering.  This is

11   called concealment money laundering, which means they are doing

12   the transactions to hide the source of the money.  So I'll just

13   leave it on the screen for a second.

14           And here is the second object of Count Two, the second

15   way the defendant conspired to commit money laundering.  This

16   one is pretty simple.  It's basically a conspiracy to commit

17   money laundering by agreeing to do a transaction that has

18   $10,000 or more from the wire fraud that we've already talked

19   about.  So conspiracy to do a transaction of $10,000 or more

20   with money from the wire fraud.

21           The evidence shows the defendant is guilty of Count

22   Two.  He conspired to do money laundering.  And before I talk

23   about why the defendant is guilty, let me just point out that

24   the eight reasons we've already gone through about the wire

25   fraud conspiracy apply equally here.  Those are all reasons you

1    know that the defendant was engaged in transferring money that

2    he knew was coming down a wire fraud and that he had an illegal

3    purpose in doing all of that.  So they all apply here.  They

4    are all reasons that the defendant was also guilty of this

5    count.

6          By the way, what I'm about to say also applies -- the

7    reverse is also true.  I'm about to give you some reasons you

8    know why the defendant was engaged in money laundering.  All of

9    that is also evidence of him participating in this wire fraud

10   conspiracy, okay?  It's all ways in which he was attempting to

11   conceal his wire fraud.

12         So let's talk about the evidence of money laundering.

13   And for this, what we're going to talk about is Dustin Palmer's

14   testimony for a bit.  Remember he stood up here he had the

15   microphone and the whiteboard; he was writing things out.  He's

16   an expert in money laundering.  And he told you the goal in

17   money laundering is to be able to use the money without people

18   knowing it's illegal.

19         So the whole point is to find ways to sort of conceal

20   the source, conceal where it's coming from, make it look like

21   it's not illegal.  And he said money launderers use common

22   techniques, which are like -- I think he used the words like

23   means, methods, patterns.  But what he's talking about is just

24   like, Here's the ways that money launderers do money

25   laundering.  He said in a money laundering case, he might

1    see -- it could be one, could be more of these techniques and,

2    he said, typical money laundering case, you've got like two to

3    five.  Here we see six of those techniques.  And those are the

4    six reasons you know the defendant was laundering money.

5         So the first reason you know the defendant was

6    laundering money, the first technique being used, is what

7    expert Dustin Palmer called layering.  And layering just means

8    adding a transaction when only one or two will do.  The goal is

9    to hide the source of the money by adding what Mr. Palmer

10   called an extra hop.

11        So here's an example of layering by the defendant.

12   We've seen this over and over and over again.  There's an extra

13   transaction, there are two hops when -- which I've marked in

14   red circles here.  We have We Build the Wall to Tim Shea, and

15   then Tim Shea to Brian Kolfage.  So those are the extra

16   transactions.

17        If this was a legitimate transaction, they could have

18   done it with one, one hop.  One will do, in Mr. Palmer's words.

19   And I've marked that on this; that's where the dotted red line

20   is between We Build the Wall and Freedom Daily.  Look at this,

21   this whole thing was legit; they could have just paid it

22   directly, 50,000 right into Freedom Daily, right?  But instead

23   of that direct payment, they do a technique of money laundering

24   which is multiple hops.

25        Let me explain this.  All right.  If I'm money and I'm

1   trying to get to this point, this is the easy path.  What the

2   defendant was doing was taking two hops.  Start here, come over

3   here, come all the way over here, and then back to here.  And

4   the reason for all the hops is because they don't want law

5   enforcement, they don't want the jury to see this path right

6   here.  And that's what we've got on the screen.  That's

7   layering.

8          The next money laundering technique we see in the

9   evidence is large round-dollar transactions.  Mr. Palmer told

10  you that these large payments, usually with three or four

11  zeros, can be money laundering.  We saw large round-dollar

12  transactions over and over and over again, particularly before

13  the defendant knew he was under investigation.

14         Here's some examples.  All the red boxes.  100 in, 500

15  out; 50 in, 25 out.  Sometimes there could be legitimate

16  reasons for someone having a large round transaction.  I think

17  we all know that from life; there could be a good reason for

18  that.  Not here though.  The reason we know that is because

19  there are more signs in the transaction information that these

20  are money laundering.

21         The third technique of money laundering here is what

22  the defendant is writing on the checks and on the wire

23  transfers.  As Mr. Palmer said:  "The memo could say something

24  really unusual or odd like just car, and then be for a pretty

25  large amount of money, like $200,000."  And we see that type of

1    pattern here.

2         So look at this.  Here's an example:  The defendant is

3    doing these large round-dollar transactions, and putting on the

4    memo lines things like "per invoice" or "social media

5    accounts."  And that's like their version, that's their

6    equivalent of writing "car" on this thing, right?  Huge wire

7    per invoice.  No invoice number or anything.

8         And we know this is money laundering because the

9    defendant and Kolfage text about how they should be putting

10   explanations on memo lines to avoid detection.  I'll show you

11   that.  Here is Brian Kolfage to the defendant, Government

12   Exhibit 55:  "When I get paid for anything from RPMM, I think

13   it needs to be annotated for what.  So for all of these wall

14   chunks, when you send me a check, make sure it says

15   'merchandise' or something on it."

16        Merchandise or something, or something.  If this was a

17   legitimate transaction, do you think they would be telling each

18   other, Just put something on it.  Just put merchandise or

19   something on it.  Big check.  Big wire.  Just put something on

20   it.  This is Kolfage telling the defendant that for any payment

21   from Ranch Property to Kolfage, they need to come up with a

22   fake explanation for the payment, and that's money laundering.

23        And in particular, Kolfage tells the defendant that

24   they could be saying that he's being contracted for social

25   media.  This is, of course, what Tim Shea writes on a check

1    just a few days later:  See, on April 16, 2019, Kolfage tells

2    the defendant to write that he got social media.  Then, just

3    six days later, he writes, just that on -- he writes just that

4    on a payment to Kolfage.  He writes "social media accounts."

5    So if this was real, Kolfage wouldn't need to tell him what to

6    write on a check.  This is an example of using a vague memo as

7    part of money laundering to conceal the true purpose of a

8    transaction, which is paying a kickback to Kolfage, just as

9    Mr. Palmer told you.

10           There's a fourth technique of money laundering.

11   Dustin Palmer named fake invoicing or inflated invoices as a

12   technique of money laundering.  And I asked him to explain

13   that, and here's what he said:  He said, They are giving all

14   the extra money so they can launder that money and make it

15   appear legitimate.  So we saw that several times.

16           Start with the example of the security invoices.

17   Defense counsel several times has said that the defendant

18   helped with security services, and so I want to look at one of

19   those invoices.  So this invoice comes in from something called

20   Vision Quest Solutions, and it's for security work related to a

21   We Build the Wall event.  And this is a real invoice.  Vision

22   Quest Solutions real invoice.  It says people that work

23   described I think like four or six people doing security work

24   for construction of some sort of event.  And the invoice says

25   what they did.  And the invoice goes to Tim Shea.

1          And then the defendant makes -- the next day or maybe

2     it's 30 minutes later, he makes this invoice, and it's an

3     inflated invoice.  It's a fake inflated invoice, and he's

4     billing for the security services provided by Vision Quest

5     Solutions, and he sends this to We Build the Wall.

6          And here's the real difference between these two

7     invoices:  The defendant's invoice is about two and a half

8     times what Vision Quest Solutions actually billed.  Vision

9     Quest billed $20,000 for the actual security work.  The

10    defendant invoices We Build the Wall for 48,762.  And what did

11    he do with this money?  Here it is.  He paid Vision Quest

12    Solutions the money it was owed, you see the transfer, about

13    $20,000.  Then he kicks back.  What does he do with the extra?

14    He kicks back 20,000 to Kolfage, just as they had secretly

15    planned, and he pockets the rest.  That's a classic case of

16    money laundering right there.  Jack up the invoice, come up

17    with an inflated fake invoice, use the extra money, the

18    proceeds of the crime, and launder it.

19         This wasn't just a onetime thing either.

20         The defense actually put a few of these inflated

21    invoices into evidence as their exhibits.  And they might

22    reference them in their summations, so I just want to be clear

23    that all these things were a tool for money laundering.  So

24    what we are looking at here are Defense Exhibits 623 and 623-A.

25    And these are the invoices for the drone services that they

1    talked about, all right.

2            Let's zoom in.  So the defendant sends Kolfage an

3    invoice and it says:  Contract company to utilize commercial

4    drone services, $46,725.  So according to this invoice, the

5    defendant is hiring someone to do something with drones.

6            By the way, no evidence that Tim Shea -- no evidence

7    in this case that Tim Shea was actually doing anything with

8    drones.  There's evidence that other people were doing stuff

9    with drones; there's Defense Exhibit 800, which is an example

10   of someone else sending a quote for drones, and Tim Shea

11   saying, Wow, this is really high.  But there's no actual

12   evidence that Tim Shea did anything with drones other than send

13   an invoice.

14           So as you can see, he sends Brian Kolfage this email

15   with an invoice, $46,725 for drone services.  And he gets paid.

16   And what happens to the money?  Drone services?  No.  Half the

17   money that was supposed to go for drone services goes to

18   Kolfage, and the other half goes to the defendant.  Right out

19   of Ranch Property.  Whole thing was a sham.  No payment to a

20   drone company; just a way to launder money.  So if the

21   defendant is showing you invoices, you should scrutinize them.

22   Look at the transactions in Government Exhibit 901, like this

23   transaction.  They are just a way to launder money.

24           The fifth technique of money laundering was the use of

25   a company as an intermediary.  It's Ranch Property.  It was set

1    up in Wyoming by the defendant.  He knew how to make a company

2    in Colorado, we know that because he created Winning Energy in

3    Colorado.  But for this one, his name wasn't visible as an

4    owner, and the address listed was for Wyoming, not Colorado,

5    where he lives.

6           You recall these messages.  We talked about these

7    earlier, Government Exhibit 29.  The defendant wanted to create

8    a company that was cloaked or veiled to keep his ownership

9    secret.  Dustin Palmer told you there are certain states like

10   Wyoming, some countries outside of the United States where you

11   can create a company and keep your identity secret.  And that's

12   sometimes done -- there's legitimate reasons for that, but it's

13   sometimes done by money launderers to conceal the source of

14   illegal money.  Special Agent Yves Hunziker, who testified at

15   the trial, told you he knew from experience that money

16   launderers sometimes selected Wyoming because of the secrecy

17   rules.

18          So after the defendant creates Ranch Property, he and

19   his wife create a website and they say it's a splash page for

20   legitimacy.  So splash page, it just means a single-page

21   website.  And so they are making this so if someone Googles

22   them, something pops up.  It's for legitimacy.  So people would

23   think this was real; to hide what they were doing with the

24   company, which was laundering money.

25          Now, defense counsel suggested that a reason it was

1    called Ranch Property was because it was the defendant's job to

2    find properties.  And again, that's not something you need to

3    figure out in this case.  You don't need to decide whether the

4    defendant was doing any work for land along the border.  The

5    question again is whether they were using the company to

6    launder money.  It could be that he's doing some work, but then

7    also the company is being used to launder money.  And plainly

8    that's how Ranch Property was being used.  So once the

9    defendant set up Ranch Property, he used it to launder money.

10   We've seen this exhibit before.  Over and over the defendant is

11   passing money to Ranch Property and then transferring it as a

12   kickback to Brian Kolfage.

13            And I just want to mention two more reasons why we

14   know Ranch Property was plainly a way to launder money.  So one

15   reason you know this was a vehicle to launder money is because

16   the defendant made up fake financials about the company to

17   serve his purposes.  So when he filed, for instance, with the

18   Small Business Administration to get a loan in 2020, he said

19   Ranch Property had a total cost of goods sold of a little over

20   $140,000.  That's Government Exhibit 452 on the screen.  So

21   he's saying, This thing is selling a lot of stuff.  That's what

22   he tells the SBA when he gets this loan.  But when he was asked

23   the cost of goods sold on his tax filings the same year, he

24   says zero.  Same question, answer is zero.  That's Government

25   852.

1          The other reason you know this was a vehicle for money

2     laundering is because Tim Shea doesn't keep any money in the

3     account.  The balance in the account ranged from zero to

4     something under 2,000.  We saw a bunch of charts where the

5     balance was under like $100.  And when money comes in, he

6     immediately took it out.  For example, the SBA loan, it comes

7     in, 60 grand in to Ranch Property, he takes it out the same

8     day, uses it on a bunch of personal stuff.  What does that

9     mean?  It shows that Ranch Property is just a pass-through;

10    it's a way, it's a vehicle, for just moving money around.

11         So let me put this all together.  Defendant says he

12    wants to make a company that is cloaked or veiled to hide his

13    secret -- hide his identity.  He sets up Ranch Property like a

14    week later.  He sets it up in a state where he can keep his

15    identity secret.  His identity is, in fact, secret.  He and his

16    wife then create a website.  It's a splash page for legitimacy.

17    It doesn't say his name on it, it doesn't really say what they

18    are doing, it's got an 800 number.  Nowhere are the words "Tim

19    Shea" or "Amanda Shea" on it.

20         And then the finances associated with the thing are

21    kind of screwy.  Like he's giving conflicting reports to the

22    IRS and the SBA; he's draining the account constantly; he uses

23    the money for personal expenses; he never keeps money in there.

24    So regardless of what you think about what Tim Shea was doing

25    for We Build the Wall, regardless of whether he ever used the

1    name Ranch Property for something related to We Build the Wall,

2    the evidence shows that he was using the Ranch Property bank

3    account to launder money for all the reasons I just mentioned.

4            All right.  Five techniques.  This is the last

5    technique of money laundering that we see.  And that is

6    papering of transactions.  So here's Dustin Palmer's testimony:

7            Papering a transaction is when the parties will put

8    together papers either before or after the transaction to make

9    sure that others, when they see the transaction, get the

10   appropriate impression.  It can sometimes be used in a

11   fraudulent way, in this case like for money laundering.  If

12   they want people to think something was transacted, they might

13   write that down even though it was actually not.

14           So there was papering in this case.  We're going to

15   talk about it in depth in a bit.  So I'm just flagging it now.

16   But the defendant papered his illegal transactions with Kolfage

17   by making this backdated contracts.  There are two of them.

18   Dustin Palmer told you backdating was a tool or a technique of

19   money launderers to paper transactions.  So as we'll discuss,

20   the defendant created these false documents that are backdated;

21   and when he did that, he was engaging in money laundering.

22           All right.  That's the six techniques of money

23   laundering.  More techniques, the expert said, you should

24   expect even to see in a typical money laundering case.  That's

25   how you know the defendant is guilty of money laundering.

1   This, like for Count One, has elements, parts of the crime.

2   Here they are.  I will just leave that on for a second.

3          All of these elements are proven.  Let's check them

4   off.  We talked about all the evidence that the defendant and

5   Kolfage engaged in many transactions to launder stolen money

6   from We Build the Wall.  You've heard the evidence over the

7   last hour that the money came from fraud on donors, on We Build

8   the Wall itself; you've heard all the reasons why the defendant

9   is guilty of that wire fraud.  So the first three elements are

10  proven.  And we just talked through the six techniques of the

11  ways in which the defendant laundered money to conceal the

12  nature, the source, the location, of where the money came from

13  and what they were doing.  So that's the last element, and

14  that's also proven.

15         As I mentioned, there are two parts to Count Two, two

16  types of money laundering.  Here's the second one:  Money

17  laundering over $10,000.  Here are the elements.  And all the

18  evidence we just talked about, they all -- they meet all the

19  elements here.

20         So first, there were interstate financial

21  transactions.  We've talked about that.  We've looked at how

22  the wires went from state to state.  Second and third, the

23  transactions involved money that came from wire fraud in an

24  amount greater than $10,000.  So you know the defendant was

25  transferring amounts coming out of We Build the Wall, passing

1    it to Kolfage, and they were greater than 10,000.  You know the

2    defendant acted knowing where the money came from.  We went

3    through the eight reasons he's guilty; we went through the six

4    ways you know it's money laundering.  And then finally, the

5    transactions took place in the United States.  You know that's

6    true as well.

7         All right.  We're through the first two counts, we've

8    done the majority of the work at this point.  Count Three is

9    the last crime we're going to talk about.  It's falsification

10   of documents to obstruct justice.  That's Count Three.

11        Quick overview.

12        October 2019, the defendant and his co-conspirators

13   learn about a criminal grand jury subpoena that I'm going to

14   show you in a second.  And they found out about the subpoena,

15   which was supposed to be secret, because it was leaked.

16   They're worried about it, so they sign two backdated contracts

17   to cover their tracks.  The contracts give fake reasons for why

18   the money transfers are happening.  They did that to have a

19   cover story for a day like today and to obstruct justice.

20   That's the whole crime.

21        So, like I said, time period, October 2019.  This is

22   the subpoena, Government Exhibit 551.  It goes to Synovus Bank.

23   Now, remember Synovus Bank, Synovus Bank is one of those banks

24   that had the accounts for We Build the Wall.  And so part of

25   the reason they are thinking about Synovus bank here is because

1    in the Synovus Bank bank records, there's records of all these

2    transfers going from We Build the Wall to Tim Shea's company,

3    Ranch Property.

4            So Richard Billue was the banker who testified.  He

5    gets this thing.  He doesn't read all the way through it.  He

6    misses the warning that it was illegal to disclose the

7    subpoena.  And he calls Rich Kaye, who is working with We Build

8    the Wall.  He tells Rich Kaye that the U.S. Attorney's Office

9    is doing this investigation; he tells him the crimes that are

10   under investigation.

11           Rich Kaye immediately calls Andy Badolato.  You

12   remember this phone chart.  So he calls Andy Badolato, the

13   money guy.  Badolato calls Kolfage and Bannon.  Kolfage tells

14   Tim Shea.  And you could tell they are all kind of freaking out

15   about this.  There's a lot of phone calls.  Badolato is texting

16   Bannon.  Urgent, 911, call me.  Says he doesn't want to talk

17   about it over text, just over the phone.  And they are

18   worried -- the defendant is worried that they are going to get

19   caught.  We know that from the text messages and we know from

20   what they do next.

21           So Kolfage then tells Tim Shea and his wife, after

22   learning more about the subpoena, to "get RPMM stuff ASAP."

23   That's Government Exhibit 53.  RPMM, as you know well, is Ranch

24   Property Marketing and Management.  So he's saying subpoena,

25   get the Ranch Property Marketing and Management stuff ASAP.

1          Folks, who learns about a grand jury subpoena that's
2     part of a criminal investigation and races to get stuff about
3     Ranch Property Marketing and Management as soon as possible?
4     You can look at the subpoena.  It says nothing about Ranch
5     Property Marketing and Management on it.  So why are they
6     racing to get the RPMM stuff ASAP?  The reason is because they
7     knew exactly what this was about.  This was the classic, you
8     get the thing, you're like, I know what this is about.

9          And so what they are doing is they get the subpoena,
10    and they are like this is the oh, shit moment where they are
11    like, Guess what?  We know this is about payments through RPMM.
12    Let's get the RPMM stuff.  So they knew what the crime was, and
13    that's why Kolfage responds to the subpoena by telling the
14    defendant to get that stuff ASAP.

15         What are they talking about when they say the RPMM
16    stuff?  They are talking about two backdated contracts.  Why
17    did they need those two contracts?  Because there are two parts
18    to the fraud and money laundering conspiracy.  There's money
19    coming from We Build the Wall to Ranch Property, and there's
20    money from Ranch Property going to Kolfage.

21         Here's the first backdated document.  It's supposed to
22    be a "vendor services agreement" between We Build the Wall and
23    Ranch Property, and it's dated March 1, 2019.  This document
24    exists to provide an explanation for why We Build the Wall is
25    paying Ranch Property.  It says it's for gathering info on

landowners.  But this agreement was just to paper the

transaction.  It says March 1, 2019, but they actually put

together and finalize it in October 2019, after learning of the

subpoena.

Here's the evidence to that:  On the left is the day

Tim Shea uploads the draft document to Google documents,

October 19, 2019, two days after Kolfage says, Get me the RPMM

stuff.  And the same day he sends a PDF of the document to

Amanda Shea.  Again, October 19, 2019, a week after they learn

about the subpoena.

Andy Crain, who analyzed the data about the document,

looked at the metadata for this agreement and saw it was last

modified in October 2019, long after it was dated.  So they are

backdating this document to make it look like it's an agreement

that was in place from the beginning, long before they knew

they were under investigation.

And isn't that convenient?  Wouldn't you want -- if

you're under a criminal investigation, wouldn't you want a

document that says, Oh, look, we were -- these payments are

legitimate.  There is an agreement that is from March at the

very beginning, where we signed up and said, Tim Shea's company

was paid by We Build the Wall.  So that's why they are

backdating this thing, because they want something that

predates the investigation that they can point to and say, Hey,

it was all legit.

1    And the defendant did the same thing for the other leg

2    of the transaction.  He put together a signed contract between

3    him and Kolfage, backdated to March 29, 2019, to explain why he

4    was paying Kolfage.  Okay.  So there's two of these things.

5    This is the agreement that says he's paying Kolfage for a donor

6    list, an email list.  But the email evidence shows this

7    document is not from March 29, 2019, they are executing it on

8    October 29, 2019.  That's Government Exhibit 133.

9    Andy Crain looked at the metadata on this document.

10   He found it was created, modified, and signed between October

11   22 and October 29, 2019, after the defendant learned of the

12   subpoena.  There was no evidence, according to Crain, that this

13   document was created in March 2019.  So this is a backdated

14   contract created after they learn of the subpoena.

15   Here are the elements of Count Three:

16   First, the defendant falsified or caused the

17   falsification of a document; second, the defendant acted

18   knowingly; third, the defendant acted with intent to impede,

19   obstruct, or influence an investigation within the jurisdiction

20   of a department or agency of the United States.

21   We can go through this easily.

22   First, the evidence shows that the defendant created

23   the RPMM vendor services agreement and he signed the backdated

24   donor list agreement.  I expect Judge Torres is going to tell

25   you — and you should follow her instructions — that a document

1    that is falsified -- you see that word "falsified" or caused

2    the falsification if it misrepresents the true nature of the

3    parties' agreement and/or if it's backdated.  And here, both

4    agreements are plainly backdated.  And you know from the email

5    and from the metadata that they also misrepresent the true

6    nature of what was going on.  They say it was for vendor

7    services or to buy an email list; but we know this is actually

8    about money laundering and kickbacks.

9            The agreements paper these things in the way they do

10   because they want to describe them as something -- they want to

11   describe these illegal transactions as something they are not,

12   but they are falsified documents.  So let's check that off.

13           The next element is the defendant acted knowingly.

14   That's obvious.  You know from the emails and text messages

15   about the subpoena and the documents that he knew exactly what

16   he was doing; so we check that off.

17           And the last element is that the defendant's intent

18   was to impede or obstruct or influence an investigation.

19   You're going to hear that an investigation within the

20   jurisdiction of a department or agency of the U.S. includes a

21   grand jury investigation.  The subpoena here was issued as part

22   of the Southern District of New York's grand jury

23   investigation.  And you know the defendant's actions were to

24   impede or obstruct that investigation or influence it because

25   he made these agreements shortly after learning of the

1   subpoena.  And we looked at the text messages that showed

2   they're reacting to the subpoena, they are worried, they are

3   switching to Signal, Wickr.  So he's focused on having a cover

4   story.  And the defendant did all this because he knew

5   investigators were looking at him.  That's why he comes up with

6   these explanations for his kickbacks.  So we'll check that box

7   off.  And the defendant is guilty on Count Three because of the

8   backdated agreements that provide false cover stories for why

9   he was getting paid and he was making payments to Kolfage.

10          So we're now through the counts.  It's all three

11  counts.  We're through them.  The defendant is guilty of Counts

12  One, Two, and Three.

13          Judge Torres is going to tell you the government has

14  to prove one more thing, which is called venue.  Venue means it

15  was proper to bring this case here in this courthouse in the

16  Southern District of New York.  Southern District of New York

17  are places where you all live; so Manhattan, the Bronx,

18  Westchester, the other northern counties.

19          We only need to prove this by a preponderance of the

20  evidence.  So it's a different burden of proof.  Preponderance

21  of the evidence just means it's more probable than not.  You're

22  going to hear the government doesn't have to prove the whole

23  crime was committed in the Southern District or the defendant

24  was even in New York.  All that's necessary for this is just

25  that it's likely -- more likely than not that any act in

1    furtherance of the crimes occurred in this district.  And that

2    act can be done by the defendant or one of his co-conspirators.

3    So somebody in the conspiracy has to have done something in New

4    York in furtherance of the conspiracies.

5           So one of the acts in furtherance of the conspiracy

6    was filing registration statements to raise money in the

7    Southern District of New York.  That's Government Exhibit 351

8    and 352.  They did this so they wouldn't get in trouble getting

9    New York donors to donate to We Build the Wall.  Part of that

10   filing included the bylaws that said Kolfage would not take a

11   penny.  So they made this false promise to donors in New York.

12          Here's another act in the Southern District of New

13   York caused by the defendants and his co-conspirators.  This is

14   donor data from GoFundMe.  There were a ton of donors in the

15   Southern District of New York.  They accessed the GoFundMe page

16   from the Southern District, and they made their donations in

17   this district.  Each donor was a victim, so each was lied to;

18   each was defrauded.  These are New Yorkers, who are just like

19   Nicole Keller and Bill Ward.

20          The defendant also set up a P.O. Box in Colorado to

21   get checks from donors.  Here are the texts that prove the

22   defendant is the one who set up the P.O. Box.

23          This is Government Exhibit 271.  It's a spreadsheet

24   that shows people in New York, including in the Southern

25   District, mailed checks from this district to the defendant's

1    P.O. Box.  This shows that people who live in this district and

2    other places in New York were defrauded by the defendant and

3    his partners in crime.  These are some of those checks.  They

4    are from New York, New York; Sleepy Hollow; Suffern; North

5    Salem; Pleasantville; Salt Point.  All Southern District.

6    That's direct involvement by the defendant in receiving

7    donations from this district.

