UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

UNITED STATES OF AMERICA,

                                             Docket No. S2 20 Cr. 412 (AT)

    -v.-

TIMOTHY SHEA,
                         Defendant.

———————————————————————

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, TIMOTHY SHEA, respectfully submits this Memorandum

in aid of his plea for leniency at sentencing at the hearing to be held on April 26,

2023. Attached to this Memorandum is Exhibit A, a letter from Mr. Shea. Because

of personal circumstances of this attorney we do not yet have any other supporting

documents, but expect to have some within a few days, and we ask that the Court

accept them.

### Objections to the Probation Department Pre-Sentence Report

The following are both objections to and further explanations of the

statements made in the Pre-Sentence Report ("PSR"). None of them affects the

calculation of the federal sentencing guidelines. It is also understood that the

Probation Office did not have the benefit of any statements by Mr. Shea or the

defense with respect to the charges herein. We submit that the Court should have a view of the defense side of the allegations as well as an understanding of what Mr. admits, and takes responsibility for, and what we feel the government (and therefore the account in the PSR) have wrong about the facts.

Paragraph 13:

(Background to the case): Mr. Shea only got to know co-defendant Brian Kolfage because Brian was working with Mr. Shea's wife, Amanda Shea, on website publication of news stories with a conservative point of view. Brian had a non-profit entity called Freedom Daily for some years, and later formed another one called Trump Republic. The operation consisted of re-posting conservative news articles and opinions, and for Trump Republic, some celebrity news, from numerous sources, and earning money on advertising revenue when people "clicked onto" the page. Mr. Shea believes Freedom Daily earned roughly $1.4 million during 2016. Mr. Shea had come contact with Brian, and in about 2016 agreed to form a Facebook page for re-posting the conservative articles in return for sharing the advertising revenue. He also worked with Trump Republic for which he performed a number of functions, including picking stories to post or rewrite and then post.

In early 2018 the Facebook pages were all taken down and the business was

abruptly came to a stop. Brian and Mr. Shea proceeded to buy up other Facebook pages, ones which were fairly inactive but had many followers, and therefore inexpensive to buy. Later these pages were used to promote the crowd-funding project which is the subject of this case.

In late 2018, after Congress refused to fund Donald Trump's proposed border wall, Brian presented the idea to the Sheas of starting a crowd-funding project to raise some cash and send it to President Trump. A woman named "Tiffany" who had been a Tea Party activist and who knew, among other people, Andy Badolato (co-defendant in this case) got involved with putting it together. Neither the Sheas nor Brian Kolfage had high expectations for the project, and they assumed it would be quick and not entail much effort. During the first week, however, millions of dollars came in and they were astounded. They realized that there might be a way to capitalize on the large response even though Brian had stated on the fundraising page that he would not receive any payment for his role in the campaign.. They decided to form a Board and figure out how to get the money to President Trump.

They learned very quickly that the money could not just be given to Trump or the government, and the idea was formed to use it to build a portion of the border wall. They were advised by an attorney to contact all the donors to seek

their consent for changing the mission of the project, and the vast majority agreed. The lawyer also established a non-profit entity, hereinafter called WBTW ("We Build the Wall") to handle the finances necessary for the new version of the project.

Mr. Shea saw opportunities for himself to make income from the project through working for it and being paid, and later by setting up side businesses and making profits from the side business.

Paragraph 34:

The "secret agreement" discussed in this paragraph was never communicated to Mr. Shea: he only learned of it after his arrest. He was aware that Brian had made promises in the fund-raising web pages that he would not take any money for his role in the project – a promise that Mr. Shea thought was more like a salesman's boast than an actual promise –  but also thought was not unreasonable because, until it exploded in receipts of donations, he did not believe Brian would be doing more than lending his name to the fund-raising effort (as a wounded and disabled war hero).

Paragraph 40:

This text exchange has been misinterpreted by the government and the Probation Office. It took place in March, 2018, about three months after the first

donations were starting to come in, and when the stated mission had been changed to actually building a portion of the border wall. Mr. Shea began to realize that nothing was being done about actually getting a wall built except some general talk and had become concerned that if they did not take concrete steps to start the project that it would be seen as a fraud. He did not pay much attention to the statement about "hiring ourselves" made by Brian because, as stated above, he was not aware of the secret payment arraignment and he did not think it was unreasonable that Brian should be "hired" by the project because he was now doing a great deal more work to make it successful.

