FREEMAN, NOOTER & GINSBERG
ATTORNEYS AT LAW

LOUIS M. FREEMAN
THOMAS H. NOOTER*
LEE A. GINSBERG

75 MAIDEN LANE
SUITE 907
NEW YORK, N.Y. 10038

(212) 608-0808
Cell: (917) 847-1361

*NY AND CALIF. BARS

June 9, 2023

The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

RE:   United States v. Timothy Shea, et al.,  20 Cr. 412 (AT)

**Supplemental Sentencing Submission**

Your Honor:

I am writing to respectfully ask the Court to accept this additional sentencing argument for two reasons: 1) because I would otherwise be able to respond to the government and to make additional points on sentence at the sentencing hearing next week, I thought it would be helpful for the Court to receive them in advance, and 2) as the Court knows, I had requested a postponement of the sentence for several personal and professional reasons and when that application was denied I had a relatively short amount of time to complete my original submission.

<u>The Offense Conduct</u>

While the Court is fully aware of the offense conduct based on having presided at the trials of Mr. Shea, there are nevertheless things that should be pointed out with respect to his conduct relative to that of the other defendants. The government's sentencing letter mentions twice that Mr. Shea is the least culpable of the defendants who were indicted in this case (see Gov't Sentencing Submission at p. 41, "He [Mr. Shea] certainly was less critical to the scheme than

-1-

either Badolato or Kolfage. ...” and p. 42, “While the Government agrees that his culpability, relative to his co-defendants, is a basis for a meaningful downward variance...”).

The Government then argues that Mr. Shea deserves a greater sentence than either of the co-defendants after making a very strong argument in the Gov’t Sentencing Submission that Mr. Kolfage did not actually accept responsibility, as shown by various internet postings which are described and pictured in the Submission. See pages 16 through 24. The substantial difference in the Guidelines calculations between Mr. Kolfage and Mr. Shea included points being awarded to Kolfage for acceptance of responsibility. The Government claims that Mr. Shea has not fully accepted responsibility in the letter he submitted with our original sentencing submission – which we concede but only because we disagree with the Government’s inferences from text messages, etc., about what Mr. Shea knew at any given time, or what his level of knowledge or motives were – and yet Mr. Shea, even by going to trial, never attempted to mislead the Court or the jury as to his participation or role, whereas the Government argues that Kolfage was completely disingenuous in his acceptance of responsibility based on his publically broadcasted statements about the case.

It is also clear that Mr. Shea’s Sentencing Guidelines calculation includes a number of enhancing factors which either would have been applicable to the co-defendants, or which are similar to other conduct committed by the co-defendants which could have resulted in enhancements to the Guidelines levels but for their having made plea agreements that did not take them into account (See pp. 25 to 26 on other conduct by Kolfage, and the “central role” played by Mr. Badolato, described at pp. 32 – 33 of the Gov’t Sentencing Submission).

<u>History and Characteristics of the Defendant</u>

The main point I want to raise is that, in the context of “the history and characteristics of the defendant,” Mr. Shea is being portrayed as someone he is not. The objective facts as found in the PSR itself and in the letters submitted as exhibits show that he is a good man who got swept up in a dizzying vision of becoming enriched by something that both got out of control and was not what he planned.

Indeed, the history and characteristics of Mr. Shea are that he is clearly a very good man, father, husband, and citizen. As the letters from friends and family show, he has a great deal of responsibility for raising the three children, ages seventeen and (the twin girls), sixteen. (PSR, p. 19). As his wife related to the Probation Officer who prepared the PSR, Mr. Shea is a devoted father, "involved in all aspects of the children's lives." (PSR, p. 20).

Mr. Shea has worked hard to support his family through various entrepreneurial jobs and businesses, mostly selling real estate, but also other single-owner companies he and his wife have established since the 1990's. (See PSR, paragraphs 121 through 126, pp. 21 through 23). In absolutely none of these jobs or business ventures is there a hint of any kind of misrepresentation, fraud, or theft. The real estate business depends on earning commissions on individual sales, and the other business he has formed depend on making a profit through sales of products or services. Unlike occupations that are compensated by a salary, sales-based small businesses depend on seeking out opportunities to grow a business (or multiple businesses) and ways to sell more products in order to create a profit, which is the earnings an entrepreneur makes by running a business. For that reason, the opportunity to make profits through sales of products related to the We Build the Wall project seemed natural and legitimate.

Nothing in Mr. Shea's work history suggests that he ever made money through misrepresentations, fraud, or theft. To say he was motivated by "greed" when he got involved with the We Build the Wall fund-raising scheme is not correct: he was indeed motivated by a desire to earn money. But nothing prior to this particular project suggests that his initial intent was to do it illegally. His efforts were geared toward creating or involving himself in the "side" businesses which were not illegal and did not involve any misrepresentations (particularly since the idea of selling the wall "products" online took off the proposed banner promising again that "all proceeds go directly to building the wall" before the web page went public). Hoping to make a lot of money on a business venture is not the same as "greed."

