UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA

    -against-

TIMOTHY SHEA,
                       Defendant.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __10/3/2025___
```

20 Cr. 412-4 (AT)

**ORDER**

ANALISA TORRES, District Judge:

    Defendant *pro se*, Timothy Shea, moves for compassionate release or a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Mot., ECF No. 435. For the reasons stated below, the motion is denied.

## BACKGROUND

    On October 28, 2022, a jury found Shea guilty of conspiracy to commit wire fraud, conspiracy to commit money laundering, and falsification of records, in violation of 18 U.S.C. §§ 1349, 1956(h), 1519, and 2. ECF entry dated 10/28/2022 (jury verdict); *see also* ECF No. 179 (superseding indictment). The evidence at trial established that in December 2018, Shea and his co-conspirator, Brian Kolfage, devised a plan to fundraise to build a wall along the southern border of the United States. Gov't Opp. at 1–2. Shea and Kolfage set their plan in motion: They launched a GoFundMe campaign titled "We The People Will Fund The Wall" and formed a non-profit entity called We Build the Wall, Inc. ("WBTW") to receive the money from the campaign. *Id.* at 2; Sentencing Tr. at 19:24–20:15, ECF No. 415. Kolfage, the president of WBTW and public face of the GoFundMe campaign, represented to the public that 100% of the funds raised would go toward building the wall and that "not a penny" would be used to compensate Kolfage or WBTW's leadership. Gov't Opp. at 2; Sentencing Tr. at 20:3–25. This was a lie. While Kolfage made these representations, Shea set up a shell company, transferred

donations from WBTW to the shell company, kicked back some of that money to Kolfage, and kept the remainder for himself. Gov't Opp. at 3; Sentencing Tr. at 21:3–8.

By October 2019, Shea had stolen hundreds of thousands of dollars in donations and paid about a quarter of a million dollars to Kolfage in kickbacks. Gov't Opp. at 3; Sentencing Tr. at 21:3–8. The fraudulent scheme ended up netting more than $20 million from its victims. Gov't Opp. at 2; Sentencing Tr. at 20:1–3. Nicole Keller, a tenth-grade biology teacher from Pennsylvania, donated to the WBTW campaign because her late husband was a border patrol agent and border security was an issue of great concern to both of them. Sentencing Tr. at 22:2–6. At trial, Keller testified that she "was insulted that [Shea and his co-conspirators] had taken what should be a position of honor and valor" to defraud her. *Id*. at 22:6–9. Victims such as Keller donated their money to the WBTW campaign to express their views on a political issue that was important to them. As the Government and the undersigned emphasized at sentencing, Shea and his co-conspirators eroded the public's faith in the political process. *Id*. at 22:10–16.

On July 25, 2023, the Court sentenced Shea to 63 months' imprisonment, to be followed by three years of supervised release. ECF No. 411 (judgment). Shea began serving his sentence on October 23, 2023. Gov't Opp. at 4. On June 17, 2024, he submitted a compassionate release request to the Bureau of Prisons ("BOP") "based on the serious downturn in [his] wife's mental health related to alcoholism," stating that his wife, Amanda Shea, is "incapacitated" and "unable to provide adequate care for [their] two minor children." Mot. Ex. J. The BOP denied the request on July 11, 2024. Gov't Opp. at 4. On November 4, 2024, Shea moved this Court for compassionate release or a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A)(i). Mot.

**LEGAL STANDARD**

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i) provides that:

> the court, . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

To be entitled to relief under this provision, a defendant must satisfy the exhaustion requirement and demonstrate that "extraordinary and compelling reasons" warrant a reduction of his sentence. In determining whether such extraordinary and compelling reasons exist, a court may consider, as relevant here, "[t]he death or incapacitation of the caregiver of the defendant's minor child" and "[t]he incapacitation of the defendant's spouse . . . when the defendant would be the only available caregiver for the spouse." U.S.S.G. § 1B1.13(b)(3)(A)–(B).