8                    (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. ROOS:  So the defendant and his co-conspirators

2      caused donors in this district to write checks and send them to

3      the defendant.

4           And then there is evidence that some of the

5      defendant's co-conspirators were in New York at various points

6      central to the conspiracy.  So for instance, in January 2019,

7      between January 4 and 7, Bannon and Badolato were both in New

8      York.  And you know that from the Loews Hotel receipt and the

9      text message here up on the screen.

10          And while Badolato and Bannon were in New York,

11     they're communicating constantly with Kolfage about building

12     the wall, GoFundMe, using the money.  This is like less than a

13     week before the big January 11 announcement on GoFundMe.

14          And here is example of a call log just between Kolfage

15     and Badolato in New York.  Here is an example of the type of

16     things they were talking about.  This is January 5, so while

17     Badolato and Bannon were in New York, Kolfage has clearly just

18     spoken to them, and he says to Tim Shea that Steve needs the

19     mail count.  He thinks it is 30K.  They are talking about the

20     money that's come in.  Kolfage is asking this info for Shea

21     because Bannon is trying to direct the flow of money for We

22     Build the Wall.  And that's another act in furtherance of the

23     conspiracy.

24          One final piece on venue.  For Count Three, the

25     investigation came from the Southern District of New York.

1    This is the subpoena.  Judge Torres will tell you that venue

2    for the last crime, fabrication of documents, is proper in the

3    district where the investigation was based.  So that's this

4    district.  So when defendant tried to obstruct an investigation

5    from here, that's sufficient for venue on last crime.

6         So those are all the reasons that venue is proper here

7    in New York.  On this, you need to find it is more probable

8    than not.

9         We're through the charges, we're through all the

10   evidence.  We're almost done.  There is one last thing I want

11   to cover before I sit down, and that's some of the defense

12   arguments, just one in particular.

13        As I said earlier, the defendant doesn't have any

14   burden in this case, and the defense doesn't need to make any

15   arguments.  But when the defense makes arguments, you should

16   see if they match up with the evidence.  You should think about

17   them like you would any other argument.  Do they make sense?

18   Are they supported by evidence?

19        We've already talked about some of these defenses,

20   like the Tim Shea did work defense, or one I'm not going to

21   bother talking about, because it is a distraction, is the but

22   we built the wall defense.

23        But there is one defense I want to talk about a little

24   bit more.  That's the what I am going to call we really had a

25   handshake deal defense.  So, the defense wants you to think

1    that there was a handshake deal back in March.  And the reason

2    they want you -- they are making this argument there was a

3    handshake deal is because the computer evidence shows that

4    these documents, these contracts, these fake documents, were

5    clearly created in October.  So, that's pretty damning because

6    if they're created in October, it couldn't have been created in

7    March.  So the only real explanation is, oh, well, we had a

8    handshake deal, we didn't write it down until October.

9          Before I talk about what the evidence shows, let me

10   talk about what there is no evidence of.  There is no evidence

11   that these contracts existed in March.  There is no handwritten

12   notes in the case, there is no handwritten version of the

13   contract, there are no e-mails at the time saying we have this

14   handshake deal, there are no text messages in March saying we

15   have this handshake deal.  None of the payments that go from

16   Tim Shea to Brian Kolfage say something like for handshake deal

17   or for contract or anything like that.  There is no evidence of

18   any form that this thing existed, written or not, back in

19   March 2019.

20         On the other hand, you know that the defendant created

21   these backdated contracts in October 2019.  We looked at the

22   computer evidence of that.  But there is also additional

23   evidence that this arrangement didn't exist, and those are

24   found in the defendant's words.  So let me show you.

25         So if Tim Shea actually had a handshake deal back in

1    March 2019 to buy a donor list from Brian Kolfage for $150,000,

2    why is he making these monthly payments in smaller amounts and

3    why is he writing different things on the memo lines.  How can

4    the payments be for buying an e-mail list, and also social

5    media accounts.  Why does this not match up to the reason he's

6    given you, which is buying an e-mail list.  The reason is

7    because it is a lie.

8           Here is another issue with this argument.  If Tim Shea

9    bought an e-mail list from Brian Kolfage in March, why is he

10   saying stuff in June or July that makes it clear he didn't have

11   an e-mail list.

12          Let me show you.  You know they didn't have a

13   handshake deal in March because Tim Shea is saying -- this is

14   in June -- imagine what we could do with the big list.  So in

15   June he's imagining in June what can they do with a big e-mail

16   list.  And when Kolfage tells him it is actually a huge process

17   to deal with the e-mail list, because they have to clean up the

18   data, they have to process it, how does he respond.  What does

19   Tim Shea say.  He says, oh shit, I had no idea it was so in

20   depth.

21          Does that sound like a guy who already bought this

22   e-mail list three months before?  Does it sound like a guy who

23   would even buy a e-mail list or would want to do it?  It

24   doesn't.  It doesn't sound like a guy who had a handshake deal

25   three months before to buy it.  And that's why this defense

1    isn't based on the evidence.  The evidence shows the opposite.

2              Here is another example of that, Government Exhibit

3    119.  Tim Sheas to Kolfage in July now, we definitely need to

4    come up with some side businesses from all these opportunities,

5    like e-mail lists.  So again, the defense is daydreaming about

6    things he could do with We Build the Wall, side businesses and

7    he suggests e-mail lists.

8              Wait.  I thought this guy already bought this e-mail

9    list back in March of 2019 for $150,000.  Why is he now in July

10   talking about doing this deal?  The answer, you know, is

11   because there never was a handshake deal.  Right.  He is

12   texting, he's e-mailing about this in June and July because it

13   did not exist in March.

14             Those contracts were made in October, not in March.

15   They were to paper the transactions.  It was done to obstruct

16   justice.  They were intended for a day just like today, so that

17   the defendant would have an excuse, he would have a distraction

18   in federal court.

19             Ladies and gentlemen, you know the truth.  The

20   defendant and his co-conspirators, they lied to donors, they

21   lied to the board of We Build the Wall, they stole and looted

22   from the organization, they laundered the money through the

23   defendant's business.  He paid kickbacks, they kept all this a

24   secret.  And when he learned he was under federal

25   investigation, he created two more fake documents to cover his

M5v3she2

1    tracks.

2          And for all those reasons, he's guilty beyond a

3    reasonable doubt.  So hold him accountable.  Find him guilty.

4          THE COURT:  Members of the jury, we have heard the

5    summation of the prosecution.  But the trial is not yet over.

6          You're finished, correct?

7          MR. ROOS:  Yes.

8          THE COURT:  Okay.  And we still have the summation of

9    the defense and the rebuttal and my instructions on the law.

10          We're going to take a bathroom break now.  I'll be

11    calling you back in to hear the defense summation, but you're

12    still not permitted to discuss the case amongst yourselves or

13    with anyone else.  Don't permit anyone to discuss it in your

14    presence.  I know it is extremely tempting, but don't do it.

15    I'll call you back shortly.

16          (Jury excused)

17          THE COURT:  All right.  So we'll take 10 minutes.

18          MR. MERINGOLO:  Thanks, Judge.

19          (Recess)

20          (in open court; jury not present)

21          THE COURT:  All righty, let's get started.

22          MR. MERINGOLO:  Your Honor, we have an issue here.

23          THE COURT:  What is that?

24          MR. MERINGOLO:  The government has Exhibit 20 printed

25    out in their exhibits.  Now I'm going to reference it, it is a

M5v3she2

1    critical piece of evidence for the defense, and they said they

2    changed it mid-trial.  I mean, if they did, it is complete

3    oversight for me.  But, it was in the binders and it is what

4    we've been holding and anticipating this whole time.

5           Now I put it up there, obviously, it's GX 20.  I

6    believed it was in and now they're telling me it's not.  They

7    cut off the two pieces, the two top text messages.

8           THE COURT:  I'll hear from the government.

9           MR. ROOS:  Yes, your Honor.  We are talking about

10   background Government Exhibit 20.  When the government -- there

11   initially was a different version of Government Exhibit 20.  We

12   never offered it.  The defense never offered it.  We then

13   offered a version of Government Exhibit 20, it is at page 475

14   of the transcript.  Mr. Sobelman read through it and that's the

15   one that's in evidence.

16          THE COURT:  So in other words, the one that you

17   referenced today in your summation is the same that was

18   admitted into evidence?

19          MR. ROOS:  Correct.

20          THE COURT:  Well, then, that's what you have to deal

21   with.  You were here and awake during the trial.

22          MR. MERINGOLO:  It is -- I had their exhibits, it is

23   complete, it is oversight by me.  It is what it is.  I just, I

24   mean, these are all bait and switch things.

25          THE COURT:  No, I don't call that a bait and switch

M5v3she2

1   when they admit a document, they put it up, they talk about it

2   for a long time, and you're present.  That is not bait and

3   switch.

4          MR. MERINGOLO:  They only talked about two lines in

5   it.  I had, when I went to it, in the thing they're only

6   talking about two lines, which is my whole theory.  They only

7   take two lines at a time.  I didn't know they only took two

8   lines and deleted the top part of the exhibit they printed for

9   me.

10          MR. ROOS:  We didn't delete from the top portion.  It

11   is from Andy Badolato's iCloud, but it is just a different text

12   message.  We just didn't end up, we never offered the text

13   message exchange he's interested in.  We offered a different

14   exhibit.  I showed it in the government closing.  And we just

15   never offered this.  Mr. Sobelman read through Exhibit 20.  I

16   don't know why he never showed it.

17          MR. MERINGOLO:  It is my fault then.  It is my fault.

18   I'll scratch it from --

19          THE COURT:  Let's get the jury.

20          (Jury present)

21          THE COURT:  Do the parties agree that all the jurors

22   are present and properly seated?

23          MR. ROOS:  Yes, your Honor.

24          THE COURT:  Please be seated.  Members of the jury,

25   you'll now hear the summation of the defense.

1          MR. MERINGOLO:  Good morning, everyone.  I hope

2     everyone had a good weekend.  I know I drink a lot of Diet

3     Coke, but only during the trial.

4          First I want to thank you.  This isn't an easy thing

5     to do. No one woke up last Monday and said I want to be on the

6     jury.  And you spent a week and a day with us listening to

7     evidence, and I saw everybody taking their notes, and it is

8     very appreciated.

9          The government is doing their job, I am doing my job,

10    I thank Judge Torres.  And most importantly, which no one ever

11    does, I thank the court reporter.  Because without the court

12    reporter, there would be no testimony taken or given or

13    documented.

14         The government said a lot of things in their opening,

15    and after their opening I wanted to run out the door and say oh

16    my God, what happened.  You know, if I believed every word they

17    said, you know, and how they put the evidence in, you know, you

18    would vote guilty.

19         But there are two sides to every story like we all saw

20    during the trial.  Every time someone got up on direct

21    examination, perfectly answered and everything went smoothly.

22    But then when they got up on cross-examination, maybe the

23    evidence wasn't so smooth, maybe there were different things,

24    and that's what reasonable doubt is.  You can't have a

25    streamline of evidence to just go through without someone

M5v3she2                    Summation - Mr. Meringolo

1    trying to combat that.  Any time you combat that, it puts

2    doubts in, especially certain witnesses that we had.

3            When we started the trial last Tuesday, I opened up

4    running around, they're going to get a text message over here

5    and pull a text message from over here.  I said they are going

6    to pull a story together.  You've seen when they got the

7    indictment.  It is in evidence.  It is a stipulation.  Tim Shea

8    was arrested on August I believe 20, 2020.  Not one witness you

9    heard, ladies and gentlemen, met the government before he was

10   indicted.  So I submit to you, they get an indictment, and then

11   they put the pieces together, which is what they did here, and

12   developed their story, but their story has doubts.  And their

13   story has reasonable doubts.  And I submit to you common sense

14   equals reasonable doubt equals not guilty.

15           Now, my adversary just went and said, why didn't he

16   pay –- why didn't he 1099 Freedom Daily?  Everybody must have

17   said, well, why didn't you 1099 Freedom Daily to lower his tax

18   liability.  He would lower his tax liability by $75,000, right.

19   I'm just, I don't know what it is in Colorado.  State, city, we

20   know if you make that money, maybe you have to pay 50 percent,

21   40 something percent, whatever it will be.  I am not good at

22   math, let me just use that.  Why wouldn't he do that?  Why

23   wouldn't he lower his tax liability?  Isn't that common sense?

24           The government says the money laundering guy, who he

25   gave $65,000 to, to put up a couple of charts, he said, oh,

1    that's what they do.  No.  No, if you are a criminal, you want

2    to pay less taxes.  That's common sense.

3            And now we talk about this list.  They put an e-mail

4    in at the end.  The list.  This e-mail list.  It is undisputed

5    how valuable this e-mail list is.  It's undisputed that

6    Mr. Kolfage owned, being the president, owns that e-mail list.

7    It is undisputed that they've been in business 2018, before

8    2018 I think according to the woman who came from North

9    Carolina or South Carolina, that they flew in, maybe even

10   before that I think the evidence may show.  But we definitely

11   know 2018, 2019, 2020, that Mr. Shea and Mr. Kolfage was in

12   business.

13           And then the government just said again on their

14   closing that Freedom Daily was a shell, a shell.  But, if we

15   recall, remember that gentleman who the government, every chart

16   that's in this case, no witness said I did the charts.  They

17   sat on there and they said the government gave me the charts,

18   and I verified it.  The government gave me the charts and I

19   verified it.  I believe three witnesses talked -- maybe four,

20   talked about charts.  None of them had anything to do with the

21   charts.  The government had something to do with the charts.

22   They put the text messages, the e-mails, and everything that

23   was in those charts, they did that.

24           So when they take a text message from January and then

25   put it next to a text message from April, when the witness said

1    there were hundreds of text messages.  The evidence in this

2    case from the guy we paid $20,000, the metadata guy.  The meta

3    verse.  He gave them $20,000 to tell us the e-mail came from

4    Rich Kaye.  He said he reviewed 40 phones and e-mail accounts

5    and computers that were all gathered during the search when

6    they arrested people.  Okay.  So, they had everything.

7         And then the government, the evidence showed, remember

8    they put the text message in, ladies and gentlemen, oh, Tim

9    Shea and everybody they are going on Signal.  And that's like,

10   oh, wow.  Signal, WhatsApp.  They don't want to be detected.

11   Saying this is nefarious.  It is common practice for people to

12   use that, but they are saying, look, they got the subpoena then

13   they are on Signal.  When the individual, the meta verse got on

14   the stand, the $20,000 guy, he said no one told me to review

15   the Signal.  We think the government didn't review the Signal.

16   Common sense says the government reviewed the Signal on all

17   these phones and we didn't see one Signal text.

18        Common sense equals reasonable doubt, reasonable doubt

19   equals not guilty.

20        The government told you this was a secret agreement,

21   right.  Tim Shea and Brian Kolfage had a secret agreement.

22   Okay.  And this secret agreement was to launder money.  And

23   ladies and gentlemen, how would I sit here, and like I did in

24   the beginning, ever dispute that money went from Ranch Property

25   to Freedom Daily.  I didn't dispute that.  I didn't dispute

1    that.  But they didn't prove beyond a reasonable doubt what

2    that was for.  We submit that it was for the list.  The list we

3    paid aftertax dollars for.

4          Anyone who does a business and maybe they're trying

5    to, they can use this list to formulate another business,

6    whether it be Winning Energy.  The evidence will show and the

7    bank records, which we're going to go through which is in

8    evidence and we went through with the gentleman on the stand, I

9    don't know if you recall.  I'll show you my -- if you remember

10   that.  The evidence will show money going back and forth.  Back

11   and forth.

12         So the government stayed silent on the $183,000 that

13   went from Freedom Daily from 2018, 2019 and 2020 to the Sheas.

14   Why?  That is common sense.  Reasonable doubt.  Why did they

15   not even address it?

16         Maybe Mr. Sobelman, now they get to go after me.

17   That's the law.  They get to go after me.  So address why you

18   didn't talk about Freedom Daily giving money to the Sheas.

19         I submit to you money is going back and forth, and

20   they cannot prove beyond a reasonable doubt on what it was for.

21   Just because a lawyer sits up here, and including me, ladies

22   and gentlemen, don't believe what I say.  But there is no one

23   who came in to testify, there is no one who came in to testify

24   to say -- that wasn't my phone.  There is no one who came in to

25   testify to say what that money was exactly for.

1          The $80,000 guy said, oh, this is what happens with

2    money laundering.  But did he say, well, if you're giving money

3    immediately out and money is immediately coming in, everybody

4    was silent.  All the money that was going back and forth.  So I

5    submit to you, that alone is reasonable doubt.  190,000 going

6    from Mr. Shea to Brian Kolfage.  $183,000 going from

7    Mr. Kolfage to Shea.

8          Now, the government said that Freedom Daily was

9    defunct and they were out of business.  But money was going --

10   you see it.  Money was going from Freedom Daily to the Sheas.

11   I submit to you that's reasonable doubt.  That's reasonable

12   doubt, ladies and gentlemen.  Because no one is explaining

13   either way.  The only people who are explaining what happened

14   either way are lawyers.  Okay.  And lawyers, we know are not --

15   we're just doing what we do.  But don't take us for our word.

16   Say where in the testimony, Judge Torres, where in the

17   testimony did somebody say this is what the money was for?

18   Where in the testimony?  Where in the testimony did somebody

19   say Mr. Shea told me this was what the money was for.

20         We're going to pull a text message from here and a

21   text message from here.  Everybody knows that people

22   misinterpret text messages.  And if you want to take a text

23   message from March 1st and add one from April 1st, you can make

24   it sound like whatever you want.

25         Just looking at the charts and plugging these things

1    in, it is reasonable doubt.

2          So, the taxes in this case, I am going to start with

3    the taxes.  Because he owes the taxes, right.  But ladies and

4    gentlemen, Amanda Shea writes an e-mail says give me the 1099.

5    Right?  Isn't that something that you can use your common sense

6    and say they're asking for the 1099.  And then We Build the

7    Wall the accountant says, where it says it's for rent.  That's

8    a thing he puts it on his income anyhow?  This is what the

9    government is using against you?  Use your common sense.  He

10   doesn't even make his own 1099.  That's what life is.  The

11   company does.  He gets the 1099, ladies and gentlemen, it says

12   rent.  He puts it down as income.  He puts it down as income.

13   He doesn't even take the 1099.  And he takes these two

14   deductions, ladies and gentlemen.

15         But, before we can continue, the evidence will show --

16   where is the bank records -- the evidence will show and I want

17   everyone to say, Judge Torres, please, give me the Sheas' bank

18   records.  Look at the debits, okay.  Look at all the debits.

19   And we'll keep going over this throughout this summation.

20   We'll see if you look at the bank records, which, and

21   respectfully, ladies and gentlemen, I am going to need some

22   time, okay.  We look at the bank records, you say, Judge

23   Torres, let me get the bank records from the Sheas in 2019.  We

24   don't, I won't even bother with you 2018.

25         And you'll see United Airlines going to Texas in

1   January.  You'll see charges to a hotel in D.C. in January.

2   You'll see a rental car, you'll see debits in Florida.  You'll

3   see an international flight UA -- Houston, Texas.  You'll see a

4   United Airlines flight in Texas in February.  You'll see

5   Southwest Airlines flight in Texas.  You can go through all of

6   them.  I'm only in March.  And you can go through all of them.

7   You can see, you can detect -- the evidence will show that's in

8   the record, you can say I want to look at all the Sheas' bank

9   records for 12 months.  What were they doing?  What was Tim

10  doing?  Tim was flying everywhere.  And they're here to say

11  that he didn't work?  So that's in evidence.  That's common

12  sense.  That he's going everywhere, Texas, Florida, Washington.

13  He's not going to the border for his health.

14          Whatever you believe, they built the wall.  Right?

15  And the evidence will show that Tim Shea, and it shows that Tim

16  Shea was instrumental in building that wall.  So you keep

17  going.

18          In June, when the invoices -- if you want to match up

19  the invoices, he is on United Airlines in June to Texas.  You

20  can just ask, there's 12 jurors, each one of you take a bank

21  record and go through it, highlight it, and say here's where

22  Mr. Shea was.  Okay.

23          Imagine somebody saying you didn't work when you

24  worked and the evidence is there?  But I had to wait until the

25  summation, ladies and gentlemen.  And I asked you in the

1  beginning for some patience with me.  I had to wait the whole

2  trial and wait to speak to you to say look at the bank records,

3  dissect where Mr. Shea has been.  Okay.  And that's work.  Real

4  work.  That's common sense.  Common sense is reasonable doubt

5  and reasonable doubt is not guilty.

6      And I have all the bank records and let's just take

7  January just to show you.  Because, you know what, don't

8  believe me.  Don't believe me.  Look at the bank records.  When

9  it comes up, I'll come back.

10     Not one witness did the government bring here before

11 the indictment.  Danielle was fired in 2018 by Mr. Kolfage.

12 That's what the evidence will show.  The source of the money in

13 and out, they can't say for certainty why Freedom Daily was

14 paying Mr. Shea.  Reasonable doubt.  And why Mr. Shea was

15 paying Freedom Daily.  That's reasonable doubt.

16     And you have those bank records and I did that chart

17 and we'll show it in a little bit.

18     Now just to give you an overall view, the evidence in

19 this case with respect to this contract, ladies and gentlemen,

20 the March 29 contract, a memorialization of a contract is not

21 criminal.  I think the government would even have to concede if

22 you memorialize a contract, it is not criminal.  Okay.

23     The evidence in this case will show that that contract

24 comes from Richard Kaye.  Richard -- who is Richard Kaye?  We

25 all know who Richard Kaye is.  I told you, ladies and

1    gentlemen, on my opening statement, pay attention to Richard

2    Kaye.  So this guy is from Barnes & Thornburg.  Right.  Big

3    firm.  Big firm.  He's the guy where the e-mail originates

4    from.  He's the guy who -- who the metadata guy says that's the

5    last time before it's sent the document was changed.  So I

6    submit to you, ladies and gentlemen, that the document comes

7    from the lawyer in this case.

8            Okay.  So just back to this.  I digress one minute.

9    You go through all of these things.  This is his debit card.

10   This is his debit card.  Right.  And in his debit card, it

11   shows United.  Okay.  And there are many, many charges here

12   that you can ask Judge Torres to ask for these bank records.

13   That's Frontier, Southwest Airlines.  Here's what I said.

14   There is the hotel.  So there is all these charges, I mean

15   there's -- okay.

16           Let's do in January.  He hasn't been paid yet.  Right.

17   These are Texas, he's in Texas.  Remember, he hasn't been paid

18   yet.  He didn't get paid until March.

19           Let's go back to this contract.  The contract, ladies

20   and gentlemen, comes from the lawyer.  And I submit to you that

21   the lawyer works for this Barnes & Thornburg.  And the lawyer

22   Richard Kaye, is a partner in that law firm.  And that's a huge

23   law firm.  Someone like me they don't, they wouldn't even let

24   walk in the door.  But it is a huge law firm and that's where

25   the e-mail originates from.  And it originates from him on

1   October 22, 2019.

2              And I submit to you, ladies and gentlemen, that this

3   e-mail and this attachment originates from Richard Kaye the

4   lawyer.  The lawyer that We Build the Wall paid over $600,000

5   to.

6              Now, if you want to get your pens out, you could say

7   this is in evidence, and these are the payments to Richard Kaye

8   and Barnes & Thornburg.  Okay.  $235,000 to the lawyer and the

9   law firm on February 4.  You see 75,000, 100,000, 75,000 on

10  November 2nd after that contract.  I'm sure he billed for that

11  contract.  And 50,000, 68,000 in July of 2020.

12             There is a stipulation that we signed and the lawyer,

13  respectfully, he didn't do anything wrong but he is a lawyer in

14  the stipulation that he's a lawyer in good standing.

15             So, it originates from the lawyer's e-mail, this

16  contract, that they are charging my client with in Count Three.

17  I submit to you, my client did nothing wrong.

18             What's further evidence that he did nothing wrong with

19  respect to that contract, the contract comes from the lawyer,

20  to Amanda, to Tim or Brian, signed, sent back.  No one changes

21  a word.  No one even changes a word.  And then this is a text

22  message that wasn't shown to you, ladies and gentlemen.  Where

23  Brian says to Tim -- I have to find it.  And you know I'm

24  disorganized here.  But Brian says -- and I got to thank Clara

25  and Angelica.  Because without them, I wouldn't have found all

1     this stuff.  But if you guys could find that text message that

2     would be great.

3             But Brian says, in sum and substance, and I want you

4     to ask for the text message.  Brian says Tim, send me the

5     contract Rich did for me.  Okay?  Send me the contract.

6             So the evidence is that the lawyer has the last time

7     you see this contract anywhere, the first time, is the lawyer

8     sending the contract.  I submit to you, a lawyer who has made

9     this amount of money, he's not sitting here on Count Three, I

10    can tell you that much.

11            MR. ROOS:  Objection, your Honor.  That's legally

12    inappropriate.

13            THE COURT:  The attorney is not on trial.

14            MR. MERINGOLO:  The attorney is not on trial but he's

15    the one who sent the e-mail.  He is the one who got paid over

16    $600,000.  You can find it in GX 100 and GX 1000 and GX 1200.

17            So, I submit to you, ladies and gentlemen, when the

18    contract is going back and forth, no one even makes a change.

19    Because what happens when a lawyer sends you a contract?  You

20    sign it, you send it back.  Okay?  Whether it be your mortgage,

21    whether it be an e-mail list.  And ladies and gentlemen, that's

22    common sense.  And like we said, common sense -- find this

23    e-mail.  Common sense is reasonable doubt and reasonable doubt

24    is not guilty.  Okay?

25            Now the last thing with Shea, with Kaye, is just to

1    show you that he was a partner in this Barnes & Thornburg.