Mr. Shea also realizes that some aspects of the project could be done more efficiently and inexpensively if they did the work themselves. They had planned to hire a company called "Red Matrix" which would attempt to identify the owners of various parcels of land along the border and determine whether they were actually owned by the federal government and leased to the people living on it. After consideration of the idea they decided this could be more cheaply done by themselves.

Paragraph 41:

It is correct that payments were made to Brian through a company owned by Mr. Shea, but he did not know about the secret salary agreement.

Part of the "plan" that Mr. Shea wanted to establish was the formation of a company through which to conduct the real estate transactions for obtaining properties on which to build the wall. The company he established under Wyoming law was called Ranch Property Marketing and Management (hereinafter, "Ranch Property") and was not a "shell" company because Mr. Shea intended to use it for the wall-building project and then later for his own real estate work which he hoped to be able to conduct with the help of the email list of donors that was generated by the crowd-funding project. Because that prospect had not yet become a reality it did mostly serve as a pass-through for payments to Brian.

Mr. Shea and Brian made an agreement for Mr, Shea to purchase the email list from the WBTW non-profit entity for $150,000 in March or April of 2019 (a few months after the fund-raising effort had started). At that time the agreement was only memorialized on a dinner napkin, but they had intentions of having a real contract drafted and signed. They did not get around to actually doing it, however until in October, 2019, they realized that the project was coming under law enforcement scrutiny and they decided to finalize the contract and back-date it (a serious error of judgment Mr. Shea admits and regrets). They had, as discussed,

bought and sold Facebook pages and other websites before, and knew that they could be a valuable resource, but they were not sure it was legal to sell the information on an email list. For that reason they suggested putting the payments into the "veiled" entity (his Wyoming corporation) so that if it turned out that the sale was improper, it would not be discovered until they could reverse the plan. This is also why payments were marked as being for "social media" rather than for the email list. Again Mr. Shea regrets having made misstatements on the business records but did not realize the seriousness of his actions.

Paragraph 44:

The $50,000 wire was originally intended to be used to pay the company Red Matrix for the property "overlay" work they were going to do in order to identify properties (or portions of properties) along the border that could be purchased for building the wall on, and to make sure they were not actually owned by the federal Bureau of Land Management. Just after the wire was sent they decided not to hire Red Matrix, so Mr. Shea forwarded $25,000 to Brian as a partial payment toward the purchase of the email list and kept the other half for expenses he anticipated in connection with travel to the border (where the wall was being built) to approach landowners and later to supervise aspects of the construction of the wall.

Note that the reference to creating a "spashpage" was not to making a fraudulent web page, but rather to making a page that if any property owners were to "google" Mr. Shea or the others after being approached about selling property for the wall that there would be a way for them to see that Mr. Shea and the project to build the wall were genuine.

Paragraph 45:

As stated, the payments were marked for "social media" rather than for the email list because they were not sure of the legality of purchasing the list. Mr. Shea was not using the list yet, and he also believed that Brian, as the President of the WBTW entity, had the right to sell the list and keep the money (because it would not be from donors) as payment for this "side" business.

During 2019 a number of banks where WBTW had accounts told Brian that they no longer wanted their business and that they had to go to another bank. Mr. Shea found out later that Andy Badolato, who had control over the debit card for the accounts, was using it far too frequently for a normal non-profit organization. Later Mr. Shea, being worried about this apparently unauthorized activity, hired an investigator to look into Mr. Badoloto's background and received a report that stated that Mr. Badolato had been involved in a number of failed businesses in the past, which made Mr. Shea very concerned. In November, 2019, his wife,

Amanda, was named Treasurer of the non-profit but was not actually given access to the account records until late January, 2020, when she discovered the questionable transactions in the account (and when Mr. Shea, who never had access to the account, hired the private investigator).

Paragraph 47:

These payments were for the income from the merchandise selling side business, which Mr. Shea had no reason to believe was fraudulent or being used to conceal payment to Brian. His understanding, however, of the split of the proceeds was different from what Austin Rickles testified to at trial (not saying Mr. Rickles was wrong, just that Mr. Shea was not told the same thing): Mr. Rickles said his company, which actually produced or contracted for the production of the merchandise, was to get 30% and the other 70% to go back to WBTW. (See Trial transcript at pp.434-444). Mr. Shea's understanding was that only 20% of what Mr. Rickles sent was to be designated for the WBTW entity and that the rest (a total of 50%) was for Brian and Mr. Shea to split as investors or entrepreneurs in the business. When Amanda Shea was treasure she kept the 20% aside that was to be donated to the WBTW entity itself.

Paragraph 51:

Some of what Mr. Shea received was for actual expenses, such as travel and

payment for security services, for the wall construction project. Others were used personally because he considered them as his income for doing the work he did.