I would point out, however, that the evidence showed that Mr. Shea's intial enthusiasm (more expressed by his wife than by himself, by the way) was also aimed at making those profits through the possible side businesses that could be generated by the fund-raising project, and not by stealing the money from the

donations themselves. This is shown in the trial exhibit **GX 1**, in a part of the text exchanges which took place the first day the idea was proposed by Kolfage, December 12, 2018, at page 2, in an exchange starting at line 31, where Kolfage says "So after it gets people to by shit and we get money" Shea responds "...Why don't we just add our own affiliate links to it [to the webpage]. We have an idea and artwork for a trump energy drink, like Red Bull. [Shows the "art"]. After Kolfage mentions that it will take time, Mr. Shea says, "My brother came up with it and already had a drop ship drink distributor. They do everything, including packaging and shipping. Can be sold on Amazon. ..." (**GX 1**, pp. 1-2).

The Government argues that the side businesses – the energy drinks (which were purchased with what was intended to be a loan from the funds in the WBTW accounts) and other merchandise related to the private building of a portion of the wall, are somehow themselves illegal. They tried to support that argument with evidence, presented at trial through the witness Austin Rickles, that the website for selling the merchandise also had the same disclaimer that all profits would go to building the wall. But as I have argued elsewhere, that disclaimer never was added to the public version of the website – it was merely an idea under discussion (which we assert Mr. Shea was against), which was not, in fact, stated in the public offering of the merchandise.

The fact that the vast majority of money raised by the initial fund-raising project belies the idea that Mr. Shea agreed to participate in a wholesale theft. It is also belied by Mr. Shea's having reported his income on his 2019 tax return without even taking what were probably numerous legitimate business expenses as deductions (like for travel to the site of the wall construction). He explained that he stupidly and wrongly filed a very unfinished income tax return in haste with the intention of fixing it up later (by filing an amended return), but that does not explain why he would report hundreds of thousands of dollars of income from the WBTW project if he believed he had stolen the money.

The theory that Mr. Shea intentionally became involved in the scheme to basically steal money for himself and his friend, Mr. Kolfage, is also belied by his genuine and deeply held religious values, as is described in most of the letters submitted on his behalf. The testimonials are not just bald statements that he is a moral and devout man, but the examples given – for example, by his daughter about the devotional reading time he spends with his children (**Exhibit G**), the

description of Mr. Shea's role in his church in the letter by Clinton Dorris (**Exhibit B**) and the description of how he raised Katelyn Phipps after her mother died when she was eleven years old (and not having a father in her life), noting that "he introduced Christ into my life..." (**Exhibit D**).

Indeed, Mr. Shea's service to others is remarkable. In addition to taking over as a father figure for the Phipps family, including legally adopting the youngest member of the five-children family, as described by Andrew Phipps (**Exhibit E**). The description of Mr. Shea as "Mr. Mom" to his three teenage children given in Mr. Dorris's letter, as well as the very specific descriptions of the care and dedication to his children described by two of the children themselves, shows how remarkable a man he is. He truly shows his character through his good deeds, hard work, substantial volunteer work, and being so well respected as a role model in his community, his family, and his "adopted" family.

We understand that Mr. Kolfage and Mr. Badolato have significant disability and health issues that serve as the reason the Government has recommended that they receive a more lenient sentence than Mr. Shea, who, for all intents and purposes, is healthy. There is a factor unique to Mr. Shea, however, which I will describe in a separate letter which I would ask to have filed under seal, as it relates to a private health issue of a member of Mr. Shea's family.

The salient mitigating factor in Mr. Shea's case is his exemplary character and the incredible damage his removal from his family and community will wreak on his wife and children.

Mr. Shea does not deny that he ended up committing offenses. Some of what he saw from his perspective in the project differs greatly from the way the Government tries to interpret what happened based on the circumstantial evidence of text messages and emails. The important thing is that it is not something he would ever do again. The toll that his arrest has taken on his family, to whom he is obviously fiercely devoted, is more than enough to ensure that he will never fall into a trap for greed or any other reason of trying to misappropriate money to which he is not entitled.

Any period incarceration would be devastating for the family. As noted by Mr. Shea's wife the children are already taking medication for anxiety due to Mr.

Shea's arrest two years ago, and as described in paragraph 103 (PSR, p. 19), she has her own significant problems which would be an impediment to having to financially support the family and be available for the children's needs in the small-town area in which they live. Mr. Shea's son made a note in his letter to the Court that Mr. Shea drives him to basketball practices, sometimes over an hour from home. (**Exhibit I**). His daughter, in her letter, also notes that "the hours he spends mobile to get medicines, food, to drop anyone off somewhere, to pick anyone up..." is a significant part of what he does in taking care of the family that will be taken away if he is incarcerated. (**Exhibit G**). Because of the problems his wife has she is not likely to be able to take his place for that kind of support for the children. While trying to be optimistic, Mr. Shea's son reveals a great deal of anxiety as a result of his father's arrest and conviction.  All of the family members discuss Mr. Shea's deep commitment to his religion and the role that religious devotion plays in the life of the family.