**DISCUSSION**

The parties do not dispute that Shea has met the exhaustion requirement because he submitted, and the BOP denied, his compassionate release request. Mot. at 4 n.1; Gov't Opp. at 4. Accordingly, the Court considers whether any "extraordinary and compelling reasons" exist that would warrant compassionate release. 18 U.S.C. § 3582(c)(1)(A)(i).

Shea argues that, due to her "severe alcoholism," Amanda is incapacitated for the purposes of U.S.S.G. § 1B1.13(b)(3)(A)–(B) and therefore cannot care for their two minor children and requires Shea to care for her. Mot. at 6–8 (capitalization altered). Shea principally relies on Amanda's March and September 2024 arrests for driving while intoxicated, Mot. at 2, 7–8, and argues that he is the only viable caregiver for their children, *id*. at 1–2, 7–8; *see also* ECF No. 442 (supplemental declarations in support of Shea's motion).

3

Showing incapacitation under U.S.S.G. § 1B1.13(b)(3)(A)–(B) "is a heavy burden." *United States v. Denko*, No. 20 Cr. 15, 2022 WL 1124826, at *2 (E.D.N.Y. Apr. 14, 2022) (citation omitted); *see United States v. Cole*, No. 18 Cr. 167, 2024 WL 3729133, at *17 (D. Md. Aug. 7, 2024). Incapacitation, as used in § 1B1.13(b)(3)(A), means that the "caregiver suffered a severe injury (e.g., auto accident) or suffers from a severe illness (e.g., cancer) that renders the caregiver incapable of caring for the child." *Cole*, 2024 WL 3729133, at *17 (quoting BOP Program Statement § 5050.50(5)); *see also United States v. Copeland*, No. 02 Cr. 1120, 2020 WL 2537250, at *2 (S.D.N.Y. May 19, 2020) (stating that "the BOP's Program Statement" is a "useful tool[] for defining the 'extraordinary and compelling' standard"). As used in § 1B1.13(b)(3)(B), incapacitation means that the defendant's spouse has "[s]uffered a serious injury, or a debilitating physical illness and the result of the injury or illness is that the spouse . . . is completely disabled," or has a "severe cognitive deficit (e.g., Alzheimer's disease or traumatic brain injury that has severely affected the spouse's . . . mental capacity or function)." BOP Program Statement 5050.50(6).

Shea fails to establish extraordinary and compelling circumstances based on his claim of Amanda's incapacity. Although he argues that her "alcoholism has progressed beyond mere substance abuse to complete incapacitation as a caregiver," Mot. at 6, the Government represents, and Shea does not dispute, that Amanda has participated in a court-imposed alcohol abstinence program since October 2024, Gov't Opp. at 5. In December 2024, she successfully completed two months of wearing an ankle bracelet that monitored her alcohol consumption. *Id*. Since the ankle monitor was removed in December, Amanda has taken three drug tests per month, none of which have returned positive. *Id*. And, aside from missing one test, she has not incurred any violations of her pretrial release conditions. *Id*. In sum, with the assistance of court

intervention, Amanda has refrained from alcohol use for more than seven months. In light of these circumstances, the Court cannot find that, under U.S.S.G. § 1B1.13(b)(3)(A)–(B), Amanda is incapacitated such that she cannot care for her minor children or herself.[1]

## CONCLUSION

For the foregoing reasons, Shea's motion is DENIED. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 435, 436, and 439, and to mail a copy of this order to Shea *pro se*.

SO ORDERED.

Dated: October 3, 2025
New York, New York

_____
ANALISA TORRES
United States District Judge

---

[1] To the extent Shea claims eligibility for compassionate release under the catchall provision of U.S.S.G. § 1B1.13(b)(5), which allows a finding of extraordinary and compelling reasons when the "defendant presents any other circumstance or combination of circumstances" that are "similar in gravity" to the enumerated circumstances, this argument fails. *See* Mot. at 11–12. Given that Amanda's condition does not satisfy the incapacitation standard under § 1B1.13(b)(3)(A)–(B), the "crises" that Shea claims are affecting "his minor children and . . . spouse" cannot be considered "similar in gravity" to any enumerated circumstance. *See id.*