2    That is his e-mail that Richard Kaye was a partner.  Okay.  And

3    I believe all the money went to the law firm.  Not Mr. Kaye.

4    But you know from the GoFundMe gentleman who was up here,

5    Mr. Kaye was the one who was dealing with him from the

6    inception of this.  So and he was paid I believe 100,000,

7    whatever he was paid in February probably for the time that he

8    worked.

9            So, Mr. Kaye was with We Build the Wall from its

10   inception to at least July 30, 2020.  Okay.  I believe We Build

11   the Wall was shut down when Mr. Shea was indicted.

12           Back to the taxes.  And that he pays aftertax dollars

13   for that list.  Aftertax dollars.  To me, you know, in my

14   former life when I used to understand business.  I don't

15   understand business now.  I don't understand much.  But usually

16   you can do what you want to do with aftertax dollars.  What's

17   the value of the list?  Even the GoFundMe gentleman, he

18   testified -- you say, Judge Torres, I want the testimony if

19   that list was valuable.  The GoFundMe guy says the list was

20   valuable.

21           We know the list was valuable because, ladies and

22   gentlemen, that list got $25 million, okay.  $25 million, the

23   gentleman from the GoFundMe said that was the number one

24   GoFundMe at that time in 2019 of all time.

25           So, picture you were a real businessman, whether you

1    are doing a startup, whether you're doing an energy drink, or,

2    more importantly, ladies and gentlemen, if you were involved in

3    real estate.  And you had a list of 384,000 people who donated

4    to whatever cause you believe in.

5           We may not believe in what Tim Shea believes in.  We

6    may not even believe what the wall is.  But just figure, take

7    yourself out, and say, 384,000 people who donated to a cause

8    that I believe.  What is the value of that list?  I mean, it's

9    valuable.  It is actually extremely valuable, if you thought of

10   it in a Winning Energy type of scenario, that I'm going to sell

11   Winning Energy drinks with the list.  You'd buy 50,000 cans

12   possibly to sell a Winning Energy drink.  Right.  You may do

13   that.  Once they're fulfilled, and respectfully, that was a

14   loan.  And there was a conflict of interest with Brian.

15   Conflict of interests are not crimes, the last I heard.

16          What happens today if Tim wrote a check and paid that

17   loan?  What would happen?  He would pay the loan back plus

18   interest.  If you look at that loan, Tim was charged fees for

19   the loan like bank fees.  Look at the loan carefully.  Charged

20   fees, more fees than if you went to a bank.  In 2019,

21   10 percent interest.  That's what the evidence will show.  I

22   submit to you that there is nothing wrong with that loan.

23          And also, ladies and gentlemen, that Winning Energy

24   has nothing to do with this case.  It is not a charged crime.

25   Okay.  Neither is the taxes.  Okay.  If you ask Judge Torres,

1    give me the evidence on the taxes that relate to the crimes,

2    there is none.  It is what's called -- it is not charged.

3    Okay.  So I thought you should also know that.

4         Now the government wanted to do Ranch Property, ladies

5    and gentlemen.  They put up Ranch Property took this loan,

6    right.  But in the stipulation, the evidence will show, that

7    the loan's not due.  As we sit here today, or the other day

8    when the stipulation, the loan's not due.  Okay.  We've been

9    indicted for 20 months, still the loan is not due.  That's what

10   the evidence is.  Okay.  So, if Mr. Shea wanted to pay that

11   loan tomorrow, the loan gets paid with the interest.  It is a

12   low interest because it is an SBA loan.  When the SBA gives

13   their loans, they do an investigation.  And the government came

14   up here with a chart, this, that, the other thing.  There was

15   other moneys going in from We Build the Wall.  Look at the bank

16   records, because it was no testimony on it.

17        Now, the individual, the gentleman who testified about

18   the taxes, right.  He said that you are allowed to take

19   deductions, right?  And we saw in Mr. Shea's tax return, there

20   were deductions for a Range Rover and cell phones.  But now,

21   ladies and gentlemen, and maybe Mr. Shea, you know, rushed it.

22   He went to H&R Block, nothing wrong with H&R Block, my cousin

23   works there.  Not the sharpest tool in the shed, but he works

24   there.

25        You can see all the deductions that the individual

1   from the IRS said you can take.  You can take hotels, as long

2   as it is for business, you can take airfare, you can take meals

3   if you are away.  Stuff like that.  And you can read his

4   testimony.  And it said any -- then here is the one thing I

5   wanted to just show it to you, ladies and gentlemen.  I said to

6   him, to this gentleman -- I'm very bad with names so I'm not

7   going to say his name.

8         I said:  The standard deductions correct?  Line 17,

9   18.

10  "A.    If they choose to do so, sir.

11  "Q.  Right now as we speak for the ladies and gentlemen of the

12  jury, they could amend their" -- meaning Amanda Shea and Tim

13  Shea-- "they could amend their tax returns right now if they

14  wanted to?

15  "A.  They could, sir.

16  "Q.  Anybody in America could amend their tax return at any

17  time, correct?

18  "A.  That's correct."

19        If I was Tim after this trial, I would take all those

20  deductions that you guys are going to pull out and see.  Okay.

21  Also, and this individual said that can he deduct -- okay.

22  Here is one other thing.  Because don't take my word for it at

23  all.  Don't take my word for it.  I am going to read 14.

24  "Q.  And there wasn't one deduction for taking travel, say an

25  airplane to the southern border, that wasn't one deduction for

M5v3she2                    Summation - Mr. Meringolo

1  that, correct?

2  "A.  I did not see that.

3  "Q.  There wasn't one deduction for Mr. Shea staying at a

4  hotel, correct?

5  "A.  I didn't see that, sir."

6          So you, ladies and gentlemen, when you ask Judge

7  Torres for a printout of all the bank records, maybe we are not

8  accountants, I'm certainly -- I can't add two plus two.  But,

9  you'll see they're all deductions he could have taken that he

10  didn't take.

11          And I'm not blaming the H&R Block guy.  I am saying

12  maybe he was rushing things, maybe he was trying to get his

13  taxes in.  He took all the income, he said forget about

14  deductions.  Let me take my car.

15          Anyone who has their own business, which, you know,

16  most -- people do and don't.  You know there are these

17  deductions, right.  And I said, if there are any deductions

18  that he missed, he could amend his taxes tonight, right?  And I

19  knew that was in the records when I asked that question, ladies

20  and gentlemen.

21          And I submit to you, all this stuff with the taxes in

22  and out.  You know, you guys are better than me.  You'll use

23  your common sense, you'll use your common sense when you look

24  at those bank records.

25          So he took his gross income to get the taxes in.  I

1    don't know if there was an extension until October.  The

2    evidence is not here.  I don't know one way or another.  Maybe

3    he failed to file it in March and he just wanted to get it in.

4            But if you also look at the tax records, it shows that

5    he did the tax return I believe in August right before he was

6    indicted.  I have it right here the e-signature.  And if you

7    can read it, it is 8/18/20 and he was indicted and the

8    stipulation will show 8/20.

9            Also, if you recall when the gentleman was on the

10   stand I asked him, do people normally get indicted when they

11   amend their returns after they have been indicted?  They're

12   indicted now like Mr. Shea.  And let's find that.  Because that

13   was a -- I said when they're indicted like Mr. Shea, is it

14   normal for people -- and ask for this testimony -- is it normal

15   for people to amend?  And he says sometimes they do, sometimes

16   they don't.  I says, if you recall, well, when you are under

17   indictment in a federal case, and you amend, isn't it true

18   sometimes people get indicted for the taxes?  And he said yes.

19           So, I'm pretty much done with the tax guy.  And you

20   use your common sense, ladies and gentlemen.  And I submit to

21   you, ladies and gentlemen, he used aftertax dollars, aftertax

22   dollars.  You can do -- in this country, you can do what -- I

23   think in this country you can do whatever you want with

24   aftertax dollars.

25           I have current former students, and one student told

1    me to buy Bitcoin five years ago.  And I said you're crazy,

2    which I still think he was crazy.  That would have been a good

3    thing, right.  But we don't know what value is, this is a

4    person, the individual, what the individual thinks Bitcoin may

5    be worth money.  What an individual thinks a list may be good

6    to sell cans or real estate or something or anything.

7            Who are we to get in anybody's mind and who are we to

8    tell anybody what to do with aftertax dollars?  I submit to

9    you, that's reasonable doubt.

10           Okay.  So, RPMM.  They say it was a shell company.  A

11   shell company just to move money.  The only reason was to move

12   money to Brian Kolfage that's what the government was saying

13   for two hours this morning.

14           I submit to you, ladies and gentlemen, and the

15   government knew it wasn't a shell company.  It was a single

16   member LLC.  And you can look at the individual, the gentleman,

17   I think it was the $80,000 guy.  And he said that people do

18   single member LLCs all the time.

19           So now I want you to use your common sense, again,

20   okay.  Let's use your common sense.  Why would Tim Shea open a

21   company in Wyoming, that he don't want anybody to be -- to

22   detect that he's the owner?  Okay.  Why would he do that?

23   Three months after We Build the Wall.  Common sense says, and

24   I'm just going to talk to you straight.  You're building the

25   border wall, right.  We say whether we agree with it or not,

1    for this practical purposes irrelevant.  Okay.  He's building

2    the border wall.

3          We all have life experiences.  Good, bad, different,

4    right or left.  The political climate of building a border wall

5    with personal funds, would you -- if you take yourself out of

6    whatever you believe in and put yourself in another man's

7    shoes, would you want anyone to know where you lived?

8          I submit to you, common sense would say I don't want

9    anybody to know where I live anyhow.  But if I'm building a

10   border wall, I certainly don't want anyone to know.  Common

11   sense equals reasonable doubt.  Reasonable doubt equals not

12   guilty.

13         If you're building a wall, and he was working.  Right.

14   You see he's going there, and as Judge Torres told you before

15   we began, she gave you the analogy that if it's raining

16   outside, and you didn't see, the windows were -- I am not doing

17   a good job.  If the windows were closed and it was raining

18   outside and somebody came in with a wet umbrella you could say

19   it was raining.  Okay.  That's a fair assumption that Judge

20   Torres told you.

21         So, if you're building a border wall and you're

22   working, do you want people to know?  One, that's common sense

23   you don't.  Number two, do you want personal liability?  Or do

24   you want to open an LLC, a Inc., or whatever they call it.  Any

25   of these, I don't know whatever corporation to have protection,

1    and he says we're going to cloak and veil.  He don't know

2    what -- read that.  Read that.  That's what he said and the

3    government says, oh, it's cloaking and veil.

4            Who wants personal liability in this life that's going

5    to do business?  Right?  He's building the southern border

6    wall.  And the evidence, that analogy that I gave you that

7    Judge Torres gave you, he's sending and we're going to get to

8    it.  He's trying to get land.  The border wall is completed.

9    Okay.  So it's like he's trying to get land.  It didn't just

10   happen.  That's common sense.

11           Tim Shea is on the front lines, ladies and gentlemen,

12   that's what the evidence shows, sending e-mails out to get

13   land, a ranch owner on the southern border and the wall is

14   built.

15           And us New Yorkers, we know, and when a wall is built

16   like that, you can see how big that is.  You can watch that

17   video, which I apologize it was much better on the computer and

18   I know it was all crazy.  But watch the video in the room and

19   with the sound and everything.

20           But, you go from taking a whole section in the middle

21   of nowhere, and building a border wall.  And what happens when

22   you build a wall.  We know, we're New Yorkers, you got to get a

23   architect, you got to get concrete, you got to get steel, you

24   got to get men and women.  To build a border wall like that is

25   a monumental feat.  This wasn't the government.  And

1   respectfully to Mr. Brian Kolfage who -- whatever you say about

2   him here, he is a hero.  The guy lost his legs and his arm and

3   had his other arm sewed back.  He wasn't down at the border

4   helping him build the wall.  He wasn't.  Tim Shea, that's what

5   the evidence is here.  Tim Shea.

6           So, I asked the $80,000 guy, and I know I just said

7   that, but don't believe me.  I said, privacy reasons, could be

8   security reasons as well for their personal well being.  He

9   says yes.  This is with respect to the corporation.

10          Certainly it's not a crime to want to hide your

11  residence, is it, right?  I don't speak correctly sometimes.

12  It is not a crime to hide.  No, it is not.

13          So I believe if you use your common sense, whether you

14  believe it or not, if you were building a border wall, you

15  would not want your name out there and you would want to

16  protect yourself from civil liability.  Because if you don't

17  get the right architect, and the concrete is not laid right,

18  and the steel isn't put up correctly, and somebody gets hurt,

19  you are going to go to jail.

20          Like I said the first time I spoke to you, ladies and

21  gentlemen, I read the text message in the beginning of that

22  text message Mr. Shea says I need Spanish speaking people

23  because the people -- he doesn't speak Spanish, and he needs

24  Spanish speaking people to try to get the land.  Let's think of

25  that and think of Judge Torres' analogy.

1          Now there were invoices, right.  There were invoices

2     from Ranch Property.  So match those invoices up to the

3     payments.  The government is sitting here saying because he

4     marked an invoice up, that's evidence of money laundering.

5          I submit to you, ladies and gentlemen, use your common

6     sense.  Common sense is reasonable doubt.  Reasonable doubt is

7     not guilty.

8          Tim Shea never said he was working for free.  I didn't

9     see any text message for that.  Tim Shea is not on the board.

10    That's what the evidence shows.  You know what you do?  You

11    match up those invoices with when he's going around.  Right.

12    Like the money laundering guy said, and I believe it was the

13    government's questions that says if you 1099 the gentleman,

14    meaning Tim Shea, would pay for his own expenses, we have all

15    those expenses in the bank records, okay.  So why not, why not

16    mark it up.

17         The guy got $80,000.  We all were sitting here saying

18    we are in the wrong business if that guy got $80,000 to just

19    come up here for 30 minutes.  So Tim Shea can't make money?

20    It's money laundering?

21         Also, ladies and gentlemen, you can look at the bank

22    records here too.  These are other law firms that got paid from

23    We Build the Wall.  Major law firms, Quinn Emanuel, the other

24    law firm.  That other guy is probably a guy.

25         So you can see those things, GX 100, GX 12 and GX 16.

M5v3she2                    Summation - Mr. Meringolo

1    Please don't take my word for it at all.

2           Now, Kobach, right.  That was the stipulation that he

3    said and government put that up and I stipulated to that,

4    ladies and gentlemen.  I stipulated to that, too.  Mr. Kobach

5    did not know anyone was getting paid.  He's general counsel,

6    this guy.  He's not on the front lines.  He's in that video

7    doing the nice things.  He is the former -- what's he the

8    former of?  He's former secretary of state of Kansas.

9    Politician.  He was the lawyer for We Build the Wall.

10          But in that stipulation, which the government has, you

11   know me.  It says that he knows Tim Shea did security.  And Tim

12   Shea did do security, too.  He did security at the border.

13   Now, ladies and gentlemen, when -- common sense real life

14   experience, the border is one of the most dangerous -- whether

15   you like it or not, it is one of the most dangerous places on

16   earth.  Whatever you think, that's the truth.  It is what it

17   is.

18          So Mr. Kobach he's the lawyer and he's involved since

19   the inception of the charity.  He agrees that Tim did security.

20   Because he's the one, the politician who is doing the video so

21   he would know, oh, and read that stipulation.  Don't even take

22   my word for it.  So he is the lawyer.

23          Now let's go, you have the bank records, GX 1600.  And

24   this is Mr. Kobach.  Kris Kobach, he is a lawyer.  I am not

25   saying anybody shouldn't make money.  Right.  That's none of my

M5v3she2                    Summation - Mr. Meringolo

1   business.  But, these are the payments that Mr. Kobach was

2   getting paid.  37,000 in February.  26,000 in April.  25,000 in

3   may.  GX 1600 and GX 12.  Tell the judge print this out and I

4   want to see if this lawyer is telling me the truth.  473, he

5   probably put in an expense.  28,000, May, 25,000 in May.

6   25,000, 26, 25, 26, 25, 26, 25, 50.  A month before the

7   indictment is here.  So this is Kris Kobach.  General counsel.

8   I'm not saying he shouldn't have got paid that money.  I don't

9   know what he did.  But I'm not saying -- that's the evidence.

10  This is the evidence.  We are not saying he shouldn't have got

11  paid.  When you work, you get paid.

12          And in this case, the only one who was doing multiple

13  jobs, like if you had a startup company, anyone who knows that

14  you are doing a 100 jobs so they needed security.  Tim is doing

15  security.  They wanted a drone, Tim's doing the drone.  They

16  wanted land, Tim's doing land.

17          So here is another thing that I want you to use your

18  common sense, ladies and gentlemen and why you should vote not

19  guilty.  Look at the Sheas' bank accounts.  The only income is

20  from We Build the Wall for Tim Shea.  Tim Shea's 51 years old

21  as he sits here today.  If you look at all his e-mails, this is

22  in evidence.  Look at all the signature pages and e-mails.  It

23  says -- and it is Tim@realestate.  Okay.  And he says Tim is

24  affiliated with real estate.  So there is no income.  Okay.  No

25  income, basically, from anywhere else.  Maybe there is 5,000.

1   So, but I want you to go through the records, the Sheas'
2   records very important.
3          So, he's doing what needs to be done here, to help --
4   and he didn't do it himself.  You needed contractors, you
5   needed cement guys, steel guys, I'm not here saying those
6   people didn't work.  That's real work.  Not something like I am
7   doing, sitting up here and talking.  That's real work.  Okay.
8   So, but Tim was the one who gets the land.  Tim is providing
9   the security at the border.  Tim got paid.  And Tim got paid
10  well and Tim did what he wanted with his money.
11         You want to pull text messages out of here and there.
12  I submit to you, ladies and gentlemen, pull the whole, pull the
13  whole transcript, text messages, and go one by one and see how
14  the text messages they weave into these charts.  That's what I
15  think we should do.  Right.  You want to get to the bottom of
16  this.  Not just one text message here, one text message there.
17  Thank you for bearing with me.
18         If you look at the text messages about who is getting
19  paid, right.  What the government did here is they have a text
20  message with Andy Badolato and Brian Kolfage.  And it is not
21  nice what Tim's friends did to him.  But still, but if you look
22  at the text message, Andy Badolato and Brian Kolfage, they say
23  I want 100 grand, I want 20 grand a month.  Tim's not on those
24  text messages.  But they put that text message right here.
25  Kolfage says I want 100 grand.  I want 20 grand a month.  And

1    then the next text message is something about Tim a month

2    later.

3            Just so you guys know, and I know you know the case

4    and I apologize for not being so succinct.  But if I come

5    across something, I want you guys really to know, this is the

6    metadata guy.  And he says I don't have a perfect recall.

7    There was on the order of 30, maybe 40 total devices.

8            So, don't take my word for it that I said 30, 40

9    devices.  That's how many devices they had that they were

10   looking at.

11           In addition to that, they said -- I said were there

12   computers?  Whose computers did you review.  And he reviewed

13   Mr. Kolfage.  I can tell you, ladies and gentlemen, if that

14   contract was on Mr. Kolfage's computer, they would be up and

15   center jumping up and down.  But it comes from the lawyer

16   Richard Kaye who was paid over $600.000.

17           Okay.  I don't know if you guys recall this.  And we

18   talked about this earlier.  This is the chart that I did with

19   that gentleman.  Okay.  Now, why did I go back to 2018 when we

20   did this chart?  Because to show the relationship that they

21   had.  And you know what's reasonable doubt, ladies and

22   gentlemen?  That the government just got up here and told you,

23   basically, it was one way again.  And that Freedom Daily went

24   out of business.  But if you just look at the transactions,

25   look at the transactions.  And ask yourself why is money going

1    both ways?  And I submit to you when you say why, that's

2    reasonable doubt.  And reasonable doubt is not guilty.

3         When you look at here, here, here's when supposedly

4    this conspiracy started.  With Shea and Kolfage.  I submit to

5    you Shea and Kolfage the answer is reasonable doubt.  Shea and

6    Kolfage the answer is not guilty.

7         Now, Kolfage was dealing with Bannon.  I don't believe

8    maybe on a chain e-mail Tim was on with this guy Bannon once.

9    But Kolfage you can see Badolato, like the government just

10   said, Badolato, Bannon, and those characters.  While Tim Shea

11   is at the border according to the bank records that's in

12   evidence.

13        So you see, here we go January, we go March, we go

14   June, June is a big payment.  July is a big payment.  Right?

15   This is in the heart of what the government, ladies and

16   gentlemen, is saying the heart of the money laundering

17   conspiracy.  Okay?  And I read that e-mail differently.  When

18   he's talking about lists.  But you read it how you feel.

19   That's all that governs here is how you guys feel.  Not us.

20   Then we have September, which is -- we have September, we have

21   August, we have -- why did I do 2020.  Right, August 2020 it's

22   going back from -- now remember, ladies and gentlemen.  This is

23   from Kolfage Freedom Daily, to Tim.  This is reasonable doubt

24   right here.  One, they didn't put it in.  Two, no one could

25   explain either way.  We are going to pull text messages out and

1  interpret text messages?  We know what goes on when you

2  interpret text messages.

3          So during this period of time, you have $187,000 going

4  from Kolfage to Tim.  And during the other period of time you

5  have 190,000 going from Tim to Kolfage.  But it can only be

6  money laundering one way.  But I thought Freedom Daily was out

7  of business they just said.  So this honestly, Exhibit 1.  We

8  only have like 10 exhibits and the video, but this is the

9  critical piece of evidence on why we're not guilty of money

10  laundering and wire fraud.  And you know why?  Because it's

11  common sense.  No one could explain it.  No evidence in this

12  courtroom truly explained why the money was going both ways.

13  And when we say Tim Shea was working for a single member LLC,

14  he can -- the money laundering, the $80,000 guy he said you can

15  do with your money whatever you want.

16          I'm not going to belabor you guys with these dates of

17  these charts, but you all can go through it, match up the

18  invoices.  And it is okay for somebody to make money.

19          We saw what happened here, right.  So, I'm going to

20  put this over here or else we're going to lose it.

21          We did talk about Winning Energy, so I'm just going

22  to -- if I have a point or two that I didn't say.  Oh.  Here's

23  common sense, equals reasonable doubt, equals not guilty.

24  Winning Energy.  I'll get back to that.  I don't want to --

25  Winning Energy.  They take a loan.  Right.  This is a big money

1    laundering scheme.  Stipulation, the government read Kris

2    Kobach, the guy who made 3, 400,000, that lawyer, that guy.  I

3    didn't know what was going on.  That's okay.  That's fine.

4           If this was such a big money laundering scheme, ladies

5    and gentlemen, use your common sense.  Why are we taking a

6    loan?  Why aren't we sending a fake invoice.  Hey, let's send a

7    fake invoice.  They want to say it's a fake loan.  Why don't we

8    send a fake invoice so I don't owe the money back.  We are in a

9    scheme together.  In addition to that, if you look, it is in

10   the middle of the pandemic, the middle of the pandemic, the

11   beginning of the pandemic.  He takes a loan.  If he pays it

12   back, nothing happens.  But he takes the loan, ladies and

13   gentlemen, memorializes the loan.  Why not just take a salary,

14   send an invoice, send an invoice from Winning Energy?  I don't

15   have to pay the money back.  Let me get the cans, hang out.

16   That's common sense.  That equals reasonable doubt.  And that's

17   not guilty.

18          And then what does he do with the money.  They make

19   this big deal about this.  He pays -- he doesn't go to the

20   Bahamas.  There is a couple of Door Dash things, you saw that

21   the guy eats, but Tim is not going -- they put evidence Bannon

22   is hanging out in a hotel over here $10,000.  What's this guy

23   doing.  We are at the southern border.  We're working.

24          So if you really want to look at their chart, which I

25   won't -- I'll just go like that.  And look at the e-mail.  This

1    isn't even in the case.  But if this there is such a criminal

2    conspiracy.  Right.  If there is such a criminal conspiracy,

3    common sense says don't give me a loan.  Here is an invoice.

4    Here is an invoice, pay me, I'll kickback the money to you,

5    like the government is saying.

6           The only people who are saying it, ladies and

7    gentlemen, and this is reasonable doubt, whether you like it or

8    not, it's reasonable doubt.  The only people that are saying it

9    is this table.  The people who created the charts.  The people

10   who put the text messages together.  And there is nothing wrong

11   with that, but it is just reasonable doubt.  So I'm done with

12   Winning Energy.

13          Oh.  3,000 donors in New York.  Right?  3,000 donors

14   in New York.  Why don't we just give them a MetroCard.  We are

15   flying people from all over the country.  Just a little common

16   sense.  384,000 donors, ladies and gentlemen.  Winding down.

17   So, if you want -- it's in evidence and you'll see it.

18          The proposal for the drones.  Now the government is

19   saying that the drones -- oh, I don't know what they are

20   saying.  This is a fugazi.  If you look at 627A, this is them

21   after the subpoena memorializing everything.  There is nothing

22   wrong with that.  You get a subpoena from the government, and

23   you get everything together and you give it to them.  If you

24   didn't give them documents, all hell would break loose.  So

25   they formalize agreements and send it to them.  Now, and Rich

1    Kaye formalized agreements, the lawyer.

2           So here's a proposal.  Now remember, $5,000 a day for

3    the drone.  This is not -- well, if it was in Manhattan

4    probably would be more.  But this is in the middle of nowhere.

5    This is the southern border that they are trying to do.  If we

6    could for one minute, ladies and gentlemen, just when we say in

7    the middle of nowhere.  This is really in the middle of

8    nowhere.  It is so dangerous there.

9           Then there is an e-mail back and forth with a group, a

10   former military group for security.  So you see that Tim is

11   trying to get a former military group to help out with these

12   events and stuff like that.  And yeah, they cost more money

13   because they're former military.  With events like this, it is

14   highly charged.  Okay.  I'll go through the security work a

15   little bit that Tim was doing.

16          Anybody knows, this project, it's similar to like a

17   startup.  They want to build a border wall on the southern

18   border.  And when you do a startup, those of us have done it,

19   most of us fail.  You got to wear a lot of hats when you do a

20   startup.  And Tim was wearing a lot of hats, and there is

21   nothing wrong with working hard.  There is nothing wrong with

22   working hard.