Paragraph 53:

While it is true that Brian Kolfage made repeated statements about not taking anything for himself from the donations to the build-the-wall campaign, it should be noted that Mr. Shea never made such representations and was not party to the communication by Brian to Andy Badolato concerning what the public did not know about payments to him.

Paragraph 55:

The "donor list agreement" (for the purchase of the email list) has been discussed *infra*. Mr. Shea admits that documents were backdated, but felt they reflected the true oral agreements that had been in place during the life of the project. He realizes that this was wrong and regrets handling it that way.

Paragraph 57:

There is a huge misunderstanding about the "banner" on the merchandise sales website. When the merchandise sales operation was being set up a webpage was being designed for it The PSR is completely wrong in stating that "Shea proposed the banner to Kolfage;" The webpage which contained the statement that all proceeds go directly to building the wall was NOT on a publically available

webpage. The webpage was being designed, and when Mr. Shea saw the banner "promise" he was alarmed. He took a photo or screenshot (attached to GX 23 as ING_1783.jpeg which is a digital photograph[1]) of it and sent it to Brian saying "...do we want this statement at the top," (because it was already there, on the "draft web page." He was actually asking, "do we really want to say this?" (See Trial Transcript at p. 208). Mr. Shea in fact saw the banner and questioned the wisdom of using it, noting that he did not want "to go to jail." Brian responded with his opinion that "since it can't be proven its ok," but also noting, "I'll ask." Within twenty-four hours the banner was taken off of the draft web page and, as far as Mr. Shea knows, it never appeared on the web page that actually went up on the internet. It was Mr. Shea who, being concerned about making a false representation, told Brian it should not be there, and as a result, it was not.

The misrepresentation presented at trial concerning the online merchandise store was that the producer of the merchandise was told by Brian that he would keep 30% and 70% would go back to WBTW. That was never Mr. Shea's

---

[1]Note that Austin Rickles was shown the exhibit by Mr. Shea' attorney who apparently did not know or did nor remember that the "banner" line had been removed from the webpage before the webpage was made public. Mr. Rickles recognized the webpage and then was asked about the banner without being asked whether it was on the website at the time that it was active. Trial, p. 439-440. He said that he had seen the banner before but not that it was on the active website.

understanding. As stated, he and Brian hoped to make money on the operation, which in fact, did not violate any representation which actually was displayed to customers of the online store.

Paragraph 58:

The transaction for $225,000 was actually for Facebook pages, and it is disputable whether it was fraudulent. As previously explained, during the period after Brian's Facebook pages were closed down by the Facebook company in around 2018 he and Mr. Shea set about buying little-used Facebook pages that catered to conservative people and had a large following but no profits. They purchased at least five such sites, and later used them to promote the WBTW project. In about August, 2020 they decided that since WBTW was benefitting from the pages that it should buy them – or essentially reimburse them for the purchases they had made in the past several years and for the money they had put into keeping them active – and that $225,000 would be a fair price based on the number of followers the pages had.

Paragraph 59:

The "Winning Energy" side business was a legitimate business established by Mr. Shea to sell energy drinks with advertising that catered to Trump supporters. He realized that if he could make a large bulk purchase from the

supplier he could increase his profit margin and he had heard that Brian and Andy Badolato had taken a loan from the WBTW entity for another business project they had. The went to an attorney in the District of Columbia who told them that they would need a written loan agreement and repayment terms with interest for it to be an above-board transaction, and who drew up the paperwork. Mr. Shea used the loan proceeds in June 2021 to buy the drink products which he kept in a warehouse in Florida.

Paragraph 60-61:

During the pandemic the government issued the "PPP" loan program to help businesses maintain their employees despite the huge downturn in business. The program applied to single-business owners who would normally have taken a salary or share of profits under normal business conditions which thus had only one employee. Mr. Shea is not aware of any false statements made in the application.

Because the money was to help him, as the only employee of the business, continue to have income (which was the equivalent of his salary) the use of the proceeds for personal expenses was not in contravention of the loan agreement. Unlike most people who took PPP loans, Mr. Shea did not apply for forgiveness of the loan. He had only made one small monthly re-payment on the loan before they

were arrested.

<u>Paragraph 62</u>:

Mr. Shea filed a joint return for 2019 very hurriedly because at the time (August, 2020, after obtaining an extension of the filing date) he and his wife were looking to buy a new home and needed to show that they had income. Mr. Shea realized that the return was not accurate, but he expected to file an amended return when he could pull together records which would accurately account for his income from all sources and his expenses. Instead he foolishly put the income from WBTW that he and his wife received (a total of $387,344 – see PSR paragraph 134) and listed a few expenses he believed were correct but not complete.