<u>Acceptance of Responsibility</u>

As stated in our original sentencing memorandum a defendant who admits error but does not agree with the prosecution's version of everything that they think happened is in a very bad position to benefit from the Guidelines definition of acceptance of responsibility. More than that, he is in a very bad position with respect to accepting a plea agreement to avoid trial. This conundrum was articulated to some degree in the colloquy at pages 3 through 8 of the trial, before the second trial commenced, in a discussion about the history of plea offers in this case. At the very least, that explanation by Mr. Meringolo shows that there was a major effort before trial (both of them) to have Mr. Shea receive a plea agreement, which would necessarily have had him accept responsibility (responding to the Government's citation of the Summary Order in *United States v. Roizman*, 408 F. App'x 443 (2d Cir. 2011).

In the first years of the Guidelines there was no limitation on the ability to accept responsibility (and be awarded a reduction of points) after going to trial, provided that one did not present a false defense (an alibi, for example). Later, presumably to encourage more defendants to plead guilty, the Sentencing Commission added the current restrictions on awarding acceptance points after trial which make it almost impossible to do so. We submit that those limitations are extremely unfair: one should not be penalized for exercising their

constitutional right rather than be rewarded for showing remorse and acknowledgment that they did wrong – even after trial – which is an indication of taking a step towards rehabilitation.

Mr. Shea wrote and submitted his letter to the Court to show the latter. While the Government is correct in stating that Application Note 2 to U.S,S.G.§ 3E1.1 does favor "pre-trial" conduct evidencing remorse, here we would argue that Mr. Shea's efforts to come to a plea agreement twice – before each of the two trials – is such an example of an effort to acknowledge responsibility.

I also note that the quote from his trial attorney in summation[1] is exactly what is permitted when trying a case and only using the failure of the Government to prove it beyond a reasonable doubt as a defense when the client is, in fact, guilty of the crime but not in the manner the prosecution believes ("I submit to you that is not true, that they can't prove that beyond a reasonable doubt...," and otherwise states an uncontested fact ("he worked"). *Id*.

While it may have been apparent, or likely, that the funds raised in the original plan could not be paid directly to the Government or the president, the fact that they would be sent to Brian's organization does not imply that they would then simply be stolen. Moreover, the secret arrangement to pay a $20,000 "salary" to Kolfage would not have been apparent to Mr. Shea simply from the number of times Mr. Shea transferred that amount to Kolfage because, as is clear from page 6 of the Gov't Sentencing Submission, those "salary" payments were also coming to Kolfage from Bannon's organization. The fact that the early text exchange show that Mr. Shea expected that the fundraising project might be a source of earning income does not mean that he thought it would be by taking any of the money raised directly from donors as opposed to by other side businesses (like the energy drink project already in existence, and the statement that they "buy shit and we get money." (GX 1) .

In any event, the important thing about his letter is what it expresses for the Court at this time. Our position is that Mr. Shea's primary responsibility here was in doctoring and backdating records to conceal the payments made to Kolfage. Mr. Shea also acknowledges that he lacked good judgment in thinking that the

---

[1]Gov't Sentencing Submission, p. 36, footnote 9.

assertion that Kolfage would not "take a penny" of the money was a salesman's boast and not something anyone who wanted to donate to the wall project would care about, and that Kolfage actually deserved payments for the work he ended up putting into the project and the continued fund-raising. Mr. Shea did not make this assertion. When Mr. Shea tried to warn Kolfage off the idea of adding a similar promise not to take any of the proceeds of the merchandise project and Kolfage's response was "I'll ask. I think since it can't be proven it's ok." GX 23, emphasis added), Mr. Shea's response was "K. I don't want to go to jail." At that point (February 4, 2019) they were receiving advice from attorneys, and Kolfage's response "I'll ask" implied, if not clearly stated, that he would check with the attorneys and that is what satisfied Mr. Shea. (And then, in fact, the "banner" was not put onto the public website for the merchandise sales).

<u>The Appropriate Sentence</u>

The Government's description of the facts of the case show what they also acknowledge as being true, namely that Mr. Shea was the least culpable defendant in this indictment. He did not originate the idea of the fundraising plan, he did not originate the idea of making an assertion that all of the money would go into building of the wall, he received some money for his role but, in fact, he did actual work on behalf of the project (and never made the claim himself that he was not taking any pay for his role), and the main fraudulent activity was in assisting his friend in covering up the violation of the friend's promise, after the fact.

We are not suggesting that Mr. Shea should now benefit from a plea offer he rejected prior to the first trial. We are suggesting that a sentence that would have been considered appropriate at that time is still appropriate at this time. There are numerous differences between Mr. Shea and the other co-defendants, all of which, except for their health issues (which I suggest are somewhat offset by Mr. Shea's family issues) point toward his being given a more lenient sentence than others in this case.

Respectfully submitted,

Thomas H. Nooter
Attorney for Defendant Shea

cc:   Damian Williams, United States Attorney, by ECF