23          So Charlie Ford, he is a pretty famous guy in this

24   security-type industry.  He writes Tim an e-mail.  And it is

25   about the event in El Paso.  Okay.  This is the final invoice

M5v3she2                    Summation – Mr. Meringolo

1    for the telethon event near El Paso from 6/23 to 6/27.  We were

2    spot on with the quote.  We ran four advisors.  But the final

3    total went up a little with the addition of extra bodies so we

4    can handle SB's EP.  That's Steve Bannon getting executive

5    protection.  That's what that means.  Aside from that curve

6    ball, we stayed within the original budget parameters which I'm

7    very happy about.  then they thank Tim because this is to Tim.

8    Thank you again for keeping us in mind for all your needs.  We

9    really enjoy working with you.  Whatever.  Whatever they're

10   saying.

11        But this is Tim doing work.  Getting executive

12   protection, which are probably armed people.  Very

13   sophisticated.  Potentially SEALS or some type of military.

14   You can read this.  This is July of 2019.

15        You know what, ladies and gentlemen?  The government

16   came here and in the beginning they said this is a shell

17   company, and I don't want you to quote me, but I think they

18   said he didn't work.  I said, ladies and gentlemen, if this is

19   not a shell company, because that's the representations.

20   Remember I had the piece of paper, I said I could have objected

21   but I didn't.  It's very inflammatory.  I said I wanted them to

22   say it.  I wanted them to say it because I know Tim worked.  If

23   Tim worked, that wasn't a shell company.  That's reasonable

24   doubt.  That's not guilty.  I'm moving along.

25        Now, this one, I believe Tim told me they didn't get

1    this contract with GAS.  And they wanted to get this security

2    contract because these are the guys who actually, you know, the

3    private guys who went into Benghazi, but they didn't get this

4    contract so there wouldn't be an invoice, but it shows Tim is

5    trying.  Tim is working.

6           Then here is the other invoice for $61,000.  You guys

7    can read this and you guys can match it up.  Did Tim add some

8    money for his work and his travel and what he's doing?  I hope

9    he did.  I don't know for sure, but I hope he did.

10          So I submit to you, the government's position in this

11   whole thing, this money laundering, this wire fraud, this

12   kickback scheme.  Kickback schemes go one way.  We're New

13   Yorkers.  Right.  We want to kick back, it goes one way.  It

14   doesn't go both ways.  That's, we use our common sense.  We are

15   New Yorkers.  When you're getting a kickback, it only goes one

16   way.  You don't have to be a genius to know that.  That's just

17   common sense.  Real life experience.

18          I got two more things.  I really apologize.  But it's

19   necessary.

20          Whatever I'm missing is my fault.  I can tell you that

21   much.  If I didn't say it, the veiled that Tim writes, personal

22   protection.  When Tim is cursing, right, I mean maybe some of

23   us curse, some don't.  We need an F'ing plan.  We need a plan.

24   If we're going to build a wall at the border, and I can tell

25   you this much.  Steve Bannon didn't have anything to do with

1    building the border wall.  He was there with his executive

2    protection like it said in that e-mail.  Okay.

3           So, let's just take a look at the border wall

4    completed.  You guys have the video.  I'm not going to waste

5    your time with the video but I want you to look at the video.

6    Hopefully you can hear what was going on.  You can see what's

7    going on.  If you look at that wall.  This is just a picture.

8    But that is an amazing feat to do of construction for private

9    people.  Right.  This protects the communities, this protects

10   the border patrol, and this protects human trafficking.  And

11   the goal of We Build the Wall was to do these little walls in

12   places that didn't -- at that time the government didn't want

13   to do.  That was the goal of this.  Okay.  And they did two

14   walls.  They didn't do one, they did two walls, and this is one

15   of the walls they did.  And you can see there's lights, there's

16   steel, I mean that's an incline.  Any of us know construction,

17   an incline in the middle of nowhere on a cliff is extremely

18   difficult.  You'll see they gutted that whole piece.  They

19   actually excavated the whole, that whole piece.

20          And Tim didn't do everything.  But Tim was part of

21   that team to do it.  So whatever you think, he's part of doing

22   something like a marvel type of construction.  I can tell you

23   that first hand.  Whether I agree or not, it is a marvel type

24   construction.

25          Best witness here, best witness in this case, right,

1    was the guy from Arizona.  You know, and the lady but she was a

2    little, she lost her husband, she was very upset and I

3    shouldn't.  But the gentleman, the military guy, 20 years in

4    the military.  The guy from Arizona.  He wasn't at the border,

5    but he was up and he donated to the wall.  He donated and it

6    was his understanding that the walls were going to be built.

7           Now I say, now there came a time that you've learned

8    that actually, built portions, small portions of the wall on

9    the southern border.  He says I saw some of that information.

10   So that's his testimony.  So it is not just some defense lawyer

11   showing you some picture.  And then, let's go through this.

12   this is important.  This guy is important.

13          I say on page 310-13:  "Okay.  And what you followed

14   and the wall that was built, were you happy with that portion

15   of wall?

16   "A.  It was interesting, satisfying I guess, that some of the

17   money was used as advertised.  Okay."

18          Here is the critical piece of evidence in this case,

19   ladies and gentlemen.  While you are going to use your common

20   sense why it is reasonable doubt, and why it's not guilty.  And

21   it is their witness, the gentleman from Arizona instead of

22   giving someone a token or a MetroCard from New York.

23   "Q.  Were you opposed to We Build the Wall's hiring a

24   contractor in order to get that land?

25   "A.  No.

1    "Q.  It would be perfectly okay if they paid somebody to go out

2    and search for private land, right, to buy?

3    "A.  I assume that may be part of the process, yes.

4    "Q.  Okay.  And you're certainly okay if they paid for

5    construction work, right?

6    "A.  Yes.

7    "Q.  And we expected them to pay the guys who were doing the

8    construction, right?

9    "A.  Right.

10   "Q.  And we expected them to pay for the steel that they got,

11   right?

12   "A.  Yes.

13   "Q.  And you know that We Build the Wall, they did other

14   fundraisers to get more money.  Are you aware of that?

15   "A.  Yes, vaguely, not particularly."

16          So this gentleman, okay.  Let's read this.

17   "Q.  Say a fundraising event, would you be opposed if We Build

18   the Wall paid security officers' salary for the day?

19   "A.  No.

20   "Q.  Would you be opposed for someone who was an intermediary

21   with the security to get paid, to hire the security, would you

22   be opposed to that person getting paid?

23   "A.  No."

24          Then just to verify.

25   "Q.  And then with you when you donated, you get various

1   e-mails for things?

2   "A.  Yes."

3           That verifies that the donors' e-mails were given to

4   We Build the Wall, GoFundMe and We Build the Wall, Brian

5   Kolfage who was the president, owned, he owned -- you guys do

6   your own, he had access to it.  I believe the GoFundMe guy says

7   there are charities that own it, but you can look that

8   testimony up.

9           So, Mr. Ward had no problem, no problem with anyone

10  getting paid as a contractor.  He had no problem paying the

11  security.  He had no problem paying the person who facilitated

12  the security.  He had no problem paying someone to get the

13  land.  He had no problem.

14          So, there are a few things I'd like to present to you.

15  So, this is Brian texting Tim.  Okay.  Now we know from what's

16  in evidence with us, Tim sent, wrote a letter, remember I read

17  it to you on Thursday, I read a long letter to you guys on what

18  Tim was proposing to send the people who own the properties.

19  That was on March 27, 2019.  And we know that the wall was

20  done, Mr. Ward confirmed it.  So you don't think I'm crazy

21  showing you a picture and you'll see the video that it was

22  being done.

23          So I believe the government put this in.  He said good

24  job Tim.  I heard your new company found a bunch of land for

25  us.  And then they say Ranch Property Management.  They laugh

1    good job.

2            I submit to you, Tim finds land, and the government

3    puts those e-mails in as if this is a big scheme.  Why can't

4    another guy say good job.  Good job.  What's wrong with that?

5    That's the evidence in the case here.  There is nothing wrong

6    with that.  And then here you read, please read these.  If you

7    can, if you can.  I am not trying to waste your time.

8            This is in 2018.  This is Tim Shea saying, so use

9    private contractors to build and fund with the GoFundMe like a

10   construction loan.  Now, there is no loan.  There is no

11   nothing.  Tim is saying let's get private contractors, but he's

12   not -- he is a real estate guy.  He is not that sophisticated

13   to say construction loan.  It sounds -- but it is the money

14   they are going to use to build the wall.  And Tim is saying, we

15   got to get contractors to build the wall.  Right.  We don't got

16   to get Brian Kolfage to build the wall.  Tim's not going to

17   build it himself.  Anybody who has anything to do with

18   materials or anything with construction, it is a -- it's tough.

19   I'm telling you it's tough.

20           And now the government also said the website, right.

21   The splash page and probably everybody knows, but the young

22   people probably know better.  They say they want it as a

23   presence.  We want the splash page as a presence.  So Tim is

24   sending out e-mails to landowners to try to get their land,

25   they call them ranchers, to try to get their land to build on

1     the southern border.  They put up a splash page.  There is

2     nothing wrong with that for a presence.  To show we exist.

3     Because if you send somebody a letter, we want to come on your

4     property at the southern border and we are going to build on it

5     for free, people may throw it out.  Most people probably did.

6     And somebody may well say, let me see who are these people and

7     they have a presence.  There is nothing wrong with having a

8     presence in business.

9          This is what the government -- have you seen the

10    website?  Then Tim says yeah, but I did it from the desktop.

11    Amanda made the logo.  So, these are social media, at the end

12    of the day, these are social media people.  They were doing

13    social media with Freedom Daily.  Freedom Daily did not go out

14    of business when the government said because you saw the money

15    back and forth.  This is what they did.  So whatever Bannon and

16    all these other guys were doing, it is what it is.  But what

17    Tim is doing is why we're here.

18         It is like your parents or you tell your kids, I don't

19    care what the other people are doing, I only care what you guys

20    are doing.

21         And here is the thing.  Right.  Here it is.  This is

22    what Tim's doing.  So Tim, I think this is the day or within a

23    day or two that Ranch Property gets incorporated.  Right.

24    That's in one of their charts.  So I want to give you the

25    e-mail from the day that Ranch Property gets incorporated.  So

1    this is March 29, 2019.  Read this over.  Let me know if there

2    are any changes to be made.  So, this is coming from Tim at

3    Ranch Property.

4            So, I think it's very important, this thing, this

5    piece of evidence.  Because this is showing what Tim wants to

6    do.  This is him taking initiative on trying to get the land

7    for the project.  Right.  You don't see Steve Bannon coming

8    here writing a letter.  You don't see Steve Bannon going to the

9    border wall but for having executive protection.  We see the

10   working guy doing it.  He's working.  You can read it.  And he

11   says exciting opportunity.  He talks about, listen, it is his

12   friend, the triple amputee, it's his friend.  We are not going

13   to say we're not friends.  But it is a different relationship.

14           Here, here's what common sense reasonable doubt is.

15   Not guilty, and I just thought of this.  You see any money

16   going from Freedom Daily to COAR.  I don't know the answer

17   because I didn't even look at that.  I just thought of that

18   right now.  You see any money going from Freedom Daily, Brian's

19   company, back to COAR, Bannon's company.  I submit to you that

20   there is no money.  And I submit to you that would be

21   reasonable doubt.  And I submit to you that's not guilty.  But

22   do you see money going from Freedom Daily to Tim Shea, Tim Shea

23   to Freedom?  Yes, you do.  We're not hiding behind that.

24           But this letter is -- you know, I'm not going to read

25   it to you guys again.  Because I am up here long enough as it

1    is.  But, this is the longest time I've ever done on any of

2    these, and it's been two-and-a-half years so I'm probably very

3    rusty.

4              He has a 1-800 number and you just read it.  And this

5    is what he's doing.  This is what he's doing.  The worst thing

6    in the world is somebody, when you're working and somebody says

7    you are not working hard.  You are not working at all.  Okay.

8              So now, let's go through another exhibit.  And ladies

9    and gentlemen, I'm closing in on.  This is in 2020.

10   January 22, 2020.  This is Tim to Amanda.  They're talking,

11   this is what they're talking about.  Right.  This is an invoice

12   for 5,800.  Maybe if the bank records are there and I don't

13   know if we even went this far.  Did we go this far?  Maybe we

14   went this far.  I didn't think we went that far with the bank

15   records and the expenses.  But, here is what Tim is sending

16   them an invoice.  Marketing towards new wall building locations

17   in Mission, Texas and the Rio Grande Valley, Texas.  Utilize

18   Facebook ads, utilize Google ads, pull info on landowners,

19   track locations and cold calls.

20             That's what Tim is doing.  You probably, everybody

21   would know this better than me, but when you are in real

22   estate, you understand how to do that.  You pull landowners,

23   the site.  You pull up and see who is there and you cold call

24   them.  Sir or ma'am, would you like me to build a wall on your

25   property.  Not everybody -- people will hang up on you.  It is

1    just like anything else.  They set up meetings.

2            I'm telling you, this is where I say common sense and

3    why it's reasonable doubt, why it's not guilty.  So if you are

4    looking to meet people in Mission, Texas, and Rio Grande, and

5    you're setting up the meetings, you are going to having to go

6    there, okay.  We know Bannon didn't go.  If you are going to

7    get the properties in Mission, Texas, and the Rio Grande

8    Valley, Tim's saying, I mean, use your common sense.  All

9    right.  Almost done.

10           In the beginning, sometimes you get confused up here.

11   But it's not like laying concrete, I can tell you.  Actually I

12   can tell you.

13           In the beginning I asked you, I asked you, please, to

14   be patient to the end.  Well, here's Gordon -- this is the

15   GoFundMe guy?  Would there be value in a list of donors, is

16   that fair to say?  Yes, generally donor lists have value.

17           There is no evidence of anybody else selling a donor

18   list.  Right.  The only evidence is the contract of selling the

19   donor list to Tim Shea.  That's the only evidence.  Everybody

20   knows that has value.  And in social media circles -- I'm not

21   even on it so I have no idea, but if you are a social media

22   person, you know these things have value.  Big value.  The

23   largest accumulation of a GoFundMe in the GoFundMe history at

24   this time.

25           So, we know Brian Kolfage is the owner, owns the list.

1   There is no evidence whatsoever, ladies and gentlemen, of him

2   selling that list.

3           Listen, Brian's an opportunist.  It is what it is,

4   right.  It is what it is.  Hero.  Massive hero, I mean

5   unbelievable.  You wouldn't want to be that he guy.  But there

6   is no evidence that that list is sold except to Tim Shea.  And

7   it has value.  I mean, that's what we are trying to say here.

8   That's reasonable doubt.  It has value.  But, Tim's represented

9   by counsel, so he was told not to file his taxes like we said.

10  Tim's represented by counsel here right now, ladies and

11  gentlemen.  And I'm here up here, you know, potentially make a

12  fool out of myself.

13          But, what's in the bank records, and what the

14  government hasn't showed you, ladies and gentlemen, is what I

15  asked you to really be patient for.  Because ladies and

16  gentlemen, in the summer of 2020, the bank called Tim Shea.

17  Unsolicited, maybe he's on his cell phone driving on the

18  highway.  And they ask him questions.  And I'm going to go

19  through those questions and answers right now and then I am

20  going to conclude.  And the government can come up here, but

21  this is in evidence.  This is GX 2000.

22          And you think if they thought this was important, and

23  it was good for them, they would have put it up, right, they

24  would have brought it up.  They are bringing up everything.

25  And truth be told, I didn't find this.  Clara and Angelica

1    found this.  There is no way on earth I would have ever found

2    this.

3            So on 6/15, Mr. Jordan Hill calls Timothy Shea.  And

4    they calling about all these transactions.  This is the end,

5    right, 2020.  Government doesn't have -- I believe they don't

6    have anything on their chart in 2020.  Right.  Let's go through

7    this.

8            What's your relationship to We Build the Wall?  He's

9    driving down the highway on the phone.  What type of business

10   is it, why did you send wires?  Why did they come from three

11   different accounts?  Who owns the business?  Please be as

12   detailed as possible.

13           Answer:  His wife works for We Build the Wall.  And is

14   a founder of the business.  The business is in support of

15   building the wall.  Her payroll was through wires up until this

16   month.  Now they use paper checks.  The owner of the business

17   name is Brian Koosage.

18           So, tell me, tell me the evidence in that thing.  Is

19   anything wrong with that?  You guys can verify that as truth.

20   Right?  Every answer in that you can verify as truth.

21           What is your relationship with Brian Freedom Daily?

22   What is the purpose of sending checks to them?  What type of

23   business is Freedom Daily?  What is Brian's relationship to the

24   business?  Please be as detailed as possible.

25           Now, ladies and gentlemen, if you want to ask Tim what

1   he was doing, here it is, buried in the bank accounts GX 2000.

2   GX 2000.  Just ask Judge Torres.  She'll give it to you if you

3   don't believe this.

4          Brian is the owner of We Build the Wall.  They're

5   going to dispute that, ladies and gentlemen?  No.  And Freedom

6   Daily.  Was -- was Timothy paying Brian for an e-mail list.

7   Freedom Daily is an e-mail newsletter.  Brian is the owner of

8   Freedom Daily as well.

9          I submit to you, ladies and gentlemen, that that is

10  the only piece of evidence in this entire case that where

11  someone asked Tim, not represented by counsel, in the middle of

12  nowhere, wherever he was at the time, on June 25, 2020.

13  June 15, 2020.  Well, he's in Texas on the 12th, that I can

14  prove to you through the bank records.  What does he say?  I

15  bought an e-mail list.  I bought an e-mail list.  That's what

16  he's telling the bank.  He maybe not even knew he's being

17  recorded.  And that's what he's saying, everything here is

18  true.  They talk about this guy Bill.  What's your relationship

19  with Bill?

20         They rent a home from him.  So they are paying him

21  rent.

22         They know that's true.  That's true too.  Everything

23  is true here.  He's buying a list.  That's reasonable doubt.

24  Reasonable doubt is not guilty.  And then they are talking

25  about PayPal transfers.  It is reimbursement for things we have

1    done.  They have paid their own money for.  So there is money

2    going back and forth.  That's reasonable doubt.  This is a

3    critical piece of evidence.  And if it was so bad for the

4    defense, why didn't they show it to you?  Because it's buried.

5    It is buried in the bank records.  And they know, they didn't

6    know we had Clara and Angelica.

7               MR. ROOS:  Objection.  The bank records are in

8    evidence.

9               THE COURT:  Overruled.

10              MR. MERINGOLO:  It's in evidence.

11              So, ladies and gentlemen, when you go back to -- first

12   of all, thank you, thank you for putting up with me.  It's

13   okay, you don't even know, I appreciate it.  I know no one woke

14   up and said I want to be on jury duty.

15              But, this is reasonable doubt, ladies and gentlemen.

16   You know, I ask you to use your common sense and the government

17   will come up here and say defense counsel, you go to prosecutor

18   school, defense counsel said this, defense counsel said that,

19   don't be misinterpreted what he says.  He's baiting and

20   switching and doing this and he is doing that, and I say pull

21   up the bank record when they call Tim Shea.  See what Tim Shea

22   had to say when they called him.  They want to know if we are

23   going to make a decision in federal court in the Southern

24   District of New York.  Wouldn't you want to know what Tim Shea

25   said?  That's reasonable doubt because that's the evidence in

M5v3she2                    Summation - Mr. Meringolo

1  the case.

2          Money is going back and forth.  That's reasonable

3  doubt.  There is no money coming from Bannon.  There is no

4  money from Freedom Daily going to Bannon.  There is only money

5  going back and forth.

6          Ranch Properties, not a shell company.  It is a single

7  member LLC.  Pull that $80,000 guy.  He can do whatever he

8  wants with the money.  Wants to be protected.  The evidence

9  will show you want to be protected from personal liability if

10 you're helping build a border wall.  If you are providing

11 security with armed guards.  If something happens, what happens

12 to you if you don't have a corporation?  And making it

13 nefarious that it's in Wyoming?  That he wants personal

14 liability.  He wants -- he doesn't want anybody to know him?

15         Ask what would I do -- I am not saying you would ever

16 be involved in this -- what would you do if you were?  Also,

17 the evidence shows there is no other income that year.

18 49-year-old guy.  He leaves his job.  And you know what he

19 believes?  That list is valuable like we all do.  Right?  Like

20 the GoFundMe guy did.  That's what the evidence shows, like we

21 know from our firsthand experiences, especially the people who

22 are in business.  They have a target market for 384,000 people

23 that bought it.  And who drafts that contract?  Richard Kaye

24 drafts that contract, the guy who got $600,000.

25         Thank you very much.  I submit to you, ladies and

M5v3she2

1    gentlemen, this is a reasonable doubt case.  And reasonable

2    doubt equals not guilty.  Thank you very much.

3          THE COURT:  Members of the jury, we're not finished

4    yet.  We will have the rebuttal from the government after a

5    brief break.  Remember that you are not allowed to discuss the

6    case yet.  We'll have rebuttal, then my instructions, and only

7    after I tell you that you're ready to discuss the case can you

8    start deliberating.  So don't discuss the case.  I'll call you

9    back shortly.

10          (Jury excused)

11          THE COURT:  I was hoping that the rebuttal would not

12    be lengthy so that I can get to my instructions before I have

13    them go to lunch.

14          MR. ROOS:  I think --

15          MR. SOBELMAN:  I am going to do my best.  I guess what

16    does your Honor mean by lengthy?

17          THE COURT:  Well, it's now --

18          MR. SOBELMAN:  He took maybe an hour and 20 minutes.

19    I was hoping to take 20 or so.

20          THE COURT:  So, the question would be whether or not

21    we have them have their lunch before they get their

22    instructions.  And if you are going to take 20 minutes, they

23    are going to be pretty hungry by then.  So, I'll allow them to

24    have their lunch before I start my instructions.

25          MR. SOBELMAN:  Okay.

1          THE COURT:  All righty.

2          MR. MERINGOLO:  Thank you, Judge.

3          THE COURT:  Yes.

4          (Recess)

5          (In open court; jury not present)

6          THE COURT:  Please have the jurors return.

7          (Jury present)

8          THE COURT:  Do the parties agree that the jurors are

9     present and properly seated?

10          MR. SOBELMAN:  Yes, your Honor.

11          MR. MERINGOLO:  Yes.

12          THE COURT:  Please be seated.

13          Members of the jury, we're now going to hear the

14     rebuttal by the government.

15          MR. SOBELMAN:  When Mr. Roos gave his summation, he

16     walked you step by step through the evidence that proves the

17     defendant's guilt beyond a reasonable doubt.  And as you know,

18     that evidence is overwhelming.

19          When defense counsel spoke, you didn't hear as much

20     about the evidence.  You heard arguments, passionate arguments.

21     He's fighting hard for his client.  You didn't hear a lot about

22     the evidence.  And this case isn't about the lawyers or

23     arguments.  It is about the evidence.

24          Let me be clear.  In our system, the defendant has no

25     burden.  It is the government that has the burden, as you know.

M5v3she2                          Rebuttal - Mr. Sobelman

1    We embrace that burden.  But we are entitled to respond to the

2    defense's arguments and this is my chance to do that.

3            I'm not going to respond to every argument.  He talked

4    I think for over an hour.  I'm going to keep this as short as I

5    can.  Most of what you heard was just a distraction, and I

6    think you already know that.  But I do want to touch on a few

7    of the main themes just to make sure everything is clear in

8    your minds.

9            Now, defense counsel put up notes from a bank

10   interview that the defendant had with a bank employee.  So

11   couple things he didn't tell you or didn't show you.  Let's

12   take a look at the rest of the page.  If we go to Government

13   Exhibit 2000, page 548983.

14           So, if we look at the top of the page, you'll see why

15   this interview took place.  The bank flagged these transactions

16   as suspected money laundering, as suspected fraud.  The bank,

17   using the same tools Mr. Palmer told you about, saw the same

18   thing that you saw in this trial.  The use of half a dozen

19   money laundering techniques.  That's why they're reaching out

20   to him.

21           The second thing defense counsel didn't tell you and

22   didn't point out to you is this occurs in May 2020, months

23   after the defendant learns about the federal investigation.

24   Months after he and Brian Kolfage and their co-conspirators get

25   their stories straight, and make those fake backdated

1   agreements.  At this point, May 2020, it is an easy lie for the

2   defendant to tell.  It's been cooked up months ago.  This is

3   only more proof of the defendant's guilt.

4         By the way, it is not something the government hid.

5   It is in the government's own exhibit.  For defense counsel to

6   say otherwise just isn't true.  It is easily dismissed, and if

7   you want to read it at all, it is just another lie that the

8   defendant told.

9         It is obviously not a defense to fraud and money

10  laundering to say, well, I lied to the bank too when they asked

11  me about the same thing.

12        Similarly, the defense tried to suggest that there

13  might be other evidence out there that the government didn't

14  present in court.  There is all these phones, there's Signal,

15  there's Wickr.  Well, the judge is going to give you an

16  instruction about this, and that's how you'll know that you can

17  totally dismiss this argument.  The judge will tell you:

18  During the questioning of some witnesses, the defense asked

19  whether those witnesses reviewed certain devices or materials

20  that are not in evidence.  I -- the judge, not me -- instruct

21  you that each party had an equal opportunity or lack of

22  opportunity to review those devices and materials and offer

23  them into evidence.

24        When the judge gives that instruction, listen to it,

25  and understand that the evidence you have is overwhelming proof

M5v3she2                    Rebuttal - Mr. Sobelman

1   of the defendant's guilt, and you don't need to speculate what

2   might be out there that wasn't brought into this court.

3          Defense counsel talked a little bit about Winning

4   Energy.  And first, I think he wanted to have it at least two

5   ways, maybe three.  First it was it doesn't matter, it is not

6   charged in this case, you shouldn't pay attention to it at all.