The WBTW organization gave him a W-9 as proof of receipts of money but apparently whoever filled it out had made an error in the category. Mr. Shea believes that the tax-preparer who filled out the application put the correct form of income on the actual application (not "rent") and was not aware that he was somehow attesting to the complete accuracy of the document he had not prepared.

It is notable that if he had believed that he obtained the money from WBTW illegally it seems unlikely that he would have reported it to the IRS.

<u>Paragraph 63</u>:

Mr. Shea's explanation for his failure to submit returns for 2020 and 2021 is correctly stated.

Acceptance of Responsibility

We are asking the Court to find that Mr. Shea has accepted responsibility in the letter that is attached hereto as **Exhibit A**. In it he still differs with the government's interpretations of conversations, texts, and other details of Mr. Shea's conduct in the case, which is one of the reasons he did not simply accept a plea offer in the first place. But he has acknowledged committing conduct which would make him guilty of the three charges against him.

Under the Application Note 2 for Federal Sentencing Guideline § 3E1.1 the Court can find that even after trial a defendant has accepted responsibility if the reasons for putting "the government to its burden of proof" are not related to a false assertion of innocence, usually because there was some legal defense that does not relate to factual guilt – here, the question of venue.

Mr. Shea was made a plea offer prior to the first trial, but after having made an agreement in principle to a stipulated guidelines calculation the government changed the offer by increasing the guidelines range. He was advised by his counsel at the time that he had a good defense based on the lack of venue in the Southern District and that he had little to lose by going to trial. He did so without

giving testimony concerning any false assertion of innocence, and the result was a hung jury. Prior to the second trial the government greatly increased the guidelines sentencing range for a stipulated guidelines calculation, and he was again advised by his attorney to do the retrial. Again, he did not take the witness stand or call witnesses to testify to any phony assertions of a defense but relied on his constitutional right to have the case proved beyond a reasonable doubt.

We recognize that awarding points for acceptance of responsibility after trial is supposed to be rare (as the Application Note itself says). But whether or not the points are awarded, we ask the Court to take into consideration Mr. Shea's acknowledgment of responsibility, and to understand the circumstances that led him to go forward with a trial even though he and his attorneys attempted to come to a plea agreement prior to both trials.

Prior Criminal Record

None. Mr. Shea's personal history as outlined in the PSR show an unblemished history of abiding by the law and being a hard-working responsible family man.

The 3553(a) factors

As is well-known to the Court, the factors listed in 18 U.S.C. § 3553(a) are as follows:

(a) Factors To Be Considered in Imposing a Sentence.— The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner... [Emphasis added.]

Only two of these are relevant to this case.

### The "Nature and Circumstances of the Offense"

In stating the objections to the factual assertions made in the PSR Mr. Shea is trying to show two things: 1) he is not trying to assert his innocence of the crimes, and 2) there is a logical explanation for his the succumbing to the exercise of very bad judgment which is not a reflection of who he is as a person.

When the proposal for the crowd-funding page was made to him by Brian, –

– which was something of a continuation of other activity in support of conservative causes and support of former President Trump – neither of them expected it would amount to much or take much effort. When it immediately took off resulting in millions of dollars coming in, and when they learned, almost simultaneously with the launch of the campaign, that they could not just hand over the money to Donald Trump or to the government for the purpose of building the border wall, they changed the plan (on notice to the donors so they could opt in to the new idea) to one of trying to build a portion of the wall themselves. In that process Mr. Shea first came to a realization that a lot of work was going to be involved, from which he could possibly make income, and, as the prospects unfolded, that there might be other ways to capitalize on the interest in the wall through side businesses which he could set up and which he did not believe would be fraudulent.

To this end he made very sincere efforts to make sure the wall project was a real thing, and to seek advice of attorneys and others with experience in fund-raising and setting up businesses and non-profit entities to carry through with the project. He put a great deal of time and effort into it, and as an entrepreneur hoped for a return on his efforts. Although he was deeply involved in the actual effort to construct the wall he was not fully informed of some of what others in the project

were doing, particularly of the secret arrangement for Mr. Kolfage to get a large

payment followed by a monthly "salary" even though he had stated in the fund-

raising media that he would not take any money.

As explained by Mr. Shea, the flurry of activity and responsibility for

getting the project underway resulted in his using some very bad judgment about

the handling of money and of keeping and doctoring of records. By the time he

had come to realize that things were not as they should be (to the extent that he

hired a private investigator to see why improper-looking expenses were being

charged against the WBTW account) he was so far into it that he did not really see

a way out. And he had already backdated contracts and inflated invoices to obtain

money he was not, at that point, entitled to.