7   And later in his summation, his argument changed and it was

8   it's really important evidence, because it shows you that they

9   committed the fraud two different ways, and that means that

10  they didn't commit the fraud at all.

11         Both arguments are wrong.  It is part of the charged

12  crime.  It occurred during the charged conspiracy.  It is part

13  of the fraud conspiracy.  It is part of the money laundering

14  conspiracy.

15         MR. MERINGOLO:  Objection, your Honor.  It's not.

16         THE COURT:  Overruled.

17         MR. SOBELMAN:  And it is another example of how

18  Kolfage and Tim Shea defrauded We Build the Wall, took donors'

19  money, and spent it on something for themselves.  A private

20  business that they had and that they were partners in on the

21  side.  A classic money laundering technique.  Take the money

22  out, put it into a different business, use that money to try to

23  make more money.  That's what Winning Energy is all about.

24         And defense wants to say, well, they pretended it was

25  a loan, and therefore, because they didn't submit fake

1     invoices, like the other false fraudulent transactions, somehow

2     you should read something into that.

3              This is what you can read into it.  The timing, it is

4     in 2020.  It is after the defendant and Mr. Kolfage know

5     federal investigators are looking at them.  So they do two

6     things differently.  One, they paper it as a loan.  Probably

7     because it would have been really unbelievable that Winning

8     Energy, an energy drink company, was doing some kind of work

9     for We Build the Wall.  And second, they actually paper it at

10    the time it happens as opposed to backdating it.  This time

11    they know they need to have something to show investigators

12    later.  So they do it at the time.

13             But the loan never gets paid back, even though the

14    text messages that you saw in closing from the government show

15    you they're actually selling these drinks, they're making

16    money, but not a dollar of the loan gets paid back because it's

17    not a real loan.  It is just self-dealing.  It is just part of

18    the fraud.

19             Defense counsel talked about Kris Kobach a little bit.

20    He wants you to focus on, oh, there is a lawyer who worked for

21    We Build the Wall and he was paid a lot of money working for We

22    Build the Wall.  Who cares how much Kris Kobach made.  The

23    point of this is Kris Kobach was lied to.  The defendant and

24    Kolfage hid things from him.  It is in a stipulation.  It is

25    not disputed at all.  You saw the conflict of interest policy.

M5v3she2                        Rebuttal - Mr. Sobelman

1   You know that Kris Kobach was the general counsel, he was the

2   top lawyer for We Build the Wall, he was a member of the board

3   of directors.  And that Kolfage and Tim Shea, because he's

4   married to the treasurer and another member of the board,

5   Amanda Shea, they can't self-deal without disclosing it to the

6   board and getting approval.  And you know that never happened

7   for any of the transactions with Winning Energy or Ranch

8   Property.  Not one of them.  Not they went for one and they

9   forgot for the other, but they went for 2019 and didn't go in

10  2020 or they went for 2020 but didn't go in 2019.  Kris Kobach

11  knows about not a dollar going out.  Because they know if he

12  knew, he'd say no.  This is a misuse of our funds.  You are not

13  just going to skim off the top of donor money.

14          There is nothing in that stipulation that's helpful to

15  the defense.  The fact that someone else told Kris Kobach at

16  some point that Tim Shea was involved in security is not a

17  defense to this case.

18          Now relatedly, defense counsel suggested Tim Shea's

19  just this hard-working guy, who got paid for the work he did,

20  there is nothing wrong with getting paid for work that you do.

21  He actually earned all this money.

22          And it's not clear what defense counsel is exactly

23  trying to get you to believe.  He says he is just a real estate

24  guy so he knows real estate.  But then later he said, well, he

25  is a social media guy, all he knows is social media.  Then we

M5v3she2                      Rebuttal - Mr. Sobelman

1    see documents about drones, we see documents about security.

2    We see an e-mail to landowners that never got sent.

3           And just remember, for each of the invoices you saw,

4    including the ones defense counsel put up, there is a chart in

5    evidence showing how those invoices, the ones that were

6    actually sent to We Build the Wall, came with a kickback.  Came

7    with a cut for Tim Shea, and a kickback to Brian Kolfage.  What

8    kind of legitimate work arrangement could that possibly be?

9    It's not.

10          And by the way, when you do work, you get paid.  But

11   when you do work, do you mark it up two-and-a-half times when

12   someone else does the work?  And then give a cut of your part

13   to someone else the same day?  Of course not.  Your common

14   sense tells you exactly what's going on here, which is Tim Shea

15   scamming people, he's using money to buy energy drinks that he

16   can sell for his own profit and for Brian Kolfage's profit.

17   That's not honest.  That's not hard work.  Marking up other

18   people's invoices takes about 30 seconds.  To say that, like

19   one of the invoices has four or six former military people were

20   guarding the construction site.  Of course they deserve to be

21   paid for that work.  No one is saying otherwise.  But to spend

22   30 seconds creating your own invoice to bill for someone else's

23   work that you can take two-and-a-half times more than?  That's

24   dishonest.  That's fraud.

25          By the way, what did he do with all the money that he

M5v3she2                        Rebuttal – Mr. Sobelman

1    pretended to earn?  The cuts that he was taking from other

2    people's work?  He didn't invest it in his business RPMM.  He

3    didn't pay employees, he didn't use it to pay his taxes.

4    Instead he paid kickbacks and he paid off his own credit card

5    bills.  He bought a $70,000 Range Rover.  That's what he's

6    doing with the money.

7         Remember, the brilliant part of the scheme, and it

8    wasn't perfect, they're not perfect criminals, but the

9    brilliant part of the scheme is to insert Tim Shea in all these

10   different business arrangements where there is some work going

11   on.  There is security contractors, maybe they are hiring

12   someone to fly a drone.  But they insert him in the middle.

13   And the question is why?  And you know from the invoices and

14   the bank records and the text messages exactly why.  They want

15   an opportunity to take their cut in secret.  And if he's in the

16   middle, he can do that.

17        There is some e-mails where you saw Tim Shea initially

18   just forwards the Vision Quest invoice for security to We Build

19   the Wall.  They could have just paid it directly.  And then the

20   next day, he sends a new one on RPMM stationery for like

21   $30,000 more for the same work.  Why?  So he can take a cut and

22   pay a kickback.  There is no other reason.

23        Now there is a text message I want to pull up real

24   quick, Government Exhibit 32, that defense counsel showed the

25   beginning of the exchange.  So it is April 5, 2019, early in

M5v3she2                        Rebuttal – Mr. Sobelman

1    the scheme.  And this is where Brian Kolfage says good job,

2    Tim, I heard your new company found a bunch of land for us.

3    Smiley face.

4            This is clearly a joke.  Okay.  And if you weren't

5    sure just based on that and the fact that Amanda Shea laughs at

6    it lower down, they don't say thank you.  Thanks for

7    appreciating our hard work.  Like, Brian Kolfage even says

8    Ranch Property Management, because he knows the joke might not

9    make sense if he doesn't explain what he's talking about.

10   Amanda Shea then jokes back RPMM is top notch.  Brian

11   Kolfage –– this is the part that defense counsel didn't read to

12   you because it's not good for him.  He says you hear?  You

13   hear?  We just got two big ones, meaning two properties.  Two

14   land properties.  Tim Shea doesn't say I know, I'm the one who

15   got the property.  I've been working very hard and getting paid

16   legitimately.  He says no, where is it?  Because he has no idea

17   this is going on.  No idea.  He's not involved.  Kolfage is

18   joking with him.  They are going to pay him for something he

19   didn't do, because that's how they get their cut.  So Tim

20   writes back.  No, where is it?  And Kolfage says call me.

21   Probably doesn't want to explain the whole thing in text

22   message.  And the kicker is Amanda Shea says I was kidding

23   about the raise.  I'm 10 times happier with RPMM.  LOL.

24   Meaning, I'm very happy with the arrangement we recently agreed

25   to, for us just to get a cut from other people's work.  I don't

M5v3she2                    Rebuttal - Mr. Sobelman

1    want a raise for my $70,000 salary because I know Tim will get

2    400K this year for doing very little.  Riding on other people's

3    backs.

4           Now defense counsel also suggested it's some kind of

5    defense because a wall was built.  Now, we told you, Ms. Moe

6    told you in her opening statement there is no dispute that a

7    wall was built.  That many millions of the dollars that were

8    raised were used to build that wall.  This is a complete

9    distraction.  Building a wall isn't a defense to stealing, it

10   is not a defense to lying, it is not a defense to money

11   laundering, it is not a defense to obstruction of justice.

12   This case is not about whether a portion of a wall was built or

13   how long it was or how much money was spent on it.  None of

14   that matters.

15          Judge Torres will read you the legal instructions, and

16   there is not going to be one thing in there that says, well, if

17   they built part of the wall, the defendant might not be guilty.

18   That's just not the law.  He's guilty either way.

19          That makes sense, right?  You can't raise millions of

20   dollars, steal a bunch of it, and say, but it's okay because I

21   didn't steal all of it.  We actually used some of it for the

22   things we promised people we would use it for.

23          And ask yourself, why is defense counsel so focused on

24   the wall?  It is an attempt to distract you from the evidence

25   that really matters.  If you focus on that evidence, the text

1    messages, the e-mails, the bank records, defendant's done.

2    Right.  He's guilty.  Wall or no wall.

3           Defense counsel also talked a lot, very loudly, about

4    Rich Kaye who you know is a lawyer who did some work for We

5    Build the Wall.  He even put up the payments going from We

6    Build the Wall to his law firm, as if that proves anything at

7    all.  Remember, Rich Kaye was, first of all, We Build the

8    Wall's lawyer, right, not Tim Shea's lawyer.  No evidence in

9    this trial that he was Tim Shea's lawyer, that he provided any

10   legal advice to Tim Shea, that he had any conversations with

11   Tim Shea, that he talked to Tim Shea about anything.

12          He also talked about other law firms.  We didn't even

13   hear about those law firms during the trial.  There was a list

14   of law firms and other money they were paid.  I am not sure

15   what he's suggesting about that, but it's meaningless.

16          Now, Judge Torres is going to instruct you that this

17   is not a defense.  I expect she'll instruct you the defense has

18   not claimed and cannot claim that the defendant's conduct was

19   lawful, because he acted in good faith on the advice of a

20   lawyer.  She will also instruct you that a lawyer's involvement

21   with an individual or entity does not itself constitute a

22   defense to any of the charges in the case.

23          And your common sense tells you this makes perfect

24   sense.  You can't create fake documents and then claim it's

25   okay just because a lawyer was involved in some way.  You can't

1    sign a fake contract just because someone else sent it to you.

2    Tim Shea, not Rich Kaye, is the one who stole the money,

3    laundered it, and kept a cut.  Tim Shea, not Rich Kaye, is the

4    one who signed his name to that fake backdated contract.  Rich

5    Kaye or any of the other lawyers provide no defense in this

6    case.

7            Defense counsel also argued in his opening and his

8    closing about aftertax dollars.  He's using aftertax dollars,

9    you can do whatever you want with your aftertax dollars.  This

10   is America.  You can do whatever you want with your money.

11           There's a lot of things you can't do with your money,

12   right.  That's why we have laws.  But the premise is totally

13   flawed, so before I get to the major point of you just can't do

14   whatever you want with your money, which is obvious.  The

15   premise is flawed.

16           One, he files his taxes in August 2020, after they

17   were due, long after they were due, and he doesn't pay a

18   dollar.  This isn't aftertax money.  He's paying these

19   kickbacks before he files his taxes, and then when he belatedly

20   files them, he leaves things out, as you know.  And he doesn't

21   pay a dollar.

22           So the idea that, well, this is a hardworking guy who

23   pays his taxes on time, and then he just uses his money to give

24   it to people that coincidently happen to fit into the kickback

25   schedule that his co-conspirators agreed to, you can reject all

M5v3she2                        Rebuttal - Mr. Sobelman

1    of that.

2              Now, back to the first point.  You can't just do

3    whatever you want with your money.  Judge Torres will read you

4    the legal instructions.  She'll explain to you it is illegal to

5    pay kickbacks.  It is illegal to transfer more than $10,000 in

6    crime proceeds.  She'll explain to you it is illegal to move

7    stolen money to conceal its source or destination.

8              It isn't the case if I receive money, even if it is

9    crime proceeds from the crime I committed, and then I can just

10   do whatever I want with it as long as I later tell the IRS I

11   received some money.  Not a defense.  Not at all.

12             By the way, the money we've been talking about, it is

13   not even Tim Shea's money.  Right?  He was saying it was his

14   money.  No, it is donors' money.  This is money that he and

15   Kolfage and others were stealing.  It is We Build the Wall's

16   money.  It is donors' money.  It is Ms. Keller's money.  It is

17   Mr. Ward's money.  50 and $100 at a time that he's taking out

18   tens and hundreds of thousands of dollars.

19             So even if you could do what you wanted with your own

20   money, which you can't, even in America.  You certainly aren't

21   allowed to do what you want with other people's money.

22             Now Mr. Meringolo spent some time on this idea of a

23   shell company.  He says, well, if they did some work, the whole

24   case falls apart because then it is not a shell company.  Judge

25   Torres will read you the legal instructions.  You won't hear

1   anything about a shell company.  The point of you hearing about

2   that through the trial, which I think you all understand, is

3   that you can't use another company for fraud.  Whether it does

4   a little business, whether it does a lot of business, doesn't

5   matter.  The point about Ranch Property is it was set up in a

6   certain way that has all the hallmarks of being a vehicle for

7   money laundering.  Right.  It has a generic name, set up in

8   Wyoming.

9       Oh, and defense counsel says he didn't want people to

10  know he owned it for safety reasons or something like that.

11  Political reasons.  This is the guy who's married to the woman

12  who is a front person for We Build the Wall.  She is the

13  treasurer, she is the CFO, she is in all the filings.  You saw

14  she is on the website.  He and her are both posting publicly on

15  Facebook and other places about We Build the Wall.  They are

16  not exactly embarrassed or hiding their participation in it.

17      And, by the way, Winning Energy is certainly just as

18  political as We Build the Wall, and he's putting himself out

19  there on that.  You heard from Ms. Deperi, on social media he's

20  saying I am the CEO of Winning Energy.  And they're putting

21  that stuff online everywhere.  So that excuse holds no weight.

22  And it doesn't explain the fact that they create the splash

23  page for legitimacy, and they use the company's accounts over

24  and over as a passthrough.

25      And you saw with the SBA loan too.  There is no

1    business expenses.  He just takes it out and spends it.  There

2    is no business that they're running.  Whatever you want to call

3    it, shell company, passthrough, it was used in this case, in

4    the facts that matter, as a vehicle for money laundering.

5             Defense counsel also tried to focus your attention on

6    a bunch of unrelated irrelevant money transfers from Freedom

7    Daily's bank account to the Sheas.  This was the handwritten

8    exhibit.  You also know this is a distraction for at least

9    three reasons.  First, this money doesn't come from We Build

10   the Wall.  Right.  This case is about money stolen from We

11   Build the Wall, laundered, kicked back.  That's the money we

12   followed during this trial.  The fact that they're business

13   partners for other things, and they're passing back money to

14   each other that, by the way, as you know from the IRS

15   testimony, and Government Exhibit 911, Tim Shea never reports

16   this on his taxes, right.  Kind of undermines the he just uses

17   aftertax dollars.  Well, maybe when he reports things.  He

18   doesn't report this.  But this money has nothing to do with We

19   Build the Wall.  Has nothing to do with the kickbacks.  It is a

20   total distraction.

21            Second, you saw these transfers started before the

22   defendant and Kolfage even came up with We Build the Wall and

23   they continued after.  They don't line up with the kickback

24   schedule.  They're not relevant.  There is no connection.  So

25   the question before you is, where did the stolen We Build the

Wall money go?  That chart, those bank records don't help you

answer that question.  Whatever side hustle Brian Kolfage and

Tim Shea had in addition to all this other activity, all this

fraud, all this money laundering, it just doesn't matter.

By the way, the kickbacks for the wall money only went

one way.  You don't see any money going to Brian Kolfage and

then going to Tim Shea.  It is all going one way.

Just one or two more things.  Defense counsel talked a

lot about this donor list agreement.  This backdated agreement.

He said well, the list was really valuable.  Remember

Mr. Palmer talked to you about different covers people have for

transactions, especially backdated.  He said sometimes -- the

example he gave was a car.  Like saying well, there a is fake

transfer document for this car, but like it says Ferrari, and

Ferraris are worth a lot of money, man, so it must have really

happened.

No.  The fact that this list might have been worth a

lot of money provides no defense to the defendant.  That

agreement, that backdated agreement that they only made after

learning about the investigation to try to fool investigators,

what do we know about it?  How do we know they didn't have some

kind of handshake agreement earlier?

First, the defendant's own text messages, which I

won't go through again but Mr. Roos showed you, Government

Exhibit 41 in case you want to take a look, show there was no

M5v3she2                              Rebuttal - Mr. Sobelman

1    deal.  There was a series of text messages in June and July
2    months after this agreement was supposedly in place where they
3    are saying -- where Tim Shea is saying, wow, a list, that
4    sounds really complicated, I don't know anything about how to
5    do that.  And there is another e-mail where he says maybe we
6    can do some kind of side business to make more money out of
7    this We Build the Wall thing.  Maybe something with an e-mail
8    list.

9          Defense counsel didn't talk about those text messages
10   or e-mails because there is no good response from them.  They
11   mean what they say and they say what they mean.  There was no
12   agreement.  It didn't exist.  Not until they learned about the
13   investigation.

14         Now, another reason why this makes no sense.  The fact
15   that deal would have ever existed, which is Kolfage and Shea
16   are partners in We Build the Wall and other things as you know.
17   And Government Exhibit 15, there is a text message exchange
18   very early on in December 2018, where they are saying, well,
19   I'm thinking maybe -- and this is Kolfage talking -- maybe
20   we'll make you, meaning Tim Shea or Amanda, the president of We
21   Build the Wall.  Turns out they decide to make Kolfage the
22   president.  But they are equals here.  And it would make no
23   sense for Tim Shea to pay $150,000 to his business partner for
24   something that they basically co-owned to the extent anyone
25   owns it.  Why would Tim Shea, who is a partner in We Build the

M5v3she2                         Rebuttal - Mr. Sobelman

1   Wall, pay Kolfage for We Build the Wall's list that he also

2   owns?  It makes no sense and your common sense tells you that

3   would have never happened.

4           Also, why would Tim Shea have agreed to spend $150,000

5   of his own money for a brand-new company, money that his

6   company doesn't have, right, the balance is zero before each We

7   Build the Wall payment comes in, or sometimes it is $100 or

8   $2,000.  It is close to zero.  He agrees to spend $150,000 to

9   buy a list of e-mail addresses that of course he already has,

10  but also what's he going to do with them?  What's he going to

11  do with a $150,000 e-mail list?  The only business RPMM ever

12  did with anyone, and the only transactions they ever had with

13  anyone is with We Build the Wall.  So what's he going to do?

14  He is going to rent the list from We Build the Wall and then

15  sell it to We Build the Wall?  Like, it doesn't make any sense

16  because it didn't happen.  It was just a cover story.

17          Now defense counsel criticized us, he says, well, the

18  people who testified, they were only talked to weeks or months

19  before the trial.  They weren't all interviewed before the

20  indictment, before the defendant was arrested.  And you know

21  that's the case for at least two reasons.  And you know why

22  that's the case for at least two reasons.  One is you know from

23  the subpoena and Billue's testimony, the investigation was

24  secret to prevent obstruction of the exact type that Tim Shea

25  engaged in.  Right.  The government's not going to go around

1    interviewing dozens of people from around the country, when

2    there is a secret investigation going on to prevent

3    obstruction.

4         Second, and most importantly, the evidence in this

5    case as you know is devastating.  And it is in text messages

6    and it is in e-mails and it is in bank records.  Things that

7    don't need to be interviewed.  You don't have to ask a bank

8    record a question to know what happened.  You don't have to ask

9    a text message a question to know what happened.  That's the

10   most important evidence in this case.  Any suggestion otherwise

11   is wrong.

12        Defense counsel had this whole thing, common sense,

13   and reasonable doubt, and the thing he repeated over and over

14   and over.  I'll just say this about reasonable doubt.  You

15   heard a lot about it from him.  You'll hear a little more from

16   the judge.  But just remember this.  There is nothing mystical

17   or magical about the term reasonable doubt.  It is the very

18   same standard that's applied in every criminal case every day

19   in the country and has been since its founding.  Every day

20   juries reach verdicts.

21        Defense counsel also suggested that maybe Bill Ward

22   somehow didn't care that Tim Shea was stealing money from We

23   Build the Wall.  The argument I thought came out a little

24   unclear.  But, the real question is this.  And defense counsel

25   read a few questions about -- the colloquy with Bill Ward.  Oh,

M5v3she2                        Rebuttal - Mr. Sobelman

1   well, Bill Ward said people could get paid for doing security.

2   Defense counsel didn't ask Bill Ward, and I think you know why,

3   would it have been okay with you if someone had taken the

4   security invoices, doubled them, and then kept the difference?

5   And then paid a kickback with some of that?  He didn't ask him

6   would it be okay if the treasurer's husband had self-dealed

7   with the organization, and violated the conflict of interest

8   rules to take money for his own energy drink company without

9   telling the other members of the board of directors.

10              (Continued on next page)

1          MR. SOBELMAN:  No questions like that were asked,

2     right.  And we all know how Bill Ward would have answered; we

3     all know how Nicole Keller would have answered; we all know how

4     the other 380,000 people that Tim Shea defrauded would have

5     answered.  They would have said, No, that would not have been

6     okay with me.

7          No one donates to a nonprofit thinking that the

8     nonprofit is going to loan money to an energy drink company.

9     No one donates to a nonprofit so that someone who is business

10    partners with the president can insert himself in otherwise

11    legitimate transactions so he can take his cut; so he can buy a

12    $70,000 Range Rover.  Bill Ward would not be okay with that,

13    and neither should you.

14         Now, when we started this trial, Ms. Moe asked you to

15    do three things:

16         First, pay close attention to the evidence.  You've

17    done that.  We thank you very much for that.

18         Second, follow Judge Torres's instructions on the law.

19    She's going to give you those instructions later this

20    afternoon.

21         Third, use your common sense, the same common sense

22    you use every day.

23         Now don't let defense counsel distract you.  Don't be

24    swayed by emotions or sympathy or yelling or banging on the

25    table or running around or tearing things down and crossing

M5VVSHE3                    Rebuttal - Mr. Sobelman

1   things out and ripping things up.  Just look at the evidence

2   and the law.  Use your common sense.  If you do those things,

3   you will quickly see that the evidence is overwhelming.  It

4   proves that Tim Shea defrauded donors, donors like Nicole

5   Keller, Bill Ward, donors who trusted them with their $50,

6   their $100, who donated to a cause they believed in.  They

7   trusted that people like Tim Shea, like the defendant, wouldn't

8   steal from them.  But he did.

9          The evidence also proves that Tim Shea defrauded We

10  Build the Wall.  It proves that Tim Shea laundered the money he

11  stole.  And it proves that Tim Shea signed a fake, backdated

12  agreement, a fake contract to cover up his crimes.

13         He's guilty.

14         THE COURT:  Members of the jury, it's lunchtime.  And

15  so we will take an hour for lunch, and then you'll come back

16  and you'll hear my instructions on the law.

17         It's very, very tempting, now that you have heard the

18  summations, that you'll feel that you're ready to talk about

19  the case.  But you're not.  Only after I give you my

20  instructions are you permitted to start discussing the case.

21         So don't discuss the case.  Don't let anyone discuss

22  it in your presence.  Have a good lunch.

23         We'll be back in an hour.

24         (Jury not present)

25         THE COURT:  Have a good lunch.

 1            (Luncheon recess)

 2                 A F T E R N O O N   S E S S I O N

 3                          2:45 P.M.

 4            (Jury present)

 5            THE COURT:  Do the parties agree that all jurors are

 6     present and properly seated?

 7            MR. SOBELMAN:  Yes, your Honor.

 8            MR. MERINGOLO:  Yes, your Honor.

 9            THE COURT:  Please be seated.

10            Members of the jury, I have your instructions on your

11     chairs.  I'd like you to read along with me silently.

12            We're going to start on page 5.

13            Ladies and gentlemen of the jury, we are now

14     approaching the most important part of this case, your

15     deliberations.  It has been obvious to me and to counsel that

16     until now, you have faithfully discharged your duty to listen

17     carefully and to observe each witness who testified.  I ask

18     that you give me that same careful attention as I read these

19     instructions.

20            You have now heard all the evidence in the case, as

21     well as the final arguments of the lawyers.  My duty at this

22     point is to instruct you on the law.  It is your duty as jurors

23     to follow the law as I state it and to apply the law to the

24     facts as you find them from the evidence presented.

25            On these legal matters, you must take the law as I

M5VVSHE3                         Charge

1    give it to you.  If an attorney has stated a legal principle

2    different from any that I state to you in my instructions, it

3    is my instructions that you must follow.  Moreover, you should

4    not single out any instruction as alone stating the law.

5    Instead, you should consider my instructions as a whole when

6    you retire to deliberate in the jury room.  You should not, any

7    of you, be concerned about the wisdom of any rule that I state.

8    Regardless of any opinion that you may have as to what the law

9    may be or what it should be, it is your sworn duty to base your

10   verdict upon the law as I give it to you.

11           Your final role is to pass upon and decide the fact

12   issues in this case.  You, the members of the jury, are the

13   sole and exclusive judges of the facts.  You pass upon the

14   weight of the evidence; you determine the credibility of the

15   witnesses; you resolve such conflicts as there may be in the

16   testimony; and you draw whatever reasonable inferences you

17   decide to draw from the facts as you have determined them.  I

18   shall later discuss with you how to determine the credibility

19   or believability of the witnesses.

20           In determining the facts, you must rely upon your own

21   recollection of the evidence.  What the lawyers have said in

22   their opening statements, in their closing arguments, and in

23   their objections is not evidence.  Nothing that I may have said

24   during the trial or may say during these instructions

25   constitutes evidence.