The only other sentencing factor that has relevance here is § 3553(a)(2)(B)

– general deterrence of others to discourage others from committing a similar

crime. While we recognize that this is a stated and rational goal of sentencing, for

this kind of crime we submit that a relatively low sentence is adequate to meet this

goal, and that the embarrassment and publicity that have already surrounded this

prosecution will provide a sufficient lesson for anybody who might be inclined to

try something like this themselves.

In short, Mr. Shea is a very good man who succumbed to some bad activity

because he was carried away with the prospect of making a really big income. The Probation Department recognized this when they recommended a sentence which is half of the low end of the guidelines range. This Court should recognize, in light of Mr. Shea's letter, that any prison sentence will represent a huge punishment for Mr. Shea and that, other than deterring others from committing similar crimes, there is no good reason to incarcerate Mr. Shea for years rather than months.

<u>Defendant's Sentencing Request</u>

Timothy Shea asks the Court to set a sentence below the stipulated Guidelines range for reasons already stated, which include his background and current personal circumstances taking into consideration the letter by Mr. Shea submitted with this Memorandum as **Exhibit A**. The original plea offers made to Mr. Shea placed his sentencing range at a level of about 24 months which we submit was sensible and reasonable. We submit that the Court should consider a sentence at that level because it  meets, but does not exceed, the goals of sentencing as expressed in 18 U.S.C. § 3553(a).

In this case the Probation Department has made a fairly rare recommenda-tion that the Court make a variance from the Guidelines range and impose a sentence of 54 months on all counts to run concurrently with each other. They did this without having heard some of the explanations or mitigating circumstances

that Mr. Shea has provided in his letter to the Court, or his admissions and acceptance of responsibility. This recommendation points out the strong mitigating factors in Mr. Shea's life, but takes the government's view of the seriousness of the charges. As stated above, Mr. Shea, with some dispute as to details about the events, does now take responsibility for his guilt and we ask that because of his relative level of culpability in the case he should be given a sentence lower than the Probation Department recommendation.

The Guidelines range that the Probation Department found applicable is 108 to 135 months – significantly higher than is being recommended for the two co-defendants. The fact that he was not awarded three points reduction for acceptance of responsibility does not explain the significant difference this sentencing range apparently being applied to his two co-defendants who did enter guilty pleas. We have no wish for the Court to sentence Mr. Kolfage to anything higher that he bargained for, but it seems extremely unfair that Mr. Shea should receive anything more severe that Mr. Kolfage.

Moreover, as to all of the defendants, the extraordinarily high guidelines range is driven by the large amount of money raised in the campaign. It is not as if the original plan or expectation was that such a large amount would come into the fund so quickly. As with many crimes, this dollar amount was almost random and

therefore should not be a driving factor in assessing the seriousness of the case.

Moreover, much of the money was actually used as the donors expected it to be. It is also very uncertain how many donors actually would have withheld their donations if there had been no misrepresentation, or if the representation had been of the true facts, which were that Mr. Kolfage and others working on the fund and on the building of the wall were going to be paid for their services. It seems a little strange that the two witnesses the government found to say that the misrepresentation was material to them had to be brought it from Arizona and Pennsylvania and that no witness from the Southern District was called to say that.

In short, for reasons that are unique to the facts of this case, the Guidelines range calculated by the Probation Department, while correct, are nevertheless unreasonable. The very large numbers are driven by the total amount collected, and the level of materiality to the thousands of donors is difficult to assess but seems unlikely to be as high as those numbers suggest. We ask that the Court take all of this into consideration and impose a sentence that takes into consideration the quality of Mr. Shea's character, the circumstances of his becoming sucked into the whirlwind of the project, the fact that at a number of points in the history of the offense he tried to ameliorate the illegalities that were becoming apparent to him, and that he has now acknowledged and accepted responsibility for his actions

Dated:      New York, New York
            April 12, 2023


                              Respectfully submitted,


                              Thomas H. Nooter
                              Attorney for Defendant
                              Freeman, Nooter & Ginsberg
                              75 Maiden Lane, Suite 503
                              New York, NY 10038
                              (212) 608-0808
                              Email: nooteresq@gmail.com

cc:    Office of the United States Attorney (by ECF)
       Attention: AUSA Robert B. Sobelman, Esq.
       AUSA Mollie Bracewell, Esq , and Derek Wikstrom, Esq.