1            Questions asked by the attorneys or even myself are

2     not in and of themselves evidence.  Only questions coupled with

3     answers are evidence.  Therefore, you may not infer any fact

4     from the mere asking of a question.  Moreover, you may not

5     consider any answer that I directed you to disregard or that I

6     directed struck from the record.

7            The evidence in this case consists of the sworn

8     testimony of the witnesses, on both direct and

9     cross-examination; the exhibits received in evidence; and the

10    stipulations of the parties.  By contrast, you may not consider

11    exhibits that were marked for identification or any other

12    document you may have seen but not received as evidence.  Only

13    those exhibits actually received may be considered as evidence.

14           Similarly, testimony that has been excluded, stricken,

15    or that you may have been instructed to disregard is not

16    evidence and must be ignored.  Some evidence has been received

17    for limited purposes only.  When I have given you a limiting

18    instruction as to such evidence, you must follow that

19    instruction and consider such evidence only for the limited

20    purpose that I allowed.

21           Obviously anything you may have seen or heard outside

22    the courtroom is not evidence.  Nothing I have said or done

23    should be used by you to determine whether the government has

24    met its burden of proof.  I have no view as to whether the

25    government has met its burden, and you should not infer that I

1    do from anything that I have said or done.

2              You should draw no inference or conclusion for or

3    against any party by reason of lawyers making objections.

4    Counsel not only have the right, but the duty, to make legal

5    objections when they think that such objections are

6    appropriate.

7              Also, do not draw any inference from any of my

8    rulings.  The rulings I have made during trial are not any

9    indication of my views of what your decision should be as to

10   whether or not the defendant has been proven guilty beyond a

11   reasonable doubt.  You should draw no inference or conclusion

12   of any kind, favorable or unfavorable, with respect to any

13   witness or any party in the case, by reason of any comment,

14   question, or instruction of mine.

15             The defendant has pleaded not guilty to the charges in

16   the indictment.  Because the defendant has pleaded not guilty,

17   the burden is on the prosecution to prove guilt beyond a

18   reasonable doubt.  This burden always remains with the

19   government and never shifts to the defendant.  Indeed, the law

20   never imposes upon a criminal defendant the burden of proving

21   his innocence or even the duty of calling any witness or

22   producing any evidence at all.

23             The law presumes a defendant innocent of all charges

24   against him.  I therefore instruct you that you must presume

25   the defendant innocent throughout your deliberations until such

1   time, if ever, as you as a jury are unanimously satisfied that

2   the government has proven the defendant's guilt beyond a

3   reasonable doubt.

4           The defendant began the trial with a clean slate.

5   This presumption of innocence alone is sufficient to acquit

6   unless you are unanimously convinced beyond a reasonable doubt

7   of the defendant's guilt, after a careful and impartial

8   consideration of all the evidence against him.  If the

9   government fails to overcome the presumption of innocence and

10  does not sustain its burden of proving guilt beyond a

11  reasonable doubt with respect to the defendant, you must find

12  the defendant not guilty.

13          The presumption of innocence was with the defendant

14  when the time began and remains with him even now as I speak.

15  It will continue into your deliberations unless and until you

16  are convinced that the government has proven the defendant's

17  guilt beyond a reasonable doubt.

18          In determining whether the government has satisfied

19  its burden of proving the defendant's guilt beyond a reasonable

20  doubt, you may consider all the evidence presented, whether by

21  the government or the defense.  In doing so, remember that even

22  though the defendant may have introduced evidence, the burden

23  of proof remains on the government.

24          I have said that the government must prove the

25  defendant's guilt beyond a reasonable doubt.  The question then

M5VVSHE3                          Charge

1   is what is a reasonable doubt?  The words almost define

2   themselves.  It is doubt based upon reason and common sense.

3   It is doubt that a reasonable person has after carefully

4   weighing all of the evidence.  It is doubt which would cause a

5   reasonable person to hesitate to act in a matter of importance

6   in his or her personal life.

7           Proof beyond a reasonable doubt must, therefore, be

8   proof of such a convincing character that a reasonable person

9   would not hesitate to rely and act upon it in the most

10  important of his or her own affairs.  A reasonable doubt is not

11  a caprice or whim.  It is not a speculation or suspicion.  It

12  is not an excuse to avoid the performance of an unpleasant

13  duty.  And it is not sympathy.

14          In a criminal case, the burden is at all times on the

15  government to prove guilt beyond a reasonable doubt.  The law

16  does not require that the government prove guilt beyond all

17  possible doubt or to a mathematical certainty.  On the other

18  hand, it is not sufficient to prove that the defendant is

19  probably guilty.  Proof of guilt beyond a reasonable doubt is

20  proof that leaves you so firmly convinced of the defendant's

21  guilt, that you have no reasonable doubt of the existence of

22  any element of the crime or of the defendant's identity as the

23  person who committed the crime.

24          A reasonable doubt may arise from evidence or lack of

25  evidence.  If, after a fair and impartial consideration of all

1    the evidence, you are satisfied of the defendant's guilt beyond

2    a reasonable doubt as to the charge you are considering, it is

3    your duty to find the defendant guilty.  On the other hand, if

4    after a fair and impartial consideration of all the evidence,

5    you have a reasonable doubt, then you must find the defendant

6    not guilty of that charge.

7             There are two types of evidence which you may properly

8    use in deciding whether the defendant is guilty or not guilty

9    of the charged crimes:  Direct and circumstantial evidence.

10            Direct evidence is evidence that proves a disputed

11   fact directly.  For example, where a witness testifies to what

12   he or she saw, heard or observed, that is called direct

13   evidence.

14            Circumstantial evidence, by contrast, is evidence that

15   tends to prove a disputed fact by proof of other facts.  To

16   remind you of the example that I gave you at the beginning of

17   the trial, suppose that when you came into the courthouse today

18   the sun was shining, it was a nice day, but that the courtroom

19   shades were drawn and you could not look outside.  Then later,

20   as you were sitting here, someone walked in with a dripping wet

21   umbrella; and soon after someone else walked in with a dripping

22   wet raincoat.

23            Now, on our assumed facts, you cannot look outside the

24   courtroom and you cannot see whether or not it is raining.  So

25   you have no direct evidence of that fact.  But on the

1   combination of facts about the umbrella and the raincoat, it

2   would be reasonable for you to conclude that it had been

3   raining.

4        That is all there is to circumstantial evidence.

5   Using your reason and experience, you infer from established

6   facts the existence or the nonexistence of some other fact.

7   Many material facts, such as a person's state of mind, are not

8   easily proved by direct evidence.  Usually, such facts are

9   established by circumstantial evidence and the reasonable

10  inferences you draw.  Circumstantial evidence is of no less

11  value than direct evidence, for it is a general rule that the

12  law makes no distinction between direct and circumstantial

13  evidence, but simply requires that before convicting a

14  defendant, the jury must be satisfied of the defendant's guilt

15  beyond a reasonable doubt from all of the evidence in the case.

16       Now, whether the circumstantial evidence leads you

17  inevitably to a particular inference is another matter.  Let me

18  give you another example.  Let's say that one evening you go

19  into a subway station.  It's a local stop and it's not rush

20  hour.  You arrive at the platform and you are surprised to find

21  a large crowd of people waiting on the platform.  You didn't

22  expect there to be so many people, but there are lots of people

23  waiting.

24       Now, you might infer from this fact that there must

25  not have been a train for quite some time.  But is that an

1   inference you must draw from the circumstantial evidence of a

2   crowded subway platform?

3          It is certainly a weaker inference than the one about

4   the umbrella and the raincoat, because if you think more about

5   it, maybe there are other equally plausible explanations.

6   Maybe there was a train just a minute ago that went out of

7   service and they said, Everybody off the train.  Or maybe it's

8   10:30 p.m. and you're waiting at the 50th Street stop of the

9   No. 1 train, and a Broadway show has just let out.  There is

10  more than one plausible possible explanation.  So in this

11  example, you wouldn't have as strong a basis for drawing any

12  one particular inference.

13         It must be clear to you by now that counsel for the

14  parties are asking you to draw very different conclusions about

15  some of the factual issues in this case.  An important part of

16  that decision will involve making judgments about the testimony

17  of the witnesses that you have listened to and observed.   In

18  making these judgments, you should carefully scrutinize all of

19  the testimony of each witness, the circumstances under which

20  each witness testified, and any other matter in evidence that

21  may help you to decide the truth and the importance of each

22  witness's testimony.

23         Your decision whether or not to believe a witness may

24  depend on how that witness impressed you.  Was the witness

25  candid, frank, and forthright?  Or did the witness seem to be

1   evasive or suspect in some way?  How did the way the witness

2   testified on direct examination compare with how the witness

3   testified on cross-examination?  Was the witness consistent or

4   contradictory?  Did the witness appear to know what he or she

5   was talking about?  Did the witness strike you as someone who

6   was trying to report his or her knowledge accurately?  What was

7   the witness's demeanor like?  These are examples of the kinds

8   of common sense questions you should ask yourselves in deciding

9   whether a witness is or is not truthful.

10          In addition, you may consider whether a witness had

11  any possible bias or relationship with a party or any possible

12  interest in the outcome of the case.  Such a bias or

13  relationship does not necessarily make the witness unworthy of

14  belief.  These are simply factors that you may consider.  If a

15  witness made statements in the past that are inconsistent with

16  his or her testimony during the trial concerning facts that are

17  at issue, you may consider that fact in deciding how much of

18  the testimony, if any, to believe.

19          In making this determination, you may consider whether

20  the witness purposefully made a false statement or whether it

21  was an innocent mistake.  You may already consider whether the

22  inconsistency concerns an important fact or merely a small

23  detail, as well as whether the witness had an explanation for

24  the inconsistency and, if so, whether that explanation appealed

25  to your common sense.

M5VVSHE3                          Charge

1          If you find that a witness has testified falsely as to

2     any material fact or if you find that a witness had previously

3     been untruthful when testifying under oath or otherwise, you

4     may reject that witness's testimony in its entirety or you may

5     accept only those parts that you believe to be truthful or that

6     are corroborated by other independent evidence in the case.

7          You should also consider whether the witness had an

8     opportunity to observe the events he or she testified about,

9     and whether the witness's recollection of the facts stands up

10    in light of the other evidence in the case.  In other words,

11    what you must try to do in deciding credibility is to size up a

12    person just as you would in any important matter where you are

13    trying to decide if a person is truthful, straightforward, and

14    accurate in his or her recollection.

15         Now, a witness may be discredited or impeached by

16    contradictory evidence or by evidence that at some other time

17    the witness had said or done something that is inconsistent

18    with the witness's present testimony.  The earlier inconsistent

19    or contradictory statements are admissible only to discredit or

20    impeach the credibility of a witness, not to establish the

21    truth of earlier statements made somewhere else.

22         You may also consider a witness's earlier silence or

23    inaction that is inconsistent with his or her courtroom

24    testimony to determine whether the witness is impeached.  If

25    you believe that any witness has been impeached and, thus,

discredited, then it is for you to give the testimony of that
witness as much or as little weight, if any, as you think it
deserves.

You are not required to accept testimony, even though
the testimony is uncontradicted and the witness's testimony is
not challenged.  You may reject it because of the witness's
bearing or demeanor or because of the apparent improbability of
the testimony or for other reasons sufficient for you to
conclude that the testimony is not worthy of belief.  It is for
you, the jury, and for you alone, not the lawyers or the
witnesses or me as the judge to decide the credibility of
witnesses who appeared here and the weight that their testimony
deserves.

I have referred to the two separate decisions that the
jury must make in evaluating witnesses:  Credibility and
weight.  When you decide whether you believe what a witness
says, you decide credibility.  When you decide how much to
allow that evidence to affect your decision on any issue, you
decide the weight to give to the testimony.

In evaluating the credibility of witnesses, you should
take into account any evidence that the witness who testified
may benefit in some way from the outcome of this case.  Such an
interest in the outcome creates a motive to testify falsely and
may sway the witness to testify in a way that advances his or
her own interests.  Therefore, if you find that any witness

1   whose testimony you are considering may have an interest in the

2   outcome of this trial, then you should bear that factor in mind

3   when evaluating the credibility of his or her testimony and

4   accept it with great care.

5         This is not to suggest that a witness who has an

6   interest in the outcome of a case will testify falsely.  It is

7   for you to decide to what extent, if at all, the witness's

8   interest has affected or colored his or her testimony.

9         You are to perform the duty of finding the facts

10  without bias or prejudice as to any party.  You are to perform

11  your final duty in an attitude of complete fairness and

12  impartiality.  The case is important to the government, for the

13  enforcement of criminal laws is a matter of prime concern to

14  the community.  Equally it is important to the defendant who is

15  charged with serious crimes.

16        The fact that the prosecution is brought in the name

17  of the United States of America entitles the government to no

18  greater consideration than that accorded to any other party to

19  a litigation.  By the same token, it is entitled to no less

20  consideration.  The parties, whether the government or an

21  individual, stand as equals at the bar of justice.

22        Under your oath as jurors, you are not to be swayed by

23  sympathy.  You are to be guided solely by the evidence in this

24  case; and the crucial question that you must ask yourselves as

25  you sift through the evidence is:  Has the government proven

1    the guilt of the defendant beyond a reasonable doubt?

2              It is for you, and you alone, to decide whether the

3    government has proven that the defendant is guilty of the

4    crimes charged, solely on the basis of the evidence and subject

5    to the law as I have instructed you.  It must be clear to you

6    that once you let fear or prejudice or bias or sympathy

7    interfere with your thinking, there is a risk that you will not

8    arrive at a true and just verdict.

9              If you have a reasonable doubt as to the defendant's

10   guilt, you should not hesitate to find the defendant not

11   guilty.  But, on the other hand, if you find that the

12   government has met its burden of proving the defendant's guilt

13   beyond a reasonable doubt, then you should not hesitate to find

14   the defendant guilty.

15             Under your oath as jurors, you cannot allow a

16   consideration of possible punishment that may be imposed upon

17   the defendant, if convicted, to influence you in any way or to

18   enter into your deliberations.  The duty of imposing sentence

19   is mine, and mine alone.  Your function is to weigh the

20   evidence and determine whether the defendant is or is not

21   guilty based on the evidence and the law.  Therefore, I

22   instruct you not to consider punishment or possible punishment

23   during your deliberations.

24             The defendant, Timothy Shea, is formally charged in an

25   indictment.  The indictment is a document containing the

M5VVSHE3                        Charge

1   charges against the defendant.  It is not evidence or proof of

2   the defendant's guilt.  You are directed not to consider or

3   discuss how the indictment was obtained.  Before you begin your

4   deliberations, you will be provided with a copy of the

5   indictment.  Therefore, I will not read the entire indictment

6   to you at this time; instead, I will summarize in general terms

7   the offenses charged.  Then I will explain to you in detail the

8   elements of those offenses.

9          The indictment contains three counts or charges

10  against the defendant.

11         Count One charges the defendant with conspiracy to

12  commit wire fraud, in violation of Title 18, United States

13  Code, Section 1349.  This count alleges that the defendant

14  agreed to participate in a scheme to make or cause to be made

15  through the use of interstate communications such as text

16  messages, emails, phone calls, and posts on websites and social

17  media, false statements to donors, specifically, that 100

18  percent of the funds donated to We Build the Wall would be used

19  for construction of a wall at the southern border of the United

20  States, and that none of the money donated will be used to

21  compensate Brian Kolfage, the founder and president of We Build

22  the Wall.  The count further alleges that these statements were

23  made in order to obtain the donors' money.

24         Count One also alleges that the defendant and his

25  co-conspirators devised a scheme for businesses created by the

1    defendant to receive money from We Build the Wall in exchange

2    for the defendant paying a kickback to Mr. Kolfage.

3            Count Two charges the defendant with conspiracy to

4    commit money laundering, in violation of Title 18, United

5    States Code, Section 1956(h).  This count alleges that the

6    defendant agreed to launder the fraudulently obtained proceeds

7    from the scheme charged in Count One.  In particular, Count Two

8    alleges that the defendant agreed to engage in financial

9    transactions that he knew were designed to conceal and disguise

10   the nature, location, source, ownership, or control of the

11   money obtained through the scheme charged in Count One.  Count

12   Two also alleges that the defendant agreed to engage in

13   financial transactions involving more than $10,000 of the

14   fraudulently obtained proceeds.

15           Count Three charges the defendant with falsification

16   of records, in violation of Title 18, United States Code,

17   Section 1519 and 2.  This count alleges that the defendant

18   created or caused the creation of documents that were falsely

19   backdated and stated false reasons for payments from We Build

20   the Wall to the defendant, and from the defendant to

21   Mr. Kolfage, with the intent to impede, obstruct, or influence

22   an investigation by the United States Attorney's Office for the

23   Southern District of New York.

24           You must consider each count separately and you must

25   return a verdict of guilty or not guilty for each count.

1  Whether you find the defendant guilty or not guilty as to one

2  offense should not affect your verdict as to any other offense

3  charged.

4       Here, Counts One and Two both charge conspiracy

5  offenses, so let me explain to you what a conspiracy is.  These

6  instructions about conspiracy apply to both counts.

7       A conspiracy is a kind of criminal partnership, a

8  combination or agreement of two or more persons to join

9  together to accomplish some unlawful purpose.  The crime of

10  conspiracy to violate a federal law is an independent offense.

11  It is separate and distinct from the violation of any specific

12  federal laws, which the law refers to as substantive crimes.

13       If a conspiracy exists, even if it should fail in its

14  purpose, it is still punishable as a crime.  Indeed, you may

15  find the defendant guilty of conspiracy to commit an offense

16  even though the substantive crime which was the object of the

17  conspiracy, was not actually committed.  Congress has deemed it

18  appropriate to make conspiracy standing alone a separate crime,

19  even if the conspiracy is not successful.

20       In order for the defendant to be guilty of conspiracy,

21  the government must prove beyond a reasonable doubt the

22  following two elements:

23       First, that the charged conspiracy existed; and

24  second, that at some point during the conspiracy's existence,

25  the defendant knowingly and willfully joined the alleged

conspiracy.

Now, let us separately consider the two elements:
First, the existence of the conspiracy; and second, whether the
defendant knowingly and willfully joined the conspiracy.

Starting with the first element, what is a conspiracy?
A conspiracy is an agreement or an understanding between two or
more people to accomplish by concerted action one or more
unlawful purposes.  In this case, the unlawful purpose alleged
to be the object of the conspiracy charged in Count One is to
commit wire fraud.  And the unlawful purpose alleged to be the
object of the conspiracy in Count Two is to commit money
laundering.  I will give you instructions on each of these
unlawful purposes or objects of the conspiracies later on.

The gist or the essence of the crime of conspiracy is
the unlawful agreement of two or more people to commit a crime.
As I mentioned earlier, the ultimate success of the conspiracy
or the actual commission of the crime that is the object of the
conspiracy is not required for a conspiracy to have existed.
Rather, the government is required to prove beyond a reasonable
doubt only that two or more people in some way or manner,
explicitly or implicitly, came to an understanding to
accomplish the unlawful object.

To prove the existence of a conspiracy, the government
is not required to show that two or more people sat around a
table and entered into an express or formal agreement orally or

M5VVSHE3                          Charge

1   in writing, stating that they had formed a conspiracy to commit

2   a crime.  Similarly, you need not find that the alleged

3   co-conspirators stated in words or writing what the scheme was,

4   its object or purpose, every precise detail of the scheme or

5   the means by which its object or purpose was to be

6   accomplished.  What the government must prove is that there was

7   a mutual understanding, either spoken or unspoken, between two

8   or more people, to cooperate with each other to accomplish an

9   unlawful act.

10         It is rare that a conspiracy can be proven by direct

11   evidence of an explicit agreement.  Rather, in determining

12   whether there has been an unlawful agreement as alleged in the

13   indictment, you must consider the actions and conduct of all

14   the alleged co-conspirators that were meant to carry out the

15   apparent criminal purpose.  The old adage "actions speak louder

16   than words" applies here.  Often the only evidence that is

17   available with respect to the existence of a conspiracy is that

18   of disconnected acts and conduct on the part of the alleged

19   individual co-conspirators.  When taken all together and

20   considered as a whole, however, these acts and conduct may

21   warrant the inference that a conspiracy existed just as

22   conclusively as more direct proof, such as evidence of an

23   express agreement.

24         Further, although the indictment charges that the

25   alleged conspiracies began in or around December 2018, and

1  continued up to in or around June 2020, it is not essential

2  that the government prove that the conspiracy in question

3  started or ended on those specific dates or that it existed

4  throughout the entire period.  Rather, it is sufficient to

5  satisfy the first element if you find that the charged

6  conspiracy was formed and that it existed for any time within

7  the charged period.

8          If you conclude that the government has proven beyond

9  a reasonable doubt that a charged conspiracy existed, then you

10 must consider the second element:  Whether the defendant

11 participated in the conspiracy knowingly and willfully, with

12 knowledge of its unlawful purpose or purposes, and in

13 furtherance of its unlawful object or objects.

14         To act knowingly means to act voluntarily and

15 deliberately rather than mistakenly or inadvertently.  To act

16 willfully means to act voluntarily and with a wrongful purpose.

17         Put differently, an act is done knowingly and

18 willfully if it is done purposefully and deliberately with an

19 intent to do something the law forbids; that is, the

20 defendant's act must have been the product of the defendant's

21 conscious determination rather than the product of a mistake,

22 accident, mere negligence, or some other innocent reason.

23         Now, science has not yet devised a manner of looking

24 into a person's mind and knowing what the person is thinking.

25 However, you have before you evidence of certain acts,

1   conversations, and statements alleged to have been made by,

2   with, or in the presence of the defendant and others.  The

3   ultimate facts of knowledge and criminal intent may be

4   established by words, conduct, and all the surrounding

5   circumstances, as well as the rational or logical inferences

6   that may be drawn from the words and conduct.  It is for you to

7   determine whether the government has established beyond a

8   reasonable doubt such knowledge and intent on the part of the

9   defendant.

10          It is not necessary for the government to show that

11   the defendant was fully informed as to all the details of the

12   conspiracy in order for you to infer knowledge on his part; nor

13   does the defendant need to know the full extent of the

14   conspiracy or all its participants.  Indeed, it is not

15   necessary that the government knew more than one other member

16   of the conspiracy.  It is also not necessary that the defendant

17   received any monetary benefit from participating in the

18   conspiracy.  It is enough if he participated in the conspiracy

19   knowingly and willfully as I have defined those terms.

20   Although proof of a financial interest in the outcome of the

21   scheme is not essential, if you find that the defendant had

22   such an interest, that is a factor you may properly consider in

23   determining whether he was a member of the conspiracy.

24          If you determine that the defendant became a member of

25   the conspiracy, the duration and extent of the defendant's

1    participation has no bearing on the issue of the defendant's

2    guilt.  Some co-conspirators play major roles, but others play

3    minor roles.  An equal role is not what the law requires.  In

4    fact, even a single act may be sufficient to draw the defendant

5    within the ambit of the conspiracy if it meets the elements I

6    have described.

7            The defendant also need not have joined the conspiracy

8    at the outset.  The defendant may have joined it at any time:

9    at the beginning, in the middle, or at the end, and the

10   defendant will still be held responsible for all that was done

11   before he joined, as well as all that was done during the

12   conspiracy's existence when the defendant was a member.

13           However, I want to caution you that mere association

14   with a member of a conspiracy does not make a person a member

15   of the conspiracy, even when that association is coupled with

16   knowledge that the second person is committing a crime.  Mere

17   presence at the scene of a crime, even coupled with knowledge

18   that a crime is taking place, is not sufficient to support a

19   conviction.  In other words, knowledge without participation is

20   not sufficient to satisfy the second element.  What is

21   necessary is that the defendant participated in the conspiracy

22   with the knowledge of its unlawful purpose and with the intent

23   to aid in the accomplishment of its unlawful object or objects.

24           In sum, if you find that the defendant, with an

25   understanding of the unlawful nature of the charged conspiracy,

1    intentionally engaged, advised, or assisted in the conspiracy

2    for the purpose of furthering the illegal undertaking, you

3    should conclude that the defendant became a knowing and willing

4    participant in the unlawful agreement, that is to say, a

5    conspirator.

6            You will recall that I have admitted into evidence

7    against the defendant the acts and statements of others because

8    these acts and statements were committed or made by people who

9    the government alleges were also confederates or

10   co-conspirators of the defendant.  The reason for allowing this

11   evidence to be received against the defendant has to do, in

12   part, with the nature of the crime of conspiracy.  As I have

13   said, a conspiracy is often referred to as a partnership in

14   crime.  As in other types of partnerships, when people enter

15   into a conspiracy to accomplish an unlawful end, each and every

16   member becomes an agent for the other conspirators in carrying

17   out the conspiracy.

18           Therefore, the reasonably foreseeable declarations,

19   statements, and omissions of any member of the conspiracy made

20   in furtherance of the common purpose of the conspiracy are

21   deemed under the law to be the acts of all of the members, and

22   all of the members are responsible for such acts, declarations,

23   statements, and omissions.

24           If you find beyond a reasonable doubt the defendant

25   was a member of a conspiracy charged in the indictment, then

M5VVSHE3                          Charge

1    any acts done or statements made in furtherance of the

2    conspiracy by a person also found by you to have been a member

3    of the same conspiracy may be considered against the defendant.

4    This is so even if such acts were committed or such statements

5    were made in the defendant's absence and/or without his

6    knowledge.

7              I have just instructed you on the elements of a

8    conspiracy charge generally; and those instructions apply to

9    Count One, which charges a wire fraud conspiracy.

10             The elements of a wire fraud conspiracy are:

11             First, that two or more people entered into an

12   unlawful agreement to commit wire fraud; and second, that the

13   defendant knowingly and willfully entered into the agreement.

14             I will now address the objects of the conspiracy

15   alleged in Count One.  The objects of this conspiracy are to

16   violate Title 18, United States Code, Sections 1343 and 1346,

17   which prohibit wire fraud and honest services wire fraud.

18             Sections 1343 and 1346 provide in pertinent part:

19             Whoever, having devised or intending to devise any

20   scheme or artifice to defraud or for obtaining money or

21   property by means of false or fraudulent pretenses,

22   representations, or promises, transmits or causes to be

23   transmitted by means of wire, radio, or television

24   communication in interstate or foreign commerce, any writings,

25   signs, signals, pictures, or sounds for the purpose of

1   executing such scheme or artifice shall be guilty of a crime.

2   The term "scheme or artifice to defraud" includes a scheme or

3   artifice to deprive another of the intangible right of honest

4   services.

5         As I explained earlier, the object of a conspiracy is

6   the illegal goal the co-conspirators agree or hope to achieve.

7         Count One of the indictment charges that there were

8   two objects or illegal goals of the conspiracy.  As I told you

9   before, you need not find that the defendant actually committed

10  the objects of the conspiracy, but only that he agreed with

11  others to commit one or both of those crimes.

12        The first object of the conspiracy alleges that the

13  defendant agreed to commit wire fraud.  I will refer to this as

14  the substantive wire fraud object.  The second object of the

15  conspiracy alleges that the defendant agreed to commit honest

16  services wire fraud.  I will refer to this as the honest

17  services wire fraud object.

18        There are two lines for Count One for you to fill in

19  on the verdict form.  The first line asks whether the defendant

20  is guilty of the first object of the conspiracy; and the second

21  line asks whether the defendant is guilty of the second object

22  of the conspiracy.  In order to find the defendant guilty of

23  either object, there must be unanimous agreement on that

24  object.  With that in mind, I will now proceed to discuss the

25  elements of each form of wire fraud.

M5VVSHE3                         Charge

1          We will first consider the elements of the first

2     object, substantive wire fraud, which has three elements:

3          First, the existence of a scheme or artifice to

4     defraud or to obtain money or property by means of materially

5     false or fraudulent pretenses, representations, or promises;

6     second, the defendant participated in the scheme or artifice to

7     defraud or to obtain money or property by means of materially

8     false or fraudulent pretenses, representations, or promises,

9     with knowledge of its fraudulent nature and with specific

10    intent to defraud; and, third, in the execution of the scheme,

11    the defendant or one of his co-conspirators used or caused to

12    be used interstate or foreign wires.

13         If you find beyond a reasonable doubt that the

14    defendant agreed with at least one other person to commit

15    substantive wire fraud, then the substantive wire fraud object

16    of Count One would be proven.  However, if you find that the

17    government has not met its burden to prove that the defendant

18    agreed with at least one other person to commit substantive

19    wire fraud, then the object would not be proven.

20         I will now describe the three elements of substantive

21    wire fraud in greater detail.  The wire fraud statute provides

22    that it can be satisfied by the existence of a scheme or

23    artifice to defraud or to obtain money or property by means of

24    false or fraudulent pretenses, representations, or promises.  A

25    scheme or artifice is just a plan for the accomplishment of an

object.   A pretense, representation, statement, or promise is

fraudulent if it was made falsely and with intent to deceive.

A representation, statement, claim, or promise may also be

fraudulent if it contains half-truths or if it conceals

material facts in a manner that makes what is said or

represented deliberately misleading or deceptive.

          The deception need not be premised on spoken or

written words alone; the arrangement of words or the

circumstances in which they are used may convey the false and

deceptive appearance.   If there is deception, the manner in

which it is accomplished does not matter.   This element does

not require that any particular person actually relied on or

actually suffered damages as a consequence of any fraudulent

representation or concealment of facts.

          Nor need you find that the defendant profited from

fraud.   It is enough that a false statement or a statement

omitting material facts that made what was said deliberately

misleading was made as part of a fraudulent scheme in the

expectation that it would be relied on.   You must concentrate

on whether there was such a scheme, not on the consequences of

the scheme.   Of course, proof concerning the accomplishment of

the goals of the scheme may be the most persuasive evidence of

the existence of the scheme itself.

          In addition, the false or fraudulent representation or

failure to disclose must relate to a material fact or matter.

M5VVSHE3                    Charge

A material fact is one which would reasonably be expected to be

of concern to a reasonable and prudent person in relying upon

the representation or statement in making a decision.  That

means that if you find a particular statement or representation

false, you must determine whether that statement or

representation was one that a reasonable person might have

considered important in making his or her decision.  The same

principle applies to fraudulent half-truths or omissions, that

is, failures to disclose facts.  A scheme to defraud need not

be shown by direct evidence, but may be established by all the

circumstances and facts in the case.

As to the second element of substantive wire fraud,

the defendant must have devised or participated in the

fraudulent scheme knowingly, willfully, and with specific

intend to defraud.  As I have already instructed you, to act

knowingly means to act voluntarily and deliberately rather than

mistakenly or inadvertently.  To act willfully means to act

voluntarily and with a wrongful purpose.  To act with intent to

defraud means to act knowingly and with the specific intent to

deceive for the purpose of causing some financial or property

loss to another.  The words "devised" and "participated" are

words that you are familiar with and, therefore, I need not

spend much time defining them for you.

To devise a scheme to defraud is to concoct or plan

it.  To participate in a scheme to defraud means to associate

M5VVSHE3                         Charge

1   oneself with it with a view and an intent toward making it

2   succeed.  Although a mere onlooker is not a participant in a

3   scheme to defraud, it is not necessary that a participate be

4   someone who personally and visibly executes the scheme to

5   defraud.  Direct proof of knowledge and fraudulent intent is

6   almost never available.  It would be a rare case where it could

7   be shown that a person wrote or stated that, as of a given time

8   in the past, he committed an act with fraudulent intent.  Such

9   direct proof is not required.

10          The ultimate facts of knowledge and criminal intent,

11   though subjective, may be established by circumstantial

12   evidence, based upon a person's outward manifestations, his

13   words, conduct, and acts, and all the surrounding circumstances

14   disclosed by the evidence and the rational or logical

15   inferences that may be drawn from them.

16          Because an essential element of the crime charged is

17   intent to defraud, it follows that good faith on the part of

18   the defendant is a complete defense to a charge of substantive

19   wire fraud.  The burden is on the government to prove

20   fraudulent intent and the consequent lack of good faith beyond

21   a reasonable doubt.

22          The third and final element of substantive wire fraud

23   is that interstate wires, for example, phone calls, email

24   communications, text messages, social media, or website posts,

25   and bank wires were used in furtherance of the scheme to

defraud or to obtain money or property by means of materially

false or fraudulent pretenses, representations, or promises.

The wire communication must be an interstate wire,

that is, it must pass between two or more states or a state and

a foreign country.  The use of the wire need not itself be a

fraudulent representation.  It must, however, further or assist

in some way in carrying out the scheme.

It is not necessary for the defendant to be directly

or personally involved in any wire communication, as long as

the communication is reasonably foreseeable in the execution of

the alleged scheme to defraud in which the defendant is accused

of participating.  In this regard, it would be sufficient to

establish this element of the crime if the evidence justifies a

finding that the defendant or one of his co-conspirators caused

the wires to be used by others.  But this does not mean that

the defendant or one of his co-conspirators themselves must

have specifically authorized others to execute a wire

communication.

When one does an act with knowledge that the use of

wires will follow in the ordinary course of business, or where

such use of wires can reasonably be foreseen, even though not

actually intended, then he causes the wires to be used.

Incidentally, this wire communication requirement is satisfied

even if the wire communication was done by a person with no

knowledge of the fraudulent scheme, including a victim of the

1    alleged fraud.

2            Let me also add the following:  Only the wire

3    communication must be reasonably foreseeable, not its

4    interstate or foreign component.  Thus, if you find that the

5    wire communication was reasonably foreseeable and the

6    interstate or foreign wire communications actually took place,

7    then this element is satisfied, even if it was not foreseeable

8    that the wire communication would cross state or national

9    lines.

10           The crime of honest services wire fraud, which is the

11   second object of Count One, has three elements:

12           First, the existence of a scheme or artifice to

13   defraud We Build the Wall by depriving it of its right to Brian

14   Kolfage's honest services through kickbacks; second, the

15   defendant participated in the scheme or artifice to defraud

16   with knowledge of its fraudulent nature and with specific

17   intent to defraud; and third, in the execution of the scheme,

18   the defendant or one of his co-conspirators used or caused to

19   be used interstate or foreign wires.

20           If you find beyond a reasonable doubt that the

21   defendant agreed with at least one other person to commit

22   honest services wire fraud, then the honest services wire fraud

23   object of Count One would be proven.  However, if you find that

24   the government has not met its burden to prove that the

25   defendant agreed with at least one other person to commit

1    honest services wire fraud, then the object would not be

2    proven.  As you may have noticed, the third element of honest

3    services wire fraud is identical to the third element of

4    substantive wire fraud; so you can refer to the instructions I

5    just gave you for the third element of substantive wire fraud

6    for the third element of this object as well.

7            The first element of honest services wire fraud as

8    charged against the defendant is the existence of a scheme or

9    artifice to defraud We Build the Wall by depriving it of its

10   right to Mr. Kolfage's honest services through one or more

11   kickbacks.  A corporate officer or director owes a fiduciary

12   duty of loyalty to the organization of which the person is an

13   officer or director, which means they have a duty to put their

14   organization's interests first, ahead of their own.  When the

15   government proves beyond a reasonable doubt that a corporate

16   officer or director has obtained a corrupt payment for himself

17   in exchange for taking actions in connection with his

18   organization, the officer or director has breached his

19   fiduciary duty of loyalty to the organization.  This is so

20   because the organization is not receiving what it expects and

21   is entitled to, namely, the loyal services of its officer or

22   director.

23           A scheme to defraud in this context is a plan to

24   deprive We Build the Wall of its right to Mr. Kolfage's honest

25   services through one or more kickbacks in a *quid pro quo*.

M5VVSHE3                        Charge

1    *Quid pro quo*" is Latin and it means "this for that" or "these

2    for those."  A kickback occurs when a person directly or

3    indirectly promises, gives, or offers a corporate officer or

4    director something of value, such as money, in exchange for the

5    performance of an act or a promise to perform an act, and the

6    act itself provides the source of the funds to be kicked back.

7    The kickback can be given on a one-time basis or as a stream of

8    payments.  The specific transactions comprising the illegal

9    scheme need not match up precisely this for that.  The scheme

10   to defraud must be material to the corporate officer or

11   director's organization, meaning that the scheme had a natural

12   tendency to influence or is capable of influencing a decision

13   or action by the organization.

14        The government is not required to show that the

15   corporate officer or director performed or promised to perform

16   an act solely because of the thing of value he received.  All

17   that is required is that the corporate officer or director

18   performed or promised to perform the act in question at least

19   in part because of the thing of value he received.

20        Furthermore, it is not necessary that the government

21   prove the defendant or his co-conspirators caused or intended

22   to cause any harm to We Build the Wall.  Although the

23   government need not prove that any action taken by Mr. Kolfage

24   was contrary to We Build the Wall's interests, you may consider

25   the existence or nonexistence of such evidence in determining

whether Mr. Kolfage took any action at least in part because of

the potential kickback or kickbacks paid by the defendant, and

not exclusively because it was at the direction of or for the

benefit of We Build the Wall.  Rather, the intended loss that

the government must prove is only the organization's loss of

its intangible right to its officer or director's honest

services.

        In other words, it is not a defense that the offer or

promise of anything of value was made by the defendant to

Mr. Kolfage in exchange for actions that were lawful,

desirable, or even beneficial to We Build the Wall.  The

offense of honest services fraud is not concerned with the

wisdom or results of the actions taken by the corporate officer

or director, but rather with the manner in which the corporate

officer or director decides to take those actions.

        The second element of honest services wire fraud as

charged against the defendant is that the defendant

participated in the scheme or artifice to defraud We Build the

Wall by depriving it of Mr. Kolfage's honest services knowingly

and willfully with knowledge of its fraudulent nature and with

specific intent to defraud.  I have already instructed you

regarding what it means to act knowingly and willfully and to

participate in or devise a scheme, and you should use those

instructions here.

        As I explained earlier, direct proof of knowledge and

1  fraudulent intent is almost never available.  The ultimate

2  facts of knowledge and criminal intent — though subjective —

3  may be established by circumstantial evidence, based upon a

4  person's outward manifestations, his words, conduct, and acts

5  and all the surrounding circumstances disclosed by the

6  evidence, and the rational or logical inferences that may be

7  drawn from them.

8          The fact that an officer or director's conduct

9  violates an organization's rules, policies, or codes of conduct

10  does not necessarily mean that there was a scheme to defraud.

11  Nor is it sufficient to merely prove that Mr. Kolfage was

12  engaged in undisclosed self-dealing or failure to disclose a

13  conflict of interest.  However, you may consider any evidence

14  that the defendant knew that Mr. Kolfage intentionally did or

15  did not disclose or concealed material information about a

16  financial or personal conflict of interest, money received, or

17  any behavior indicating consciousness of guilt as evidence of

18  the defendant's state of mind.

19          Since an essential element of the crime charged is

20  intent to defraud, it follows that the good faith on the part

21  of the defendant is a complete defense to a charge of honest

22  services wire fraud.  The burden is on the government to prove

23  fraudulent intent and the consequent lack of good faith beyond

24  a reasonable doubt.

25          As a reminder, the third element, the honest services

wire fraud object, the use of interstate wires, is the same as
the third element of the substantive wire fraud object.  And
you can apply the instruction I gave you earlier for the honest
services wire fraud object as well.

Count Two charges the defendant with participating in
a conspiracy to commit money laundering, in violation of Title
18, United States Code, Section 1956(h).

Specifically, Count Two charges the defendant with
conspiring to commit money laundering from in or around
December 2018, through in or around June 2020, by agreeing to
launder the proceeds of the wire fraud conspiracy charged in
Count One.  I have already instructed you on the elements of a
conspiracy charge generally, and those instructions apply to
Count Two, which charges a money laundering conspiracy.

The elements of money laundering conspiracy are:

First, that two or more people entered into an
unlawful agreement to commit money laundering; and second, that
the defendant knowingly and willfully entered into the
agreement.  In other words, the elements of the conspiracy
charged in Count Two are the same elements the government is
required to prove with respect to the conspiracy alleged in
Count One; namely, the existence of an agreement to commit a
crime and knowing and willful entry of the defendant into that
agreement.  As I explained earlier, the object of a conspiracy
is the illegal goal the co-conspirators agree or hope to

M5VVSHE3                        Charge

1   achieve.

2           Count Two of the indictment charges that there were

3   two objects or illegal goals of the conspiracy.  As I told you

4   before, you need not find that the defendant actually committed

5   the objects of the charged conspiracy, but only that he agreed

6   with others to commit at least one of the objects.

7           The first object of the conspiracy alleges that the

8   defendant agreed to commit money laundering by engaging in

9   financial transactions that involve the proceeds of the wire

10   fraud in order to conceal or disguise the nature, location,

11   source, ownership, or control of the proceeds of the wire

12   fraud.  I will refer to this object as concealment money

13   laundering.

14           The second object of the conspiracy alleges that the

15   defendant agreed to commit money laundering by engaging in

16   monetary transactions greater than $10,000 involving the

17   proceeds of the wire fraud.

18           There are two lines for Count Two for you to fill in

19   on the verdict form.  The first line asks whether the defendant

20   is guilty of the first object of the conspiracy; and the second

21   line asks whether the defendant is guilty of the second object

22   of the conspiracy.  In order to find the defendant guilty of

23   either object, there must be unanimous agreement on that

24   object.  With that in mind, I will now proceed to discuss the

25   elements of each form of money laundering.

We will first consider the elements of the first object, which is concealment money laundering.

Concealment money laundering has the following elements:

First, that the defendant conducted or attempted to conduct a financial transaction which must, in some way or degree, have affected interstate or foreign commerce.

Second, that the financial transaction at issue involved the proceeds of specified unlawful activity, which here is alleged to have been a wire fraud scheme.

Third, that the defendant knew that the financial transaction involved the proceeds of some form of unlawful activity.

And fourth, that the defendant knew that the transaction was designed in whole or in part either to disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity.

If you find beyond a reasonable doubt that the defendant agreed with at least one other person to commit concealment money laundering, then the concealment money laundering object of Count Two would be proven.  However, if you find that the government has not met its burden to prove that the defendant agreed with at least one other person to commit concealment money laundering, then the object would not be proven.

1            The first element of concealment money laundering is

2     that the defendant conducted a financial transaction which in

3     some way or degree affected interstate or foreign commerce.

4     The term "conducts" includes the action of initiating,

5     concluding, or participating in initiating or concluding a

6     transaction.  The term "financial transaction" means, one, a

7     transaction involving a financial institution which is engaged

8     in or the activities of which affect interstate or foreign

9     commerce in any way or degree; or two, a transaction which in

10    any way or degree affects interstate or foreign commerce and

11    involves the movement of funds by wire or other means or

12    involves one or more monetary instruments.  I instruct you that

13    a federally insured bank, a commercial bank, a private bank, a

14    credit union, and a loan or finance company all constitute

15    financial institutions.

16            A transaction involving a financial institution

17    includes a deposit/withdrawal/transfer between accounts,

18    exchange of currency, loan, extension of credit, purchase or

19    sale of any stock, bond, certificate of deposit, or any other

20    monetary instrument, use of a safe-deposit box or any other

21    payment, transfer, or delivery by, through, or to a financial

22    institution by whatever means.  The term "funds" includes any

23    currency, money or other medium of exchange that can be used to

24    pay for goods and services.

25            Interstate commerce includes any transmission,

1    transfer, or transportation of goods or services, both tangible

2    and intangible, communications and/or persons between persons,

3    places or entities located in one state, including the District

4    of Columbia, and persons, places or entities located in another

5    state, regardless of whether done for a business purpose or

6    otherwise.  "Foreign commerce" means the same thing, except it

7    is between a person, place or entity in the United States and a

8    person, place or entity in a foreign country.

9            In determining whether a person or institution is

10   engaged in or whether a transaction affects interstate or

11   foreign commerce, the involvement in interstate or foreign

12   commerce can be minimal.  Any involvement at all will satisfy

13   this element.  It does not matter whether the effect on

14   interstate or foreign commerce was harmful or beneficial to a

15   particular business or to commerce in general.  The government

16   satisfies its burden of proving an effect on interstate or

17   foreign commerce if it proves beyond a reasonable doubt any

18   effect, whether it was harmful or not.

19           In addition, it does not matter whether the defendant

20   actually intended or anticipated an effect on interstate or

21   foreign commerce by his actions or that commerce was actually

22   affected.  All that is necessary is that the natural and

23   probable consequences of the acts the defendant agreed to take

24   would affect interstate or foreign commerce.

25           The second element of concealment money laundering is

M5VVSHE3                          Charge

that the financial transactions must involve the proceeds of
specified unlawful activity.  The term "proceeds" means any
property or any interest in property that someone acquires or
retains as profits resulting from the commission of the
specified unlawful activity.

         The term "specified unlawful activity" means any one
of a variety of offenses described in the statute.  In this
case, the government has alleged that the money involved in
financial transactions at issue in this case was derived from
the wire fraud conspiracy charged in Count One of the
indictment.  I instruct you as a matter of law that the charge
in Count One meets the definition of specified unlawful
activity, but you must determine whether the funds involved in
the financial transactions were the proceeds of that unlawful
activity.

         The third element of concealment money laundering is
that the defendant knew that the financial transactions at
issue involved the proceeds of some form — though not
necessarily which form — of unlawful activity.  Keep in mind
that it is not necessary for the defendant to know that the
proceeds came from the wire fraud scheme or that the defendant
personally participated in the wire fraud scheme.  It is
sufficient that the defendant knew that the proceeds came from
some form of unlawful activity.

         The fourth and final element of concealment money

1  laundering concerns the purpose of the transaction.

2          Specifically, the fourth element is that the defendant

3  conducted financial transactions with knowledge that the

4  transactions were designed, in whole or in part, to conceal or

5  disguise the nature, location, source, ownership, or control of

6  the proceeds of the specified unlawful activity.  The terms I

7  have just used have their everyday ordinary meanings.

8          As I have previously instructed, to act knowingly

9  means to act purposely and deliberately, and not because of

10  mistake or accident, mere negligence or other innocent reason;

11  that is, the acts must be the product of a defendant's

12  conscious objective.  If you find that the evidence establishes

13  beyond a reasonable doubt that the defendant knew the purpose

14  of this particular transaction in issue, and that the

15  transaction was either designed to conceal or disguise the true

16  origin of the property in question, then this element is

17  satisfied.

18          The intent to disguise or conceal the true origin of

19  the property need not be the sole motivating factor; however,

20  if you find that the defendant knew of the transaction, but did

21  not know that it was either designed to conceal or disguise the

22  true origin of the property in question, but instead thought

23  the transaction was intended to further an innocent

24  transaction, you must find that this element has not been

25  satisfied and find the defendant not guilty.

1            Proof that the defendant knew the purpose of the

2    financial transaction was to conceal or disguise the location

3    or ownership of the proceeds of unlawful activity may be

4    established by circumstantial evidence.  In other words, you

5    are entitled to find from the circumstances surrounding the

6    financial transaction what the purpose of the activity was, and

7    that the defendant knew of that purpose.  For the fourth

8    element to be satisfied, the defendant need not know which

9    specified unlawful activity he was agreeing to help conceal.

10   He need only know that a purpose of the financial transaction

11   was concealing the nature, location, source, ownership or

12   control of the funds.

13           The second object of Count Two is engaging in monetary

14   transactions of over $10,000 in property derived from specified

15   unlawful activity.  The elements of this object are as follows:

16           First, the defendant engaged in a monetary transaction

17   in or affecting interstate commerce; second, that the monetary

18   transaction involved criminally derived property of a value

19   greater than $10,000; third, that the property was derived from

20   specified unlawful activity; fourth, that the defendant acted

21   knowing that the transaction involved proceeds of a criminal

22   offense; and fifth, that the transaction took place in the

23   United States.

24           If you find beyond a reasonable doubt that the

25   defendant agreed with at least one other person to engage in

monetary transactions involving over $10,000 in property

derived from specified unlawful activity, then the second

object of Count Two would be proven.  However, if you find that

the government has not met its burden to prove that the

defendant agreed with at least one other person to engage in

monetary transactions of over $10,000 in property derived from

specified unlawful activity, then the object would not have

been proven.

The first element of this object is that the defendant

agreed to engage in a monetary transaction in or affecting

interstate commerce.  The term monetary transaction means the

deposit, withdrawal, transfer, or exchange in or affecting

interstate or foreign commerce of funds or a monetary

instrument by, through, or to a financial institution.  The

term "interstate or foreign commerce" means commerce between

any combination of states or between the United States and a

foreign country.  You must find that had the object of the

conspiracy been completed, the transaction would have affected

interstate commerce in some way, however minimal.  The same

definition of "interstate commerce" used in reference to the

concealment money laundering object applies here.

The second element of this object is that the monetary

transactions involved criminally derived property having a

value in excess of $10,000.  The term "criminally derived

property" means any property constituting or derived from

proceeds obtained from a criminal offense.  The terms

"specified unlawful activity and proceeds" have the same

meanings I provided previously with respect to the first object

of the conspiracy.  I instruct you as a matter of law that wire

fraud is both a criminal offense and specified unlawful

activity.

The government is not required to prove that all of

the property involved in the transaction was criminally derived

property.  However, the government must prove that more than

$10,000 of the property involved was criminally derived

property.

The third and fourth elements of this object are that

the property derived from specified unlawful activity, and that

the defendant acted knowing that the transaction involved

proceeds of a criminal offense.  The term "specified unlawful

activity" was defined previously, and that definition applies

equally to this second object of the conspiracy charged in

Count Two.

I instruct you that the government is not required to

prove that the defendant knew the particular offense from which

the criminally derived property was derived.  However, the

government must prove beyond a reasonable doubt that the

defendant knew that the transaction involved criminally derived

property, which I remind you means any property constituting or

derived from proceeds obtained from a criminal offense.  If you

M5VVSHE3                        Charge

1   find that the government has established beyond a reasonable

2   doubt that the defendant knew that the transaction involved

3   property derived from a criminal offense, then this element is

4   satisfied.  The fifth element of this object is that the

5   agreed-upon transaction took place in the United States.

6         Count Three charges the defendant with falsification

7   of records, in violation of Title 18, United States Code,

8   Sections 1519 and 2.  Specifically, Count Three charges the

9   defendant with creating or causing the creation of, in or

10  around October 2019, documents that were falsely backdated and

11  stated false reasons for payments from We Build the Wall to the

12  defendant and from the defendant to Mr. Kolfage, with the

13  intent to impede, instruct, or influence an investigation by

14  the United States Attorney's Office for the Southern District

15  of New York.

16        Section 1519 provides:  Whoever knowingly alters,

17  destroys, mutilates, conceals, covers up, falsifies, or makes a

18  false entry in any record, document, or tangible object, with

19  the intent to impede, obstruct, or influence the investigation

20  or proper administration of any matter within the jurisdiction

21  of any department or agency of the United States or any case

22  filed under Title 11 or in relation to or contemplation of any

23  such matter or case shall be guilty of a crime.

24        The elements of falsification of records are, first,

25  that the defendant falsified or caused the falsification of a

M5VVSHE3                      Charge

1    dock; second, the defendant acted knowingly; and third, the

2    defendant acted with the intent to impede, obstruct, or

3    influence an investigation within the jurisdiction of a

4    department or agency of the United States Government.

5           The first element is that the defendant falsified any

6    document.  Both tampering with preexisting documents and

7    creating a new document may constitute falsifying a document.

8    A written contract may be falsified if it misrepresents the

9    true nature of the parties' agreement or backdates an agreement

10   to appear that it was signed at an earlier time.

11          The second element is that the defendant acted

12   knowingly as I have already defined that term.  Whether the

13   defendant acted knowingly may be proven by the defendant's

14   conduct and by all of the facts and circumstances surrounding

15   the case.

16          The third element the government must prove beyond a

17   reasonable doubt is that the defendant acted with the intent to

18   impede, obstruct, or influence an investigation within the

19   jurisdiction of a department or agency of the United States

20   Government.  The government is not required to prove that the

21   defendant knew his conduct would obstruct a federal

22   investigation or that a federal investigation would take place

23   or that he knew of the limits of federal jurisdiction.

24          However, the government is required to prove that the

25   investigation that the defendant intended to impede, obstruct,

or influence did, in fact, concern a matter within the

jurisdiction of an agency of the United States.  I instruct you

as a matter of law that the United States Attorney's Office for

the Southern District of New York is an agency of the United

States, and that grand jury investigations conducted by that

office are matters within the jurisdiction of that office.

       With respect to Count Three, the government has also

charged the defendant under two other theories of guilt:

Willful causation and aiding and abetting.  This means that if

you find that the defendant did not directly commit the

offense, you must then consider whether he willfully caused or

aided and abetted the commission of the offense.  However, if

you find that the defendant did directly commit the offense,

then you may convict on Count Three without considering these

other two theories of guilt.

       If you all agree that the defendant is guilty of Count

Three under at least one of the three theories of guilt about

which I will instruct you, that is, as the person who directly

commit the offense under the willful causation theory, or as an

aider and abettor, then you may find the defendant guilty even

if you do not all agree on the particular theory of guilt.

       I have already explained what it means to directly

commit the offense.  Let me now explain the concepts of

willfully causing and aiding and abetting to you.

       First, willful causation.  It is the law that whoever

willfully causes another person to do an act that would be a
crime if the defendant performed that act directly, is held
responsible for that crime as if he committed that crime
directly.  This means that the defendant may be found guilty
even if he did not physically commit the crime or participate
in the actual criminal conduct.  Thus, one who intentionally
causes another person to falsify a document, as I have defined
that crime, is guilty of falsifying a document if the
government proves that he acted knowingly and satisfied the
other elements of the crime, which I've already described to
you.

So if you find that the government proved beyond a
reasonable doubt that the defendant willfully caused another
person to falsify a document as I have defined that crime, you
must find the defendant guilty under the theory of willful
causation.  This is so even if the individual that falsified
the document had no criminal intent.

Second, aiding and abetting.  It is unlawful for a
person to aid, abet, counsel, command, induce, or procure
someone else to commit a criminal offense.  A person who does
that is just as guilty of the offense as someone who actually
commits the offense.  In order to convict the defendant as an
aider and abettor, the government must prove two elements
beyond a reasonable doubt:

First, the government must prove that a person other

than the defendant committed the crime charged in Count Three;

and second, the government must prove that the defendant

willfully and knowingly associated himself in some way with the

crime, and that he willfully and knowingly engaged in some

affirmative conduct or some overt act for the specific purpose

of bringing about the crime.

       The mere presence of the defendant in a place where a

crime is being committed, even with knowledge that a crime is

being committed, is not enough to make him an aider and

abettor.  A defendant's acquiescence in criminal conduct by

others, even with guilty knowledge, is not enough to establish

aiding and abetting.  An aider and abettor must know that a

crime is being committed and act in a way that is intended to

bring about the success of the criminal venture.

       As to each charge, the government, in addition to

proving the essential elements of that charge, must also

establish that venue was proper in the Southern District of New

York, which includes all of Manhattan and the Bronx, as well as

Westchester, Rockland, Putnam, Dutchess, Orange, and Sullivan

Counties.  Unlike the elements of the offenses which must be

proven beyond a reasonable doubt, the government is only

required to prove venue by a preponderance of the evidence.  A

preponderance of the evidence means that it is more probable

than not that something occurred.

       The government does not have to prove that a completed

1    crime was committed within the Southern District of New York or

2    that the defendant was ever in the Southern District of New

3    York.  It is sufficient to satisfy the venue requirement if any

4    act in furtherance of the crime occurred in this district.  The

5    act itself may not be a criminal act.  And the act need not

6    have been taken by the defendant, so long as the act was part

7    of the crime that you find the defendant committed.

8            With respect to Counts One and Two, you need to find

9    that it is more likely than not that an act in furtherance of

10   the charged conspiracies was committed or caused to be

11   committed in the Southern District of New York by the defendant

12   or a co-conspirator during the life of the conspiracy.

13           With respect to Count Three, there are two ways in

14   which you may find venue proper.  First, you may find that it

15   is more likely than not that an act in furtherance of the

16   charged crime was committed or caused to be committed in the

17   Southern District of New York.  Second, you may find that it is

18   more likely than not that the investigation that the defendant

19   intended to impede, obstruct, or influence was being conducted

20   in the Southern District of New York.

21           Proof of motive is not a necessary element of any of

22   the crimes with which the defendant is charged.  Proof of

23   motive does not establish guilt nor does the lack of proof of

24   motive establish that the defendant is not guilty.  If the

25   guilt of the defendant is proven beyond a reasonable doubt, it

1  is immaterial what the defendant's motive for the crime or

2  crimes may be or whether the defendant's motive was shown at

3  all.  The presence or absence of motive is, however, a

4  circumstance which you may consider as bearing on the intent of

5  the defendant.

6          It is unimportant whether a victim might have

7  discovered the fraudulent scheme charged in Count One had the

8  victim probed further.  If you find that a scheme or artifice

9  to defraud or obtain money or property by means of materially

10  false or fraudulent pretenses, representations, or promises

11  existed, it is irrelevant whether you believe that a victim was

12  careless, gullible, or even negligent.  Carelessness,

13  gullibility, or negligence on the part of the victim is no

14  defense to a charge of fraud.

15          You have heard evidence that We Build the Wall hired

16  lawyers.  A lawyer's involvement with an individual or entity

17  does not itself constitute a defense to any of the charges in

18  this case.  The defense has not claimed and cannot claim that

19  the defendant's conduct was lawful because he acted in good

20  faith on the advice of a lawyer.

21          If you conclude that other people may have been

22  involved in criminal acts charged in the indictment, you may

23  not draw any inference, favorable or unfavorable, toward either

24  the government or the defendant from the fact that those people

25  are not named as defendants in the indictment or are not

M5VVSHE3                         Charge

1    present at this trial.  You also may not speculate as to the

2    reasons why other people are not defendants in this trial.

3    Those matters are wholly outside your concern and have no

4    bearing on your function as jurors at this trial.

5            The defendant did not testify in this case.  Under our

6    Constitution, a defendant has no obligation to testify or

7    present any evidence because it is the government's burden to

8    prove a defendant guilty beyond a reasonable doubt.  That

9    burden remains with the government throughout the entire trial

10   and never shifts to a defendant.  A defendant is never required

11   to prove that he is innocent.  You may not attach any

12   significance to the fact that the defendant did not testify.

13   No adverse inference against him may be drawn by you because he

14   did not take the witness stand.  You may not hold this against

15   him or consider it in any way in your deliberations in the jury

16   room.

17           You have heard the testimony of some witnesses who are

18   law enforcement officers or government employees.  The fact

19   that a witness works in law enforcement or for the government

20   does not mean that that witness's testimony is, by virtue of

21   the witness's position, deserving of more or less consideration

22   or greater or lesser weight than that of any other witness.

23   The testimony of such a witness should not be regarded as more

24   or less truthful or accurate than that of any other witness

25   simply based on the witness's employment.

1          You have heard the testimony of a witness who has

2     testified under a grant of immunity from this Court.  What this

3     means is that the testimony of the witness may not be used

4     against him or her in any criminal case, except a prosecution

5     for perjury, giving a false statement, or otherwise failing to

6     comply with the immunity order of this Court.  You are

7     instructed that the government is entitled to call as a witness

8     a person who has been granted immunity by order of this Court.

9          In addition, it does not follow that simply because a

10    person may have participated in criminal conduct, that the

11    person is incapable of giving truthful testimony.  Such

12    testimony should be scrutinized with great care.  You should

13    examine it closely to determine whether or not it is colored in

14    such a way as to place guilt upon the defendant in order to

15    further the witness's own interests.  If you believe the

16    testimony to be true and determine to accept it, you may give

17    it such weight, if any, as you believe it deserves.

18         You have heard testimony from what we call an expert

19    witness.  An expert witness is a witness who by education or

20    experience has acquired learning or experience in a specialized

21    area of knowledge.  Such witnesses are permitted to express

22    their opinions as to relevant matters in which they have

23    special knowledge, skill, experience, and training.  Expert

24    testimony is presented to you on the theory that someone who is

25    experienced in the field can assist you in understanding the

1    evidence or in reaching an independents decision on the facts.

2          Your role in judging credibility applies to experts as

3    well as other witnesses.  In weighing this opinion testimony,

4    you may consider the witness's qualifications, his or her

5    opinions, the reasons for testifying, as well as all of the

6    other considerations that ordinarily apply when you are

7    deciding whether or not to believe a witness's testimony.

8          You may give the opinion testimony whatever weight, if

9    any, you find it deserves in light of the evidence in this

10   case.  You should not, however, accept opinion testimony merely

11   because I allowed the witness to testify concerning his or her

12   opinion; nor should you substitute it for your own reason,

13   judgment, and common sense.  The determination of the facts in

14   this case rests solely with you.  As with the testimony of any

15   other witness, you may decide to accept all, some, or none of

16   the testimony of any expert witness.

17         There are several people whose names you have heard

18   during the course of the trial but who did not appear to

19   testify here.  I instruct you that each party had an equal

20   opportunity or lack of opportunity to call any of these

21   witnesses.  Therefore, you should not draw any inferences or

22   reach any conclusions as to what they would have said if they

23   had been called to testify.

24         Additionally, during the questioning of some

25   witnesses, the defense asked whether those witnesses reviewed

M5VVSHE3                         Charge

1    certain devices or materials that are not in evidence.  I

2    instruct you that each party had an equal opportunity or lack

3    of opportunity to review those devices and materials and offer

4    them into evidence.  You should, however, remember my

5    instruction that the law does not impose on a defendant in a

6    criminal case the burden or duty of calling any witness or

7    producing any evidence.  The burden remains with the government

8    to prove the defendant guilty beyond a reasonable doubt.

9           You have heard evidence during the trial that

10   witnesses have discussed the facts of the case and their

11   courtroom with the lawyers before the witnesses appeared in

12   court.  Although you may consider that fact when you are

13   evaluating witnesses' credibility, understand that there is

14   nothing unusual or improper about a witness meeting with

15   lawyers before testifying so that the witness can be aware of

16   the subjects he or she will be questioned about, focus on those

17   subjects, and have the opportunity to review relevant exhibits

18   before being questioned about them.  Such consultation helps

19   conserve your time and the Court's time.  In fact, it would be

20   unusual for a lawyer to call a witness without such

21   consultation.  Again, the weight you give to the fact or the

22   nature of the witness's preparation for his or her testimony

23   and what inferences you draw from such preparation are matters

24   completely within your discretion.

25          In this case you've heard evidence in the form of

1   stipulations of testimony.  A stipulation of testimony is an

2   agreement between the parties that, if called as a witness, the

3   person would have given certain testimony.  You must accept as

4   true the fact that the witness would have given that testimony.

5   However, it is for you to determine the weight to be given that

6   testimony.

7          In this case you've heard evidence in the form of

8   stipulations of fact.  A stipulation of fact is information

9   that the parties agree to present to the jury as evidence

10  without calling a witness to testify.  The parties agree that

11  the facts contained in the stipulations are true.  You must

12  accept those facts as true.

13         Some of the exhibits admitted into evidence include

14  redactions of certain information.  "Redacted" means that part

15  of the document or photograph was taken out.  There is nothing

16  unusual or improper about such redactions.  You are to concern

17  yourself only with the part of the item that has been admitted

18  into evidence.  You should not consider any possible reason why

19  the other part of it has been deleted.

20         You have heard testimony about evidence seized in

21  connection with certain searches conducted by law enforcement

22  officers.  Evidence obtained from these searches was properly

23  admitted in this case and may be properly considered by you.

24  Such searches were entirely appropriate law enforcement

25  actions.

1           Whether you approve or disapprove of how the evidence

2    was obtained should not enter into your deliberations because I

3    instruct you that the use of the evidence is entirely lawful.

4    You must, therefore, regardless of your personal opinions, give

5    this evidence full consideration, along with all the other

6    evidence in the case in determining whether the government has

7    proven the defendant's guilt beyond a reasonable doubt.

8           In cases involving allegations of fraud and money

9    laundering, like this one, courts often issue orders

10   restraining the use of or transfer of funds so that they may be

11   safeguarded for return to the victims of the crime, which can

12   only be done after the conclusion of a criminal case.  Whether

13   or not such an order was issued by the Court in connection with

14   this case should have no bearing on your consideration of the

15   issues in this trial.

16          Your verdict must be based solely on the evidence

17   developed at trial or the lack of evidence.  It would be

18   improper for you to consider, in reaching your decision as to

19   whether the government sustained its burden of proof, any

20   personal feelings you may have about the defendant's race,

21   religion, national origin, gender, age, sexual orientation,

22   disability or veteran status.  Similarly, it would be improper

23   for you to consider any personal feelings you may have about

24   the race, religion, national origin, gender, age, sexual

25   orientation, disability or veteran status of any witness or

M5VVSHE3                         Charge

1    anyone else involved in this case.  A defendant is entitled to

2    a trial free from prejudice, and our judicial system cannot

3    work unless you reach a verdict through a fair and impartial

4    consideration of the evidence.

5           It would be equally improper for you to allow any

6    feelings you might have about the nature of the crimes charged

7    or the laws which apply to this case to interfere with your

8    decision-making process.  To repeat, your verdict must be based

9    exclusively upon the evidence or lack of evidence in this case.

10          You will note that the indictment alleges that certain

11   acts occurred on or around various dates or that a certain

12   amount of money was involved.  It does not matter if the

13   evidence you heard at trial indicates that a particular act

14   occurred on a different date or that the amount of money

15   involved was different.  The law requires only a substantial

16   similarity between the dates alleged in the indictment and the

17   dates established by the evidence, or the amounts alleged in

18   the indictment and the amounts established by the evidence.

19          You have heard defense counsel refer to the fact that

20   certain investigative techniques were or were not used by law

21   enforcement authorities.  There is no legal requirement that

22   law enforcement agents investigate crimes in a particular way

23   or that the government prove its case through any particular

24   means.  Although you are to carefully consider the evidence

25   presented by the government, you need not speculate as to why

1  they used the techniques they did or why they did not use other

2  techniques.  The government is not on trial and law enforcement

3  techniques are not your concern.  Your concern is to determine

4  whether or not, based on the evidence or lack of evidence, the

5  guilt of the defendant has been proven beyond a reasonable

6  doubt.

7          Video recordings have been admitted into evidence and

8  transcripts of the recordings were provided to use as aids.  I

9  instruct you then and I remind you now that the transcripts are

10  not evidence.  The transcripts were provided only as an aid to

11  you in watching the videos.  It is for you to decide whether

12  the transcripts correctly present the conversations and

13  statements recorded in the videos that you watched.  If you

14  wish to watch any of the videos again, they will be made

15  available to you during your deliberations.

16          Some of the exhibits that were admitted into evidence

17  were in the form of charts and summaries.  I decided to admit

18  these charts, in addition to the underlying documents that they

19  represent, in order to save time and avoid unnecessary

20  inconvenience.  You should consider these charts and summaries

21  as you would any other evidence.

22          There have also been charts and exhibits introduced

23  merely as summaries or analyses of testimony and documents in

24  the case.  They are not, however, evidence themselves.  They

25  are graphic representations or other ways of summarizing more

1   voluminous information that was either described in the

2   testimony of a witness or reflected in documents admitted into

3   evidence.  It is often easier and more convenient to utilize

4   charts and summaries as opposed to placing all of the

5   underlying documents in front of you.  But it is up to you to

6   decide whether the summary exhibits fairly and correctly

7   reflect the underlying testimony and documents they purport to

8   summarize.

9           To the extent that the summary exhibits conform to

10   your understanding of the underlying evidence, you may accept

11   them.  To the extent that they do not, you should disregard

12   them and rely on the underlying evidence instead.  But one way

13   or the other, please understand that the summary exhibits are

14   not in and of themselves direct evidence; they are merely

15   intended to serve as aids in the parties' presentation of the

16   evidence.

17           (Continued on next page)

18

19

20

21

22

23

24

25

M5v3she4                          Charge

1          THE COURT:  Before you retire to deliberate, there are

2     a few more areas I need to instruct you on.

3          Your job is to decide whether the evidence establishes

4     the guilt of the defendant with respect to the crimes charged

5     in the indictment beyond a reasonable doubt.

6          Deliberations must take place in the jury room with

7     all jurors present.  If any juror leaves the room, say for a

8     bathroom break, all deliberations must stop and may resume only

9     when every juror is present.

10          In order to return a verdict, each juror must agree to

11     such verdict.  You have the duty as jurors to consult with one

12     another and to deliberate with a view to reaching an agreement,

13     if it can be done without giving up individual judgment.

14          As jurors, each one of you must decide the case for

15     yourself, but only after an impartial consideration of the

16     evidence with your fellow jurors.

17          No juror should give up any honestly held conviction

18     as to the weight or effect of the evidence solely because of

19     the opinion of your fellow jurors or for the mere purpose of

20     returning a verdict.

21          During the course of your deliberations, you as

22     individuals should not hesitate to reexamine your own views and

23     change your opinion if convinced it is erroneous.

24          For those of you who took notes during the trial.

25     Remember any notes you took are to be used only to refresh your

memory during deliberations.  They may not be used as authority

to persuade your fellow jurors as to what a witness did or did

not say.  Your notes are not superior to your or your fellow

jurors' independent recollection.  Those of you who did not

take notes should not be influenced by the fact that another

juror has taken notes.  Rather, you should rely on your own

independent recollection of the evidence.

        If there is any question as to what the testimony was,

or what my instructions to you were, you should ask to have

that portion of the testimony or the instructions read back to

you.

        Your notes and the notes of your fellow jurors are not

a substitute for the official record or for the governing

principles of law I have set forth.  The court transcript

prevails over a juror's notes.

        You will have in the jury room copies of the exhibits

introduced into evidence should you wish to consult them.

        If, during the course of your deliberations, your

recollection of any part of the testimony should fail, or if

you should find yourself in doubt concerning my instructions to

you on the law, you have the option to return to the courtroom

for the purpose of having such testimony or instructions read

back to you.  Your foreperson, Juror No. 1, should write out

your request and give it to the court security officer who will

deliver the note to me.  As soon as the attorneys, the

1    defendant, and court staff are assembled in the courtroom,

2    you'll be called back to the courtroom and I will promptly

3    respond to your request.  During any readback of testimony,

4    keep in mind how the witness's demeanor appeared to you as you

5    observed the witness testify.

6            I want you to keep in mind that I cannot hand over to

7    you a written transcript of testimony.  If you want to hear

8    testimony again, you must come back to the courtroom, everyone

9    must be assembled, and our extremely competent court reporters

10   will read back the testimony.

11           In any event, do not tell me or anyone else how the

12   jury stands on the issue of whether or not the defendant is

13   guilty until after a unanimous verdict is reached.

14           In order to reach a verdict, all 12 members of the

15   jury must agree.  Your verdict on each count must be unanimous.

16   Whenever all your members are in agreement, you must report

17   your verdict to the Court.  When you have reached a verdict,

18   simply tell the court security officer that you have a verdict,

19   but not what the verdict is, and you will be promptly called

20   back to the courtroom to announce your verdict.

21           Because the trial jury is about to retire to

22   deliberate, I now charge and I emphasize that there must be no

23   further communication or contact between the trial jury and the

24   alternate jurors.  The alternates will be provided a separate

25   area to await the rendition of the trial jury's verdict.  The

M5v3she4                    Charge

1    alternates are not to discuss this case with anyone, including

2    yourselves.  Nor are you to read anything about the case, nor

3    you are to permit anyone to discuss the case with you, nor are

4    you to form any opinion as to the factual issues in this case,

5    nor are you to form or express any opinion as to the guilt or

6    innocence of the defendant unless and until such time as you

7    may be requested to participate in the trial jury's

8    deliberations.

9          During your deliberations, lunch will be provided.

10   You should not leave the jury room during deliberations unless

11   you are instructed to do so.

12         Are there any smokers on the jury?

13         If you are a smoker, as I will not be in the jury room

14   with you, should you desire a smoking break, you must make that

15   request to your jury foreperson.  Should the foreperson declare

16   a break, the court security officer must be notified.  During

17   this break, all deliberations must cease.  As smoking is not

18   permitted inside the building, the smokers will be escorted by

19   the court security officer outside the building to smoke.

20   During the recess, the smokers outside the building cannot

21   discuss the case, and the non-smokers in the jury deliberation

22   room may not discuss the case.  You may not resume your

23   deliberations until all of you are back in the jury room.  Do

24   you all understand?

25         Counsel, please approach.

1              (At the sidebar)

2              THE COURT:  I want to make sure my interns can hear.

3      The indictment is going to go into the jury room.  Are there

4      any requests for redactions or is it going in as is?

5              MR. SOBELMAN:  The operative indictment is not a

6      speaking indictment, so we have no issue with it going back

7      unredacted.  But, I am not sure if defense counsel has a

8      different view.

9              MR. ROOS:  This only charges this particular defendant

10     so it is not that situation.

11             MR. SOBELMAN:  Sorry.  I should have clarified that as

12     well.

13             THE COURT:  I was speaking of the superseding

14     indictment.

15             MR. SOBELMAN:  It is the S2 indictment.

16             THE COURT:  Are there any exceptions to the charge?

17             MS. MOE:  None from the government.

18             MR. MERINGOLO:  None from the defense.

19             THE COURT:  Thank you.

20             (In open court)

21             THE COURT:  Now I am about to submit this case to you

22     for your final determination.

23             As I have previously stated, the law and your oath

24     require that you render a fair and impartial verdict without

25     fear, favor, or sympathy.

1            Now take this case and in the fulfillment of your oath

2     and in accordance with the instructions of the Court, render a

3     true and impartial verdict.

4            You may escort the jury to the jury room.

5            (Jury begins deliberations.  Time noted 4:14 p.m.)

6            THE COURT:  Please swear in the marshal.

7            You may be seated.

8            (Court security officer sworn)

9            THE COURT:  Do I have your permission to send in the

10    paper exhibits?

11           MS. MOE:  Your Honor, we have no objection to sending

12    back the assembled government exhibits.  I don't believe we've

13    had an opportunity to take a look at the assembled defense

14    exhibits, but we can do that very quickly.

15           On the subject of paperwork with respect to the

16    indictment, we just wanted to print out a separate copy that

17    didn't have the ECF header which has some additional

18    information, in particular about the date of the return of the

19    superseding indictment, which, given the nature of the trial

20    evidence, might be confusing to jurors.

21           THE COURT:  I do have a version that does not have any

22    ECF information on it.  It does have on the last page the

23    handwritten date, the word superseding indictment, and then the

24    signature of Judge Aaron.

25           MS. MOE:  Perhaps we could just remove the backing of

1    the indictment to avoid juror confusion, given the evidence

2    about the defendant's arrest in August of 2020, just to avoid

3    any confusion about what a superseding indictment might be.

4              THE COURT:  Is there any objection to that?

5              MR. MERINGOLO:  No objection.

6              MS. MOE:  Thank you, your Honor.  We can just take a

7    moment to confer with the defense on the exhibits.  Otherwise,

8    no issues regarding paperwork from the government.

9              THE COURT:  Also with respect to video evidence.  Do

10   you have a device that they can use in the jury room?

11             LAW CLERK:  We already have it, your Honor.

12             THE COURT:  Yes?  Okay.  All right then.  Why don't

13   you go ahead and confer and once you have decided, I'll have

14   those documents brought into the jury room.

15             Is there anything -- we have all of the cell numbers?

16             LAW CLERK:  Yes, we do.

17             THE COURT:  Is there anything else you wanted to say?

18             MS. MOE:  Your Honor, nothing with respect to

19   paperwork going back to the jury.  We did have a question about

20   timing.

21             Does the Court have a view about the schedule for

22   today or tomorrow for the jurors' deliberations?  We were

23   wondering whether it is the Court's practice to bring jurors

24   back or to let them leave on their own, and if so, when that

25   might be.

1          THE COURT:  I would bring them back in at five minutes

2     to 5.  And I'd have them come in tomorrow morning at 9 and let

3     them begin their deliberations when everyone is here.  You're

4     not required to be here at that time.  Just to be available.

5          MS. MOE:  Thank you, your Honor.  Aside from that, no

6     other issues from the government.

7          With respect to paperwork, if we can take a brief

8     break we'll confer with defense on defense exhibits.

9          THE COURT:  Anything from you, Mr. Meringolo?

10          MR. MERINGOLO:  No, Judge.

11          THE COURT:  All right then.  I will see you then at

12     five minutes of 5.

13              (Recess pending verdict)

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

M5VVSHE5

1          (Jury present)

2          THE COURT:  Do the parties agree that the jurors are

3    all present and properly seated?

4          MR. ROOS:  Yes, your Honor.

5          THE COURT:  Please be seated.

6          We've come to the end of our day.  You are to continue

7    your deliberations tomorrow morning at 9 o'clock.  You can come

8    directly to the jury deliberation room.  However, you cannot

9    continue deliberating until tomorrow when you're all gathered

10   together.  So stop deliberating now.

11         Don't discuss the case.  Don't permit anyone to

12   discuss the case with you.  And when you return in the morning,

13   you may commence your deliberations once everyone is present

14   and Juror No. 1 says that you are commencing your

15   deliberations.  Have a good evening.

16         (Jury not present)

17         THE COURT:  Please be seated.

18         Is there anything before we break?

19         MS. MOE:  Not from the government, your Honor.

20         Thank you.

21         MR. MERINGOLO:  Nothing, Judge.

22         THE COURT:  All right then.  See you tomorrow.

23         Thank you.  Have a good evening.

24         (Adjourned to June 1, 2022, at 9 o'clock a.m.)

25